# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**THE GROVE, INC.**                       )
                                          )
                        Plaintiff,        )
                                          )
            v.                            )    Civil Action No. 07-1591 (HHK)
                                          )              ECF
**UNITED STATES DEPARTMENT**              )
    **OF TRANSPORTATION, ET AL.**         )
                                          )
                        Defendants.       )
_____ )


## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States Department of Transportation; United States Department of Transportation, Office of Civil Rights; and Joseph Austin, in his official capacity as Associate Director, External Civil Rights Program Division, Departmental of Civil Rights, (collectively, the "Department" or "Defendants") hereby move, through and by undersigned counsel, for summary judgment, pursuant to Fed. R. Civ. P. 56. The Department respectfully refers the Court to the statement of material facts not in genuine dispute, and memorandum of points and authorities in support of this motion. A proposed Order consistent with the relief sought is also hereby attached.

For reasons provided in the memorandum of points and authorities, the Department is entitled to judgment as a matter of law.

Respectfully submitted,

_____/s/_____
Jeffrey A. Taylor (D.C. Bar # 498610)
United States Attorney

_____/s/_____
Rudolph Contreras (D.C. Bar # 434122)
Assistant United States Attorney

_____/s/_____
Mercedeh Momeni
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 305-4851

*Of Counsel*:
Paul M. Geier
Assistant General Counsel
 for Litigation
        &
Mary F. Withum
Trial Attorney
Office of the General Counsel
United States Department of Transportation
1200 New Jersey Ave., S.W.
Washington, D.C.  20590

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **THE GROVE, INC.** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-1591 (HHK) |
| ) | ECF |
| **UNITED STATES DEPARTMENT** ) | |
| **OF TRANSPORTATION, ET AL.** ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

Plaintiff, The Grove, Inc. ("The Grove"), brings this suit under the Administrative

Procedure Act ("APA"), 5 U.S.C. § 702, and the Fifth Amendment to the United States

Constitution seeking review and reversal of a final decision the United States Department

of Transportation ("Department" or "DOT") upholding a determination of the State of

Washington's Office of Minority and Women's Business Enterprises ("OMWBE"),

denying Plaintiff's eligibility to participate in the federal Airport Concessions

Disadvantaged Business Enterprise ("ACDBE") program at Seattle-Tacoma International

Airport. The ACDBE program is a nationwide Department program designed to benefit

socially and economically disadvantaged business enterprises to start and operate

concession businesses at airports receiving federal financial assistance from the Airport

Improvement Program of the Federal Aviation Administration.

The Grove is an airport concessionaire that operates as a certified disadvantaged

business nationwide at sixty stores or kiosks in fifteen airports and one train station.  It

1

sells snacks and various food items with annual revenues in the millions of dollars. AR, at 15 p.4. It has over 300 employees and was first certified as an ACDBE in 1987 under prior owners. The Grove conducts business as a disadvantaged business enterprise pursuant to Department regulations found in 49 C.F.R. Parts 23 and 26. Part 26 is the primary set of standards and certification procedures for disadvantaged business enterprises and was first developed for highway, transit and airport construction programs. Part 23 was established separately to tailor the program specifically to airport concessionaires. Part 23 expressly notes, however, that Part 26 standards and procedures apply to the airport concessions program. 49 C.F.R. §§ 23.11, 23.31(a).

The Department's regulations require a business to meet certain statutory and regulatory standards and be certified by state or local governmental authorities in order to be considered a DBE in the program. Businesses that are not eligible for the program may still participate in federally assisted contracts (but not as DBEs), both in the state in which they applied and in the nation as a whole. Thus, the denial of ACDBE certification by OMWBE applies to The Grove's concession operations at the Seattle-Tacoma International Airport only and not to The Grove's other nationwide locations. AR, at 64 p. 7.

In rendering its decision, OMWBE considered documentation from the City of Chicago ("COC"), the certifying authority from The Grove's home state of Illinois. The controlling regulations permit one certifying authority to rely on the documentation, such as site visit information, from another certifying authority in order to make its decision. 49 C.F.R. § 26.83(e); *see also* AR, 3, §1(A). The regulations also permit OMWBE to

require the applicant to augment the documentation provided to COC, which was done here.

The Grove appealed OMWBE's decision that it was ineligible for the program to the Department on September 26, 2006 in accordance with Departmental regulations set forth at 49 C.F.R. Part 26. AR at 60.  In its Final Decision, dated December 21, 2006, the Department found that The Grove's majority owner, Michelle Dukler, had not met her burden of proof in demonstrating economic disadvantage sufficient to meet the Department's statutory and regulatory requirements for ACDBE certification.  AR, at 62; 49 C.F.R. §§ 23.35, 26.67 and Appendix E.

The Department also found that the contribution of The Grove's owner was not "real and substantial" as required by 49 C.F.R. § 26.69, that her net worth exceeded the $750,000 regulatory threshold in 49 C.F.R. § 23.35, and that The Grove is not an independent business as required by 49 C.F.R. § 26.71.  Furthermore, in making this determination, the Department did not violate The Grove's Fifth Amendment due process rights.  As to each of these issues, the Department's Final Decision is consistent with applicable Department regulations, fully supported by the administrative record, is in no way arbitrary and capricious or contrary to law, and thus, should be upheld.  Thus, the Plaintiff's challenge is unfounded and Defendants are, accordingly, entitled to summary judgment in their favor.  *See* 5 U.S.C. § 706(2)(A).

**ARGUMENT**

I.    THE STANDARD OF REVIEW

A.    Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court should grant summary judgment when the non-moving party fails to make a sufficient showing concerning an element of the case for which that party will have the burden of proof at trial. *Celotex v. Catrett*, 477 U.S. 317 (1986). Moreover, summary judgment is especially appropriate in cases where the court is called upon to review a decision of an administrative agency and the record supporting that decision. In such cases, the issues are most frequently not issues of fact, but concern whether the agency erred in its application of the law or ignored the record evidence. *See, e.g.,* C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* 2733 at 366-67 (2d ed. 1983). The Rule 56 requirements are met here.

Plaintiff seeks review of the Department's decision under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). *See* Compl. at ¶ 30. Upon APA review, the Court must uphold agency determinations unless they are shown to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). This standard of review is highly deferential. *See Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43 (1983) ("the scope of review under the 'arbitrary and capricious' standard is narrow

4

and a court is not to substitute its judgment for that of the agency"); *National Trust for Historic Preservation v. Dole*, 828 F.2d 776, 782 (D.C. Cir. 1987); *Belco Petroleum Corp. v. Federal Energy Regulation Commission*, 589 F.2d 680, 685 (D.C. Cir. 1978).

It is also well settled that *de novo* judicial review of agency decisions is inappropriate. Rather, "the focal point for judicial review should be the administrative record and not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971) (establishing that courts must review agency adjudications under 5 U.S.C. § 706(2)(A) on the basis of the complete administrative record that was before the agency at the time of the decision). Thus, this Court's task is to determine whether the agency's decision was reasonable, that is, "whether it considered relevant factors and explained the facts and policy concerns on which it relied, and whether those facts have some basis in the record." *National Treasury Employees Union v. Horner*, 854 F.2d 490, 498 (D.C. Cir. 1987) (citation omitted).

Additionally, courts have long recognized that an agency's interpretation of its own regulations is subject to substantial deference, *Lyng v. Payne*, 476 U.S. 926, 939 (1986); *United States v. Larionoff*, 431 U.S. 864, 872 (1977); *Puerto Rico Elec. Power Auth. v. Federal Energy Regulation Commission*, 848 F.2d 243, 249 (D.C. Cir. 1988), and must be accepted "unless [the interpretation] is manifestly unreasonable." *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 419 (D.C. Cir. 1991) *(quoting National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 174 (D.C. Cir. 1982)).

II.    STATUTORY AND REGULATORY BACKGROUND

In 1982, Congress enacted the Surface Transportation Assistance Act ("STAA"), which provides that not less than ten percent of the funds authorized to be expended on highway and transit projects shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals.  Pub. L. No. 97-424, 96 Stat. 2097.  This same requirement has been adopted by Congress in subsequent statutes providing funding authorization for highway and transit projects.  See e.g. SAFE TEA-LU, Pub. Law No. 109-59 (2005).

Under 49 U.S.C. § 47107(e) the Secretary of Transportation may approve an airport development project grant application provided the airport operator assures that at least ten percent of the businesses selling consumer products or services to the public are small businesses that are owned and controlled by socially and economically disadvantaged individuals as defined by 49 C.F.R. Parts 23 and 26.

Pursuant to this statutory authority, the Department has adopted detailed regulations to carry out the Disadvantaged Business Enterprise program, including eligibility requirements for firms wishing to participate.  See 49 C.F.R. Parts 23 and 26.  Under that program, socially and economically disadvantaged individuals include women and members of discrete racial or ethnic minorities as defined under the Small Business Act, 15 U.S.C. § 637(d).  See  SAFE TEA-LU, Pub. Law No.109-59 (2005); 49 C.F.R. §§ 26.5 and 26.67(a).  Such persons are rebuttably presumed to be socially and economically disadvantaged.  49 C.F.R. §§ 26.5 and 26.67(b).[1]  These regulations require that state

---

[1] In addition, individuals not rebuttably presumed to be disadvantaged may make an individual showing of social and economic disadvantage in order to participate in the DBE program.  See 49 C.F.R. §  26.67(d) and 49 C.F.R. Part 26, Appendix E.

agencies receiving federal funds from the Department ("Recipients") like the OMWBE must apply the eligibility standards set forth in 49 C.F.R. Part 23 (specifically for airport concessionaires) and 49 C.F.R. Part 26 (for airport concessionaires and other DBE's) when determining whether a business can be certified as a DBE and participate in the DBE program. Thus, the regulations protect the integrity of the DBE program, and true DBEs, by carefully screening out those businesses that are not eligible to receive DBE certification. *Id*. at §§ 26.1, 26.61(d), 26.67(d) and 26.83(a).

Under the eligibility requirements set forth in 49 C.F.R. Parts 23 and 26, DBE firms must be at least 51 percent owned and controlled by one or more socially and economically disadvantaged individuals. Accordingly, in order for Plaintiff to be found eligible for the benefits of the program here, its majority owner – Michelle Dukler – must establish that she satisfies the ACDBE regulations applicable to The Grove as an airport concessionaire. 49 C.F.R. §§ 26.61(d), 26.67(d), and Part 23, Subpart C.

Several of the DBE regulations are relevant to this case. First, 49 C.F.R.§ 26.69(b), provides that "[t]o be an eligible DBE, a firm must be at lease 51% owned by socially and economically disadvantaged individuals." Second, 49 C.F.R. § 26.69(e), provides that "[t]he contributions of capital or expertise by the socially and economically disadvantaged owners to acquire their ownership interests must be real and substantial." *See also* 49 C.F.R. § 26.69(c). Third, 49 C.F.R. § 26.71(b) provides that "[o]nly an independent business may be certified as a DBE. An independent business is one the viability of which does not depend on its relationship with another firm or firms." Fourth, 49 C.F.R. § 23.35, provides a personal net worth cap of $750,000 and states that "[a]ny individual who has a personal net worth exceeding this amount is not a socially

7

and economically disadvantaged individual for purposes of this part, even if the individual is a member of a group otherwise presumed to be disadvantaged." *See also* 49 C.F.R. §§ 23.3 (PNW exclusions), 26.67(a)(2)(iii).

III.    THE DEPARTMENT'S DECISION IS REASONABLE, LAWFUL AND
        <u>FULLY SUPPORTED BY THE ADMINISTRATIVE RECORD</u>

The administrative record in this case fully demonstrates that Plaintiff failed to meet its burden to prove by a preponderance of the evidence that it satisfied the fundamental regulatory requirement of ownership by a socially and economically disadvantaged individual. *See* 49 C.F.R. § 23.35 and § 26.67(d). Neither OMWBE nor the Department dispute that Ms. Dukler, as a woman, is presumed to be socially disadvantaged within the meaning of the controlling regulations, 49 C.F.R. §§ 26.65, 26.67(b). But the facts presented by The Grove and found in the administrative record serve to rebut the presumption that she is economically disadvantaged. A.R., at 6, A.R. at, 62 generally; and 49 C.F.R. §§ 23.35, 26.67(b), (d).

In addition, the administrative record clearly demonstrates that the capital contributions of the owner of The Grove, Ms. Dukler, were not "real and substantial" pursuant to 49 C.F.R. § 26.69; that Ms. Dukler's assets exceed the personal net worth limit of $750,000, pursuant to 49 C.F.R. §23.35, and that that The Grove is not an independent business, pursuant to 49 C.F.R. § 26.71(b).

As a result, after careful review of the entire administrative record provided by OMWBE and supplemented by The Grove during the administrative proceedings below, the Department properly determined that The Grove failed to meet its burden under 49 C.F.R. Parts 23 and 26 to prove that it is owned and controlled by an economically disadvantaged individual. 49 C.F.R. §§23.35, 26.67(b), 26.71. AR, at 62. Consequently,

8

the Department's Final Decision to affirm the denial of Plaintiff's DBE certification gives

a satisfactory explanation for the agency's action, including a rational connection

between the facts found and the choice made, and therefore, must be upheld. *Motor*

*Vehicle Manufacturers*, 463 U.S. at 43.

      A.      The Grove Failed to Demonstrate that the Contribution of Capital of Its
                     Owner was Real, Substantial and Continuing Pursuant to 49 C.F.R. §26.69

In its Final Decision, the Department found that Ms. Dukler's "contribution of

capital to acquire her ownership interest in The Grove was not real, substantial, and

continuing, going beyond *pro forma* ownership of the firm as required by the Regulation

§ 26.69." AR, at 62 p.1. This is the identical ground relied upon by OMWBE to deny

certification to The Grove in its initial decision. AR, at 57 p. 2; AR 62 p. 4. The facts set

forth in the Department's Final Decision are summarized as follows:

Background: The Grove's DBE certification application provided relevant

background facts upon which the Department relied to render its Final Decision. The

firm was established in 1981, incorporated in Louisiana as Natural Energy Unlimited,

Inc. ("NEU"), and originally owned by two disadvantaged individuals, Ms. Ruth Ann

Menutis (a woman) and Mr. Paul Valteau (an African American man). AR, at 51 pp. 3-5;

AR, at 6 p. 7. Subsequently, NEU increasingly began defining itself as The Grove. Its

corporate office is now located in Westchester, Illinois. AR, at 3, § 2(a)(8). It operates

sixty concessionaire enterprises at fifteen airports nationwide. AR, at 2, 17.

The firm's ownership changed in 1999 when an investment company, Star Foods,

LLC ("Star Foods") was brought in to assist with the firm's short-term cash flow

problems because The Grove's commitments for growth and expansion would deplete the

company's cash and "leave the company short by over $1 million," and the firm would

9

have to incur loans to save the company.  The minutes of the July 7, 1999, NEU

stockholders/directors meeting stated that:

> . . . [T]his situation was created by poor decisions on airport investments,
> chronic and serious under-performance and the continuing need to finance
> local partner's investment in Grove expansion.  . . .  It was decided in
> executive session that The Grove should seek to negotiate and develop a
> long term relationship with Star Foods to solve its short term cash flow
> problems and to assist in the long term in the growth and development of a
> stronger and more viable Grove organization.

AR, at 25.

Star Foods subsequently invested $1.32 million, to acquire 35 shares (49 percent

ownership interest) in The Grove on July 23, 1999.  AR, at 60 p. 7.  The record indicates

that Star Foods is owned by Martin Dukler and Casey Cowell, both non-disadvantaged

individuals.[2]  AR, at 3, §§ 2(D), 3(B); AR, at 46 and 50.

In subsequent correspondence, dated September 26, 2006, The Grove's counsel

advised the Department that

> . . . contemporaneously with the stock sale, Ms. Menutis and Mr. Valteau
> elected two representatives of the minority shareholders as company
> directors . . . [and] on behalf of the company Ms. Menutis and Mr. Valteau
> negotiated a license for the company's continued use of The Grove
> trademarks, copyrights, and other intellectual property.

A.R., at 60.  One of the individuals elected as a director was Mr. Dukler, who is the

spouse of Ms. Dukler, the firm's current President.  AR at 60 pp. 7-8.

---

[2] In various places of the record, the sole manager of Star Foods, LLC is identified as
Durandal, Inc., and Mr. Cowell appears to serve as its President.

Ms. Dukler further described Star Foods' investment, which occurred prior to her acquisition of The Grove, in an August 23, 2005, letter to the City of Chicago[3] as follows:

> . . . Star Foods original investment in the company was made in July 1999. That investment included the purchase of a minority equity stake, a line of credit, the receipt of rights to certain [sic] of the company's intellectual property and a license agreement for the company's use of the transferred trademark(s) and copyright(s). Specifically, Star Foods purchased a 49% equity stake in The Grove for $1.32 million from Ruth Ann Menutis . . . and Paul Valteau. . . . At that time, the company had done business as Natural Energy Unlimited, Inc. (NEU).
>
> Simultaneous with its stock purchase, Star Foods agreed to provide the company with a $4 million revolving line of credit ("LOC") for working capital purposes. The credit arrangement was memorialized in a written credit agreement between NEU and Durandal, Inc., a company related to Star Foods. In addition, as further consideration for the equity infusion and the LOC, Ms. Menutis and Mr. Valteau apparently also transferred to Star Foods certain intellectual property rights owned by another corporation owned by Ms. Menutis and Mr. Valteau.
>
> Toward the end of 1999, it appears that the owners of Star Foods and Ms. Menutis and Mr. Valteau reached an agreement to restructure the LOC. In January 2000, Star Foods and the company entered into a Restructure Agreement. In the agreement, Star Foods assumed the company's outstanding indebtedness under the LOC and agreed to release the company from any repayment obligations to it. In exchange, the company agreed to credit the debt assumption as an addition to capital. Star Foods subsequently provided other paid-in capital for a total of $6.8 million. However, no additional shares of stock were issued to Star Foods and there is no agreement to do so in the future. . . . As noted under Recital G of the Restructure Agreement, as part of the original purchase transaction, Star Foods had agreed to "furnish Grove with the funding that was deemed reasonably adequate to operate the business.
>
> All of these transactions took place prior to my acquisition of a controlling interest in 2004. You will note that they materially benefited Ms. Menutis

---

[3] The OMWBE relied upon documents relating to The Grove's certification proceeding with the City of Chicago when evaluating The Grove for certification under Washington State's DBE program, a practice that is permitted by the regulation. 49 C.F.R. § 26.83(e). The referenced letter was provided by Ms. Dukler as part of The Grove's application for certification to OMWBE. AR, at 56 pp. 2-3.

> and Mr. Valteau and the company. Also of importance . . . they do not
> confer any special rights directly or indirectly to Star Foods as a minority
> shareholder nor do they, in any way, affect my ability to run the company
> as CEO.

AR, at 56 pp. 2-3[4] (the referenced credit agreement between NEU and Durandal, Inc., as well as the Restructure Agreement between Star Foods and NEU were not provided by The Grove as part of the application).

Record evidence then showed that in February 2004, Ms. Dukler purchased a 51.02 percent interest in The Grove with a cash contribution of $2.6 million. AR, at 3, § 3(B). This was accomplished beginning on February 5, 2004, when Ms. Dukler signed a term note (option) to borrow $100,000.00, from Mr. Cowell, a non-disadvantaged individual and part owner of Star Foods as well as a second term note entitled "stock purchase" made payable to Mr. Cowell for $2.5 million. Both notes specify a maturity date of October 31, 2006, at a 2 percent annual interest rate. AR, at 34(F) and (C).

On February 5, 2004, Ms. Dukler also signed, a "mortgage and security agreement" with Mr. Cowell, which references the $100,000 and $2.5 million notes. AR, at 34(G). In this agreement, Ms. Dukler pledged her residence on Fieldstone Drive (valued at $580,000), antiques, art, "Schlitz Studios," "Schlitz Furnaces," and brokerage accounts, as security for the notes. AR, at 34(G) Exhibit A. Ms. Dukler represented that these assets, when combined, totaled $2,654,425. *Id*. and attachment A.

---

[4] Martin Dukler, Ms. Dukler's husband who is also a non-disadvantaged individual and, until the second quarter of 2006, was a part owner of Star Foods, irrevocably renounced his rights to 36.5 shares of stock in The Grove from marital property on February 5, 2004, "so that his wife, Michelle Dukler, may hold the assets as her separate and exclusive property." AR, at 60 p. 24 The record contains a document entitled "Exclusion of Certain Property from Marital Property" signed by Mr. Dukler. AR, at 35.

The next day, February 6, 2004, Star Foods and Ms. Dukler executed two documents, an "option assignment agreement," assigning Star Foods' right to purchase 1.5 shares for $100,000, in consideration; and a "stock purchase agreement."  AR, at 34(A) and (D).  The "option assignment agreement" between Star Foods and Ms. Dukler states:

> Star Foods holds an option to purchase 36.5 shares of the common stock, no par value, of The Grove, Inc., a Louisiana corporation, from Paul Valteau and Ruth Ann Menutis for an exercise price of $100,000.00, cash (the Valteau/Menutis Option) pursuant to that certain stock option agreement dated July 26, 1999. [Ms.] Dukler desires to purchase from Star Foods, and Star Foods desires to sell to Dukler, a portion of the rights granted to Star Foods pursuant to the Valteau/Menutis Option. . . .  Star Foods shall assign to Dukler the right to purchase 1.5 shares pursuant to the Valteau/Menutis Option (the Dukler portion). . . . Dukler shall exercise her portion of the Valteau/Menutis Option only upon the exercise by Star Foods of its portion of the Valteau/Menutis Option.  Upon Dukler's receipt of notice by Star Foods of its intention to exercise the Valteau/Menutis Option, Dukler shall consent to exercise her portion of the Valteau/Menutis Option and shall promptly deliver to Star Foods $4,110.00, representing her pro rata portion of the exercise price under the Valteau/Menutis Option. . . . In consideration of the Dukler portion, Dukler is hereby paying to Star Foods $100,000.00 (the Dukler Portion Purchase Price).

AR, at 34(D) p. 1; AR, at 34(K).

Under the terms of the February 6, 2004, "stock purchase agreement," Ms. Dukler purchased Star Foods' 35 shares, representing "approximately" its 49 percent ownership in The Grove for $2.5 million.  AR, at 34(A) p. 2.  The record contains a check drawn on the Dukler's joint checking account dated, February 6, 2004, for $100,000, made payable to Star Foods, LLC, with the "option purchase" on the check.  AR, at 34(F).

On February 17, 2004, Ms. Dukler executed on the firm's behalf a "loan and security agreement" with Fifth Third Bank.  AR, at 34(H).  Under the terms of the agreement, The Grove "may request from time to time" loans from the bank, up to $2.5 million, which is identified as the "project loan limit."  AR, at 34(H) pp. 1, 4.  The

13

security interest granted was the firm's accounts, inventory, goods, trademarks/ copyrights, equipment, and other items. AR, at 34(H) pp. 12-13. The record contains what appears to be a corresponding "project loan" promissory note in the amount of $2.5 million, as well as a "revolving promissory note" for $500,000, between The Grove and Fifth Third Bank. Both documents are dated February 17, 2004. AR, at 34(H) (attachments at end of Loan and Security Agreement).

On February 17, 2004, Ms. Dukler and Mr. Cowell, on behalf of Star Foods, executed a "stockholders agreement," defining aspects of the owners' relationship. AR, at 34(O). The agreement appears to allow Ms. Dukler to transfer her ownership interest to her spouse or descendent, who is termed "permitted transferee," provided that the transfer "will not result in the decertification of the company as a minority business enterprise or disadvantaged business enterprise in any jurisdiction where the company then has such certification." AR, at 34(O) p.1.

On August 19, 2004, Ms. Dukler executed a "consumer note" with Fifth Third Bank, promising to pay $2.6 million at a floating interest rate with a maturity date of August 19, 2006. AR, at 34(H). The effective date of the note is August 19, 2004, however, an attachment identifies that the document was recorded on the books of the bank on August 17, 2004. AR, at 34(H) (consumer note with Fifth Third Bank).

Ms. Dukler wrote a check on August 17, 2004, apparently to repay Mr. Cowell the $2.6 million he loaned to Ms. Dukler on February 5, 2004 (a combination of the $100,000 and $2.5 million notes). AR, at 60. The record contains a counter check from Ms. Dukler's checking account for $2.6 million, and a deposit slip dated August 18, 2004 for Mr. Cowell's account for this same amount. AR, at 60.

14

The record also contains a February 6, <u>2005,</u> check drawn on the Dukler's joint checking account (check no. 2248) for $2.5 million, made payable to Star Foods, LLC. The notation on the check is "stock purchase." AR, at 34(A) Exhibit 7; AR at 62 pp. 4-6. A subsequent check in the amount of $100,000 also payable to Star Foods and drawn from the Dukler's same joint account (check no. 2249) is also included in the record. Although it numerically comes after check no. 2248, it is dated one year earlier, February 6, 2004. The notation on the check is "option purchase". AR, at 34(F). There is no demonstration in the record that the checks were negotiated. *Compare* AR, at 34(A) *with* AR, at 34 (F).

The relevant parts of the controlling Department regulation, 49 C.F.R. §26.69, state as follows:

> (a) In determining whether the socially and economically disadvantaged participants in a firm own the firm, you must consider all the facts in the record, viewed as a whole.
>
> ***
>
> (c) The firm's ownership by socially and economically disadvantaged individuals must be real, substantial, and continuing, going beyond pro forma ownership of the firm as reflected in ownership documents. The disadvantaged owners must enjoy the customary incidents of ownership, and share in the risks and profits commensurate with their ownership interests, as demonstrated by the substance, not merely the form, of arrangements.
>
> ***
>
> (e) The contributions of capital or expertise by the socially and economically disadvantaged owners to acquire their ownership interests must be real and substantial. Examples of insufficient contributions include a promise to contribute capital, an unsecured note payable to the firm or an owner who is not a disadvantaged individual, or mere participation in a firm's activities as an employee. Debt instruments from financial institutions or other organizations that lend funds in the normal course of their business do not render a firm ineligible, even if the debtor's ownership interest is security for the loan.

After applying these regulations to the record facts, *supra*, the Department found that Ms. Dukler did not prove by a preponderance of the evidence that her contribution

15

was real, substantial and continuing.  First, the Department looked at a 2004 site visit

report,[5] prepared after Ms. Dukler acquired The Grove, which came from the City of

Chicago, in the "home state" of The Grove.  AR, at 48 and 49.  OMWBE and the

Department's reliance on the documentation of another Recipient's program, *i.e.* the City

of Chicago, is expressly permitted pursuant to 49 C.F.R. § 26.83 (d) and (e)(2).  The

Department noted that the 2004 site visit report stated that Ms. Dukler arranged the

financing to acquire her ownership interest in The Grove by selling the assets of her two

prior firms and dissolving them.  AR, at 49 Item 16.  But the Department found, and The

Grove presented, no record evidence detailing the two firms and their dissolution.  AR, at

62 pp. 7, 9.  The Department also noted that the 2004 site visit report states that Ms.

Dukler "has a very valuable art collection [which] allowed her to get a line of credit for

$2.6 million."  AR, at 49 p. 16; AR, at 62 p. 7.[6]

The record also contained an August 23, 2005, letter from Ms. Dukler indicating

that she used the interest in her jointly owned personal residence with her spouse "as

partial collateral to borrow $2.6 million from an individual lender to make the

acquisition."  AR, at 56 p. 4; AR, at 62 p. 7.  Ms. Dukler also noted in the letter that, to

address concerns regarding the lender, "I secured replacement financing from Fifth Third

---

[5] The site visit report from the City of Chicago was submitted with The Grove's
application to OMWBE as Attachment 48.  As previously noted, the regulations permit
OMWBE to rely on documentation from another certifying authority.  49 C.F.R. §
26.83(e).  The Department's regulations require that recipients perform a site visit as part
of the state or locality's evaluation of a DBE applicant.  Recipients may also rely on the
site visit report of another recipient, which OMWBE did when relying upon the site visit
report of the City of Chicago.  49 C.F.R. § 26.83(c)(1).

[6] During the July 15, 2004 site visit, the officer noted that when discussing her ownership
of the firm, Ms. Dukler "added that she is, in fact, wealthy.  She could get a loan from
Fifth Third Bank that would cover the money that she borrowed for her ownership."  AR,
at 49 p. 3.

Bank and paid off the original indebtedness in full" and included a promissory note to the bank, as well as a copy of the check paying off the original balance.  AR, at 56 p. 4; AR, at 62 p. 7.

The Department did not find this evidence compelling because it showed that Ms. Dukler obtained a $2.6 million loan from Casey Cowell, one of the non-disadvantaged owners of Star Foods, using her personal and jointly held assets as collateral, followed by a loan in this amount from Fifth Third Bank to repay Mr. Cowell.  With regard to Ms. Dukler's "payment" of $2.6 million for her ownership interest in The Grove, the Department concluded that these facts do not support a conclusion that Ms. Dukler's "contribution of capital" was "real and substantial" as required by the Department's regulations.  The Department found the record "to indicate that Ms. Dukler did not obtain a loan with a lending institution using her own interest in The Grove as collateral, but rather appears to have financed the transaction with the assistance from a non-disadvantaged individual, without actually contributing her own funds" in contravention of  49 C.F.R. § 26.69(e).  AR, at 62 p. 7.  The Grove has argued that it was acceptable to borrow from friends and family.  AR, at 63 p. 8; AR 51 pp. 12-13.  Relying upon the DBE regulations, the Department disagreed that borrowing from family and friends was sufficient for purposes of the Department's regulations.  49 C.F.R. 26.69(h) and (i).

The Department also noted that while the funds from the $2.6 million loan from Fifth Third Bank were deposited in Ms. Dukler's account, she did not meet her burden to demonstrate that her funds, "as separate from that of Fifth Third Bank assets (or that of Mr. Dukler's) were used."  The Department further noted that "[s]imply depositing the proceeds from a loan into one's account to use as payment on another loan is insufficient

in the Department's view to meet the requirements of the Regulation §26.69." AR, at 62 p. 8.

The Department also determined that Ms. Dukler did not meet her burden of proof on this ownership issue based upon the record evidence of her payments on the $2.6 million loan from Fifth Third Bank. In comparison to the size of the loan used to pay for Ms. Dukler's ownership interest, the Department did not find that her payment of $164,486.12 in interest payments between August 2004 to August 2005 to be substantial. AR, at 62 p. 8; AR, at 6(J). The interest payments of $164, 486.12 constitute 6.32 percent of the loan.

The Department's Final Decision did not dispute that the DBE regulations allow the use of marital assets to form the basis of an individual's ownership in the business. "[I]n this instance, the question centers on the source of funds used and the manner of the transaction . . ." because Ms. Dukler failed to demonstrate that "her funds, as distinct from Mr. Cowell's, formed the basis of her contribution in The Grove." AR, at 62 p. 9. Thus, the Department reasonably questioned whether Ms. Dukler's contribution was "substantial" within the meaning of § 26.69. On this point, the Department questioned, first, the record evidence showing Ms. Dukler pledged her home, personal assets, and prior business assets; and, second, the Department questioned the record evidence showing the agreed upon purchase price for her ownership interest in The Grove.

Turning to the first issue, the Department found:

Although Ms. Dukler pledged her home as partial collateral to borrow the $2.6 million from Mr. Cowell, the record appears to indicate that the home was jointly owned with her spouse. [AR, at 6(D).] The attachments to the February 5, 2004, "mortgage and security agreement" between Ms. Dukler and Mr. Cowell indicate that the home was valued at $580,000.00, and had an existing mortgage. [AR, at 34(G) Exhibit A, attachment to Mortgage Security Agreement.] If this was the

18

amount valued by the parties at the time of the transaction, Ms. Dukler's share would presumably be no greater than $290,000.00, thus reducing her overall pledge of security at a minimum from $2,654,425.00 to $2,364,425.00. In addition, you indicated in your rebuttal letter that some of the items of collateral "are/were jointly owned by Ms. Dukler and her spouse (*i.e.* acquired during their marriage)" but that the "bulk of the items were owned by Ms. Dukler prior to her marriage." [AR, at 60 p.8 of appeal letter]  Without a clearer identification of which items were owned solely by Ms. Dukler, or could be considered shared assets with her spouse, it is difficult to determine whether Ms. Dukler's pledge of collateral can be considered substantial. It is equally unclear as to which of the assets can be attributed to Schlitz Studios or Schlitz Furnaces. The amounts listed for each of these entities are $142,000.00, and $606,500.00, respectively. [AR, at 34(G) Exhibit A, attachment to Mortgage Security Agreement.]  As mentioned above, Ms. Dukler indicated to [the City of Chicago, or "COC"] during its on-site that she sold the assets of her two firms. [AR, at 49 p. 2.]  However, the circumstances and timing of such a sale would be relevant to determine how much of these assets could be attributable to Ms. Dukler, particularly if there were additional owners in these businesses. The record is unclear on these points.

A.R. at 62 p. 9-10. With regard to the second issue, the Department determined:

Ms. Dukler indicated in her August 23, 2005, letter to COC that the agreed upon purchase price for her ownership interest "was based on arms-length negotiations and reflected the company's financial status at the time, which included significant operating losses from 1999 thru 2003." [AR, at 56, p. 5.]  The Grove's consolidated financial statements for December 31, 2004, 2003, and 2002, indicate that the firm is engaged in retail sales of snack foods; and as of December 31, 2004, operated 60 units (ranging from freestanding carts to in-line stores) at 15 airports and one train station across the country. [AR, at 15 p. 3 of independent auditor's report.]  As stated above, Ms. Dukler further indicated in her letter to COC that Star Foods assumed the company's outstanding indebtedness under the $4 million line of credit agreement (releasing it from any repayment obligations and crediting the debt assumption as an addition to capital); and provided other paid-in capital for a total of $6.8 million. [AR, at 56 p. 3.]  The "consolidated income statement [for the] 12 months ending in December 31, 2003," attached to the February 17, 2004, "loan and security agreement" with Fifth Third Bank, indicates $[] the firm's gross profit $[], and that the total stockholders' equity $[]. [AR, at 34(H) (consolidated income statement).]  In addition, the firm's gross receipts, according to its federal tax returns for the years 2001, 2002, and 2003, amounted to $[], $[], and $[][respectively. [AR, at 8.]  Therefore, assuming Ms. Dukler's contribution of $2.6 million was deemed sufficient, this appears less than reasonable to acquire a firm the size of The Grove. In addition, Ms. Dukler's contribution is substantially less than Star Foods' investment, which consisted of an initial investment of $1.32 million, the unknown amount of debts credited as an addition to capital, and the

$6.8 million in other paid-in capital provided to the firm with no corresponding ownership share.  [AR, at 56 pp. 2-3.]

The Department finds Ms. Dukler's argument that the purchase price of the firm reflected the firm's financial status "which included significant operating losses from 1999 thru 2003" unpersuasive.  The tax returns contained in the record for 2001, 2002, and 2003 indicate the firm claimed large amounts of deductions for these years; however, depreciation and compensation of officers accounted for a large share of the items.  [AR, at 8.]

Since the record does not contain the July 26, 1999, Stock Option Agreement between Star Foods, Ms. Menutis, and Mr. Valteau (referenced in various documents), the circumstances of why Star Foods effectuated the purchase in this manner are unclear.

AR, at 62 p. 10.

In addition, the Department also questioned the pledge of security by Ms. Dukler

to Fifth Third Bank.  The Department's Final Decision noted that:

While the consumer note between Ms. Dukler and Fifth Third Bank contained a pledge of security, this security consisted of among other things, "any and all property in which the lender is at any time granted a lien for any obligation including, without limitation, all collateral specified in any of the documents executed in connection with this note."  This would seem to imply that the only items Ms. Dukler pledged under this agreement were obligations already involving Fifth Third Bank.  The connection is that Ms. Dukler's consumer note appears to have occurred well after the firm's loan and security agreement with Fifth Third Bank, wherein the firm's assets were pledged as security.  A second connection is evidence in the record showing that Mr. Cowell was repaid for his $2.6 million loan to Ms. Dukler on August 17, 2004, the same day the consumer loan was recorded on the bank's books.  (The effective date of this document is listed as August 19, 2004.)

AR, at 62 p.10.

The Department drew from this information "a conclusion that Mr. Cowell was

repaid with funds from Fifth Third Bank as opposed to Ms. Dukler."  AR, at 62 p. 10.

This conclusion by the Department was based on the record evidence presented by the

applicant and contained in the original record before Washington State's OMWBE.

Therefore, it was reasonable for the Department to affirm the OMWBE decision which

based its denial, in part, on the failure of Ms. Dukler to demonstrate through the record evidence that her contributions to acquire an ownership interest were "real and substantial" as required by the regulation. In this regard, the Department considered the relevant factors established in the regulation, such as the requirement that the Department consider all the facts in the record viewed as a whole. 49 C.F.R. § 26.69(a); *National Treasury Employees Union*, 854 F.2d at 498 (to determine whether Agency's decision is reasonable, court must determine whether Agency considered relevant factors, explained the facts and policy concerns on which it relied, and whether facts based in record).

When affirming the OMWBE decision, for example, the Department reviewed and cited to the entire administrative record, with particular focus on record portions which detailed Ms. Dukler's (1) acquisition of her ownership interest, including the various notes and financing arrangements with the non-disadvantaged owner of Star Foods, Mr. Cowell, and Fifth Third Bank, (2) the evidence of personal assets including a fine art collection, single family residence and sale proceeds of a prior business claimed as collateral or contribution and presented by Ms. Dukler to support the application, (3) the evidence, explanations and additional evidence by Ms. Dukler to explain her claim that joint marital assets were either not used or not relevant to the calculations, as well as (4) the consolidated financial statements and tax returns for The Grove as well as Ms. Dukler, personally. It is beyond dispute that the Department properly viewed the record as a whole, considered the relevant factors, explained its policy concerns and cited to the record in support of its Final Decision. *National Treasury Employees Union*, 854 F.2d at 498.

When rendering its decision on whether Ms. Dukler's contribution was real and substantial, the Department also addressed extensively the controlling factors set forth in 49 C.F.R. § 26.69 (c) and (e). These factors require the Department to determine whether Ms. Dukler's ownership is more than *pro forma*, and especially, that her contribution of capital is real and substantial. In this regard, the Department detailed its view, with extensive reference to the administrative record evidence, that Ms. Dukler's contribution did not meet her burden of proof. Examples from the administrative record cited by the Department – and discussed in the Final Decision – include questions concerning the sale and value of assets in her two prior firms, Schlitz Studios and Schlitz Furnaces, and their value, and the use of her jointly owned personal residence for loan collateral. AR, at 34(G). The Department looked at this evidence and found the evidence to be unpersuasive, lacking and insufficient to carry her burden because, for example, the record evidence about the sale of Schlitz Studios and Schlitz Furnaces lacked information on the details of the sale, and thus, rendered questionable the value of $142,000 and $606,500 represented in the record as her collateral for a loan from Mr. Cowell the non-disadvantaged owner of Star Foods. AR, at 6 and 34(G). These reasonable, record-based determinations by the Department should be affirmed because they are based on substantial evidence and reflect reasoned judgments drawn from unclear or inconsistent documents in the record. *Motor Vehicle Manufacturer's Assoc.*, 463 U.S. at 43 (scope of review is narrow and court should not substitute its judgment for that of agency). And further, the burden was on Ms. Dukler to demonstrate the value and ownership of these assets, which she failed to do, even though she had several opportunities to do so.

Furthermore, the Department found questionable Ms. Dukler's representation of her share of the jointly-owned personal residence. AR, at 62 p. 9. Although the represented value is $580,000, the Department and OMWBE below, determined that Ms. Dukler thus should have only claimed $290,000 as collateral for the $2.6 million loan from Mr. Cowell. AR, at 62 p. 9. The Department's judgment on this point is reasonable and supported by the record. *Motor Vehicle Manufacturer's Assoc.*, 463 U.S. at 43. This would make the net asset value of the home to be $260,000, $130,000 of which Ms. Dukler could claim as collateral for the $2.6 million loan. This record evidence thus renders suspect the values of the other property used by Ms. Dukler as collateral for the $2.6 million loan from Mr. Cowell, particularly given the absence of supporting documents establishing the value of her personal items, discussed above.

Finally, the Department questioned the value of the agreed upon purchase price of Ms. Dukler's share of The Grove and determined that the price, although alleged to be derived from an arm's length transaction with Mr. Cowell, the non-disadvantaged owner of Star Foods and her husband's business partner, appeared inconsistent with record evidence of The Grove's financial statements, especially when The Grove's profits in 2003 were in the millions of dollars. AR, at 8. Its operating losses were largely due to depreciation and compensation of officers, including Ms. Dukler. AR, at 62 p. 10; AR, at 8. The court is also respectfully referred to the significant gross receipts and compensation of officers. *Id*.

Viewed in its entirety, the Department's Final Decision was reasonable, based on relevant factors set out in the applicable regulation, and were explained by the Department with cites to the record. *National Treasury Employees Union*, 854 F.2d at

498.  In this instance, the Department's Final Decision did not err in the application of

law or ignore the record evidence.  Further, the Final Decision that Ms. Dukler's

contribution was not real and substantial, merits substantial deference by the court here

and warrants acceptance now because the Department's interpretation of the regulations

as applied to the evidence is not manifestly unreasonable.  *Lyng v. Payne*, 476 U.S. 926,

939 (1986).

> B.    The Grove Failed to Demonstrate that its Owner is
>        Economically Disadvantaged Pursuant to 49 C.F.R. § 23.35

In its decision, the Department concluded that Ms. Dukler "is not economically

disadvantaged as defined by the Regulation § 23.35."  AR, at 62 p. 1.  That regulation

provides that the personal net worth standard for determining eligibility for an ACDBE is

$750,000 and that "[a]ny individual who has a personal net worth exceeding this amount

is not a socially and economically disadvantaged individual for purposes of this part,

even if the individual is a member of a group otherwise presumed to be disadvantaged."

*Id*.  It is not disputed that Ms. Dukler, as a woman, is rebuttably presumed to be

disadvantaged under 49 C.F.R. § 26.67(a).  But because the OMWBE found her personal

net worth to exceed the threshold standard of $750,000, she was not deemed

economically disadvantaged as required under the program.  49 C.F.R. § 26.67(a)(2).

The Department reviewed the OMWBE's decision on this issue and agreed that Ms.

Dukler did not demonstrate that she is an economically disadvantaged individual within

the criteria of Parts 23 and 26.  AR, at 62 p. 11-17.  A review of the record evidence

presented supports that conclusion on the bases explained by the Department's Final

Decision, as follows.

(1)      <u>The Record Presented</u>

Key to the decision finding Ms. Dukler not economically disadvantaged based on her personal net worth is the information she provided in her personal net worth statement, dated August 31, 2005.  Exh. 1, attached hereto, was derived from the Administrative Record at 62 p. 11-13, for the Court's ease of reference.  In addition, the statement included the following summary list of Ms. Dukler's assets as of August 18, 2005.  The record contains a more detailed summary listing each individual item, totaling over $2,000,000,000, plus significant amounts in home equity.  AR, at 6 and 34(G).  Based upon this information, and as set forth below, OMWBE concluded that Ms. Dukler has more than $2 million in unencumbered assets.  The Department affirmed that conclusion.  AR, at 57.

When reviewing the record of assets, it is evident that Ms. Dukler possess a level of personal assets that created concern for both OMWBE and the Department in view of the $750,000 personal net worth cap and a key goal of the program, which is to assist the socially and economically disadvantaged individuals, not persons of evident wealth and economic means.  Despite possessing substantial valuable assets, Ms. Dukler claims a personal net worth of only $157.  OMWBE and The Department squarely rejected that claim.  A.R., at 57 and A.R., at 62.

Indeed, given the significant personal assets set forth in the record it was reasonable for both the OMWBE and the Department to scrutinize the personal net worth statement of Ms. Dukler in view of the regulatory requirements and goals of the ACDBE program to assist businesses owned by socially and economically disadvantaged individuals.  49 C.F.R. § 23.1  The scrutiny by the OMWBE and the Department are

particularly appropriate because the personal net worth limits were added to the DBE program specifically to prevent wealthy individuals from accruing the benefits of the program to the detriment of those small business owners who truly need a "level playing field on which . . . [to] compete fairly for opportunities for concessions."  49 C.F.R. § 23.1(b).  This wealth limit is also generally deemed as necessary for the program to be narrowly tailored.  70 Fed. Reg. 14496, 14498 (March 22, 2005).  In fact, when the DBE program was challenged in the past, the personal net worth requirements were added due to a concern for the "Sultan of Brunei" scenario.  That is, without the personal net worth limitation, even the Sultan of Brunei, one of the world's wealthiest persons, would qualify as disadvantaged under the Department's DBE programs.  *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000) *citing Adarand Constructors, Inc. v. Pena*, 965 F. Supp. 1556, 1581 n.17; *see also* 64 Fed. Reg. 5096, 5098 (Feb. 2, 1999) (referencing Congressional debate concerning the need to "exclude wealthy members of the designated groups- meaning those who are not, in fact, disadvantaged", using the Sultan of Brunei as an example).

(2)     No Documented Evidence Shows That Ms. Dukler Was Required
        to Pledge Personal Assets To Capitalize or Expand The Grove

When reviewing and upholding the OMWBE's decision, the Department specifically cited to the preamble to Part 23 of the regulation that highlights the concern of commentators that the $750,000 standard could inhibit opportunities for small business owners to enter the concessions field because many franchises require that an owner have a certain threshold of assets in order to grant the franchise.  70 Fed. Reg. at 14496-14519 (March 22, 2005).  To address this concern, the regulation permits an ACDBE owner/applicant to exclude from their personal net worth calculation the amount of assets

26

necessary to obtain the franchise, up to $3 million dollars.  The applicable preamble

section, cited by the Department in its Final Decision, also recognizes instances where

airport concessionaires can exclude up to $3 million in assets from their personal net

worth if, in fact, these assets are needed by the firm to expand its concessions business at

airports.  The preamble permits the owner to produce letters from banks that this was the

case, or that "assets that have in fact been encumbered to support existing financing for

the applicant's business."[7]  As stated in the preamble, this provision would extend only

to "recourse" assets (*i.e.*, those that were encumbered or to be encumbered in order to

obtain financing, as in a case where an asset is used a collateral for a loan.)

     In reviewing a firm's eligibility for the program, recipients, including OMWBE,

are responsible for verifying the documentation pertinent to this exclusion.  The

additional information that owners will have to obtain and recipients will have to evaluate

is, in the Department's view, justified in the interest of a narrowly tailored regulation that

remains a fair and flexible regulation that achieves the objectives of nondiscrimination

---

[7] The first example of this situation provided in the preamble is an owner/applicant for ACDBE certification that documents that its franchisor requires the applicant to have $X in assets before it will grant the franchise.  In such a case, this amount would be excluded from the PNW calculation.  Similarly, the preamble stated: "if the owner of an ACDBE retail or service business who wished to expand operations to another airport could document that a number of financial institutions required $Y in personal assets to back a loan needed for the expansion, $Y would be excluded from the PNW calculation. That is, *an applicant could present documentation to the certifying authority that he or she required a certain amount of assets to open or expand a concessions business*.  70 Fed. Reg. at 14498-14499 (emphasis supplied).  In the preamble's third example, a hypothetical business owner with a PNW of $4.6 million produces adequate documentation from at least two financial institutions that they will require $3.6 million in assets to support their granting a loan necessary to open a concession business at a particular airport.  The business owner's documentation "would also need to justify the need for a loan of the amount referenced in the letters from the financial institutions, documenting the build-out costs and other capital investment needed to begin operating the concession." *Id*.

and opening business opportunities to ACDBEs.  The preamble states that this mechanism is "to prevent the eligibility standards from becoming too open-ended, resulting in the participation of individuals so wealthy that it would be difficult to justify their inclusion in a program aimed at disadvantaged individuals. . . ."

After a detailed review of the administrative record in this case, the Department concluded in its Final Decision that Ms. Dukler presented no evidence, nor did she claim, that she was required to pledge personal assets to capitalize or expand The Grove, as set forth in the regulation or as explained in the preamble.  AR, at 62 pp. 14-16.

The record does not contain any documentation that Fifth Third Bank required Ms. Dukler to pledge her personal assets as collateral to capitalize or expand The Grove. The Department found no attachments to the consumer note with Fifth Third Bank that list specific collateral for the loan; nor are there any documents relating to The Grove's expansion or construction activities, or statements or letters by Fifth Third Bank concerning the purpose of the consumer loan.  AR, at 34(H).  In addition, The Grove does not make any assertion in the documentation it submitted that the loan was required for expansion or build-out costs, and the loan clearly has been identified for the sole purpose to refinance the loan from Mr. Cowell.  Lastly, Ms. Dukler's list of assets contained in the record is in connection with the collateral for her loan from Mr. Cowell.  There is no indication in the record that the loan was required for use by the firm as envisioned by the regulation.  Thus, as stated in the Department's Final Decision, Ms. Dukler made no claim or showing, and thus has failed to carry her burden of proof in demonstrating that she was required or needed to pledge her home and personal assets in order to capitalize

or expand the Grove.  AR, at 62 p. 16.  Thus, she demonstrated no basis for her personal

net worth to exceed the regulatory cap of $750,000.

(3)    The Record of Dukler's Personal Property Calculation Are
       Unclear and Do Not Meet Her Burden of Proof Under § 26.61(b)

       The Department also determined that the record in this proceeding did not support

Ms. Dukler's burden of proof with regard to her personal property calculation.  The net

worth statement shows real estate valued at $230,000 on the asset side and $2.3 million

as a liability for "mortgages on real estate" which shows the status as "pending until

occupancy next year."  Concurrently, section 4 shows Ms. Dukler owning real estate at

South Oak Street, with an original cost of $2.8 million and a mortgage balance of $2.3

million.  A.R., at 6.  The property is identified as Ms. Dukler's primary residence, yet it

also states that Ms. Dukler is living in a rental property while her home at the Oak Street

address is being built.  Ms. Dukler also stated in prior correspondence that her prior

residence on Fieldstone Drive was sold on July 5, 2005, and that the sale proceeds were

committed to purchase a new home.  A.R., at 6; A.R., at 62 pp. 11-12.

       The Department cited two problems with the information provided and reasonably

concluded that the entries on Ms. Dukler's personal net worth statement were unclear and

did not meet her burden of proof pursuant to § 26.61(b).  Specifically, the Department

stated:

       First, the construction contract was signed by both Martin and Michelle Dukler
       and could be considered a joint asset.  As such, only half the mortgage should be
       counted as a liability.  Second, there is a question as to what value can be placed
       on the asset since construction may or may not have started.  This is relevant to
       the property's worth since the "new home construction agreement" states that "[i]t
       is anticipated that the builder will substantially complete the work within 12
       months from when construction begins which is defined here as when demolition
       begins on the existing home."  Therefore, if an existing home on the property
       exists, there presumably is an existing value to this asset.  In addition, the timing

29

of the construction is relevant to the asset's value since under the terms of the contract it appears the Duklers paid the builder $62,500.00 in July 2005 (when the construction agreement was signed), but that the remainder is due upon issuance of the building permit ($292,500.00) and at closing ($2,489,750.00). Given these considerations, the entries on Ms. Dukler's personal net worth statement are unclear and the Department determines that she has not met her burden of proof as specified under §26.61(b).

AR, at 62 p. 17.

The Department thus reasonably concluded from the record that Ms. Dukler's proof with regard to her personal net worth calculation relating to her residence, was unclear and did not satisfy her regulatory burden. *Id.*

(4)    The Record Contains No Substantive Evidence That Dukler Has Personally Guaranteed Other Company Debt and Lease Obligations of The Company

Finally, in support of her appeal to the Department, Ms. Dukler claimed that she has "personally guaranteed other company debt and airport lease obligations" for the Grove. AR, at 60 p. 30; AR, at 62 p. 17. In its decision, the Department dismissed this assertion on the basis that the record contained no evidence to support it, other than the company debt or lease obligations already discussed. Furthermore, other record evidence in support of this application not previously discussed, in fact, shows that Ms. Dukler did not routinely personally guarantee company obligations. For example, the lease agreement for business equipment submitted in the application to OMWBE contains Ms. Dukler's signature as company president, yet the space for her signature as personal guarantor is left blank. AR, at 12.

In sum, when the Department's Final Decision addressing these points is assessed against the applicable standard, the Final Decision is not arbitrary and capricious, but is rather, a reasonable determination that Ms. Dukler is not socially and economically disadvantaged as required under the applicable regulations. 49 C.F.R. §§ 23.35 and

30

26.67.  For instance, the Department explained in detail that Ms. Dukler failed to present record evidence that she was required to pledge personal assets, such as her home and personal assets, to capitalize or expand The Grove.  AR, at 62 p. 16.  The Department cited to the preamble section of the applicable rule, and explained that the ACDBE owner needs to demonstrate that certain assets were required to obtain financing.  Ms. Dukler failed to make this showing.

The Department also explained that the example in the preamble to the regulation, which sets out acceptable documentation from financial institutions to support granting a loan and exceeding the PNW threshold by $3.6 million, was directly on point.  But The Grove's application, by contrast, failed to present evidence from financial institutions justifying the need for the loan, documenting build-out costs and other capital investment needed to begin operating the concession.  There is nothing in the Department's application of the regulation to the facts presented here that is manifestly unreasonable, particularly when the facts presented relate directly to the example from the regulation's preamble which the Department found directly on point.  *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 419 (D.C. Cir. 1991) (agency's interpretation of regulations must be accepted unless manifestly unreasonable).

In addition, the Department's review of Ms. Dukler's personal property calculation was reasonable when it found that the representations of the values of her real estate assets were unclear and inconsistent.  The properties, whether current or under construction, were not listed as joint assets although jointly owned with her husband and the full mortgage balance, rather than half, was included as a liability on her PNW statement.  Furthermore, the Department reasonably questioned whether the value on the

new home under construction was accurate because construction may not have yet started

and the new property included an existing residence to be demolished which may have an

existing value.  The Department also questioned the timing of the construction, and found

it relevant to the asset's value due to the three different draw payments (totaling more

than $2.5 million) that were due to be paid, but not yet paid by Ms. Dukler.  Based upon

this information presented by the applicant, the Department found the clarity of the

transactions so lacking as not to meet the required burden of proof.  AR, at 62 p. 17.  The

Department thus considered the relevant factors, explained the facts and policy concerns,

and showed that the facts were record-based.  *National Treasury Employees Union*, 854

F.2d at 498.

Furthermore, the record lacked substantive evidence of Ms. Dukler's personal

guarantee of company debt and lease obligations, despite her claims of such guarantees.

The record evidence explained above, when coupled with the examples previously

discussed, support the Department's determination that the record lacks substantial

evidence for Ms. Dukler's assertion that she has personally guaranteed other company

debt and lease obligations.

The Department's overall interpretation that Ms. Dukler did not meet her burden

of proof showing that she is an economically disadvantaged individual, is reasonable,

based on significant experience dealing with PNW statements of DBE applicants, such as

The Grove, and is entitled to substantial deference.  *Motor Vehicles Manufacturers

Assoc.*, 463 U.S. at 43.  The Department's Final Decision should also be affirmed

because the scope of review under the "arbitrary and capricious" standard is narrow and

the court is not to substitute its judgment for that of the agency. *National Trust for Historic Preservation*, 828 F.2d at 782.

As noted in both the OMWBE and Department decisions, the applicant firm has the burden of demonstrating by a preponderance of the record evidence, that it is owned and controlled by a socially and economically disadvantaged individual. 49 C.F.R. §§ 26.61(b) and (d), 26.67(d). Because the applicant did not provide record evidence to support the claim of Ms. Dukler's need to pledge personal assets to expand The Grove, her personal and real property calculations are unclear, and insufficient evidence was presented of personal guarantees of company debt or lease obligations, the applicant has failed to meet its burden of proof on this assertion. Accordingly, the Department's Final Decision is reasonable and fully supported by the record.

C.    The Grove Failed to Demonstrate that it is an
      <u>Independent Business</u> Pursuant to 49 C.F.R. § 26.71

In its Final Decision, the Department concluded that The Grove "is not an independent business pursuant to the Regulation § 26.71." AR, at 62 p. 1. This determination was based on (1) the financial dealings between the Grove, Star Foods, and Georgia's Grove,[8] and (2) Ms. Dukler's ownership arrangement with Star Foods and her control of the firm.[9] The applicable regulation provides:

---

[8] Georgia's Grove is affiliated with Star Foods, LLC. AR, at 60 p. 17.

[9] The matter of "control" of the Grove is no longer at issue. Following the issuance of DOT's final decision, counsel for the Grove requested by letter dated February 15, 2007 that the DOT re-evaluate this issue, and provided additional argument in support of Ms. Dukler's "control" of the Grove. In view of the additional arguments in support of the Grove, the DOT determined that Ms. Dukler met her burden to show control of the firm. "The Department's December 21, 2006, decision addressed Ms. Dukler's ability to control The Grove given restrictions in the firm's bylaws and other documents. We have determined that the firm has met its burden of proof in this regard, and we are removing this section from the decision." DOT decision letter June 8, 2007. A.R., at 65.

(a) In determining whether socially and economically disadvantaged owners control a firm, you [the recipient] must consider all the facts in the record, viewed as a whole.

(b) Only an independent business may be certified as a DBE.  An independent business is one the viability of which does not depend on its relationship with another firm or firms.

49 C.F.R. §26.71(a) and (b).

The Department first looked at how Star Foods and The Grove developed their relationship, as evidenced by the record submitted.  When viewing the record as a whole the Department found that Star Foods provided a $4 million revolving line of credit to The Grove when Star Foods acquired a 49 percent ownership interest in it.  AR, at 62 p. 21.  According to Ms. Dukler, The Grove entered into a restructure agreement with Star Foods in January 2000 wherein "Star Foods also assumed the company's outstanding indebtedness under the letter of credit and agreed to release [The Grove] from any repayment obligations to it.  In exchange, the company agreed to credit the debt assumption as an addition to capital."  AR, at 56 p. 3.  These two financial infusions by Star Foods were followed by another infusion of $6.8 million in additional working capital without any corresponding issuance of stock.  AR, at 56 p. 3.

Although Ms. Dukler claimed that these cash infusions and debt assumptions only benefited the prior owners and did not "confer any special rights directly or indirectly to Star Foods as a minority shareholder" or affect her ability to run the company, the Department determined that the timing of the transactions was not the central issue relating to The Grove's independence.  AR, at 56 p. 3; AR, at 62 p. 22.  Rather, Department found the central issue to be whether The Grove's relationship with Star Foods complied with §26.71(b), which focuses on an independent business' viability

34

depending upon its relationship with other firm(s). AR, at 62 p. 22. To analyze this central issue, the Department then relied on the four factors set forth in §26.71(b)(1)-(4), which provides:

> (1) In determining whether a potential DBE is an independent business, you must scrutinize relationships with non-DBE firms, in such areas as personnel, facilities, equipment, financial and/or bonding support, and other resources.
>
> (2) You must consider whether present or recent employer/employee relationships between the disadvantaged owner(s) of the potential DBE and non-DBE firms or persons associated with non-DBE firms compromise the independence of the potential DBE firm.
>
> (3) You must examine the firm's relationships with prime contractors to determine whether a pattern of exclusive or primary dealings with a prime contractor compromises the independence of the potential DBE firm.
>
> (4) In considering factors related to the independence of a potential DBE firm, you must consider the consistency of relationships between the potential DBE and non-DBE firms with normal industry practice.

49 C.F.R.§26.71(b)(1)-(4).

Upon application of these factors to the evidence presented by The Grove and included in the OMWBE record on review, the Department concluded that The Grove depended upon Star Foods for financial support and received substantial funding from it. AR, at 62 p. 22. Record evidence to support this conclusion includes the fact that Star Foods assumed The Grove's outstanding indebtedness under the $4 million line of credit agreement (releasing it from any repayment obligations and crediting the debt assumption as an addition to capital) and provided additional paid in capital for a total of $6.8 million. AR, at 56 pp. 2-3. The Department further noted that the capital infusion appeared gratuitous because there was no corresponding transfer or purchase of stock ownership in The Grove. AR, at 62 p. 22; A.R., at 25.

In addition to the financial support and relationship between The Grove and Star Foods, meeting minutes also reflect a lack of financial independence and intent to rely on Star Foods for continued viability. According to the record, The Grove intended to establish a "long term relationship with Star Foods to solve its short term cash flow problems and to assist in the long term in the growth and development of a stronger and more viable Gove organization." AR, at 62 p. 22. The Department noted in its decision that the regulations do not prohibit the capital venture arrangement *per se*, but instead found that the resulting financial arrangement compromised The Grove's independence. ". . . Star Foods' infusion of capital appears to have been such a vital factor in The Grove's development, that the conclusion that The Grove is not independent, as defined by the Regulation, is unmistakable and clear." AR, at 62 p. 22. These factors support the Department's conclusion that The Grove is not an independent business under § 26.71(b)(1), which requires OMWBE, and the Department on review, to "scrutinize relationships with non-DBE firms, in such areas as . . . financial . . . support." This conclusion by the Department is not manifestly unreasonable and its interpretation of its own regulation is subject to substantial deference. *Lyng*, 476 U.S. 939; *Liberty Maritime Corp*., 928 F.2d at 419.

The Department further noted that the resulting financial arrangements appeared "designed to rescue a firm in difficulty, provide Star Foods (a non-DBE firm) the opportunity to continue to participate as a shareholder in an existing DBE certified firm, and install Ms. Dukler as the firm's 51% owner and president, who it appears did not acquire her ownership interest in the firm in accordance with the Regulation § 26.69." AR, at 62 pp. 22-23.

36

The record disclosed further evidence of financial dealings between The Grove and Star Foods which, when scrutinized as required by the controlling regulation, buttressed the Department's conclusion that The Grove is not an independent firm. The additional evidence involves The Grove's financial dealings with Star Foods and Georgia's Grove with respect to The Grove's loan and security agreement with Fifth Third Bank, dated February 17, 2004, whereby The Grove makes payments to Star Foods and/or Georgia's Grove, pursuant to section 11(h) of the loan and security agreement, which states:

> Except as set forth on Schedule 11(h) hereto or as permitted pursuant to subsection 11(c) hereof, borrower is not conducting, permitting or suffering to be conducted, transactions with any parent, affiliate, or subsidiary other than transactions with a parent, affiliate, or subsidiary for the purchase or sale of inventory or services in the ordinary course of business pursuant to terms that are no less favorable to borrower than the terms upon which such transactions would have been made had they been made to or with a person that is not a parent, affiliate, or subsidiary.

Section 11(c) states:

> Borrower has not made any loans or advances to any parent, affiliate, or subsidiary or other person except for advances authorized hereunder to employees, officers and directors of borrower for travel and other expenses arising in the ordinary course of borrower's business and loans . . . .

AR, at 34(H) p. 18 (Loan and Security Agreement). The Department's decision also noted the following affiliated transactions set forth at Schedule 11(h) to the agreement:

1. The Grove Inc. makes license fee payments to Star Foods;

2. The Grove Inc. may make payments on behalf of Star Foods and/or Georgia's Grove and charge Star Foods and/or Georgia's Grove for such payments;

3. The Grove, Inc. may make payments to Star Foods and/or Georgia's Grove for payments Star Foods and/or Georgia's Grove have made on The Grove, Inc.'s behalf;

4.  The Grove Inc. may perform accounting, administrative, or marketing functions for Star Foods and/or Georgia's Grove for which it may or may not be directly or indirectly reimbursed;

5.  Any transactions of The Grove, Inc. related to its 70 percent interest and managing partner status for NEU of Chicago.

AR, at 62 p. 23.

The Department determined that these affiliated transactions indicated a lack of independence of The Grove from Star Foods, in such areas as financial support (item 3, *supra*), and personnel or other resources (item 4, *supra*).   The Department also found that these affiliated transactions evidenced a pattern of exclusive or primary dealings, and consistency of relationships with a non-DBE firm (items 1 – 5, *supra*).   All of these record facts supported the Department's decision that The Grove lacks independence from Star Foods according to the criteria set forth at § 26.71(b)(1) – (4).   Furthermore, these determinations by the Department show that the Department reviewed the entire administrative record, considered the relevant factors, and explained the facts and policy concerns on which its decision relied.  *National Treasury Employees Union*, 854 F.2d at 498; 49 C.F.R. § 26.89(e).

Further record evidence from the Fifth Third Bank loan and security agreement indirectly supports the Department's conclusion that The Grove is not an independent business but rather, is dependent upon Star Foods for its viability.   Section 11(o) of the loan security agreement states, "[e]xcept as set forth on Schedule 11(o) hereto, borrower has no parent, subsidiaries, affiliates, or divisions, nor is borrower engaged in any joint venture or partnership with any other person."  Schedule 11(o) lists the following as affiliates:  "Star Foods, LLC, Georgia's Grove, LLC, and Natural Energy Unlimited of

38

Chicago (a partnership)."  AR, at 34(H) (Loan and Security Agreement).  Again, the

record evidence represents that The Grove is directly affiliated with Star Foods and

further supports the earlier conclusion, found in the financial relationships described

above, that The Grove's viability appears dependent upon another non-DBE firm.  *See* 49

C.F.R. § 26.71(b).  Based upon this information from the loan and security agreement,

the Department concluded that:

> This aspect of the relationship between the firms is unclear in the record;
> however, the issue arises as to why The Grove listed these firms as affiliates in its
> loan and security agreement with Fifth Third Bank.  This could be an instance
> where the reference to these firms in this manner was necessary in order for the
> bank to enter into its agreement with The Grove in the first place.

AR, at 62 p. 24.  The Department determined that this factor, coupled with the others

discussed above, showed that The Grove lacked the requisite independence required of

the regulation.  Because the Department is experienced in reviewing hundreds of

administrative records submitted by recipients, such as this one where business

relationships with non-disadvantaged entities are often intertwined, the Department is

entitled to substantial deference in its interpretation of its own regulations.  *Lyng*, 476

U.S. at 939.   Accordingly, the Department's denial of DBE certification should be

upheld.

IV.    THE DEPARTMENT DID NOT VIOLATE THE GROVE'S EQUAL
       PROTECTION UNDER THE FIFTH AMENDMENT TO THE CONSITUTION

The Plaintiff alleges in Count II of its complaint that the Department denied its

"equal protection of the laws as required by the Fifth Amendment to the Constitution, by

intentionally treating the appeal of its denial of DBE status differently from others

similarly situated".  Compl., at 21.  The Plaintiff then cites to various examples of alleged

violations of equal protection, but seems to rely solely on its allegation that speculates

"OCR has never scrutinized the capital contribution of a racial minority business owner . . . in the way that it has scrutinized Ms. Dukler's Contribution." Compl., at 14(c)(3). Plaintiff's reference to a single DBE decision involving a racial minority-owned DBE, where the capital contribution of its owner was at issue, leaves the Department without sufficient information to rebut the vague allegations and amounts to nothing more than speculation. Further, this allegation seems to have been included to afford the Plaintiff at yet another bite at the proverbial apple.

Plaintiff challenges the application of the certification process and not the DBE program itself as unconstituional. Compl., Count II. It cannot establish an equal protection violation by the Defendants because it cannot prove that the Department purposefully or intentionally treated its application any differently than it treats those of other, similarly situated complainants. *Dowling v. Commonwealth of Pa. Liquor Control Bd.*, No. 88 Civ. 7568, 1992 WL 328840, at *6 (E.D. Pa. Oct. 27, 1992) (equal protection claim requires proof of purposeful discrimination, which entails demonstration that plaintiff "received 'different treatment from that received by other individuals similarly situated.'") *quoting Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990). *See also*, generally, *Sherbrooke Turf, Inc. v. Minn. Dept. of Transportation, et al.*, 345 F.3d 964 (8th Cir. 2003).

The Department's regulations afford all applicants the same opportunities to participate in the certification process and were equally applied to The Grove's case. Specifically, the Department's Final Decision, and the process it followed, in no way violates The Grove's rights to equal protection because the Department adhered to the procedural requirements outlined in the regulations, each step of the way. The

Department thereby afforded The Grove its due process under the Fifth Amendment to the Constitution when it affirmed the OMWBE's decision to deny recertification to The Grove as an ACDBE based on the eligibility requirements of the Department's program. In order to succeed, The Grove had the burden of proof to show by a preponderance of the evidence that it is owned by a socially and economically disadvantaged individual. 49 C.F.R. § 26.61. Despite The Grove's contentions about violation of its equal protection rights, 49 C.F.R. Parts 23 and 26 clearly provided the Plaintiff the procedures and guidelines for the certification proceeding below and subsequent appeal to the Department, as they do to all applicants for this program. The Department afforded The Grove adequate due process procedures in full compliance with the relevant guidelines, thereby affording it equal protection.

The regulatory guidelines the Department must follow to process appeals from recipient final decisions are set out at 49 C.F.R. § 26.89. These regulations provide The Grove with notice of the procedures that the Department will follow in the appeal process. The regulations require The Grove to file a written appeal to the Department within 90 days of the OMWBE final decision, including information and arguments concerning why the OMWBE decision should be reversed. 49 C.F.R. 26.89(c). The Grove filed a timely appeal. AR, at 60. Upon receipt of the appeal, the regulation requires the Department to request a copy of the recipient's complete administrative record in the matter. 49 C.F.R. § 26.89(d). The evidence shows that the Department properly complied with these requirements. Specifically, on September 26, 2006, the Department timely requested the administrative record from OMWBE, which OMWBE transmitted to the Department on October 27, 2006. AR, at 61; AR, at 1.

41

The regulations also permit the applicant to file supplemental materials. The Grove did so in this case. AR, at 66. The supplemental materials included extensive legal argument and exhibits to support its contention that the OMWBE decision should not be affirmed. AR, at 60. The Department's policy is then to issue its Final Decision within 180 days of receipt of the administrative record from the recipient, and provide written notice to the firm. 49 C.F.R. § 26.89(f)(7). The Department issued its written Final Decision within this timeframe. AR, at 62.

The regulations provide that the Department's decision is administratively final and not subject to petitions for reconsideration. 49 C.F.R. 26.89(g). Notwithstanding this provision, on February 15, 2007, The Grove petitioned the Department to reconsider its Final Decision. AR, at 63. With that petition for reconsideration, The Grove submitted further legal arguments and supplemental information about the airport concession industry that it deemed relevant to The Grove's appeal. *Id.* The Department considered this additional information and argument, despite its lack of an obligation to do so. On June 8, 2007, the Department issued a response to The Grove's February 15, 2007, petition and upheld the Final Decision in most respects, but changed one aspect of its determination with regard to the issue of Ms. Dukler's control of The Grove. Specifically, the Department determined that the firm met its burden of proof regarding Ms. Dukler's ability to control The Grove, given restrictions in the firm's bylaws and other documents, and removed that portion from its December 21, 2006, Final Decision. AR, at 64 p. 6.

Further in its June 8, 2007 letter, the Department reiterated the standard of proof required by The Grove and applied by the Department in rendering its determination that,

> Pursuant to §26.61(b), it is the firm seeking certification—not the recipient—that bears the burden of demonstrating, by a preponderance of the evidence, that it meets the regulation's requirements concerning group membership or individual disadvantage, business size, ownership, and control. When an applicant is denied certification and appeals to the Department, §26.89(e) mandates that we base our decision solely on the entire administrative record. We decide whether the recipient's decision (e.g., that an applicant failed to carry its burden of proof with respect to one or more of the elements of certification) is based on substantial evidence, consistent with the provisions of the regulation. We do not make a de novo review of the matter; nor do we conduct a hearing. If an applicant wishes to appeal a recipient's determination, the regulation §26.89(c) permits the applicant to submit supplemental information and arguments concerning why the recipient's decision should be reversed.

AR, 64 at 1.

The record evidence thus shows that The Grove was afforded proper due process. Moreover, although The Grove is not certified as a disadvantaged business enterprise in Washington State, it is still a licensed, lawful business in the State of Washington, and a certified, lawful disadvantaged business enterprise in 15 other airports throughout the United States and still able to bid on contracts at airports receiving Airport Improvement Program funds. AR, at 64 p.7. Finally, while The Grove claims that it was denied due process, the evidence above shows that the Department followed the regulatory process and found that The Grove did not meet its burden of proof. The Department's Final Decision was proper because it fulfilled the objectives of the program to ensure that the program is narrowly tailored to firms that can demonstrate by a preponderance of the evidence that they are owned and controlled by socially and economically disadvantages individuals. 49 C.F.R. § 26.1. Accordingly, the Plaintiff's claim must fail because the Department did not deny The Grove any due process when it properly followed the regulatory process and the Department is entitled to substantial deference in its

43

interpretation of its own regulations. *Lyng*, 476 U.S. at 939. Thus, the Defendants are

entitled to judgment as a matter of law on Count II of the Complaint.

V.    <u>CONCLUSION</u>

For the forgoing reasons, the Court should grant Defendants' Motion for

Summary Judgment.

Respectfully submitted,


_____/s/_____
Jeffrey A. Taylor (D.C. Bar # 498610)
United States Attorney


_____/s/_____
Rudolph Contreras (D.C. Bar # 434122)
Assistant United States Attorney


_____/s/_____
Mercedeh Momeni
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 305-4851


*Of Counsel*:
Paul M. Geier
Assistant General Counsel
  for Litigation
        &
Mary F. Withum
Trial Attorney
Office of the General Counsel
United States Department of Transportation
1200 New Jersey Ave., S.W.
Washington, D.C.  20590

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December, 2007, I caused the foregoing

*Motion for Summary Judgment and all attachments* to be served on parties of record via

ECF.


_____/s/_____
MERCEDEH MOMENI
Assistant United States Attorney
555 4th Street, NW
Civil Division
Washington, DC 20530
(202) 305-4851
(202) 514-8780 (facsimile)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

                             )

**THE GROVE, INC.**                )

                             )

                   Plaintiff,     )

                             )

                 v.          )     Civil Action No. 07-1591

                             )           (HHK)

**UNITED STATES DEPARTMENT**    )

    **OF TRANSPORTATION, ET AL.** )

                             )

                 Defendants.   )

_____)

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

Defendants, United States Department of Transportation (the "Department"), <u>et al.</u>, respectfully submit this statement of material facts as to which there is no genuine dispute, in accordance with LCvR 7(h) and 56.1:

1. Plaintiff, The Grove, Inc. ("The Grove") is an airport concessionaire that operates as a certified disadvantaged business nationwide at sixty stores or kiosks in fifteen airports and one train station.  AR, at 2, 17.  It sells snacks and various food items with annual revenues in the millions of dollars.  AR, at 15 p. 4.  It has hundreds of employees and was first certified as an Airport Concessions Disadvantaged Business Enterprise ("ACDBE"), pursuant to 49 C.F.R. Parts 23 and 26, in 1987 under prior owners.  AR, at 3; AR, at 49.   Its corporate office is located in Westchester, Illinois.  AR, at 3, § 2(a)(8).

2.   In its Final Decision, dated December 21, 2006, the Department found that The Grove's majority owner, Michelle Dukler, had not met her burden of proof in

demonstrating economic disadvantage sufficient to meet the Department's statutory and regulatory requirements for ACDBE certification.  AR, at 62; 49 C.F.R. §§ 23.35, 26.67 and Appendix E.  The Department found that the contribution of The Grove's owner was not "real and substantial" as required by 49 C.F.R. § 26.69, that her net worth exceeded the $750,000 regulatory threshold in 49 C.F.R. § 23.35, and that The Grove is not an independent business as required by 49 C.F.R. § 26.71.  AR, at 62 pp. 1-2.

I.      Background of The Grove and Star Foods' 1999 Investment

3.  The firm was established in 1981, incorporated in Louisiana as Natural Energy Unlimited, Inc. ("NEU") and originally owned by two disadvantaged individuals, Ms. Ruth Ann Menutis (a woman) and Mr. Paul Valteau (an African American man).  AR, at 51 pp. 3-5; AR, at 6 p. 7.  Subsequently, NEU became The Grove.

4.  The firm's ownership changed in 1999 when an investment company, Star Foods, LLC ("Star Foods") was brought in to assist with the firm's short-term cash flow problems.  AR, at 25.  According to meeting minutes of NEU, dated July 7, 1999, The Grove's commitments for growth and expansion would deplete the company's cash and "leave the company short by over $1 million," and the firm would have to incur loans to save the company.  The Grove (then still NEU) sought "to develop a long term relationship with Star Foods to solve its short term cash flow problems and to assist in the long term in the growth and development of a stronger and more viable Grove organization." AR, at 25.

5.  Star Foods subsequently acquired 35 shares (49 percent ownership interest) in The Grove on July 23, 1999.  AR, at 60 p.7.  At the time of The Grove's ACDBE application to Office of Minority and Women's Business Enterprises ("OMWBE"), Star

Foods was owned by Casey Cowell and Martin Dukler, both non-disadvantaged individuals. AR, at 3, §§ 2(D), 3(B); AR, at 46 and 50. Martin Dukler is the spouse of The Grove's current president and majority shareholder, Michelle Dukler. AR, at 60 pp. 7-8. (In the second quarter of 2006, after the OMWBE denial, Martin Dukler disposed of his ownership interest in Star Foods. AR, at 60 p. 24.)

6. At the same time as the stock sale, Ms. Menutis and Mr. Valteau elected two representatives of Star Foods, one of whom was Mr. Dukler. AR, at 60 pp. 7-8. Star Foods also agreed to provide The Grove with a revolving line of credit ("LOC"). AR, at 56 pp. 2-3. In a Restructure Agreement in January 2000, Star Foods assumed The Grove's outstanding indebtedness under the LOC and agreed to release The Grove from any repayment obligations under it. AR, at 56 pp. 2-3. The Grove credited the debt assumption of Star Foods as paid in capital. AR, at 56 pp. 2-3. Star Foods provided additional capital. AR, at 56 pp. 2-3. No additional shares of stock were issued to Star Foods as a result of this cash infusion and debt assumption. AR, at 56 pp. 2-3.

II.    <u>Dukler's Acquisition of Ownership in 2004</u>

7. In February 2004, Ms. Dukler purchased a 51.02 percent interest in The Grove with a cash contribution of $2.6 million. AR, at 3, § 3(B). This was accomplished beginning on February 5, 2004, when Ms. Dukler signed a term note (option) to borrow $100,000.00, from Mr. Cowell, a non-disadvantaged individual and part owner of Star Foods as well as a second term note entitled "stock purchase" made payable to Mr. Cowell for $2.5 million. Both notes specify a maturity date of October 31, 2006, at a 2 percent annual interest rate. AR, at 34(F) and (C).

8.  Ms. Dukler also signed on February 5, 2004, a "mortgage and security agreement" with Mr. Cowell, which references the $100,000 and $2.5 million notes. AR, at 34(G).  In this agreement, Ms. Dukler pledged as security for the notes her residence at Fieldstone Drive (valued at $580,000), antiques, art, "Schlitz Studios," "Schlitz Furnaces," and brokerage accounts.  AR, at 34(G) Exhibit A.  Ms. Dukler represented that these assets, when combined, totaled $2,600,000. AR, at 34(G) Exhibit A and Attachment A.

9.  The next day, February 6, 2004, Star Foods and Ms. Dukler executed two documents, an "option assignment agreement," assigning Star Foods' right to purchase 1.5 shares for $100,000, in consideration; and a "stock purchase agreement."  AR, at 34(A) and (D).  The "option assignment agreement" between Star Foods and Ms. Dukler showed that Star Foods held an option to purchase 36.5 shares of the common stock, no par value, of The Grove, Inc., from Mr. Valteau and Ms. Menutis for an exercise price of $100,000.00, cash (the Valteau/Menutis Option) pursuant to a stock option agreement dated July 26, 1999.  AR, at 34 (D) and (K).  Ms. Dukler purchased from Star Foods a portion of the rights granted to Star Foods pursuant to the Valteau/Menutis Option.  AT, at 34 (D and (K).  Star Foods then assigned to Ms. Dukler the right to purchase 1.5 shares pursuant to the Valteau/Menutis Option (the Dukler portion) from Star Foods for $4,110.00, representing Dukler's pro rata portion of the exercise price under the Valteau/Menutis Option. AR, at 34(D) and (K).  In consideration of the Dukler portion, Ms. Dukler paid Star Foods $100,000.00 (the Dukler Portion Purchase Price).  AR, at 34(D) p. 1; AR, at 34(K).

10.  Under the terms of the February 6, 2004, "stock purchase agreement," Ms. Dukler purchased Star Foods' 35 shares, representing "approximately" its 49 percent ownership in The Grove for $2.5 million.  AR, at 34(A) p. 2.  The record contains a check drawn on the Dukler's joint checking account (check no. 2249) dated, February 6, 2004, for $100,000, made payable to Star Foods, LLC, with the "option purchase" on the check.  AR, at 34(F).

11.  The record also contains a February 6, 2005, check drawn on the Dukler's joint checking account (check no. 2248) for $2.5 million, made payable to Star Foods, LLC.  The notation on the check is "stock purchase."  AR, at 34(A) Exhibit 7; AR at 62 pp. 4-6.  Although check no. 2248 (for $2.5 million) comes sequentially before check no. 2249 (for $100,000), check no. 2248 is dated one year later than check no. 2249.  There is no demonstration in the record that check nos. 2248 or 2249 were negotiated.  *Compare* AR, at 34(A) *with* AR, at 34 (F).

12.  On February 17, 2004, Ms. Dukler executed on the firm's behalf a "loan and security agreement" with Fifth Third Bank.  AR, at 34(H).  Under the terms of the agreement, The Grove "may request from time to time" loans from the bank, up to $2.5 million, which is identified as the "project loan limit."  AR, at 34(H) pp. 1, 4.  The security interest granted was the firm's accounts, inventory, goods, trademarks/ copyrights, equipment, and other items.  AR, at 34(H) pp. 12-13.  The record contains what appears to be a corresponding "project loan" promissory note in the amount of $2.5 million, as well as a "revolving promissory note" for $500,000, between The Grove and Fifth Third Bank.  Both documents are dated February 17, 2004.  AR, at 34(H) (attachments at end of Loan and Security Agreement).

13.  An attachment to the Loan and Security Agreement lists the firm's locations and types of concessions at various airports.  AR, at 34(H).  Section 14 of the agreement, entitled "tangible net worth," required The Grove to maintain various financial covenants, including its tangible net worth and cash flow coverage ratio. AR, at 34(H) and the attached consolidated income statement, pp. 1, 3.

14.  On February 17, 2004, Ms. Dukler and Mr. Cowell, on behalf of Star Foods, executed a "stockholders agreement," defining aspects of the owners' relationship, including .  AR, at 34(O).

15.  On August 19, 2004, Ms. Dukler executed a "consumer note" with Fifth Third Bank, promising to pay $2.6 million at a floating interest rate with a maturity date of August 19, 2006.  AR, at 34(H).  The effective date of the note is August 19, 2004, however, an attachment identifies that the document was recorded on the books of the bank on August 17, 2004.  AR, at 34(H) (consumer note with Fifth Third Bank).

16.  Ms. Dukler wrote a check on August 17, 2004, apparently to repay Mr. Cowell the $2.6 million he loaned to Ms. Dukler on February 5, 2004 (a combination of the $100,000 and $2.5 million notes).  AR, at 60.  The record contains a counter check from Ms. Dukler's checking account for $2.6 million, and a deposit slip dated August 18, 2004 for Mr. Cowell's account for this same amount.  AR, at 60.

17.  In July 2004 the City of Chicago, performed a site visit and reported that Ms. Dukler arranged the financing to acquire her ownership interest in The Grove by selling the assets of her two prior firms and dissolving them.  AR, at 49 Item 16.  No record evidence details the two firms, Schlitz Studios and Schlitz Furnaces, and their dissolution.  AR, at 62 pp. 7, 9.  The 2004 site visit report states that Ms. Dukler "has a

very valuable art collection [which] allowed her to get a line of credit for $2.6 million." AR, at 49 p. 16; AR, at 62 p. 7.  During the July 15, 2004 site visit, the officer noted that when discussing her ownership of the firm, Ms. Dukler "added that she is, in fact, wealthy.  She could get a loan from Fifth Third Bank that would cover the money that she borrowed for her ownership."  AR, at 49 p. 3.

18.  On August 23, 2005, Ms. Dukler wrote a letter to the City of Chicago indicating that she used the interest in the jointly owned personal residence of her and her spouse "as partial collateral to borrow $2.6 million from an individual lender to make the acquisition."  AR, at 56 p. 4; AR 62 p. 7.  Ms. Dukler also noted in the letter that, to address concerns regarding the lender, "I secured replacement financing from Fifth Third Bank and paid off the original indebtedness in full" and included a promissory note to the bank, as well as a copy of the check paying off the original balance.  AR, at 56 p. 4; AR, at 62 p. 7.

19.  Ms. Dukler claims a personal net worth of only $157.  AR, at 6.

20.  There are no attachments to the consumer note with Fifth Third Bank that list specific collateral for the loan; nor are there any documents relating to The Grove's expansion or construction activities, or statements or letters by Fifth Third Bank concerning the purpose of the consumer loan.  AR, at 34(H).  The Grove does not make any assertion in the documentation it submitted that the consumer loan obtained by Ms. Dukler was required for expansion or build-out costs.  AR, at 34.

21.  The net worth statement shows real estate valued at $230,000 on the asset side and $2.3 million as a liability for "mortgages on real estate" which shows the status as "pending until occupancy next year."  AR, at 6.  Section 4 shows Ms. Dukler owning

real estate on South Oak Street, with an original cost of $2.8 million and a mortgage

balance of $2.3 million.  AR, at 6.  The property is identified as Ms. Dukler's primary

residence, yet it also states that Ms. Dukler is living in a rental property while her home

at the Oak Street address is being built.  AR, at 6.  Ms. Dukler also stated in prior

correspondence that her prior residence on Fieldstone Drive was sold on July 5, 2005 and

that the sale proceeds were committed to purchase a new home.  AR, at 6.

22.  The lease agreement for business equipment submitted in the application to

OMWBE contains Ms. Dukler's signature as company president, yet the space for her

signature as personal guarantor is left blank.  AR, at 12.

23.  Star Foods provided a revolving line of credit to The Grove when Star Foods

acquired a 49 percent ownership interest in it.  AR, at 62 p. 21.   The Grove entered into a

restructure agreement with Star Foods in January 2000 wherein Star Foods also assumed

the company's outstanding indebtedness under the letter of credit and agreed to release

[The Grove] from any repayment obligations to it.  In exchange, the company agreed to

credit the debt assumption as an addition to capital.  AR, at 56 p. 3.  These two financial

infusions by Star Foods were followed by another of millions of dollars in additional

working capital without any corresponding issuance of stock.  AR, at 56 p. 3.

24. The Grove intended to establish a "long term relationship with Star Foods to

solve its short term cash flow problems and to assist in the long term in the growth and

development of a stronger and more viable Gove organization." AR, at 25.

25.  The Grove's loan and security agreement with Fifth Third Bank, dated

February 17, 2004, requires that The Grove make payments to Star Foods and/or

Georgia's Grove, pursuant to section 11(h) of the loan and security agreement.  AR, at 34(H) p. 18 and Schedule 11 (h).

26.  The loan and security agreement with Fifth Third Bank also sets forth the following affiliates of The Grove:  Star Foods, Georgia's Grove, LLC, and Natural Energy Unlimited of Chicago (a partnership).  AR, at 34(H) Schedule 11(o).

27.  On September 12, 2005, the OMWBE received The Grove's application for ACDBE certification in order to operate a concession at Seattle-Tacoma International Airport.  AR, at 1, 2.   The application included approximately 56 attachments which form the bulk of the administrative record for this proceeding.  AR, at 1-56.  The Grove's application to OMWBE included a 2004 site visit report from the City of Chicago, which was prepared after Ms. Dukler acquired The Grove.  AR, at 48 and 49.

III.    OMWBE Decision to Deny Certification

28.  On November 30, 2005, the OMWBE issued its decision to deny the application of The Grove for ACDBE certification.  AR, at 57.  The OMWBE found, *inter alia*, that first, "[t]he purchase of ownership interest in the firm by Ms. Michelle Dukler is not real and substantial." AR, at 57 p. 2.  The OMWBE stated that, first, "Ms. Dukler obtained a loan from an ineligible person using secured assets for the purpose of purchasing the business.  AR, at 57 p. 2; second, Ms. Dukler included on her personal net worth statement assets that were no longer encumbered and should have been included in her personal net worth statement.  AR, at 57 p. 2-3;  third, Ms. Dukler did not have control the operations of the firm.  AR, at 57 p. 3; fourth, The Grove is not an independent business because, *inter alia*, it is "intertwined with Star Foods, LLC, a non-

certified business, which is owned by Mr. Dukler and Mr. Cowell." Ar, at 57 p. 3; fifth,

"The Grove operates as a family owned and operated business." AR, at 57 p. 3.

29. On December 16, 2005, The Grove requested an informal review of the

OMWBE decision and submitted additional information and arguments in support of its

application. AR, at 58.

30. On June 28, 2006, the OMWBE affirmed its previous decision to deny the

ACDBE application of The Grove. AR, at 59.

31. On September 26, 2006, The Grove appealed the OMWBE decision to the

Department, along with supplemental information and legal argument in support of its

appeal. AR, at 60.

IV. The Department's Final Decision Affirming the OMWBE Denial

32. On September 26, 2006, the Department timely requested the administrative

record from OMWBE, which OMWBE transmitted to the Department on October 27,

2006. AR, at 61; AR, at 1.

33. On December 21, 2006, the Department issued its Final Decision to affirm

the OMWBE decision. AR, at 62.

34. In its Final Decision, dated December 21, 2006, the Department found that

The Grove's majority owner, Michelle Dukler, had not met her burden of proof in

demonstrating economic disadvantage sufficient to meet the Department's statutory and

regulatory requirements for ACDBE certification. AR, at 62; 49 C.F.R. §§ 23.35, 26.67

and Appendix E.

35. The Department concluded that the contribution of the The Grove's owner

was not "real and substantial" as required by 49 C.F.R. § 26.69, that her net worth

exceeded the $750,000 regulatory threshold in 49 C.F.R. § 23.35, and that The Grove is not an independent business as required by 49 C.F.R. § 26.71. AR, at 62.

36. On February 15, 2007, The Grove petitioned the Department to reconsider its Final Decision.  AR, at 63.  With that petition for reconsideration, The Grove submitted further legal arguments and supplemental information about the airport concession industry that it deemed relevant to The Grove's appeal.  AR, at 63.  The Department considered this additional information and argument and on June 8, 2007, the Department issued a response to The Grove's February 15, 2007, petition and upheld the Final Decision in most respects, but changed one aspect of its determination with regard to the issue of Ms. Dukler's control of The Grove.  AR, at 64.   Specifically, the Department determined that the firm met its burden of proof regarding Ms. Dukler's ability to control The Grove given restrictions in the firm's bylaws and other documents, and removed that portion from its December 21, 2006, Final Decision.   AR, at 64 p. 6.

Respectfully submitted,

_____/s/_____
Jeffrey A. Taylor (D.C. Bar # 498610)
United States Attorney

_____/s/_____
Rudolph Contreras (D.C. Bar # 434122)
Assistant United States Attorney

_____/s/_____
Mercedeh Momeni
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 305-4851

*Of Counsel*:
Paul M. Geier
Assistant General Counsel
  for Litigation
          &
Mary F. Withum
Trial Attorney
Office of the General Counsel
United States Department of Transportation
1200 New Jersey Ave., S.W.
Washington, D.C.  20590

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

_____
                                              )
**THE GROVE, INC.**                           )
                                              )
                              Plaintiff,      )
                                              )
                    v.                        )        Civil Action No. 07-1591(HHK)
                                              )        ECF
**UNITED STATES DEPARTMENT**                  )
      **OF TRANSPORTATION, ET AL.**           )
                                              )
                              Defendants.     )
_____)

**<u>ORDER</u>**

Upon consideration of the Defendants' Motion Summary Judgment, the

oppositions and replies thereto, the administrative record, and the entire record herein, it

is hereby

ORDERED that Defendant's motion be and hereby is GRANTED, and it is

further

ORDERED that, Plaintiff's Complaint is dismissed with prejudice.

DATED:


                              _____
                              UNITED STATES DISTRICT JUDGE

Copies to:

John Longstreth, Esq.
Kirkpatrick & Lockhart Preston Gates & Ellis LLP
1601 K Street, N.W.
Washington, D.C.  20006-1600

Mercedeh Momeni, Esq.
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W.
Washington, D.C.  20530

46