# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE GROVE, INC.

                        Plaintiff,

       v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION , ET AL.

                        Defendants.

Civil Action No. 07-1591 (HHK)

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

The Grove, Inc. hereby moves, through undersigned counsel, for summary judgment, pursuant to Fed. R. Civ. P. 56. The Grove respectfully refers the Court to Plaintiff's statement of material facts not in genuine dispute, Plaintiff's opposition to Defendants' statement of material facts not in dispute, and Plaintiff's memorandum of points and authorities in support of the motion, all of which are being filed herewith. A proposed Order consistent with the relief sought is also hereby attached.

Date: January 22, 2008

Respectfully submitted,

John Longstreth (#367047)
William Kirk (#370762)
KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
1601 K Street, N.W.
Washington, D.C. 20006-1600
(202) 778-9000
(202) 778-9100 (fax)
Counsel for Plaintiff, The Grove, Inc

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE GROVE, INC.

　　　　　　　　　Plaintiff,

　　　v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION , ET AL.

　　　　　　　　　Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 07-1591 (HHK)

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

John Longstreth (#367047)
William Kirk (##370762)
Kirkpatrick & Lockhart
Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, D.C. 20006-1600
(202) 778-9000
(202) 778-9100 (fax)

Counsel for Plaintiff, The Grove, Inc.

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT .................................................................................. 3

FACTUAL AND PROCEDURAL BACKGROUND ............................................... 6

ARGUMENT ........................................................................................................... 9

I.      Standard of Review ................................................................................... 9

II.     Burden of Proof ...................................................................................... 11

III.    The Grove Properly Established Its Eligibility for ACDBE Status ............ 13

IV.     The Grounds Set Out by OMWBE Were Not Sufficient to Deny Certification to The Grove ........................................................................ 17

V.      OCR Improperly Attempted to Rely on Additional Grounds Not Specified in the OMWBE Decision ......................................................... 23

    A.  OCR Sua Sponte and Improperly Considered Whether Ms. DuklerPaid Adequate Consideration for The Grove ........................................... 23

    B.  OCR Sua Sponte and Improperly Evaluated the Adequacy of Ms. Dukler's Interest Payments .................................................................... 28

    C.  OCR Sua Sponte and Improperly Considered Financial Investments by Star Foods in 1999-2000 ................................................................. 28

    D.  OCR Sua Sponte and Improperly Questioned the Value of the Collateral for Ms. Dukler's Loan from Mr. Cowell ................................ 30

    E.  OCR Sua Sponte and Improperly Questioned the Value of Ms. Dukler's Home Equity and Mortgage ..................................................... 32

    F.  OCR Sua Sponte and Improperly Considered License Fee Payments on Its Own Motion, But Did Not Rely on Them, Though the Government's Brief Improperly Attempts to Do So ................................ 34

VI.     Equal Protection .................................................................................... 34

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE GROVE, INC. | : |
| | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| UNITED STATES DEPARTMENT OF | :    Civil Action No. 07-1591 (HHK) |
| TRANSPORTATION , ET AL. | : |
| | : |
| | : |
| | : |
| | : |
| Defendants. | : |
| | : |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

This case seeks review of a Final Decision of the United States Department of Transportation Office of Civil Rights ("OCR"). The Final Decision was issued in two parts: a December 2006 decision ("the OCR Decision" or "Decision") and a June 2007 supplement to that decision ("the OCR Supplemental Decision" or "Supplemental Decision").

The Final Decision affirmed the rejection by the Washington State Office of Minority and Women's Business Enterprises ("OMWBE") of an application by Plaintiff, The Grove, Inc. ("The Grove" or "the Company") for Airport Concessionaire Disadvantaged Business Enterprise ("ACDBE" or "DBE") status at Sea-Tac International Airport.

Department of Transportation ("DOT") regulations require that all grounds relied upon by OCR for its Decision must be specified in the OMWBE decision. 49 C.F.R. § 26.89. The

1

OCR decision is thus required to be only a review of the OMWBE decision on the specific grounds OMWBE advanced, and cannot advance new grounds of decision.[1]

In this case, however, OCR did not act as a neutral reviewer of the OMWBE decision. Instead, it engaged in extensive purported fact finding and invented entirely new arguments to support the OMWBE denial, in an effort to affirm an OMWBE decision that was plainly erroneous, contrary to the facts of record, and contrary to the DOT's regulations. Not only were OCR's efforts to shore up the faulty OMWBE decision improper to begin with, but the arguments advanced by OCR were plainly wrong. The table below compares the OMWBE grounds (two of which have been expressly abandoned by OCR) to the very different grounds on which OCR relies.

| OMWBE Grounds | OCR Grounds |
|---|---|
| Ms. Dukler did not control The Grove. | OCR admitted that Ms. Dukler controlled the business. |
| Ms. Dukler exceeded the PNW limitation because she used The Grove's assets for collateral. | OCR conceded that the firm's assets were used for a project loan, not for a separate personal loan taken out by Ms. Dukler to pay for her shares in The Grove, but refused to count the personal loan as a liability. |
| Ms. Dukler's $2.6 million payment, because it was placed in a joint account with her husband for a single, day, was improper; OMWBE was unable to "trace" the funds Ms. Dukler used to purchase her interest in The Grove. | The $2.6 million payment was improper because it was inadequate compensation for a 51% interest in The Grove. |
| The Grove was not independent of Star Foods, citing a regulation discussing recent employer/employee relationships with Messrs. Dukler and Cowell, and because of "cross-ownership" with Star Foods, which was (and is) a minority shareholder of The Grove. | The Grove was "financially dependant" on Star Foods as the result of a 1999/2000 paid-in capital contribution. No subsequent financial investment or contribution was cited. |
| The Grove was a family business. | OCR admitted Ms. Dukler controlled The Grove, and did not reference any "family business." |

---

[1] This procedure thus differs from one in which an agency reviews the decision of its own administrative law judge, and is thus free to reject the administrative law judge's reasoning and issue a new decision based on its own reasoning. *See, e.g.*, *Universal Camera Corp. v. NLRB*, 340 U.S. 456 (1951). An OCR decision affirming an OMWBE decision must be based on the grounds cited by OMWBE, not on new grounds it develops independently.

## SUMMARY OF ARGUMENT

OCR is responsible for certification appeals under DOT's DBE program pursuant to regulations codified at 49 C.F.R. Parts 23 and 26. These regulations define a DBE as a small business owned and controlled by a socially and economically disadvantaged individual. 49 C.F.R. § 26.69(b). The statute at issue, 49 U.S.C. § 47107 (e), requires airport recipients of DOT funds to assure only "to the maximum extent practicable" that DBEs constitute at least 10 percent of all businesses at the airport selling consumer products or services, and does not provide for a guaranteed set-aside. Thus, improper disqualifications can harm the DBE program as a whole and do not mean that another DBE will in fact run the business at issue.

There is no dispute in this case that Michelle Dukler, the owner of The Grove, is a woman who is presumed disadvantaged under 49 C.F.R. § 26.5(2)(vi). The government also admits that Ms. Dukler owns 51% of The Grove as required under 49 C.F.R. § 26.69(b),[2] and that she controls The Grove, as required by 49 C.F.R. § 26.71(d), an admission that the government made after first attempting to deny that she controlled the Company. See Supplemental Decision, at 6: "The Department's December 21, 2006 Decision addressed Ms. Dukler's ability to control The Grove given restrictions in the firm's bylaws and other documents. We have determined that the firm has met its burden of proof in this regard, and we are removing this section from the decision." [Bates 01139].[3]

Given that The Grove is both owned and controlled by an individual who is presumed disadvantaged, this case should be a very straightforward one. The Grove is a small business that, at the time of application, had net income of $356,543.00. [AR XV, Bates 00385]. The

---

[2]  *See* Memorandum in Support of Motion for Summary Judgment ("Defendants' Mem.") at 10.
[3]  Citations to the record are somewhat confusing in the government's brief because they do not use Bates numbers but generally reference tabs in the Administrative Record. We will use both where possible, and Bates numbers in each case.

government's position that The Grove does not qualify as an ACDBE is based largely on its

contention that a $2.6 million personal bank loan that Ms. Dukler has taken out in connection

with her purchase of a controlling interest in The Grove, and is obligated to repay at a market

rate of interest, is not a real financial obligation. This surprising conclusion is, as might be

expected, arbitrary, capricious, and utterly contrary to the undisputed facts of record, as well as

being wrong as a matter of law. This erroneous conclusion also largely underlies Defendants'

other arguments in support of the decision to deny The Grove's ACDBE certification, each of

which likewise fails.

First, the government argues that Ms. Dukler's contribution of $2.6 million to purchase

her majority share of The Grove, now reflected in a personal loan from the Fifth Third Bank, was

not a "real and substantial contribution of capital," despite the fact that the largest contribution of

capital OCR has ever previously found not to be real and substantial was $12,800 in the *KLM

Family Trucking* decision.[4] Ms. Dukler's contribution was thus 200 times greater than any

contribution OCR has ever before found not to be real and substantial. Moreover, there is no

evidence in the record that suggests that this was not a fairly negotiated arm's-length transaction.

OMWBE's conclusion is largely based on the mistaken assumption that because Ms. Dukler took

out a loan to pay for her interest in The Grove she did not use "her money." [AR VII, Bates

0094]. In fact Ms. Dukler has borrowed from a financial institution, Fifth Third Bank, which

---

[4] See *KLM Family Trucking*, No. 05-0040 (Feb. 15, 2005) available at
http://osdbuweb.dot.gov/documents/Appeal_Decisions/r_05-
0040%20KLM%20%20Family%20Trucking.doc. Plaintiff reviewed all DBE appeal decisions made
available to the public at http://osdbu.dot.gov and the only other decisions that found contributions not to
be real and substantial involve alleged contributions ranging from $10.00, in *Advanced Safety Mgmt.
Services, LLC*, No. 03-0004 (Dec. 24, 2002), available at
http://osdbuweb.dot/gov/documents/appeal/decisions/ASMS.txt, to the $12,800 figure which was cited in
the Complaint and which the government has not challenged. The government also belatedly complied
with a FOIA request for any additional decisions that might exist on the subject but these disclosed no
higher amounts (and in fact, some are redacted to hide the amount of the contributions at issue in those
cases even though the same decisions are available on the website in unredacted form).

lends funds in the normal course of its business. The loan is further evidenced and secured by Ms. Dukler's written promissory note to the bank. OMWBE made this argument despite the fact that DOT's regulations expressly allow a socially and economically disadvantaged individuals to borrow funds to acquire their ownership interests–exactly what Ms. Dukler has done here. *See* 49 C.F.R. §26.69(e).

Second, the government argues that Ms. Dukler's personal net worth ("PNW") exceeds the $750,000 threshold under the DOT regulations. Again, this is a conclusion reached by ignoring Ms. Dukler's personal liability of $2.6 million on her personal promissory note to the Fifth Third Bank.

Third, the government argues that The Grove's business is not "independent" of another firm, Star Foods, LLC ("Star Foods"), even though DOT has now conceded Ms. Dukler controls The Grove and has since February 2004. OCR's conclusion was reached on the basis of an initial investment of Star Foods in The Grove and certain paid-in capital provided to The Grove by Star in 1999 and 2000, well before Ms. Dukler took control of the Company in February 2004. This ground was not advanced by OMWBE and thus is not a proper ground for a decision by OCR. Moreover, even if it were proper for OCR to consider this ground, OCR did not in any event apply the tests set forth in the DOT regulations. For example, it is uncontested on the record that The Grove is not dependent on Star Foods for any of its contracts, operations, or management, and that The Grove has no common officers or directors with Star Foods.[5] There is also no showing in the record, or even an allegation, that The Grove has received any financial or

---

[5] The owner of Star Foods, Casey Cowell, is not, and never was, an officer of the Grove. He was a director of The Grove and resigned when Ms. Dukler purchased her controlling interest in February 2004. He is currently a shareholder of Star Foods, which is a minority shareholder of The Grove. Martin Dukler is also a former director of the Grove, who resigned when Ms. Dukler purchased her controlling interest in February 2004. At the time of Ms. Dukler's acquisition of the controlling interest in The Grove, Mr. Dukler was simply a minority owner in Star Foods. Mr. Dukler disposed of his ownership interest in Star Foods in the second quarter of 2006.

other assistance from Star Foods since Ms. Dukler assumed control of the Company in 2004. Reliance on transactions going back to 1999 and 2000 also violates the DOT's regulations, which require that determinations be made on "the status and circumstances of the firm as of the date of the decision being appealed." 49 C.F.R .§ 26.89(f)(6). It is particularly inappropriate for DOT to violate the rule in this case by taking account of transactions many years before Ms. Dukler even assumed control of the Company.

Based on the facts of record (the key ones of ownership and control now being admitted by the government), there is no question that The Grove has met the burden of proof required for its certification as an ACDBE. Defendants' unproven and demonstrably wrong contentions to the contrary cannot change these basic facts. As a result, Defendants' Motion for Summary Judgment should be denied, The Grove's Cross-Motion for Summary Judgment granted, and the case should be remanded to DOT for remand to OMWBE with instructions to certify The Grove as an ACDBE. *See American Bioscience, Inc. v. Thompson*, 269 F. 3d 1077, 1081 & n. 8 (D.C. Cir. 2001)("If an appellant has standing -- which is undeniable here-- and prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order. . . . whether or not appellant has suffered irreparable injury, if it makes out its case under the APA it is entitled to a remedy.")

## FACTUAL AND PROCEDURAL BACKGROUND

The Grove is a woman-owned and controlled firm that is certified as an "airport concessions disadvantaged business enterprise" ("ACDBE" or "DBE") and which in 2005, at the time of its application, operated sixty stores and/or kiosks in fifteen airports and one train station. [AR II at 17, Bates 00011]. It has hundreds of employees, many of whom are members of groups that are presumed disadvantaged under the statute and regulations governing the ACDBE

program. *See* 49 C.F.R. § 26.5. It was first certified as an ACDBE, pursuant to 49 C.F.R. Parts

23 and 26, in 1987 under prior owners. [AR III, Bates 00013; AR XLIX, Bates 00781] Its

corporate office is located in Westchester, Illinois. [AR III at § 2(a)(8), Bates 00013].

On February 5, 2004, Michelle Dukler, a woman presumed disadvantaged under the DOT

DBE regulations, signed a term note to borrow $100,000.00 from an individual, Mr. Casey

Cowell, to exercise an option to buy 1.5 shares of The Grove, as well as a term note payable to

Mr. Cowell for $2.5 million to buy an additional 35 shares of the Grove. [AR XXXIV, Bates

00595]. Ms. Dukler also signed on February 5, 2004, a "mortgage and security agreement" with

Mr. Cowell, which references the $100,000 and $2.5 million notes. In this agreement, Ms.

Dukler pledged as security for the notes her residence, antiques, art, Schlitz Studios, Schlitz

furnaces, and brokerage accounts. [AR XXXIV(G), Bates 00619].

February 6, 2004, the day after executing the loan with Mr. Cowell, Ms. Dukler bought a

majority interest in The Grove in two transactions, a "stock purchase agreement" under which

she paid $2.5 million for 35 shares [AR XXXIV, Bates 00595] or about 49% of The Grove's

shares, and an option agreement under which she paid $100,000 for an option to buy 1.5 shares,

or about 2% of The Grove's shares. [AR XXXIV, Bates 00606] The result of these transactions

was that Ms. Dukler acquired and now owns 51% of The Grove.

On August 17, 2004, Ms. Dukler obtained a personal bank loan from Fifth Third Bank in

the amount of $2.6 million, secured by her personal promissory note [AR XXXIV (G) at Exhibit

A, Bates 00619] and used the proceeds to pay off her prior February 2004 loan from Mr. Cowell

in that amount. [AR XXXIV(H), Bates 00635].

The Grove submitted an application to OMWBE dated August 26, 2005, for certification

as an ACDBE. This application included 44 tabs of exhibits, provided each of the documents

and information requested by OMWBE that applied to The Grove, including governance and management information, stock ownership, three-year financial information, audited financial information, and information on all of the Company's contracts. At no time did OMWBE suggest that this application was incomplete or confusing, or ask The Grove to provide additional documentation or clarification, evidenced by the fact that the record does not include any such request. Ms. Dukler also provided a certified net worth statement showing her assets and personal liabilities in a form provided by the regulations, which showed net worth well under the $750,000 threshold.[6]

In a letter dated November 30, 2005, OMWBE responded to The Grove's thoroughly documented and supported application. [Bates 00993] The response, much of which was highly speculative, determined that Ms. Dukler owned 51% of The Grove but concluded that The Grove was not eligible for certification as an ACDBE. On June 28, 2006, OMWBE denied The Grove's appeal of its November 30, 2005 determination. [Bates 01007].

On September 26, 2006, The Grove appealed OMWBE's determination to DOT. [Bates 00926] In a letter dated December 21, 2006, and signed by Joseph Austin, OCR denied The Grove's appeal. OCR supplemented its decision with a June 8, 2007 letter also signed by Joseph Austin which stated that, although OCR's initial letter decision had been "administratively final and not subject to petitions for reconsideration," OCR "wish[ed] to address specific points [The Grove] raised." [Bates 01134]. OCR's June 8, 2007 Supplemental Decision, which it stated should be considered part of its final Decision, acknowledged and admitted, contrary to the conclusion in OCR's December 2006 letter and to OMWBE's determination, that Ms. Dukler

---

[6]   As shown at page 19, below, this statement was actually less favorable to Ms. Dukler than DOT regulations permit, as it included items such as equity in her primary residence, which need not be included. Properly counted under the DOT regulations, Ms. Dukler's net worth is negative by at least over half a million dollars. See infra p.19

controls The Grove. OCR invited The Grove to reapply and noted that its application applied only to Sea-Tac Airport and not to the other jurisdictions in which The Grove is certified.[7] Despite this limitation, the OCR's erroneous decision is a threat to The Grove's very existence, if other jurisdictions choose to follow it.

## ARGUMENT

### I.    Standard of Review

An agency's decision receives no deference if it fails to reflect an understanding of the relevant facts and evidence before the agency. After a "searching and careful inquiry" into the facts, *Am. Trucking Ass'n v. EPA*, 283 F.3d 355, 362 (D.C. Cir. 2002), an agency's actions will be found arbitrary and capricious if the agency has failed to "examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted), or has reached a conclusion unsupported by substantial evidence, *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 683-84 (D.C. Cir. 1984). The OCR decision should not be upheld, as it includes such conclusions. *See* pp. 12-13, 17-22, *infra*.

Agency decisions with obvious flaws that go beyond a difference of opinion should not be upheld. "[A]n agency [decision is] arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at

---

[7] A review of other OCR decisions in DBE appeal cases reveals that this is unusual language which does not appear commonly in OCR decisions.

43.  A court "may not find substantial evidence 'merely on the basis of evidence which in and of itself justified [the agency's decision], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Lakeland Bus. Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 456, 487 (1951)).  The OCR decision should not be upheld, as it fails to take into account contrary evidence.  *See* pp. 12-13, 19-23, 27-28, *infra.*

Conclusions in agency decisions must have some basis in fact.  "An agency's unsupported assertion does not amount to substantial evidence."  *Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1313 (D.C. Cir. 1991); *McDonnell Douglas Corp. v. Dep't of the Air Force*, 375 F.3d 1182 (D.C. Cir. 2004) (agency's "declaration of fact that it is 'capable of exact proof' but is unsupported by any evidence" is insufficient to make the agency's decision nonarbitrary); *Id.* at 1191 n.4.  The OCR decision should not be upheld, as it includes unsupported assertions.  *See* pp. 12-13, 23-33 *infra.*

Agencies must follow their regulations and can change rules adopted by notice and comment only after a new notice and comment period.  *See ATA v. FAA*, 291 F.3d 49 (D.C. Cir. 2002); *USWAG v. EPA*, 236 F.3d 749 (D.C. Cir. 2001).  Finally, in this case, the familiar rule of *Chenery*[8] that a reviewing court may not rely on grounds not advanced by the agency to affirm its decision, applies as well to the OCR's review of the OMWBE decision, since OCR cannot

---

[8]  *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis").  *See also Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 204 n.4 (D.C. Cir. 2007) ("[W]e cannot affirm [the agency decision] on the basis of a post-hoc explanation by agency counsel.").

rely on grounds that OMWBE did not itself advance. The OCR decision should not be upheld, as it announces new rules and is based on new grounds. *See* pp 23-33 *infra*.

## II.     Burden of Proof

Much of OCR's final decision consists of vague, unspecific, and often confusing references to The Grove's alleged failure to meet its "burden of proof" as to Ms Dukler's contribution, her personal net worth, and The Grove's independence from Star Foods. Little in the way of hard evidence is pointed to by OCR, but the hope seems to be that if enough smoke is thrown up accompanied by references to the "burden of proof" the Court will allow the decision to stand, particularly given OCR's invitation that The Grove could simply apply again to OMWBE and that the decision will allegedly not affect The Grove in other jurisdictions.

The Grove respectfully submits that this is an improper view of the burden of proof. As noted above, The Grove's voluminous, 44-tab application certification to OMWBE as an ACDBE provided each of the documents and information requested by OMWBE that applied to The Grove, including three-year financial information, audited financial information, and information on all of the Company's contracts. OMWBE never asked for additional information or clarification of the information provided, choosing instead to advance erroneous interpretations of the information provided. In upholding the OMWBE decision, OCR made only speculative and tentative conclusions that this record evidence was insufficient. Not only are these assertions speculative on their face, but as discussed more fully below many are inconsistent with the DOT's own regulations.

| The Grove's Evidence | OCR's Speculation |
|---|---|
| Documented Proof of Contribution Used to Acquire Ownership (Application Tab IX); Stock Purchase Agreement, Assignment Separate from Option; Stock Purchase Promissory Note with Check; Option Assignment Agreement; Assignment of the Option; Option Purchase Promissory Note with Check (Application Tab XLIV) | The arrangement by which Ms. Dukler obtained her ownership interest in The Grove "does not appear" to meet the requirements of the regulation. |
| Ms. Dukler's Personal Financial Statement and Supporting Documentation (Tab VI, A-K); The Grove, Inc. Signed Loan Agreement (Tab X) | It "does not appear to be the case" that Ms. Dukler demonstrated that her personal assets were required or necessary to obtain funding. |
| Commercial Loan Bank Statement from Fifth Third Bank (Application Tab VI(H)) | Ms. Dukler "appears to have financed the transaction" by which she obtained a loan from non-disadvantaged individuals. |

In addition, DOT's regulations put the burden on Ms. Dukler to certify a personal net worth of less than $750,000. Ms. Dukler did so. The government cites (but does not quote from) three regulations in support of its claim that Ms. Dukler did not meet an alleged burden of proof on this issue *See* Defendants' Mem. at 8. The first, 49 C.F.R. § 23.35, simply sets out the requirements and says nothing about burden of proof. The second, 49 C.F.R. § 26.67(b) sets out that Ms. Dukler, as a woman, is rebuttably presumed to be socially and economically disadvantaged. It states that a personal net worth statement can be required, as it was here, but says the presumption of economic disadvantage is rebutted only if that statement "shows" that the personal net worth exceeds $750,000. OCR did not find the statement "showed" a net worth over $750,000 but instead purported to find the statement unclear, which under DOT's regulation does not rebut the presumption. The third cited regulation, 46 C.F.R. § 26.67(d), discusses individualized determinations of social or economic disadvantage which, according to section (b), do not apply if personal net worth exceeds $750,000.

In sum, while Ms. Dukler has amply shown that her personal net worth is less than $750,000 regardless of how the burden of proof is allocated, it is important to note that the government has not supported its contention that it was Ms. Dukler's burden to show her personal net worth was less than $750,000 once she was rebuttably presumed to be socially and economically disadvantaged as a woman.

### III.    The Grove Properly Established Its Eligibility for ACDBE Status

The Grove is owned and controlled by Michelle Dukler, who as a woman is presumed disadvantaged. Ms. Dukler has substantial business experience, and her entrepreneurial career was most recently featured in a leading industry publication, *Airport Revenue News*. At no point in the case has Ms. Dukler's expertise to run The Grove been questioned.

Ms. Dukler purchased her 51% interest in The Grove for $2.6 million, borrowing the money first from Casey Cowell in a secured transaction that OMWBE admitted was permissible under the DOT rules,[9] and then replacing that loan with a personal loan from Fifth Third Bank. [AR XXXIV (H), Bates 000635] Ms. Dukler's 51% ownership interest is sufficient under the DOT regulations to make her the owner of The Grove. 49 C.F.R. § 26.69(a). DOT's regulations also provide that a loan can be the source of the owner's real and substantial investment. 49 C.F.R. § 26.69(e) ("Debt instruments from financial institutions or other organizations that lend funds in the normal course of business may not render a firm ineligible, even if the debtor's ownership interest is security for the loan.").

It is uncontested that the Fifth Third Bank note is a personal liability of Ms. Dukler to the bank, that she personally assumed liability for $2.6 million on the note and that in the first year

---

[9]  "Michelle Dukler, the eligible owner of 51 percent of the Firm, obtained a loan from an ineligible person for the purpose of acquiring the funds to purchase her ownership interest in the Firm. This is not expressly prohibited by the federal regulations."  [Bates 00994]

she held it she paid the bank at least $164,000 in interest on the note. [AR VI(H), Bates 00066].

Simply put, Ms. Dukler borrowed $2.6 million from Casey Cowell, then repaid him and

refinanced the loan with Fifth Third Bank. [AR XXXIV (H), Bates 000635] As a matter of law,

there is simply no basis for any assertion that this loan is not a legitimate loan from a legitimate

financial institution or that $2.6 million is not a "real and substantial" investment. A holding that

Ms. Dukler's contribution of the proceeds of this loan is not a real and substantial investment in

the Company is in essence a repeal of 49 C.F.R. § 26.69(e).

Ms. Dukler submitted evidence that she controls The Grove and has "the power to direct

or cause the direction of the management and policies of the firm and make day-to-day as well as

long-term decisions on matters of management, policy, and operations." 49 C.F.R. § 26.71(d).

Although both OMWBE and OCR made numerous erroneous findings that Ms. Dukler did not

control The Grove, OCR's Supplemental Decision finally admitted that she does control the

Company. ("The Department's Dec. 21, 2006 decision addressed Ms. Dukler's ability to control

The Grove given restrictions in the firm's bylaws and other documents. We have determined

that the firm has met its burden of proof in this regard, and we are removing this section from the

decision.") [Bates 01139]

To satisfy the requirements of 49 C.F.R. § 26.71(b), Ms. Dukler also submitted evidence

that The Grove's "viability . . . does not depend on its relationship with another firm or firms,"

including its minority shareholder, Star Foods.[10] None of the indicia of dependence set out in 49

C.F.R. § 26.71(b) are present here. OMWBE described Mr. Cowell and Mr. Dukler as "former

officers and directors of The Grove," and did not identify any employer/employee relationship at

---

[10] For example, The Grove submitted voluminous business records, none of which had anything to do with Star Foods, including licenses and permits, bank authorization and signatory cards, lists of equipment, and vehicle titles. The Grove also set out in Joint Appendix 5 [AR V, Bates 00022-25], a list of its officers and its relationships with other firms.

14

all, much less a "present or recent one" that might "compromise the independence" of The Grove as required by DOT's regulations. As noted above, DOT must apply its regulations as they are written, at least until such time as it sees fit to change them. *See, e.g., ATA v. FAA*, 291 F.3d 49, 53 (D.C. Cir. 2002) (explaining that an FAA interpretation of its own regulations would not be upheld if it was "plainly erroneous and inconsistent with the regulation"); *see also Geo-Seis Helicopters, Inc. v. United States,* No. 07-155C (Ct. Fed. Cl., July 30, 2007) ("While the Air Force might like to have GAO rewrite the plain language of the statutes and regulations . . . the court will apply the FAR as written, not as the government and [the protestor] urge that it should have been written.").

OMWBE did not cite any actions of either Mr. Cowell or Mr. Dukler of any kind that indicated their present involvement with management or day-to-day operations of The Grove. (In fact, they resigned from their positions with The Grove immediately following Ms. Dukler's purchase of a controlling interest in the Company.) Nor did OMWBE deal with the voluminous documentation presented by The Grove showing that Ms. Dukler controls the operations, the checking accounts, and all aspects of the business of the firm. OMWBE also cited 49 C.F.R. § 26.71(l), which applies to a firm "formerly owned and/or controlled by a non-disadvantaged individual" and is thus inapplicable to The Grove, which was formerly owned and controlled by disadvantaged individuals. OMWBE contended that Mr. Dukler was CEO of a company that operated in the "same business" as The Grove. However, that company operated in manufacturing and wholesale distribution, while The Grove is in retail sales in airports.[11]

---

[11] As further evidence that the companies operated in different businesses, their North American Industry Classification System ("NAICS") codes are different [Bates 00954-956]. If, as Washington alleges, The Grove and Star Foods were in the same or similar industries, then they would have the same NAICS designation.

OMWBE did not, in any event, explain how Mr. Dukler's involvement in the other company compromised the independence of The Grove.

Finally, OMWBE did not cite or address numerous other factors that DBE regulations require it to address in making a finding as to independence, including "relationships with non-DBE firms, in areas such as personnel, facilities, equipment, financial and/or bonding support, and other resources," § 26.71(b)(1), "the firm's relationships with prime contractors," §26.71(b)(3), and "the consistency of relationships between the potential DBE and non-DBE firms with normal industry practice." § 26.71(b)(4). **None** of these factors that OMWBE is required to look to determine independence were even mentioned in OMWBE's decision (or OCR's for that matter). Finally, it should be noted that the DBE regulations cited by OMWBE on this point are meant to "govern determinations concerning control," and OCR has since conceded that Ms. Dukler, not Mr. Cowell, nor Star Foods, controls The Grove.

The facts surrounding the relationship between The Grove and Star Foods are completely dissimilar from those in the one case in which a federal court upheld a DOT/OCR determination that a business applying for DBE status was not independent. *See Shearin Const., Inc. v. Mineta*, 232 F. Supp. 2d 608 (E.D. Va. 2002). In that case, the non-disadvantaged party (the DBE owner's husband's uncle) employed plaintiff's husband, and, importantly, two of the firm's three jobs had been for the uncle's company, thus raising the concern that the alleged DBE could not obtain business without sweetheart deals from a non-disadvantaged relative. There is no such relationship of any kind between The Grove and Star Foods; The Grove is not dependent on Star Foods for any of its business. Star Foods does not employ Ms. Dukler's husband, who has no relationship with The Grove at all, and The Grove's financial arrangements are with Fifth Third Bank, not Star Foods. Moreover, The Grove's concession contracts are with airports and airport

authorities, not Star Foods or any party related to The Grove or Star Foods. This is simply not a situation where The Grove is dependent on related parties for its business.

As required by the regulations, Ms. Dukler submitted a certification that her personal net worth was less than $750,000, supported by information showing her assets and her liabilities. OMWBE's finding to the contrary is based largely on ignoring her $2.6 million personal loan and improperly refusing to deduct it from her PNW, based on the erroneous conclusion that she had used The Grove's assets as collateral for the loan. The value of her holdings in The Grove is, by regulation, not included in this calculation. *See* 49 C.F.R. § 26.67(a)(2)(iii)(A).

### IV.    The Grounds Set Out by OMWBE Were Not Sufficient to Deny Certification to The Grove.

As set out above, the only grounds on which OCR was permitted under its regulations to affirm OMWBE's decision were the specific grounds relied on by OMWBE in its November 30, 2005 and June 28, 2006 decisions. 49 C.F.R. § 26.89(f)(5). OCR all but admits violating this rule when it contends that the factors in its decision were "relevant to the core concepts raised by OMWBE," rather than being the actual "grounds . . . specified" in that decision. [AR LI at 2, Bates 01085] OCR thus admitted that OMWBE's grounds were patently insufficient to support denial and, in violation of its own regulations, asserted new grounds which were not only improper, but likewise insufficient.

OMWBE stated only five grounds for its decision, none of which withstand scrutiny.

First, OMWBE stated that Ms. Dukler could not control the Company because she could not convene a stockholders' meeting. OCR expressly disclaimed reliance on this ground and conceded that Ms. Dukler controls The Grove, and thus she has the power to convene a stockholders' meeting.

17

Second, OMWBE stated that Ms. Dukler exceeded the PNW limitation because her August 17, 2004 loan used the firm's assets for collateral and her own assets were "not encumbered" by the loan. This wrongly confused Ms. Dukler's August 2004 personal loan with a February 2004 project loan and line of credit that The Grove had taken out from Fifth Third Bank that did use the Company's assets as collateral. In any event, it wrongly refused to find that Ms. Dukler's $2.6 million personal loan was a liability because it supposedly did not encumber other personal assets. Whether or not Ms. Dukler's assets were encumbered, Ms. Dukler's $2.6 million personal loan put her PNW well below $750,000. The following table shows the correct calculation of Ms. Dukler's PNW:

Personal Net Worth
(From Bates 00039)

| **Assets** | | **Liabilities** | |
|---|---|---|---|
| Cash on Hand | 63,058 | Note Payable to Bank | $2,600,000[3] |
| IRA | $9,050 | Installment Account | $49,300 |
| Life Insurance Surrender Value | $4,684 | Real Estate Mortgage | [4] |
| Stocks & Bonds | [1] | | |
| Real Estate | [2] | | |
| Automobile | $15,440 | | |
| Other Personal Property | $2,027,225 | | |
| | | | |
| Total Assets | **$2,119,457** | Total Liabilities | **$2,649,300** |
| | | | |
| **Total negative net worth** | **-$529,843** | | |

(1) $2,600,000 cost basis of 36.5 shares of The Grove, Inc., not included in personal net worth per DOT regulation 49 C.F.R. § 23.3. ("An individual's personal net worth does not include the following: The individual's ownership interest in ACDBE firm or a firm that is applying for ACDBE certification; the individual's equity in his or her primary place of residence...") *See* 49 C.F.R. § 26.5, 70 Federal Reg. 14,496; 14,498 (2005).

(2) Ms. Dukler's only real estate is her personal residence, equity in which is not counted in personal net worth per 49 C.F.R § 23.3. See 49 C.F.R. § 26.6 (same as above).

(3) Ms. Dukler's personal loan from Fifth Third Bank, obtained August 17, 2004.

(4) The real estate mortgage of $2,300,000 is not counted for these purposes in order to remove an issue raised by the government on this matter, and it is not necessary to include it in any event to show Ms. Dukler's net worth is negative. However, the regulations would permit its inclusion, which would serve to make Ms. Dukler's personal net worth negative to an even greater degree.

OMWBE did not cite to any evidence or principle of law that Ms. Dukler was not personally liable to repay the $2.6 million loan, or that it should not be treated as a liability for purposes of calculating Ms. Dukler's net worth. Nor did OMWBE cite to any DOT regulations or authority to support the proposition that Ms. Dukler does not have a liability on her personal loan to Fifth Third Bank even if it does not "encumber her assets." Again, the liability is in any event, greater than the value of her assets. OMWBE also failed to cite any principle of

accounting rules, banking law, or contract law to support the assertion that a personal promissory

note is not a legal obligation and therefore a liability of the holder – and no such principle exists.

Indeed, even if the loan was secured by The Grove's assets, it would still be a personal liability

of Ms. Dukler's. *See* 49 C.F.R. 26.69(e) (expressly allowing "the debtor's ownership interest [to

be] security for the loan"].

Third, OMWBE stated that the $2.6 million payment for Ms. Dukler's acquisition loan

from Mr. Cowell was not real and substantial because it came from a joint checking account Ms.

Dukler maintained with her husband, into which she had, for a single day, placed the proceeds of

her loan from Mr. Cowell before using those proceeds to acquire her share of The Grove.

OMWBE later admitted on rehearing that mere placement of the loan proceeds into the joint

account was not a sufficient basis for denial under the DOT regulations, but then claimed to be

unable to "trace" the funds though the joint account even though the $2.6 million was deposited

in the account one day and then withdrawn from the same account the very next day to pay for

the stock. [12]

It was simply arbitrary and capricious and inconsistent with the record for OMWBE to

claim "tracing" of the funds was impossible in this circumstance.  In addition, the Defendants'

own Motion for Summary Judgment includes a complete "tracing" of the funds from Mr. Cowell

to the joint account to the payment for The Grove stock, thus itself undermining OMWBE's

claim that this task was impossible.  *See* Defendants' Mem. at 12-13.  OMWBE and OCR were

also informed of DOT's regulations at 26.69(i)(1) which require that the assets acquired with the

loan proceeds (i.e., The Grove's stock) are to be considered Ms. Dukler's sole property upon Mr.

Dukler's irrevocable renouncement of his rights in the property, which he made on February 5,

---

[12] "The Firm contends Ms. Dukler used the same borrowed finds to acquire the stock, but does not
provide documentation that satisfactorily traces the disposition of the borrowed funds to establish its
claim."  [Bates 01093]

2004. Curiously, OMWBE offered in purported support of its "tracing" ground, 49 C.F.R.

§ 26.69(j)(3), which on its face does not apply. That regulation sets out grounds on which

OMWBE **may not** consider a contribution of capital as failing to be real and substantial. The

cited provision reads, "However, you **must not** regard a contribution of capital as **failing** to be

real and substantial, solely because . . . [o]wnership of the firm in question or its assets [is[

transferred for adequate consideration from a spouse who is not a socially and economically

disadvantaged individual to a spouse who is such an individual. In this case, you must give

particularly close and careful scrutiny to the ownership and control of a firm to ensure that it is

owned and controlled, in substance as well as in form, by a socially and economically

disadvantaged individual." (emphasis added) OMWBE made no effort in any event to explain

how the cited regulation was relevant to The Grove's application, and as noted above, OCR has

admitted that Ms. Dukler owns and controls The Grove.

Fourth, OMWBE stated that The Grove was not independent because of a prior and

current relationship with Star Foods. Again, The Grove submitted substantial information

showing that it was owned and controlled by Ms. Dukler and was in no way dependent on Star

Foods. OMWBE stated that The Grove was "intertwined with Star Foods, LLC," its minority

shareholder, which was owned by Mr. Cowell and Mr. Dukler. OMWBE relied on 49 C.F.R. §

26.71(b)(2), which allows consideration whether "present or recent employer/employee

relationships" between DBE firms and non-DBE firms or persons "compromise the

independence of the potential DBE firm." However, as set out above, OMWBE described Mr.

Cowell and Mr. Dukler as "former officers and directors of The Grove," and did not identify any

employer/employee relationship at all, much less a "present or recent" one that might

"compromise the independence" of The Grove. OMWBE also did not cite any actions of either

Mr. Cowell or Mr. Dukler of any kind (other than their resignations as officers and/or directors of The Grove following Ms. Dukler's purchase of a controlling interest in the Company), much less any actions that indicated their involvement with management or day-to-day operations of The Grove. Under the DOT regulations, it was perfectly proper for Messrs. Cowell and Dukler to be on The Grove's Board, as long as Ms. Dukler controlled the Company, as OCR now admits she does. In any event, both Mr. Cowell and Mr. Dukler have resigned from the Board of The Grove, and the issue is and was simply irrelevant.

OMWBE also cited 49 C.F.R. § 26.71(l), which applies to a firm "formerly owned and/or controlled by a non-disadvantaged individual," and thus is inapplicable to The Grove, which was formerly owned and controlled by **disadvantaged** individuals. OMWBE contended that Mr. Dukler was CEO of a company operating in the "same business" as The Grove, but that company operated in manufacturing and wholesale food distribution, and The Grove is in retail sales. *See supra* note 11. OMWBE did not, in any event, provide any facts to support its allegation that Mr. Dukler's involvement in the other company compromised the independence of The Grove.

Finally, as also noted above, OMWBE did not cite or address numerous other factors the DBE regulations require it to address in making a finding as to independence, including "relationships with non-DBE firms, in such areas as personnel, facilities, equipment, financial and/or bonding support, and other resources," § 26.71(b)(1), "the firm's relationships with prime contractors," § 26.71(b)(3), and "the consistency of relationships between the potential DBE and non-DBE firms with normal industry practice." § 26.71(b)(4). In any event, the DBE regulations cited by OMWBE on this point are meant to "govern determinations concerning control," and OCR has since conceded that Ms. Dukler, not Mr. Cowell, Mr. Dukler, Star Foods, or any other person, controls The Grove.

OMWBE's last stated reason for denial was that The Grove was a "family business." OMWBE did not cite any regulations or support on this ground and offered it simply as speculation. OCR did not even mention this ground and concedes that Ms. Dukler, not her family, controls The Grove.

## V.    OCR Improperly Attempted to Rely on Additional Grounds Not Specified in the OMWBE Decision

The OCR Decision and Supplemental Decision improperly reviewed the patently deficient OMWBE decision by adding new grounds and arguments in support of the certification denial, rather than simply reviewing the decision on the bases OMWBE had set forth. Tellingly, the government makes no effort to support the reasoning laid out in the OMWBE decision, which is the one that OCR was supposed to be reviewing, but instead sets out a number of irrelevant and erroneous points that OCR raised in its improper review of the OMWBE decision. The Court need not consider any of these grounds in support of OMWBE's decision, as they violate § 26.89(f)(5) as not being grounds specified in the OMWBE decision. In many cases they also violate § 26.89(f)(6) as they deal with historical events rather than events at the time of The Grove's application. DOT again admits as much by arguing that § 26.89(f) "cannot be read literally," thus again showing the considerable looseness with which DOT has treated its own regulations that it is required to follow. *See ATA v. FAA, supra.*

While the OCR decision is complex and confusing, it set out the following alleged bases for denial, none of which are in the grounds set forth by OMWBE, which are dealt with above.

### A.    OCR Sua Sponte and Improperly Considered Whether Ms. Dukler Paid Adequate Consideration for The Grove.

OCR first contended that Ms. Dukler's $2.6 million was not adequate consideration for 51% of The Grove. This ground was never raised by OMWBE and is not supported by any

recognized business valuation or generally accepted accounting principle. Nor does OCR cite any precedent in which it has contested the adequacy of consideration in the amount of $2.6 million for a share of a DBE enterprise or in which it has set out rules or standards by which it will determine whether a payment is "adequate" compensation for a share of a business. Certainly no such standards are set out in OCR's decision. In addition, OCR lacks the necessary expertise or familiarity with The Grove's operations to value the business. The valuation of a business requires either expertise, or the familiarity that an owner or director has with his or her own business. *See Allied Sys. Ltd. v. Teams Allied Sys. Ltd. v. Teamsters Auto. Transp. Chauffeurs*, 304 F.3d 785, 792 (8th Cir. 2002) (holding that, although an officer was not qualified as an expert, his testimony as to value or projected profits of the business was admitted only because of the particularized knowledge that he had by virtue of his position in the business).

In the present case, OCR did not use any established accounting concepts, standards and procedures, such as "Generally Accepted Accounting Principles" or "GAAP" or the Internal Revenue Service ("IRS") guidance on the valuation of closely-held companies (see IRS Revenue Ruling 59-60), that have been developed and are the standards of practice for accountants and business valuation experts in reporting on and analyzing the financial condition of companies for valuation purposes. IRS Ruling 59-60 also incorporates the standard of "fair market value"— the price that would be demanded and paid in a sale involving a willing buyer under no compulsion to buy and a willing seller under no compulsion to sell, both having reasonable knowledge of the relevant facts about the asset. Instead, OCR substituted its own inexpert judgment for the price agreed upon between the parties.

Valuing a business (and accordingly a reasonable price for a block of its stock) requires an analysis of many factors that OCR did not address, including the company's income potential (e.g. cash flow and gross and net revenues), its assets and the quality thereof, the firm's liabilities, and consideration of the market in which it operates. Financial statements do not by themselves establish the value of a company (or of its stock) but instead provide shareholders and others with data combined with other critical information that can be used to analyze a company's financial condition at a particular point in time. For example, "paid-in-capital" is simply a record of the asset of capital received from investors, and is not particularly meaningful in determining the performance or the financial condition of a company (i.e., a company's value).[13]

Although OCR suggested (with no valid support) that $2.6 million was not an adequate price for Ms. Dukler's purchase of The Grove's stock, in fact the Company was not in particularly good financial health at the time. Under accounting standards and the IRS Revenue Ruling, earnings and future income potential are critical factors for valuing the stock of firms that sell products or services to the public, but the Company experienced an accumulated loss of more than $2 million during the period 1999 through 2003. [Bates 01076-79]. In 2003, the Company's earnings were slightly positive for the year; however, the cash flow of the Company was a negative $289,548—that followed a negative cash flow of $287,302 in 2002. *Id.*

The quality and quantity of assets are also important. At the time of Ms. Dukler's stock purchase, the Company had leases for 62 airport locations. A schedule of all of the Company's locations and the respective lease expiration dates as of the time of Ms. Dukler's stock purchase [Bates 01081] shows that

---

[13] To illustrate this point, the paid-in capital shown on the financial statements of Enron just prior to its collapse would have recorded that billions of dollars had been invested in the company. Clearly, this entry on the balance sheet was anything but an indicator of that company's financial condition or its worth.

- Leases for 7 locations were set to expire or had expired.
- Leases for 23 additional locations had 1 year or less on the lease term.
- In the aggregate, more than fifty percent (50%) of all the Company's locations had lease terms of two years or less.

The airport concessions business can also be very volatile given the condition of the airline industry. Literally overnight, The Grove and other concession operators can be, and have been, adversely impacted by government decisions, by an airline's decision to reduce flights at an airport or by an airport's decision to close a terminal. Airline bankruptcies and consolidations can cause the loss of flights and passenger traffic (e.g., American Airlines' acquisition of Trans World Airlines; Delta Air Lines' decision to "de-hub" at the Dallas-Ft. Worth Airport). Moreover, the industry is very susceptible to labor problems and strikes by airline personnel that have caused severe sales losses in several instances. The Company also suffered a significant reduction in sales immediately following September 11, 2001, and its overall costs of doing business went up substantially as well (e.g., insurance rates, the cost of bonding, the price of inventory, the price of building materials and increased costs related to security) OCR made reference in its "valuation" of The Grove to several factors, but did not show any of these were relevant to a proper valuation. First, it referred to The Grove's "annual revenues in the millions of dollars," but these are gross revenues without any expenses deducted. The Grove did not have net income in the millions of dollars. Separately in the record [AR XV at 6, Bates 00385] are The Grove's consolidated income statements for 2002, 2003 and 2004 that show operating income of $305,045, $357,838, and $692,577 and net income of only ($119,671), $75,460, and $356,543 for the three years 2002 to 2004, respectively.

Although the government states that The Grove's revenues less cost of goods (i.e., gross profit) for the year 2002 was $13,038,546.60, the government did not deduct the remaining

company expenses totaling $12,680,708.11, due largely to payroll expenses and occupancy

expense, amounts that are large as would be expected for a company in the airport retail food

services business [AR XXXIV(H), Bates 00688] and that has over 300 employees on payroll.

[AR XLIX, Bates 00784].  Moreover, by definition, the EBITDA (Earnings Before Income

Taxes, Depreciation and Amortization) of $1,746,626.46 does not deduct for depreciation.  The

government nonetheless falsely asserts in its brief that The Grove earned huge profits that were

offset primarily by depreciation and high officers' salaries.  *See* Defendants' Mem. at 23.  In

sum, the government offered no basis whatsoever to speculate that the $2.6 million Ms. Dukler

paid for her 51% share of the Grove, which had operating and net income well under $500,000 in

each of the years 2002 to 2004, was inadequate in any way.[14]  The government's speculation on

the matter does not meet its burden of rational decision-making and certainly cannot serve to

place any additional burden on The Grove to further support the valuation provided, which was

based on a valid contract for the purchase and sale of the stake purchased by Ms. Dukler.

In summary, in looking at the Company's historical net earnings the financial data shows

major losses prior to Ms. Dukler's stock purchase.  The financial data indicates negative cash

flows with continuing significant capital expenditure demands.  Lease terms were a key issue as

well as increased market risk.  There is no indication that OCR considered these factors, or other

relevant factors such as the firm's liquidity, solvency, profitability, operating margins, and return

on equity.  Instead, it looked at the irrelevant factors such as the price a shareholder paid for a

minority share in 1999 (five years previously and pre- 9/11), as well as the capital that an

investor provided to the Company the following year in an effort to protect its investment in a

---

[14]   All of the figures presented here come from the Company's independent auditors report.  [*See* AR XV, Bates 000382].

troubled business.  Reliance on these factors for valuation purposes was arbitrary, capricious, and wholly unsupported in the record.

**B.    OCR Sua Sponte and Improperly Evaluated the Adequacy of Ms. Dukler's Interest Payments.**

OCR also suggested that $164,486.12 in interest payments within the first year of the $2.6 million loan was not substantial.  [AR VI (H), Bates 00066].  In effect, OCR is suggesting that the interest rate on Ms. Dukler's loan from Fifth Third bank is an indicator of whether the price she paid for her Grove stock is a "real and substantial contribution of capital."  OCR offers no principle of accounting or law in support of this proposition.  In this case, Ms. Dukler executed her loan in August 2004.  According to the terms of the promissory note for the loan, she paid interest at the prime rate, which fluctuated over the first year of the loan from 4.75% to 7.25%.  Curiously, OCR does not attempt to square the fact that Ms. Dukler is making interest payments on the loan with its assertion that it is not really her loan and she is not really liable for it.  Moreover, neither OCR nor the government on brief offers any evidence why these are insubstantial payments or that Fifth Third Bank treated the loan differently than any other loan.

OCR's decision, echoed by the government's brief, also creates unnecessary confusion as to the bank account numbers: 0018 is the personal loan account and 3001 is Ms. Dukler's personal checking account that she used to make the interest payments on the loan.  Thus, the evidence that the government cites as evidence of confusion in fact confirms that Ms. Dukler was (and is) paying off the personal loan with her own funds from her personal checking account.

**C.    OCR Sua Sponte and Improperly Considered Financial Investments by Star Foods in 1999-2000.**

OCR relied on the 1999-2000 Star Foods' paid-in capital as evidence that The Grove was financially dependent on Star Foods in 2004.  Defendants conceded in their Motion for Summary

Judgment that "the regulations do not prohibit this capital venture per se" but instead argue that

the resulting financial arrangement compromised The Grove's independence. *See* Defendants'

Mem. at 36. OMWBE did not cite or rely upon Star Foods' prior investment in the Company in

support of its denial, and in any event there was and is no evidence in the record presented to

OCR that Star Foods had provided any subsequent financial support to The Grove. In addition,

there is nothing in the record evidence to suggest any financial arrangements between The Grove

and Star Foods or support a contention that The Grove is in any way dependent upon Star Foods.

OCR argues this investment was supposedly "a vital factor in The Grove's development"

(*id.*), without stating why this is prohibited or problematic under the DOT regulations. In any

event, the matters referred to by OCR all occurred many years before Ms. Dukler assumed

control of The Grove, and reliance on this ground thus violated 49 C.F.R. § 26.89(f)(6), which

requires a review of the circumstances at the time of the application, not many years previously.

Moreover, OCR also conceded that Star Foods did not obtain a controlling interest in The Grove

as a result of this capital infusion.[15] As the record shows, these transactions benefited The

Grove, and they "do not confer any special rights, directly or indirectly to Star Foods as a

minority shareholder nor do they, in any way, affect [Ms. Dukler's] ability to run the company as

CEO." [AR LVI at 3, Bates 00832].

Again, OCR has not cited any "infusion" of capital from Star Foods in the seven years

since the 1999-2000 "infusion" (or any other specific action by Star Foods relevant to The

Grove's status as an independent business). OCR also has not challenged The Grove's showing

that neither Star Foods nor any present or former officer of Star Foods has any role whatsoever

in the operation or management of The Grove; nor has OCR cited any evidence of record that

---

[15] "Specifically, the Department determined that the firm met its burden of proof regarding Ms. Dukler's ability to control The Grove . . . and removed that portion from its December 21, 2006, Final Decision." Defendants' Mem. at 42.

The Grove is either operationally or financially dependent on Star Foods. OCR also did not cite to or state any accounting or legal principle to support its characterization of any investment of capital as compromising the independence of The Grove.

Again, this was a makeweight argument that OCR should not have advanced in the absence of OMWBE having raised the same ground, the argument had no substance in any event, and the argument is irrelevant given that OCR now concedes that Ms. Dukler, not Star Foods, controls The Grove.

### D.    OCR Sua Sponte and Improperly Questioned the Value of the Collateral for Ms. Dukler's Loan from Mr. Cowell.

OCR stated it "appeared" Ms. Dukler used Mr. Cowell's funds and not hers to acquire her interest in The Grove, ignoring that her loan from Mr. Cowell was pursuant to a binding written contract and was secured with a promissory note and a pledge of assets. Once Ms. Dukler borrowed the funds, these funds were hers and were properly used to acquire her controlling interest. OCR also ignores that this loan was paid off in any event with a refinancing borrowing from a financial institution (Fifth Third Bank) for which Ms. Dukler was, is, and remains personally liable. The government admits (Defendants' Statement of Material Facts as to which there is no Genuine Dispute at 3) that the loan from Mr. Cowell was supported by collateral that Ms. Dukler valued at $2.6 million. The government speculates that the collateral may have been worth less, but does not explain why Mr. Cowell was not the best judge of what would adequately secure his loan; nor why any of this is relevant given that Ms. Dukler replaced the loan from Mr. Cowell with a loan from Fifth Third Bank. Nor does the government explain why it challenges the alleged value of Ms. Dukler's security here, but counts it at full value in making its arguments as to Ms. Dukler's PNW.

As to the collateral for the loan from Mr. Cowell, the government states that OCR "did not dispute that the DBE regulations allow the use of marital assets to form the basis for an individual's ownership in the business." Defendants' Mem. at 18.  That is particularly so where, as here, Mr. Dukler irrevocably renounced his interest in The Grove stock acquired by Ms. Dukler to avoid any question on the issue.  DOT's regulations expressly provide that "When marital assets (other than the assets of the business in question) are held jointly as community property by both spouses, you must deem the ownership interest in the firm to have been acquired by that spouse with his or her own resources, provided that the other spouse irrevocably renounces and transfers all rights in the ownership interests in the manner sanctioned by the laws of the state in which either spouse or the firm is domiciled." 49 C.F.R. § 26.69(h)(2)(i)(1).  In this circumstance, Mr. Dukler has renounced any ownership interest in the shares of The Grove, and it is thus irrelevant – as DOT's brief itself claims to recognize—whether he could have claimed an interest in the joint marital assets that may have been pledged as security for the stock Ms. Dukler purchased.

Nonetheless, OCR claimed it needed "a clearer identification of which items were owned solely by Ms. Dukler, or could be considered shared assets with her spouse." Defendants' Motion for Summary Judgment at 19, *citing* AR at 01085, pp. 9-10.  Thus, the decision arbitrarily and capriciously challenges precisely what it claims not to be challenging, namely, Mr. Dukler's purported interest in the shares, or the collateral for them, which is irrelevant given the renunciation.  Moreover,  as OCR knew, this matter was  irrelevant given that the loan from Mr. Cowell was replaced by the loan from Fifth Third Bank.  In any event, Ms. Dukler provided a fully itemized list of her assets, which is contained in bates 00626-634 of the record.

The government also argues that OCR was correct to "disagree that borrowing from friends and family was sufficient for purposes of the Department's regulations." However, the government and OCR are attempting to turn this matter on its head. The issue is, in fact, whether, and if so why, such borrowing is "insufficient" or prohibited by DOT rules. Defendants' Motion for Summary Judgment at 17. While OCR and the government cite generally to sections 26.69(h) and (i) on this matter, as specifically conceded by OMWBE, the specific provisions of those sections do not prohibit such financing – and neither OCR nor the government state otherwise.

OCR argues that Ms. Dukler has not shown that she used "her funds as separate from that of Fifth Third Bank (or that [sic] of Mr. Dukler's) were used." This also makes no sense; any loan uses the bank's funds, but once borrowed they become the funds of the borrower as a matter of property and banking law. The alternative would lead to the absurd conclusion that the bank, rather than Ms Dukler, had some reason to pay "its" funds to Mr. Cowell to pay off Ms. Dukler's loan from him, or that the Bank, not Ms. Dukler, was the legal owner of The Grove shares, as they were paid for with "its funds."

Again, we address these items here to show the manner in which OCR purposefully went beyond its proper reviewing role, and reached decisions that were arbitrary and capricious and inconsistent with the record. None of these reasons are a proper basis for affirmance of OMWBE's decision in any event, because none were specifically relied upon by OMWBE.

### E.     OCR Sua Sponte and Improperly Questioned the Value of Ms. Dukler's Home Equity and Mortgage.

As to Ms. Dukler's personal net worth, OCR made two errors. First, it affirmed OMWBE's assertion that Ms. Dukler's personal bank loan should not be considered a personal liability of Ms. Dukler. As noted above, there is no basis for such a holding with respect to Ms.

Dukler's loan from Fifth Third Bank and no basis to affirm OMWBE's decision on this ground. There can be no clearer expression of a liability than Ms. Dukler's personal promissory note in which she "promised to pay to the order of Fifth Third Bank the sum of two million six hundred Thousand and 00/00 Dollars ($2,600,000) "the Borrowing") plus interest as provided herein." [AR XXXIV(H), Bates 000635-641].

Second, OCR alleged that there was a "lack of clarity" as to the home equity mortgage amount in the calculation of Ms. Dukler's personal net worth. Again, this was not a ground raised by OMWBE and thus not a ground on which OCR could properly rely, and OCR makes no sustained argument other than to express confusion as to the actual amount. In any event, the highest amount OCR claims for Ms. Dukler's home equity is $500,000 ($2.8 million cost and a mortgage balance of $2.3 million), of which Ms. Dukler's share would be $250,000, leaving her well below the PNW threshold.

Moreover, as noted above, home equity is expressly excluded from a personal net worth calculation by 49 C.F.R. § 26.5 ("personal net worth does not include . . . the individual's equity in his or her primary place of residence"), and 49 C.F.R. § 26.67(a)(2)(iii)(B) (same). Finally, OCR argues that as the new home construction contract is a "joint asset," only half of the mortgage should be considered. However, as noted above, Ms. Dukler has a negative net worth under the DOT regulations even if her home mortgage is excluded entirely, making this entire belatedly raised issue even further irrelevant. OCR's effort to add this new issue should thus be rejected.

F.    **OCR Sua Sponte and Improperly Considered License Fee Payments on Its Own Motion, But Did Not Rely on Them, Though the Government's Brief Improperly Attempts to Do So.**

OCR, again echoed by Defendants' Motion for Summary Judgment at 37-38, also questions certain licensee fee payments as listed in Section 11 of the Loan and Security Agreement. This was not a ground raised by OMWBE and nothing in the regulations says that a payment of a license fee constitutes dependence or would otherwise compromise The Grove's independent management operations. Moreover, as to the payments other than the license fees, Section 11 is permissive and affirms the Company's discretion. Section 11 states repeatedly that The Grove "may" make certain payments; yet there is no evidence of record that it ever made any payments other than the license payments. The fact that it was The Grove's option whether or not to make any other such payments is a further indication of The Grove's independence.

In any event, as the government fails to note, the Final Decision expressly states that "without more details the Department cannot reach a conclusion in this regard." [Bates 01108] Thus, the government on brief attempts to rely on a ground on which OCR expressly refused to rely, not to mention that OMWBE had not relied on it either. This again violates not only DOT's regulations, but also the rule against post hoc rationalizations by counsel on brief. *See, e.g., Chenery*, n.8, *supra; Owner-Operator Indep. Drivers Ass'n*, n.8, *supra.*

## VI.    **Equal Protection**

The government argues that The Grove received adequate procedural protections and the same process given others. This misunderstands The Grove's equal protection claim. First, The Grove claims it was "singled out" for unfair treatment given that Ms. Dukler's investment of $2.6 million was so much greater than any other investment that OCR has ever been found not to

be real and substantial.  In addition, The Grove was denied equal protection when OCR failed to

fulfill its proper role of a neutral reviewer and instead became an advocate.

The Grove's claims implicate equal protection grounds on at least two different bases.

First, The Grove's contribution of $2.6 million was considered inadequate when this amount is

nearly 200 times larger than the highest amount OCR had ever previously found inadequate,

$12,800.  This raises the strong inference that The Grove has been "singled out" for invidious

discrimination.  *See Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam)

(recognizing "class of one" equal protection claims in such circumstances); *Racine Charter One,*

*Inc. v. Racine Unified School Dist.*, 424 F.3d 677, 680 (7th Cir. 2005) ("The district court

properly construed [an independent charter school's] class of one equal protection claim");

*Christian Heritage Academy v. Oklahoma Secondary School Activities Ass'n*, 483 F.3d 1025,

1037 (10th Cir. 2007) (finding that Christian Heritage Academy suffered suffered discrimination

as a class of one).

The Grove also believes that the egregious facts of this case, including the OCR's

patently invalid attempts to raise new grounds on appeal to affirm the denial of The Grove's

DBE status, raise the inference that the plaintiff has been singled out on an impermissible basis,

namely that it is a woman-owned business rather than a business owned by a racial minority.  *See*

*Harlen Assoc. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (court

denied equal protection claim when plaintiff failed to argue that he was singled out based on

"impermissible considerations such as race, religion, intent to inhibit or punish the exercise of

constitutional rights, or malicious or bad faith intent to injure a person").

Because the disparate treatment of The Grove under the facts set out above rises to egregious levels, The Grove has stated a claim for violation of the equal protection guarantee of the Fifth Amendment.

Respectfully submitted,

John Longstreth (#367047)
William Kirk (##370762)
Kirkpatrick & Lockhart
Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, D.C. 20006-1600
(202) 778-9000
(202) 778-9100 (fax)

Counsel for Plaintiff, The Grove, Inc.

Date:  January 22, 2008

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE GROVE, INC. | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| UNITED STATES DEPARTMENT OF | : | |
| TRANSPORTATION , ET AL | : | |
| | : | Civil Action No: 07 – 1591 (HHK) |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

## PLAINTIFF'S STATEMENT
## OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to LCvR7(h) and 56.1, Plaintiff hereby submits this Statement of Material Facts as to Which There Is No Genuine Dispute.  Plaintiff is also filing herewith a Cross-Motion for Summary Judgment and a Response to Defendants' Statement of Material Facts as to Which There is no Genuine Dispute.

1.      The Grove, Inc. ("The Grove" or "The Company") is a woman-owned and controlled firm that is certified as an "airport concessions disadvantaged business enterprise" (ACDBE) and which in 2005, operated sixty stores and/or kiosks in fifteen airports and one train station.  [AR II at 17, Bates 00011].  It has hundreds of employees, many of whom are members of groups that are presumed disadvantaged under the statute and regulations governing the ACDBE program. *See* Complaint ¶ 4.; 49 C.F.R. §26.5.

2.    The Grove was first certified as an ACDBE pursuant to 49 C.F.R. Parts 23 and 26, in 1987 under prior owners.  [AR III, Bates 00013; AR XLIV, Bates 00781].  Its corporate office is located in Westchester, Illinois.  [AR III at § 2(a)(8), Bates 00013].

3.    The Grove was certified at the time of the Decision at issue in this case in as an ACDBE in twenty jurisdictions.  Complaint ¶ 4.

4.    Michelle Dukler, the owner of The Grove, is a woman.  She is thus presumed socially and economically disadvantaged under 49 C.F.R § 26.5(2)(vi).

5.    The government admits that Ms. Dukler owns 51% of The Grove as required under 49 C.F.R. § 26.69(b).  *See* Memorandum In Support of Motion to Dismiss ("Defendant's Mem.") at 10.

6.    The government admits that Ms. Dukler controls The Grove, as required by 49 C.F.R. § 26.71(d), an admission that the government made after first attempting to deny that she controlled the Company.  *See* Supplemental Decision at 6: "The Department's December 21, 2006 Decision addressed Ms. Dukler's ability to control The Grove given restrictions in the firm's bylaws and other documents.  We have determined that the firm has met its burden of proof in this regard, and we are removing this section from the decision."  [Bates 01139]

7.    The Grove is a small business that, at the time of its application, had net income of $356,543.  [AR XV, Bates 00385].

8.    The largest contribution of capital that the Department of Transportation's Office of Civil Rights ("OCR") has ever previously found not to be real and substantial was $12,800.  See *KLM Family Trucking*, No. 05-0040 (Feb. 15, 2005) available at http://osdbuweb.dot.gov/documents/Appeal_Decisions/r_05-0040%20KLM%20%20Family%20Trucking.doc.

9.    Star Foods, LLC ("Star Foods"), a minority shareholder of the owner of The Grove, purchased a 49% interest in the Company in 1999 and made a paid-in capital contribution in 2000, well before Ms. Dukler took control of the company in February 2004.

10    There is no evidence of record that Star Foods provided any additional financial assistance to the Grove since 2000, through paid in capital or otherwise.

11.    The Grove filed an application to Office of Minority and Women's Business Enterprises of the State of Washington (OMWBE) dated September 9, 2005 for certification as an ACDBE. This voluminous, 44-tab application provided each of the documents and information requested by OMWBE that applied to The Grove, including three-year financial information, audited financial information, and information on all of the company's contracts. *See* AR I-LVI, Bates 00001-00835. At no time did OMWBE suggest that this application was incomplete or confusing, or ask The Grove to provide additional documentation or clarification.

12.    The (OCR) issued on December 21, 2006 a decision affirming the rejection by OMWBE of The Grove for ACDBE status at Sea-Tac International Airport. [Bates 01085] Although the letter states that the "determination is administratively final," OCR in fact supplemented the Decision in a letter dated June 8, 2007 in which, among other things, it conceded that Ms. Dukler does in fact control The Grove, and withdrew its earlier erroneous findings to the contrary. [Bates 01134]

13.    The majority of The Grove's shares have at all times to the present been owned by disadvantaged individuals. [AR LI at pp. 3-5, Bates 00795-797; AR VI at 7, Bates 00032]. Neither OCR nor the state agency whose decision OCR was to review in this matter, the OMWBE, has ever asserted or found to the contrary.

14.    Star Foods, the minority shareholder owner of The Grove, is owned by Casey Cowell, a non-disadvantaged individual.  Until January 1, 2006 Martin Dukler also had an ownership interest in Star Foods.

15.    On February 5, 2004, Martin Dukler, in accordance with DOT regulations, 49 C.F.R. § 26.69(i), irrevocably renounced, transferred and relinquished any right, title or interest in The Grove.  [AR XXXIV, Bates 00727].  Neither Mr. Cowell nor Mr. Dukler has ever had any direct ownership interest in The Grove.

16.    Mr. Cowell has never been an officer or employee of The Grove.  Messrs. Cowell and Dukler were, as permitted by the DOT regulations, directors of The Grove from 2000 until February 13, 2004, when Ms. Dukler assumed ownership and control of the Company, and by July 30, 2004, Ms. Dukler was the sole director of The Grove.  [AR XXXIV(N), Bates 00718].

17.    Mr. Dukler had no role in the management of the company as director, officer or employee after February 13, 2004.  [AR XLIV, Bates 00753].  Since well before the time of the application to OMWBE on September 9, 2005, neither Mr. Cowell nor Mr. Dukler has been a director, officer or employee of The Grove and neither has had any voting rights in The Grove.  [AR XLV at 1, Bates 00751].

18.    Ms. Dukler purchased her 51.02% interest in The Grove in February, 2004 for $2.6 million, with her own funds which she borrowed pursuant to a written, securitized agreement from Mr. Cowell.  [AR XXXIV(C), Bates 00608; AR XXXIV, Bates 00616].

19.    Ms. Dukler executed a mortgage and security agreement with Mr. Cowell in her name only on February 5, 2004 as security for the $2.6 million loan and that the security consisted of

personal assets that Ms. Dukler valued at $2.6 million, which valuation Mr. Cowell accepted in making the loan. [AR at XXXIV(G) at Exhibit A, Bates 00619].[1]

20.      On February 6, 2004, the day after executing the loan with Mr. Cowell, Ms. Dukler bought a majority interest in The Grove in two transactions, a "stock purchase agreement" under which she paid $2.5 million for 35 shares [AR XXXIV, Bates 00595] or about 49% of The Grove's shares, and an option agreement under which she paid $100,000 for an option to buy 1.5 shares, or about 2 % of The Grove's shares. [AR XXXIV, Bates 00606]. She then exercised the option and purchased the remainder of The Grove's shares.

21.      On August 17, 2004, Ms. Dukler obtained a personal bank loan from Fifth Third Bank in the amount of $2.6 million, secured by her personal promissory note [AR XXXIV (G) at Exhibit A, Bates 00619] and used the proceeds to pay off her prior February 2004 loan from Mr. Cowell in that amount. [AR XXXIV(H), Bates 00635].

22.      Ms. Dukler paid the $100,000 for the option to buy 1.5 of The Grove's shares with check number 2249, drawn from the Duklers' joint account. [AR XXXIV, Bates 00618].

23.      Check number 2248, which comes immediately before check 2249 dated February 6, 2004, is dated, apparently unintentionally, February 6, 2005. Neither OCR nor OMWBE ever raised the issue of whether this apparent error had any effect on the transaction or asked for such documentation of negotiation or cancellation. The stock and option purchase transactions both went ahead on the basis of the checks and Mr. Cowell was repaid his $2.6 million loan with the proceeds of an August 2004 loan to Ms. Dukler from Fifth Third Bank. [AR XXXIV, Bates 00635]. The "Assignment Separate From Certificate" executed on February 6, 2004 expressly states that the transfer of the 35 shares of stock to Ms. Dukler was "for value received." [AR

---

[1] The proceeds of the loan were deposited in the Duklers' joint account and withdrawn the very next day via check number 2248 [AR XXXIV(C), Bates 00605] to purchase Ms. Dukler's 36.5 shares in The Grove from Star Foods. Thus, at this point in time, Star Foods owned no shares in The Grove.

XXXIV(B), Bates 00606]. A City of Chicago report dated May 18, 2004, states expressly that the documentation submitted by Ms. Dukler included "cancelled checks in the sums of $2.5 million and $100,000," from the joint checking account of Mr. and Ms. Dukler, thus confirming that the checks were in fact negotiated. [AR XLIX at 5, Bates 00787].

24.     On February 17, 2004, The Grove executed a project loan in the amount of $2.5 million and a line of credit in the amount of $500,000, both secured by assets of the firm. [AR XXXIV(H), Bates 00643]. This loan was separate from the August, 2004 personal loan taken out by Ms. Dukler to repay the $2.6 million she had borrowed from Mr. Cowell.

25.     The Grove's Loan and Security Agreement issued in connection with the project loan, contained a list of the Company's locations and types of concessions [AR XXXIV, Bates 00682-686], and that the loan required The Grove to maintain a minimum tangible net worth of $2,050,000 as of December 31, 2004 and until the Liabilities were paid in full. [AR XXXIV(H) at Section 14, Bates 00671]. The Grove's tangible net worth as of December 31, 2003 was $2,403,074.90 and its total stockholder's equity was $3,029,464.42. [AR XXXIV, Bates 00691]. The Agreement also included as an attachment a consolidated income statement that showed earnings before income taxes, deprecation and amortization of $1,746,626.46. [AR XXXIV(H), Bates 00688].[2] Separately in the record [AR XV at 6, Bates 00385] are The Grove's consolidated income statements for 2002, 2003 and 2004 that show operating income of $305, 045, $357, 838, and $692, 577 and net income of ($119.671), $75,460, and $356,543 for the three years 2002 to 2004 respectively.

---

[2]  Although gross profit was $13,038,546.60, direct expenses totaled $12,680,708.11, due largely to payroll and payroll expenses and airport rent expense. [AR XXXIV(H), Bates 00688]. The Company has over 300 employees on payroll. [AR XLIX, Bates 00784]. Net income after minority interest was $356,543 [AR XV, Bates 00385].

26.     On February 17, 2004, Ms. Dukler and Mr. Cowell, on behalf of Star Foods, executed a "stockholders agreement," defining aspects of the owners' relationship. [AR XXXIV(O), Bates 00717].

27.     Ms. Dukler executed a personal loan with Fifth Third Bank, a commercial lending institution, denominated a "consumer note" on August 17, 2004 (the date handwritten in the acknowledgement section, although the preprinted text of the Note lists an effective date of August 19, 2004) in the amount of $2,600,000. [AR XXXIV (H), Bates 00888]

28. Ms. Dukler wrote a check for $2,600,000 on August 17, 2004 to repay her loan to Mr. Cowell, and Mr. Cowell deposited the same amount into his bank account the next day. [AR XXXIV(I), Bates 00706].

29.     Ms. Dukler replaced her February 2004 loan from Mr. Cowell in August 2004 with the personal loan from Fifth Third Bank. [AR XXXIV(H), Bates 00635].

30.     The Fifth Third Bank note is a personal indebtedness of Ms. Dukler to the Bank. The note states that Ms. Dukler "promised to pay to the order of Fifth Third bank the sum of two million six hundred Thousand and 00/00 Dollars ($2,600,000)"the Borrowing") plus interest as provided herein." [AR XXXIV(H), Bates 000635-641]. Under this agreement, Ms. Dukler remains liable on the $2.6 million personal note whether or not other of her assets are "encumbered" under the note.

31.     In the first year Ms. Dukler held the note she paid the bank at least $164,000 in interest on the note. [AR VI(H), Bates 00066].

32.     Ms. Dukler provided a "personal financial statement" that showed assets of $4,949,457. including the value of her stock in The Grove at $2.6 million, and liabilities of $4,949,300, including her $2.6 million promissory note payable to Fifth Third Bank. [AR VI, Bates 00039].

Her personal net worth was thus shown as $157. However, under the applicable DOT

regulations the proper calculation of "[a]n individual's personal net worth does not include the

following: The individual's ownership interest in ACDBE firm or a firm that is applying for

ACDBE certification . . ." , 49 C.F.R. § 23.3. Accordingly, under the DOT regulations, the

information Ms. Dukler provided, should have shown a negative personal net worth of

(-$2,599,843).

33.      DOT regulations also provide that personal net worth does not include "the individual's

equity in his or her primary place of residence…" *See* 49 C.F.R. § 26.5, 70 Federal Reg. 14,496;

14,498 (2005). It is uncontested that if Ms. Dukler's personal net worth statement did not

include either equity or liability for her personal residence – an outcome **less** favorable to her

than the DOT regulations provide, her personal net worth would still be negative:

Personal Net Worth
(from Bates 00039)

| **Assets** | | **Liabilities** | |
|---|---|---|---|
| Cash on Hand | 63, 058 | Note Payable to Bank | $2,600,000[3] |
| IRA | $9,050 | Installment Account | $49,300 |
| Life Insurance Surrender | | | |
| Value | $4,684 | Real Estate Mortgage | [4] |
| Stocks & Bonds | [1] | | |
| Real Estate | [2] | | |
| Automobile | $15,440 | | |
| Other Personal Property | $2,027,225 | | |
| | | | |
| Total Assets | **$2,119,457** | Total Liabilities | **$2,649,300** |
| | | | |
| **Total negative net worth** | **-$529,843** | | |

(1)  $2,600,000 cost basis of 36.5 shares of The Grove, Inc., not included in Ms. Dukler's
     personal net worth per DOT regulation 49 C.F.R. § 23.3. ("An individual's personal net
     worth does not include the following: The individual's ownership interest in ACDBE firm or
     a firm that is applying for ACDBE certification; the individual's equity in his or her primary
     place of residence…") *See* 49 C.F.R. § 26.5, 70 Federal Reg. 14,496; 14,498 (2005)

8

(2)  Ms. Dukler's only real estate is her personal residence, equity in which is not counted in personal net worth per 49 C.F.R § 23.3.  *See* 49 C.F.R. § 26.6 (same as above)

(3)  Ms. Dukler's personal loan from Fifth Third Bank, obtained August 17, 2004.

(4)  The real estate mortgage of $2,300,000 is not counted for these purposes in order to remove an issue raised by the government on this matter, and it is not necessary to include it in any event to show Ms. Dukler's net worth is negative.  However, the regulations would permit its inclusion, which would serve to make Ms. Dukler's personal net worth negative to an even greater degree.


34.    Ms. Dukler signed as company President for The Grove as Lessee for the lease of certain office equipment at a rate of $281.98 per month.  A guarantor was not required for the transaction.  Ms. Dukler did, however, personally guarantee a project loan in the amount of up to $3 million.  [AR XXXIV, Bates 00635].

35.    The Grove submitted a financial statement with its application to OMWBE that shows three years of financial statements with de minimis payments to Star Foods.  [AR XV, Bates 00380].


Date:  January 22, 2008                         Respectfully submitted,


                                                _____
                                                John Longstreth (#367047)
                                                William Kirk (#370762)
                                                Kirkpatrick & Lockhart
                                                Preston Gates Ellis LLP
                                                1601 K Street, N.W.
                                                Washington, D.C. 20006-1600
                                                (202) 778-9000
                                                (202) 778-9100 (fax)

                                                Counsel for Plaintiff, The Grove, Inc.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THE GROVE, INC.                                    :

                                                   :

                          Plaintiff,               :

         v.                                        :

UNITED STATES DEPARTMENT OF                        :
TRANSPORTATION , ET AL                             :

                                                   :    Civil Action No: 07 – 1591 (HHK)

                                                   :

                                                   :

                          Defendants.              :
                                                   :

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT
## OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to D.D.C.R. 7(h) and 56.1, Plaintiff hereby submits this response to Defendants'

Statement of Material Facts as to Which There Is No Genuine Dispute.  Plaintiff is also filing

herewith a cross-motion for summary judgment supported by it own statement of facts as which

there is no genuine dispute.

1.      Admitted except that the "annual revenues in the millions of dollars" referenced are gross

revenues.  The Grove does not have net income or profits in the millions of dollars.  In addition,

many of The Grove's employees are members of groups that are presumed disadvantaged under

the statute and regulations governing the Airport Concessions Disadvantaged Business

Enterprise (ACDBE) program.  *See* 49 C.F.R. § 26.5

2.      Denied that the referenced December 21, 2006 letter [Bates 01085] was the "Final

Decision" of the Department of Transportation's Office of Civil Rights (OCR) in the matter.

Although the letter states that the "determination is administratively final," the Department in

fact supplemented the Decision in a letter dated June 8, 2007 [Bates 01134] in which, among

other things, it conceded that Ms. Dukler does in fact control The Grove, and withdrew its earlier

erroneous findings to the contrary.  The remainder of this paragraph contains a characterization

of the legal conclusions in the December 21, 2007 letter to which no response is required, to the

extent a response is required the conclusions are denied as Ms. Dukler in fact made a real and

substantial contribution of $2.6 million to acquire her interest in The Grove, and Ms. Dukler does

not have a personal net worth that exceeds $750,000 under the Department's regulations, and

The Grove is an independent business.

3.      Admitted that The Grove was established and originally owned by two disadvantaged

individuals; stated further that The Grove has at all times to the present been owned by

disadvantaged individuals and that neither OCR nor the state agency whose decision OCR was

ostensibly reviewing in this matter, the Office of Minority and Women's Business Enterprises of

the State of Washington (OMWBE) has ever asserted or found to the contrary.

4.      Admitted that Star Foods became a minority owner of the firm in 1999 and that The

Grove was in financial difficulties at the time.  Denied that Star Foods exercises any control over

The Grove or that it has given The Grove any financial assistance since January 2000, over four

years before Ms. Dukler became the owner of The Grove.

5.      Admitted that Star Foods is and has been at all relevant times a minority owner of The

Grove, that Star Foods is owned by Casey Cowell, a non-disadvantaged individual and that until

the second quarter of 2006, Martin Dukler also had an ownership interest in Star Foods.  On

February 5, 2004, Martin Dukler, in accordance with DOT regulations, 49 CFR 26.69(i),

irrevocably renounced, transferred and relinquished any right, title or interest in The Grove.  [AR

XXXV, Bates 00727], and neither Mr. Cowell nor Mr. Dukler has ever had any direct ownership

interest in The Grove. Mr. Cowell has never been an officer or employee of The Grove. Messrs. Cowell and Dukler were, as permitted by the DOT regulations, directors of The Grove from 2000 until February 13, 2004, when Ms. Dukler assumed ownership and control of the Company, and by July 30, 2004 Ms. Dukler was the sole director of The Grove. [AR XXXV(N), Bates 00718] Mr. Dukler had no role in the management of the company as director, officer or employee after February 13, 2004. [AR XLV, Bates 00753-754]. Since well before the time of the application to OMWBE on September 9, 2005, neither Mr. Cowell nor Mr. Dukler has been a director, officer or employee of The Grove and neither has had any voting rights in The Grove. [AR XLV, Bates 00751].

6.      Admitted that Star Foods agreed to provide a line of credit and assumed The Grove's outstanding indebtedness in January, 2000 and that Star Foods received no additional shares of stock but retained a 49% minority interest in The Grove. There is no evidence of record, and the government has not asserted, that Star Foods has provided any additional financial assistance to The Grove since 2000, or any assistance since Ms. Dukler acquired ownership and control of The Grove in 2004.

7.      Admitted that Ms. Dukler purchased her 51.02% interest in The Grove in February, 2004 for $2.6 million, which funds she borrowed from Mr. Cowell, but denies that either OMWBE or OCR has ever relied on to the amount of the interest rate on the loan as a ground for denial in any of their decisions as to The Grove's eligibility for DBE status.

8.      Admitted that Ms. Dukler executed a mortgage and security agreement with Mr. Cowell on February 5, 2004 as security for the $2.6 million loan and that the security consisted of personal assets that Ms. Dukler valued at $2.6 million, which valuation Mr. Cowell accepted in making the loan. [AR XXXV(G) at Exhibit A, Bates 00626]

9.      Admitted that February 6, 2004, the day after executing the loan with Mr. Cowell, Ms. Dukler bought a majority interest in The Grove in two transactions, a "stock purchase agreement" under which she paid $2.5 million for 35 shares, or about 49% of The Grove's shares, and an option agreement under which she paid $100,000 for an option to buy 1.5 shares, or about 2 % of The Grove's shares.  Denied that the structuring of the purchase transaction, as opposed to the result under which Ms. Dukler owned 51% of The Grove's shares for a purchase price of $2.6 million, has any material relevance to the matter, or that this structuring violated any of the Department's regulations.

10.     Admitted that on February 6, 2004, Ms. Dukler purchased 35 shares, or approximately 49% of the Grove's shares under a stock purchase agreement, and also wrote a check numbered 2249 drawn on the Duklers' joint checking account for an "option purchase" for $100,000.

11.     Admitted that check numbered 2248, which comes immediately before check 2249 dated February 6, 2004, is dated, apparently unintentionally, February 6, 2005, denies that this apparent error had any effect on the transaction, and in particular denies that there is "no demonstration in the record that check nos. 2248 or 2249 were negotiated."  Apart from the fact that neither OCR or OMWBE ever raised this issue or asked for such documentation of negotiation or cancellation, the stock and option purchase transactions both went ahead on the basis of the checks, and Mr. Cowell was repaid his $2.6 million loan with the proceeds of an August 2004 loan to Ms. Dukler from Fifth Third Bank, both facts that are squarely inconsistent with the government's belated speculation that the checks were never negotiated.  In addition, the "Assignment Separate From Certificate" executed on February 6, 2004 expressly states that the transfer of the 35 shares of stock to Ms. Dukler was "for value received."  [AR XXXV(B), Bates 00606].  Finally, a City of Chicago report states expressly that the documentation

submitted by Ms. Dukler included "cancelled checks in the sums of $2.5 million and $100,000," from the joint checking account of Mr. and Ms. Dukler, thus confirming that the checks were in fact negotiated. [AR XLX, Bates 00787].[1]

12.    Admitted that on February 17, 2004, The Grove executed a project loan in the amount of $2.5 million and a line of credit in the amount of $500,000, both secured by assets of the firm; denies that this loan was the same as the August, 2004 personal loan taken out by Ms. Dukler to repay the $2.6 million she had borrowed from Casey Cowell.

13    Admitted that the Loan and Security Agreement contained a list of the firm's locations and types of concessions [AR XXXV(H) at Exhibit A, Bates 00681-686], and that the loan required The Grove to maintain a minimum tangible net worth of $2,050,000 as of December 31, 2004 and until the Liabilities were paid in full.   [AR XXXV(H) at Section 14, Bates 00671]. The Grove's tangible net worth as of December 31, 2003 was $2,403,074.90 and its total stockholder's equity was $3,029,464.42. [AR XXXV(H), Bates 00691].  The Agreement also included as an attachment a consolidated income statement that showed earnings before income taxes, deprecation and amortization of $1,746,626.46.  [AR XXXV(H), Bates 00688].[2] Separately in the record [AR XV at 6, Bates 00385] are The Grove's consolidated income statements for 2002, 2003 and 2004 that show  operating income of $305, 045, $357, 838, and

---

[1]   The City of Chicago report erroneously states that funds derived from the joint checking account cannot conclusively be deemed Ms. Dukler's, but this ignores Mr. Dukler's renunciation of any interest in The Grove, as well as the DOT's own regulation that states placement of Ms. Dukler's loan proceeds in a joint account was not sufficient to deem the money she had borrowed to be joint property rather than her own.  49 C.F.R. § 26.69 (j)(2).  In any event, while OMWBE attempted to rely on this ground for denial, OCR has not.

[2]   Although gross profit was $13,038,546.60, direct expenses totaled $12,680,708.11, due largely to payroll and payroll expenses and airport rent expense. [AR at XXV(H), Bates 00688]  The Company has over 300 employees on payroll. [AR at XLX, Bates 00784].  Net income after minority interest was $356,543 [AR at XV, Bates 00385]

$692, 577 and net income of ($119.671), $75,460, and $356.543 for the three years 2002 to 2004 respectively.

14.     Admitted.

15.     Admitted that Ms. Dukler executed a personal loan denominated a "consumer note" on August 17, 2004 (the date handwritten in the acknowledgement section, although the preprinted text of the Note lists an effective date of August 19, 2004) in the amount of $2,600,000. [AR XXXIV (H), Bates 00888]

16.     Admitted that Ms. Dukler write a check for $2,600,000 on August 17, 2004 to repay her loan to Mr. Cowell and that Mr. Cowell deposited the same amount into his bank account the next day.  [AR XXV(I), Bates 00706].

17.     Admitted that Ms. Dukler used assets formerly used in her two prior businesses as security for her $2.6 million loan from Mr. Cowell and that she replaced that loan in August 2004 with the personal loan from Fifth Third Bank.  The unsupported and hearsay characterizations of Ms. Dukler's purported comments about her wealth are denied, and it is further expressly denied that Ms. Dukler exceeds the personal net worth threshold as properly calculated under DOT's regulation governing calculation of personal net worth.

18.     Admitted that Ms. Dukler's letter to The City of Chicago discusses her $ 2.6 million secured loan from Casey Cowell, which was secured in part by the equity in her residence, and notes that she paid off the loan to Mr. Cowell with the proceeds of a $2.6 million personal loan from Fifth Third Bank, evidenced by a promissory note for which she remains personally liable. [AR XXXIV (H), Bates 00888].  The letter to the City of Chicago also sets out certain capital payments and assumptions of debt made by Star Foods in 1999 and 2000 and confirms that all of these payments were made prior to Ms. Dukler's acquiring a controlling interest in the firm in

2004, that they benefited The Grove., and that they "do not confer any special rights, directly or

indirectly to Star Foods as a minority shareholder nor do they, in any way, affect my ability to

run the company as CEO." [AR LVI at 3, Bates 00832]. The letter also detailed Ms. Dukler's

20 years experience in retail sales, including 11 years owning and managing other companies

and three years in a senior management position with The Grove itself. [*Id.* at 5, Bates 00834].

Finally, the letter provided all of the documentation the City of Chicago had sought with respect

to The Grove, and the City of Chicago took no further action against the Grove based on that

information.

19. Admitted that Ms. Dukler provided a "personal financial statement" that showed assets of

$4,949,457. including the value of her stock in The Grove at $2.6 million, and liabilities of

$4,949,300, including her $2.6 million promissory note payable to Fifth Third Bank.

[AR VI at 1, Bates 00039]. Denied, however, that under the Department's regulation governing

the calculation of personal net worth that the value of The Grove stock is properly considered in

assessing her personal net worth and that $157 is therefore the proper calculation of personal net

worth under the regulations. Denied further that Ms. Dukler's home equity is properly

considered in the personal net worth calculation or that any issue concerning her home mortgage

is material since even if no mortgage is included Ms. Dukler's personal net worth under the

DOT's regulations is a negative personal net worth of (- $529, 843):

Personal Net Worth
(from Bates 00039)

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on Hand | 63, 058 | Note Payable to Bank | $2,600,000[3] |
| IRA | $9,050 | Installment Account | $49,300 |
| Life Insurance Surrender Value | $4,684 | Real Estate Mortgage | [4] |
| Stocks & Bonds | [1] | | |
| Real Estate | [2] | | |
| Automobile | $15,440 | | |
| Other Personal Property | $2,027,225 | | |
| | | | |
| Total Assets | **$2,119,457** | Total Liabilities | **$2,649,300** |
| | | | |
| **Total negative net worth** | **-$529,843** | | |

(1)  $2,600,000 cost basis of 36.5 shares of The Grove, Inc., not included in Ms. Dukler's personal net worth per DOT regulation 49 C.F.R. 23.3.  ("An individual's personal net worth does not include the following: The individual's ownership interest in ACDBE firm or a firm that is applying for ACDBE certification; the individual's equity in his or her primary place of residence…") *See* 49 C.F.R. 26.5, 70 Federal Reg. 14,496; 14,498 (2005)

(2)  Ms. Dukler's only real estate is her personal residence, equity in which is not counted in personal net worth per 49 C.F.R 23.3.  See 49 C.F.R. 26.6 (same as above)

(3)  Ms. Dukler's personal loan from Fifth Third Bank, obtained August 17, 2004.

(4)  The real estate mortgage of $2,300,000 is not counted for these purposes in order to remove an issue raised by the government on this matter, and it is not necessary to include it in any event to show Ms. Dukler's net worth is negative.  However, the regulations would permit its inclusion, which would serve to make Ms. Dukler's personal net worth negative to an even greater degree.

20.    Admitted that the promissory note executed with Fifth Third Bank does not include a

collateral schedule or a statement that the loan was needed for expansion or build-out costs;

denied that this means that the loan is not a personal obligation of Ms. Dukler's that she is

obligated to repay and that is properly considered a liability in assessing her personal net worth,

and further denied that whether other assets are "encumbered" by the loan has any bearing on whether the loan itself is a personal liability of Ms. Dukler's for $2.6 million..

21.    Admitted that the net worth statement shows certain values and liabilities but denied that home equity is a material fact. Home equity is expressly excluded from a personal net worth calculation by 49 C.F.R. § 26.5 ("personal net worth does not include . . . the individual's equity in his or her primary place of residence"), and 49 C.F.R. § 26.67(a)(2)(iii)(B) (same). OCR argues that as the new home construction contract is a "joint asset," only half of the mortgage should be considered. However, as noted above, Ms. Dukler has a negative net worth under the DOT regulations even if her home mortgage is excluded entirely.

22.    Admitted that Ms. Dukler signed as company President for The Grove as Lessee for the lease of certain office equipment at a rate of $281.98 per month; denies that a guarantor was required for the transaction, or that it is a material fact that Ms. Dukler did not sign as guarantor.

23.    Admitted that the cited letter to the City of Chicago also sets out certain capital payments and assumption of debt undertaken by Star Foods in 1999 and 2000 and confirms that all of these payments were made prior to Ms. Dukler's acquiring a controlling interest in the firm in 2004, that they benefited The Grove., and that they "do not confer any special rights, directly or indirectly to Star Foods as a minority shareholder nor do they, in any way, affect my ability to run the company as CEO." [AR 56 at 3, bates 00832]

24.    Admitted that the quote, also set out above, is accurately taken from 1999 Board minutes of the Company. Denied that the statement has any relevance to the certification of the Grove under Ms. Dukler's ownership as the statement was made 5 years before Ms. Dukler took ownership of The Grove and since Star has not provided any financial or other assistance to The Grove, and there is no record evidence of any such assistance, since 2000.

25.    Denied.  The loan merely lists certain permitted transactions but does not require that payments be made.  Moreover the only payment listed is a license fee to Star Foods, the other payments to Star Foods and /or Georgia's Grove "may be" made but there is no record of any such payments in the record.  Also denied that this fact is material since OCR's June 8, 2007 letter expressly disclaims any reliance on this factor in OCR's decision.

26.    Admitted that the companies are listed as affiliates in the Loan Agreement, denied that there is any showing of record that they are affiliates under the applicable DOT regulations, which incorporate Small Business Administration regulations, or that OCR relied on any affiliate status in its decision.

27.    Admitted.

28.    Admitted that OMWBE issued a decision to deny The Grove's application for ACDBE certification on November 30, 2005 that listed five specific grounds for denial.  Denied that any of the grounds are valid or that OCR, as required by DOT regulations, relied only on these specific grounds in reviewing the OMWBE decision.  For example, OMWBE stated first that "Ms. Dukler obtained a loan from an ineligible person using secured assets for the purpose of purchasing the business."  DOT's regulations make clear that an interest can be acquired with funds from a loan, so OCR did not rely on this ground, but instead invented new grounds on which to assert the contribution was not "real and substantial."  Other grounds cited by OMWBE were also abandoned by OCR, including that Ms. Dukler did not have control of the Grove and that The Grove is a "family business."

29.    Admitted.

30.    Admitted that OMWBE came to the same result on rehearing that the application should

be denied, though it was forced to concede that some of its earlier reasoning was wrong and

substituted equally faulty reasoning to reach the result.

31.    Admitted.

32.    Admitted.

33.    Admitted that the decision issued that date, but denied that the decision was correct or

that it properly relied on the same specific grounds relied on by OMWBE.

34.    Denied to the extent that this is intended to suggest that the "economic disadvantage"

ground differs from the alleged ground that Ms. Dukler exceed the $750,000

personal net worth threshold.

35.    Admitted that these were the stated grounds for OCR's decision (plus an assertion that

Mr. Dukler did not control The Grove, which was later withdrawn), but denied that the decision

was correct or that it properly relied on the same specific grounds relied on by OMWBE.

36.    Admitted that OCR conceded on further review in its June 8, 2007 letter supplementing

its earlier decision that that Ms. Dukler controls The Grove, denies that the rest of the decision

was correct or that it properly relied on the same specific grounds relied on by OMWBE.

Date: January 22, 2008                          Respectfully submitted,

_____
John Longstreth (#367047)
William Kirk (#370762)
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, D.C. 20006-1600
(202) 778-9000
(202) 778-9100 (fax)
Counsel for Plaintiff, The Grove, Inc.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE GROVE, INC. | : |
| | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| UNITED STATES DEPARTMENT OF | : |
| TRANSPORTATION , ET AL. | : |
| | : |
| | : |
| | : |
| | : |
| Defendants. | : |

Civil Action No. 07-1591 (HHK)

## **ORDER**

Upon consideration of Defendant's Motion for Summary Judgment, Plaintiff's Cross-Motion for Summary Judgment, the administrative record, and the entire record herein, it is hereby

ORDERED that Plaintiff's motion be and hereby is GRANTED.  The Department of Transportation's Final Decision dated December 21, 2006 and June 8, 2007, is hereby VACATED and Defendants are preliminarily and permanently enjoined from enforcing the decision or acting in reliance on it; and it is further

ORDERED that DOT shall remand the matter to the Washington Office of Minority and Women's Business Enterprise with instructions to grant The Grove's application for certification as an Airport Concessionaire Disadvantaged Business Enterprise.


DATED: January 22, 2008

_____
UNITED STATES DISTRICT JUDGE

Copies via ECF to:

John Longstreth, Esq.
William Kirk, Esq.
Kirkpatrick & Lockhart Preston Gates & Ellis LLP
1601 K St. N.W.
Washington, D.C. 20006-1600

Mercedeh Momeni, Esq.
Assistant United States Attorney
Judiciary Center Building
555 4th Street N.W.
Washington, D.C. 20530