**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|                          |   |                              |
|--------------------------|---|------------------------------|
|                          | ) |                              |
| **THE GROVE, INC.**      | ) |                              |
|                          | ) |                              |
| Plaintiff,               | ) |                              |
|                          | ) |                              |
| v.                       | ) | Civil Action No. 07-1591 (HHK) |
|                          | ) | ECF                          |
| **UNITED STATES DEPARTMENT** | ) |                          |
| **OF TRANSPORTATION, ET AL.** | ) |                        |
|                          | ) |                              |
| Defendants.              | ) |                              |

_____)

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY**
**JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION**

INTRODUCTION

Defendants, United States Department of Transportation, et al. ("Department" or "Defendants"), respectfully submit this Reply in Support of their Motion for Summary Judgment ("Opening Brief") and in Opposition to Plaintiff's Cross Motion for Summary Judgment.  The Grove seeks review and reversal of a Department final decision (and its supplement) under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and pursuant to the Fifth Amendment to the United States Constitution.  The Department's final decision upheld a determination of the State of Washington's Office of Minority and Women's Business Enterprises ("OMWBE") denying Plaintiff's eligibility to participate in the federal Airport Concessions Disadvantaged Business Enterprise ("ACDBE") program at the Seattle-Tacoma International Airport ("SEA-TAC").

The Department's final decision is consistent with applicable Department regulations, fully supported by the administrative record, is in no way arbitrary and capricious or contrary to law, and thus, should be upheld.  Plaintiff has now had an

opportunity to provide the Court with its reasons why it believes it is entitled to the relief

it seeks.  *See* USDC Pacer Dkt. Nos. 13 and 14, Pl. Cross Motion ("XMSJ") and

Opposition ("Pl. Opp.") respectively.  Despite Plaintiff's problematic assertions,[1] the

Defendants are entitled to summary judgment in their favor.  See 5 U.S.C. § 706(2)(A).

<u>LEGAL ARGUMENT</u>

## I.      **<u>The Grove Did Not Properly Establish Its Eligibility for ACDBE Status.</u>**

The Grove argues that it properly established its eligibility for ACDBE status and

that the grounds relied on by OMWBE were insufficient to deny it certification.  <u>See</u>

XMSJ, Sections III and IV.  The Department disagrees.  The record evidence discussed

throughout the Opening Brief demonstrates that The Grove did not meet its burden of

proof.  <u>National Treasury Employees Union v. Horner</u>, 854 F.2d, 490, 498 (D.C. Cir.

1987).

---

[1]  A few examples are as follows.  Plaintiff provides the Court with arguments in the form of comparative charts.  <u>See e.g.</u> XMSJ, pp. 2 and 12.  However, it fails to provide citations to the record in support of its contentions therein.  <u>Id</u>.  Additionally, in these charts Plaintiff seems to confuse the legal basis for OMWBE's decisions and OCR's addressing the supporting facts, by calling both of the foregoing "Grounds".  XMSJ, p. 2.

Furthermore, Plaintiff states that OCR admitted that Ms. Dukler controlled the business. <u>Id</u>.  In its final decision, OCR cites to The Grove's by laws for its conclusion that Ms. Dukler did not fully control the business.  In its supplemental decision, the Department determined that The Grove met its burden of proof to demonstrate that the bylaw restrictions regarding a quorum of stockholders was not an impediment to Ms. Dukler's ability to control The Grove under 49 C.F.R. 26.71(c) (regulation precludes restrictions on discretion of disadvantaged owners through by-laws or otherwise).  However, the foregoing is insufficient to show control because, as the Department found, the Grove could satisfy not 26.71(b), which provides another required element, <u>i.e.</u>, independence, for "control".  Compare AR, at 62 (Bates 01103-01105) with AR, at 64 (Bates 01139).

It is also interesting to note that Plaintiff offers the OMWBE's "grounds" for denial that "The Grove was not independent of Star Foods . . ." to OCR's "grounds" that "The Grove was 'financially dependent' on Star Food" as a contradiction.  <u>Id</u>.

The Grove argues first that it properly established its eligibility for ACDBE status because Michelle Dukler, owns 51% of The Grove, which she purchased for $2.6 million via a loan from the non-disadvantaged owner of Star Foods, and her husband's business partner, Casey Cowell.  Ms. Dukler subsequently paid off the loan to Mr. Cowell through another loan she secured with the Fifth Third Bank.  <u>See</u> XMSJ, at 13.  Notwithstanding this assertion, and as repeatedly noted by the Department, Ms. Dukler's 51% ownership stake of record does not satisfy the eligibility requirement of the regulation if her capital contribution is not "real and substantial."  <u>See</u> Opening Brief, at 9-24.  As explained below in greater detail, the regulation requires much more than a mere showing that a disadvantaged owner possesses the requisite number of shares or proportion of a firm to be the "51 percent owner."

Nothing in The Grove's Brief shows anything more than what was previously argued and rejected by the Department in the final decisions of December 2006 and June 2007.  The Department determined that the $2.6 million capital contribution, obtained through Mr. Cowell, who also controls Star Foods, the non-disadvantaged owner of 49% of The Grove, is not "real and substantial."  <u>See</u> Opening Brief, at 20-23.  Ms. Dukler's refinancing of the loan through Fifth Third Bank to repay Mr. Cowell did not remedy the problem.  As noted in the Opening Brief at 28, for example, the record does not contain any documentation that the loan from the Fifth Third Bank required Ms. Dukler to pledge her personal assets to capitalize or expand The Grove, and thereby fails to meet the regulatory requirement of 70 Fed. Reg. at 14498-14499, even if the other questions raised by OMWBE and the Department regarding the various loan arrangements were overlooked.  Moreover, The Grove's claim that § 26.69(e) permits a debt instrument as

the source of an owner's "real and substantial" investment remains unavailing. This is so because the record fails to show any specific evidence that Ms. Dukler pledged her ownership interest in The Grove as collateral for the $2.6 million loan used to repay Mr. Cowell, and The Grove does not provide a record citation to any such evidence, because there is none. See XMSJ, at 13.[2]

The remainder of The Grove's arguments, supporting the claim that it properly established its ACDBE eligibility, focuses on the issue of The Grove's independence from other businesses. See XMSJ, at 14-17. As discussed more fully below, the final decision properly determined that the record facts failed to demonstrate by a preponderance of the evidence that The Grove is fully independent as required by the regulation. See Opening Brief, at 33-39. This determination was based on the financial infusions by Star Foods as well as the contractual agreements, such as the Loan and Security Agreement contained in the record, showing financial affiliations and transactions between The Grove, Star Foods and Georgia's Grove, allowed by that contract. AR, at 34(H) p.18, Schedule 11(h) (Bates 00662; 00695).

Plaintiff's Cross Motion also fails to show that Ms. Dukler properly established that her net worth was below the $750,000 threshold. See XMSJ, at 17. For the reasons discussed below, and in the Opening Brief, at 24-33, the Grove's application failed to

---

[2] The Grove cites to Ms. Dukler's Consumer Note with Fifth Third Bank as evidence that the loan is permissible under the regulations "even if the debtor's ownership interest is security for the loan." 49 C.F.R. 26.69(e). But the cited Consumer Note (Bates 00635) makes no specific reference to The Grove or Ms. Dukler's ownership interest. The note merely generally references different types of collateral and cites to "all collateral specified in any of the documents executed in connection with this Note." There are no attached documents setting forth specific collateral. Likewise, the accompanying Acknowledgement attached to the note references "collateral pledged," but does not specify that collateral. (Bates 00641).

establish by a preponderance of the evidence that Ms. Dukler is, in fact, economically disadvantaged and was therefore properly denied.

In sum, the record does not support The Grove's claim that it met the eligibility requirements. The determination involves more than a checklist type of review inferred by The Grove. Rather, the Department is obligated to review the entire record and thereby qualitatively review the basis of Ms. Dukler's 51% ownership interest to determine whether it is "real and substantial" because OMWBE denied the application on this ground. The Department is obligated to review the entire record to examine whether Ms. Dukler's personal net worth exceeds the regulatory threshold because OMWBE denied the application on this ground also. The Department is further obligated to review the entire record to assess the qualitative basis of the relationship to Star Foods, The Grove's 49% non-disadvantaged owner, to ensure that The Grove is in fact independent because OMWBE denied the application on this ground.

After applying its expertise, derived from reviewing well over a thousand DBE and ACDBE applications over the years, and in view of the regulatory burden of proof imposed on The Grove, the Department properly upheld the OMWBE denial of certification here. The Department's interpretation of its regulations is reasonably applied here and due substantial deference. Lyng v. Payne, 476 U.S. 926, 939 (1989); Puerto Rico Elec. Power Auth. v. Federal Energy Regulation Commission, 848 F.2d 243, 249 (D.C. Cir. 1988). Despite Plaintiff's insistence, the Court may not substitute its judgment for that of the agency, particularly here, where the Department has reasonably exercised its expertise. National Trust for Historic Preservation v. Dole, 828 F.2d 776,

782 (D.C. Cir. 1987).  Accordingly, the Department's final decision thus should be upheld.

## II.    **The Grove Did Not Meet Its Burden of Proof.**

Contrary to The Grove's assertions in support of its Cross Motion (at 11-13), the Department properly set forth and relied upon the applicable eligibility requirements, including those relating to the burden of proof.  See Opening Brief "Statutory and Regulatory Background", at 6-8 (" . . . for Plaintiff to be found eligible for the benefits of the program here, its majority owner – Michelle Dukler – must establish that she satisfies the ACDBE regulations applicable to the Grove as an airport concessionaire.  49 C.F.R. §§ 26.61(d), 26.67(d), and Part 23, Subpart C").  The referenced regulations, except for Part 23, Subpart C,[3] address the applicant's burden of proof, which is by a "preponderance of the evidence" to prove that the owners are "socially and economically disadvantaged."  The referenced regulation § 26.67(d) further cross-references to Part 26, Appendix E, which details the factors to consider for economic disadvantage determinations, including the financial information an applicant must submit.

The Grove's claim that its "voluminous 44-tab certification application" was sufficient to meet its burden of proof, ignores the detailed and exhaustive explanation in the final decision supporting the OMWBE denial, as well as the Department's decision and its supplement, which specifically cited to the application and explained why the proffered materials are insufficient to prove its case by the preponderance of the evidence.  The Department does not render its decision based on the quantity of

---

[3] Part 23, Subpart C sets out the certification and eligibility of ACDBEs including certification, size and personal net worth standards, among other things.  49 C.F.R. Part 23, Subpart C.

documents produced, but rather, looks to what the documents, viewed as a whole, reveal about the applicant's eligibility.

The Grove nonetheless argues that it has met its burden of proof.  See XMSJ at 11.  But when OMWBE, and subsequently the Department, cited examples where The Grove's application was unclear or lacking, and thus failed to meet the burden of proof, The Grove simply responds that "[a]t no time did OMWBE suggest that this application was incomplete or confusing, or ask The Grove to provide additional documentation or clarification."  XMSJ, at 8.  But this response glosses over the key fact that it is The Grove's obligation, and not that of the reviewing agency, to prove by a preponderance of the evidence that it is eligible for ACDBE status.  49 C.F.R. § 26.61(b).

As the OMWBE noted in its decision, this application was the third application to OMWBE by The Grove for ACDBE certification at SEA-TAC, the two prior ones being filed and withdrawn by The Grove in 2003 and 2004.  OMWBE, however, noted in its decision that "[t]he third and current application was received on September 12, 2005 and is being considered as a whole and on it's [sic] own merits."  AR, at 57, at 2.  It was reasonable for OMWBE to accept that The Grove's application contained all the supporting information it required particularly because:  1) The Grove had submitted two prior applications with OMWBE; 2) The Grove represented that it was already ACDBE certified in at least fifteen jurisdictions nationwide; and 3) The Grove's repeated representations that its owner, Ms. Dukler, is a well-qualified business person who is capable of operating and controlling the business.  (See Bates 00002 and 00022).  The Grove is also represented by counsel who is well-versed in the ACDBE program, counsel

which submitted argument in support of the application when The Grove asked OMWBE for an Informal Review of OMWBE's initial denial.  AR, at 58 (Bates 00849-00911).

Based upon these representations, it was reasonable for OMWBE to render its decision on the application as filed and as supplemented by its counsel in the Request for Informal Review.  AR, at 58 (Bates 00849-00911).  What is not reasonable is for The Grove to claim that the OMBWE decision is in error because OMWBE did not request more information because the burden of proof rests squarely with the applicant.  49 C.F.R. § 26.61(b).  In fact, the OMWBE decision following the Request for Informal Review admonished The Grove for failing to provide adequate documentation about The Grove's relationship with Star Foods, and thus supported the OMWBE decision to find Ms. Dukler's ownership in The Grove not to be "real and substantial."  AR, at 59 p.1-2 (Bates 00915-00916).  Specifically, the OMWBE stated:

> . . . The firm has <u>failed to provide proper documentation</u>.  While not a basis for this Office's decision, <u>the failure to provide complete and accurate information is a violation of § 26.73(c) and is grounds for denial of certification on its own merit</u>.  However, the office has chosen instead to review the documents the Firm previously provided.  Under 26.61(b), the Firm has the burden of proof to demonstrate that it meets the requirements of certification.  Based on the documentation supplied regarding Star Foods, LLC and Georgia's Grove, LLC, the Office has no basis to change its earlier determination.

AR, at 59 p. 2 (emphasis supplied) (Bates 00916).  The appeal to the Department contained no new documentation from The Grove on this point either.

In addition to the numerous examples from the record provided in the Opening Brief, two very patent – yet still unexplained – examples of The Grove's failure to meet its burden of proof involve:  1) the inconsistencies surrounding the two checks used by Ms. Dukler to pay Star Foods for her ownership interest in The Grove, which Ms. Dukler asserts to validate her purchase of The Grove as "real and substantial" (Compare AR, at

34(A) with 34(F) (Bates 00605 and 00618); and 2) the personal net worth ("PNW")

statement submitted with the application, which is either inaccurate or inconsistent with

other portions of the record evidence of Ms. Dukler's assets, including her personal

residence.  AR, at 6 (Bates 00039-00071).

     The Opening Brief noted that the two sequential checks were dated one year apart

and did not appear to have been negotiated.  Opening Brief, at 14-15.  The Grove

attempted to minimize this troubling inconsistency by claiming that the time difference in

the check dates was "apparently unintentional" and then denied "that this apparent error

had any effect on the transaction".  Grove's Response to Def's Statement of Mat. Facts,

at ¶ 11.  Yet The Grove's application represented that the checks were used by Ms.

Dukler to purchase her ownership interest from Star Foods.  The checks therefore were

presented to validate the legitimacy of Ms. Dukler's purchase of The Grove as "real and

substantial."  But it is questionable whether a bank would so casually accept and deposit

a check for $2.5 million dated one year after it was alleged to be written.  The Grove

failed to provide proof that the checks were actually presented and paid by the bank.

This inconsistency plainly demonstrates that The Grove failed to prove, by a

preponderance of the evidence, that Ms. Dukler's acquisition and financing of The Grove

was in fact as it was represented in the narrative of the application.  See 49 C.F.R. §

26.61(b)(Burden of proof rests with the applicant, in detail).

     A second obvious point which demonstrates that The Grove failed to satisfy its

burden of proof relates to the PNW statement.  In the PNW statement submitted with the

application, The Grove provided details of Ms. Dukler's various assets and liabilities to

support the proposition that she is economically disadvantaged because her net worth is

limited to $157.  AR, at 6 (Bates 00039).  In its brief in support of its Cross Motion, however, The Grove provides a new and revised PNW statement to show that Ms. Dukler allegedly has an <u>actual</u> net worth of negative $529,843, which it claims shows that her net worth was "well below $750,000."  <u>See</u> XMSJ, at 18.  This is the first time the Department has been provided with the foregoing alleged negative net worth.  <u>See</u> AR, generally.  The fact that The Grove submits a revised PNW statement so dramatically inconsistent with the first statement and at this late date, actually reinforces the conclusion that The Grove did not meet its burden of proof.  The new statement differs substantially from that offered in the application (a positive net worth of $157 compared to a negative net worth of $529,843).  Rather than supporting Ms. Dukler's position, the new information instead lends credence to the determination by the Department that elements of Ms. Dukler's first PNW were unclear and inconsistent.  <u>See</u> Opening Brief, at 18-20, 29-30 (<u>e.g.</u>, real property values and inconsistent values of assets).

When viewed in its entirety, and based upon the interpretation of its own regulations, the Department's conclusion that Ms. Dukler failed to meet her burden of proof, by a preponderance of evidence, in the application is reasonable and should be upheld.  <u>National Treasury Employees Union</u>, 854 F.2d at 498.

**III.     <u>OMWBE's Decision Was Reasonable and Considered the Full Record.</u>**

The Grove argues that the Department should not have affirmed the OMWBE's decision.  But the Department's review of the OMWBE decisions in this matter demonstrated that OMWBE reasonably analyzed the application and reached a conclusion supported by the record.  The OMWBE decisions – particularly its June 28, 2006 decision issued in response to The Grove's December 16, 2005 Request for Review

– is instructive for its detailed review of the state's decision.  AR, at 58 and 59 (Bates 00849-911; 00913-00922).

  A.  <u>OMWBE's November 30, 2005 Decision</u>

  OMWBE issued two decisions on the application of The Grove.  The first decision, dated November 30, 2005, set forth five grounds to deny ACDBE certification. The grounds were as follows:

  A)  The purchase of the ownership interest of the firm by Ms. Dukler is not real and substantial;

  B)  The personal financial statement submitted by The Grove included assets that showed Ms. Dukler not to be an eligible person under the rules of the DBE program;

  C)  Ms. Dukler did not control the operations of the firm;

  D)  Based upon the current relationships between the firm and Star Foods, the firm is not an independent business;

  E)  The firm operates as a family owned and operated business.

AR, at 57 (Bates 00836-00848).  The OMWBE added that, although not a basis for its decision, it "noted other issues that must be addressed should the firm appeal" its decision.  <u>Id</u>. Specifically, the OMWBE noted that affiliates must be considered together to determine whether a concern meets small business criteria.  "As the firm and Star Foods, LLC, are affiliates, this office would need to collect complete business taxes for Star Foods, LLC for each of the last three years should the firm appeal this office's decision."  <u>Id</u>.

The OMWBE thus set out five grounds for denying The Grove's application in its first review and decision, dated November 30, 2005.  AR, at 57 (Bates 00836-00848). The OMWBE explained the facts supporting these grounds in two pages of narrative, supported by a list of 37 documents in the application that OMWBE relied upon, plus a full listing of the controlling regulations that OMWBE applied to its analysis.

Two weeks later, on December 16, 2005, The Grove submitted its letter Request for Informal Review, in essence a request for a reconsideration of its prior decision.  In support of its request, The Grove submitted a 22 page legal argument with seven supporting exhibits.  AR, at 58 (Bates 00849-00911).  The Grove argued, inter alia, that the OMWBE did not properly "consider all the facts in the record, viewed as a whole" and is "based on suppositions, not the facts in the record" and did not view The Grove's application based on present circumstances.  Id. at 1-2 (Bates 00850).  The Grove then re-traced the facts relating to the loan from Mr. Cowell, the joint checking account, and Ms. Dukler's expertise and experience running The Grove.

The Grove also argued that Ms. Dukler meets the PNW requirements because "[t]he Denial [by OMWBE] must have misunderstood Ms. Dukler's Personal Net Worth Statement."  Id. at 9 (Bates 00858).  The Grove also argued that OMWBE mistakenly determined that The Grove is not an independent business.  The Grove concluded by arguing that The Grove is not affiliated with Star Foods, despite its submission of documents to the contrary.  See e.g. Bates 00695.

**B.    OMWBE's June 28, 2006 Decision**

In response, the OMWBE on June 28, 2006, issued a second decision, which affirmed its prior denial and supported its conclusions with a detailed fact narrative

supporting the grounds for denial. AR, at 59 (Bates 00913-00922). The OMWBE's

decision is well reasoned and enhances the grounds asserted for denial in the first

decision. For example, with regard to the issue of "real and substantial" ownership by

Ms. Dukler, OMWBE stated:

> Michelle Dukler, the eligible owner of 51 percent of the Firm, obtained a loan
> from an ineligible person for the purpose of acquiring the funds to purchase her
> ownership interest in the Firm. This is not expressly prohibited by the federal
> regulations. However, the funds paid to Star Foods, LLC to purchase her
> ownership interest came from a joint checking account with Ms. Dukler's
> ineligible spouse, Martin Dukler. He has a history of involvement with the Firm
> both as an officer and director; is a current owner, officer and director of Star
> Foods, LLC (current 49% owner of the Firm); and works in the same or similar
> industry as the Firm. He is also the CEO of Georgia's Grove, LLC. Accordingly,
> Ms. Dukler's ownership is not real and substantial as required by the federal
> regulations. (See 49 CFR 26,69(h).)

AR, at 59 (Bates 00915).

OMWBE also rejected The Grove's argument that the funds did not lose their

separate property character by being deposited into a joint account,[4] citing a failure by

Ms. Dukler to "provide documentation that satisfactorily traces the disposition of the

borrowed funds to establish its claim." AR, 59 at 1 (Bates 00915). Thus, contrary to The

Grove's repeated claims (see XMSJ, Secs. II and III), it has not provided all

documentation required by OMWBE.

The OMWBE also ruled that Ms. Dukler's experience and past history with the

firm had no bearing on her contribution, that OMWBE made no contention that Ms.

Dukler lacked the necessary expertise. Rather, OMWBE found that "there is no

---

[4] Plaintiff makes much ado about that this check was deposited in the joint account for
one day only. See XMSJ, p. 7. However, given the substantial amount in question and
the impact of the situation on the perception of who may actually control the Grove, Ms.
Dukler could have easily established a new or separate account thereby avoiding this
difficulty in its entirety.

information contained in the Certification Application to indicate Ms. Dukler's contribution [i.e., to actually obtain her ownership interest] is based on anything other than cash." Id. at 2 (Bates 00916). The OMWBE concluded that "[t]he Firm has submitted no documentation as required by 49 CFR 26.69(f)(1) for this Office to recognize Ms. Dukler's expertise as a contribution made to acquire her ownership interest." Id. (emphasis supplied) (Bates 00916). OMWBE then explained why it concluded that The Grove is in the "same or similar industry" as Star Foods based upon prior representations to the Department that Star Foods is an investment company that specializes in the snack food industry, that Star Foods owns and manages businesses operating in the snack food concessions industry, and that both owners of Star Foods were members of The Grove's board of directors. AR, at 59 (Bates 00915-00916). OMWBE concluded that it found no basis to change its earlier determination that Ms. Dukler's contribution was not real and substantial, and again noted that "[t]he Firm failed to provide further documentation" regarding the affiliation – or alleged lack thereof - between The Grove, Star Foods' and Georgia's Grove. AR, at 59 (Bates 00916).

The OMWBE then discussed the other grounds of its earlier decision and explained how The Grove's application failed to meet the regulatory criteria. With regard to personal net worth, OMWBE described how Ms. Dukler's personal net worth exceeded the $750,000 cap based upon the manner in which she used her assets, be it her personal assets or her interest in The Grove, as collateral for the loan from Fifth Third Bank. OMWBE concluded that "the Firm was unsuccessful on this issue initially, and has not provided sufficient additional information for the Office to reconsider its determination on this issue." Id. at 3 (Bates 00916-00917 and 00837-838).

As to the other key ground of denial, the OMWBE determined that The Grove does not operate as an independent business because it found The Grove to be "intertwined" with Star Foods, a non-disadvantaged business, which owns 49% of The Grove and previously had common ownership, board of directors and officers.  AR, at 59 (Bates 00917).  The Grove argued that because Mr. Cowell and Mr. Dukler resigned from The Grove, that the previous relationships were not relevant to present circumstances.  OMWBE disagreed and determined that 49 C.F.R. § 26.71(b)(2) applied and specifically directed OMWBE to "consider whether present or recent employee/employer relationships between the disadvantaged owners of the potential DBE and non-DBE firms or persons associated with non-DBE firms compromise the independence of a potential DBE firm."  AR, at 59 (Bates 00918).

In further support of its determination regarding The Grove's independence, OMWBE noted that "Ms. Dukler did not purchase her ownership interest in the Firm directly from the previously presumed eligible owners" but, rather, purchased her ownership interest from Star Foods.  See Bates 00918. OMWBE then looked to whether "the transfer of ownership and/or control to the disadvantaged individual was made for reasons other than obtaining certification as a DBE", pursuant to 49 C.F.R. 26.71(l).  The OMWBE concluded that the evidence was insufficient and, thus, upheld its prior determination.  Id. at 4 (Bates 00918).

The Grove countered that the two-year time period since Messrs. Cowell and Dukler resigned from The Grove was significant.  OMWBE disagreed and found:

> The current application submitted by the Firm was submitted to this Office on September 12, 2005, after USDOT remanded the Firm's file back to the City of Chicago.  Since then other jurisdictions have reconsidered the Firm's certification

> eligibility since the resignations of Mr. Cowell and Mr. Dukler.[5]  The Office has considered the recent decisions of these other jurisdictions, but finds they are not determinative.

AR, at 59, p. 4 (Bates 00918).  The review of recent decisions by OMWBE, set forth in the accompanying footnote (provided as foot note 7, supra), provided further basis for OMWBE to reach its conclusions about the ineligibility of The Grove, because the state recipient may permissibly look to and rely upon the certification applications and decisions of other jurisdictions when rendering its determination.  49 C.F.R. § 26.83(e).  OMWBE concluded its decision by reiterating its determination that based upon the record provided, Star Foods and The Grove are affiliates.[6]  AR, at 59, p. 4 (Bates 00918-00919).

The second decision by OMWBE shows, even more than its initial decision[7] did, that OMWBE looked to all the facts in the record, considered the relevant legal authority, and explained its decision reasonably.  See Bates 00913-922.  The Department found this

---

[5] The Office considered the recent certification letters submitted by the Firm evidencing certifications issued by the Greater Orlando Aviation Authority, Virginia Department of Minority Business Enterprise, Metropolitan Nashville Airport Authority and City of Chicago.  The Office contacted each agency.  Two of the jurisdictions based their certification determinations largely upon the USDOT's decision in favor of the Firm.  However, USDOT's decision was based upon procedural grounds; it was not a substantive review of the Firm's eligibility.  As well, the Virginia Department of Minority Business Enterprise did not consider the owner's personal net worth; it did not review Ms. Dukler's financial documents.  Similarly, while the City of Chicago recently withdrew its proposed removal of eligibility of the Firm, it did so without resolving its "continuing concerns regarding the proper calculation of Ms. Dukler's personal net worth. (See City of Chicago May 24, 2006 letter)."  See Bates 00918.

[6] OMWBE reiterated in its decision that because The Grove did not file the documentation noted in its prior decision of November 30, 2005, that related to Star Foods, it could not render a determination whether The Grove is a small business under federal regulations.  AR, at 59 (Bates 00919).

[7] OMWBE's initial decision narrative may not have been lengthy.  However, the State's subsequent June 2006 supplemental decision explained in greater detail its rationale for its decision.

analysis convincing and rendered its final decision on the same grounds asserted by OMWBE while also finding additional factual support for that determination when viewing the entire record provided.

## IV.     The Department Reasonably Interpreted And Applied The Regulations.

The controlling regulation, 49 C.F.R. § 26.89, states the process for certification appeals to the Department.  Under subsection (e) of the regulation, "[t]he Department makes its decision based solely on the entire administrative record . . . does not make a <u>de novo</u> review of the matter and does not conduct a hearing."  Subsection (f)(5) of the same regulation also provides that "[t]he Department does not uphold your [<u>i.e.</u> the recipient state agency,[8] or here, OMWBE] decision based on grounds not specified in your decision."  It is on the basis of the latter subsection that The Grove claims that the Department has erred.  <u>See</u> XMSJ, pp. 23-34.  The Grove's interpretation of the regulation, however, is incorrect and inconsistent with the Department's longstanding practice, interpretation, and application of its own regulations because it demands that the Department ignore those parts of the administrative record that do not support The Grove's position, if those record facts were not expressly identified by OMWBE.  <u>Liberty Maritime Corp. v. United States</u>, 928 F.2d 413, 419 (D.C. Cir. 1991)(agency's interpretation of its own regulations must be accepted unless manifestly unreasonable). The Grove's interpretation is manifestly unreasonable and was rejected by the Department.

---

[8] A recipient need not be a state agency.  For example, the Port Authority of New Jersey and New York are recipients of DOT airport grant funds, but are not a single state agency.  Similarly, the City of Chicago is a recipient.

The Department's interpretation and application of the regulations for DBE appeals involves both of the two key obligations cited above:  (1) to make its decision on the basis of "the entire administrative record;" and (2) to rely only on the grounds specified in a recipients' decision.  In interpreting and applying the regulations, the Department consistently refuses to uphold a recipient's decision on a ground, or legal basis, <u>not</u> specified in the decision.  But when upholding a ground cited in a recipient's decision, the Department looks to the entire administrative record, and relies on the entire set of record facts supporting a legal ground cited by a recipient, to determine whether the legal ground is properly supported in the record.  This interpretation of the Department's regulations is reasonable and should be given substantial deference now.  <u>Lyng</u>, 476 U.S. at 939; <u>United States v. Larionoff</u>, 431 U.S. 864, 872 (1977).  Thus, in this case for example, the Department could not uphold the OMWBE decision on the legal basis that The Grove failed to show that it qualified as a small business because OMWBE never asserted this ground, or legal basis, as a reason to deny certification.[9]

The Department interprets its regulations in this manner for several important legal and policy reasons.  For instance, through its role as appellate reviewer of hundreds of DBE applications throughout the entire country, the Department has developed extensive expertise and experience in the interpretation and application of the DBE regulations that is not available in most state agencies.  For this reason, the Department often sees common fact patterns and concerns in applications that may not be readily apparent to state recipients, but which often indicate that an applicant may not be

---

[9] While not directly cited by OMWBE as a basis of denial, the OMWBE did, however, note that in order to make that determination, it required additional documentation from The Grove.  AR, at 59 (Bates 00919).

disadvantaged.  The Grove, in fact, presented one of many common fact patterns for example, in the case of Ms. Dukler's personal net worth.  It has been the Department's experience that applicants with significant personal assets may not qualify as economically disadvantaged when the record facts are closely scrutinized.  See e.g. In re: Lion's Group, Inc., No. 07-0114 (August 10, 2007) (owner exceeded PNW threshold upon closer scrutiny of information obtained by state agency regarding owner's other business interests); In re: Dirt & Aggregate Interchange, Inc., No. 05-0118 (December 19, 2005) (value of owner's Hawaiian rental properties questioned to determine validity of economic disadvantage claim by DBE applicant); In re: Rampart Hydro Services, Inc., No. 06-0124 (November 8, 2006) (DBE owner's net worth exceeded PNW threshold after closer analysis of contingent liabilities and other business ownership interests).[10]

In fact, the Department recently issued a "question and answer" document to guide recipients who may be reviewing applications wherein the applicant may have a personal net worth under $750,000, but could nonetheless not meet the economic disadvantage criteria.  For years since the program first instituted PNW limits, the Department has consistently issued guidance to its recipients via its website and public outreach to explain its longstanding positions on certification matters.

> **Q**. Section 23.31; 27.67(b)(2):  If the owner of a DBE or ACDBE certified firm or applicant firm has a personal net worth of less than $750,000, does that necessarily mean that the recipient must regard the owner as being economically disadvantaged?
> **A.**
> * No.  A person cannot be regarded as economically disadvantaged if he or she exceeds the $750,000 personal net worth (PNW) cap.  However, there may be some cases in which an individual whose PNW is less than $750,000 may properly be regarded as not being economically disadvantaged.

---

[10]http://www.osdbu.dot.gov/OSDBUSERVICES/DBEPROGRAM/GuidanceforDBEProgramAdministrators/FAQsonDBEProgramRegs49CFR23/tabid/303/Default.aspx

* The legal and policy rationale behind the PNW provision of the rule is that a program designed to assist socially and economically disadvantaged individuals should not include people who can reasonably be regarded as having accumulated wealth too substantial to need the program's assistance.

*Consequently, in determining whether an individual is economically disadvantaged, a recipient is entitled to <u>look not only at the individual's PNW but also at his or her overall economic situation to make a reasonable determination of whether the individual is fairly regarded as being economically disadvantaged</u>.

* Consistent with Small Business Administration practice in the 8(a) program, it is <u>appropriate for recipients to review the total fair market value of the individual's assets and determine if that level appears to be substantial and indicates an ability to accumulate substantial wealth</u>.

* For example, an individual with very high assets and significant liabilities may, in accounting terms, have a PNW of less than $750,000.  However, the person's assets (e.g., a <u>very expensive house, a yacht, extensive real or personal property holdings</u>) <u>may lead to a conclusion that he or she is not economically disadvantaged.</u>  The recipient can rebut the individual's presumption of economic disadvantage under these circumstances, as provided in sec. 26.67(b)(2).

*This guidance applies to determinations of economic disadvantage under both 49 CFR Part 23 and 49 CFR Part 26.

<u>See</u> http://www.osdbu.dot.gov/OSDBUSERVICES/DBEPROGRAM/

GuidanceforDBEProgramAdministrators/FAQsonDBEProgramRegs49CFR23/tabid/303/

Default.aspx.

The Department also has a national view of the DBE program and a compelling

desire for consistency in the program through consistent application of the regulations,

and the obligation to ensure that only eligible firms can enter and remain in the program.

The Department thus possesses a broader view of the program and applicants than

individual state recipients, which may not encounter the breadth of issues inherent in the

DBE program.  The Department can ensure a more consistent application of the

regulations by interpreting and applying the regulations on the two step basis set forth

above, i.e., 1) render a decision based "solely on the entire record" § 26.89(e); and 2) render decision based only "on grounds . . . specified in the decision." § 26.89(f)(5).

As the agency primarily charged with administering and implementing the DBE program on a national level, the Department is also the source of the applicable regulations and guidance, including "Q&As", such as the Q&A noted above, which guide both recipients and applicants.  The Department thus has a broader knowledge of the historical basis for the regulations, Congressional intent, the concerns of the public expressed through public comments on proposed regulations, and the case law that has developed.  The Opening Brief detailed some of the many policy concerns relating to the criteria for economic disadvantage, which were necessary to ensure the program is narrowly tailored for Constitutional purposes, and to prevent the "Sultan of Brunei" scenario.  "That is, without the personal net worth limitation, even the Sultan of Brunei, one of the world's wealthiest persons, would qualify as disadvantaged under the Department's DBE programs.  Adarand Constructors, Inc. v. Slater, 228 F.3d 1147 (10th Cir. 2000)."  Opening Brief, at 25-26.

It is therefore entirely appropriate for the Department, pursuant to its regulatory requirement to "make its decision based solely on the entire administrative record" by considering each of the grounds, or legal bases, raised by OMWBE and then citing to facts evident throughout the entire administrative record to support those grounds, even if those facts are in addition to the facts raised by OMWBE.  Thus, it is entirely appropriate and consistent with the Department's practice and reasonable interpretation of its regulations to look at the grounds raised by OMWBE in its decision and find factual support in the entire administrative for those grounds in the Department's final decision.

That is why, for example, the Department concurred with OMWBE that Ms. Dukler failed to show by a preponderance of the evidence that: (1) her $2.6 million contribution was not "real and substantial;" (2) her PNW statement contained errors or inaccuracies to indicate unencumbered assets in excess of $750,000; and (3) The Grove was not an independent business.   For this reason, The Grove's contention that the Department "sua sponte and improperly" considered six record facts to uphold the grounds cited by OMWBE is wrong and its request for summary judgment on this basis must be denied.  See XMSJ, at 23-34.

Finally, The Grove was not prejudiced by the Department's reasoned application of its regulations described above because the Department – and OMWBE below – provided extensive opportunity to submit additional evidence and legal argument throughout the review process.  In this case in particular, The Grove had multiple opportunities to confront and challenge the denial.  After the first OMWBE denial decision, The Grove sought reconsideration of that decision in its Request for Informal Review, and submitted additional legal argument and information.  AR, at 58 (Bates 00924-00991).  The OMWBE responded in detail with references to the record.  AR, at 59 (Bates 00913-00922).

The Grove had another opportunity to submit legal argument and additional evidence to support its application when it appealed the OMWBE decision to the Department.  The Grove readily availed itself of this opportunity.  AR, at 60 (Bates 00924-00991).  Although the Department does not entertain petitions for reconsideration, 49 C.F.R. § 26(g), at the urging of The Grove's counsel, the Department agreed to take another look at the evidence and issued a second explanatory letter.  The Grove thus took

an additional opportunity to confront the facts against it and respond. AR, at 63 (Bates 01110-01133). In both instances, the Department maintained its decision that The Grove is ineligible for the program.[12]

## V. The Decision Was Based On The Status Of The Grove At The Time Of Application.

Another point raised by The Grove to claim that the Department's decision improperly relies on grounds not specified in the OMWBE decision involves the reference to historical events. XMSJ, at 23. The Grove claims that the Department has thereby violated § 26.89(f)(6), which states that "[t]he Department's decision is based on the status and circumstances of the firm as of the date of the decision being appealed." Id. The Grove then accuses the Department of showing "considerable looseness with which DOT treated its own regulations that it is required to follow." XMSJ, at 23. The Department disagrees with The Grove's allegation and previously explained its views on this issue to The Grove. Moreover, The Grove's misquote of a purported admission by the Department "that § 26.89(f) 'cannot be read literally,'" is absolutely wrong and takes the attributed statement completely out of context.

The Department's full discussion of how it treats information in the application that is of a historical nature is set forth in the June 8, 2007 Supplemental Decision, at 2-4, which discusses not only the Department's interpretation of § 26.89(f)(6), but also the

---

[12] The Department did, however change its determination regarding whether restrictions noted by OMWBE and the Department in The Grove's bylaws limited Ms. Dukler's ability to control The Grove. The Department took another hard look at the bylaws and The Grove's legal argument, and concluded that The Grove had met its burden of proof on this issue based on site visit information from The Grove's home state. AR, at 46 (Bates 01139).

related regulation § 26.73(b).[13]  The referenced discussion specifically addressed The Grove's continuing contention that the Department improperly looked at historical information about how Ms. Dukler derived her ownership interest via Star Foods, the non-disadvantaged 49% owner of The Grove.  The Department fully explained its reasoning in the Supplemental Decision, which explained why its application of the regulation, i.e., § 26.89(f)(6), must be read in conjunction with subsection (e), which requires the Department to look at the entire administrative record when rending its decision.  The Department stated:

> In this context, it is not reasonable to read paragraph (f) literally to mean that the Department is restricted to considering a snapshot of the firm on, in this case, June 28, 2006.  The status and circumstances of the firm on the date of an appeal necessarily include relevant information on the record about the ownership and control of the firm, all of which pertained to the ownership and control of the firm before the date on which the appeal was filed and which the recipient acquired before that date.

AR, at 64 p.3 (Bates 01136).

The Department then explained why the companion regulation, i.e. § 26.73(b) is also "not a prohibition of consideration by the recipient of relevant information about the ownership and control of the firm, including information about how the present owner acquired his or her ownership interest."  AR, at 64 p.3 (Bates 01136)  Nor is the regulation a "mandate for intentional blindness to matters in the firm's past that have continuing importance in determining whether the owner has, for example, made a

---

[13] The regulation states, in relevant part:
> [Y]ou [i.e., the state recipient] must evaluate the eligibility of a firm on the basis of present circumstances.  You must not refuse to certify a firm based solely on historical information indicating a lack of ownership or control of the firm by a socially and economically disadvantaged individual at some time in the past, if the firm currently meets the ownership and control standards of this part. . .

49 C.F.R. § 26.73(b).

sufficient contribution of capital to support his or her claim of ownership." Id. Rather, the Department properly interprets the regulation to rule out consideration of historical information only in circumstances that "have no present relevance" to a determination of a firm's ownership. This interpretation of the regulation is reasonable and entitled to substantial deference. Lyng, 476 U.S. at 939; Liberty Maritime Corp., 928 F.2d at 419.

The Department therefore concluded in its Supplemental Decision that The Grove's assertion that both OMWBE's and the Department's review of Ms. Dukler's ownership history was entirely relevant and permitted under the regulation because it had "present relevance" to whether Ms. Dukler's contribution of capital was "real and substantial."

> Because the present ownership structure of The Grove was established by the series of transactions beginning in 1999, and there have not been intervening changes in the ownership structure of the company that render those transactions irrelevant, we believe that the transactions leading up to, and including, Ms. Dukler's acquisition of her interests in The Grove are relevant and were appropriately considered by OMWBE and the Department. Clearly, OMWBE had concerns that Ms. Dukler did not purchase her ownership in The Grove directly from the firm's original [disadvantaged] owners (Ms. Menutis and Mr. Valteau) and that Ms. Dukler's acquisition of her ownership interests did not presently conform to the requirements of the regulation. OMWBE therefore, appropriately explored the circumstances and background of how Ms. Dukler acquired her ownership interests.

AR, at 64 p. 4 (Bates 01137) (footnote omitted). The Department concluded by noting in a companion footnote that "[i]nadequate evidence of sufficient contribution of capital, or other attributes of ownership, does not become sanctified simply by the passage of time." AR, at 64 n.1 (Bates 01137).

The Supplemental Decision also noted that its review of the record indicated a lapse in certification between June 30, 2002 and February 2004, when Ms. Dukler purchased Grove stock. AR, at 64 (Bates 01140). The record was unclear as to who

owned and controlled the firm during that time period and whether it was an eligible disadvantaged person. Any recent lapse in a DBE's certification is relevant to current eligibility.

For this reason, The Grove's contention that the Department ignored its own regulation and improperly relied upon historical information rather than present circumstances to assess the eligibility of The Grove, is without merit and does not support its motion. Ms. Dukler's insufficient contribution of capital does not become sanctified simply by the passage of time. Neither she nor other applicants can be guided by the belief that the passage of time, coupled with an overly narrow and incorrect reading of the regulation will somehow permit them to obtain DBE eligibility for which they are otherwise unqualified. The Department properly applied the controlling regulations, viewed the entire record as a whole, and refused to take a "blind eye" to obvious issues regarding Ms. Dukler's contribution of capital. National Treasury Employees Union, 854 F.2d at 498.

## VI.    The Department  Properly Determined that Dukler's Ownership Was Not Real And Substantial.

The Grove argues that the Department "sua sponte and improperly" evaluated The Grove's ACDBE application, citing six record facts included in the final decision that The Grove claims were grounds not specified in the OMWBE decision. The Department disagrees. Set forth below is the Department's opposition and reply to the six record facts cited by The Grove, at §§ V(A) – (F), of its brief in support of its Cross Motion. The six record facts cover the three grounds addressed in the final decision and at issue in the Department's motion for summary judgment. These facts are addressed as follows:

1. Real and Substantial Contribution:  Sections V(A) – (C) (XMSJ, at 23-30), which discusses Ms. Dukler's consideration for The Grove, her interest payments for The Grove, and the financial investments of Star Foods, all relate to OMWBE's cited ground of denial that Ms. Dukler's capital contribution was not "real and substantial."  49 C.F.R. § 26.69.  AR, at 57, 59, 62, and 64 (Bates 00837-00838; 00915-00916; 01087-01094; 01137-01138).

2. Personal Net Worth:  Sections V(D) and (E) (XMSJ, at 30-33), which discuss the value of Dukler's collateral for her loan from Mr. Cowell, and the value of her home equity and mortgage, all relate to OMWBE's cited ground of denial that her PNW did not demonstrate that she is economically disadvantaged.  49 C.F.R. §§ 23.35 & 26.67.  AR, at 57, 59, 62, and 64 (Bates 00837-00838; 00916-00917; 01095-01101 & 01109; 01138-01139).

3. Independence:  Section V(F) (XMSJ, at 34), which discuss The Grove's relationships with Star Foods, and thus relates to OMWBE's ground of denial that is that The Grove is not an independent business.  49 C.F.R. § 26.71.  AR, at 57, 59, 62, and 64 (Bates 00838; 00917-00919; 01105-01109; 01139).

A. **The Department's Analysis Of A "Real And Substantial" Contribution Of Capital Properly Looks At More Than The Face Amount Of The Contribution**

The Department is correct to determine that Ms. Dukler's capital contribution of $2.6 million is not "real and substantial" pursuant to 49 U.S.C. § 26.69(e).  The Grove urges this court to reject the Department's reasoned interpretation of its own regulations about whether Ms. Dukler's $2.6 million contribution was "real and substantial" because it was "200 times greater than any contribution [the Department] has ever before found not to be real and substantial."  XMSJ, at 4 (referencing <u>KLM Family Trucking</u>, No. 05-

27

0040 (Feb. 15, 2005) where the Department rejected as "real and substantial" a contribution of $12,800).

Reduced to its essential claim, The Grove says the Department erred because the Department refused to limit its focus simply to the dollar value of the transaction. But the Department's obligation, like that of OMWBE, is not simply to look at the face amount of money invested, but rather, to look at the source and structure of the ownership acquisition to ensure that a non-disadvantaged individual is not circumventing the rules to obtain certification. The adequacy of Ms. Dukler's contribution thus affects whether it is "real and substantial." If the Department were to limit its review only to the dollar amount of the transaction, it would be ignoring Congressional mandates and its own regulations implementing those mandates. E.g., 49 C.F.R. § 23.1 (describing objectives of the program, among others "to ensure that only firms that fully meet this part's eligibility standards are permitted to participate as ACDBE's").

The Department has consistently taken a close look at DBE program appeals involving capital contributions of owners seeking DBE certification not only to ensure that they meet the requirements, but also because in its experience, ownership in a DBE is sometimes obtained without adequate consideration. Ms. Dukler was not singled out for special scrutiny. When The Department, and OMWBE before it, looked beyond the dollar value of the transaction, the record evidence showed that Ms. Dukler's $2.6 million contribution was not "real and substantial." For example, The Grove claimed that "the government offered no basis whatsoever to speculate that the $2.6 million Ms. Dukler paid for her 51 percent share of The Grove, which had operating and net income well under $500,000 in each of the years 2002 to 2004, was inadequate in any way." XMSJ,

28

at 27.  The Grove then claimed that "[t]he government's speculation on the matter does not meet its burden. . ."  Id.

But as noted above, The Grove, not the Department, bears the burden of demonstrating that Ms. Dukler's purchase was "real and substantial" within the meaning of § 26.69.  As such it is not the Department's role to assess the firm's viability in the market and determine what a reasonable buyer would pay for the firm.  It is reasonable however, for OMWBE (and the Department on appeal) to examine what Ms. Dukler actually paid for her share of the firm in relation to other buyers and affiliates, most notably Star Foods, the 49% non-disadvantaged owner of The Grove.  The Department fully explained in its brief and again below, its concerns about the Star Foods' investment and why it is relevant to determine whether Ms. Dukler's contribution is "real and substantial."  This is precisely the inquiry required by the regulations.

### B.    Dukler's Interest Payments Fail To Demonstrate A "Real And Substantial" Contribution of Capital

As further support to uphold the OMWBE's denial ground that Ms. Dukler's contribution of capital was not "real and substantial," the Department looked at the interest payments made on the loan from Fifth Third Bank and concluded that the record evidence further supported the OMWBE's decision.  AR, at 62 p. 8 (Bates 01092).  The Department concluded that total interest payments of $164,000 did not appear to be substantial for her stock purchase in The Grove compared to the $2.5 million purchase price this conclusion was reasonable based upon the evidence presented as explained in the final decision.

The Department relied upon an internet statement of alleged payments and unclear evidence regarding Ms. Dukler's various accounts.  The Grove argues that the

Department creates unnecessary confusion as to the bank account numbers.  XMSJ, at 28.

If the record was confused, it was based upon the unclear information provided by The

Grove.  The Department's determination on this point was reasonable, and it should be

noted, was only a minor basis for upholding the OMWBE's determination that The Grove

failed to prove its eligibility by a preponderance of the evidence.  In fact, there were

significantly more factual problems disclosed by the record, in both the OMWBE's and

the Department's final decision, on which to base a determination that Ms. Dukler failed

to demonstrate that her contribution of capital was "real and substantial."

### C.    The Financial Investments of Star Foods Affect Dukler's Contribution

In this case, the record showed that Star Foods invested much more than $1.32

million as part of The Grove's restructuring.[14]  Contrary to The Grove's assertion about

limiting the review only to historical earnings (XMSJ, at 27-28), the inquiry of Ms.

Dukler's purchase price vis-à-vis Star Foods' cash infusions and purchase price is

relevant because the investment by Star Foods occurred prior to Ms. Dukler's purchase of

The Grove from Star Foods – a purchase initially financed by a $2.6 million loan from

Mr. Cowell, the non-disadvantaged owner of Star Foods.  It is a reasonable interpretation

of the Department's regulation to take into consideration what Star Foods invested in The

---

[14] In the final decision, at 21-22 (Bates 01105-01106, the Department set forth the various cash outlays by Star Foods to The Grove prior to Ms. Dukler's purchase.

> It appears that at the time of its purchase of 49 percent of The Grove from Ms. Menutis and Mr. Valteau, Star Foods provided a $4 million revolving line of credit to the firm.  According to Ms. Dukler's August 23, 2005, letter to the City of Chicago ("COC"), in the two firm's January 2000 restructure agreement, "Star Foods also assumed the company's outstanding indebtedness under the letter of credit and agreed to release [The Grove] from any repayment obligations to it.  In exchange, the company agreed to credit the debt assumption as an addition to capital."  Star Foods later provided $6.8 million in additional working capital without a corresponding issuance of stock.

Grove to re-capitalize the firm, and then compare that amount to what Ms. Dukler paid

for The Grove to see if her contribution qualifies as "real and substantial" under the

Regulation.

The Grove's argument that the Department must only consider historical negative

net earnings and financial data showing major losses implies that OMWBE and the

Department must act as financial analysts to determine how much a willing buyer would

pay for the firm in this case, given profits or losses.  While this goes well beyond the

Department's role and that of OMWBE in initial certification matters, it is telling that

Star Foods invested more than $6.8 million overall to purchase a 49% stake and

recapitalize the firm prior to Ms. Dukler's purchase, but only a few years later, offered

Ms. Dukler the opportunity to purchase her majority interest in The Grove for only $2.6

million, less than half of Star Foods' total cash infusion.  In essence, the Grove is arguing

that the Department should look at the firm's "historical net earnings" and "major losses"

prior to Ms. Dukler's purchase, while at the same time ignore Star Foods' cash infusion

and the resulting worth of the company.[15]  The Department refused to do so because the

---

[15] This analysis applies equally to the Department's determination of whether The Grove
is an independent business, in view of Star Foods level of ownership and prior financing.
As the Department stated in the final decision:

> . . . The Grove's dependence upon Star Foods for financial support could not be
> clearer.  This conclusion is bolstered by the fact that Star Foods' infusion of $6.8
> million in capital appears gratuitous, and was made without a corresponding
> transfer or purchase of stock ownership in the business.  The Grove clearly was
> dependent upon Star Foods for financial support and received substantial funds.
> NEU's July 7, 1999, stockholders/directors meeting minutes indicate that The
> Grove intended to establish a "long term relationship with Star Foods to solve its
> short term cash flow problems and to assist in the long term in the growth and
> development of a stronger and more viable Grove organization."  The Department
> notes that it is not merely the language of these minutes that is determinative, but
> instead the resulting financial arrangement that occurred.  While the capital

controlling regulations require it to "make[] its decision based solely on the entire administrative record." 49 C.F.R. § 26.89(e). Given the expertise and experience of the Department in certification cases, the prior significant cash infusion of Star Foods, a non-disadvantaged business, is entirely relevant and necessary to determining whether Ms. Dukler's contribution of capital was "real and substantial." In this specific instance, Star Foods invested nearly $7 million for a 49% stake, and at best, Ms. Dukler invested $2.6 million for her 51% stake, it is difficult for The Grove to carry its burden of proof that the ownership by Ms. Dukler is "real and substantial" because the substance of ownership follows the money.

The cash infusions of the non-disadvantaged Star Foods were not the only record facts to buttress the Department's determination that Ms. Dukler did not prove by a preponderance of the evidence that her contribution of capital was "real and substantial." For example, The Grove alleges on page 3 of its brief that "the government also admits that Ms. Dukler owns 51 percent of the Grove as required under 49 CFR §26.69(b). . ."[16] The Grove then argued that once Ms. Dukler borrowed the funds, they became hers and

venture arrangement in this instance is not prohibited by the Regulation per se, Star Foods' infusion of capital appears to have been such a vital factor in The Grove's development, that the conclusion that The Grove is not independent as defined by the Regulation is unmistakable and clear. In addition, this arrangement appears designed to rescue a firm in difficulty, provide Star Foods (a non-DBE firm) the opportunity to continue to participate as a shareholder in an existing DBE certified firm, and install Ms. Dukler as the firm's 51 percent owner and President, who it appears did not acquire her ownership interest in the firm in accordance with the Regulation §26.69.

AR, at 62 (Bates 01106).

[16] The Grove takes the Department's statement out of context. When stating that Ms. Dukler is the 51 percent owner, the Department clearly referred to her ownership percentage only, rather than affirming that her ownership met the requirements of the regulation. The Department's statement in this regard was simply and explanation of the relative ownership percentages between individuals, nothing more.

were properly used by her to acquire her 51 percent ownership interest.  See XMSJ, at

13-14.  As noted above, the regulation requires much more than a showing that a

disadvantaged owner possesses the requisite number of shares or proportion of a firm to

be the "51 percent owner."  49 C.F.R. § 26.69.

> Section (c) of that provision states in part:

> The firm's ownership by socially and economically disadvantaged individuals
> must be real, substantial, and continuing, going beyond pro forma ownership of
> the firm as reflected in ownership documents.

Section (e) states in part:

> The contributions of capital or expertise by the socially and economically
> disadvantaged owners to acquire their ownership interests must be real and
> substantial. Examples of insufficient contributions include a promise to contribute
> capital, an unsecured note payable to the firm or an owner who is not a
> disadvantaged individual, or mere participation in a firm's activities as an
> employee.

49 C.F.R. § 26.69.  Ms. Dukler must meet all requirements of the Regulation and must

meet her burden of proof that her contribution was "real."  While Ms. Dukler may have

borrowed the funds, the Department previously noted that the transaction did not fulfill

regulatory requirements for a variety of reasons, including evidence of involvement in

The Grove by non-disadvantaged persons which would diminish her ability to prove by a

preponderance of the evidence a "real and substantial" ownership interest.[17]

## VI.    **The Department Properly Reviewed Dukler's Personal Net Worth.**

The Grove argues that the Department erred in questioning the value of Ms.

Dukler's loan collateral and the value of her home equity and mortgage.  XMSJ, at 30-33.

---

[17] In particular, the transaction involving Mr. Cowell brings into play other parts of the
regulation dealing with "real and substantial" contributions, i.e., §26.69(h) because the
record facts suggests that Mr. Cowell remains an owner in Star Foods.  See 49 C.F.R. §
26.69(h)(1) – (2).  The OMWBE decision raised this same ground as a basis of denial
with respect to the involvement in the firm of Mr. Dukler. AR, at 59 (Bates 00915).

Given the entire administrative record which showed several patent inconsistencies in the assets which Ms. Dukler relied on to verify that she is economically disadvantaged, the Department's scrutiny was reasonable and consistent with Congressional mandates and the Department's experience with prior DBE applicants of evident wealth.  See, e.g., In re Dirt & Aggregate Interchange, Inc., No. 05-0118 (remand to state for further fact finding regarding applicant with extensive real estate holdings in Hawaii apparently valued below market on personal financial statement).   Furthermore, because OMWBE raised Dukler's personal net worth as a ground for its denial, it was appropriate for the Department to review the entire administrative record on this ground in order to render a proper final decision.  AR, at 57, p.2, AR at 59, p. 2-3 (Bates 00837, 00916-00917).

The Department's recent "Q&A" guidance[18] on the review of PNW statements, discussed above, is instructive.  The Department has experienced cases where an individual with very high assets and significant liabilities may, in accounting terms, have a PNW of less than $750,000.  "However, the person's assets (e.g., a very expensive house, a yacht, extensive real or personal property holdings) may lead to a conclusion that he or she is not economically disadvantaged".  In re: J. Mooncotch Crane Rental, No. 07-0115 (October 9, 2007) (denying third party challenge to economic disadvantage claim by competitor after Department considered value of owner's personal assets, including luxury yacht, which ultimately fell below regulatory threshold).

The policy concerns supporting such close scrutiny of the personal net worth of DBE owners was discussed in the final decision and previously explained in the Opening Brief, at 24-25, AR, at 57 (Bates 1098-1101) and AR, at 59 (Bates 1138-1139).  The

---

[18] This guidance applies to determinations of economic disadvantage under both 49 CFR Part 23 and 49 CFR Part 26.

policy concern about wealthy individuals using the program to the detriment of truly

needy small business owners is well established and evident in the regulation. Hence, the

Department properly reviewed the record based on the OMWBE's denial ground that Ms.

Dukler did not demonstrate that she was economically disadvantaged. The Department

therefore, did not improperly consider the value of the loan collateral, Ms. Dukler's home

equity or mortgage, and other substantial personal and real property because all these

elements factor in to the determination whether she is economically disadvantaged.

Moreover, despite The Grove's attempts to explain away the inconsistent facts in the

record evidence cited by the Department, the records do in fact, show inconsistencies and

irregularities which support the OMWBE's conclusion below, and the Department's in

the final decision, that Ms. Dukler's personal financial statement does not clearly

demonstrate that she is economically disadvantaged.

**VII.    The Department Properly Determined The Grove Lacked Independence.**

The Grove further indicts the Department for citing to additional factual evidence

from the administrative record to support OMWBE's conclusion that The Grove did not

show by a preponderance of the evidence that it is an independent business. The Grove

claims that the Department improperly cited license fee payments as a fact which

OMWBE did not cite in its decision. In fact, OMWBE discussed at length the affiliate

problem and lack of independence posed by Star Foods. See, e.g., AR, at 57 p. 3, 59 at 2-

5. (Bates 00838; 00917-00919). Furthermore, the Department did not state that any

license fee payments had been made, rather the Department looked at the record evidence

of the relationship between The Grove and Star Foods which indicated a relationship with

Star Foods that did not meet the regulatory requirements of independence. Specifically,

the Department noted from a review of the Loan and Security Agreement between The

Grove and Fifth Third Bank, the following "Affiliate Transactions" set forth at Schedule

11(h) to the agreement:

1.  The Grove Inc. makes license fee payments to Star Foods;

2.  The Grove Inc. may make payments on behalf of Star Foods and/or Georgia's
    Grove and charge Star Foods and/or Georgia's Grove for such payments;

3.  The Grove, Inc. may make payments to Star Foods and/or Georgia's Grove for
    payments Star Foods and/or Georgia's Grove have made on The Grove, Inc.'s
    behalf;

4.  The Grove Inc. may perform accounting, administrative, or marketing functions
    for Star Foods and/or Georgia's Grove for which it may or may not be directly or
    indirectly reimbursed;

5.  Any transactions of The Grove, Inc. related to its 70 percent interest and
    managing partner status for NEU of Chicago.

AR, at 34(H) p. 18 (Bates 00695).  Opening Brief, at 37-38.  This information showed

that even if no license fee payments were ever made, that The Grove does indeed have

contractual obligations with Star Foods and Georgia's Grove, and thus has not satisfied

the requirements for independence under the regulation.  The Grove's application simply

contains too many facts in contradiction to its arguments that it is not affiliated with Star

Foods, even if, in fact, The Grove is independent of its 49% owner.  But the Department,

like OMWBE before it, must look to the entire record to make its determination, and that

record does not dispute that "on paper" The Grove and Star Foods appear to be affiliates,

regardless of whether any license fee payments were ever made pursuant to the

representations in the Loan and Security Agreement.  Accordingly, the Department's

citation to the fact of a license fee payment obligation set forth in the application is not

improper because it directly relates to whether The Grove is independent, a ground

specifically relied upon by OMWBE to deny certification.  AR, at 57, 57 (Bates 00838; 00917-00919).

## VIII.   **The Grove Was Not Denied Equal Protection.**

The Grove's claim that it was denied equal protection under the Fifth Amendment to the Constitution, when its application was denied, lacks merit.  See XMSJ, at 34-35. Notwithstanding the Department's explanation in its Opening Brief, at 39-44, which showed why Plaintiff was not denied equal protection, the Plaintiff argues that the Department "singled" it out because: 1) Ms. Dukler's contribution was alleged to be 200 times larger than any prior determination of a "real and substantial" capital contribution case issued by the Department; and 2) that the Department allegedly raised new grounds for denial of its application "rais[ing] the inference" that The Grove was "singled-out on an impermissible basis, namely that it is a woman-owned business rather than a business owned by a racial minority."  See XMSJ, at 35.  Plaintiff bases its claims on speculation and its misunderstanding of OCR's decision.

### A.   The Adequacy of Plaintiff's Contribution

First, OCR's denial of Ms. Dukler's application based, inter alia, on concerns about the adequacy of her contribution—as it impacts Plaintiff's equal protection claim— was fully addressed in Defendants' Opening Brief, at pages 39-41.  Preliminarily, Plaintiff here suggests that the Court should substitute its judgment and declare that the Plaintiff's questionable contribution should have been deemed proper by the Department because the highest amount the Department has purportedly found inadequate previously, was much lower.  See XMSJ, at 35.  Plaintiff's speculative argument does not address a number of other variables that could impact the situation, for example, that the program

was established to aid small businesses, where dollar amounts at issue are naturally much lower, or where other businesses with significant dollar amount contributions, which were rejected by a state agency, never appealed to OCR.  Assuming <u>arguendo</u> only, that the Court were willing to reach this issue, Plaintiff is still lacking evidence that it was not treated the same as other similarly situated applicants.  Plaintiff simply fails to provide the required evidence to meet its burden that the Department intentionally or purposefully treated its application any differently than other similarly situated business.  <u>See</u> <u>generally</u>, <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (Plaintiffs claiming an equal protection violation—even those who allege to constitute a "class of one"—must demonstrate that they were intentionally treated differently from others similarly situated <u>and</u> that there is no rational basis for the difference in treatment.)

To support her position, Plaintiff erroneously cites to cases that address equal protection claims for a "class of one".  <u>See</u> <u>e.g</u>. XMSJ, at 35, citing <u>Olech</u>,.  She is already a member of a protected class, based on her sex, and should not be deemed a class of one.  In another case cited by Plaintiff, <u>Racine Charter One, Inc. v. Racine Unified School Dist.</u>, 424 F.3d 677 (7th Cir. 2005), the Seventh Circuit affirmed a lower court's grant of summary judgment against a charter school's § 1983 claim against school district for refusing to bus charter school students.  The Seventh Circuit found that the charter school students were not similarly situated to other students attending schools in the district and, even if similarly situated, the district had a rational basis for denying busing to them.  Because Plaintiff's contentions here are based on vague and conclusory contentions, they should be disregarded.  Additionally, as described in detail, in Sections

I through VII supra, Defendants' decision to deny the application was rational and well supported by the facts.

B.  OCR's Reference to Supporting Facts

The Grove confuses the concept of legal basis and supporting facts when it claims that OCR attempted to "raise new grounds on appeal to affirm the denial of the Grove's DBE status" thereby raising "the inference that the plaintiff has been singled out on an impermissible basis."  See XMSJ, at 35.  The Department has fully explained that it properly may cite to additional record facts to support OMWBE's cited legal grounds for denial, consistent with the Department's longstanding practice.  In this case, and as explained above in this brief, the Department looked to the entire record and rendered its final decision on the same grounds relied upon by OMWBE.  That is, The Grove failed to prove by a preponderance of the evidence that 1) Ms. Dukler's contribution of capital is real and substantial; 2) Ms. Dukler is not economically disadvantaged because her PNW exceeds $750,000; and 3) The Grove is not an independent business in view of the documented affiliations with Star Foods (its 49% non-certified owner), and Georgia's Grove.  Indeed, the OCR would have been remiss in its duties not to consider the entire record and all the facts provided by Plaintiff's own documents.

Plaintiff claims that OCR's consideration of the facts in full is evidence that she was "singled out on an impermissible basis," due to her sex.  See XMSJ, at 35-36. Plaintiff cites to the case of Harlen Assoc. v. Incorporated Village of Mineola, 273 F.3d 494 (2d Cir. 2001), to support her claim.  Harlen involved an applicant denied a special use permit for operating a convenience store.  The Second Circuit affirmed the lower

court's summary judgment dismissing the case in favor of the government and found,

inter alia,[19]  that

> Harlen does not assert membership in a protected class, rather it claims
> that the Board's denial of its application for a special use permit was
> unconstitutional selective enforcement.  We disagree.  To prevail on a
> claim of selective enforcement, plaintiffs [] traditionally have been
> required to show both (1) that they were treated differently from other
> similarly situated individuals, and (2) that such differential treatment was
> based on impermissible considerations such as race, religion, intent to
> inhibit or punish the exercise of constitutional rights, or malicious or bad
> faith intent to injure a person.

Harlen, 273 F.3d at 499 (emphasis added).  Here, Plaintiff, although never using the

terms "selective enforcement," is claiming that it was "singled out" because its 51%

owner is a woman, and she does belong to a protected class.  However, as noted in

section VIII.A., supra, The Grove has failed to show that it was treated differently, or

provide anything more than its bear assertion that the denial had a nexus to its owner's

sex.

As noted above, the Department's final decision qualitatively reviewed the

substance of Ms. Dukler's capital contribution rather than simply rubber stamping it

because of its size.  The Department provided valid reasons, discussed throughout its

final decision, its supplemental decision, and its brief, to support the OMWBE

determination that Ms. Dukler's $2.6 million cash contribution did not meet the eligibility

requirements based on the application supplied by The Grove.  Those arguments need not

be repeated here as they are exhaustively set forth above.  The Grove may disagree with

---

[19] The Court also found that "enmity directed towards a business property use may not
form the basis of a constitutional equal protection claim because equal protection rights
vest in individuals rather than business activities."  Harlen 273 F.3d at 503.  This case
therefore does not support The Grove's claim and, instead, may present a basis for
dismissal by the court here.  That basis is that an equal protection claim, if any, rests with
Ms. Dukler, not The Grove.  But The Grove is the Plaintiff in this action, not Ms. Dukler.

the foregoing and the Department's interpretation of its regulations, as well as the conclusions reached, but the Department's position is reasonable, supported by substantial record evidence and does not violate The Grove's equal protection rights.

The Grove's equal protection claim thus fails because the Department's final decision is reasoned, fully supported by the administrative record, and consistent with the Department's interpretation of its regulations, which is entitled to deference.  <u>National Treasury Employees Union</u>; 854 F.2d at 498; <u>Lyng</u>, 476 U.S. at 939.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendants' Motion for

Summary Judgment and deny Plaintiff's Cross-Motion for Summary Judgment.

Respectfully submitted,


_____/s/_____
Jeffrey A. Taylor (D.C. Bar # 498610)
United States Attorney


_____/s/_____
Rudolph Contreras (D.C. Bar # 434122)
Assistant United States Attorney


_____/s/_____
Mercedeh Momeni
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 305-4851

*Of Counsel*:
Paul M. Geier
Assistant General Counsel
  for Litigation
        &
Mary F. Withum
Trial Attorney
Office of the General Counsel
United States Department of Transportation
1200 New Jersey Ave., S.W.
Washington, D.C.  20590

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of February 2008, I caused the foregoing

*Defendants' Reply in Support of Motion for Summary Judgment and in Opposition to*

*Cross Motion, with all attachments* to be served on parties of record via ECF.


    /s
_____

MERCEDEH MOMENI
Assistant United States Attorney
555 4th Street, NW
Civil Division
Washington, DC 20530
(202) 305-4851
(202) 514-8780 (facsimile)

**NITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**THE GROVE, INC.**                     )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )  Civil Action No. 07-1591 (HHK)
                                        )  ECF
**UNITED STATES DEPARTMENT**            )
    **OF TRANSPORTATION, ET AL.** )
                                        )
                    Defendants.         )
_____)

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL**
**FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE**

      Pursuant to LCvR 7(h) and 56.1, the United States Department of Transportation, et al. ("Department" or "Defendants"), hereby responds to the Plaintiff's Statement of Material Facts As To Which There Is No Genuine Dispute.

      1.     Defendants agree with the first sentence.  The second sentence, addressing The Grove's employees, is a statement that is not a material fact in that it does not "affect the outcome of the case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

      2 – 5.   Defendants agree with these paragraphs.

      6.     The statement is not a material fact in that it does not "affect the outcome of the case under governing law."  Nails v. England, 311 F. Supp.2d 116, 121 (D.D.C. 2004).  The issue of Ms. Dukler's control of The Grove, pursuant to 49 C.F.R. § 26.71(d), is no longer at issue in this certification application.

7.      Defendants agree that at the time of application, The Grove had a net income of $356,543.  With regard to the Plaintiff's contention that it is a "small business", that statement is not a material fact in that it does not "affect the outcome of the case under governing law."  <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).  OMWBE specifically declined to render a decision on whether The Grove is a small business due to insufficient documentation.  AR, at 57 and 59 (Bates 00838; 00919 and 00695).

8.      The statement is not a material fact in that it does not "affect the outcome of the case under governing law."  <u>Nails v. England</u>, 311 F. Supp.2d 116, 121 (D.D.C. 2004).

9 – 10. Defendants agree with these paragraphs.

11.      Defendants agree with the first sentence and that The Grove submitted a 44-tab application for ACDBE certification, but note that OMWBE rejected the application for the reasons set forth in the two OMWBE decisions.  OMWBE noted several instances where The Grove's application was unclear, lacked information, or did not satisfy its burden of proof.  AR, at 57 and 59 (Bates 00836-00848; 00913-00922).

12.      Defendants agree with the first sentence.  With regard to the second sentence, Defendants agree that the Department, at the request of The Grove, reviewed the questions raised on appeal and issued a supplemental decision, dated June 8, 2007.  In that decision the Department determined that Ms. Dukler demonstrated by a preponderance of the evidence that restrictions within the bylaws and other documents did not limit her ability to control The Grove.  AR, at 64 (Bates 01139).

13.     Defendants disagree with The Grove's characterization that the majority of The

Grove's shares have at all times to the present been owned by disadvantaged individuals.

With regard to the second sentence, both OMWBE and the Department have indeed

determined that Ms. Dukler, the 51% owner of The Grove failed to demonstrate that she

was economically disadvantaged.  AR, at 57, 59, 62, and 64 (Bates 00837-00838; 00916-

00917; 01095-01101 and 01109; 01138-01139).

14-16.  Defendants agree with these paragraphs.

17.     Defendants agree with this paragraph but disagree with the characterization that

neither Mr. Dukler nor Mr. Cowell has been a director, officer, or employee of the Grove,

since well before the time of application.

18.     Defendants disagree with The Grove's characterization that Ms. Dukler purchased

her interest "with her own funds" to the extent that it may suggest that the final decision

as to whether her contribution is "real and substantial" is incorrect.

19.     Defendants agree with this paragraph.

20.     Defendants agree that Ms. Dukler purchased a majority stake in The Grove, but

note that OMWBE rejected that this purchase satisfied the requirements to demonstrate

that her capital contribution is "real and substantial."  AR, at 57, 59 (Bates 00837-00838;

00915-00916).  Defendants disagree with The Grove's statement that Ms. Dukler

purchased the "remainder of The Grove's shares" because the record does not indicate

that Ms. Dukler purchased more than a majority stake.

21-22.  Defendants agree with these paragraphs.

23.     Defendants disagree with The Grove's characterization that check no. 2248, in the

amount of $2.5 million, which was post-dated February 6, 2005 "apparently

unintentionally," as there is no record evidence to support that claim. AR, at 34 (Bates 00605; 00618). Defendants disagree with The Grove's characterization of the issue as an "apparent error" and whether it had any effect on the transaction to the extent that it suggests that the final decision at issue here is incorrect. Defendants agree with the third and fourth sentences of the paragraph. Defendants disagree with The Grove's characterization that the noted report "confirm[ed] that the checks were in fact negotiated" in the fifth sentence of the paragraph to the extent that it suggests that the final decision at issue here is incorrect, or that the record contains proof that the Dukler's bank paid a $2.5 million post-dated check, or the earlier noted $100,000 check.

24-29. Defendants agree with these paragraphs.

30. Defendants agree with the first two sentences. With regard to the third sentence, Defendants disagree with the characterization of Ms. Dukler's assets as "encumbered under the note" to the extent that it suggests that the final decision at issue here is incorrect.

31. Defendants agree with this statement.

32. Defendants disagree with The Grove's newly revised description of Ms. Dukler's personal net worth. The Department's final decision at issue here provides the Department's view of Ms. Dukler's personal net worth.

33. Defendants disagree with The Grove's newly revised calculation of Ms. Dukler's personal net worth because it is not part of the administrative record and only presented here for the first time.

34. Defendants agree with the first sentence. With regard to the second sentence, Defendants are without sufficient knowledge and information as to whether a guarantor

was or as not required for the transaction.  With regard to the third sentence, Defendants

disagree that the referenced citation to the record reflects a project loan of up to $3

million, as the document indicates a $2.6 million figure.  (Bates at 00635).

35.    Defendants disagree with The Grove's characterization of "de minimus"

payments to Star Foods to the extent that it may suggest that the final decision here is

incorrect.

Respectfully submitted,


_____/s/_____
Jeffrey A. Taylor (D.C. Bar # 498610)
United States Attorney


_____/s/_____
Rudolph Contreras (D.C. Bar # 434122)
Assistant United States Attorney


_____/s/_____
Mercedeh Momeni
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 305-4851

*Of Counsel*:
Paul M. Geier
Assistant General Counsel
  for Litigation

Mary F. Withum
Trial Attorney

Office of the General Counsel
United States Department of Transportation
1200 New Jersey Ave., S.W.
Washington, D.C.  20590
(202) 366-4731