# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE GROVE, INC. | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF | : | Civil Action No. 07-1591 (HHK) |
| TRANSPORTATION, ET AL. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S REPLY IN SUPPORT OF
## CROSS-MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The joint brief ("Def. Reply") filed by Defendants Department of Transportation ("DOT"), DOT's Office of Civil Rights ("OCR") and Joseph Austin acts as a reply in support of Defendants' motion for summary judgment ("DMSJ"), and an opposition to The Grove's Cross-Motion for Summary Judgment ("Grove XMSJ"). Defendants' Reply offers no sound basis whatsoever for opposing The Grove's motion, which should be granted so that this matter can be remanded to the OCR with instructions to direct that The Grove's certification be granted.

## SUMMARY OF ARGUMENT

Defendants' Reply takes very little issue with the facts as set out in The Grove's motion.[1] Instead, it makes clear that Defendants do not consider themselves to be bound strictly by the DOT rules that are supposed to govern applications for Airport Concessions Disadvantaged Business Enterprise ("ACDBE") status and that are intended to provide some certainty to applicants in that process.[2]   There are several salient examples that cover each of Defendants' asserted grounds for denial: personal net worth, independence, and "real and substantial contribution."

First, with respect to the "personal net worth" requirement, Defendants first promised, then declined, to provide a chart showing that the net worth of The Grove's majority owner, Michelle Dukler, exceeded $750,000.[3]  The Grove's cross-motion does include such a chart that accurately sets out Ms. Dukler's net worth as negative, based on a proper application of the DOT's regulations to the uncontested facts of record.  Defendants make no effort to show that the chart is wrong, but improperly attempt to dismiss the chart on procedural grounds in that a slightly different version was presented to the agency, even though that chart and all the evidence of record shows Ms. Dukler's  personal net worth to be well below $750,000.  *See* Bates 00039. Worse, however, Defendants engage in a long discussion of a portion of a recent "question and answer" document – issued long after the appeals and Final Decision in this case – that

---

[1]  Filed herewith is Plaintiff's Reply to Defendants' Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Dispute ("Fact Reply"), which lays out that Defendants admit the vast majority of those facts and purport to deny others either with no basis in the record, or  merely on the ground that they are inconsistent with OCR's Final Decision in this case. *See* Fact Reply at ¶¶ 1-35. Defendants also cite supposed "burden of proof" problems while ignoring evidence of record that supports The Grove's position.

[2]  "Those regulated by an administrative agency are entitled to 'know the rules by which the game will be played.'" *Alaska Professional Hunters Ass'n, Inc., v. F.A.A.,* 177 F.3d 1030, 1035 (D.C. Cir. 1999), quoting Holmes, Holdsworth's English Law, 25 Law Quarterly Rev. 414 (1909).

[3]   *See* Errata to Defendants' Motion for Summary Judgment ("Def. Errata"), filed December 12, 2007.

purportedly gives them the right to judge Ms. Dukler, or any other applicant, *not to be economically disadvantaged even if she does not exceed the $750,000 personal net worth threshold of the regulation.* Def. Reply at 19-20.  The assertion of such standardless power to override a regulation in order to achieve a purported policy aim (Defendants attempt to equate Ms. Dukler with the "Sultan of Brunei") is the very opposite of reasonable and lawful administrative decision-making.[4]

As a further reflection of this attempt to assert standardless power,  Defendants cite and quote from several purported OCR rulings on net worth issues that they do not make available with their pleading and are not available online.   As discussed below, Plaintiff has now had  a chance to review these rulings, which are the only precedent Defendants have ever attempted to cite in this matter, and properly characterized they support Plaintiff's position and not Defendants'.

Second, as to the discussion of The Grove's independence from Star Foods (a minority shareholder) Defendants make no effort to rely on or cite DOT's regulations at all.  As set out in The Grove's opening brief, the rules governing determinations as to independence  are set out in 49 C.F.R. § 26.71(b).   Grove XMSJ at 21-22.   These are part of a regulation that governs "control," and Defendants concede Ms. Dukler controls The Grove.  Moreover, the factors listed in that regulation as relevant to a determination of independence go to whether The Grove depends for its "viability" on another company, and none of the factors contained in the regulation are even referenced in the Defendants' discussion of OCR's determination as to

---

[4]  *See, e.g., Panhandle E. Pipe Line Co. v. Fed. Energy Regulatory Comm'n*, 613 F.2d 1120, 1136 (D.C. Cir. 1979) (noting that "[t]he fact that a regulation as written does not provide [the agency] a quick way to reach a desired result does not authorize it to ignore the regulation or label it 'inappropriate'"); *Pearce v. Director, Office of Workers' Comp. Programs*, 647 F.2d 716, 726 (7th Cir. 1981) (stating that "it is well settled that reasonable regulations promulgated pursuant to statutory authority have the force and effect of law. . . . [and] an agency is bound by its own regulations").

independence. *See* Def. Reply at 35-37.   (For example, The Grove has not received any financial contribution from Star Foods for over seven years.) Instead, Defendants' discussion of the independence issue relies almost entirely on certain "affiliate transactions" set out in a Loan and Security Agreement between The Grove and Fifth Third Bank. *This was a ground OCR expressly held it did not have enough information on which to make a finding.* [Bates 1108]. For Defendants to attempt to rely on this ground now as virtually the sole evidence of a lack of independence is entirely inconsistent with the record and with the government's obligation not to attempt to rely in litigation on post hoc explanations not advanced by the agency.   Moreover, terms such as "affiliate" and "related party" transactions as customarily used in bank loan documents are not legal terms of art and certainly do not refer to any definitions contained in the DOT regulations or cited to by Defendants.

Finally, as to Ms. Dukler's real and substantial contribution of $2.6 million to buy her shares in The Grove, the Department does not take issue with the fact that this amount is *200 times greater* than any contribution it has ever before found not to be real and substantial (choosing instead to try to label this "not a material fact").   Defendants' Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Dispute  ("Def. Fact Response") at ¶ 8.  Instead, Defendants repeat their assertion, advanced for the first time in their motion for summary judgment, of so-called "inconsistencies surrounding the two checks" Ms. Dukler used to pay for her ownership interest in The Grove.  Defendants speculate, with no basis whatsoever in the record, that a $2.5 million check she wrote to Star Foods may never have been negotiated, a ground neither OCR nor the Washington Office of Minority and Women's Business Enterprise

("OMWBE") ever relied on. This violates the well-established rule against post hoc rationalizations to support an agency decision.[5]

The government's newly-minted speculation on this issue also ignores, among other things, evidence in the record from a City of Chicago report that verified the check had in fact been negotiated.[6] The speculation is also groundless given that the government concedes that Ms. Dukler paid Mr. Cowell a total of $2.6 million for the proceeds of her replacement loan of $2.6 million from Fifth Third Bank,[7] something she would have had no obligation to do if the checks from him in that amount had never been negotiated to pay Star Foods, and further concedes that Mr. Cowell placed the proceeds of the repayment in his bank account.[8] Finally, to eliminate any conceivable question on this issue, attached hereto are copies of the cancelled checks, dated and time-stamped contemporaneously, along with a declaration from Ms. Dukler that they were provided to the state agency with her application (and thus must have been inadvertently omitted from the administrative record filed with this Court). *See* Attachment A.

Defendants move on from groundless speculation to, once again, contradicting their own regulations. In dismissing Ms. Dukler's $2.6 million contribution via the replacement loan from Fifth Third Bank, Defendants misread the DOT's regulation at 49 C.F.R. §26.69(e), which states

---

[5] *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely on the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis"). *See also Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 204 n.4 (D.C. Cir. 2007) ("[W]e cannot affirm [the agency decision] on the basis of a post-hoc explanation by agency counsel.").

[6] *See* AR XLIX at 5, Bates 00787 (stating expressly that the documentation submitted by Ms. Dukler included "cancelled checks in the sum of $2.5 million and $100,000" from the joint checking account of Mr. and Ms. Dukler, thus confirming that the checks were in fact negotiated). The government has relied on other aspects of the City of Chicago's report when it has suited it. *See, e.g.*, Def. Reply at 23 (relying on site visit information from the City of Chicago report).

[7] *See* Def. Fact Response at ¶ 21 (admitting that Ms. Dukler "used the proceeds to pay off her prior February 2004 loan from Mr. Cowell in that amount").

[8] *See id.*

expressly that: "Debt instruments from financial institutions or other organizations that lend funds in the normal course of their business do not render a firm ineligible, even if the debtor's ownership interest is security for the loan."

Defendants, however, attempt to read the "even if" language as imposing an *eligibility requirement* that Ms. Dukler have pledged her interest in The Grove in connection with the loan, thus reading the entire regulation backwards.   Def. Reply at 4.   The "even if" language by its plain meaning provides a permissive illustration of what can be pledged as collateral, not a requirement as to what must be pledged.   As noted by the Supreme Court in *Christensen v. Harris County*, 529 U.S. 576, 588 (2000), deference to an agency's construction of its regulation is "warranted only when the language of the regulation is ambiguous."   Here there is simply no way to read the plain language of the regulations to *require* that the ownership interest in the firm be pledged as collateral, rather than simply offering it as an illustration of a permissible security. [9]

Here, Ms. Dukler pledged her own personal promissory note instead as security for the $2.6 million loan from Fifth Third Bank, something also not prohibited by any  DOT regulation. By doing so, Ms. Dukler was putting all of her personal property (including her shares in The Grove) at risk to secure the loan, thus assuming a very real and substantial risk – a risk greater than the pledge of shares alone.   Defendants have not pointed to any prior case (despite their assertion that they have experience in this area) in which an owner who has taken this level of risk and made this level of contribution has been found not to have undertaken a liability or to have made a "real and substantial" contribution.

---

[9] In fact, the import of the regulation is arguably to make sure that such a pledge should not be interpreted as an indicator of lack of control.

In sum, Defendants' Reply supports and confirms the arbitrary and capricious nature of their decision-making and the fact that The Grove was denied proper process. Defendants have argued that applicable regulations should not be read literally, that they are free to interpret these regulations as they see fit, and that they may uphold their decision on specific circumstances and grounds not in the OMWBE decision, despite a regulation specifically forbidding this. The regulation prohibiting reliance on new grounds would have no meaning if such a course were allowed. Defendants further ignore their own regulations as to the appropriate considerations in a determination of whether an individual has met the $750,000 PNW threshold, and now submit a new argument that the PNW threshold can be ignored in particular cases, when it "appears" that it should be. This is not law, but the essence of arbitrary and capricious decision-making that is contrary to law.

## ARGUMENT

Of the 42 pages of Defendants' Reply/Opposition pleading, only 16 are devoted to directly defending the three bases of the OCR's Final Decision. We will take each in order.

## I.     The Department's Determination That Ms. Dukler's Ownership Was Not Real and Substantial Was Improper.

Defendants do not contest that Ms. Dukler's contribution was 200 times greater than any that OCR had ever previously found not to be "real and substantial," but argue that they were not required to focus "simply [on] the dollar value of the transaction," but rather could look to the "source and structure of the ownership acquisition." Def. Reply at 28. But as The Grove showed in its opening brief, the source of Ms. Dukler's funds and the structure of the transaction were fully in accordance with the applicable DOT regulations. Ms. Dukler first obtained a fully secured loan from Mr. Cowell in February 2004 for the $2.6 million she used to buy her

ownership interest in The Grove, then replaced that loan in August 2004 with a loan from Fifth

Third Bank, secured by her own promissory note, and taking Mr. Cowell entirely out of the

picture  well before the date of the OMWBE application, as Ms. Dukler was no longer indebted

to him. OCR was required to evaluate the eligibility of the firm based on present circumstances.

*See Hoffman & Company, Inc. v. SCDOT*, No. 00ALJ-19-0533-C (Apr. 17, 2001), available at

http://www.scalc.net/decisions.aspx?q=4&id=3936  and attached hereto as Attachment B

(ordering the certification as a DBE of a business whose disadvantaged owner's interest was

acquired in substantial part by an unsecured promissory note to a former owner of the business,

facts that are of course much less favorable than those here as the loan was not secured and was

never replaced by a private loan, because of the requirement applicable to both the recipient and

to OCR on appeal that firms must be evaluated on the basis of present circumstances rather than

"on historical information indicating a lack of ownership or control of the firm by socially and

economically disadvantaged individuals at some time in the past" ).

OCR instead went beyond DOT's regulations – and beyond the specific grounds raised

by OMWBE, on which it was supposed to be relying – to argue that $2.6 million was inadequate

consideration for Ms. Dukler's 51% interest in The Grove, despite OCR's failure to point to any

evidence that had any relevance to The Grove's actual worth in 2004, the time Ms. Dukler

bought her shares.

The Grove presented evidence of an arms'-length transaction between a willing buyer

and seller at $2.6 million, and set forth in its opening memorandum four pages of supporting

material establishing that (a) the government's attempt to rely on what Star Foods had paid many

years before (and before the disruptions of September 11, 2001) for its share of The Grove was

not sufficient to raise an issue on the question of its 2004 value under Generally Accepted

Accounting Principles ("GAAP"), IRS guidelines, or any other proper basis for valuing a company; (b) the valuation was consistent with the past earnings and future income potential of The Grove, as provided under IRS standards, all of which information The Grove provided for the record; and (c) the $2.6 million valuation was consistent with the quality and quantity of The Grove's assets, which relied heavily on airport leases that were set to expire in the short term (see Bates 01081), and the volatility of the business, as shown by the major changes that affected it following September 11, 2001. *See* Grove XMSJ at 24-28. This information was also presented to OMWBE and OCR in The Grove's appeals. *See* Bates 00979-83 and 01120-24.

Defendants also make no effort to stand behind their false assertion that The Grove in fact earned high gross profits that were offset primarily by depreciation and high officers' salaries, which The Grove directly addressed at page 27 of its opening memorandum. In fact, The Grove had negative net income from 1999-2002, and positive net income of only $75,460 in 2003. *See* Bates 01176-79. Nothing in any of the information of record is inconsistent with the value of Ms. Dukler's share of The Grove in February 2004 as $2.6 million.

In sum, it is wrong for the government to assert that The Grove's position is that the government should "ignore Star Foods' cash infusion and the resulting worth of the Company." Def. Reply at 31. The "worth of the Company" in 2004 is *precisely* the issue as to which The Grove met its burden of proof by establishing under recognized IRS and GAAP rules that $2.6 million was a fair valuation for Ms. Dukler's share of the company. *See* Bates 00979-83. Faced with this showing, if OCR chose to belatedly raise the issue of the $2.6 million valuation, OCR was required to determine the matter using proper accounting tools and methods. OCR did not even attempt to do so, relying instead on speculation that Star Foods' payments in 1999 and 2000, when the airline industry looked very different than it did in 2004, somehow raised an

issue as to the adequacy of the consideration Ms. Dukler paid in 2004. *See* Grove XMSJ at 24-28.[10] The Grove's presentation of a fully documented transaction between a willing buyer and seller and all of the foregoing information makes clear it easily met its burden of proof.

Moreover, The Grove was forced to rely on this evidence even though OCR improperly raised the valuation issue for the first time on appeal of OMWBE's decision, thus limiting The Grove's ability to present evidence on the issue below. Although Defendants argue that DOT's regulations properly allow OCR to fish through the record to find additional facts that support the "grounds, or legal bases" raised by OMWBE, Def. Reply at 21, such a reasoning as applied in this case makes a mockery of DOT's regulation that the decision on review must be based on the "grounds specified" in the decision of the reviewing agency (here OMWBE). 49 C.F.R. § 26.89(f)(5). In evaluating whether Ms. Dukler's contribution was real and substantial, OMWBE relied on a series of grounds that OCR did *not* adopt, including that the funds to pay Mr. Cowell for the stock resided for a single day in a joint checking account (something expressly permitted by DOT's regulations, *see* 49 C.F.R. § 26.69 (j)(3)), and a stated concern that the funds could not be "traced through" that account in a day, even though the record included a dated term note and cancelled checks doing just that. [Bates 00616; 00618; 00605] OMWBE did not breathe a word about the ground ultimately adopted by OCR that $2.6 million was somehow inadequate consideration for Ms. Dukler's 51% share of The Grove. OCR was, under the Department's regulations, quite simply precluded from belatedly relying on this ground to affirm OMWBE's decision.[11] In any event, as shown above, this newly-created ground was of no substance.

---

[10]  Moreover, as reflected in the record, Star's payments in 2000 were for the purpose of paying off debt to keep the company afloat, which is a sign of a troubled company, not a particularly valuable one. *See* Bates 01120-22.

[11]  At most, if OCR comes up with additional facts or grounds that cause it to have questions about the valuation, it should remand to the state, which is the remedy that was undertaken in one of the decisions Defendants cite, *In Re Dirt & Aggregate Interchange, Inc.*, No. 05-118 (attached hereto as Attachment C)

In addition, there can be no doubt that Star Foods' payment in 1999 and 2000, whether or not considered in relationship to the amount of Ms. Dukler's payment in 2004, have *not* given Star Foods any control over The Grove. Defendants' Reply suggests the issue of Star's infusion of cash is relevant because "the substance of ownership follows the money." Def. Reply at 32. The meaning of this statement is unclear, but if it is taken to mean that Star Foods' payment of a larger amount than Ms. Dukler's payment means that Star Foods has more control over The Grove than does Ms. Dukler, it is without reference to any facts, and is on its face arbitrary. Moreover, the assertion is directly contradicted by the Final Decision's direct finding that Ms. Dukler, and not Star Foods or any other party, controls The Grove. As Defendants admit, "the issue of Ms. Dukler's control of The Grove, pursuant to 49 C.F.R. § 26.71(d), is no longer at issue in this certification application." Def. Fact Response at ¶ 6.

The fact that another shareholder's paid-in capital is reflected in the company's books as greater in 2000 than Ms. Dukler's investment in 2004 has no bearing whatsoever on the proper valuation on the stock. Many companies, particularly those that have lost value (e.g. Enron, Krispy Kreme) have stock values that are lower than the paid-in capital amounts to the company. It is simply an ordinary business outcome that some investors in a company pay far more for their shares than other investors as stock values change, and this fact offers no support for the idea that Ms. Dukler's contribution was not "real and substantial." Simply put, the price Star Foods paid for its shares or paid-in capital of the company in 1999 and 2000 has no more bearing, as an *a priori* matter, on the actual value of The Grove's stock in 2004, than payments to Enron at the same time would have on actual value of Enron stock now. Yet that is the *only* argument OCR advanced to support its newly-developed "valuation" ground.

Other than the valuation issues and those related to the Star payments, Defendants' only other argument on the "real and substantial" investment point is that interest payments of $164,000 are not substantial compared to a $2.6 million purchase price. Defendants' position on this point is difficult to understand, given that the $164,000 interest payments, *to which the government admits,* correspond to a 6.32% (prime-floating) interest rate on the funds, and given that there is no contention that 6.32% is an inadequate interest rate payment for a loan of this nature or that it does not indicate a real and substantial investment. *See* Bates 00066-67; 000896-97. In any event, Defendants all but abandon the point by arguing that the OCR's determination on the interest matter "was only a minor basis for upholding OMWBE's determination." Def. Reply at 30.

Finally, Defendants conclude their discussion of the "real and substantial investment" point with a confusing attempt to argue that it is not sufficient for Ms. Dukler to show that she owns 51% of The Grove and that the funds she borrowed became hers once borrowed. *See* Def. Reply at 32-33. Defendants then cite two regulations that deal with real and substantial ownership (49 C.F.R. § 26.69(c)) and with contributions of capital (49 C.F.R. § 26.69(e)) that in no way support their arguments because Ms. Dukler was fully in compliance with both regulations. Indeed, the government's citation to the latter regulation is misleading because it leaves out its final sentence, quoted above, which states that "[d]ebt instruments from financial institutions or other organizations that lend funds in the normal course of their business do not render a firm ineligible, even if the debtor's ownership interest is security for the loan." *See* 49 C.F.R. § 26.69(e) (last sentence omitted in the government's quotation). Ms. Dukler's loan from Fifth Third Bank to pay for her shares falls directly within the permission of this regulation. Moreover, Ms. Dukler pledged a personal promissory note as security, taking a far greater risk

than she would have had she pledged merely her stock, and placing her well within the bounds of the regulation.[12] Ms. Dukler's undoubted ownership of 51% of the company, her conceded control of the company, and the fact that she – in words of the regulation that Defendants again omit from the "cherry-picked" quotation they use – "enjoy[s] the customary incidents of ownership and share[s] in the risks and profits commensurate with her ownership interest," all make clear that hers is not the kind of "pro forma ownership" referred to in the other regulation on which the government attempts to rely, 49 C.F.R. § 26.69(c).

In sum, the government has provided no basis for any conclusion that Ms. Dukler's $2.6 million purchase of her 51% share of The Grove's shares, based on a loan secured by a personal promissory note, is not a "real and substantial" contribution. This asserted basis to uphold the decision is arbitrary, capricious, inconsistent with DOT's regulations, and unsupported by the evidence of record.

## II.    The Department Did Not Properly Review Ms. Dukler's Net Worth

While not offering themselves any figure as to Ms. Dukler's personal net worth, Defendants suggest OCR properly upheld denial of The Grove's certification on this ground because of alleged "inconsistencies" in the assets Ms. Dukler listed in her statement. Again, the Defendants do not cite a single regulation in support of their discussion of this point, *see* Def. Reply at 33-35, but rely instead on a "Q&A" Guidance document issued *after* the Final Decision

---

[12]    The government also notes on page 3 of its Reply that there is no documentation that the loan from Fifth Third Bank required Ms. Dukler to pledge personal assets to capitalize or expand The Grove. This is a non sequitur that has nothing to do with this case. The cited regulations requiring such a pledge apply only if an applicant such as Ms. Dukler does not want to count the pledged personal assets as part of her personal net worth. Here, Ms. Dukler is making no such claim and therefore there is no issue raised by whether she pledged personal assets to secure this or any other loan. In fact, as set out in the statement of material facts and conceded by the government, The Grove's assets were pledged with respect to a different project loan and line of credit with Fifth Third Bank that was entered into with The Grove, not Ms. Dukler, back in February 2004, and is wholly separate from the loan through which she contributed to buy her shares. Plaintiff's Statement of Material Facts as to Which There Is No Genuine Dispute ("Pl. Fact Statement") at ¶ 24; Def. Fact Response at ¶ 24.

in the case that supposedly gives them free rein to make some kind of impressionistic determination as to whether an individual is economically disadvantaged, *even if that person specifically meets the personal net worth requirements of the regulations. Id.* at 34-35. As noted above, this is not law; it is merely license to an agency to come to any conclusion it wants when it finds it convenient to do so. Nor indeed do the Defendants even point to any specific item from the Q&A document that they claim supports their decision, much less try to square it with any of DOT's published regulations. Finally Defendants impermissibly offer a new argument that all of this discretion is proper because OCR has reviewed such issues in the past. *Id.* at 28, 34. Defendants cite no law for this proposition (in fact, personal net worth determinations had been part of the ACDBE program for only six months before the application was filed), or for their ability to raise the argument for the first time now.

Defendants do cite two non-ACDBE cases in their discussion on this point: *In re Dirt & Aggregate Interchange, Inc.*, No. 05-118, and *In re J. Mooncotch Crane Rental*, No. 07-0115 (attached hereto as Attachment C). However, in neither of the cited cases did the Department uphold a finding that an individual's personal net worth was above the $750,000 threshold, much less rely on some kind of amorphous "Q&A" guidance to do so.

In *Dirt and Aggregate* the matter was remanded to the state for further inquiry into the valuation of applicant's "extensive real estate holdings," which went beyond home equity that is expressly excluded from personal net worth calculations by DOT regulation. *See* 49 C.F.R. § 26.5 (defining "personal net worth" to exclude "the individual's equity in his or her private place of residence"). OCR determined that it appeared that the state agency had erroneously derived value estimates for the owner's real estate holdings based on other properties in the vicinity and "made general assumptions that because [the owner's] properties were within these

areas, his properties are worth comparable amounts if sold on the market today." *Dirt &*

*Aggregate* at 9. Even though the state agency's efforts to determine the actual market value of

the property in that case went well beyond Defendants' speculations here, OCR remanded that

case back to the state agency so that it could "obtain more definitive data in order to make a

more accurate analysis of the specific properties in question." *Id. Dirt and Aggregate* supports at

the very least a remand in this case, and given OCR's failure to point to any valid basis for its

belatedly raised arguments, the remedy here should go further and require that The Grove's

application be granted.

In  *J. Mooncotch Crane Rental* [sic: the party's name in the ruling provided us by

Defendants is *Stevenson Crane Service, Inc.*][13] the Department found the DBE owner to be

economically  disadvantaged even though she and her husband owned a luxury yacht, finding

that the state agency had appropriately determined the yacht to be both an asset and a liability.

This case also offers no support for the  government's conclusion here.   Ms. Dukler, unlike the

owners whose claims of disadvantage were upheld, owns no luxury yacht or real estate beyond

her personal residence.  It is difficult to see how they could be considered disadvantaged and she

not, given that her personal net worth is well below the $750,000 threshold.[14]

The Grove's opening brief, Grove XMSJ at  18-19, sets out in chart form the proper

calculation of Ms. Dukler's personal net worth, based on amounts in the record that the

government has not challenged and on a proper application of the DOT regulations.    It

---

[13]  In order to remove any doubt that the decisions cited by the government do not support its position,
and for the convenience of the Court,  we are attaching them to this reply.

[14] Nor do the other cases cited by Defendants as examples of the PNW  "fact patterns" with which they
have experience. In *In re Rampart Hydro Services, Inc.*, No. 06-0124 (attached hereto as Attachment C)
OCR found that the owner had improperly excluded her ownership interest in the firm's general partner, a
firm which performed the contracts for the applicant firm.  In *In re Lion's Group*, No. 07-0114 (attached
hereto as Attachment C) it found that the owner's ownership interest in other companies had been
improperly excluded from his PNW statement.  Neither of those circumstances applies here.

concludes properly that her personal net worth is negative. *Id.* In particular, since the regulations expressly allow Ms. Dukler to exclude any equity in her personal residence, *see* 49 C.F.R. § 26.5, and since the government has sought to raise certain unexplained "inconsistencies" with respect to Ms. Dukler's personal residence as a part of its claim that she has somehow failed to meet her "burden of proof," the chart simply removes any reference to her equity in her residence or her mortgage on the residence. The result of this is to remove from the case an immaterial issue that Defendants have raised, so that the issue no longer confuses the outcome of the case.

Defendants suggest that The Grove's effort to remove this issue irrelevant under the DOT regulations (and one that the government itself has sought to confuse in order to raise unwarranted questions about The Grove's application) makes the personal net worth illustration in The Grove's brief so "dramatically inconsistent" with the statement produced in the record that it should be ignored. Def. Reply at 9-10. Defendants merely seek to mask the fact that they have presented no alternative net worth calculation and have no basis to challenge the information presented by The Grove. The "dramatic inconsistency" posited by Defendants consists of nothing more than The Grove's taking the information presented in the record [Bates 00039], and removing references to Ms. Dukler's home equity and mortgage, and the value of her Grove shares, both of which are expressly required to be excluded from personal net worth calculations by DOT's regulations.[15] Any confusion in the matter has been created by Defendants to hide their lack of any real response to the point.

Because they have offered no alternative calculation themselves as to Ms. Dukler's personal net worth, there is thus no evidence of record presented by Defendants to counter Ms.

---

[15]    Ms. Dukler had originally included the information only at OMWBE's insistence, which was unsupported by the regulations.

Dukler's showing that she meets the personal net worth requirement. Indeed, the government has chosen not to present its own illustration of Ms. Dukler's personal net worth despite stating in its opening brief that it would do so (and then withdrawing that statement).[16] As noted above, Defendants have chosen instead to rely on a later issued "Q&A" document that purports to allow them to decree, without any apparent standards, that an individual is not economically disadvantaged even if her net personal wealth falls under the $750,0000 threshold of the regulation.

The personal net worth chart presented with The Grove's opening brief also properly does not count as an asset the value of Ms. Dukler's ownership interest in The Grove. This too is expressly required by DOT regulation. *See* 26 C.F.R. § 26.5 (defining "personal net worth" to exclude "[t]he individual's ownership interest in an applicant or participating DBE firm"). Again, The Grove has simply properly applied DOT's regulations to uncontested facts of record in excluding this ownership interest.

Finally, the personal net worth chart presented with The Grove's opening brief also properly counts as a liability her personal promissory note to Fifth Third Bank in the amount of $2.6 million. As set forth in The Grove's opening brief, Grove XMSJ at 19-20, Defendants' failure to accept this note as a liability for purposes of calculating Ms. Dukler's personal net worth has no basis whatever in fact or law. The note is an unconditional promise to pay Fifth Third Bank $2.6 million, secured by a personal promissory note. In the first year she held the note, the government concedes that Ms. Dukler paid over $164,000 interest on the loan,[17] an amount that represents a rate in excess of 6.3%. There is not, and cannot be, any contention that the Fifth Third Bank is not a legitimate financial institution or that the loan is not a legitimate

---

[16]  *See* Def. Errata., filed December 12, 2007.
[17]  *See* Pl. Fact Statement at ¶ 31, Def. Fact Response at ¶ 31.

loan. To the extent Defendants have challenged Ms. Dukler's personal net worth statement by

challenging her inclusion of the loan as a liability on her personal net worth statement, that

determination is wholly arbitrary, capricious, and contrary to law.   It is also contrary to

precedent that allows a loan to be considered a liability even if it is used to buy a luxury yacht.

See *J. Mooncotch Crane Rental*, No. 07-0115 (attached hereto as Attachment C).

The Department also states that it did not "improperly consider the value of the loan

collateral" in determining Ms. Dukler's personal net worth.  Def. Reply at 35.  This statement is

difficult to understand.  As to the loan from Fifth Third Bank, Ms. Dukler's security for the loan

was her personal promissory note to the Bank.  This loan is a liability of $2.6 million that

Defendants cannot reasonably question as a liability in determining Ms. Dukler's personal net

worth.  As to the loan from Mr. Cowell that the Fifth Third Bank loan replaced (and which is

now thus not a transaction material to this matter), Ms. Dukler's primary collateral for that loan,

as stated in documents provided in the record [Bates 00619-35], was $2,027,225 (mostly the

market value of inventory from prior liquidated businesses).  That is the same amount on the

personal net worth statements presented here, *see* Grove XMSJ at 19, and Defendants have never

presented any evidence whatsoever of any discrepancy in this figure (which, Defendants admit,

was accepted by Mr. Cowell as sufficient to collateralize his loan).[18]

Defendants do make brief reference to an argument they set out at more length in their

opening brief ("Def. MFSJ Br.") at 25-28 & n.7,  suggesting that Ms. Dukler was required to

show that her personal loan from Fifth Third Bank "required Ms. Dukler to pledge her personal

assets to capitalize or expand the Grove." *See* Def. Reply at 3, *citing* 70 Fed. Reg. at 14498-99.

As the Defendants' opening brief sets out, however, such documentation is required only if the

owner/applicant intends "to exclude from their personal net worth calculation that amount  of

---

[18]   *See* Pl. Fact Statement at ¶19 (agreed to by the government).

assets necessary to obtain the franchise," or if the "assets are needed by the firm to expand its concession business at airports." Def. MFSJ Br. at 26-27. The personal loan had no such purpose, however, nor did Ms. Dukler have to show that it did. Ms. Dukler would have been required to make such a showing only if, for example, she wanted to exclude the $2,027,225 from her personal net worth calculation. However, since she did not, no such showing that she was required to pledge her assets for the loan is necessary.[19]

The key question is not what assets were or were not used as security for the $2.6 million personal loan Ms. Dukler took out from Fifth Third Bank, but whether that loan constitutes a liability of Ms. Dukler. There is no question that a personal note obligating Ms. Dukler to pay the bank $2.6 million (stating "Michelle Aimee Dukler . . . hereby promises to pay to the order of Fifth Third Bank . . . the sum of Two Million Six Hundred Thousand and 00.100 Dollars . . . plus interest" [Bates 00888]), and secured by a personal promissory note that puts her assets at risk if she defaults, is a liability of Ms. Dukler and was properly counted as such in her statements of personal net worth.

In sum, Defendants have failed to offer any legitimate reason for their conclusion that Ms. Dukler failed to meet the personal net worth test, much less deal with the rebuttable presumption that Ms. Dukler is economically disadvantaged. The conclusion is arbitrary and capricious and inconsistent with the law, and The Grove respectfully suggests that it must be vacated.

---

[19]  In fact, The Grove's assets were pledged in connection with the separate project loan and line of credit that The Grove took out from Fifth Third Bank in February 2004. The reviewing agency at times appears to have confused the two loans, although there is no material issue that they were separate loans. *See* Fact Reply ¶¶ 21-25.

**III.    The Department Did Not Properly Determine That The Grove Lacked Independence**

Defendants spend less than two pages of their brief defending OCR's decision on the issue of The Grove's independence from Star Foods. *See* Def. Reply at 35-37. Remarkably, almost all of this discussion attempts to rely on a series of "affiliate transactions" set forth at Schedule 11(h) to a Loan and Security Agreement The Grove entered into with Fifth Third Bank in February 2004. Defendants' argument on this point is that they must "look to the entire record" and that The Grove and Star Foods "appear to be affiliates." Def. Reply at 36.

Even apart from the equivocal nature of this conclusion as to the "appearance" of affiliation, and the anomaly of considering The Grove to be "dependent" on Star Foods when in fact Ms. Dukler controls it, [20] Defendants utterly fail to come to grips with the fact that, as pointed out in The Grove's opening brief, the agency below expressly declined to base its decision on this ground. *See* Grove XMSJ at 34. Indeed, the Final Decision stated expressly as to the issue of Section 11 of the Loan and Security Agreement that "without more details the Department cannot reach a conclusion in this regard." [Bates 1108]. Defendants' argument on this point is thus in direct violation of the rule that an agency decision cannot be defended on appeal on grounds not raised by the agency itself.[21]

Moreover, Defendants' argument on the point makes no effort to reference the Department's regulations or any precedent of a court or of the agency on the point. As The Grove pointed out in its opening brief, the only court decision located on point found that a

---

[20] Given that Ms. Dukler now indisputably controls The Grove, Defendants offer no reason why an affiliate relationship should matter in the first place.

[21]    *See, e.g., Detroit Newspaper Agency v. NLRB*, 435 F.3d 302, 311 (D.C. Cir. 2006)("We must accept the Board's decision on its own terms, ignoring post-hoc rationalizations by counsel and rejecting the temptation to supply reasons to support the Board's decision that the Board itself has not offered.") *See also SEC v. Chenery Corp.*, 318 U.S. 80, 89-90 (1943).")

company lacked independence when almost all of its work was done for a company owned by a relative who was not a disadvantaged individual. Grove XMSJ at 16. This is, of course, not even remotely the case with The Grove, and Defendants have not pointed to any precedent that supports their position on the independence issue. Nor do they challenge The Grove's showing that Star Foods has made no financial contribution to The Grove since 2000, over seven years ago and four years before Ms. Dukler assumed control of The Grove. There is no conceivable basis for a finding that The Grove depends for its viability on Star Foods when it has had no assistance at all from Star Foods for over seven years.[22]

Defendants also make no attempt to rely on or even cite the DOT regulations that expressly address independence issues, laid out at 26 C.F.R. § 26.71(b) *as part of the section that deals with "control," an issue Defendants have conceded.* As noted in The Grove's opening brief, Grove XMSJ at 22, these include "relationships with non-DBE firms, in such areas as personnel, facilities, equipment, financial and/or bonding support, and other resources," § 26.71(b)(1), "the firm's relationships with prime contractors," § 26.71(b)(3), and "the consistency of relationships between the potential DBE and non-DBE firms with normal industry practice." 49 C.F.R. § 26.71(b)(4). OMWBE attempted to rely on 49 C.F.R. § 26.71(b)(2), which allows consideration of whether "present or recent employer/employee relationships" between DBE firms and non-DBE firms or persons "compromise the independence of the potential DBE firm." However, as set out above, the Star personnel who had any relationship to The Grove, Mr. Cowell and Mr. Dukler, were "former officers and directors of The Grove," and had no employer/employee relationship at all, much less a "present or recent" one that might

---

[22]   Defendants suggest that they can look at such history because 49 C.F.R. § 26.89(f)(6), requiring review be based on fact at the time of the application, "cannot be read literally" in light of their obligation to look at the entire record, but applying that reasoning to allow the Department to dredge up seven year old transactions that have no ongoing effect on the company would cause Section 26.89(f)(6) to have no meaning at all, an unreasonable reading of the Department's regulation.

"compromise the independence" of The Grove.   Moreover, Defendants admit that both Mr.

Cowell and Mr. Dukler  resigned as officers and/or directors of The Grove following Ms.

Dukler's purchase of a controlling interest in The Grove, and that Mr. Dukler does not even

retain a relationship with Star Foods.[23]

Again, Defendants' position on the issue of independence makes no effort to square the

agency's decision with DOT's own regulations, and is arbitrary, capricious, and inconsistent

with the record.  It also continues the pattern of Defendants trying to assert issues that have not

been relied upon below in an effort to preserve an agency decision that has no sound basis.

Because none of the three grounds on which Defendants have attempted to uphold the

certification decision are proper even under the most liberal standards of APA review, the

agency's decision should be vacated and the case remanded to OCR with instructions to direct

the OMWBE to grant The Grove's application.


### IV.  Equal Protection

Despite the fact that The Grove's owner's contribution of $2.6 million was nearly 200

times greater than the largest amount OCR has ever found not to be "real and substantial," the

government attempts to argue that, because The Grove's owner is a woman,  The Grove is barred

from raising a "class of one" equal protection claim based on having been singled out for unfair

treatment.  This is false.  As the government itself points out, in support of a different argument,

"The Grove is the plaintiff in this action, not Ms. Dukler."  Def. Reply at n.19.  Even if Ms.

Dukler *were* the plaintiff here, an individual who is a member of a protected class is entitled to

bring a "class of one" equal protection claim.  *See Karchnak v. Swatara Township*, No. 07-CV-

1405, slip op. at 9  (M.D. Pa.  Feb. 11, 2008) (holding that plaintiff, who, as a woman, was a

---

[23]   Pl. Fact Statement at ¶ 15; Def. Fact Response at ¶¶ 14-16.

member of a protected class, could bring an equal protection claim under "two paradigms . . . First, a plaintiff may allege that she is a member of a protected class . . . Second, she may allege that she belongs to a 'class of one.'"). Indeed, a portion of the Q&A guidance that, unlike the one Defendants rely on, predates the Final Decision specifically prohibits using additional requests for PNW information as a way to target or harass "specific firms or classes of firms."[24]

The government also attempts to disregard the dramatic difference between The Grove's owner's contribution and the highest contribution that has ever been challenged by OCR (The Grove's contribution being nearly 200 times greater than the highest amount ever challenged as not "real and substantial") as evidence of The Grove having been singled out for unfair treatment. Defendants seem to attempt to avoid this fact by suggesting that no business appealing a denial of DBE certification has ever been "similarly situated" to the Grove – a claim that, if accepted, would make it impossible for The Grove to demonstrate that it was treated differently from other similarly situated applicants. *See* Def. Reply at 38. This assertion seems somewhat disingenuous. If The Grove's application for DBE certification truly involved "a number of other variables" (Def. Reply at 37) that made its situation entirely unprecedented such that it could not be compared to any other DBE appeal applicant for equal protection analysis, Defendants should have raised this in response to The Grove's equal protection claim in their opening brief, or at least pointed to some of these unique factors in response. Indeed, if Defendants in fact have seen so many different situations, *see* Def. Reply at 5, they should have been able to show how The Grove's situation differs from those they have seen before. Instead, they do not cite any of their prior cases to support their position, and now attempt to avoid the

---

[24] Office of Small and Disadvantaged Business Utilization, *Questions and Answers about 49 CFR Part 26*, http://osdbudev.heitechservices.com/business/dbe/qna/dbeqna30.cfm#TOC57 (Apr. 12, 1999).

inference of unfair treatment suggested by the fact that no DBE owner's contribution of anywhere near the size of Ms. Dukler's has ever been questioned by OCR.

The government also suggests in a footnote that The Grove's allegations that it has been singled out on an impermissible basis – its owner's gender – are irrelevant because The Grove is a corporation rather than an individual. *See* Def. Reply at n.19. This argument also fails, as it is well established that "corporations are as much entitled to the equal protection of the laws guaranteed by the Fourteenth Amendment as are natural persons." *Louis K. Liggettt Co. v. Lee*, 288 U.S. 517, 536 (1933) (citing numerous cases).

Finally, the government has attempted to explain the new grounds OCR raised to support the denial of DBE certification by relabeling these new grounds "supporting facts." Def. Reply at 39. This is an improper characterization of the new grounds that OCR raised to support the denial of DBE certification and, as stated above, makes a mockery of DOT's regulations requiring that a decision on review must be based on "grounds specified" in the decision of the reviewing agency (here OMWBE). 49 C.F.R. § 26.89(f)(5). As The Grove has previously shown, many of the new grounds offered by OCR were presented in response to The Grove's challenges to the grounds on which OMWBE relied, which were insufficient to deny certification to The Grove. *See* Grove XMSJ at 17-33. Whether labeled "new grounds" or "supporting facts," it is clear that if the OMWBE decision had been sufficient, there would have been no need for OCR to incorporate such extensive material beyond that cited in OMWBE's decision. As a reviewing agency, OCR's proper role was simply to review the OMWBE decision and its basis, not to supplement or support it. The fact that it did so suggests that the government singled out The Grove in its improper attempts to support the OMWBE decision.

## CONCLUSION

Plaintiff respectfully requests that its Cross-Motion for Summary Judgment be granted, Defendants' motion denied, and this case reminded to OCR with directions that The Grove's certification be granted.

Respectfully submitted,

_____
John Longstreth (#367047)
William Kirk (#370762)
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
1601 K Street, N.W.
Washington, D.C.  20006-1600
(202) 778-9000
(202) 778-9100 (fax)

Counsel for Plaintiff, The Grove, Inc.

Date:  March 10, 2008

## **CONCLUSION**

Plaintiff respectfully requests that its Cross-Motion for Summary Judgment be granted,

Defendants' motion denied, and this case reminded to OCR with directions that The Grove's

certification be granted.


Respectfully submitted,

_____

John Longstreth (#367047)
William Kirk (#370762)
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
1601 K Street, N.W.
Washington, D.C.  20006-1600
(202) 778-9000
(202) 778-9100 (fax)

Counsel for Plaintiff, The Grove, Inc.


Date:  March 10, 2008

# ATTACHMENT A

DECLARATION OF MICHELLE DUKLER

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE GROVE, INC.

                    Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, ET AL.

                    Defendants.

: Civil Action No. 07-1591 (HHK)

## DECLARATION OF MICHELLE DUKLER

I, Michelle Dukler, declare under penalty of perjury, pursuant to 28 U.S.C. §1746 as follows:

1. The attached documentation shows the February 20, 2004 negotiation and cancellation of three checks made payable to Star Foods, Inc.

2. The attached documentation was in fact provided by me to the Washington State Office of Minority and Women's Business Enterprises ("OMWBE") as part of the application of The Grove, Inc. for certification as a disadvantaged business enterprise.

3. I do not know why this documentation is not included in the administrative record for this case, but I affirm that I did provide it to OMWBE on behalf of The Grove.

Dated: March 5th 2008

Michelle Dukler

Reprint - 3/22/2004, 2:56pm

MARTIN DULKER
MICHELLE DUKLER
6756 FIELDSTONE
BURR RIDGE, IL  60521

73-2295/773
0433063703

2248

DATE 2-6-05

PAY TO THE
ORDER OF  Star Foods, LLC.    $2,500,000.

Two million five hundred thousand & 00/100  DOLLARS

Midwest Bank and Trust Company
Hinsdale Banking Center

MEMO Stock Purchase

⑈071922955⑈ 043066 26 703⑈ 2248    ⑈0250000000⑈

FEB 03 04

5913

3 2

02-25-0
INCLEARING001  01000000900

#1115001089329

Reprint - 3/22/2004, 2:56pm

**MARTIN DULKER**
**MICHELLE DUKLER**
6750 FIELDSTONE
BURR RIDGE, IL 60521

-73-2235/719
0430662670

2249

DATE 2-6-04

PAY TO THE
ORDER OF ___Star Foods LLC___ $ 100,000.

___One Hundred Thousand & 40/100___ DOLLARS

Midwest Bank and Trust Company
Hinsdale Banking Center

MEMO ___Asset Purchase___

⑈071922955⑈ 0430662670⑈ 2249 ⑈00 0000000⑈

FEB 20 04

5913
3

02-23-04
INCLEARING001

Checks paid to Star Foods for
Asset purchase per closing schedule

Reprint - 3/22/2004, 2:50pm

MARTIN DULKER
MICHELLE DUKLER
0766 FIELDSTONE
DURR RIDGE, IL  60521

73-2235/719
04330035703

2247

DATE 2·6·04

PAY TO THE
ORDER OF _Star Foods  LLC_____ $ 4,110.—

_four thousand One hundred ten & 00/100_____ DOLLARS

Midwest Bank and Trust Company
Hinsdale Banking Center

MEMO _Option Assignment Agreement_

⑈071922955⑈ 04306626703⑈ 2247  ⑈0000411000⑈

FEB 20 04

5913

INCLEARING001  010000910



**MIDWEST BANK**
And Trust Company
*A subsidiary of Midwest Banc Holdings, Inc.*

Midwest Centre, 501 West North Avenue, Melrose Park, IL 60160   708-865-2500
Internet: www.midwestbank.com

STATEMENT Date      2/05/04          Page      3
Primary Account         4306626703
Enclosures                        41

CheckSmart Plus NOW                    4306626703   (Continued)

Activity in Date Order
| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
| | ██████ PPD | | |
| 1/28 | Total of 1 Check Presented | 367.26- | 21,022.47 |
| 1/29 | Total of 1 Check Presented | 500.00- | 20,522.47 |
| | ███ CHECK # 2235 ███████ | | |
| | ██████████ PPD | | |
| 1/30 | Total of 2 Checks Presented | 193.03- | 26,030.24 |
| | ████████████████ | | 26,008.12 |
| | ██████████ | 22.04-DC | 25,987.08 |
| | ███████████ | 2,596.29-AW | 23,390.79 |
| 2/05 | Wire Transfer Credit | 100,000.00 | 123,390.79 |
| | CASEY COWELL | | |
| | 021001033 | | |
| | 02058136901* | | |
| | SUITE 3450 60611 | | |
| | DBTCO AMERICAS NYC | | |
| | PER YOUR REQUEST CASEY COWELL | | |
| 2/05 | Wire Transfer Credit | 2,500,000.00 | 2,623,390.79 |
| | CASEY COWELL | | |
| | 021001033 | | |
| | 02058136901* | | |
| | SUITE 3450 60611 | | |
| | DBTCO AMERICAS NYC | | |
| | PER YOUR REQUEST CASEY COWELL | | |
| 2/05 | INTEREST PAID | 150.77 IN | 2,623,541.56 |
| 2/05 | Total of 1 Check Presented | 18.00- | 2,623,523.56 |
| 2/05 | Wire Transfer Fee | 5.00-WF | 2,623,518.56 |
| 2/05 | Wire Transfer Fee | 5.00-WF | 2,623,513.56 |
| 2/05 | Telephone Transfer Debit | 177.39-TE | 2,623,336.17 |

*(handwritten: loan from cowell)*

Checks in Serial Number Order
| Date | Check No | Amount | Date | Check No | Amount | Date | Check No | Amount |
|------|----------|--------|------|----------|--------|------|----------|--------|
| 1/26 | | 2500.00 | 1/13 | 2203 | 500.00 | 1/13 | 2215 | 654.59 |
| 1/12 | 2185* | 480.00 | 1/13 | 2204 | 164.31 | 1/15 | 2216 | 24.00 |
| 1/20 | 2188* | 34.80 | 1/14 | 2205 | 300.00 | 1/13 | 2217 | 430.00 |
| 1/12 | 2189 | 35862.33 | 1/13 | 2206 | 113.13 | 1/21 | 2218 | 350.00 |
| 1/07 | 2190 | 417.75 | 1/13 | 2207 | 150.00 | 1/21 | 2219 | 696.13 |
| 1/06 | 2191 | 400.00 | 1/14 | 2208 | 67.09 | 1/26 | 2221* | 14.43 |
| 1/08 | 2196* | 420.00 | 1/14 | 2209 | 500.00 | 1/23 | 2222 | 4200.00 |
| 1/22 | 2198* | 15.00 | 1/16 | 2210 | 2000.00 | 1/22 | 2223 | 1005.00 |
| 1/13 | 2199 | 499.72 | 1/13 | 2211 | 84.84 | 1/22 | 2224 | 400.00 |
| 1/13 | 2200 | 144.45 | 1/13 | 2212 | 9190.30 | 1/21 | 2225 | 654.59 |
| 1/13 | 2201 | 160.05 | 1/13 | 2213 | 500.00 | 1/22 | 2227* | 219.26 |
| 1/13 | 2202 | 500.00 | 1/16 | 2214 | 23.40 | 1/30 | 2230* | 69.90 |

* Indicates a break in check number sequence.

*...nks For Banking The Midwest Way!*                    Member FDIC

# ATTACHMENT B

*HOFFMAN & COMPANY, INC. V. SCDOT*

Saturday, March 08, 2008 Division of Motor Vehicle Hearings

SC Administrative Law Court Decisions
CAPTION:
Hoffman & Company, Inc. vs. SCDOT

AGENCY:
South Carolina Department of Transportation

PARTIES:
Petitioners:
Hoffman & Company, Inc.

Respondents:
South Carolina Department of Transportation

DOCKET NUMBER:
00-ALJ-19-0533-CC

APPEARANCES:
n/a

ORDERS:

FINAL ORDER AND DECISION
STATEMENT OF THE CASE

This matter comes before the Administrative Law Judge Division (Division) pursuant to
S.C. Code Ann. Â§ 1-23-600(B) (Supp. 2000) and 25A S.C. Code Ann. Regs. 63-700 et
seq. (Supp. 2000), upon the Petitioner's request for a contested case hearing to review a
decision of the Respondent, South Carolina Department of Transportation (Department),
denying the Petitioner's application for certification as a Disadvantaged Business
Enterprise (DBE). A contested case hearing on the merits of the Petitioner's request was
held at the offices of the Division in Columbia, South Carolina, on March 1, 2001. For
the following reasons, I find that the Petitioner's application for certification should be
granted.

DISCUSSION

The Department is required to certify eligible firms to participate in the state DBE
program, pursuant to S.C. Code Ann. Â§ 12-28-2930(B) (Rev. 2000). The Department,
as a recipient of federal funds, is also required to implement a DBE program in
compliance with 49 C.F.R. Part 26. The DBE program allows eligible firms to compete
for and receive portions of construction projects as subcontractors. Participation in the

DBE program is limited to firms which are certified by the Department as a DBE, based upon the standards and procedures set forth in 25A S.C. Code Ann. Regs. 63-703 and 63-704 (Supp. 2000) and 49 C.F.R. Part 26. To be certified as a DBE, a firm must be owned and controlled by one or more individuals who are either socially and economically disadvantaged ethnic minorities or females. See 25A S.C. Code Ann. Regs. 63-703 (Supp. 2000); 49 C.F.R. Part 26, Subpart A, § 26.5.

The Petitioner applied for certification as a DBE in January and February 2000. The Petitioner's application was presented to the Department's Disadvantaged Business Enterprise Advisory Committee for review. By certified letter dated June 27, 2000, the Department notified the Petitioner that its request for certification was denied, based upon the Department's determination that the Petitioner's owner, Candace Phelps, had failed to demonstrate that she made a "real and substantial contribution" to fund the start-up of the company or that she had sufficient ability and expertise to control the day-to-day operations of the company.

FINDINGS OF FACT

Having observed the witnesses and exhibits presented at the hearing and closely passed upon their credibility, taking into consideration the burden of persuasion by the parties, I make the following findings of fact by a preponderance of the evidence:

1. Notice of the date, time, place, and nature of the hearing was timely given to all parties.

2. The Petitioner, Hoffman & Company, Inc., a Georgia corporation which prepares aerial surveys, three-dimensional mapping, and land surveys for use by engineers and developers, applied to the Department for certification as a Disadvantaged Business Enterprise pursuant to 25A S.C. Ann. Regs. 63-700 et. seq. and 49 CFR Part 26. The Department, following its investigation, denied certification.

3. Candace Phelps is the majority shareholder of Hoffman & Company. She directly owns 5,100 shares or 51% of Hoffman & Company. The contributions for Candace Phelps' ownership of the company included approximately $49,000.00 of her savings and $225,000.00 received in a loan from her father. Her remaining purchase price was paid by a $612,000.00 promissory note to Irving C. Hoffman. However, Ms. Phelps has repaid a substantial portion of that loan and currently owes only $155,00000 on the note. Additionally, Ms. Phelps has repaid the $225,000.00 loan from her father.

Although the original documentation submitted to the South Carolina Department of Transportation could reasonably have been interpreted to question Ms. Phelps' ownership interest, her ownership interest in Hoffman & Company is real and substantial. Additionally, the Department's concerns as to loans made for acquisition of that interest have been allayed by the passage of time and current payments and level of capital contribution on the part of Ms. Phelps.

4. Hoffman & Company's principal business is photogrammetric mapping. Photogrammetry is "the science of making reliable measurements by the use of photographs and especially aerial photographs (as in surveying)." Merriam Webster's Collegiate Dictionary 875 (10th ed. 1993). Candace Phelps has a four-year degree in Geomatics from the College of Engineering at the University of Florida. The University of Florida defines and describes "geomatics" as:

Geomatics is the modern scientific term referring to the integrated approach of measurement, analysis, and management of the descriptions and locations of Earth-based data, often termed spatial data. These data come from many sources, including earth orbiting satellites, air and sea-borne sensors and ground based instruments. It is processed and manipulated with state-of-the-art information technology using computer software and hardware.

Geomatics has applications in all disciplines which depend on spatial data, including environmental studies, planning, engineering, navigation, geology and geophysics, land development and land ownership. It is thus fundamental to all geoscience disciplines which use spatially related data, such as- Surveying, Geodesy, Remote Sensing & Photogrammetry, Cartography, Geographic Information Systems and Global Positioning Systems.

See http://www.surv.ufl.edu/. In other words, her degree specializes in the field in which Hoffman & Company operates. Therefore, Ms. Phelps has the requisite skill and expertise in areas critical to the company's operations and potential success.

After Ms. Phelps originally purchased her ownership in Hoffman & Company, she did not actively manage the company. Rather, Irving Hoffman continued to manage the company for the first year after the purchase. Ms. Phelps then hired Everett Roper as general manager of Hoffman & Company while she completed her college education. After she completed her college education, Ms. Phelps assumed management duties at Hoffman & Company in June 1999. Ms. Phelps eventually terminated the services of Mr. Roper and assumed control of the management of Hoffman & Company in December 1999.

Ms. Phelps now acts as the Chairman of the Board of Directors, President and CEO, and Treasurer of Hoffman & Company. While she delegates some areas of responsibility, such as recruiting or estimating, she manages the policies, operations and fiscal affairs of the company on a day-to-day and long range basis. She also reviews work and cost estimates of subordinates and makes changes in her discretion. Ms. Phelps decides what equipment is necessary for the safe and efficient operation of the company, and personally assumes the risks associated with borrowing capital to purchase such equipment.

5. Hoffman & Company is not dependent upon a relationship with any other company for its success. Furthermore, there are no formal or informal restrictions on the company which limit the discretion of Ms. Phelps to control the destiny of Hoffman & Company.

6. Hoffman & Company is certified as a Disadvantaged Business Enterprise by both the Alabama and Georgia Departments of Transportation. Additionally, Hoffman & Company is certified as a Female Business Enterprise by the City of Atlanta, Georgia.

CONCLUSIONS OF LAW

Based upon the above Findings of Fact, I conclude the following as a matter of law:

Jurisdiction and Relevant Law

1. This Division has subject matter jurisdiction in this case pursuant to S.C. Code Ann. § 1-23-600(B) (Supp. 2000) and 25A S.C. Code Ann. Regs. 63-704(K) (Supp. 2000).

2. The Department is required to certify eligible firms to participate in the state DBE program pursuant to S.C. Code Ann. § 12-28-2930(B) (Rev. 2000). As a recipient of federal highway funds, the Department is also required to implement a DBE program in compliance with 49 C.F.R. Part 26. The Department has promulgated regulations to implement both the state and federal DBE programs in South Carolina. See 25A S.C. Code Ann. Regs. 63-700 et seq. (Supp. 2000). Pursuant to the regulations, the Department has adopted the standards for certifying DBEs which are set forth in 49 C.F.R. Part 26. See 25A S.C. Code Ann. Regs. 63-702(A) and 63-703(A) (Supp. 2000).

3. A firm seeking certification as a DBE has the burden of demonstrating, by the preponderance of the evidence, that it meets the requirements of 49 C.F.R. Part 26 concerning group membership or individual disadvantage, business size, ownership, and control. 49 C.F.R. § 26.61 (b).

4. The Department does not contest whether Hoffman & Company meets the requirements of group membership or business size. If Ms. Phelps owns and controls the firm, the firm would qualify as a DBE because she is a member of the presumptively disadvantaged group of women. See 25A S.C. Code Ann. Regs. 63-701(F) (Supp. 2000); 49 C.F.R. § 26.67(a). However, the Department denied certification as a DBE to Hoffman & Company on the grounds of ownership and control. The Department contends that Ms. Phelps did not make a real and substantial contribution to acquire her ownership of Hoffman & Company as required by 25A S.C. Code Ann. Regs. 63-700(E) and 49 C.F.R. § 26.69, nor does she "control" the firm as required by Regulation 63-700(E) and 49 C.F.R. § 26.71. Hoffman & Company, on the other hand, contends that Ms. Phelps meets the requirements of the regulations concerning ownership and control.

Ownership

5. The Department contends that Ms. Phelps does not "own" Hoffman & Company within the meaning of the regulations because she did not make a "real and substantial" financial contribution to the firm. 49 C.F.R Â§26.69(c) sets forth that a firm's ownership by disadvantaged individuals:

must be real, substantial, and continuing, going beyond pro forma ownership of

the firm as reflected in ownership documents. The disadvantaged owners must

enjoy the customary incidents of ownership, and share in the risks and profits

commensurate with their ownership interests, as demonstrated by the substance,

not merely the form, of arrangements.

Additionally, 49 C.F.R Â§26.69(e) provides that:

[t]he contributions of capital or expertise by the socially and economically disadvantaged owners to acquire their ownership interests must be real and substantial. Examples of insufficient contributions include . . . an unsecured note payable to the firm or an owner who is not a disadvantaged individual . . . .

(emphasis added). Ms. Phelps' initial ownership was acquired, in substantial part, by an unsecured promissory note to Irving Hoffman. However, 49 C.F.R Â§26.73(b) provides:

[y]ou must evaluate the eligibility of a firm on the basis of present circumstances. You must not refuse to certify a firm based solely on historical information indicating a lack of ownership or control of the firm by socially and economically disadvantaged individuals at some time in the past, if the firm currently meets the ownership and control standards of this part.

Currently, the only debt Ms. Phelps owes on her original purchase of 5,100 shares in the company is $155,000.00 on the original note of $612,000.00 to Mr. Hoffman. Therefore, I conclude that Candace Phelps made a real and substantial financial contribution to Hoffman & Company and that she is the "owner" of Hoffman & Company within the meaning of 49 C.F.R. Â§26.69.

Management and Control

6. The Department also argues that Ms. Phelps does not "control" Hoffman & Company according to the requirements of 49 C.F.R. Â§26.71 because she lacks the necessary technical expertise and experience. 49 C.F.R. Â§26.71(d) provides that "[t]he socially and economically disadvantaged owners must possess the power to direct or cause the direction of the management and policies of the firm and to make day-to-day as well as long-term decisions on matters of management, policy and operations." Additionally, the

disadvantaged owner must "hold the highest officer position in the company" and "control the board of directors." 49 C.F.R. §26.71(d)(1) and (2). The Department asserts that Ms. Phelps' lack of experience prohibits her from being able to manage the company. Rather, the Department argues that Mr. Hoffman who is still employed by Hoffman & Company is the party who possesses the requisite ability to control the firm.

The DBE regulations do not prohibit the involvement of non-disadvantaged persons in a firm. 49 C.F.R. § 26.71(e) states, in part, that "[i]ndividuals who are not socially and economically disadvantaged may be involved in a DBE firm as owners, managers, employees, stockholders, officers, and/or directors." Furthermore, 49 C.F.R. § 26.71(f) provides that:

[t]he socially and economically disadvantaged owners of the firm may delegate various areas of the management, policymaking, or daily operations of the firm to other participants in the firm, regardless of whether these participants are socially and economically disadvantaged individuals. Such delegations of authority must be revocable, and the socially and economically disadvantaged owners must retain the power to hire and fire any person to whom such authority is delegated. The managerial role of the socially and economically disadvantaged owners in the firm's overall affairs must be such that the recipient can reasonably conclude that the socially and economically disadvantaged owners actually exercise control over the firm's operations, management, and policy.

With respect to the expertise necessary to control a firm, the regulations state:

[t]he socially and economically disadvantaged owners must have an overall understanding of, and managerial and technical competence and experience directly related to, the type of business in which the firm is engaged and the firm's operations. The socially and economically disadvantaged owners are not required to have experience or expertise in every critical area of the firm's operations, or to have greater experience or expertise in a given field than managers or key employees. The socially and economically disadvantaged owners must have the ability to intelligently and critically evaluate information presented by other participants in the firm's activities and to use this information to make independent decisions concerning the firm's daily operations, management, and policymaking. Generally, expertise limited to office management, administration, or bookkeeping functions unrelated to the principal business activities of the firm is insufficient to demonstrate control.

49 C.F.R. § 26.71(g).

Applying these guidelines to the facts of this case, it is undisputed that Ms. Phelps holds the position of President of Hoffman & Company and is the Chairman of the Board of Directors. The evidence further reveals that Ms. Phelps performs virtually all key management functions for Hoffman & Company. Though David Wilkins and other employees possess management authority, Ms. Phelps ultimately possesses the power to fire those individuals. Therefore, Ms. Phelps has the power to direct the management and

policies of the firm and to make both day-to-day and long-term decisions concerning the management, policy and operations of Hoffman & Company.

The question is also whether Ms. Phelps has sufficient experience and expertise to be able to evaluate information provided by others and to use the information to make independent decisions concerning the firm's operations. See 49 C.F.R. §  26.71(g). Ms. Phelps possesses education in photogrammetric mapping and experience in the area of surveying. There is no dispute that Mr. Hoffman and some of the employees of Hoffman & Company possess greater experience and expertise in the photogrammetric mapping industry than does Ms. Phelps. However, as set forth above, although the owner of a firm must possess an overall understanding of and competence in the business in which the firm is engaged, the regulations do not require the disadvantaged owner of a firm to have experience and expertise in every area of the firm's operations or to have greater experience and expertise than key employees of the firm. While Mr. Hoffman offers his opinions and assistance on bids and estimates, Ms. Phelps has an understanding of, and the technical competence and experience directly related to the business of Hoffman & Company. I therefore conclude that Ms. Phelps possesses sufficient experience and expertise to be able to evaluate information provided by Mr. Hoffman and others and to make independent decisions on behalf of Hoffman & Company.

ORDER

Based upon a review of all the evidence in the record, together with the applicable law, I find that Candace Phelps "owns" and "controls" Hoffman & Company for purposes of 49 C.F.R. Part 26 and that Hoffman & Company's application for certification as a Disadvantaged Business Enterprise must be granted.

IT IS THEREFORE ORDERED that the application of Hoffman & Company for certification as a Disadvantaged Business Enterprise is granted.

AND IT IS SO ORDERED.

_____

Ralph King Anderson, III

Administrative Law Judge

April 17, 2001

Columbia, South Carolina

--------------------------------------------------------------------------------

Copyright © 2004-2007 SC Administrative Law CourtSearch:

# ATTACHMENT C

*DBE APPEAL DECISIONS CITED BY DEFENDANTS*

December 19, 2005

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Reference No.: 05–0118

Ms. Rita Nelson
Reconsideration Official – Appeals
California Department of Transportation
1823 14th Street – MS 79
Sacramento, CA 95814-7189

Dear Ms. Nelson:

This is in response to an appeal of Disadvantaged Business Enterprise (DBE) certification denial filed on behalf of Dirt & Aggregate Interchange, Inc. ("DAI"). We have carefully reviewed the material from the California Department of Transportation ("CUCP"), as well as the information provided on behalf of DAI, by its attorney, Mr. ▮▮▮▮▮▮ and have concluded that the record should be developed further before the Department can make a final decision on the appeal. Accordingly, we are remanding the case to CUCP for further consideration.

<u>SIZE STANDARDS</u>

According to the record, Mr. Henry Pelfrey is the sole owner, President, and director of DAI, a firm established in 1976. DAI is a highway contractor, guardrail supplier, and construction equipment sale and rental firm. In its March 5, 2004 letter, the CUCP informed DAI that as of October 23, 2004, the CUCP implemented the use of the North American Industry Classification System to identify work types for participants of the DBE program. In this letter, the CUCP enclosed DAI's current DBE certificate and designated NAICS codes, asking the firm to verify this information and to contact a member of the CUCP if there are any additions or deletions to the firm's NAICS codes. The CUCP assigned the firm the following NAICS codes:

> 237310 Highway, street, and bridge construction
> 238110 Poured concrete foundation and structure contractors
> 238120 Structural steel and precise concrete contractors
> 238910 Site preparation contractors
> 238990 All other specialty trade contractors

On June 1, 2005, the CUCP notified Mr. Pelfrey that since DAI had average three year gross receipts of $█████████ it had exceeded the maximum size standard ($12,000,000.00) to be considered a small business in the work category "site preparation and specialty trade contractors." The CUCP sent a similar letter to the firm that same day explaining that since the average of firm's gross receipts for 2001 ($1█████████), 2002 ($█████████), and 2003 ($█████████) was $█████████, this exceeded the size limitation for the firm's "primary work" categories 238910 and 238990 for the California State Minority Business Enterprise Program.

In Mr. █████████ June 17, 2004, letter to CUCP, he alleged that 1) the CUCP's original DBE certification did not indicate any primary industry as defined by 13 CFR §121.107; 2) the CUCP did not possess information by which to assess DAI's primary industry when it assigned the firm's NAICS codes; 3) the CUCP failed to determine "primary industry" in accordance with 13 CFR §121.07, if based on its June 1, 2005, letter, a review of the firm's application and tax records indicates the primary work for DAI is 238910 and 238990;" 4) a proper evaluation of receipts, employees and costs of doing business under each contract or subcontract shows that DAI's primary industry would be NAICS code 23710 (Highway, Street, and Bridge Construction), which has a size limitation of $28.5 million.

The record contains a copy of the firm's July 2000 "Disadvantaged, Minority Women Business Enterprise Application" that states that DAI's business is "highway road construction, site development, airport projects, and manufacturing and supplying certain construction supplies, such as concrete guardrail barrier[s]."

To be eligible for the Department's DBE program under the Department's Regulation 49 C.F.R Part 26 ("the Regulation") §26.65, a firm must not exceed the applicable size standard set by the SBA. At the time of CUCP's review, DAI's average gross receipts were $█████████, which exceeded the size standard for NAICS Code 238910 and 238990 of $12,000,000.00. However, recently, the SBA amended its size standard for these codes to $13,000,000.00 effective December 6, 2005.

The amount of work a firm performs in each work classification is not a consideration in determining whether a firm exceeds the size standards. Recipients are to apply the size standards set by the SBA to the applicable categories of work a firm is certified in measured against the firm's gross receipts. According to the CUCP's July 7, 2005, letter, it did not receive a response from DAI concerning the assignment of NAICS codes. In addition, the letter indicates that the CUCP automatically removed NAICS codes if the firm did not have the required licenses. According to the firm's DBE renewal application, DAI has a C-32 license (Parking and Highway Improvement Contractor). The CUCP's July 7, 2005, letter notes that in order to have a NAICS code of 237310 (Highway, Street and Bridge Construction), the firm must posses a "A General Engineering Contractor's" license.

In Mr. █████████ August 2, 2005, rebuttal letter, he claims that the firm submitted to the CUCP evidence establishing that 78% of DAI's revenue, 77% of its costs of goods, and 76 % of its labor were attributable to the installation of guardrail and work under NAICS code 237310; and disagrees as to the CUCP's assignment of NAICS codes 238910 and 238990. In his letter, he offers a quote of the description of NAICS code 237130 which states:

This industry comprises establishments primarily engaged in the construction of highways (including elevated), streets, roads, airport runways, public sidewalks, or bridges. The work performed may include new work, reconstruction, rehabilitation, and repairs. Specialty trade contractors are included in this group if they are engaged in activities primarily related to highway, street, and bridge construction (e.g., installing guardrails on highways).

Under the Regulation §26.65, recipients must apply current SBA business size standard(s) found in 13 CFR Part 121 appropriate to the type(s) of work the firm seeks to perform in DOT-assisted contracts. Thus it would appear that the CUCP's obligation under the Regulation is to compare the type of work a firm requests to perform to the size standards established by the SBA. The recipient must verify that the applicant firm is capable of performing the type of work being requested and has the equipment and capability to perform the work. The CUCP appears to have done this in this instance. The Department notes that the method of assigning specific work codes to a firm is not an issue that can be appealed to the Department under the Regulation. Similarly, there is no provision in the Department's Regulation mandating that a recipient afford a firm a hearing to challenge this determination, as alleged by Mr. ███.

Since the size standards used to deny the firm have been amended to a higher figure, and the firm's gross receipts in NAICS Code 238910 and 238990 appear below this standard, CUCP's determination that the firm is ineligible is not supported by the record and is hereby reversed.

PERSONAL NET WORTH

In responding to our request for the record in this matter, CUCP provided additional information to demonstrate how it arrived at the conclusion that Mr. Pelfrey was not economically disadvantaged within the meaning of the Department's Regulation §26.67. Since it is unclear from the Department's reading of the record whether this information was shared with the firm, the Department will summarize the information used by CUCP, and offer the firm the opportunity to respond.

On May 24, 2005, the CUCP informed Mr. Pelfrey that the firm had graduated from the program because, based on CUCP's evaluation, he had exceeded the $750,000.00 limitation on his personal net worth statement. CUCP assessed Mr. Pelfrey's personal net worth using his December 31, 2003, financial statement:

| **Personal Financial Statement as of December 31, 2003** | | **CUCP Evaluation** |
|---|---|---|
| **Assets** | | |
| Cash in Bank | ███ | ███ |
| Savings Account | | |
| IRA account | ███ | ███ |
| Note receivable | | |
| Life Insurance | | |
| Stocks and Bond | | |
| Real Estate | ███ | ███ |
| 2nd real estate | | |



**Personal Financial Statement as of December 31, 2003 (Cont'd)**

**CUCP Evaluation**

The record contains a copy of CUCP's analysis, which states:

> [On] May 24, 2005, the Department sent Mr. Pelfrey a letter advising that he was no longer eligible for the DBE program. The letter cited that incorrect property values were listed on his personal financial statement and that the actual values of his properties exceeded $750,000.00. Some of the factors the [CUCP] considered in arriving at its determination were (1) the state of ▓▓▓▓ is not a community property state, yet Mr. Pelfrey had divided his assets, 2) a comparison of prior personal financial statements and the 2003 personal income taxes, 3) the [CUCP], using internal real estate sites, verified several of the market values reported by the DBE owners were undervalued (i.e. ▓▓▓▓ properties). . . .

> The following assumption was used by the [CUCP] to evaluate Mr. Pelfrey's net worth after finding several discrepancies in his [PNW statement] that was submitted. Mr. Pelfrey undervalued his properties and applied the community property law, which does not exist in ▓▓▓▓. He used county assessor's value for properties, which does not reflect the fair market value of his properties. . . .

[CUCP's] position after uncovering the facts determined Mr. Pelfrey's net worth clearly exceeded the $750,000 [personal net worth requirement]. Attachment 2 contains a detailed analysis by the [CUCP] of the fair market value for Mr. Pelfrey's properties including his ownership interest. The [CUCP] determined Mr. Pelfrey's ███ share in the ███████ appears to have been undervalued. The trust contains six rental properties in ██████ according to the personal net worth dated March 17, 2000. At that time the trust was valued at $██████. On July 28, 2004, Mr. Pelfrey stated his share value at $██████. To determine a conservative fair market value of the trust that includes six ██████ properties, the [CUCP] estimated each of these rental properties to be worth $██████. Therefore, the total value of the trust at a minimum is $████████ and Mr. Pelfrey's ████████████████.

In addition, several other properties in ██████ were not reported at their fair market value and the [personal financial statement] was inaccurate and deficient in values. Mr. Pelfrey's rental home at ████████████ was listed on the [personal financial statement] with a fair market value of $██████. The rental description for this property named ████████████████ is described as top of the line resort vacation rental in ████. The description of the home and amenities extracted from the website is in attachment 3. The average market value of homes in this area is [allegedly] in excess of ████████ dollars (see attachment 4). The same value, ████████████ dollars, was applied to the property located at ████████████ According to the ██████ Department of Transportation, properties located on ████████ face the ocean. This area is a highly desirable and exclusive resort location.[1]

CUCP's valuation of Mr. Pelfrey's ownership interest in real property (referred as attachment 2 above) is as follows:



| | Ownership Interest Reported on Personal Financial Statement | Fair Market Value Reported on Personal Financial Statement as of 12/31/03 | [CUCP's] Evaluation of Ownership Interest | [CUCP's] Estimate of Fair Market Value based on Ownership Interest |
|---|---|---|---|---|
| ██████████ | ██ | ██ | ██ | ██ |
| ██████ | ██ | ██ | ██ | ██ |



---

[1] Attachment 3 is a page from a website "4BeachNuts.com" describing "██████," a rental property on ██████, which shows rental rates ranging from $██████ per week. A similar attachment from Vacation.Com also describes the ██████ property. Attachment 4 is a real estate listing from Realtor.Com for ████████████ in ██████, which shows an asking price of $██████.



| (Cont'd) | Ownership Interest Reported on Personal Financial Statement | Fair Market Value Reported on Personal Financial Statement as of 12/31/03 | [CUCP's] Evaluation of Ownership Interest | [CUCP's] Estimate of Fair Market Value based on Ownership Interest |
|---|---|---|---|---|
| ████████ | ██ | ███ | ██ | ███ |
| ████ | ███ | ███ | ███ | ███ |
| █████ | ██ | ███ | ███ | ███ |
| ███████ | ███ | ██ | ███ | ██ |
| █████ | ███ | ███ | ███ | ██ |
| █████ | ██ | ███ | ███ | ██ |
| ███ | ██ | ███ | ███ | ██ |
| **Total Real Estate Value** | | $████ | | $████ |

As shown above, CUCP determined that Mr. Pelfrey's share in the ████████████ was undervalued and that several properties were not reported at fair market value. Each asset, with the exception of the cattle ranch and hatchery, are addressed below:

████    Vacation Rentals

To substantiate the CUCP's valuation of the █████████████████████ property, the record contains a copy of a "real property assessment notice for fiscal year July 1, 2005 to June 30, 2006" which shows the property's net taxable value to be $████. A similar notice for the ███████████ address shows a net taxable value of $████. However, as noted above, CUCP reasoned that other homes in the area are worth more given the amenities in similar homes. The CUCP submitted to the Department a real estate listing for a house on ████ Drive with an asking price of $████. It appears that the CUCP's valuation of the ████ ████ and ████████rive rental properties is appropriate in this case. It also appears reasonable to include in an owner's personal net worth the value a particular parcel will receive in the marketplace.

Undeveloped Residential Lots

In Mr. ███████ rebuttal letter to the Department, he submitted a personal net worth statement for Mr. Pelfrey that, according to his calculation, places him under the $750,000.00 net worth limitation. The Department notes that he estimated the fair market value of Mr. Pelfrey's one-half interest in the various rental properties much higher than the amounts reported on his December 31, 2003 personal net worth statement.



| | Ownership Interest | 100 % Fair Market Value for Jointly Owned Assets | Mr. Pelfrey's Net Worth |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | [left blank] | |

Although it is likely that these amounts increased from the time of Mr. Pelfrey's personal net worth statement was submitted to the CUCP, the values he reported for the undeveloped residential lots seem to support the CUCP's conclusion as to their value, even though he disagrees with the ownership amounts. It is important to note that while Mr. ███████ chart (reproduced above) identifies Mr. Pelfrey's interest for all properties at █ percent, he indicated in his June 17, 2005, letter to the CUCP:

[The .█ Acre Residential Lot]

This is an undeveloped parcel of property. The ███████ County real property records list Mr. Pelfrey as the sole owner of the property. That notwithstanding, ███████ is a community property state. ███████ Mr. Pelfrey's spouse, though not listed on the deed, has an equitable one-half interest in the property, because of the community property status of ███████. . . . The fair market value cited in Mr. Pelfrey's July 28, 2004, PNW statement, which was compiled as of



12/31/03, listed the fair market value for this property as $████, which was one half of the fair market value, as listed on the a tax statement which was in effect as of December 31, 2003. The tax statement which covers the fiscal year July 1, 2005 to June 30, 2006, which is the basis for an updated PNW statement . . . lists the fair market value as $████ Mr. Pelfrey has filed a tax appeal with respect to this property. Mr. Pelfrey contends the fair market value of the property is actually 20 percent less than the value stated on the 2005 assessment notice. That notwithstanding, Mr. Pelfrey has included $████ one-half of the fair market value of the property in his PNW calculation.

[The ████████ Property]

Mr. Pelfrey owns an undivided one-half interest in this undeveloped lot. The property is currently not properly zoned for any building or permitted development. Mr. Pelfrey and his spouse bought the property at a tax foreclosure auction. Variances will be required or the property will have to be re-zoned in order to permit development. The fair market value as of December 31, 2003, was $████. Mr. Pelfrey included one-half of that amount in his PNW statement submitted to [CUCP] on July 28, 2004. The fair market value, as of the ████████ County Assessment, for the bare land is $████. Mr. Pelfrey has included $████, one-half of ████████ County's fair market valuation for the property, in his updated PNW calculation.

For the ███ acre lot, the CUCP appears to have counted the property's full value to Mr. Pelfrey. As Mr. ████ indicated in his June 17, 2005, letter to the CUP, "the ████ County real property records list Mr. Pelfrey as the sole owner of the property." He alleged in that letter however, that although Ms. ████— Mr. Pelfrey's spouse, is not listed on the deed, only one-half of the property's value should be attributed to Mr. Pelfrey since ████ is a community property state.

The Department agrees with the CUCP on this point. Since Mr. Pelfrey lives in ████████ State, which is not a community property state and only his name appears on the real property records, it is reasonable to attribute the full 100 percent value of this parcel to him, even though it is located in ████ which is a community property state. The Department's Regulation §26.69, which references the concept of community property, does so in the context of marital assets used to acquire ownership interest by one spouse. This provision is not a relevant factor when determining an applicant's net worth.

With regards to the ████ Avenue property, we agree that only 50 percent of its value should be attributed to Mr. Pelfrey.

<u>Assets Held in Trust</u>

The CUCP's valuation of Mr. Pelfrey's █ percent ownership interest in the "████ Trust" also appears reasonable. According to CUCP "the trust contains six rental properties in ████ according to the personal net worth dated March 17, 2000. At that time the trust was valued at $████████." As indicated above, the CUCP estimated that each property was worth

$███████ and that given Mr. Pelfrey's ██ percent ownership in the trust, the resulting figure to place on personal net worth calculation would be $████████, not $████████ as originally listed.

██████████████

According to Mr. ████████ June 17, 2005, letter to the CUCP, Mr. Pelfrey is the sole owner of lots ███████, which he states has a fair market value of $███████. The valuation of this asset, originally estimated by Mr. Pelfrey and CUCP as $███████ is not in dispute and will not be addressed further.

The Department is unable to render a decision regarding Mr. Pelfrey's personal net worth and whether it exceeds the $750,000.00 limitation specified under the Department's Regulation §26.67(b). It appears that for some of Mr. Pelfrey's assets, the CUCP derived value estimates based on other properties in the vicinity, and made general assumptions that because Mr. Pelfrey's properties were within these areas; his properties are worth comparable amounts if sold on the market today. The Department suggests that the CUCP obtain more definitive data in order to make a more accurate analysis of the specific properties in question. As such, we are remanding the case to the CUCP to develop the record further before the Department can make a final decision on this aspect of the appeal. The CUCP should request and the applicant firm should provide any additional information needed to substantiate the value of Mr. Pelfrey's properties. Once the CUCP's analysis is complete, the Department is requesting that the CUCP provide the firm an additional opportunity to respond to its analysis and address Mr. Pelfrey's disadvantaged status. If the firm wishes to rebut the information used by CUCP in reaching its conclusion that Mr. Pelfrey's personal net worth exceeds the $750,000.00 limit specified in the Department's Regulation §26.67(a)(2)(i), the firm must do so within 45 days of receiving CUCP's analysis. If there is disagreement concerning Mr. Pelfrey's disadvantaged status, CUCP is directed to hold a hearing and afford the firm the opportunity to renew its appeal to the Department.

Sincerely,


Joseph E. Austin, Chief
External Policy and Program Development Division
Departmental Office of Civil Rights

cc: ██████████████

October 9, 2007

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Reference No: 07–0115

Mr. Timothy R. Conway
Attorney at Law
Conway & Mrowiec
20 South Clark Street
Suite #750
Chicago, IL 60603

Dear Mr. Conway:

This is in reference to the complaint filed by your client, ████████████████ ("██████"), challenging the February 19, 2007, determination by the Chicago Transit Authority ("CTA") that Stevenson Crane Service, Inc. ("SCS") is eligible for the Disadvantaged Business Enterprise (DBE). We have carefully reviewed the material from CTA, as well as that you provided on behalf of your client, and have concluded that CTA properly determined that SCS remains eligible for the DBE program.

On June 29, 2005, Mr. ██████████████ filed a third-party complaint with CTA alleging that SCS was not eligible for the DBE program because its owner, Ms. Donna Stevenson, exceeded the personal net worth limitation of $750,000.00, as set forth in the Department's DBE Regulation 49 CFR Part 26 ("the Regulation") §26.67(a)(2). After obtaining information from the firm and reviewing its record in the matter, CTA issued a decision on October 27, 2005, and determined that SCS remained an eligible DBE. Following your June 29, 2006, rebuttal letter to the Department, we reviewed the record, identified several areas which needed to be developed further, and on September 29, 2006, remanded the matter back to CTA for further consideration.

The record indicates that following the Department's instructions in its September 29, 2006, letter, CTA requested additional financial information from Ms. Stevenson. After reviewing the information provided, CTA determined on February 19, 2007, (hereafter "February 2007 determination") that Ms. Stevenson's personal net worth continued to be under the $750,000.00, limitation. On May 17, 2007, you filed a second challenge to CTA's February 2007 determination. This letter responds to the allegations you raised.

1. According to your May 17, 2007, letter you received a redacted copy of CTA's February 2007 determination. You alleged that CTA withheld information from your client and did not properly follow the requirements of §26.87(a)(3). Specifically, you alleged that the redacted copy of CTA's February 2007 determination was unintelligible because of many redactions, which rendered you unable to determine CTA's reasons for its decision. The Department disagrees. Although CTA provided you with a redacted decision, the substance of CTA's decision process can be clearly discerned. CTA properly redacted information concerning Ms. Stevenson's finances pursuant to the following sections of the Regulation:

> §26.67(a)(2)(iv): Notwithstanding any provision of Federal or state law, you must not release an individual's personal net worth statement nor any documentation supporting it to any third party without the written consent of the submitter. Provided, that you must transmit this information to DOT in any certification appeal proceeding under §26.89 in which the disadvantaged status of the individual is in question.

> §26.109(a)(2): Notwithstanding any provision of Federal or state law, you must not release information that may be reasonably be construed as confidential business information to any third party without the written consent of the firm that submitted the information. This includes applications for DBE certification and supporting documentation. However, you must transmit this information to DOT in any certification appeal proceeding under §26.89 in which the disadvantaged status of the individual is in question.

2. You alleged that CTA treated the unpaid taxes of SCS as a liability on Ms. Stevenson's personal net worth calculation, improperly reasoning that that since SCS is a Subchapter S Corporation and Ms. Stevenson is the sole owner of the firm, she is taxed on the pass through taxes. You alleged further that if CTA accepts this as a liability, it must also count SCS assets as part of its calculation including Ms. Stevenson's salary and other benefits from the company. The following sections of the Regulation define personal net worth and specify how recipients are to determine whether an applicant exceeds the $750,000.00, personal net worth limitation.

> §26.5: Personal net worth means the net value of the assets of an individual remaining after total liabilities are deducted. An individual's personal net worth does not include: The individual's ownership interest in an applicant or participating DBE firm; or the individual's equity in his or her primary place of residence. An individual's personal net worth includes only his or her own share of assets held jointly or as community property with the individual's spouse.

> §26.67(a)(2)(iii): In determining an individual's net worth, you must observe the following requirements: (A) Exclude an individual's ownership interest in the applicant firm; (B) Exclude the individual's equity in his or her primary residence (except any portion of such equity that is attributable to excessive withdrawals from the applicant firm). (C) Do not use a contingent liability to reduce an individual's net worth. (D) With respect to assets held in vested pension plans, Individual Retirement Accounts, 401(k) accounts, or other retirement savings or

investment programs in which the assets cannot be distributed to the individual at the present time without significant adverse tax or interest consequences, include only the present value of such assets, less the tax and interest penalties that would accrue if the asset were distributed at the present time.

As stated above, an owner's interest in his or her firm is not included in the calculation of their assets for determining personal net worth. In its February 2007 determination, CTA clearly chose not to include the firm's unpaid taxes as a liability except for a certain amount. The Department agrees with CTA on this point.

3. You alleged that Ms. Stevenson is not economically disadvantaged as evidenced by her 65-foot yacht, real estate holdings, other assets, and access to capital. You mention four assets in your May 17, 2007, letter, to support this allegation which the Department addresses below:

    a. Joint Bank Accounts

    CTA calculated Ms. Stevenson's assets in various bank accounts that she held jointly with her husband by dividing the balance amount by one-half. You allege that under Illinois law, all funds in a joint account can be withdrawn by any one account owner, and therefore; Ms. Stevenson's personal net worth should include the full amount in the accounts. This interpretation is in error. As indicated above, the Regulation §26.5 states that "an individual's personal net worth includes only his or her own share of assets held jointly or as community property with the individual's spouse." The Department's question and answer document on this subject states:

    **In calculating personal net worth, how should assets held by spouses in joint or community property be counted?**

    **A.** The Department is aware that there have been many questions about how to calculate personal net worth (PNW), of which this is one. The Department has asked for comment on potential changes to the rule on this subject. Meanwhile, we offer the following suggestions concerning marital assets.

    The basic principle in counting assets in the personal net worth calculation is to count the present value of assets attributable to the individual.

    If an asset is held as community property, or jointly (including a tenancy by the entireties) between two people, 50 percent of the value of the asset is normally attributed to each person.

    For example, suppose a woman owner of a firm applying for DBE certification has, with her husband, a $100,000 joint savings account. Half of this asset -- $50,000 -- would be counted toward her personal net worth. The recipient to which her firm applied would not count the full $100,000 toward her personal net

worth.

A legal instrument valid under state law can alter this normal attribution of assets
between owners.

b. ███████████████

According to the record, this property was sold in June 2005, and CTA appears to
have inquired as to how Ms. Stevenson treated the proceeds from the sale. CTA
correctly examined Ms. Stevenson's share of funds held in bank accounts with her
husband, increasing the final figure for this asset on Ms. Stevenson's personal net
worth calculation.

c. <u>Yacht</u>

You alleged that publicly available information about boats comparable to the
Stevensons' boat ("████████████") indicates that the value CTA should place
on the vessel should be between $███████ and $███████. You further
allege that the equity the Stevensons' have in this asset is between $███████
and $███████, and; as a result, $███████ to $███████ should be
attributed to Ms. Stevenson on the asset side of her personal net worth statement.
To determine the value of this asset, CTA obtained records concerning the boat's
trade-in value from ███████████████ and other documentation. §26.5
requires recipients to assess the net value of the assets of an individual remaining
after total liabilities are deducted. It appears that CTA properly obtained
sufficient information to calculate the value of this asset and appropriately
counted both the asset and liability amounts on Ms. Stevenson's personal net
worth calculation.

d. ███████████████

You make four allegations with respect to this asset, which the Stevensons' hold
jointly: (1) CTA's valuation roughly corresponds to the original $███████
appraisal in 2002 for the property improved with one building; (2) Ms.
Stevensons' equity interest is at least $███████; (3) CTA improperly concluded
that a potential judgment following the litigation involving the property should
not be added to the calculation; and (4) publicly available records demonstrate
that an SBA loan against the property should not have been counted by CTA.

Following the Department's September 29, 2006, remand in this matter, the firm
submitted a broker's opinion of the property's value dated November 29, 2006, to
CTA. The record supports a conclusion that the value of the property was
accurately counted by CTA. You claim that Ms. Stevenson chose not to pursue
an amount that was available under her attorney's professional liability policy;
and that half of this settlement should be added to her personal net worth
calculation. CTA did not add to the property's value a potential judgment

stemming from the Stevensons' claim against the seller of the property and their
former attorney. This approach is correct. If Ms. Stevenson were to collect a
judgment following her lawsuit(s), then this amount would need to be added in.
Since the record does not indicate that this has occurred, it would be incorrect to
attribute a future settlement to Ms. Stevenson's net worth. Lastly, the record
contains a copy of the SBA loan which identifies the ███████ as borrowers.
As a result, Ms. Stevenson's share of this amount was counted as a liability by
CTA.

Pursuant to §26.89, the Department makes its decision regarding an appeal based solely on the
entire administrative record. The Department does not make a de novo review of the matter and
does not conduct a hearing. Our decision is based on the status and circumstances of the firm as
of the date of the decision being appealed. In this instance, our review of the entire
administrative record supports a conclusion that CTA has properly addressed the Department's
concerns raised in our September 29, 2006, letter and determined that SCS remains eligible for
the DBE program. Your FOIA request is not addressed in this letter. Should you have any
questions regarding the status of your request, please contact Ms. Kathy Ray, Freedom of
Information Act Officer, U.S. Department of Transportation, 1200 New Jersey Ave. S.E., Room
W94-124, Washington, DC 20590.

This determination is administratively final as of the date of this correspondence. Your appeal is
being closed in our files.

Sincerely,


Joseph E. Austin, Associate Director
External Civil Rights Programs Division
Departmental Office of Civil Rights

cc: CTA

November 8, 2006

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Reference No: 06–0124

John F. Wingerter
Attorney at Law
Cohen & Grigsby
11 Stanwix Street
15th Floor
Pittsburgh, PA 15222-1319

Dear Attorney Wingerter:

This is in response to the appeal that you filed on behalf of your client, Rampart Hydro Services, Inc. ("RHS, Inc."). We have carefully reviewed the material from the Office of Minority and Women's Business Enterprises ("OMWBE"), as well as the information you provided, and have concluded that the denial of the firm's certification as a Disadvantaged Business Enterprise (DBE) under criteria set forth in 49 CFR Part 26 ("the Regulation") is supported by substantial record evidence.

Your appeal is denied based upon our determination that substantial record evidence supports a conclusion that the disadvantaged business owner has not met the economic disadvantage requirements as specified by the Regulation §26.67.

Your appeal is also denied based upon our determination that substantial record evidence supports a conclusion that the disadvantaged business owner does not possess the power to direct or cause the direction of the management and policies of the firm and to make day-to-day as well as long-term decisions on matters of management, policy and operations as required by the Regulation §26.71.

The specific reasons for the denial of your appeal include the following:

<u>ECONOMIC DISADVANTAGE</u>

**According to the Regulation at §26.61(b), the firm seeking certification has the burden of demonstrating to you, by a preponderance of the evidence, that it meets the requirements**

of this subpart concerning group membership or individual disadvantage, business size, ownership, and control.

Under the Regulation §26.61(e) you must make determinations concerning whether individuals and firms have met their burden of demonstrating group membership, ownership, control, and social and economic disadvantage (where disadvantage must be demonstrated on an individual basis) by considering all the facts in the record, viewed as a whole.

The Regulation at §26.5 defines "personal net worth" to mean the net value of the assets of an individual remaining after total liabilities are deducted. An individual's personal net worth does not include: The individual's ownership interest in an applicant or participating DBE firm; or the individual's equity in his or her primary place of residence. An individual's personal net worth includes only his or her own share of assets held jointly or as community property with the individual's spouse.

The Regulation at §26.67(a)(1) and (2)(i) states, in part, that you must require applicants to submit a signed, notarized certification that each presumptively disadvantaged owner is, in fact, socially and economically disadvantaged. You must require each individual owner of a firm applying to participate as a DBE (except a firm applying to participate as a DBE airport concessionaire) whose ownership and control are relied upon for DBE certification to certify that he or she has a personal net worth that does not exceed $750,000.00.

Under the Regulation at §26.67(a)(2)(iii), in determining an individual's net worth, you must observe the following requirements: (a) exclude an individual's ownership interest in the applicant firm; (b) exclude the individual's equity in his or her primary residence (except any portion of such equity that is attributable to excessive withdrawals from the applicant firm); (c) do not use a contingent liability to reduce an individual's net worth; (d) with respect to assets held in vested pension plans, Individual Retirement Accounts, 401(k) accounts, or other retirement savings or investment programs in which the assets cannot be distributed to the individual at the present time without significant adverse tax or interest consequences, include only the present value of such assets, less the tax and interest penalties that would accrue if the asset were distributed at the present time.

According to RHS, Inc.'s June 16, 2005, DBE certification application, the firm was established in March 1998 and serves as the general partner and manager of Rampart Hydro Services, L.P. ("RHS, L.P."). Originally named Rampart Construction Services, Inc., the firm's name changed to RHS, Inc. in January 2002 following the purchase of the minority partner's share of the firm in 2000. The DBE certification application indicates that RHS, Inc. was incorporated on December 28, 2004, and shares its phone number with RHS, L.P. and occupies one office with that firm's location at ████████████████ Pennsylvania. Ms. Beth Newbold-Winkler is RHS, Inc.'s President, sole owner and employee, and serves as the firm's treasurer and Secretary. Her spouse, Mr. ███████████ a non-disadvantaged individual, is the firm's Vice President. Ms. Newbold-Winkler is also the manager and sole limited partner of RHS, L.P.

Ms. Newbold-Winkler describes the formation of the firms in attachments 1 and 2, to the firm's DBE certification application as follows:

> The operating company (the L.P.) was originally started in 1987 as Flow Services, LLC (a Washington state LLC), a subsidiary of Flow International Corporation. In September 1997 it was sold to Safeworks, LLC in an employee buyout and became a subsidiary of that company. The name of the company was changed to Rampart Construction Services, LLC (a Washington state LLC). I was part of this buyout and it was at this time that I made my original contribution of $■■■■■■ toward the purchase of the company. (This investment was then credited toward the purchase price when I bought the assets of the company in 1998).

> On March 6, 1998, in preparation for the purchase of the assets of Rampart Construction Services, LLC, I created Newbold Enterprises, L.P. (a Pennsylvania Limited Partnership) to be the main operating company and Newbold Enterprises, Inc. (a Pennsylvania Sub-S Corporation) the General Partner for the L.P. On April 1, 1998, I concluded the purchase of the assets of the prior company and placed them into Newbold Enterprises, L.P. Simultaneous with the purchase was the change of the company name from Newbold Enterprises, L.P. to Rampart Construction Services, L.P. At the same time the name of the General Partner was changed to Rampart Construction Services, Inc.

> In this new company I was the 51% owner of the L.P. and the 51 % owner of the Inc. I had a minority interest partner (■■■■■■■■r) who held 48% of the L.P. and 49% of the Inc. The General Partner Rampart Construction Services, Inc. holds a 1% ownership in the L.P. In May 2000, I bought out the interest of the minority interest partner completely and became the 99% owner of the L.P. and the 100% owner of the Inc. In January 2002 the names of both companies were changed to better reflect our construction specialty line of work. The L.P. became [RHS, L.P.] and the Inc. became [RHS, Inc.] Only the name changed, nothing else. Federal Id #s, ownership structure, etc. all remained the same. . . .

> The organization was set up in its current structure for tax and liability purposes. [RHS, Inc.] is the 1% owner and the General Partner of [RHS, L.P.]. As General Partner, [RHS, Inc.] is responsible for the overall management of the L.P. [RHS, Inc.] holds all ultimate legal and financial responsibility. I am the only individual authorized (through and as President of the Inc.) to commit the L. P. financially, to sign bank agreements, sign contracts, etc. I am the sole employee of [RHS, Inc.] and carry out all of its functions. All other employees are in the L.P. The only activity of [RHS, Inc.] is to function as the General Partner of the L.P. It only operates in that capacity and only in Pennsylvania. [RHS, Inc.] is registered in several states because those states require the General Partner of a Partnership operating in that state to be registered there as well. . . . [RHS, Inc.]

pays all of its own expenses and bills the L.P. for management on a break-even basis.

It appears that the sole function of RHS, Inc. is to manage RHS, L.P., an arrangement developed for financial and tax reasons. According to attachment 9 of the firm's DBE application, RHS, Inc. "exists only to be the general partner of RHS, L.P. and provide management services to the L.P." The attachment states:

> [RHS, Inc.] carries on no other business. [RHS, Inc.] pays for its own expenses and then charges RHS, L.P. on a direct cost basis with no mark up. The income or loss that shows on [RHS, Inc.'s] books is the carry through from the L.P. due to the 1% ownership that [RHS, Inc.] holds in the L.P. [RHS, Inc.] does not have reviewed financial statements separate from the L.P. [Ms. Newbold-Winkler] keep[s] the internal books for [RHS, Inc.] throughout the year. [RHS, Inc.'s] books are then reconciled to the L.P's at the end of the year by the accountants and appear on the financial statements of the L.P. as "management fees."

The record contains Ms. Newbold-Winkler's personal net worth statement, as of December 31, 2004. This statement was submitted along with the firm's DBE certification application and lists the following assets and liabilities:

Personal Financial Statement
Beth Newbold-Winkler
Business Name of Applicant / Borrower – Rampart Hydro Services, L.P. and Inc.

| **Assets** | | **Liabilities** | |
|---|---|---|---|
| Cash on hand and in banks | ■ | Accounts payable | ■ |
| Savings  Accounts | -- | Note payable to banks and others | -- |
| IRA or other retirement account | ■ | Installment account (auto) | -- |
| Accounts and notes receivable | ■ | Installment account (other) | -- |
| Life Insurance - Cash Surrender Value Only | | Loan on 401K | ■ |
| Stocks and Bonds | ■ | Mortgages on real estate | ■ |
| Real Estate | ■ | Unpaid Taxes | -- |
| Automobile – present value | -- | Other liabilities | -- |
| Other personal property | | | |
| Other Assets | | | |
| Total Assets | ■ | Total Liabilities | ■ |
| | | Net Worth | |
| | | Total | ■ |
| Sources of Income | | Contingent Liabilities | |
| Salary | ■ | Company Loans | ■ |

Entries on this personal net worth statement and "schedules," dated January 17, 2005, which are attached to the firm's DBE application, describe the values for some of these assets. The $███████ "real estate" entry consisted of Ms. Newbold-Winkler's two properties. — her primary residence (derived from the asset's cost of $███████, a present market value of $███████, and a mortgage balance of $███████), and the value of a time share in New Orleans with an original cost of $███████, and a present market value of $███████. For "accounts and notes receivable," an attached schedule indicates this amount is for "Rampart Hydro Services, owned by Beth Newbold-Winkler, Date due – open, amount due $███████." The "other assets, listed on "Schedule J" is for the "net worth of business owned," which is $███████. This schedule is as follows:



| | Asset value | Debt/liabilities | Total equity | Net equity |
|---|---|---|---|---|
| RHS, L.P. (asset value listed does not include contributed capital) | ███████ | ███████ | ███████ | ███████ |
| RHS L.P. contributed capital | | | | ███████ |
| RCS Associates, LLC | ███████ | ███████ | ███████ | ███████ |
| | | | | ███████ |

Finally, the contingent liabilities, Ms. Newbold appears to indicate that she is the "co-guarantor on ███████ debt for Rampart Hydro Services - as of 12/31/04 debt balance was $███████ Co-guarantor on bonds for Rampart Hydro Services - as of 12/31/04 approx. $███████ of contracts are bonded. Co-guarantor on ███████ Debt for RCS Associates – as of 12/31/04 debt balance was $███████." Pursuant to the Department's Regulation at §26.67(a)(2)(iii)(c) in determining an individual's net worth, you do not use contingent liabilities to reduce an individual's net worth.

Under the Regulation at §26.5 and §26.67(a)(2)(iii), an applicant's personal net worth does not include an individual's ownership interest in an applicant or participating DBE firm; or the individual's equity in his or her primary place of residence. In addition, under the Regulation §26.67(a)(2)(iii)(d), an individual's net worth includes assets held in vested pension plans, Individual Retirement Accounts, 401(k) accounts, or other retirement savings or investment programs even though the assets cannot be distributed to the individual at the present time without significant adverse tax or interest consequences. For these types of assets, the Regulation states that only the present value of such assets, less the tax and interest penalties that would accrue if the asset were distributed at the present time, are to be counted in calculating net worth.

In her November 29, 2005, appeal to OMWBE's Certification Committee, Ms. Newbold-Winkler stated that, pursuant to the Regulation §26.67(a)(2)(iii), the equity in her business

($███████), and the net value of her personal residence ($███████) ($███████ - $███████); should be excluded from her personal net worth calculation. She also alleged that the personal net worth statement included the full value of her retirement plan, which she claims could be reduced to $███████ if a "conservative 10% tax penalty" is applied to the retirement plan. Ms. Newbold-Winkler further alleged in her August 1, 2006, appeal letter to the Department that since RHS, Inc. is the general partner of RHS, L.P., it is not separate, but rather the firms should be treated as one entity. She in essence argues that, as a result, the value of RHS, L.P. should be excluded from her personal net worth calculation.

The Department disagrees. As indicated above, Ms. Newbold-Winkler listed $███████ as her ownership interest in RHS, L.P. This amount consists of her net equity in the firm $███████, and her contributed capital of $███████. The entire $███████ is properly included in her personal net worth calculation. While Ms. Newbold-Winkler may be the sole owner of RHS, Inc., which in turn is the general partner of RHS, L.P., (a firm which performs the contracts for the entity); RHS, Inc. is considered the applicant firm. As such, Ms. Newbold-Winkler's interest in RHS, Inc. is the only permissible exclusion under the Regulation §§ 26.5 and 26.67. In addition, even with the additional exclusion from the calculation of Ms. Newbold-Winkler's residence and retirement accounts, her personal net worth exceeds the $750,000.00 limitation.

Substantial evidence thus supports the OMWBE's Certification Committee's May 3, 2006, conclusion that the firm's sole owner, Ms. Beth Newbold-Winkler's personal net worth exceeds the $750,000.00, limitation as specified by the Department's Regulation §26.67 and is not economically disadvantaged.

<u>CONTROL</u>

**The Regulation at §26.71(a) states that in determining whether socially and economically disadvantaged owners control a firm, you must consider all the facts in the record, viewed as a whole.**

**Under the Regulation at §26.71(c), a DBE firm must not be subject to any formal or informal restrictions which limit the customary discretion of the socially and economically disadvantaged owners. There can be no restrictions through corporate charter provisions, by-law provisions, contracts or any other formal or informal devices (e.g., cumulative voting rights, voting powers attached to different classes of stock, employment contracts, requirements for concurrence by non-disadvantaged partners, conditions precedent or subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights) that prevent the socially and economically disadvantaged owners, without the cooperation or vote of any non-disadvantaged individual, from making any business decision of the firm. This paragraph does not preclude a spousal co-signature on documents as provided for in §26.69(j)(2).**

**The Regulation at §26.71(d) requires that the socially and economically disadvantaged owners must possess the power to direct or cause the direction of the management and polices of the firm and to make day-to-day as well as long-term decisions on matters of management, policy and operations. A disadvantaged owner must hold the highest officer position in the company (e.g. chief executive officer or president). In a corporation,**

disadvantaged owners must control the board of directors. In a partnership, one or more disadvantaged owners must serve as general partners, with control over all partnership decisions.

Under the Regulation at §26.71(e) individuals who are not socially and economically disadvantaged may be involved in a DBE firm as owners, managers, employees, stockholders, officers, and/or directors. Such individuals must not, however, possess or exercise the power to control the firm, or be disproportionately responsible for the operation of the firm.

The Regulation §26.71(f) states that the socially and economically disadvantaged owners of the firm may delegate various areas of the management, policymaking, or daily operations of the firm to other participants in the firm, regardless of whether these participants are socially and economically disadvantaged individuals. Such delegations of authority must be revocable, and the socially and economically disadvantaged owners must retain the power to hire and fire any person to whom such authority is delegated. The managerial role of the socially and economically disadvantaged owners in the firm's overall affairs must be such that the recipient can reasonably conclude that the socially and economically disadvantaged owner actually exercises control over the firm's operations, management, and policy.

According to the Regulation at §26.71(k)(1) and (2), a socially and economically disadvantaged individual may control a firm even though one or more of the individual's immediate family members (who themselves are not socially and economically disadvantaged individuals) participate in the firm as a manager, employee, owner, or in another capacity. Except as otherwise provided in this paragraph, you must make a judgment about the control the socially and economically disadvantaged owner exercises vis-à-vis other persons involved in the business as you do in other situations, without regard to whether or not the other persons are immediate family members. If you cannot determine that the socially and economically disadvantaged owners -- as distinct from the family as a whole -- control the firm, then the socially and economically disadvantaged owners have failed to carry their burden of proof concerning control, even though they may participate significantly in the firm's activities.

1. According to Article II, § 2.01 and 2.02 of the firm's amended bylaws, adopted July 8, 2004, the business affairs of RHS, Inc. is managed by a Board of Directors, which is fixed at three directors. Other relevant bylaws sections include the following:

> Article II, §2.04 – Removal of Directors. Any director may be removed from office, with or without assigning any cause, upon the affirmative vote of shareholders holding shares representing at least a majority of all votes entitled to be cast for the election of directors.

> Article II, §2.08 – Quorum; Action at Meetings. The presence at a meeting of the Board of a majority of directors then in office will constitute a quorum for the transaction of business. Any corporate action which is authorized by a majority

of the directors present at a meeting of the Board at which a quorum is present will constitute action by the Board.

Article III, §3.02 – Removal of Officers; Vacancies.  Any officer may be removed by the Board whenever, in its judgment, the best interests of the Corporation will be served thereby, . . .

Article III, §3.03 – President and Vice Presidents.  The President is the chief executive officer of the Corporation, will have general and active management of the business of the Corporation and will see that all orders and resolutions of the Board are carried into effect.  The Vice Presidents will perform such duties as may be assigned to them by the Board or the President and, in the absence of disability of the President, will perform the duties of the President in the order of their seniority or as otherwise determined by the Board.

The firm's July 8, 2004, resolution approving the amended bylaws identifies the current directors as Ms. Newbold-Winkler and her spouse, Mr. ▮▮▮▮▮▮▮▮, a non-disadvantaged individual

The Regulation at §26.71(c) states that "a DBE firm must not be subject to any formal or informal restrictions which limit the customary discretion of the socially and economically disadvantaged owners.  There can be no restrictions through corporate charter provisions, by-law provisions, contracts or any other formal or informal devices (e.g., cumulative voting rights, voting powers attached to different classes of stock, employment contracts, requirements for concurrence by non-disadvantaged partners, conditions precedent or subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights) that prevent the socially and economically disadvantaged owners, without the cooperation or vote of any non-disadvantaged individual, from making any business decision of the firm.  This paragraph does not preclude a spousal co-signature on documents as provided for in §26.69(j)(2)."

The Regulation at §26.71(d) states in part that "the socially and economically disadvantaged owners possess the power to direct or cause the direction of the management and polices of the firm and to make day-to-day as well as long-term decisions on matters of management, policy and operations.  A disadvantaged owner must hold the highest officer position in the company (e.g. chief executive officer or president).  In a corporation, disadvantaged owners must control the board of directors."

The Regulation at §26.71(k), states that "a socially and economically disadvantaged individual may control a firm even though one or more of the individual's immediate family members (who themselves are not socially and economically disadvantaged individuals) participate in the firm as a manager, employee, owner, or in another capacity.  Except as otherwise provided in this paragraph, you must make a judgment about the control socially and economically disadvantaged owner exercises vis-à-vis other persons involved in the business as you do in other situations, without regard to whether or not the other persons are immediate family members.  If you cannot determine that the socially and economically disadvantaged owners -- as distinct from the family as a whole -- control the firm, then the socially and economically disadvantaged

owners have failed to carry their burden of proof concerning control, even though they may participate significantly in the firm's activities."

Ms. Newbold-Winkler indicated in her August 1, 2006, rebuttal letter to the Department that (1) RHS, Inc.'s directors are elected by the firm's shareholder - Ms. Newbold-Winkler, at the firm's annual meeting, and she has the power to appoint new directors of the firm; (2) Ms. Newbold can have a director removed and cause any action to be passed by the board as its sole director; and (3) Ms. Newbold-Winkler is responsible for the day-to-day management and administration of the Company.

As stated above, ▆▆▆▆▆, a non-disadvantaged individual, is a member of the board of directors and the firm's Vice President. The bylaws restrictions clearly prevent Ms. Newbold-Winkler from controlling RHS, Inc.'s board of directors, since she cannot call a quorum of the firm to transact business without ▆▆▆▆▆ approval. Ms. Newbold-Winkler alleged in her November 29, 2005, appeal letter to OMWBE's Certification Committee that pursuant to Article I, sections 1.01 and 1.04 of the bylaws; she, as the sole shareholder, can act alone, elect all directors, and constitute a quorum for all matters. However, this appears to only apply to actions at annual or special shareholder meetings, not the regularly conducted affairs of the firm. In addition, according to the record ▆▆▆▆▆ has the authority to sign company checks and is a guarantor on the firm's bank loans with ▆▆▆▆▆ Bank. Ms. Newbold-Winkler stated in her November 29, 2005, appeal that "[▆▆▆▆▆] signature appears as a guarantor on the bank loans strictly because he is my spouse and that is the policy of F▆▆▆▆▆. Considering ▆▆▆▆▆ authority, Ms. Newbold-Winkler's ability to control the firm is compromised; and the Department finds it unlikely that she would remove ▆▆▆▆▆ given his value to the firm. She has thus failed to meet her burden of proof as specified by the Regulation.

2. In her rebuttal letter to the Department, Ms. Newbold-Winkler indicated that ▆▆▆▆▆ is no longer a director following an amendment to the firm's bylaws on April 25, 2006, with an effective date of July 8, 2004. The record contains a resolution dated May 8, 2006, in which the board resolved that she is the firm's sole director. A second resolution also dated May 8, 2006, indicates that ▆▆▆▆▆ remains Vice President. The April 25, 2006, action referenced by Ms. Newbold-Winkler is not contained in the record and the only reference to it is made in the copy of the firm's amended bylaws, which she attached to her August 1, 2006, rebuttal letter to the Department. There is no indication that the April 25, 2006, change was provided to OMWBE's Certification Committee prior to its May 3, 2006 determination. Similarly, while the firm's May 8, 2006, action rendering Ms. Newbold-Winkler the firm's sole director is contained in the record, it appears to be taken after OMWBE's Certification Committee's May 3, 2006, decision, and received by OMWBE on August 2, 2006. Pursuant to the Regulation §26.89(f)(6), the Department's decision is based on the status and circumstances of the firm as of the date of decision being appealed. Since this change was made after OMWBE's decision, the Department will not consider it further.

Substantial record evidence, therefore, supports a conclusion that Ms. Newbold-Winkler does not possess the power to direct or cause the direction of the management and policies of the firm; and to make day-to-day as well as long-term decisions on matters of management, policy and operations as required by the Regulation §26.71.

OTHER ISSUES

According to the firm's 2002, 2003, 2004 Federal Tax returns Ms. Newbold-Winkler received $████████████████████████████, respectively in compensation.  However, attachment 12 to the firm's DBE application states that Ms. Newbold-Winkler is "not currently drawing any salary in order to conserve cash within the company."  The Regulation at §26.69(c) provides in part, that the disadvantaged owners must enjoy the customary incidents of ownership, and share in the risks and profits commensurate with their ownership interests, as demonstrated by the substance, not merely the form, of arrangements.  It is customary for a firm's owner to share in the profits of the firm by drawing a salary commensurate with their ownership share.  It is unclear if Ms. Newbold-Winkler is continuing to receive a salary from the firm.  In addition, since OMWBE's Certification Committee did not address this issue in its denial decision, the Department will not address it further.

In summary, the information provided cumulatively supports a conclusion that Rampart Hydro Services, Inc. does not meet the criteria as required for DBE certification under 49 CFR Part 26. The company is, therefore, ineligible to participate as a DBE on OMWBE's federal financially assisted projects.  This determination is administratively final as of the date of this correspondence.

Sincerely,


Joseph E. Austin, Chief
External Policy and Program Development Division
Departmental Office of Civil Rights

cc: OMWBE

August 10, 2007

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Reference No: 07-0114

Mr. Mulugeta Zeleke
President
The Lions Group, Inc.
6075-A Lee's Mill Road
Forest Park, GA 30297

Dear Mr. Zeleke:

This is in reference to the appeal that you filed on behalf of your firm, The Lions Group,
Inc. ("The Lions Group"). We have carefully reviewed the material provided by the
Georgia Department of Transportation ("GDOT") as well as that you provided on behalf
of your firm and have determined that the decision by the Georgia Department of
Transportation to deny your firm certification as an eligible Disadvantaged Business
Enterprise (DBE) under the criteria set forth in 49 CFR Part 26 ("the Regulation") is
supported by substantial record evidence.

Your appeal is denied based upon our determination that substantial record evidence
supports GDOT's conclusion that your firm fails to meet the eligibility criteria of the
Department's Regulation in regards to economic disadvantage.

In accordance with the Department's Regulation under **§26.67(2)(i) requires each
individual owner of a firm applying to participate as a DBE (except a firm applying
to participate as a DBE airport concessionaire) whose ownership and control are
relied upon for DBE certification to certify that he or she has a personal net worth
(PNW) that does not exceed $750,000.00.**

Substantial record evidence reveals that your PNW, as the socially and economically
disadvantaged owner of the firm, exceeds $750,000.00. According to the PNW dated
October 12, 2006, you reveal the following:

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on hand and in banks | $███ | Mortgages on Real Estate | $██████  |
| IRA | $██ | | |
| Accounts & Notes Receivable | ████ | | |



Stocks and Bonds    $▮
Real Estate
Other Assets
Total Assets    $▮                    Total Liabilities    $▮

Total Net Worth    $▮
Exclusion    $▮

**Genet Enterprises, Inc. Assets**
**2005 IRS Form 1065**
$▮

51% ownership interest    $▮

NET PNW    $▮

The 2005 tax returns for Genet Enterprises, Inc. indicate that the firm had assets of $▮. Since you are the 51% owner of that firm, we attributed $▮ as your ownership interest. Additional information obtained by GDOT reveals that you also have ownership interest in MULU Enterprises, Inc. Corp. No. ▮, and The Lions Group of Jacksonville, Corp. No. ▮. However, none of these firms and value of each were listed on your pnw. In addition, GDOT also found properties listed under your name not included on your pnw.

**§26.67(b)(1) of the Department's Regulation, in part, states "If the statement of personal net worth that an individual submits under paragraph (a)(2) of this section shows that the individual's personal net worth exceeds $750,000, the individual's presumption of economic disadvantage is rebutted. You are not required to have a proceeding under paragraph (b)(2) of this section in order to rebut the presumption of economic disadvantage in this case."**

**§26.67(b)(4) states "when an individual's presumption of social and economic disadvantage has been rebutted, his or her ownership and control of the firm in question cannot be used for the purposes of DBE eligibility under this subpart unless and until he or she makes an individual showing of social and economic. If the basis for rebutting the presumption is a determination that the individual's personal net worth exceeds $750,000, the individual is no longer eligible for participation in the program and cannot regain eligibility by making an individual showing of disadvantage.**

Your letter of rebuttal states: "Note however, my net worth is not over the threshold set under Regulation 49 CFR Part 26 and I disagree with Georgia Department of Transportation decision to declare The Lions Group, Inc. as [an] ineligible DBE firm. As you will note from the attached personal financial statement, my personal net worth excluding any interest in The Lions Group, Inc. and primary residence, as is permitted under the Regulation, 49 CFR Part 26, is only $▮."

3

Substantial record evidence supports GDOT's determination that your individual presumption of economic disadvantage is rebutted since your pnw exceeds $750,000.00 as required pursuant to 49 CFR Part 26.

Based on these findings, we have determined that The Lions Group, Inc. does not meet the requirements of the Department's Regulation. The firm is, therefore, ineligible to participate as a DBE on GDOT's Federal financially assisted projects. This determination is administratively final as of the date of this correspondence.

Sincerely,


Joseph E. Austin, Associate Director
External Civil Rights Program Division
Departmental Office of Civil Rights

cc:  GDOT

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of March 2008, I caused the foregoing

*Plaintiff's Reply in Support of Cross-Motion for Summary Judgment,* with all attachments to be

served on parties of record via ECF.

John Longstreth (#367047)
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
1601 K Street, N.W.
Washington, D.C.  20006-1600
(202) 778-9000
(202) 778-9100 (fax)

Counsel for Plaintiff, The Grove, Inc.

26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE GROVE, INC. | : |
| | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| UNITED STATES DEPARTMENT OF | : |
| TRANSPORTATION, ET AL. | : |
| | : Civil Action No: 07-1591 (HHK) |
| | : |
| | : |
| | : |
| Defendants. | : |

## PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to LCvR7(h) and 56.1, Plaintiff hereby submits this Reply to Defendants' Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Dispute. Defendants have admitted virtually every fact presented by Plaintiff. In some cases Defendants have "disagree[d]" with a fact without citing any facts or evidence to the contrary. In several cases, Defendants have stated that they refuse to admit a fact, not because they are able to cite a contrary fact, but rather because the fact, if admitted, would be contrary to the Final Decision they are attempting to defend.

**The following facts were unqualifiedly admitted by Defendants:**

1.    The Grove, Inc. ("The Grove" or "The Company") is a woman-owned and controlled firm that is certified as an "airport concessions disadvantaged business enterprise" (ACDBE) and

which in 2005, operated sixty stores and/or kiosks in fifteen airports and one train station.  [AR II at 17, Bates 00011].

2.      The Grove was first certified as an ACDBE pursuant to 49 C.F.R. Parts 23 and 26, in 1987 under prior owners.  [AR III, Bates 00013; AR XLIV, Bates 00781].  Its corporate office is located in Westchester, Illinois.  [AR III at § 2(a)(8), Bates 00013].

3.      The Grove was certified at the time of the Decision at issue in this case in as an ACDBE in twenty jurisdictions.  Complaint ¶ 4.

4.      Michelle Dukler, the owner of The Grove, is a woman.  She is thus presumed socially and economically disadvantaged under 49 C.F.R § 26.5(2)(vi).

5.      The government admits that Ms. Dukler owns 51% of The Grove as required under 49 C.F.R. § 26.69(b).  See Memorandum In Support of Motion to Dismiss ("Defendant's Mem.") at 10.

7.      The Grove at the time of its application, had net income of $356,543.  [AR XV, Bates 00385].

9.      Star Foods, LLC ("Star Foods"), a minority shareholder of the owner of The Grove, purchased a 49% interest in the Company in 1999 and made a paid-in capital contribution in 2000, well before Ms. Dukler took control of the company in February 2004.

10.     There is no evidence of record that Star Foods provided any additional financial assistance to the Grove since 2000, through paid in capital or otherwise.

11.     The Grove filed an application to  Office of Minority and Women's Business Enterprises of the State of Washington (OMWBE) dated September 9, 2005 for certification as an ACDBE. This voluminous, 44-tab application provided each of the documents and information requested by OMWBE that applied to The Grove, including three-year financial information, audited

financial information, and information on all of the company's contracts.  See AR I-LVI, Bates 00001-00835.

12.    The (OCR) issued on December 21, 2006 a decision affirming the rejection by OMWBE of The Grove for ACDBE status at Sea-Tac International Airport.  [Bates 01085]

14.    Star Foods, the minority shareholder owner of The Grove, is owned by Casey Cowell, a non-disadvantaged individual.  Until January 1, 2006 Martin Dukler also had an ownership interest in Star Foods.

15.    On February 5, 2004, Martin Dukler, in accordance with DOT regulations, 49 C.F.R. § 26.69(i), irrevocably renounced, transferred and relinquished any right, title or interest in The Grove.  [AR XXXIV, Bates 00727].  Neither Mr. Cowell nor Mr. Dukler has ever had any direct ownership interest in The Grove.

16.    Mr. Cowell has never been an officer or employee of The Grove.  Messrs. Cowell and Dukler were, as permitted by the DOT regulations, directors of The Grove from 2000 until February 13, 2004, when Ms. Dukler assumed ownership and control of the Company, and by July 30, 2004, Ms. Dukler was the sole director of The Grove.  [AR XXXIV(N), Bates 00718].

19.    Ms. Dukler executed a mortgage and security agreement with Mr. Cowell in her name only on February 5, 2004 as security for the $2.6 million loan and that the security consisted of personal assets that Ms. Dukler valued at $2.6 million, which valuation Mr. Cowell accepted in making the loan.  [AR at XXXIV(G) at Exhibit A, Bates 00619].1

21.    On August 17, 2004, Ms. Dukler obtained a personal bank loan from Fifth Third Bank in the amount of $2.6 million, secured by her personal promissory note [AR XXXIV (G) at Exhibit

---

1 The proceeds of the loan were deposited in the Duklers' joint account and withdrawn the very next day via check number 2248 [AR XXXIV(C), Bates 00605] to purchase Ms. Dukler's 36.5 shares in The Grove from Star Foods.  Thus, at this point in time, Star Foods owned no shares in The Grove.

A, Bates 00619] and used the proceeds to pay off her prior February 2004 loan from Mr. Cowell in that amount. [AR XXXIV(H), Bates 00635].

22.     Ms. Dukler paid the $100,000 for the option to buy 1.5 of The Grove's shares with check number 2249, drawn from the Duklers' joint account. [AR XXXIV, Bates 00618].

23.     The stock and option purchase transactions both went ahead on the basis of checks 2248 and 2249 and Mr. Cowell was repaid his $2.6 million loan with the proceeds of an August 2004 loan to Ms. Dukler from Fifth Third Bank. [AR XXXIV, Bates 00635]. The "Assignment Separate From Certificate" executed on February 6, 2004 expressly states that the transfer of the 35 shares of stock to Ms. Dukler was "for value received." [AR XXXIV(B), Bates 00606]. Defendants do not deny that neither OCR nor OMWBE ever raised the issue of whether this apparent error in the dating of the checks had any effect on the transaction or asked for documentation of negotiation or cancelling.

24.     On February 17, 2004, The Grove executed a project loan in the amount of $2.5 million and a line of credit in the amount of $500,000, both secured by assets of the firm. [AR XXXIV(H), Bates 00643]. This loan was separate from the August, 2004 personal loan taken out by Ms. Dukler to repay the $2.6 million she had borrowed from Mr. Cowell to finance her purchase of 50% of The Grove's shares.

25.     The Grove's Loan and Security Agreement issued in connection with the project loan and line of credit contained a list of the Company's locations and types of concessions [AR XXXIV, Bates 00682-686], and that the loan required The Grove to maintain a minimum tangible net worth of $2,050,000 as of December 31, 2004 and until the Liabilities were paid in full. [AR XXXIV(H) at Section 14, Bates 00671]. The Grove's tangible net worth as of December 31, 2003 was $2,403,074.90 and its total stockholder's equity was $3,029,464.42. [AR XXXIV,

Bates 00691]. The Agreement also included as an attachment a consolidated income statement that showed earnings before income taxes, deprecation and amortization of $1,746,626.46. [AR XXXIV(H), Bates 00688].2 Separately in the record [AR XV at 6, Bates 00385] are The Grove's consolidated income statements for 2002, 2003 and 2004 that show operating income of $305, 045, $357, 838, and $692, 577 and net income of ($119.671), $75,460, and $356,543 for the three years 2002 to 2004 respectively.

26.    On February 17, 2004, Ms. Dukler and Mr. Cowell, on behalf of Star Foods, executed a "stockholders agreement," defining aspects of the owners' relationship. [AR XXXIV(O), Bates 00717].

27.    Ms. Dukler executed a personal loan with Fifth Third Bank, a commercial lending institution, denominated a "consumer note" on August 17, 2004 (the date handwritten in the acknowledgement section, although the preprinted text of the Note lists an effective date of August 19, 2004) in the amount of $2,600,000. [AR XXXIV (H), Bates 00888]

28.    Ms. Dukler wrote a check for $2,600,000 on August 17, 2004 to repay her loan to Mr. Cowell, and Mr. Cowell deposited the same amount into his bank account the next day. [AR XXXIV(I), Bates 00706].

29.    Ms. Dukler replaced her February 2004 loan from Mr. Cowell in August 2004 with the personal loan from Fifth Third Bank. [AR XXXIV(H), Bates 00635].

30.    The Fifth Third Bank note is a personal indebtedness of Ms. Dukler to the Bank. The note states that Ms. Dukler "promised to pay to the order of Fifth Third bank the sum of two

---

2    Although gross profit was $13,038,546.60, direct expenses totaled $12,680,708.11, due largely to payroll and payroll expenses and airport rent expense. [AR XXXIV(H), Bates 00688]. The Company has over 300 employees on payroll. [AR XLIX, Bates 00784]. Net income after minority interest was $356,543 [AR XV, Bates 00385].

million six hundred Thousand and 00/00 Dollars ($2,600,000) ("the Borrowing") plus interest as provided herein." [AR XXXIV(H), Bates 000635-641].

31.    In the first year Ms. Dukler held the note she paid the bank at least $164,000 in interest on the note. [AR VI(H), Bates 00066-67].

32.    Ms. Dukler signed as company President for The Grove as Lessee for the lease of certain office equipment at a rate of $281.98 per month.

**Defendants "disagree[d]" with the following facts but cited no facts or evidence to the contrary:**

17.    Since well before the time of the application to OMWBE on September 9, 2005, neither Mr. Cowell nor Mr. Dukler has been a director, officer or employee of The Grove [AR XLV at 1, Bates 00751]. Defendants disagree with this only to the extent they take issue with the characterization of April , 2004 as "well before" September, 2005.

32.    Ms. Dukler provided a "personal financial statement" that showed assets of $4,949,457. including the value of her stock in The Grove at $2.6 million, and liabilities of $4,949,300, including her $2.6 million promissory note payable to Fifth Third Bank. [AR VI, Bates 00039]. Her personal net worth was thus shown as $157.  However, under the applicable DOT regulations the proper calculation of "[a]n individual's personal net worth does not include the following: The individual's ownership interest in ACDBE firm or a firm that is applying for ACDBE certification . . ." , 49 C.F.R. § 23.3.  Accordingly, under the DOT regulations, the information Ms. Dukler provided, should have shown a negative personal net worth of ($2,599,843). Defendants merely state that they disagree with this statement and that the Final Decision provides the Department's view of Ms. Dukler's personal net worth.

**Defendants disagreed with the following facts only "to the extent that [the facts] suggest that the final decision. . . is incorrect," without stating any facts or evidence to the contrary:**

13.    The majority of The Grove's shares have at all times to the present been owned by disadvantaged individuals.  [AR  LI at pp. 3-5, Bates 00795-797; AR VI at 7, Bates 00032]. Defendants apparently disagree that Ms. Dukler is a disadvantaged individual.

18.    Ms. Dukler purchased her 51.02% interest in The Grove in February, 2004 for $2.6 million, with her own funds which she borrowed pursuant to a written, securitized agreement from Mr. Cowell.  [AR XXXIV(C), Bates 00608; AR XXXIV, Bates 00616].

23.    A City of Chicago report dated May 18, 2004, states expressly that the documentation submitted by Ms. Dukler included  "cancelled checks in the sums of $2.5 million and $100,000," from the joint checking account of Mr. and Ms. Dukler, thus confirming that the checks were in fact negotiated.  [AR XLIX at 5, Bates 00787].

30.    Ms.  Dukler remains liable on the $2.6 million personal not with Fifth Third Bank whether or not other of her assets are "encumbered" under the note. [AR XXXIV(H), Bates 000635-641].

35.    The Grove submitted a financial statement with its application to OMWBE that shows three years of financial statements with de minimis payments to Star Foods.  [AR XV, Bates 00380].

**Defendants labeled the following facts immaterial, based on their assessment that they do not "affect the outcome of the case under governing law."**

6.    The government admits that Ms. Dukler controls The Grove, as required by 49 C.F.R. § 26.71(d), an admission that the government made after first attempting to deny that she controlled the Company.  *See* Supplemental Decision at 6: "The Department's December 21, 2006 Decision addressed Ms. Dukler's ability to control The Grove given restrictions in the

firm's bylaws and other documents.  We have determined that the firm has met its burden of proof in this regard, and we are removing this section from the decision." [Bates 01139] It is material that the government admitted that Ms. Dukler controls The Grove after first attempting to deny that she controlled the company because it provides evidence of the arbitrary nature of their decision-making, which could affect the outcome of this case.

7.      The Grove is a small business [AR XV, Bates 00385].

8.      The largest contribution of capital that the Department of Transportation's Office of Civil Rights ("OCR") has ever previously found not to be real and substantial was $12,800.  See *KLM Family Trucking*, No. 05-0040 (Feb. 15, 2005) available at

http://osdbuweb.dot.gov/documents/Appeal_Decisions/r_05-0040%20KLM%20%20Family%20Trucking.doc.    This is a material fact because it is evidence of The Grove having been singled out for unfair treatment, and thus could affect the outcome of the case under governing law.

**The following are the very few facts with respect to which Defendants make reference to the record to support their disagreement:**

23.      Check number 2248, which comes immediately before check 2249 dated February 6, 2004, is dated, apparently unintentionally, February 6, 2005.   Defendants state that there is no evidence in the record to support this claim and cite AR at 34 (Bates 00605, 00618). The fact that check 2249  appears immediately before a check dated 2005 *does* represent evidence that the dating was unintentional. In addition, evidence in the record from a City of Chicago report that verifies the check had in fact been negotiated.[3] [AR XLIX at 5, Bates 00787].   Furthermore,

---

[3] *See* AR XLIX at 5, Bates 00787 (stating expressly that the documentation submitted by Ms. Dukler included "cancelled checks in the sum of $2.5 million and $100,000" from the joint checking account of Mr. and Ms. Dukler, thus confirming that the checks were in fact negotiated). The government has relied on other aspects of the City  of Chicago's report when it has suited it. *See, e.g.*, Def. Reply at 23 (relying on site visit information from the City of Chicago report).

Defendants have cited no evidence indicating that the check was intentionally misdated. Finally, attached to Plaintiff's Reply in Support of Cross Motion for Summary Judgment are copies of the cancelled checks, dated and time-stamped contemporaneously, along with a declaration from Ms. Dukler that they were provided to the state agency with her application (and thus must have been inadvertently omitted from the administrative record filed with this Court). *See* Attachment A to Plaintiff's Reply in Support of Cross-Motion for Summary Judgment.

34.     Ms. Dukler did, however, personally guarantee a project loan in the amount of up to $3 million. [AR XXXIV, Bates 00635]. Defendants disagree that the referenced citation to the record reflects a project loan of up to $3 million, as the document indicates a $2.6 million figure. In fact, The Grove executed a project loan in the amount of $2.5 million and a line of credit in the amount of $500,000, both secured by assets of the firm. [AR XXXIV(H), Bates 00643].

Respectfully submitted,

_____
John Longstreth (#367047)
William Kirk (#370762)
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, D.C. 20006-1600
(202) 778-9000
(202) 778-9100 (fax)
Counsel for Plaintiff, The Grove, Inc.

Dated March  10, 2008