# K&L | GATES

Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street NW
Washington, DC 20006-1600

т 202.778.9000   www.klgates.com

March 24, 2008

John Longstreth
D (202) 661-6271
F (202) 778-9100
john.longstreth@klgates.com

**Via Hand Delivery**
Nancy Mayer-Whittington, Clerk of Court
Clerk's Office
United States District Court
for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re: *The Grove, Inc. v. Department of Transportation, et. al.*, Civil Action No: 07-1591

Dear Ms. Mayer-Whittington:

Please find enclosed for filing in The *Grove, Inc. v. Department of Transportation, et. al.*, Civil Action No: 07-1591, two copies of the Joint Appendix prepared jointly and agreed upon by the Parties, pursuant to LCvR 7. For the convenience of the Court, I have included one paper copy of the Joint Appendix and one copy on a compact disc.

Copies of the enclosed Joint Appendix are being served on Defendants' counsel, Mercedeh Momeni.

If you should have any questions regarding this filing, please contact me.

Respectfully submitted,

/s/ John Longstreth
John L. Longstreth

*Counsel for Plaintiff, The Grove, Inc.*

Enclosures

cc: Mercedeh Momeni

RECEIVED
MAR 24 2008
Clerk, U.S. District and
Bankruptcy Courts

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE GROVE, INC. | : |
| Plaintiff, | : |
| v. | : |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, ET AL. | : |
| | : Civil Action No: 07-1591 (HHK) |
| | : |
| Defendants. | : |
| | : |

## <u>JOINT APPENDIX</u>

Pursuant to LCvR 7, Plaintiff The Grove, Inc. hereby submits the attached appendix containing copies of those portions of the administrative record that are cited or otherwise relied upon in any memorandum in support of or in opposition to any dispositive motion in the above-captioned case.

In accordance with LCvR 7, the appendix has been prepared jointly by The Grove, Inc. and Defendants United States Department of Transportation, et. al., and the parties have agreed upon its contents.

Respectfully submitted,


 /s/  John Longstreth_____
John Longstreth (#367047)
William Kirk (#370762)
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, D.C. 20006-1600
(202) 778-9000
(202) 778-9100 (fax)
Counsel for Plaintiff, The Grove, Inc.

Dated:  March 24, 2008

| Tab | Bates Range | Document Title |
|---|---|---|
| 1 | 00001-00071 | The Grove, Inc. ("The Grove") Application to Washington Office of Minority and Women's Business Enterprise ("OMWBE") for DBE Certification (with attachments listed below) |
| | 00008-00009 | Attachment I:  State and Federal Application Designation Sheet |
| | 00010-00011 | Attachment II: Customer Survey |
| | 00012-00017 | Attachment III:  Uniform Certification Application |
| | 00018-00020 | Attachment IV: Affidavit of Certification |
| | 00021-00037 | Attachment V: Work Experience Resumes for Owners and Officers |
| | 00038 | Attachment VI: Personal Financial Statement and Supporting Documentation |
| | 00039-00040 | Attachment VI(A):  Personal Financial Statement SBA Form 413 (3-00) |
| | 00041-00048 | Attachment VI (B):  List of Personal Assets |
| | 00049 | Attachment VI (C):  Release for Prior Residence at 6756 Fieldstone |
| | 00050-00051 | Attachment VI (D):  Settlement Statement from Ticor Title for sale of 6756 Fieldstone |
| | 00052-00060 | Attachment VI (E):  New Construction Agreement from Parkview Custom Homes for Future Residence |
| | 00061-00064 | Attachment VI (F):  Copies of Three Cancelled Checks for Future Residence Purchase |
| | 00065 | Attachment VI (G):  Kelley Blue Book Value for Personal Vehicle |
| | 00066-00067 | Attachment VI (H):  Commercial Loan Bank Statement from Fifth Third Bank |
| | 00068 | Attachment VI (I):  Kansas City Life Insurance Co. Proof of Life Insurance Policy Face Value |
| | 00069 | Attachment VI (J):  Personal Checking Account Printout |

| Tab | Bates Range | Document Title |
|---|---|---|
| | 00070-00071 | Attachment VI (K):  Joint Checking Account Printouts |
| 2 | 00351-00352 | Attachment cover sheet (00351); <br><br> List of Leased Equipment and Signed Lease Agreements (00352) |
| 3 | 00379-00400 | Attachment cover sheet(00379); <br><br> Year-end Balance Sheets and Income Statements for the Past Three Years (00380-00400) |
| 4 | 00405-00407 | Attachment cover sheet (00405); <br><br> The Grove DBE/MBE Certifications Effective 08-18-05 (00406); <br><br> Section 1 – Item B- Prior/Other Applications and Privileges (00407) |
| 5 | 00412 | August 2, 2005 correspondence to Michelle Dukler from City of Chicago regarding 5th Anniversary Certification |
| 6 | 00463-00465 | Attachment cover sheet (00463); <br><br> Waiver of Notice of Special Meeting of Board of Directors of the Grove (00464-00465) |
| 7 | 00482 | Minutes of the Special Meeting of Shockholder/Directors of Natural Energy Unlimited, Inc. |
| 8 | 00594-00605 | Attachment cover sheet (00594); <br><br> Stock Purchase Agreement (00595-00604); <br><br> $2,500,000 check (dated February 6, 2005 from M. Dukler to Star Foods, LLC) (00605) |
| 9 | 00606-00607 | Assignment Separate from Certificate |
| 10 | 00608-00706 | Term note (stock purchase) (00608-00609); <br><br> Option Assignment Agreement (00610-00613); <br><br> Assignment of Option (00614-00615); <br><br> Term Note (Option) and copy of check (00616-00618); |

- 2 -

| Tab | Bates Range | Document Title |
|-----|-------------|----------------|
|     |             | Mortgage and Security Agreement (00619-00625); |
|     |             | Exhibit A to Mortgage and Security Agreement (Assets) (00626); |
|     |             | Attachment A to Mortgage and Security Agreement (Antiques) (00627-00629); |
|     |             | Attachment B to Mortgage and Security Agreement (Art Assets)(00630-00632); |
|     |             | Exhibit B to Mortgage and Security Agreement (Permitted Exceptions) (00633); |
|     |             | Attachment C to Mortgage and Security Agreement  (Schlitz Studios Assets) (00634); |
|     |             | Fifth Third Bank (Consumer Note) (00635-00642); |
|     |             | Loan and Security Agreement between Fifth Third Bank and The Grove  (00643-00680; |
|     |             | Exhibit A to Loan and Security Agreement between Fifth Third Bank and The Grove: Business and Collateral Locations (00681-00686); |
|     |             | Exhibit B to Loan and Security Agreement between Fifth Third Bank and The Grove: Compliance Certificate (00687); Consolidated Income Statement and handwritten notes (00688-00692); |
|     |             | Exhibit C to Loan and Security Agreement between Fifth Third Bank and The Grove: Commercial/Tort Claims (00693); |
|     |             | Schedule 1 to Loan and Security Agreement between Fifth Third Bank and The Grove: Permitted Liens (00694); |
|     |             | Schedule 11(h) to Loan and Security Agreement between Fifth Third Bank and The Grove: Affiliate Transactions (00695); |
|     |             | Schedule 11(i) to Loan and Security Agreement between Fifth Third Bank and The Grove: Names and Trade Names (00696); |
|     |             | Schedule 11(m) to Loan and Security Agreement between Fifth Third Bank and The Grove: Indebtedness (00697); |
|     |             | Schedule 11(o) to Loan and Security Agreement between Fifth |

| Tab | Bates Range | Document Title |
| --- | --- | --- |
| | | Third Bank and The Grove: Parent, Subsidiaries and Affiliates (00698); |
| | | Project Loan Promissory Note (00699-00700); |
| | | Revolving Promissory Note (00701-00702); |
| | | Term Loan Promissory Note (00703-00705); |
| | | Check Copies Paying Off Notes to C. Cowell (00706) |
| 11 | 00707-00708 | Written Consent of the Manager of Star Foods, LLC |
| 12 | 00709-00710 | February 9, 2004 correspondence to Michele Dukler from Star Foods L.L.C. regarding exercise of Valteau/Menutis Option |
| 13 | 00717-00718 | Waiver of Notice of Special Meeting of Board of Directors and Shareholders of the Grove (00717); |
| | | Minutes of the Special Meeting of the Board of Directors of The Grove (00718) |
| 14 | 00719-00725 | Stockholder's Agreement |
| 15 | 00726-00728 | Attachment cover sheet (00726); |
| | | Exclusion of Certain Property from Marital Property (00727-00728) |
| 16 | 00750-00751 | Star Foods, LLC Explanation of Percent Stock Ownership |
| 17 | 00752-00754 | Affidavit Explaining Martin Dukler's Role and Affiliation with The Grove |
| 18 | 00777-00780 | Attachment cover sheet (00777); |
| | | May 18, 2004 – City of Chicago Site Visit Report (00777-00780) |
| 19 | 00781-00791 | Attachment cover sheet (00781); |
| | | July 15, 2004 – City of Chicago Site Visit Report (00782-00784); |
| | | Schedule A (Final Denial Summary) (00786-00788); |
| | | Written Consent of the Manager of Star Foods, L.L.C. (00789-00791) |

- 4 -

| Tab | Bates Range | Document Title |
|---|---|---|
| 20 | 00792-00813 | Attachment cover sheet (00792); <br><br> October 28, 2004 – Appeal to U.S. Department of Transportation of City of Chicago Decision removing the Grove's DBE eligibility (00793-00813) |
| 21 | 00829-00911 | Attachment cover sheet (00829); <br><br> August 23, 2005 – The Grove correspondence to City of Chicago providing information requested related to DBE certification (00830-00835); <br><br> November 30, 2005 correspondence to Michelle Dukler from OMWBE denying the Grove's application for ACDBE certification (00836-00841); <br><br> Attachment A to November 30, 2005 OMWBE Denial (Applicable Regulations)(00842-00847); <br><br> Attachment B to November 30, 2005 OMWBE Denial (Appeal Process) (00848); <br><br> December 16, 2005 – The Grove informal review letter to OMWBE and attachments (00849-00911) |
| 22 | 00913 | June 28, 2006 – OMWBE notification regarding The Grove's show cause for review |
| 23 | 00915-00994 | August 2, 2005 – The Grove's Certification Issues Summary And Determination from the City of Chicago (00915-00919); <br><br> Applicable Federal Regulations (00920-00923); <br><br> September 26, 2005 – Appeal by The Grove of OMWBE Decision Denying ACDBE Certification (cover letter) (00924-00925); <br><br> Appeal by The Grove of OMWBE Decision Denying ACDBE Certification (dated September 26, 2005) (00926-00992); <br><br> November 30, 2005 – OMWBE decision denying ACDBE Certification to The Grove (00993-00994) |
| 24 | 01007-01008 | June 28, 2006 – OMWBE notification regarding The Grove's show cause for review |

| Tab | Bates Range | Document Title |
|-----|-------------|----------------|
| 25 | 01018-01020 | The Grove ACDBE Certifications (as of September 26, 2006) |
| 26 | 01052-01053 | Exclusion of Certain Property from Marital Property |
| 27 | 01063-01064 | $2,600,000 check (dated August 17, 2004 ) from Michelle Dukler to Casey Cowell and corresponding deposit slip. |
| 28 | 01076-01079 | The Grove Net Income History 1999-2003 (01076); The Grove Long Term Debt and Working Capital Deficit as of December 31, 2003 (01077-01079) |
| 29 | 01081 | The Grove Airport Lease Contracts as of March 2004 |
| 30 | 01082 | September 26, 2006 – correspondence from OCR to OMWBE requesting information related to OMWBE denial of The Grove's appeal of DBE certification |
| 31 | 01085-01140 | December 21, 2006 – OCR decision denying The Grove's appeal of OMWBE denial of ACDBE certification (01085-01109) February 15, 2007 – correspondence to OCR from William Kirk regarding ACDBE certification appeal of The Grove (01110-01132); June 8, 2007 – correspondence to William Kirk from Joseph E. Austin supplementing Dec. 21, 2006 OCR decision denying The Grove's appeal (01134-01140) |

Respectfully submitted,

/s/ John Longstreth
John Longstreth (#367047)
William Kirk (#370762)
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, D.C. 20006-1600
(202) 778-9000
(202) 778-9100 (fax)
Counsel for Plaintiff, The Grove, Inc.

Dated:  March 24, 2008

**CERTIFICATE OF SERVICE**

I, John Longstreth, certify that on March 24, 2008, I caused a copy of the

**JOINT APPENDIX** to be successfully served via hand delivery to the party listed

below.

_/s/ John Longstreth_
John Longstreth

Mercedeh Momeni
Assistant United States Attorney
554 4th Street, NW
Civil Division
Washington DC 20530
(202) 305-4851
(202) 514-9780 (fax)
Counsel for Defendants,
United States Department of Transportation, et. al.

# TAB 1





STATE OF WASHINGTON

# OFFICE OF MINORITY AND WOMEN'S BUSINESS ENTERPRISES

406 SOUTH WATER • POST OFFICE BOX 41160 • OLYMPIA, WASHINGTON 98504-1160
(360) 753-9693 • FAX (360) 586-7079

October 27, 2006

Mr. Joseph E. Austin, Chief
External Policy & Program Development Division
Departmental Office of Civil Rights
U.S. Department of Transportation
400 Seventh Street S.W.
Washington, D.C. 20590

Dear Mr. Austin:

Enclosed are copies of the documents you requested in your letter of September 26, 2006 regarding the DBE certification appeal of The Grove, Inc.

To the best of my knowledge, the appellant was aware of the requirements to be certified as a DBE in accordance with 49 CFR, Part 26 of the Department's DBE regulation.

If you have questions, or require further information to assist you in making a finding, please feel free to contact me at (360) 704-1181.

Sincerely,

Jean Wheat
Administrative Support

Enclosures

cc: Cathy V. Canorro, Certification Program Manager

00001



RECEIVED

SEP 1 2 2005

OMWBE

September 9, 2005

Ms. Vicky Schiantarelli
Certification Manager
OMWBE
406 South Water Street
Olympia WA 98504-1160

Re:    DBE Application for The Grove, Inc.
       Delivered via FedEx: Tracking Number  6435 2341 6910

Dear Vicky,

Enclosed please find The Grove, Inc.'s Uniform Certification Application for the State of Washington Disadvantaged Business Enterprise Program and our application fee check in the amount of $25.00.

Per your conversations with both Bill Kirk and me and also our meeting last fall, I have tried my utmost to include all the explanations and supporting documentation that you would need beyond the basic application lists to make a determination for The Grove, Inc.'s DBE certification.  If you need any additional documents, please contact me immediately and I will be more than willing to comply.

The Grove, Inc. is an established company and, at present, is doing business at the Seattle-Tacoma International Airport in Concourse A.  Any expedited attention you can give to my DBE Application and its processing would be greatly appreciated.  The Port of Seattle is currently waiting for the disposition of my DBE Application.

If you have any questions or need any clarification or additional information whatsoever, please call me at 708-531-1694 Ex. 3214 or contact my attorney Bill Kirk at 202-861-3814.  And, if you would feel more comfortable or need to see us in person, we would both be glad to meet you at your office.

Thank you in advance for your help with this application.

Best Regards,

Michelle Dukler
President
The Grove, Inc.

Enclosures

**The Grove, Inc.**
3 Westbrook Corporate Center, Suite 500, Westchester, IL 60154
Phone (708) 531-1694 • Fax (708) 531-0619

00002



# MASTER INDEX OF ATTACHMENTS



RECEIVED

SEP 1 2 2005

OMWBE

| ATTACHMENT | CONTENT (In the same order as Documents Checklists) |
|---|---|
| I | State and Federal Application Designation Sheet |
| II | Customer Survey |
| III | Uniform Certification Application |
| IV | Affidavit of Certification |
| V | Work Experience Resumes for Owners and Officers |
| VI | Personal Financial Statement and Supporting Documentation |
|  | **A. Personal Financial Statement SBA Form 413 (3-00)** |
|  | **B. List of Personal Assets** |
|  | **C. Release for Prior Residence at 6756 Fieldstone** |
|  | **D. Settlement Statement from Ticor Title for sale of 6756 Fieldstone** |
|  | **E. New Construction Agreement from Parkview Custom Homes for Future Residence** |
|  | **F. Copies of Three Cancelled Checks for Future Residence Purchase** |
|  | **G. Kelley Blue Book Value for Personal Vehicle** |
|  | **H. Commercial Loan Bank Statement from Fifth Third Bank** |
|  | **I. Kansas City Life Insurance Co. Proof of Life Insurance Policy Face Value** |
|  | **J. Personal Checking Account Printout** |
|  | **K. Joint Checking Account Printouts** |
| VII | Personal Tax Returns for Three Years - 2003, 2002 & 2001 (My 2004 Personal Return will not be available until after October 15.) |
| VIII | The Grove, Inc. Tax Returns for Three Years - 2003, 2002 & 2001 (Our 2004 Corporate Returns will be available after September 15. We will forward to you at that time) |
| IX | Documented Proof of Contribution Used to Acquire Ownership *Documentation provided in ATTACHMENT XXXIV* |
| X | The Grove, Inc. Signed Loan Agreements |
| XI | Description of Real Estate Owned/Leased by The Grove, Inc. |

00003

 

# MASTER INDEX OF ATTACHMENTS

| ATTACHMENT | CONTENT (In the same order as Documents Checklists) |
|---|---|
| XII | List of Leased Equipment and Signed Lease Agreements |
| XIII | List of Equipment and Vehicle Title |
| XIV | *There were no transfers of assets over the past two years* |
| XV | Year-end Balance Sheets and Income Statements for the Past Three Years |
| XVI | Licenses and Permits List |
| XVII | DBE Certifications and Denials |
| XVIII | Bank Authorization and Signatory Cards |
| XIX | Schedule of Salaries for Owner, Officer, Managers, Key Personnel |
| XX | *There are trust agreements held by any owner.* |
| XXI | *This does not apply. We are not a partnership or joint venture.* |
| XXII | Official Articles of Incorporation |
| XXIII | Corporate Stock Certificates and Stock Transfer Ledger |
| XXIV | Shareholders Agreement and Amendments<br>*Documentation provided in ATTACHMENT XXXIV* |
| XXV | Minutes of all Stockholders and Board of Directors Meetings |
| XXVI | Corporate By-Laws and any Amendments |
| XXVII | Corporate Bank Resolution and Bank Signature Cards |
| XXVIII | *This does not apply. We are not a LLC.* |
| XXIX | *This does not apply. We are not a trucking company.* |
| XXX | *This does not apply. We are not a regular dealer.* |

RECEIVED

SEP 1 2 2005

OMWBE

00004

Page 2

 

# MASTER INDEX OF ATTACHMENTS

| ATTACHMENT | CONTENT (*In the same order as Documents Checklists*) |
|---|---|
| | **ADDITIONAL REQUIRED DOCUMENTS - WA STATE SUPPLEMENT** |

**XXXI**      *This does not apply - Spouse's resume*

**XXXII**      *This does not apply - Spouse's Personal Financial Statement*

**XXXIII**      *This does not apply - Spouse's Ownership Interest*

**XXXIV**      Purchase/Sell Agreement Documents (List of Included Documents Follows)

    **A.** <u>Stock Purchase Agreement</u>: Ms. Dukler's purchase of 49% Grove Stock from Star Foods, LLC

    **B.** <u>Assignment Separate from the Option</u>: Star Foods, LLC assigns 49% Grove Stock to Ms. Dukler

    **C.** <u>Stock Purchase Promissory Note with Check</u>: Ms. Dukler's $2.5 million note to C. Cowell to procure funds for Grove Stock with collateral attachment.

    **D.** <u>Option Assignment Agreement</u>:  Star Foods, LLC accords Ms. Dukler 2/51 of old Option.

    **E.** <u>Assignment of the Option</u>:  Actual Assignment from Star Foods, LLC to Ms. Dukler of 2/51 Option.

    **F.** <u>Option Purchase Promissory Note with Check</u>:  Ms. Dukler's $100,000 note to C. Cowell to procure funds for the 2/51.

    **G.** <u>Mortgage and Security Agreement</u>

    **H.** <u>Fifth Third Bank Note</u>:  Ms. Dukler's $2.6 million note from Fifth Third Bank to pay C. Cowell for the two notes.

    **I.** <u>Check Copies Paying Off Notes to C. Cowell</u>

    **J.** <u>Star Foods, LLC Manager's Resolutions</u>:  Star Foods, LLC approval of actions it is taking with Ms. Dukler.

    **K.** <u>Star Foods, LLC Manager's Further Resolutions</u>:  Star Foods, LLC approval to exercise the old Option.

    **L.** <u>Notices to Exercise Options</u>:  R. Menutis and P. Valteau

RECEIVED

SEP 1 2 2005

OMWDE

00005

Page 3

 

# MASTER INDEX OF ATTACHMENTS

| ATTACHMENT | CONTENT (*In the same order as Documents Checklists*) |
|---|---|

**M.** __Assignment Separate from the Certificate__:  R. Menutis and P. Valteau

**N.** __Amendments to the Stockholder's Agreement__:  Terminates Sections 5.10 and 5.13

**O.** __Stockholder's Agreement__

| | |
|---|---|
| **XXXV** | Exclusion of Certain Property from Marital Property |
| **XXXVI** | *This does not apply - We do not have any franchisees.* |
| **XXXVII** | *This does not apply - IRS Form SS-4 - We have filed Federal tax returns.* |
| **XXXVIII** | Washington State Uniform Business Identification (UBI) Number Certificate |
| **XXXIX** | Michelle Dukler - Copy of Birth Certificate |
| **XL** | *This does not apply - Birth Certificate provides necessary information* |
| **XLI** | Copy of Michelle Dukler's Illinois State Drivers License |
| **XLII** | *This does not apply - We are not a partnership nor joint venture.* |
| **XLIII** | Certificate of Authority |
| **XLIV** | *This does not apply - We are not a trucking company.* |

RECEIVED

SEP 1 2 2005

**OMWBE**

00006

Page 4

 

# MASTER INDEX OF ATTACHMENTS

| ATTACHMENT | CONTENT (*In the same order as Documents Checklists*) |
|---|---|
| | **ADDITIONAL SUPPORTING DOCUMENTATION** |

| | |
|---|---|
| XLV | Star Foods, LLC Explanation of Percent Stock Ownership |
| XLVI | Affidavit Explaining Martin Dukler's Role and Affiliation with The Grove, Inc. |
| XLVII | Copies of Annual Reports for FL, GA, IL, KY, LA, MA, KY, NJ, NY, TX, UT, VA, WA. |
| XLVIII | May 18, 2004 - City of Chicago Site Visit Report |
| XLIX | July 15, 2004 - City of Chicago Site Visit Report |
| L | July 26, 2004 - Schedule A Final Denial Summary from the City of Chicago |
| LI | October 28, 2004 - Appeal of City of Chicago Decision made to U.S. Department of Transportation by our attorneys, Thelen Reid & Priest LLP |
| LII | June 2, 2005 - U.S. Department of Transportion Appeal Decision Reversal |
| LIII | June 28, 2005 - Our attorneys, Preston Gates Ellis & Rouvelas Meeds LLP, response to concerns of the U.S. Department of Transportation in their appeal reversal of the City of Chicago's decision |
| LIV | August 2, 2005 - The City of Chicago's Reinstatement of Certification Letter |
| LV | August 2, 2005 - The Grove, Inc.'s Certification Document from the City of Chicago |
| LVI | August 23, 2005 - The Grove, Inc.'s response letter to David Grossman, City of Chicago, regarding concerns raised in his letter of August 2. |

RECEIVED

SEP 1 2 2005

**OMWBE**

# ATTACHMENT I

RECEIVED

SEP 1 2 2005

OMWBE

00008






**WASHINGTON STATE**
**OFFICE OF MINORITY & WOMEN'S BUSINESS ENTERPRISES**

# FEDERAL APPLICATION ONLY
### (green packet)

Congratulations on your choice to apply for certification with our office. Listed below are the different designations you can apply for. If you are unsure of the designation you want to apply for, please refer to the definitions on Page 2 of this application.

1. **This firm is applying for federal certification as a (check one):**

    ✓ **DBE** Disadvantaged Business Enterprise (Please complete **all** sections of the DBE 49 C.F.R. Part 26 Uniform Certification Application)

    _____ **DBE-FAA** Disadvantaged Business Enterprise for Concessionaires located at airports (Please complete **all** sections of the DBE 49 C.F.R. Part 26 Uniform Certification Application **except** the PERSONAL FINANCIAL STATEMENT)

If you checked any designation under 1., please complete **all** sections of the DBE 49 C.F.R. Part 26 Uniform Certification Application identified above **and** provide us with all documents requested on Pages 16 and 17 of this application.

2. _____ **EPA Non-Profit Registration** (Please complete the QwikChek available online at www.omwbe.wa.gov)

3. _____ **SEDBE** Socially and Economically Disadvantaged Business Enterprise **(The SEDBE Personal Net Worth Statement and SEDBE Supplemental Form must also be completed with supporting documentation)**

Please mail the completed application with supporting documentation and non-refundable processing fee to:

**OMWBE**
**406 South Water Street**
**P.O. Box 41160**
**Olympia, WA 98504-1160**

RECEIVED

SEP 1 2 2005

OMWBE

If you have any questions or need assistance in completing the application packet, please call (360) 753-9693 or 1-866-208-1064.

**A <u>NONREFUNDABLE</u> processing fee, payable to OMWBE, must be received in order to process any application package. (See attached fee schedule)**

1

*ATTACHMENT I*

00009

# ATTACHMENT II

RECEIVED

SEP 1 2 2005

**OMWBE**

00010




RECEIVED

SEP 1 2 2005

OMWBE



WASHINGTON STATE
OFFICE OF MINORITY & WOMEN'S BUSINESS ENTERPRISES

## CUSTOMER SURVEY

For OMWBE to better serve you, please complete the following optional survey. The information you provide will assist OMWBE in identifying specific business development, financing, bonding and other training opportunities for your firm.

1. Has the business ever applied for a Linked Deposit Loan?  Yes _____  No ✓
   If Yes, Name and Branch of bank at which you made application(s) _____
   Date (s) of application _____
   Status of application(s) _____
   Loan amount(s) $ _____     Interest rate charged _____ %

2. Is your business registered with the Washington State General Administration's Office of State Procurement Vendor Registration?
   Yes _____  No ✓  If No, would you like to be?  Yes ✓  No _____

3. Contract size firm is capable of performing: *We are airport concessionaires*
   ___ Up to $10,000  ___ Up to $50,000  ___ Up to $100,000  ___ Up to $500,000  ___ More than $500,000

4. Identify which government jurisdictions with which you intend to do business:  (Check all that apply)
   ___ School districts                              ✓ King County/METRO          ___ City of Seattle
   ___ State agencies & educational institutions     ___ Spokane County            ___ City of Spokane
   ✓ Sound Transit                                   ___ Pierce County             ___ City of Tacoma
   ✓ Port of Seattle                                 ___ Yakima County             ___ City of Yakima
   ___ Port of Tacoma                                ___ Other(s) (Be Specific) *Seattle-Tacoma Airport*

5. Geographical area where the firm wants to do business in Washington:
   ___ State-wide                        ___ Only in Eastern Washington
   ✓ Only in Western Washington          ___ Only in Central Washington

6. From whom did you learn about the state M/WBE and/or federal DBE programs?  (Check all that apply)
   ___ State agency                      ___ Community organization       ___ Attended conference
   ✓ Other government entity             ___ Another business             ___ Other
   ___ Bank
   ___ For each checked item, please provide the name of the entity ___ *USDOT*

7. Identify which of the following business development, marketing or other training/technical assistance you would like to receive if your business is certified:  (Check all that apply)
   ___ Bidding/Estimating              ___ Construction Plan Review       ___ Financial Management
   ___ Blueprint Reading/Take-offs     ___ Contract Administration        ___ Loan Application
   ___ Bonding/Insurance Application   ___ Doing Business with            ___ Office Management
   ___ Business Plan                          State/Federal Agencies

*ATTACHMENT II*

00011

# ATTACHMENT III

RECEIVED

SEP 1 2 2005

**OMWBE**




**DISADVANTAGED BUSINESS ENTERPRISE PROGRAM**
**49 C.F.R. PART 26**

# UNIFORM CERTIFICATION APPLICATION

---

### ROADMAP FOR APPLICANTS

**1.   Should I apply?**
- Is your firm at least 51%-owned by a socially and economically disadvantaged individual(s) who also controls the firm?
- Is the disadvantaged owner a U.S. citizen or lawfully admitted permanent resident of the U.S.?
- Is your firm a small business that meets the Small Business Administration's (SBA's) size standard <u>and</u> does not exceed $17.42 million in gross annual receipts?
- Is your firm organized as a for-profit business?

⇒ If you answered "Yes" to all of the questions above, you <u>may be</u> eligible to participate in the U.S. DOT DBE program.

**2.   Is there an easier way to apply?**
If you are currently certified by the SBA as an 8(a) and/or SDB firm, you may be eligible for a streamlined certification application process. Under this process, the certifying agency to which you are applying will accept your current SBA application package in lieu of requiring you to fill out and submit this form. **NOTE: You must still meet the requirements for the DBE program, including undergoing an on-site review.**

**3.   Be sure to attach all of the required documents listed in the <u>Documents Check List</u> at the end of this form with your completed application.**

**4.   Where can I find more information?**
- U.S. DOT – http://osdbuweb.dot.gov/business/dbe/index.html (this site provides useful links to the rules and regulations governing the DBE program, questions and answers, and other pertinent information)
- SBA – http://www.ntis.gov/naics (provides a listing of NAICS codes) and http://www.sba.gov/size/indextableofsize.html (provides a listing of SIC codes)
- 49 CFR Part 26 (the rules and regulations governing the DBE program)

---

Under Sec. 26.107 of 49 CFR Part 26, dated February 2, 1999, if at any time, the Department or a recipient has reason to believe that any person or firm has willfully and knowingly provided incorrect information or made false statements, the Department may initiate suspension or debarment proceedings against the person or firm under 49 CFR Part 29, take enforcement action under 49 CFR Part 31, Program Fraud and Civil Remedies, and/or refer the matter to the Department of Justice for criminal prosecution under 18 U.S.C. 1001, which prohibits false statements in Federal programs.

**RECEIVED**

SEP 1 2 2005

**OMWBE**

8

*ATTACHMENT III*

00013

**PAYMENT RECEIVED**

SEP 1 2 2005

INITIALS _TH_
CHECK NO. _20792_ ($25)

## Section 1: CERTIFICATION INFORMATION

**A.    Prior/Other Certifications**

| Is your firm currently certified for any of the following programs? *(If Yes, check appropriate box(es))* | ☒ DBE | Name of certifying agency: _City of Chicago_ |
| | | Has your firm's state UCP conducted an on-site visit? _5/18/04_ |
| | | ☒ Yes, on _7/15/04_ State: _IL_    ☐ No |
| | ☐ 8(a) | ⊗ **STOP!**  If you checked either the 8(a) or SDB box, you <u>may not</u> |
| | ☐ SDB | have to complete this application.  Ask your state UCP about the streamlined application process under the SBA-DOT MOU. |

**B.    Prior/Other Applications and Privileges**

Has your firm (under any name) or any of its owners, Board of Directors, officers or management personnel, ever withdrawn an application for any of the programs listed above, or ever been denied certification, decertified, or debarred or suspended or otherwise had bidding privileges denied or restricted by any state or local agency, or Federal entity?
☒ Yes, on _8/13/04_ ☐ No
If Yes, identify State and name of state, local, or Federal agency and explain the nature of the action:

_See Attached Document_

## Section 2: GENERAL INFORMATION

**A.    Contact Information**

| (1) Contact person and Title: _Michelle Dukler President_ | (2) Legal name of firm: _The Grove, Inc._ |
| (3) Phone #: _708-531-1694_ | (4) Other Phone #: _630-660-8920_ | (5) Fax #: _708-531-0619_ |
| (6) E-mail: _michelle.dukler@grovesnacks.com_ | (7) Website (if have one): _www.grovesnacks.com_ |
| (8) Street address of firm (No P.O. Box): _3 Westbrook Corporate Center Ste 500_ | City: _Westchester_ | County/Parish: _Cook_ | State: _IL_ | Zip: _60154_ |
| (9) Mailing address of firm (if different): _Same as above_ | City: | County/Parish: | State: | Zip: |

**B.    Business Profile**

| (1) Describe the primary activities of your firm: _Airport Concessionaire_ | (2) Federal Tax ID (if any): _72-0902131_ |
| (3) This firm was established on _3/27/81_ | (4) I/We have owned this firm since: _2/13/2004_ |
| (5) Method of acquisition (check all that apply): ☐ Started new business  ☒ Bought existing business  ☐ Inherited business  ☐ Secured concession  ☐ Merger or consolidation  ☐ Other (explain) | |
| (6) Is your firm "for profit"? ☒ Yes  ☐ No | ⊗ **STOP!**  If your firm is NOT for-profit, then you do NOT qualify for this program and do NOT need to fill out this application. |

**RECEIVED**

SEP 1 2 2005

**OMWBE**

9

DBE

00014

 

**(7) Type of firm** *(check all that apply)*:
- ❑ Sole Proprietorship
- ❑ Partnership
- ☒ Corporation
- ❑ Limited Liability Partnership
- ❑ Limited Liability Corporation
- ❑ Joint Venture
- ❑ Other, Describe:

**(8)** Has your firm ever existed under different ownership, a different type of ownership, or a different name?
☒ Yes ❑ No
If Yes, explain: *I purchased this firm in February 2004 from previous owners. See documentation included in this application.*

**(9)** Number of employees: Full-time *189*     Part-time *179*     Total *368*

**(10)** Specify the gross receipts of the firm for the last 3 years: Year *2004* Total receipts $ *19,302,516*
Year *2003* Total receipts $ *16,187,174*
Year *2002* Total receipts $ *14,616,019*

**C.     Relationships with Other Businesses**

**(1)** Is your firm co-located at any of its business locations, or does it share a telephone number, P.O. Box, office space, yard, warehouse, facilities, equipment, or office staff, with any other business, organization, or entity?
☒ Yes ❑ No

If Yes, identify:  Other Firm's name: *ITracs, Inc.*
Explain nature of shared facilities: *We sublease office space in our corporate office suite to ITracs, Inc.*

| (2) At present, or at any time in the past, has your firm: | | |
|---|---|---|
| | (a) been a subsidiary of any other firm? | ❑ Yes ☒ No |
| | (b) consisted of a partnership in which one or more of the partners are other firms? | ❑ Yes ☒ No |
| | (c) owned any percentage of any other firm? | ☒ Yes ❑ No |
| | (d) had any subsidiaries? | ❑ Yes ☒ No |

**(3)** Has any other firm had an ownership interest in your firm at present or at any time in the past? ☒ Yes ❑ No

**(4)** If you answered "Yes" to any of the questions in (2)(a)-(d) and/or (3), identify the following for each *(attach extra sheets, if needed)*:

| Name | Address | Type of Business |
|---|---|---|
| 1. (2c) NEU of Chicago O'Hare | O'Hare Airport Terminal 1 Concourse B | Chgo, IL Concessions |
| 2. (3) Star Foods, LLC | 676 N. Michigan Ave Chgo IL | Investment |
| 3. | | |

**D.     Immediate Family Member Businesses**

Do any of your immediate family members own or manage another company? ☒ Yes ❑ No
If Yes, then list *(attach extra sheets, if needed)*:

| Name | Relationship | Company | Type of Business | Own or Manage? |
|---|---|---|---|---|
| 1. Martin Dukler | Husband | Star Foods LLC | Investment | One of several investors |
| 2. Martin Dukler | Husband | Georgia's Grove LLC | Wholesale | Manage |

**Section 3: OWNERSHIP**

**RECEIVED**

SEP 1 2 2005

OMWBE

10

00015

 

**Identify all individuals or holding companies with any ownership interest in your firm, providing the information requested below** (*If more than one owner, attach separate sheets for each additional owner*):

**A.    Background Information**

| | |
|---|---|
| (1) Name: Michelle Dukler | (2) Title: President | (3) Home Phone #: 630-920-0977 |

| (4) Home Address (*street and number*): | City: | State: | Zip: |
|---|---|---|---|
| 226 Justina St. | Hinsdale | IL | 60521 |

| (5) Gender: ☐ Male ☒ Female | (6) Ethnic group membership (*Check all that apply*): |
|---|---|
| (7) U.S. Citizen: ☒ Yes ☐ No | ☐ Black    ☐ Hispanic    ☐ Native American |
| (8) Lawfully Admitted Permanent Resident: ☐ Yes ☒ No | ☐ Asian Pacific    ☐ Subcontinent Asian |
| | ☒ Other (*specify*)  Caucasian |

**B.    Ownership Interest**

| | |
|---|---|
| (1) Number of years as owner: 1.5 years | (2) Initial investment to acquire ownership interest in firm: |
| (3) Percentage owned: 51% | |
| (4) Familial relationship to other owners: Husband owns 20% interest in Star Foods, LLC | |

| | Type | Dollar Value |
|---|---|---|
| Cash | $ 2,600,000 |
| Real Estate | $ |
| Equipment | $ |
| Other | $ |

| (5) Shares of Stock: | Number | Percentage | Class | Date acquired | Method Acquired |
|---|---|---|---|---|---|
| | 37.5 | 51.02% | Com | 2-13-04 | Purchase |

(6) Does this owner perform a management or supervisory function for any other business? ☐ Yes ☒ No
If Yes, identify: Name of Business: _____ Function/Title: _____

(7) Does this owner own or work for any other firm(s) that has a relationship with this firm (*e.g., ownership interest, shared office space, financial investments, equipment, leases, personnel sharing, etc.*)? ☐ Yes ☒ No

If Yes, identify: Name of Business: _____ Function/Title: _____
Nature of Business Relationship:

**C.    Disadvantaged Status – NOTE: Complete this section only for each owner applying for DBE qualification (i.e. for each owner claiming to be socially and economically disadvantaged)**

| |
|---|
| (1) What is the Personal Net Worth (PNW) of the owner(s) applying for DBE qualification? (*Use and attach the Personal Financial Statement form at the end of this application; attach additional sheets if more than one owner is applying*)<br><br>    See Attached PNW Form       $ 157 |
| (2) Has any trust been created for the benefit of this disadvantaged owner(s)? ☐ Yes ☒ No<br>If Yes, explain (*attach additional sheets if needed*): |

**RECEIVED**

SEP 1 2 2005

**OMWBE**

**Section 4: CONTROL**

11

00016




**Identify all individuals or holding companies with any ownership interest in your firm, providing the information requested below** *(If more than one owner, attach separate sheets for each additional owner):*

**A.    Background Information**

| | |
|---|---|
| (1) Name: *Star Foods, LLC* | (2) Title:      (3) Home Phone #: |

(4) Home Address *(street and number):*    City:    State:    Zip:

*676 N. Michigan Ave Ste 3450  Chicago IL  60611*

(5) Gender: ☐ Male ☐ Female ☒ *Company*    *N/A*

(6) Ethnic group membership *(Check all that apply):*
☐ Black    ☐ Hispanic    ☐ Native American
☐ Asian Pacific    ☐ Subcontinent Asian
☒ Other *(specify)*  *LLC*

(7) U.S. Citizen: ☐ Yes ☐ No  *N/A*

(8) Lawfully Admitted Permanent Resident: ☐ Yes ☐ No  *N/A*

**B.    Ownership Interest**

(1) Number of years as owner: *5.5 yrs*

(3) Percentage owned: *49%*

(4) ~~Familial relationship to other~~ owners:
*Martin Bukler*
*Casey Cowell*

| (2) Initial investment to acquire ownership interest in firm: | Type | Dollar Value |
|---|---|---|
| | Cash $ | *1,320,000* |
| | Real Estate $ | |
| | Equipment $ | |
| | Other $ | |

(5) Shares of Stock:

| Number | Percentage | Class | Date acquired | Method Acquired |
|---|---|---|---|---|
| *35* | *49%* | *COM* | *7/23/1999* | *Stock Purchase* |

(6) Does this owner perform a management or supervisory function for any other business? ☒ Yes ☐ No
If Yes, identify: Name of Business: *Star Foods LLC*    Function/Title: *Company*

(7) Does this owner own or work for any other firm(s) that has a relationship with this firm *(e.g., ownership interest, shared office space, financial investments, equipment, leases, personnel sharing, etc.)?* ☐ Yes ☒ No

If Yes, identify: Name of Business: _____    Function/Title: _____
Nature of Business Relationship:

**C.    Disadvantaged Status – NOTE: Complete this section only for each owner applying for DBE qualification (i.e. for each owner claiming to be socially and economically disadvantaged)**

(1) What is the Personal Net Worth (PNW) of the owner(s) applying for DBE qualification? *(Use and attach the Personal Financial Statement form at the end of this application; attach additional sheets if more than one owner is applying)*

*N/A*

(2) Has any trust been created for the benefit of this disadvantaged owner(s)? ☐ Yes ☐ No
If Yes, explain *(attach additional sheets if needed)*:

*N/A*

**RECEIVED**

SEP 1 2 2005

**OMWBE**

**Section 4: CONTROL**

11

# ATTACHMENT IV

RECEIVED

SEP 1 2 2005

OMWBE

00018

 

## AFFIDAVIT OF CERTIFICATION

*This form must be signed and notarized for <u>each</u> owner upon which disadvantaged status is relied.*

**A MATERIAL OR FALSE STATEMENT OR OMISSION MADE IN CONNECTION WITH THIS APPLICATION IS SUFFICIENT CAUSE FOR DENIAL OF CERTIFICATION, REVOCATION OF A PRIOR APPROVAL, INITIATION OF SUSPENSION OR DEBARMENT PROCEEDINGS, AND MAY SUBJECT THE PERSON AND/OR ENTITY MAKING THE FALSE STATEMENT TO ANY AND ALL CIVIL AND CRIMINAL PEALTIES AVAILABLE PURSUANT TO APPLICABLE FEDERAL AND STATE LAW.**

I _Michelle Dukler_ (full name printed), swear or affirm under penalty of law that I am _President_ (title) of applicant firm _The Grove Inc_ (firm name) and that I have read and understood all of the questions in this application and that all of the foregoing information and statements submitted in this application and its attachments and supporting documents are true and correct to the best of my knowledge, and that all responses to the questions are full and complete, omitting no material information. The responses include all material information necessary to fully and accurately identify and explain the operations, capabilities and pertinent history of the named firm as well as the ownership, control, and affiliations thereof.

I recognize that the information submitted in this application is for the purpose of inducing certification approval by a government agency. I understand that a government agency may, by means it deems appropriate, determine the accuracy and truth of the statements in the application, and I authorize such agency to contact any entity named in the application, and the named firm's bonding companies, banking institutions, credit agencies, contractors, clients, and other certifying agencies for the purpose of verifying the information supplied and determining the named firm's eligibility.

I agree to submit to government audit, examination and review of books, records, documents and files, in whatever form they exist, of the named firm and its affiliates, inspection of its places(s) of business and equipment, and to permit interviews of its principals, agents, and employees. I understand that refusal to permit such inquiries shall be grounds for denial of certification.

If awarded a contract or subcontract, I agree to promptly and directly provide the prime contractor, if any, and the Department, recipient agency, or federal funding agency on an ongoing basis, current, complete and accurate information regarding (1) work performed on the project; (2) payments; and (3) proposed changes, if any, to the foregoing arrangements.

I agree to provide written notice to the recipient agency or Unified Certification Program (UCP) of any material change in the information contained in the original application within 30 calendar days of such change (e.g., ownership, address, telephone number, etc.).

I acknowledge and agree that any misrepresentations in this application or in records pertaining to a contract or subcontract will be grounds for terminating any contract or subcontract which may be awarded; denial or revocation of certification; suspension and debarment; and for initiating action under federal and/or state law concerning false statement, fraud or other applicable offenses.

I certify that I am a socially and economically disadvantaged individual who is an owner of the above-referenced firm seeking certification as a Disadvantaged Business Enterprise (DBE). In support of my application, I certify that I am a member of one or more of the following groups, and that I have held myself out as a member of the group(s)  (circle all that apply):

(Female)  Black American   Hispanic American
Native American   Asian- Pacific American
Subcontinent Asian American
Other(specify) _____

**RECEIVED**

SEP 1 2 2005

**OMWBE**

17

*ATTACHMENT IV*

00019

 

I certify that I am socially disadvantaged because I have been subjected to racial or ethnic prejudice or cultural bias, or have suffered the effects of discrimination, because of my identity as a member of one or more of the groups identified above, without regard to my individual qualities.

I further certify that my personal net worth does not exceed $750,000, and that I am economically disadvantaged because my ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially and economically disadvantaged.

I declare under penalty of perjury that the information provided in this application and supporting documents is true and correct.

Executed on **8·26·05** (Date)

Signature _~Michelle Dahler~_
(DBE Applicant)

## NOTARY CERTIFICATE

Subscribed and sworn to before me this **26** day of **August**, 20 **05**.

_____
Notary Public in and for the State of:

Residing at: **Westchester, Illinois**

_____

My Commission Expires: **9/3/05**

OFFICIAL SEAL
SHARON M KOPP
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/03/08

_Sharon M. Kopp_

RECEIVED

SEP 1 2 2005

OMWBE

18

00020

# ATTACHMENT V

RECEIVED

SEP 1 2 2005

OMWBE




**A.    Identify your firm's Officers & Board of Directors** *(If additional space is required, attach a separate sheet):*

| | | Name | Title | Date Appointed | Ethnicity | Gender |
|---|---|---|---|---|---|---|
| **(1) Officers of the Company** | (a) | Michelle Dukler | President | 2-13-04 | Caucasian | F |
| | (b) | Robert Ireland | CFO | 6-1-00 | Caucasian | M |
| | (c) | | | | | |
| | (d) | | | | | |
| | (e) | | | | | |
| **(2) Board of Directors** | (a) | Michelle Dukler | President | 2-13-04 | Caucasian | F |
| | (b) | | | | | |
| | (c) | | | | | |
| | (d) | | | | | |
| | (e) | | | | | |

(3) Do any of the persons listed in (1) and/or (2) above perform a management or supervisory function for any other business? ☐ Yes ☒ No
If Yes, identify for each: Person: _____    Title: _____
Business: _____    Function: _____

(4) Do any of the persons listed in (1) and/or (2) above own or work for any other firm(s) that has a relationship with this firm *(e.g., ownership interest, shared office space, financial investments, equipment, leases, personnel sharing, etc.)?* ☐ Yes ☒ No

If Yes, identify for each: Firm Name: _____    Person: _____
Nature of Business Relationship: _____

**B.    Identify your firm's management personnel who control your firm in the following areas** *(If more than two persons, attach a separate sheet):*

| | | Name | Title | Ethnicity | Gender |
|---|---|---|---|---|---|
| **(1) Financial Decisions** *(responsibility for acquisition of lines of credit, surety bonding, supplies, etc.)* | a. | Michelle Dukler | President | C | F |
| | b. | Robert Ireland | CFO | C | M |
| **(2) Estimating and bidding** | a. | Michelle Dukler | President | C | F |
| | b. | Paul Loupakos | Sr. VP Development | C | M |
| **(3) Negotiating and Contract Execution** | a. | Michelle Dukler | President | C | F |
| | b. | Paul Loupakos | Sr. VP Development | C | M |
| **(4) Hiring/firing of management personnel** | a. | Michelle Dukler | President | C | F |
| | b. | | | C | |
| **(5) Field/Production Operations Supervisor** | a. | Michelle Dukler | President | C | F |
| | b. | Regional Mgmt Team | ← See Attachment → | | |
| **(6) Office management** | a. | Michelle Dukler | President | C | F |
| | b. | Paula Hendrickson | Controller | C | F |
| **(7) Marketing/Sales** | a. | Michelle Dukler | President | C | F |
| | b. | Tonja Pastorelle | Director Marketing | C | F |
| **(8) Purchasing of major equipment** | a. | Michelle Dukler | President | C | F |
| | b. | Paul Loupakos | Sr. VP Development | C | M |
| **(9) Authorized to Sign Company Checks (for any purpose)** | a. | Michelle Dukler | President | C | F |
| | b. | Robert Ireland | CFO | C | M |
| **(10) Authorized to make Financial Transactions** | a. | Michelle Dukler | President | C | F |
| | b. | Robert Ireland | CFO | C | M |

(11) Do any of the persons listed in (1) through (10) above perform a management or supervisory function for any other business? ☐ Yes ☒ No
If Yes, identify for each: Person: _____    Title: _____

RECEIVED

SEP 1 2 2005

OMWBE

12

00022

 

| Business: | Function: |
|---|---|

(12) Do any of the persons listed in (1) through (10) above own or work for any other firm(s) that has a relationship with this firm (e.g., *ownership interest, shared office space, financial investments, equipment, leases, personnel sharing, etc.*)?

☐ Yes ☒ No

If Yes, identify for each: Firm Name: _____ Person: _____
Nature of Business Relationship: _____

**C.    Indicate your firm's inventory in the following categories (*attach additional sheets if needed*):**

**(1)    Equipment**

| Type of Equipment | Make/Model | Current Value | Owned or Leased? |
|---|---|---|---|
| (a) Store Equipment | See Attached | $673,568 | Owned |
| (b) Office Equipment | | $21,972 | Owned (+Leased Copier) |
| (c) Computer Equipment | | $93,629 | Owned |

**(2)    Vehicles**

| Type of Vehicle | Make/Model | Current Value | Owned or Leased? |
|---|---|---|---|
| (a) Van | Ford/2004 | $14,880 | Owned |
| (b) | See Attached | | |
| (c) | | | |

**(3)    Office Space**

| Street Address | Owned or Leased? | Current Value of Property or Lease |
|---|---|---|
| (a) 3 Westbrook Corporate Center | Leased | See attached-$223,633 |
| (b) | | |

**(4)    Storage Space**

| Street Address | Owned or Leased? | Current Value of Property or Lease |
|---|---|---|
| (a) 2000 S. 25th Avenue | Leased | See attached-$23,869 |
| (b) | | |

**D.    Does your firm rely on any other firm for management functions or employee payroll? ☒ Yes ☐ No**

If Yes, explain:

PAYCHEX for payroll processing

**E.    Financial Information**

(1) Banking Information:

(a) Name of bank: Fifth Third Bank    (b) Phone No: 847 810-5545

(c) Address of bank: 990 S. Waukegan Rd City: Lake Forest State: IL Zip 60045

(2) **Bonding Information:** If you have bonding capacity, identify:    (a) Binder No: N/A

(b) Name of agent/broker We use Letters of    (c) Phone No: (   )

(d) Address of agent/broker: Credit    City: _____ State: _____ Zip: _____

13

RECEIVED

SEP 1 2 2005

OMWBE

00023

 

| (e) Bonding limit: Aggregate limit $ | Project limit $ |
|---|---|

**F.** Identify all sources, amounts, and purposes of money loaned to your firm, including the names of any persons or firms securing the loan, if other than the listed owner:

| Name of Source | Address of Source | Name of Person Securing the Loan | Original Amount | Current Balance | Purpose of Loan |
|---|---|---|---|---|---|
| 1. | See Attachment | | | | |
| 2. | | | | | |
| 3. | | | | | |

**G.** List all contributions or transfers of assets to/from your firm and to/from any of its owners over the past two years (*attach additional sheets if needed*):

| Contribution/Asset | Dollar Value | From Whom Transferred | To Whom Transferred | Relationship | Date of Transfer |
|---|---|---|---|---|---|
| 1. | NONE | | | | |
| 2. | | | | | |
| 3. | | | | | |

**H.** List current licenses/permits held by any owner and/or employee of your firm (*e.g. contractor, engineer, architect, etc.*)(*attach additional sheets if needed*):

| Name of License/Permit Holder | Type of License/Permit | Expiration Date | License Number and State |
|---|---|---|---|
| 1. | See Attachment | | |
| 2. | | | |
| 3. | | | |

**I.** List the three largest contracts completed by your firm in the past three years, if any:

| Name of Owner/Contractor | Name/Location of Project | Type of Work Performed | Dollar Value of Contract |
|---|---|---|---|
| 1. Radio's Construction | CVG Construction | Concession Development | 500,000 |
| 2. EDI Construction | EWR Construction | Concession Development | 300,000 |
| 3. HW Davis Construction | MCO Construction | Concession Development | 300,000 |

**J.** List the three largest active jobs on which your firm is currently working:

| Name of Prime Contractor and Project Number | Location of Project | Type of Work | Project Start Date | Anticipated Completion Date | Dollar Value of Contract |
|---|---|---|---|---|---|

RECEIVED

14

SEP 1 2 2005

OMWBE

00024




| | | | | Annual Sales |
|---|---|---|---|---|
| 1. Dallas-Ft Worth Airport | Concessions | Pre-1998 | N/A | $687,000 |
| 2. O'Hare Airport | Concessions | Pre-1998 | N/A | $662,000 |
| 3. Atlanta Hartsfield Airport | Concessions | Pre-1998 | N/A | $617,000 |

We are not contractors These above represent our three largest producers in the corporation and their annual sales

RECEIVED

SEP 1 2 2005

OMWBE

15

00025

**U.S. Department of Transportation**

Office of the Secretary
of Transportation

400 Seventh St., S.W.
Washington, D.C. 20590

June 2, 2005

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Reference No.: 05-0011

Mr. Michael J. McMurray
Managing Deputy Procurement Officer
City of Chicago
Department of Procurement Services
City Hall, Room 403
121 North LaSalle Street
Chicago, IL 60602

Dear Mr. McMurray:

This is in reference to the appeal filed by William A. Kirk, Jr., Preston Gates & Rouvelas Meeds, LLP, ("Counsel") on behalf of his client, Ms. Michelle Dukler, of The Grove, Inc. ("The Grove"). As you know, the appeal was filed as a result of the denial of Disadvantaged Business Enterprise (DBE) certification by the City of Chicago ("COC"). We have completed our review of the file and have concluded that the COC's action was procedurally erroneous under the Department of Transportation's DBE regulations (49 CFR Part 26). Consequently, we are reversing COC's action and directing COC to reinstate The Grove's DBE eligibility.

According to the record, Natural Energy Unlimited, d/b/a The Grove, was certified as a DBE on June 14, 2001 in the area of Retail Food: Snacks. According to the record, a controlling interest in the business was allegedly sold to Michelle Dukler on February 13, 2004. Ms. Duker notified COC of the change in ownership on March 30, 2004. (Mr. Kirk stated that the previous owners provided notice to COC of the change, but we do not find evidence in the record of such a notice.)

When it learned of the change in ownership, COC did not pursue a decertification action under §26.87 of the Regulation. Instead, COC told the firm to submit a new application for certification. The Grove submitted such an application. On June 11, 2004, COC denied firm's application on several grounds: inadequate proof of equity contribution, insufficient control by disadvantaged individuals, reliance by Ms. Dukler on non-disadvantaged individuals with respect to management, capital, resources, expertise, facilities, labor, required licensing, etc.

FROM                                    (MON) 6. 6'05 13:        T. 13:16/NO. 61689283 P  3

2

Under the Department's DBE regulations, once a firm is certified, it remains certified until and unless it is decertified through a proceeding under §26.87. It is not consistent with Part 26 for a recipient to remove a firm's certification, in the absence of a §26.87 proceeding, by requiring and then denying a new application for certification from the firm. A change in ownership of a firm does not automatically cause a firm to lose an existing certification, such that it is in the same position as a firm that has not previously applied for eligibility.

In this case, having learned of The Grove's change in ownership, COC could have begun a §26.87 proceeding. This proceeding could have been based on substantive grounds similar to those COC used to deny the firm's "new application" in June 11, 2004. Because COC did not proceed under §26.87, COC has no procedural basis for removing The Grove's DBE eligibility. We would point out that the difference between a §26.87 proceeding and a "new application" is not trivial. In the former, the recipient bears the burden of proof that the firm fails to meet eligibility criteria. In the latter, the firm bears the burden of proof that it does meet these criteria.

The Department is not taking any position, at this time, on the merits of The Grove's DBE eligibility. If COC believes that the firm does not presently meet Part 26 criteria for certification, COC may begin a §26.87 proceeding at any time. In the event that COC should decide to initiate a §26.87 proceeding, it may wish to consider the following issues regarding The Grove:

1) The Minutes of the Special Meeting of Stockholders/Directors of Natural Energy Unlimited, Inc., held on the 7th day of July 1999 at 4:00 p.m., state in part that

> *The roll of stockholders/directors having been read, and, all being present and a quorum being established. The meeting began by Ruth Ann Menutis and Paul Valteau reviewing with the fiscal staff of Natural Energy Unlimited, Inc. the financial position of the company. It was clear that mid year sales once again were flat and there was no hope of getting beyond the revenue number which The Grove appeared to have been stuck on for the last three years. That being gross revenues of around $12.4 million. Fiscal staff further advised Ruth Ann and Paul that commitments made for growth and expansion in 1999 would drain all cash from the company and leave the company short by over $1 million. Fiscal staff further advised that short of a dramatic increase in revenues, loans would have to be made to salvage the company. Staff believed strongly that this situation was created by poor decisions on airport investments, chronic and serious under-performance and the continuing need to finance local partner's investment in Grove expansion. After the report was completed and all questions were answered, Ruth Ann and Paul went into executive session to discuss remedies. It was decided in executive session that the Grove should seek to negotiate and develop a long term relationship with Star Foods to solve its short term cash flow problems and to assist in the long term in the growth and development of a stronger and more viable Grove organization. This suggestion was put in the form of a motion and carried unanimously by the board of directors.*

RECEIVED
SEP 1 2 2005
OMWBE

During the time that Michelle Dukler allegedly purchased her ownership interest in the firm, its gross receipts for 2003 were $17,797,315.00. The record does not address the amount of Star Food's investment in The Grove, which is relevant in determining Ms. Dukler's contributions. Regardless of the amount of the investment, it appears that The Grove's gross receipts showed a steady period of growth since Star Foods' involvement. The draft consolidated statement of changes in stockholders' Equity (Deficit) for Years ended December 31, 2003, 2002, and 2001 indicates that additional paid in-capital was $6,819,529.00 for 2003. The record contains a reference to an option agreement involving Star Foods that may detail Ms. Dukler's ownership of The Grove. COC should request and the firm should provide any agreements, options or documents which may be relevant in order for COC to make a decision whether the alleged investment of Michelle Dukler is real and substantial as required by Part 26.

2) The $2.6 million that Michelle Dukler allegedly invested resulted from a loan from Mr. Casey Cowell, the non-disadvantaged owner. The loan was later secured and guaranteed by the 5th 3rd Bank. According to the record, Ms. Dukler used her shares in The Grove as security for the loan. COC may wish to look into this matter further.

Counsel for Ms. Dukler stated that:

> *The final denial summary at page 2 states Ms. Dukler did not substantiate the value and ownership of the assets used to secure the loan that provides financing to purchase control of The Grove's. Martin Dukler, through the Exclusion of Certain Property from Marital Property, gave up any rights to ownership in the shares of The Grove. Section 26.6(a)(i)(1) of the Department's Regulations requires that Chicago* must deem *the ownership interest in The Grove to have been acquired by Ms. Dukler with her own individual resources provided Martin Dukler irrevocably renounces and transfers all ownership interest in The Grove. Since Ms. Dukler is deemed to have used her own resources to acquire ownership in the Grove, an appraisal of assets securing the loan is irrelevant. The list of assets listed by Ms. Dukler contains the residence of her and her husband. You may wish to check with your real estate records to ascertain whether this is reflected in its records.*

> *The Final Denial Summary alleges that the change in control was to support continued DBE certification and uses this as a basis to question The Grove's DBE status.*

> *DBE status is clearly important to a DBE firm. There is no basis in the Department's DBE Regulations to remove a firm's DBE eligibility simply because a DBE firm takes steps to retain its DBE status.*

> *Chicago may be confused with the Department's regulations concerning the efforts by a* non-DBE firm *to become a DBE firm. The Department's Regulations proves that if a firm is formerly owned by a* non-disadvantaged *individual and ownership is transferred to a socially and economically disadvantaged individual and the non-disadvantaged individual remains*

RECEIVED
SEP 1 2 2005
OMWBE

4

*involved in the firm, then the firm must show that the transfer of ownership was made for reasons other than obtaining DBE certification. §26.71(l) (1). However, this rule is not applicable to The Grove since The Grove had been a DBE firm for 20 years prior to the socially and economically disadvantaged individuals transferring ownership to another such individual.*

COC should take these comments into consideration in any further proceeding.

3) In addition, the record reveals that (a) 71.5 out of 100 shares of The Grove stock are obligated. The remaining 28.5% are Treasury stock. The Draft Consolidated Statement of Changes in Stockholders' Equity (deficit) for years ended December 31, 2003, 2002 and 2001 reveals that the treasury stock has a deficit of $3,090,640.00. COC should take this into consideration when determining whether Ms. Dukler's contribution was real and substantial.

(b) In any future proceeding, COC may wish to ascertain why The Grove still owes $574,000.00 in outstanding loans to the former owners.

(c) In any future proceeding, COC may wish to ascertain why the Stockholder's Agreement restricts Michelle Dukler's ability to issue stock to a new owner or purchase additional stock without the consent of Star Foods. This situation could arguably limit the firm's independence and/or compromise her ability to control the firm under §26.71 of the Regulation.

If COC does begin a new proceeding, it may be necessary to conduct an additional onsite review. The Department notes that an onsite review and additional information obtained by COC could raise additional issues. In order to be procedurally correct, any future proceeding to decertify The Grove must meet the procedural requirements of §26.87.

This appeal is being closed in our files. Thank you for your continued cooperation.

Sincerely,

Joseph E. Austin, Chief
External Policy and Program Development Division
Departmental Office of Civil Rights

cc: William A. Kirk, Jr.

RECEIVED

SEP 1 2 2005

OMWBE

 

**Business Background of**
**Michelle Dukler**

## Professional Background

**The Grove, Inc.**

**President, Director and Board Chairwoman (2/13/04 – Present)**
Owner and chief executive of all retail operations encompassing 60 stores in 15 airports.
Hands-on management of all team of senior staff who are responsible for all aspects of the
company includes:

- Strategic operational and financial planning
- Oversight of daily field operations including financial, customer service and sales
  performance
- Oversight of all product purchasing and selections
- Oversight of all headquarters support including finance, banking, human resources,
  lease administration, payroll, development, information systems, field support etc.
- Oversight of all real estate development for new or remodeled stores
- Responsible for all banking relationships
- Responsible for all landlord relationships
- Signing all official documents of The Company.

**Management Accomplishments during tenure:**

- Hands-on full time management (45-65 hours / week) of The Company
- Travel to locations on a weekly basis
- Negotiated and signed leases for new retail spaces in Dallas (1 new space and
  extensions for 7 spaces), Houston (1 new space), Orlando (product extension to
  include frozen treats), Cincinnati (1 new space and remodel of 1 space for lease
  extension), Salt Lake City (remodel for lease extensions for 3 spaces), Jacksonville
  (remodel for lease extension for 1 space), La Guardia (remodel for lease extensions
  for 2 spaces), New Orleans (1 new space) Seattle (2 new spaces), Newark (4 new
  spaces and remodel agreement for extension to 2 spaces) and JFK (3 new spaces)
- Negotiated and signed Subway franchise agreement for retail space in Newark.
  Pending franchise agreement has been negotiated for a retail space in La Guardia.
- Negotiated and about to sign Smoothie King franchise agreements for one of the
  retail spaces in Seattle and another retail space in Dallas.
- Interviewed and hired Area General Manager for Seattle
- Interviewed and hired Area General Manager for Newark
- Interviewed and hired Area General Manager for Salt Lake City
- Interviewed and hired Area Manager for Dallas
- Interviewed and hired Area Manager for Cincinnati
- Interviewed and hired Area Manager for Atlanta
- Interviewed and hired Regional Manager for East Coast
- Interviewed and hired Executive Assistant
- Personally oversaw the openings of 3 new stores, our first store in Seattle, new
  gourmet popcorn concept store and our largest ever store and new concept, Grove/
  Subway in Newark
- Directing the development of new retail design concept for The Grove's retail stores
  to be released in 2006

RECEIVED

SEP 1 2 2005

OMWBE          Resume -

00030

 

- Completed review of all mid-year performance reviews of HQ accounting, technology support and marketing staff
- Evaluated all senior staff yearly performance reviews
- Renegotiated company's new health and life insurance policies
- Negotiated new company line of credit and changed banks
- Reviewed and approved outside auditors annual audit of The Grove, Inc.
- Reviewed and approved proposals to Cincinnati, Dallas, Richmond, Salt Lake City, Houston, La Guardia, Jacksonville, Orlando, New Orleans, Minneapolis, Chicago, Memphis and Newark for new retail locations
- Reviewed and approved all capital spending on all store build-outs that are in process
- Reviewed case file of Assistant Manager in Dallas and approved her forced termination
- Participated in providing company strategic direction to the participants in Grove University Spring 2004 and National Management Meeting Fall 2004. Participated in Grove University 2005 and overseeing planning for National Management Meeting Fall 2005
- Weekly review of all payroll checks cut
- Weekly review of all corporate checks cut (signing of all checks over $50,000, rents, licenses and permits)
- Exceptional financial performance in 2004 and 2005. Sales above plan and earnings above plan. This is due to:
  o Weekly calls to Area General Managers
  o Daily contact with Regional Managers
  o Store visits to all locations
  o Active involvement by President in providing leadership and direction to the company
- Participation and membership in: AMAC, Embry Riddle, ACI-NA, AAAE, NIAAMC, NASFT and Global Shop.

**Director of Marketing, The Grove, Inc. (4/1/00 – 9/1/02)**
Working under the direction of the President, Ruth Ann Menutis, set up and ran the marketing department for The Grove, Inc. Developed new products, vendor relationships, in-store merchandising and graphics, standards for new store design and new store openings, and addressed issues related to product quality, costs and packaging.

**Management Accomplishments during tenure:**
Created the first marketing/advertising oriented sales program for The Grove's 45 stores including:
- Seasonal product promotions
- New in-store signage announcing promotions and product offerings
- Change of menu boards
- Change of pricing signs to reinforce brand consistency
- Definition of advertising color palette
Organized the product development initiatives of the company to include:
- Organized focus group taste profiling for new products
- Structured review of new product offerings from all the national specialty and gourmet food shows
- Organized product release programs coupled with in store advertising

RECEIVED

SEP 1 2 2005

**OMWBE**



Customer analysis
- Organized and executed a customer analysis effort to ensure that the company understood whom its customer was and what he/she wanted.

Customer complaints analysis
- Pulled all of the customer complaints and contacts into a single database to enable the company to look at trends.

Employee Incentive Program
- Created the "Platinum Customer Service" program that recognized exceptional customer service and salesmanship with custom-made Grove Platinum Customer Service Coins. The coins were convertible into prizes (radios, CD's, trips, gift cards, cash). This program later developed into the SAMPLES program in place today.

**Consultant to The Grove, Inc., (2/00 – 4/00)**
Working under the direction of The President, Ruth Ann Menutis, organized and implemented a revised "Grove University" for new store managers and assistant managers. Updated The Grove's employee training material. Coordinated Grove regional management meetings and workshops.

**Accomplishments during tenure:**
Grove University – Management Training Program
- Revised the Grove University curriculum. This curriculum had not been revised in over 7 years and was out of date and inaccurate. This effort required learning all aspects of the Grove's retail operations and all the management-operating practices in order to redevelop the training materials for new managers and assistant managers.

Employee Training
- The customer service, safety and cash handling training of sales/customer service employees had not been revised in over 5 years. This project included the review and modification of all training materials and manager's training checklists.

Regional Operations Meetings
- The senior staff of the company met every quarter. This project included developing a focused agenda for the three-day meetings, which included review of financial operations, new store development, marketing and product development, operating policies and more.

**Schlitz Studios, Inc., Milwaukee, WI**
**Schlitz Furnaces, Inc., Milwaukee, WI**

**President and sole owner (1989-1999)**
Owner and chief executive of large glass manufacturing plant and its related design studio, retail store and wholesale operations. Hands-on management of a team of senior staff who were responsible for all aspects of the two companies including:
- Strategic operational and financial planning
- Responsible for all daily operations including financial, manufacturing, inventory, creative designs and execution, shipping and or installation, retail store and wholesale operations, customer service, etc.
- Created all glass formulas and manufacturing techniques
- Responsible for the design and building of all glass manufacturing equipment and machinery
- Responsible for all product purchasing and selections

RECEIVED

SEP 1 2 2005

OMWBE

00032

 

- Responsible for all headquarters support including finance, banking, contracts, human resources, lease administration, payroll, development, information systems, field support, etc.
- Responsible for overseeing design team and their work product
- Responsible for supervision of wholesale sales staff
- Responsible for supervision of retail sales department
- Responsible for all banking relationships
- Responsible for all landlord relationships
- Sole signatory for all official documents of The Company

**Other Relevant Experience:**

**Tannery West, Milwaukee, WI (1986 – 1988)**
Retail store manager for a high-end leather goods store (purchased by Wilson's Leather).

**Hall's Crown Center, Kansas City, MO (1981 – 1986)**
Retail sales and customer service in the department store division of Hallmark Cards (an upscale store on par with Neiman Marcus).

**Harry Wells and Sons, Inc., Kansas City, MO (1978-1981)**
Provided design and drafting services, job site and construction supervision, project management and accounting and purchasing for a custom builder.

**Education:**

**University of Missouri – Kansas City (1981-1986)** Graduated in 1986 with a BS major in Biochemistry and minors in Physiology and Biology

**University Of Missouri – Kansas City School of Medicine (1981-1984)** Accelerated six-year medical program. Took a leave of absence to finish undergraduate work.

**Other affiliations or recognition;**

**Milwaukee Business Journal's "40 under 40" Alumni 1998**
"Recognizing Milwaukee's next generation of business and community leaders." Forty business men and women in Milwaukee under the age of 40 recognized as leaders in the city's business community.

**Downtown Milwaukee Rotary Club 1995-1998**
One of the first women business owners to be inducted into this long-standing and prestigious group of Milwaukee's prominent business owners and corporate leaders. Active with Toys for Tots, WICOR mentoring program and Second Harvest.

RECEIVED

SEP 1 2 2005

OMWBE



# Bob Ireland

| | |
|---|---|
| **Title** | CFO, The Grove, Inc. |
| **Professional Background** | All areas of corporate financial management. Prior positions include Director of Corporate Finance, Assistant Controller, and Senior Financial Analyst |
| **Current and Past Relevant Employment** | 2000 – Present<br>The Grove, Inc.<br>CFO and Secretary and Treasurer to Board |

As senior accountant reporting to the President, fully responsible for the following areas:

- Corporate Finance
- Corporate and store accounting
- Corporate risk management (cash, insurance, assets)
- Human Resources
- Information systems
- Taxes

Responsible for providing President and Chairwoman of Board with advice and counsel on all financial, strategic, and operational matter. Serve the company as Secretary and Treasurer.

**RECEIVED**

SEP 1 2 2005

**OMWBE**

1981 – 2000
White Hen Pantry, Inc.
Senior Director, Corporate Finance and Controller

As Senior Director, assigned responsibilities for 300+ convenience store chain ($300 million annually):

- Accounting
- Finance
- Tax Functions

| | |
|---|---|
| **Certifications** | Certified Public Accountant |
| **Education** | Northwestern University - MBA Finance and Accounting<br><br>BA Economics |

00034



# Martin A. Dukler

## __Work Experience__

### Star Foods, LLC – CEO (1999 to Present)

Star Foods, LLC is an investment and management company that focuses on the snack food industry. It holds investments in The Grove, Inc. and Georgia's Grove LLC and is in continuous search for additional opportunities. During the tenure as CEO of Star Foods, responsibilities have included acquisition research, support to investments held, and development of new business opportunities.

### Georgia's Grove, LLC – CEO (2002 – Present)

Georgia's Grove, LLC is a snack food manufacturing and wholesale distribution company with national retail clients including Subway (DAI, Inc), Hilton Hotels, Smoothie King, Stellar Partners and others. Mr. Dukler is the founder and chief executive officer of this company.

### The Grove, Inc. – CEO (2001 – 2004)

The Grove, Inc. is partially owned by Star Foods, LLC. Mr. Dukler was asked to assume certain managerial duties in support of the President and Executive Vice President when these two primary shareholders were unable to perform these functions. In 2004, Mr. Dukler resigned from all managerial and board responsibilities but retains an ownership interest.

### Heavenrich and Dukler, Inc. – President (1992 to 2002)

Heavenrich and Dukler, Inc. was an investment, consulting and brokerage company that focused on a variety of industries including the food, pet, health care, manufacturing and other middle market industries. Heavenrich and Dukler held interests in a number of companies. The company was disbanded when one of the owners retired.

### Fromm Family Foods, Inc. – CEO (1995 to 1999)

Fromm Family Foods, Inc. is a manufacturer, wholesaler, retailer and distributor of foods for the pet and livestock industries. The company was sold in 1999.

### Pet Supply Services, Inc. – President (1995 to 1999)

RECEIVED

SEP 1 2 2005

OMWBE

00035

Resume -

 

Pet Supply Services, Inc. is a distributor and retailer of pet products. The company was sold in 1999.

### Prevail Corporation – President (1982 to 1998)

Prevail Corporation was a holding company for a variety of interests including three software companies (oil and gas, retail electronic funds transfer) and three restaurants. The companies were sold at various times between 1982 and 1998.

### State of Texas – Deputy Commissioner for Human Services (1976 to 1982)

Responsible for the administration of all welfare, social service and health benefits for the indigent in the State of Texas.

### Education

Masters in Business
Masters of City and Regional Planning
Bachelors of Arts

RECEIVED

SEP 1 2 2005

OMWBE

00036

 

# Casey Cowell



| | |
|---|---|
| **Professional Background** | Casey Cowell owns and oversees the management of several diversified private companies, operating principally through Durandals, Inc., a holding company of which he is chairman and principle owner. He co-founded U.S. Robotics in 1976. The company became one of the world's leading suppliers of data communications products and systems. Mr. Cowell headed the company from its inception until its combination with 3Com Corporation in June 1997. |
| **Current and Past Relevant Employment** | 1999-2004 The Grove, Inc., Member Board of Directors.<br><br>1999-2004 Star Foods, Inc., Member Board of Directors.<br><br>Provides investment capital and management experience to food related companies. |
| **Education** | 1971–1975        University of Chicago        Chicago, Illinois<br>▪ B.A., Economics. |
| **Honors** | Serves on the board of directors of CDW Computer Centers, Inc. and Seurat Company.<br><br>Named one of "25 Top Managers" in the world by **Business Week** in 1995.<br><br>Named "Executive of the Year" in 1996 by **Crain's Chicago Business**. |

RECEIVED

SEP 1 2 2005

OMWBE

Resume -

00037

# ATTACHMENT VI

---

**RECEIVED**

SEP 1 2 2005

**OMWBE**

00038





OMB APPROVAL NO. 3245-0188
EXPIRATION DATE:11/30/2004

## PERSONAL FINANCIAL STATEMENT

U.S. SMALL BUSINESS ADMINISTRATION

As of __8/31__ , __2005__

Complete this form for: (1) each proprietor, or (2) each limited partner who owns 20% or more interest and each general partner, or (3) each stockholder owning 20% or more of voting stock, or (4) any person or entity providing a guaranty on the loan.

Name __Michelle Dukler__     Business Phone __708-531-1694 x 3214__

Residence Address __226 Justina St__     Residence Phone __630-920-0977__

City, State, & Zip Code __Hinsdale IL 60521__

Business Name of Applicant/Borrower __The Grove Inc.__

| ASSETS | (Omit Cents) | LIABILITIES | (Omit Cents) |
|---|---|---|---|
| Cash on hand & in Banks | $ 63,058 | Accounts Payable | $ 0 |
| Savings Accounts | $ 0 | Notes Payable to Banks and Others | $ 2,600,000 |
| IRA or Other Retirement Account | $ 7,050 | (Describe in Section 2) | |
| Accounts & Notes Receivable | $ 0 | Installment Account (Auto) | $ 0 |
| Life Insurance-Cash Surrender Value Only (Complete Section 8) | $ 4,684 | Mo. Payments $ 0 | |
| Stocks and Bonds (Describe in Section 3) | $ 2,600,000 | Installment Account (Other) | $ 49,300 |
| | | Mo. Payments $ 2,400 | |
| Real Estate (Describe in Section 4) | $ 230,000 | Loan on Life Insurance | $ 0 |
| | | Mortgages on Real Estate (Describe in Section 4) | $ 2,300,000 |
| Automobile-Present Value | $ 15,440 | Unpaid Taxes (Describe in Section 6) | $ 0 |
| Other Personal Property (Describe in Section 5) | $ 2,027,225 | Other Liabilities (Describe in Section 7) | $ 0 |
| Other Assets (Describe in Section 5) | $ 0 | Total Liabilities | $ 4,949,300 |
| | | Net Worth | $ 157 |
| Total | $ 4,949,457 | Total | $ 157 |

| Section 1.    Source of Income | | Contingent Liabilities | |
|---|---|---|---|
| Salary | $ 541,935 | As Endorser or Co-Maker | $ 300,000 |
| Net Investment Income | $ 0 | Legal Claims & Judgments | $ |
| Real Estate Income | $ 0 | Provision for Federal Income Tax | $ 189,677 |
| Other Income (Describe below)* | $ 0 | Other Special Debt Fifth Third Loan | $ 168,000 |

Description of Other Income in Section 1.

__N/A__

*Alimony or child support payments need not be disclosed in "Other Income" unless it is desired to have such payments counted toward total income.

Section 2. Notes Payable to Banks and Others.    (Use attachments if necessary. Each attachment must be identified as a part of this statement and signed.)

| Name and Address of Noteholder(s) | Original Balance | Current Balance | Payment Amount | Frequency (monthly.etc.) | How Secured or Endorsed Type of Collateral |
|---|---|---|---|---|---|
| Fifth Third Bank 990 S. Waukegan Rd Lake Forest IL 60045 | 2,600,000 | 2,600,000 | 14,174 (This fluctuates with the Prime Rate) | Monthly | Personal Guarantee |

**RECEIVED**

SBA Form 413 (3-00) Previous Editions Obsolete
This form was electronically produced by Elite Federal Forms, Inc.

SEP 1 2 2005

(tumble)

**OMWBE**    PNW-

00039

**Section 3.  Stocks and Bonds.** (Use attachments if necessary.  Each attachment must be identified as a part of this statement and signed).

| Number of Shares | Name of Securities | Cost | Market Value Quotation/Exchange | Date of Quotation/Exchange | Total Value |
|---|---|---|---|---|---|
| 37.5 | The Grove, Inc | | | | $2,600,000 |
| | | | | | |
| | | | | | |

**Section 4. Real Estate Owned.** (List each parcel separately.  Use attachment if necessary.  Each attachment must be identified as a part of this statement and signed.)

| | Property A | Property B | Property C |
|---|---|---|---|
| Type of Property | Will be Primary | | |
| Address | Lot located at 5509 S. Oak, Hinsdale IL | We currently live in a rental for a yr. while my home is being built | |
| Date Purchased | New Construction Contract signed 7-14-05 | | |
| Original Cost | $2,800,000 | | |
| Present Market Value | $2,800,000 | | |
| Name & Address of Mortgage Holder | Fifth Third Bank 990 S. Waukegan Rd Lake Forest IL 60045 | | |
| Mortgage Account Number | XOO853.545 | | |
| Mortgage Balance | $2,300,000 | | |
| Amount of Payment per Month/Year | $13,975 mo. or $167,700 for the yr. | | |
| Status of Mortgage | Pending until occupancy next yr. | | |

**Section 5. Other Personal Property and Other Assets.** (Describe, and if any is pledged as security, state name and address of lien holder, amount of lien, terms of payment and if delinquent, describe delinquency)

See Attached List

**Section 6.    Unpaid Taxes.** (Describe in detail, as to type, to whom payable, when due, amount, and to what property, if any, a tax lien attaches.)

N/A

**Section 7.    Other Liabilities.** (Describe in detail.)

N/A

**Section 8.    Life Insurance Held.** (Give face amount and cash surrender value of policies - name of insurance company and beneficiaries)

1) Kansas City Life Insurance Co - $75,000 Face Value - $9,684 Surrender Value -Martin Dukler Beneficiary

2) Unicare Health/Life Insurance - $10,000 Face Value - $0 Surrender Value -Martin Dukler, Beneficiary

I authorize SBA/Lender to make inquiries as necessary to verify the accuracy of the statements made and to determine my creditworthiness. I certify the above and the statements contained in the attachments are true and accurate as of the stated date(s). These statements are made for the purpose of either obtaining a loan or guaranteeing a loan. I understand FALSE statements may result in forfeiture of benefits and possible prosecution by the U.S. Attorney General (Reference 18 U.S.C. 1001).

| Signature: | Date: 9-8-05 | Social Security Number: 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 |
|---|---|---|
| Signature: | Date: | Social Security Number: |

**PLEASE NOTE:** The estimated average burden hours for the completion of this form is 1.5 hours per response. If you have questions or comments concerning this estimate or any other aspect of this information, please contact Chief, Administrative Branch, U.S. Small Business Administration, Washington, D.C. 20416, and Clearance Officer, Paper Reduction Project (3245-0188), Office of Management and Budget, Washington, D.C. 20503. PLEASE DO NOT SEND FORMS TO OMB.

RECEIVED

SEP 1 2 2005

OMWBE

 

**Michelle Dukler Assets as of 8/18/05**

| Assets Summary | Value |
|---|---|
| Antiques ( Attachment A) | $ 700,050.00 |
| Art ( Attachment B) | $ 375,875.00 |
| Jewelry | $ 202,800.00 |
| Schlitz Studios Other (Attach C) | $ 142,000.00 |
| Schlitz Furnaces | $ 606,500.00 |
| Total | $ 2,027,225.00 |

Home Equity                    $   230,000.00
New Construction at 5509 S. Oak
Occupancy not until 2006

RECEIVED

SEP 1 2 2005

OMWBE



## Antiques

| ID# | #units | Item | Value |
|---|---|---|---|
| 1 | 1 | 24" Dogwood | $130,000.00 |
| 2 | 1 | Jr. Floor twisted vine bronze base | $7,500.00 |
| 3 | 1 | 24" tulip | $150,000.00 |
| 4 | 1 | Bronze Greek key base | $10,000.00 |
| 5 | 1 | 16" Geometric | $5,500.00 |
| 6 | 1 | 16" Geometric | $5,500.00 |
| 7 | 1 | Bronze Fern base | $5,000.00 |
| 8 | 1 | Bronze stick base | $2,500.00 |
| 9 | 1 | 3 Light Lily - gold | $5,000.00 |
| 10 | 1 | 3 Light Lily - Blue | $5,000.00 |
| 11 | 1 | 2 light lily - gold | $3,000.00 |
| 12 | 1 | bronze lily mirror | $2,500.00 |
| 13 | 1 | 14" blown glass shade on a student base | $5,000.00 |
| 14 | 1 | single light feathered vase | $3,200.00 |
| 15 | 1 | Bronze mandarin lotus base | $16,700.00 |
| 16 | 1 | Magnolia Pendant | $6,000.00 |
| 17 | 1 | Parrot Window | $175,000.00 |
| 18 | 1 | 18 light lily on bronze floor base | $26,000.00 |
| 19 | 1 | Galle lamp 24" | $8,500.00 |
| 20 | 1 | Galle base 10" | $1,200.00 |
| 21 | 2 | 2 Bronze Queen Anne's lace candlesticks w/ blow outs | $2,500.00 |
| 22 | 1 | Bronze double candlestick | $1,250.00 |
| 23 | 1 | Bronze candlestick with blowout | $750.00 |
| 24 | 1 | Roseville hanging basket | $300.00 |
| 25 | 1 | Roseville hanging basket | $300.00 |
| 26 | 1 | Roseville hanging basket | $300.00 |
| 27 | 1 | Roseville bowl | $250.00 |
| 28 | 1 | Roseville ashtray | $150.00 |

RECEIVED

SEP 1 2 2005

OMWBE




| 29 | 1 | Roseville ashtray | $200.00 |
|----|---|-------------------|---------|
| 30 | 1 | Roseville bowl 12" dia | $400.00 |
| 31 | 2 | 2 - Roseville candlesticks | $250.00 |
| 32 | 1 | Roseville rectangular planter 6x14x6 | $300.00 |
| 33 | 1 | Roseville lamp base | $2,000.00 |
| 34 | 5 | 5 Lotton Paperweights c1978 | $5,000.00 |
| 35 | 1 | 13" Alamanda Charles Lotton Vase c1978 | $5,500.00 |
| 36 | 1 | 8" C.Lotton Vase c1978 | $1,200.00 |
| 37 | 1 | 6" C.Lotton Vase c1978 | $500.00 |
| 38 | 1 | 3" C. Lotton Vase c1978 | $400.00 |
| 39 | 10 | 10 Orient and Flume Paperweights c1972 | $4,000.00 |
| 40 | 5 | 5 Tiffany tiles | $5,000.00 |
| 41 | 1 | Stem Vase | $1,200.00 |
| 42 | 1 | Stem Vase | $1,200.00 |
| 43 | 1 | Cast Daum Figure (1 of 3 made) | $12,000.00 |
| 44 | 1 | Fulper Vase | $800.00 |
| 45 | 6 | 6-Bronze Tiffany Sconce and shade | $4,800.00 |
| 46 | 1 | 19th Century German Oil 17"x 35" | $6,500.00 |
| 47 | 1 | 22 Star US Navy Jack Flag Pre- Civil War w/ History | $15,000.00 |
| 48 | 1 | Pre-Civil War NY Renaissance Revival Bed w/prov | $35,000.00 |
| 49 | 1 | Pre-Civil War NY Renaissance Revival Dresser w/prov | $14,000.00 |
| 50 | 1 | Pre-Civil War NY RR Chair w/original paint and caneing w/p | $2,200.00 |
| 51 | | Misc Pottery | $2,500.00 |
| 52 | 4 | 4-1930 Original pen and ink French Quarter Drawings | $1,200.00 |
| | | | |
| | | **Total** | $700,050.00 |
| | | | |
| | | | |

RECEIVED

SEP 1 2 2005

OMWBE



| | Art Assets Pre 2000 from Appraisal | Value | |
|---|---|---|---|
| 53 | Framed Rufino Tamayo lito | $ | 9,000 |
| 54 | Patrick Wadley glass head | $ | 15,000 |
| 55 | Stephen Ray Litho Fresh Print | $ | 5,500 |
| 56 | Stephen Ray Litho Carnival III | $ | 6,500 |
| 57 | Schneuer print | $ | 12,000 |
| 58 | Bobo Alligator 1 of 5 BOBOs | $ | 1,500 |
| 59 | Bob Water Buffalo 2 of 5 | $ | 1,500 |
| 60 | Bobo Bird 3 of 5 | $ | 1,500 |
| 61 | New Guinea wood carving of man in ceremonial mask | $ | 3,500 |
| 62 | New Guinea word carving of man w/ spears | $ | 2,200 |
| 63 | Bobo Antelope 4 of 5 | $ | 1,500 |
| 64 | Reed basket brown w/ blue top | $ | 2,200 |
| 65 | Paul Jenkins print abstract in orange and blue vertical lines | $ | 12,000 |
| 66 | Curtis Brock blown glass group | $ | 12,800 |
| 67 | Carla Wilson neon - large | $ | 800 |
| 68 | Carolyn Brice Brooks 12" diameter bowl | $ | 3,400 |
| 69 | Art deco glass bowl | $ | 700 |
| 70 | Felioz 1964 abstract swirl bowl | $ | 600 |
| 71 | Etching by Micossi of two roads and church | $ | 8,200 |
| 72 | Damian Prior glass fan | $ | 3,500 |
| 73 | Fused blue on blue glass bowl by Sasaki | $ | 300 |
| 74 | Lebadang print | $ | 4,800 |
| 75 | Ulricha Vallien Open Mind 14" | $ | 350 |
| 76 | African carved pounding stands (2) | $ | 1,500 |
| 77 | Bonnie linch wall vases (2) | $ | 1,800 |
| 78 | Carolyn Brice Brooks fused clay bowl - yellow, purple,blue 6"" tall 7"" diameter | $ | 800 |
| 79 | Carolyn Brice Brooks Striped w/ square w/ pink rim | $ | 800 |
| 80 | Open basket weave ceramic bowl - peach | $ | 400 |
| 81 | Pre-columbian polychrome - dome shaped 8" diameter 1 of 10 | $ | 1,200 |
| 82 | Pre-columbian polychrome - painted geometric triangular designs 5.5" diameter 2 of 10 | $ | 1,200 |
| 83 | Pre-columbian bowl 5" diamter 3 of 10 | $ | 1,200 |
| 84 | Pre-columbian bowl 6" diameter 4 of 10 | $ | 1,200 |
| 85 | Pre-columbian bowl 6.5" diameter geometric medallian in bottom 5 of 10 | $ | 1,200 |
| 86 | Wadley glass etching/painting - Red Pumps | $ | 3,750 |
| 87 | Dall litho Adam | $ | 4,500 |
| 88 | Bensley aqua | $ | 600 |
| 89 | Steve Ray "Reverse Rainbow | $ | 4,250 |
| 90 | Mary stewart multilayer swirl ceramic bowl 4" tall 8" diameter | $ | 500 |
| 91 | Etched glass flower platter in geometric designs 15X15" | $ | 500 |
| 92 | Karel Appel litho | $ | 12,500 |
| 93 | Briss print | $ | 6,250 |
| 94 | Vallen pedestall glass bowl blue w/ white | $ | 600 |
| 95 | Brass samovar | $ | 1,500 |
| 96 | Claudia Reese ceramic piece - ceramic tray w/ geometric design 15/5X11/75 | $ | 400 |
| 97 | Claudia Reese bowl w/ ring design | $ | 400 |
| 98 | Reese dish w/ multicolored line design | $ | 400 |
| 99 | Reese oval ceramic dish w/ green striped design | $ | 400 |
| 100 | ER Witter print abstract | $ | 3,200 |
| 101 | Baskin litho - bird | $ | 4,550 |
| 102 | New Guinea wood horned man on pedestal | $ | 625 |
| 103 | Bobo bronze fish 5 of 5 | $ | 1,500 |
| 104 | Seven small aschanti bronzes | $ | 350 |
| 105 | Dali Eve | $ | 6,500 |
| 106 | Precolumbian bowl buff w/ polychrome rim 2.5" deep 6 of 10 | $ | 1,200 |
| 107 | Precolumbian ceramic bowl w/ design - cracked w/ piece missing 8.25 diameter 7 of 10 | $ | 1,200 |

RECEIVED

SEP 1 2 2005

OMWBE



| | | | |
|---|---|---|---|
| 108 | Precolumbian ceramic bowl w/ three looped feet 6" diameter 8 of 10 | $ | 1,200 |
| 109 | Round ceramic bowl dark clay on 3 pierced feet | $ | 1,200 |
| 110 | Baskin bird on man's profile | $ | 3,750 |
| 111 | Herb Mears oil | $ | 25,000 |
| 112 | precolumbian bowl on pierced feet 8" diamter 9 of 10 | $ | 1,200 |
| 113 | Precolumbian bowl buff background cracked 5.125 diameter 10 of 10 | $ | 1,200 |
| 114 | Ben Shahn Martin Luther King | $ | 9,000 |
| 115 | Rabel Litho of small child | $ | 7,550 |
| 116 | Wadley ink and wash of chair w/ figures | $ | 7,000 |
| 117 | Baskin woodblock of bearded man | $ | 9,500 |
| 118 | Proszinska abstract w/ figures of man and male nude | $ | 7,600 |
| 119 | Wadley black and white of tropical scene | $ | 6,000 |
| 120 | Wadley face w/ Red in Pantry | $ | 3,500 |
| 121 | Pear Litho from Sears | $ | 1,200 |
| 122 | Kurtis Brock Glass and Wood Sculpture | $ | 6,550 |
| 123 | Frances boob oil | $ | 12,000 |
| 124 | Matta oil | $ | 17,500 |
| 125 | Pat Hidson Horse | $ | 3,500 |
| 126 | ivory coast horse head | $ | 450 |
| 127 | Velasavaloc unframed print (screaming people) | $ | 1,000 |
| 128 | Fallon posters framed 4 | $ | 250 |
| 129 | Rembrant | $ | 24,000 |
| 130 | D Coffee African Woman | $ | 1,500 |
| 131 | Mora Tehuana planchando una iguana | $ | 750 |
| 132 | Yoruba woman holding mojo bowl | $ | 1,200 |
| 133 | Metal Heart sculpture | $ | 350 |
| 134 | african mask w/ brass pieces - Yoruba tribe | $ | 900 |
| 135 | Matisse | $ | 15,000 |
| 136 | Glass olives | $ | 800 |
| | | | |
| | **Art Assets After 2000 (Current Market Value)** | | |
| 137 | Miro Litho | $ | 1,500 |
| 138 | Chagall Floral | $ | 3,700 |
| 139 | Chagall Floral 2 | $ | 3,700 |
| 140 | Calder | $ | 7,500 |
| 141 | Appel | $ | 6,500 |
| 142 | Kostabi Oil | $ | 3,500 |
| 143 | Dali - Evil Man series | $ | 2,700 |
| | | | |
| | | | |
| | | | |
| | Total | $ | 375,875 |

RECEIVED

SEP 1 2 2005

OMWBE

00045



## Jewelry

| Asset | Value |
|---|---|
| Patek Philippe watch | $9,000.00 |
| Rolex Watch | $2,500.00 |
| Engagement Ring | $164,500.00 |
| 1800's pearl necklace | $3,600.00 |
| mabe pearl ring | $1,200.00 |
| David Yurman Bracelet | $1,100.00 |
| DY gold and silver bracelet | $1,500.00 |
| DY chain | $1,600.00 |
| DY topaz enhancer | $3,800.00 |
| DY periolite enhancer | $1,600.00 |
| DY earrings | $1,100.00 |
| Charriol diamond bracelet | $4,000.00 |
| Tahitian Pearl necklace | $2,500.00 |
| Tahitian Pearl and Diamond earrings | $3,000.00 |
| Tahitian mabe pearl necklace and earrings | $2,000.00 |
| | |
| | |
| | |
| | |
| | |
| | |
| Total | $202,800.00 |

RECEIVED

SEP 1 2 2005

OMWBE

 

## Schlitz Studios Assets

| Asset | Value |
|---|---|
| | |
| | |
| 22 molds and patterns | $33,000.00 |
| Antique Books | $5,000.00 |
| Antique drawings | $2,500.00 |
| equipment and machinery | $6,500.00 |
| Antique Glass | $25,000.00 |
| | |
| Total | $72,000.00 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**RECEIVED**

SEP 1 2 2005

**OMWBE**

00047

 

### Schlitz Furnaces Assets

| Asset | Value |
|---|---|
| | |
| Glass Inventory | $400,000.00 |
| equipment and machinery | $6,500.00 |
| Formulas | $200,000.00 |
| | |
| Total | $606,500.00 |
| | |
| | |
| | |
| | |
| | |
| | |

RECEIVED

SEP 1 2 2005

OMWBE




## RELEASE

KNOW ALL MEN BY THESE PRESENTS, that MIDWEST BANK AND TRUST COMPANY

a corporation existing under the laws of the State of Illinois

for and in consideration of the payment of the indebtedness secured by the Mortgage hereinafter mentioned, and the cancellation of all the notes thereby secured, and of the sum of one dollar, the receipt whereof is hereby acknowledged, does hereby REMISE, CONVEY, RELEASE AND QUIT CLAIM unto **Martin A . D ukler a nd M ichelle D ukler h usband and wife as tenants by the entirety.**



FRED BUCHOLZ
DUPAGE COUNTY RECORDER
JUL.28,2005                3:46 PM
OTHER                    09 – 24 – 118 – 002
**002 PAGES      R2005 – 163888**

of the County of DuPage State of Illinois , heirs, legal representative and assigns all the right, title, interest, claim or demand whatsoever it may have acquired in, through or by a certain **Mortgage** bearing the date of the 23rd day of **January, 2004** recorded in the Recorder's Office of DuPage County, in the State of Illinois, in book of records, as document No. **R2004-032825** to the premises therein described, situated in the County of **DuPage** State of Illinois, as follows, to-wit:

PARCEL 1: LOT 49 IN FIELDSTONE AT BURR RIDGE UNIT 1, BEING A SUBDIVISION OF PART OF SECTION 24, TOWNSHIP 38 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED OCTOBER 2, 1991 AS DOCUMENT R91-129790, IN DUPAGE COUNTY, ILLINOIS.

PARCEL 2:   EASEMENT INGRESS AND EGRESS OVER PRIVATE ROADS FOR THE BENEFIT OF PARCEL 1, AFORESAID, AS SET FORTH IN GRANT OF EASEMENT RECORDED SEPTEMBER 9, 1991 AS DOCUMENT R91-128791 AND AS SHOWN ON THE PLAT OF FIELDSTONE AT BURR RIDGE UNIT 1 AFORESAID.

Permanent Tax Number:                                          Common Address:

**09-24-118-002**                                          **67756 Fieldstone, Burr Ridge, IL 60522.**

together with the appurtenances thereunto belonging or appertaining.

IN TESTIMONY WHEREOF, the said corporation has caused these presents to be signed by its Senior Vice President,, and attested by its Vice President and its corporate seal to be affixed, this 8th   day of July, 2005.

By:                                               Attest:

John S. Spear, Senior Vice President                 Carolyn A. Owen, Vice President

# FOR THE PROTECTION OF THE OWNER, THIS RELEASE SHALL BE FILED WITH THE RECORDER OF DEEDS IN WHOSE OFFICE THE MORTGAGE WAS FILED.

RECEIVED

SEP 1 2 2005

**OMWBE**

00049

OMB No. 2502-0265 (Exp. 12-31-86)  Page 1

| A. | | | |
|---|---|---|---|
| TICOR TITLE INSURANCE COMPANY | | **B. TYPE OF LOAN** | |
| CLOSER: Tracy Gunderson | | 1. ☐ FHA  2. ☐ FmHA  3. ☒ CONV. UNINS. | |
| DATE OF PRINTING: 07/05/05 | | 4. ☐ VA  5. ☐ CONV. INS. | |
| TIME OF PRINTING: 11:14 | | 6. File Number: 777582 | |

SETTLEMENT STATEMENT
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

7. Loan Number 014476711B  000777582-001 TG  SC

8. Mortgage Insurance Case Number

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| | |
|---|---|
| **D. NAME OF BORROWER:** | SANJAY C. PATEL AND SONIA S. PATEL |
| **ADDRESS:** | 18 ELDERGLEN |
| | IRVINE    CALIFORNIA    92604 |
| **E. NAME OF SELLER:** | MARTIN DUKLER AND MICHELLE DUKLER |
| **ADDRESS:** | 6756 FIELDSTONE DRIVE |
| | BURR RIDGE    ILLINOIS    60527 |
| **F. NAME OF LENDER:** | WELLS FARGO BANK, N.A. |
| **ADDRESS:** | P.O. BOX 5137 |
| | DES MOINES    IOWA    50306-5137 |
| **G. PROPERTY LOCATION:** | 6756 FIELDSTONE DRIVE |
| | BURR RIDGE    ILLINOIS    60527 |

| | | |
|---|---|---|
| **H. SETTLEMENT AGENT:** Ticor Title Insurance Company | | **I. SETTLEMENT DATE:** |
| **ADDRESS:** 1990 E. Algonquin Road, Suite 100 | | July 05, 2005 |
| Schaumburg    ILLINOIS    60173 | | |
| **PLACE OF SETTLEMENT:** 1990 E. Algonquin Road, Suite 100 | | **DISBURSEMENT DATE:** |
| **ADDRESS:** Schaumburg    ILLINOIS    60173 | | July 05, 2005 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract sales price | 865,000.00 | 401. Contract sales price | 865,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 7,603.18 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes    to | | 406. City/town taxes    to | |
| 107. County taxes    to | | 407. County taxes    to | |
| 108. Assessments 07/06/05 to 07/31/05 | 408.60 | 408. Assessments 07/06/05 to 07/31/05 | 408.60 |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **20. GROSS AMT DUE FROM BORROWER** | 873,011.78 | **420. GROSS AMT DUE TO SELLER** | 865,408.60 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | 10,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 692,000.00 | 502. Settlement charges to seller (line 1400) | 3,239.50 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| | | 504. Payoff of first mortgage loan | |
| 204. $86,500.00 2ND MTG W/WELLS FARGO BANK NA | | WELLS FARGO HOME MORTGAGE, INC. | 509,918.87 |
| 205. TRANSFERED FUNDS FROM FILE #777582A | 86,335.00 | 505. Payoff of second mortgage loan | |
| | | MIDWEST BANK & TRUST COMPANY | 195,241.37 |
| 206. LENDER CREDIT | 1,000.00 | 506. | |
| 207. | | 507. | |
| 208. | | 508. DEPOSIT OR EARNEST MONEY | 10,000.00 |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes    to | | 510. City/town taxes    to | |
| 211. County taxes 07/01/04 to 12/31/04 | 5,194.04 | 511. County taxes 07/01/04 to 12/31/04 | 5,194.04 |
| 212. Assessments    to | | 512. Assessments    to | |
| 213. COUNTY TAXES 1/1/05 TO 7/5/05 | 5,528.45 | 513. COUNTY TAXES 1/1/05 TO 7/5/05 | 5,528.45 |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 800,057.49 | **520. TOTAL REDUCTIONS AMT DUE SELLER** | 729,122.23 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER** | | **600. CASH AT SETTLEMENT TO/FROM SELLER** | |
| 301. Gross amt due from borrower (line 120) | 873,011.78 | 601. Gross amt due to seller (line 420) | 865,408.60 |
| 302. Less amts paid by/for borrower (line 220) | 800,057.49 | 602. Less reductions in amt due seller (line 520) | 729,122.23 |
| **303. CASH (☒ FROM) (☐ TO) BORROWER** | 72,954.29 | **603. CASH (☒ TO) (☐ FROM) SELLER** | 136,286.37 |

RECEIVED

SEP 12 2005

OMWBE

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower  SANJAY C. PATEL    Seller  MARTIN DUKLER

SONIA S. PATEL    MICHELLE DUKLER

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Settlement Agent    Date  7/05/05

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

HUD-1 (3/86) RESPA, HB 4305.2

00050

F-2857-01 4/80                                    Page 2                    OMB No. 2502-0265 (Exp. 12-31-86)

| ORD#/ABS# 777582 | | | | | TIME OF PRIN 11:14 |
|---|---|---|---|---|---|
| ESC# 000777582 G SC | | — SETTLEMENT CHARGES | | | DATE OF PRI1 :07/05/0 |

| | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| 700. | TOTAL SALES/BROKER'S COMMISSION based on … $ 865,000.00 @ | | | |
| | Division of Commission (line 700) as follows: | | | |
| 701. | LB $ to $10,000.00POC | | | |
| 702. | SB. $ to | | | |
| 703. | Commission paid at Settlement | | | |
| | (Money retained by broker applied to commission $ ) | | | |
| 704. | Other sales agent charges: | | | |
| 705. | Additional commission: $ to | | | |
| 800. | ITEMS PAYABLE IN CONNECTION WITH LOAN | | | |
| 801. | Loan Origination Fee $ | | | |
| 802. | Loan Discount $ | | | |
| 803. | Appraisal Fee to | | | |
| 804. | Credit Report to | | | |
| 805. | Lender's Inspection Fee to | | | |
| 806. | Mortgage Insurance Application Fee to | | | |
| 807. | Assumption Fee to | | | |
| 808. | APPLICATION FEE TO WELLS FARGO BANK, N.A. $500.00        POC | | | |
| 809. | | | | |
| 810. | | | | |
| 811. | | | | |
| 812. | | | | |
| 900. | ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | | |
| 901. | Interest from 07/05/05 to 07/01/05 @$ 99.5300 /day for 4 days | ( 398.12) | |
| 902. | Mortgage Insurance Premium for 0.00 months to | | | |
| 903. | Hazard Insurance Premium for 0.00 years to | | | |
| 904. | | | | |
| 905. | | | | |
| 1000. | RESERVES DEPOSITED WITH LENDER | | | |
| 1001. | Hazard Insurance 3.00 month @$ 126.58 per month | | 379.74 | |
| 1002. | Mortgage Insurance 0.00 month @$ per month | | | |
| 1003. | City property taxes 0.00 month @$ per month | | | |
| 1004. | County property taxes 7.00 month @$ 865.67 per month | | 6,059.69 | |
| 1005. | Annual assessments 0.00 month @$ per month | | | |
| 1006. | 0.00 month @$ per month | | | |
| 1007. | 0.00 month @$ per month | | | |
| 1008. | Aggregate Accounting Adjustment | | ( 253.13) | 0.00 |
| 1100. | TITLE CHARGES | | | |
| 1101. | Settlement or Closing Fee to TICOR TITLE INSURANCE COMPANY | | 750.00 | |
| 1102. | Abstract or title search to | | | |
| 1103. | Title examination to | | | |
| 1104. | Title insurance binder to | | | |
| 1105. | Document preparation to | | | |
| 1106. | Notary fees to | | | |
| 1107. | Attorney's fee to GARDI & HAUGHT | | 350.00 | |
| 1108. | Title Insurance to TICOR TITLE INSURANCE COMPANY | | 640.00 | 1,456.00 |
| | (includes above items numbers:) | | | |
| 1109. | Lender's coverage $ 692,000.00 $ 640.00 EPA, ARM, PUD, & COMP END | | | |
| 1110. | Owner's coverage $ 865,000.00 $ 1,456.00 | | | |
| 1111. | PAYOFF OVERNIGHT/HANDLING FEE TO TICOR TITLE INSURANCE COMPA | | | 50.00 |
| 1112. | EMAIL PACKAGE FEE TO TICOR TITLE INSURANCE COMPANY | | 15.00 | |
| 1113. | IL STATE REGISTRATION FEES TO TICOR TITLE INSURANCE COMPANY | | 3.00 | 3.00 |
| 1200. | GOVERNMENT RECORDING AND TRANSFER CHARGES | | | |
| 1201. | Recording fees: Deed $ 18.00 ; Mortgage $ 39.00 ; Release $ 18.00 | | 57.00 | 18.00 |
| 1202. | City/county tax/stamps: Deed $ ; Mortgage $ | | | 432.50 |
| 1203. | State tax/stamps: Deed $ ; Mortgage $ | | 865.00 | |
| 1204. | | | | |
| 1205. | | | | |
| 1300. | ADDITIONAL SETTLEMENT CHARGES | | | |
| 1301. | Survey to G. POWELL | | | 275.00 |
| 1302. | Pest inspection to | | | |
| 1303. | SANITARY DISTRICT FEES TO FLAGG CREEK SANITARY DISTRICT | | | 140.00 |
| 1304. | | | | |
| 1305. | | | | |
| 1306. | | | | |
| 1307. | | | | |
| 1400. | TOTAL SETTLEMENT CHARGES (enter on lines 103, Section J and 502, Section K) | | 7,603.18 | 3,239.50 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower SANJAY C. PATEL        Seller

SONIA S. PATEL        MARILYN DUKLER

MICHELLE DUKLER

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause funds to be disbursed in accordance with this statement.

Settlement Agent        7/5/05        Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

TG        HUD-1 (3/86) RESPA, HB 4305.2

RECEIVED

SEP 1 2 2005

OMWBE

00051

 

# PARKVIEW CUSTOM HOMES, INC.
# NEW HOME CONSTRUCTION AGREEMENT

THIS AGREEMENT, made and entered into this July 14, 2005 by and between PARKVIEW CUSTOM HOMES, INC., an Illinois corporation, 22 North Lincoln, Hinsdale, Illinois 60521 (hereinafter "Builder") and Martin and Michelle Dukler, residing at _2310 Justina_ (hereinafter collectively "Purchaser").

## RECITALS

A.    Purchaser desires to purchase the property commonly known as 5509 South Oak Street, Hinsdale, IL 60521 as legally described on the attached Exhibit A incorporated herein by this reference ("Property"). The Property is currently owned by Parkview Custom Homes, Inc. Purchaser also desires Builder to construct on the Property the detached single family residence and other improvements (hereinafter "Residence", "Improvements", or "Work") described herein and upon the price and terms hereinafter set forth in this Agreement; and

B.    Builder agrees to construct on the Property the detached single family residence and other improvements (hereinafter "Residence", "Improvements", or "Work") described herein and upon the price and terms hereinafter set forth in this Agreement.

NOW, THEREFORE, In consideration of the above recitals which are incorporated herein and made part hereof and the mutual covenants, conditions, terms and obligations set forth in this Agreement, Builder and Purchaser hereby agree as follows:

I.    **Construction and Plans.**  The Builder shall construct the Residence on the Property, as described above, in substantial conformance with the plans, specifications, and drawings which have been agreed upon and initialed by the Builder and the Purchaser and which are attached hereto and incorporated herein by reference as Exhibit B ("Plans and Specifications"), and upon the terms and conditions set forth in this Agreement. The Builder shall be responsible for ensuring that the Plans and Specifications comply with the applicable building codes.

II.    **Purchase Price.**  The total purchase price to be paid by the Purchaser to the Builder for the completed residence is Two Million, Eight Hundred Thousand and 00/100 Dollars ($2,800,000.00).

III.    **Payment of Purchase Price.**  The Purchaser shall pay or shall authorize its agent (i.e., Lender or the title company or escrowee) to pay directly to the Builder the following sums at the following times:

A.    "Earnest Money" to Brush Hill Realtors        RECEIVED        $ 62,500.00
      Due upon acceptance of this Agreement.
                                                    SEP 1 2 2005
B.    Remainder of down payment                                     $ 292,500.00
      Due upon issuance of building permit.        OMWBE

00052



**D.**    Balance                                              $2,489,750.00
          Due at closing.

This Agreement is not contingent upon any financing approval for the Purchaser. Should Purchaser fail to make any payments when due, Builder shall have the option, but not the obligation, to declare this Agreement null and void, subject to notice requirements set forth in Section XX herein or as otherwise provided herein. Should Builder exercise that option, any funds already paid by Purchasers to Builder and/or Builder's agent shall be immediately forfeited as liquidated damages, the parties acknowledging that the home to be constructed is being built at the direction of the Purchasers, and actual damages would be difficult or impossible to determine.  Builder shall not be obligated to resume any Work until such time as all required payments have been made by Purchaser and Builder is assured to Builder's satisfaction that Purchaser shall not delay any future payments. Purchaser shall be solely responsible for any costs, expenses and/or damages incurred by any such delays. The time of completion shall be extended by such time as is necessary in Builder's discretion to accommodate such delay, but in no event for a period less than the actual length of any such delay. The final payment of the purchase price shall be made at the Closing. The Closing shall take place at the title company, no later than 5 business days after completion of construction of the project as defined in Paragraph VII hereof. All of Purchaser's lender fees and expenses, all title company fees and charges customarily paid by Purchaser, and Purchaser's escrowee disbursement and disbursement-related fees and charges shall be paid by Purchaser. All of Builder's lender fees and expenses, all title company fees and charges customarily paid by Builder, and Builder's escrowee disbursement and disbursement related fees and charges shall be paid by Builder. Builder shall pay all transfer taxes related to this transaction unless otherwise provided by local ordinance. All costs associated with the construction escrow shall be paid by Builder. At closing, all final waivers will be supplied by Builder, subcontractors and material suppliers, to the title company. Purchaser shall not be required to pay the final payment (balance) until the Builder supplies a final waiver or bond indemnifying the Purchaser of all liens.

**IV.**    **Transfer of Partial Ownership of Real Property to Purchaser.**    As a condition precedent to the enforceability of this Agreement, Seller intends to transfer fifty percent (50%) ownership in the real property commonly known as 5509 South Oak Street, Hinsdale, IL to Purchasers as Tenants in Common. Builder shall have  six (6) business days to complete his due diligence with respect to the viability of this contemplated transfer with his accountant and lender, and if he is unable to make said transfer, then he agrees to address to Purchasers' satisfaction the previously discussed issues regarding liability exposure for Purchasers and the ability for Builder or Builder's successors to complete the property in case of catastrophic consequences to Builder through the building of the Residence. If Builder is able to transfer ownership, a deed making this transfer shall be recorded by Builder's Attorney within thirty (30) days of this Agreement.

**V.**    **Time for Completion.**

        **A.**    It is anticipated that the builder will substantially complete the Work within 12 months from when construction begins which is defined here as when demolition begins on the existing home. While Builder agrees to begin the demolition as soon as possible after the execution of this Agreement, any weather-related delays in the commencement of demolition delays the start of construction.

RECEIVED

SEP 1 2 2005

OMWBE

2

00053

 

**B.**    The Builder shall not be responsible for delays in completion of the Work due to Acts of God, inclement weather, strikes, wars, riots, lockouts, material or labor shortages, lack of utility services, fire, storms, theft, vandalism, governmental regulation, inspection or restriction, change orders or other causes or casualties beyond the reasonable control of the Builder.  In the event of any such occurrence, the time for completion shall be extended accordingly.

## VI.    Permit Fees and Other Costs.

**A.**    The Work shall only include the materials to be installed by the Builder as required by the Plans and Specifications and labor reasonably and normally required to install said materials.  The Builder is to pay for all building permits and bond fees and all other approvals, documents, permits and licenses required to perform and fully complete the Work.

**B.**    The Builder shall be responsible for preparing all applications for permits and related documents.

## VII.    Substantial Completion and Certificate of Occupancy.    The Purchaser agrees that upon completion of inspections and issuance of a Certificate of Occupancy, temporary or permanent, by the proper governmental authority, the project shall be deemed substantially complete.

## VIII.    Purchaser Selections.    Purchaser shall make any color and material selections of optional construction features as requested by Builder from Builder's samples or samples displayed in the showrooms of material suppliers of Builder's choice.  Purchaser shall be responsible for payment, shipment, delivery and warranty of the materials for all special ordered items.  Builder shall bear no liability for coordination or compatibility of Purchaser-selected color and material selections. Purchaser shall make all selections within fourteen (14) days of Builder's notice to Purchaser to make such selection.  If Purchaser fails to make all or any part of such selections within said fourteen (14) day period, then Builder is authorized to make such selections as Builder deems suitable.  If any of Purchaser's selections become unavailable, Builder may require Purchaser to make new selections. Purchaser's failure to make selections as required hereunder shall not be a default by Purchaser under this Agreement, but Purchaser acknowledges that any delay in making selections may delay the closing date.

## IX.    Assurance of Possession.

**A.**    Upon commencement of the Work and throughout the construction period and at all times prior to full payment, Builder shall have sole control and exclusive possession of the Property and all improvements thereon (collectively the "Premises").  Only contractors and subcontractors and materialmen hired or approved by Builder shall be allowed to work on the Premises prior to Closing.  Builder's sole control and possession of the Premises shall expire upon payment to Builder of the full purchase price, including all change orders and extras, and any other monies due Builder under this Agreement.  Purchaser shall not occupy nor take possession of the Premises until the Work is completed and the purchase price, as adjusted from time to time in accordance with this Agreement, is paid in full to Builder.

RECEIVED

SEP 1 2 2005

OMWBE

3

00054



**B.**   Without the prior written consent of Builder, in the event Purchaser or Purchaser's designee, agent or any person or entity authorized by Purchaser (including Purchaser, contractors, subcontractors, suppliers of labor and/or materials, Lender, other persons, firms or companies other than Builder) enter the property, Purchaser agrees that such entry is at Purchaser's risk and Purchaser hereby releases Builder and agrees to indemnify and hold Builder harmless from any and all claims for injury, death or damage to Purchaser's person or property and to the person or property of any designee, agent, employee of Purchaser or to any person or persons or company other than Builder occurring on the Premises. The Purchaser, its designees, agents, contractors, subcontractors, suppliers of labor or materials, Lender, representatives, persons or companies other than Builder assume the risk of injury, death and other loss or damage by entering the Premises.

**X.   Changes and Extras.**    The cost of any extras, changes, additions or modifications requested by Purchaser are to be paid for when requests are made by Purchaser and approved in writing by Builder. No subcontractor, materialman nor any other person or entity is authorized to approve changes and/or extras or to execute change orders on behalf of Builder. Said request for changes and/or extras shall be submitted by Purchaser on Builder's Change Order Form, so long as such form is promptly and timely provided to Purchaser by Builder upon Purchaser's request thereof. No representations or agreements with respect to modifications or changes in construction or extras requested by Purchaser will be recognized unless same are timely made in writing, signed by Purchaser and Builder, and payment therefor is made to Builder by Purchaser. Builder shall not unreasonably withhold, delay or condition consent to any change orders (including, but not limited to, Purchaser selection/special order items) requested by Purchaser, except when the change order may delay the Closing Date, at which time Builder may choose to Close as scheduled and complete the Change Order after closing. The requirement for written change orders may not be waived by Builder except as provided for in Section XIV. Any delay occasioned by complying with the requirements of this Section X shall extend the completion date by the length of any such delay. In the event that a change order results in a cost savings, the purchase price shall be reduced by the cost savings to the builder. The total cost for any change and/or extra shall be the cost of any such change and/or extra to Builder plus fifteen percent (15%).

**XI.   Risk of Loss & Insurance.**    Builder shall purchase and maintain Builder's Risk Insurance on the Premises and Work in companies and amounts acceptable to Builder. Such insurance shall cover the risk of loss for all materials and equipment delivered to the Premises by the Builder or agents of the Builder, including theft, loss or damage from vandalism or casualty. Builder shall carry and maintain liability insurance and workman's compensation insurance from companies and in amounts acceptable to Builder.

**XII.   Limited Warranty.** Subject to the terms of the Builder's Limited Warranty which is attached hereto as Exhibit C and made a part hereof, Builder warrants to the Purchaser that all work will be completed in a good and workmanlike manner. The term of the Limited Warranty is one year. Said term shall commence the day after the Closing Date. The terms of the Limited Warranty are incorporated herein by reference.

**XIII.   Left Intentionally Blank.**    RECEIVED

**XIV.   Substitutions and Variations.** SEP 1 2 2005

OMWBE

4

00055

 

**A.**   The Builder reserves the right to substitute other materials, brand names or products of equal or superior quality, utility and color, as may be required by material shortages, strikes, stoppages, or such other situations as may, in the Builder's reasonable judgment, require the same, provided the Residence is not substantially different from the architectural intent of the design. Builder shall make every effort to notify Purchaser of any such changes, but shall not be prohibited nor in breach of this Agreement if such notice is not given.  Builder shall not be responsible for colors, styles, modes, patterns, shapes or sizes discontinued by the manufacturer or supplier.

**B.**   Purchaser authorizes minor variations and changes, including room sizes, from the Plans and Specifications as Builder shall find necessary or appropriate as construction progresses, provided that such variations shall not adversely and materially affect the quality or utility of the Work nor affect the physical location, basic design or outside measurements of the Residence.

**C.**   Purchaser acknowledges that there are color and natural grain variations in genuine wood and Builder shall not be responsible for same.

## XV.   <u>Left Intentionally Blank.</u>

**XVI.   <u>Trees.</u>**      The Builder shall not be held liable for the removal, damage, or death of any tree or trees before, during or after construction.  Builder may remove any tree or trees, if in his judgment it is deemed necessary for the proper completion of the Work, including for surface drainage purposes.

**XVII.   <u>Assignment.</u>**      Purchaser shall not be able to assign this Agreement to a subsequent party without Builder's written permission. Builder shall not be able to assign this Agreement to a subsequent party without Purchaser's written permission.

**XVIII.   <u>Non-Builder Work.</u>** Purchaser shall not retain other contractors or materialmen or suppliers until the Work has been completed and the Closing has taken place, without the prior written consent of Builder.  If Purchaser directly contracts with any contractor, subcontractor or materialman, without the Builders consent, the Builder shall not be responsible for any work performed by such trades.  It shall be the responsibility of the Purchaser to ensure that (i) any such tradesman is suitably trained and performs the work; (ii) proper quality and standard methods of construction and materials are utilized; and (iii) that polices of insurance are furnished to the Builder in companies and coverages acceptable to Builder prior to the commencement of any work or the ordering or delivery of any materials

**XIX.   <u>Pre-Closing Inspection & Punchlist.</u>**  At a mutually agreeable time not less than five (5) days prior to the Closing Date, Purchaser and Builder or Builders representative shall inspect the Work and shall prepare a Punchlist of any items which may require additional work or any fixtures, equipment or appliances which have yet to be installed ("Punchlist Items").  Said Punchlist shall be signed and dated, in duplicate, by both Purchaser and Builder, each party retaining an original executed copy.  Builder shall make every effort to complete such Punchlist Items prior to closing. <u>Builder shall have the option, at Builder's sole direction, to either delay the closing until the Punch List can be completed or escrow for remaining Punch List items at the time of Closing.</u>  Any items remaining on the Punchlist after the Closing Date shall be completed by Builder as soon as practical after closing.  Completion of such items is subject to the delay provisions set forth in Section V.B.

RECEIVED

SEP 1 2 2005        5

OMWBE



## XX.    Remedies.

**A.**    If Purchaser shall default in making any payment when due or shall default under any other of its covenants and obligations hereunder, and fails to cure any such default within five (5) days after Builder sends written notice of same to Purchaser, then Builder shall be entitled to any or all of the following remedies, in Builder's sole discretion, such remedies being cumulative, not exclusive: (i) Builder may immediately cease all Work; (ii) perform all or a portion of the Work; (iii) retain all monies paid to Builder, its subcontractors an material suppliers; (iv) terminate this Agreement and all of Builder's obligations hereunder while retaining all of Builder's rights and remedies hereunder and/or (v) begin marketing the property for immediate sale (vi) any and all other remedies, at law or in equity, that may be available to Builder under Illinois law, including, but not limited to remedies provided by the Illinois Mechanics Lien Act.

**B.**    In the event Builder does not elect to terminate this Agreement pursuant to Section XX.A., Builder shall be under no obligation to continue or resume the Work until such time as the default has been cured in full, any and all payments due Builder are paid to date and Purchaser has posted bonds satisfactory to Builder for the payment of all amounts to become due Builder under this Agreement.

**C.**    In the event Builder is in default of this Agreement, Purchaser's sole and exclusive remedy shall be the return of all funds previously paid by Purchaser to Builder and/or Builder's agents.

## XXI.    Exhibition by Builder.    The Builder shall, at all times prior to receiving the full purchase price provided for hereunder, have the right to exhibit the Work to any and all persons, in addition to permitting inspection by governmental authorities, lender, title company, escrowee and Purchaser.

## XXII.    Environmental Disclaimer.    Builder neither has nor claims any expertise in radon and does not provide advice to Purchaser about the acceptable levels or possible health hazards of radon.  No warranty, representation or recommendation concerning the existence nor treatment nor elimination of any radon or radon related conditions are made by Builder.  Mold, mildew, spores and other microscopic organisms and/or allergens (collectively referred to as "Mold") are environmental conditions that are common in residential properties and may affect the Property. Mold, in some forms, has been reported to be toxic and cause serious physical illnesses, including, but not limited to, allergic and/or respiratory reactions or other problems, particularly in persons with immune system problems, young children and/or the elderly. Mold has also been reported to cause extensive damage to personal and real  property.  No warranty, representation or recommendation concerning the existence nor treatment nor elimination of any mold or mold related conditions are made by Builder.  Builder makes no warranties, express or implied, about the existing or future environmental conditions of the Premises or the Work, including possible present or future pollution of the air, water or soil from any source or sources, including but not limited to, underground migration or seepage, including radon.  However, the builder will give his best efforts to prevent mold during the project. Builder's sole warranty to Purchaser is the Limited Warranty attached hereto as Exhibit C.

RECEIVED

SEP 1 2 2005          6

OMWBE

00057

 

**XXIII. Manufacturer Warranties.** Builder shall furnish to Purchaser all manufacturer warranties for any and all fixtures, equipment, appliances and person al property installed by the Builder on the Premises and for which such manufacturer warranty exists. Said manufacturer warranties shall in no way expand or affect the coverages provided pursuant to the Builder's Limited Warranty attached hereto as Exhibit C.

**XXIV. Governing Law & Unenforceable Provisions.** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. If any term, covenant, warranty, section, clause, condition or provision (hereinafter collectively "Provision") of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby and this Agreement shall be construed as if such invalid void or unenforceable Provision(s) were omitted.

**XXV. Section Headings & Gender & Plurality.** The Section headings are inserted in this Agreement for convenience only and in no way define, limit or describe the scope, content or intent of any provision of this Agreement. Wherever in this Agreement words, including pronouns, are used in the masculine, they shall be read and construed in the feminine or neuter whenever they should be so applied, and wherever in this Agreement words, including pronouns, are used in the singular or plural, they shall be read and construed in the plural or singular respectively, wherever they should be so applied.

**XXVI. Forbearance & Waiver.** Forbearance by the Builder in enforcing any of its rights and/or remedies set forth herein shall not be construed as a waiver thereof by Builder and nothing shall prohibit Builder from enforcing any such right or remedy in the future. Further, no forbearance or waiver by Builder of any specific provision hereof shall constitute a waiver by the Builder of its right to demand strict compliance with all other provisions of this Agreement.

**XXVII. Binding Effect & Assignment.** This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, devisees, legatees, successors and assigns of Purchaser and Builder. This Agreement shall not be assigned by either party hereto without the prior written consent on the non-assigning party.

**XXVIII. Entire Agreement.** This contract constitutes the entire agreement between the parties and supercedes any and all previous agreements, either oral or in writing, between the parties hereto. No representations, warranties, undertakings or promises, whether oral, implied or otherwise, have been made by either Builder or Purchaser to the other unless expressly stated herein or unless mutually agreed to in writing and executed by both parties. All amendments, supplements, addenda or riders hereto, if any, shall be in writing and executed by both parties.

**XXIX. Litigation & Attorneys Fees and Costs.** In the event either party is required to retain a lawyer and/or file a lawsuit to enforce the terms of this Agreement, the successful party in said suit shall be entitled to recover his reasonable attorneys' fees, expenses and costs of court from the unsuccessful party.

RECEIVED

SEP 1 2 2005

OMWBE

7

 

**XXX. Arbitration.** All claims, disputes and other matters in question arising our of or relating to this Agreement or the breach thereof shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. Any such dispute shall be submitted to arbitration before the Alternative Resolution Center in DuPage County. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with the applicable law in any court having jurisdiction thereof.

**XXXI. Time is of the Essence.** Time shall be of the essence of this Agreement.

**XXXII. SURVEY.** Not less than five (5) business days prior to closing, Builder shall, at Builder's expense, furnish to Purchaser or Purchaser's attorney a Plat of Survey dated not more than six (6) months prior to the date of closing, showing any encroachments, measurements of all lot lines, all easements of record, building set back lines of record, fences, all buildings and other improvements on the Real Estate.

**XXXIII.     PRORATIONS.** Proratable items shall include, without limitation, utilities, water and sewer, and homeowners' association fees, if any. Builder agrees to pay prior to or at closing any special assessments confirmed after the Date of Acceptance of this Agreement. The general real estate taxes shall be prorated as of the Date of Closing based upon 105% of the last available tax bill, and shall be re-prorated upon the issuance of the actual bill when issued.

**XXXIV.     FIXTURES AND PERSONAL PROPERTY.** At closing, Builder agrees to transfer to Purchaser all heating, electrical, plumbing, air conditioning, together with all fixtures and personal property set forth on the attached Exhibit B of this Agreement, through a Bill of Sale. Builder warrants to Purchaser that all fixtures, systems and personal property included in this Agreement shall be new and in operating condition at the time of closing.

**XXXV.     TITLE.** At Builder's expense, Builder will deliver or cause to be delivered to Purchaser or Purchaser's attorney not less than five (5) days prior to closing a title commitment for an ALTA title insurance policy in the amount of the purchase price with extended coverage by Greater Illinois Title Insurance Company or other title company at Builder's sole discretion, issued subsequent to the date of this Agreement, subject only to general real estate taxes not due and payable as of the Date of Closing, covenants, conditions, restrictions of record, building lines and easements, if any, so long as they do not interfere with the use and enjoyment of the property as a residence. If the title commitment shows any encroachments, then Builder shall have the exceptions removed or insured over by the title insurer. If Builder fails to have unpermitted exceptions waived or insured over by the title insurer prior to closing, Purchaser may elect to take title as it then is, with the right to deduct from the purchase price prior encumbrances of a definite or ascertainable amount. Builder shall furnish Purchaser at Closing an Affidavit of Title covering the date of Closing, and shall sign all other customary documentation required for the issuance of an ALTA insurance policy.

**XXXVI.     DEED.** Builder shall convey or cause to be conveyed to Purchaser or Purchaser's designated grantee good and merchantable title to the premises by recordable general warranty deed, with release of homestead rights if applicable and with real estate transfer taxes paid by Builder unless otherwise designated by local ordinance. Title when conveyed will be subject to the conditions listed in paragraph XXXV above.

8

RECEIVED

SEP 1 2 2005                                                    00059

 

**XXXVII.** **BUILDER REPRESENTATIONS.** Builder shall comply with all laws, ordinances, rules, regulations and orders of any public authority bearing on the performance of the Work. Builder shall supervise and direct the Work and shall be responsible for all construction means, methods, techniques sequences and procedures for coordinating the Work under this Agreement. Builder represents to the best of his knowledge as of the Date of this Agreement that he has no knowledge of any proposed or confirmed special assessments affecting the Property, any boundary line disputes, easements or claims of easements not shown on public records.

**XXXVIII.** **NOTICE.** All notices required shall be in writing and shall be served by one party or his attorney to the other party or his attorney. Notice to one shall be deemed notice to all, and shall be served by personal delivery, regular or certified mail, or by facsimile transmission with a copy sent via regular mail. Notice to Purchaser shall be sent to Martin and Michelle Dukler at

With a copy to Claude J. Krawczyk, Esq., O'Neil Cannon Hollman DeJong, S.C., 111 East Wisconsin Avenue, Suite 1400, Milwaukee, WI 53202 (fax:414.276.6581). Notice to Builder shall be sent to

With a copy to James R. Flynn, Esq., 907 North Elm Street, Suite 301, Hinsdale, IL 60521 (fax:630.323.5942.

EXECUTED BY PURCHASER this 14th day of July, 2005.

Martin Dukler

Michelle Dukler

ACCEPTED BY BUILDER this 14th day of July, 2005 ("Acceptance Date").
Parkview Custom Homes, Inc.

By: _____
Its: President

RECEIVED

SEP 1 2 2005

OMWBE

9

00060

 

**Fifth Third Bank**

# Check # 1001

| | | | |
|---|---|---|---|
| Amount: | $30,000.00 | Date Posted: | 03/09/2005 |
| Account Number: | PLATINUM PROMO NEW BC CHECKING XXXXX3001 | | |

MICHELLE A. DUKLER
6758 FIELDSTONE DRIVE
HINSDALE, IL 60521

1001

70-2380/719

3·4·05

PAY TO THE ORDER OF  Breuch Hill        $ 30,000 —

Twenty Thousand & no/100        DOLLARS

Fifth Third Bank

FOR Deposit 5509 s. Oak

⑆071923909⑆ 723273300⑈ 1001 ⑈000300000⑈

NORTHERN TRUST 7 CHICAGO 71000152
801 S. CANAL S-2        >071000152<
PAID

RECEIVED

SEP 1 2 2005

OMWBE

00061

 

**Fifth Third Bank**

## Check # 1003

| Amount: | $110,000.00 | Date Posted: | 07/20/2005 |
|---|---|---|---|
| Account Number: | PLATINUM PROMO NEW BC CHECKING XXXXXX3001 | | |

MICHELLE A. DUKLER
6736 FIELDSTONE DRIVE
HINSDALE, IL 60521

1003

70-8360/719

7-14-05

DATE

Fairview Custom Homes, Inc.    $ 110,000.

One hundred ten thousand & 00/100    DOLLARS

**Fifth Third Bank**
(CHICAGO)
CHICAGO, ILLINOIS

**Fifth Third**

250,000.

pmt in full for Deposit

⑈071925909⑈ 723273300⑈ 1003 ⑈001000000⑈

HINSDALE BANK & TR  >071925059<
WILLOWBROOK, IL 60514
320657652 07-19-05 10332594 08
000000079

for Deposit only

RECEIVED

SEP 12 2005

OMWBE

00062

View Check Image




Midwest Bank and Trust Company

*A subsidiary of Midwest Banc Holdings, Inc.*

Welcome to online banking at Midwest Bank and Trust Company

NetTeller　　　Options
Main | Transactions | Download | Statements | Stop Payments

Bill Payment



Contact　　　Help　　　Exit

MIDWEST BANK AND TRUST COMPANY

Page 1 of 1

RECEIVED

SEP 1 2 2005

OMWBE

00063

View Check Image



Page 1 of 1

http://www.netteller.com/midwestbankandtrust/HbdisplayCheck.cfm?CheckSide=1&CheckNumber=vBCdiQCQyqHM55NAj...    8/16/2005



Midwest Bank and Trust Company

*A Subsidiary of Midwest Bank Holdings, Inc.*

Welcome to online banking at Midwest Bank and Trust Company

**NetTeller**

**Main | Transactions | Download | Statements | Stop Payments**

Bill Payment    Options

Contact    Help    Exit

MIDWEST BANK AND TRUST COMPANY





**RECEIVED**

SEP 1 2 2005

**OMWBE**

00064







advertisement





| HOME | NEW CARS | USED CARS | REVIEWS & RATINGS | ADVICE | FINANCING |

Quick Dealer Price Quote    Search Used Car Listings    Lis

# BLUE BOOK® PRIVATE PARTY REPORT
**Illinois • August 16, 2005**
## 1998 Mercedes-Benz E-Class E320 Sedan 4D



Search Listings for This Car
List Your Car For Sale Online
Quick New Car Price Quote
Free CARFAX Record Check
Auto Loans from 4.99% APR
Insurance Quote
Print "For Sale" Sign
Payment Calculator

BLUE BOOK

Search User I

Quickly brov
600,000 use
to find exact
you want.

**Engine:** V6 3.2 Liter
**Trans:** Automatic
**Drive:** RWD
**Mileage:** 35,000



**Equipment**

| | | |
|---|---|---|
| Slip Control | Cruise Control | Leather |
| Air Conditioning | AM/FM Stereo | Dual Power Seats |
| Power Steering | Cassette | Moon Roof |
| Power Windows | Multi Compact Disc | Alloy Wheels |
| Power Door Locks | Dual Front Air Bags | |
| Telescoping Wheel | ABS (4-Wheel) | |

## Consumer Rated Condition:                               **Excellent**

"Excellent" condition means that the vehicle looks new, is in excellent mechanical condition and needs no reconditioning. This vehicle has never had any paint or body work and is free of rust. The vehicle has a clean title history and will pass a smog and safety inspection. The engine compartment is clean, with no fluid leaks and is free of any wear or visible defects. The vehicle also has complete and verifiable service records. Less than 5% of all used vehicles fall into this category.

## Private Party Value        Search Local Listings | List This Car for Sale    **($15,440)**

Private Party Value is what a buyer can expect to pay when buying a used car from a private party. The Private Party Value assumes the vehicle is sold "As Is" and carries no warranty (other than the continuing factory warranty). The final sale price may vary depending on the vehicle's actual condition and local market conditions. This value may also be used to derive Fair Market Value for insurance and vehicle donation purposes.

RECEIVED

SEP 1 2 2005

Get a Used Car Trade-In Value

OMWBE

Enter yo
search ir

View Account History




 Fifth Third Bank

• Contact Us   • Service Center   • Help   • FAQs

🔒 Log Out  |  **Summary**  |  **Manage Accounts**  |  **Make Payments**  |  **Transfer Funds**

☑ Account Balances   ☑ Account Nicknames

**Welcome MICHELLE A DUKLER**          **Account Activity**                    Ac

**Accounts**

**Account Activity**     Account Summary     Account Statements

**Account:**                                      **Description Keyword:**

COMMERCIAL LOAN / (X0018)                                                    • Go

**Displaying Account Activity for:** COMMERCIAL LOAN XXXXXXXXXX0018

| Date Posted | Effective Date | Description | Total Amount | Principal | Interest | |
|---|---|---|---|---|---|---|
| 08/19/2005 | 08/19/2005 | INTEREST PMT 100 | $14,173.62 | $0.00 | $14,173.62 | |
| 08/14/2005 | 08/14/2005 | STATEMENT | $14,173.62 | $0.00 | $14,173.62 | |
| 08/10/2005 | 08/09/2005 | RATE CHANGE 100 | | | NEW RATE | 6 |
| 08/10/2005 | 06/30/2005 | RATE CHANGE 100 | | | NEW RATE | 6 |
| 07/19/2005 | 07/19/2005 | INTEREST PMT 100 | $13,343.05 | $0.00 | $13,343.05 | |
| 07/14/2005 | 07/14/2005 | STATEMENT | $13,343.05 | $0.00 | $13,343.05 | |
| 06/30/2005 | 06/30/2005 | RATE CHANGE 100 | | | NEW RATE | 6 |
| 06/30/2005 | 05/03/2005 | RATE CHANGE 100 | | | NEW RATE | 6 |
| 06/20/2005 | 06/20/2005 | INTEREST PMT 100 | $13,433.33 | $0.00 | $13,433.33 | |
| 06/14/2005 | 06/14/2005 | STATEMENT | $13,433.33 | $0.00 | $13,433.33 | |
| 05/19/2005 | 05/19/2005 | INTEREST PMT 100 | $12,747.23 | $0.00 | $12,747.23 | |
| 05/15/2005 | 05/15/2005 | STATEMENT | $12,747.23 | $0.00 | $12,747.23 | |
| 05/04/2005 | 03/22/2005 | RATE CHANGE 100 | | | NEW RATE | 5 |
| 04/19/2005 | 04/19/2005 | INTEREST PMT 100 | $12,819.44 | $0.00 | $12,819.44 | |
| 04/14/2005 | 04/14/2005 | STATEMENT | $12,819.44 | $0.00 | $12,819.44 | |
| 03/22/2005 | 02/02/2005 | RATE CHANGE 100 | | | NEW RATE | 5 |
| 03/21/2005 | 03/21/2005 | INTEREST PMT 100 | $11,122.22 | $0.00 | $11,122.22 | |
| 03/14/2005 | 03/14/2005 | STATEMENT | $11,122.22 | $0.00 | $11,122.22 | |
| 02/22/2005 | 02/22/2005 | INTEREST PMT 100 | $12,061.11 | $0.00 | $12,061.11 | |
| 02/14/2005 | 02/14/2005 | STATEMENT | $12,061.11 | $0.00 | $12,061.11 | |
| 02/02/2005 | 12/14/2004 | RATE CHANGE 100 | | | NEW RATE | 5 |
| 01/19/2005 | 01/19/2005 | INTEREST PMT 100 | $11,754.17 | $0.00 | $11,754.17 | |
| 01/17/2005 | 01/17/2005 | STATEMENT | $11,754.17 | $0.00 | $11,754.17 | |
| 12/20/2004 | 12/20/2004 | INTEREST PMT 100 | $10,923.61 | $0.00 | $10,923.61 | |
| 12/14/2004 | 12/14/2004 | STATEMENT | $10,923.61 | $0.00 | $10,923.61 | |
| 12/14/2004 | 11/10/2004 | RATE CHANGE 100 | | | NEW RATE | 5 |
| 11/19/2004 | 11/19/2004 | INTEREST PMT 100 | $10,797.22 | $0.00 | $10,797.22 | |
| 11/14/2004 | 11/14/2004 | STATEMENT | $10,797.22 | $0.00 | $10,797.22 | |
| 11/10/2004 | 09/21/2004 | RATE CHANGE 100 | | | NEW RATE | 4 |

RECEIVED

SEP 1 2 2005

OMWBF

00066

**Account History**

| 10/19/2004 | 10/19/2004 | INTEREST PMT 100 | $10,255.56 | $0.00 | $10,255.56 | |
|---|---|---|---|---|---|---|
| 10/14/2004 | 10/14/2004 | STATEMENT | $10,255.56 | $0.00 | $10,255.56 | |
| 09/21/2004 | 08/19/2004 | RATE CHANGE 100 | | | NEW RATE | |
| 09/20/2004 | 09/20/2004 | INTEREST PMT 100 | $10,400.00 | $0.00 | $10,400.00 | |
| 09/14/2004 | 09/14/2004 | STATEMENT | $10,400.00 | $0.00 | $10,400.00 | |
| 08/24/2004 | 08/24/2004 | STATEMENT | $0.00 | $0.00 | $0.00 | |
| 08/24/2004 | 08/19/2004 | FLAT FEE WAIVE 502 | $500.00 | $0.00 | $0.00 | $5 |
| 08/24/2004 | 08/19/2004 | DISB SIMP IN/DSC 001 | $2,600,000.00 | $2,600,000.00 | $0.00 | |

Copyright (c) 2005 Fifth Third Bank. Member FDIC. ⌂ Equal Housing Lender. All Rights Reserved

Contact Us | Service Center | Help | FAQs | Privacy & Security

RECEIVED

SEP 1 2 2005

OMWBE

00067

https://www.53.com/servlet/efsonline/account-history-loan.html

8/31/2005

# *Universal Life* Annual Report

**KANSAS CITY LIFE**
**INSURANCE COMPANY**

Report Date: 06-15-2005
Policy Date: 06-14-1993

Policy No.: 2554030
Owner: Schlitz Studio Inc
Insured: Dukler,Michelle
6756 Fieldstone Dr
Burr Ridge IL 60527-5298

(504) 723-4885

Female, Age 42
Std Non Tobacco
Special Class Rating

| Agent | Home Office |
|---|---|
| Milton Sogol | PO Box 219139 |
| 6575 N Green Bay Ave | Kansas City, MO |
| Glendale WI 53209 | 64121-9139 |
| (414) 540-0029 | (800) 821-6164 |
| | www.kclife.com |

See information on page 4 regarding changes in non-guaranteed interest rates.

0264-16044

| | | | |
|---|---|---|---|
| Plan Name: | Executive - UL | Premium: | $ 150.00 Quarterly |
| Policy Form: | J118 (WI) | Total Premiums Paid to Date: | $6,950.00 |
| Current Specified Amount: | $70,000.00 | Partial Withdrawals to Date: | $0.00 |
| Current Death Benefit: | $70,000.00 | | |
| Coverage Options: | A-Level Death Benefit | | |

### Summary of Rider/Benefit Information

| Rider Name | Amount of Insurance | Expiration Age Actual/ Illustrated | Insured | Annual Rider Cost of Insurance |
|---|---|---|---|---|

Your Policy Does Not Contain Any Additional Riders Or Benefits

RECEIVED
SEP 1 2 2005
OMWBE

**Summary of Transactions**
*From 06-14-2004 through 06-14-2005*

| | |
|---|---|
| Beginning Accumulated Value: | $4,926.93 |
| + Premium Received: | $600.00 |
| - Expense Charges: | $90.00 |
| - Cost of Insurance: | $242.88 |
| + Interest Credited: | $275.27 |
| - Partial Withdrawals: | $0.00 |
| = Ending Accumulated Value: | $5,469.32 |
| - Surrender Charge: | $784.70 |
| - Ending Loan Balance: | $0.00 |
| = Cash Surrender Value: | |

*Surrender charge decreases to $0 over time*



**Summary of Loan Activity**

| | |
|---|---|
| Beginning Loan Balance: | $0.00 |
| + Additions to Loan: | $0.00 |
| + Interest Charged: | $0.00 |
| - Loan Repayments: | $0.00 |
| = Ending Loan Balance: | $0.00 |

00068

View Account History                                                 Page 1 of 1



 **Fifth Third Bank**    › Contact Us  › Service Center  › Help  › FAQs

| Log Out | Summary | Manage Accounts | Make Payments | Transfer Funds |

▣ Account Balances   ▣ Account Nicknames

**Welcome MICHELLE A DUKLER**        **Account Activity**                 Au

## Accounts

**Account Activity**    Account Summary    Account Statements                Expo

| Account: | | Statement Period: | Check #: | Description Ke |
|---|---|---|---|---|
| PLATINUM PROMO NEW BC / (X3001) | | Current Statement | | |

**Displaying Account Activity for:** PLATINUM PROMO NEW BC XXXXXX3001 - Current Period

| Date | Debit(-) | Credit(+) | Balance | Check | Description |
|---|---|---|---|---|---|
| 08/26/2005 | | | $41,536.27 | | *** DAILY BALANCE *** |
| 08/26/2005 | | $6,751.91 | | | GROVE INC PAYROLL 16959900018019X 082605 |
| 08/19/2005 | | | $34,784.36 | | *** DAILY BALANCE *** |
| 08/19/2005 | | $6,751.91 › | | | GROVE INC PAYROLL 1690280014240X 081905 |
| 08/19/2005 | $14,173.62 | | | | 5/3 COMMRCL LN #090509018900018 PA BILLPAYER 2000 |
| 08/12/2005 | | | $42,206.07 | | *** DAILY BALANCE *** |
| 08/12/2005 | | $6,751.91 | | | GROVE INC PAYROLL 16843500013528X 081205 |
| 08/05/2005 | | | $35,454.16 | | *** DAILY BALANCE *** |
| 08/05/2005 | | $6,751.96 | | | GROVE INC PAYROLL 16786000016537X 080505 |
| 07/29/2005 | | | $28,702.20 | | *** LAST STATEMENT BALANCE *** |

Transactions and other information that appear on this page have occurred since your last statement cycle date. Please selec
statement period to review previous account activity.  |  Disclosure/Error Resolution

Copyright © 2005 Fifth Third Bank. Member FDIC. ⌂ Equal Housing Lender. All Rights Reserved

Contact Us  |  Service Center  |  Help  |  FAQs  |  Privacy & Security

*Personal Account*

**RECEIVED**

SEP 1 2 2005

**OMWBE**                                                        00069

https://www.53.com/servlet/efsonline/account-history.html?TransSortCode=SORT_KEY,...    8/31/2005

View Account History




 **Fifth Third Bank**

▸ Contact Us   ▸ Service Center   ▸ Help   ▸ FAQs

🔒 Log Out | Summary | Manage Accounts | Make Payments | Transfer Funds

▸ Account Balances   ▸ Account Nicknames

Welcome **MICHELLE A DUKLER**             **Account Activity**             Au

## Accounts

**Account Activity**     Account Summary     Account Statements                    Expo

| Account: | | Statement Period: | Check #: | Description Ke |
|---|---|---|---|---|
| PLATINUM PROMO NEW BC / (X2961) | | 1 Statement Prior | | |

**Displaying Account Activity for:** PLATINUM PROMO NEW BC XXXXXX2961 - 1 Statement(s) Prior

| Date | Debit(-) | Credit(+) | Balance | Check | Description |
|---|---|---|---|---|---|
| 07/29/2005 | | | | | **\*\*\*\* ANNUAL PERCENTAGE YIELD EARNED: 0.49% \*\*\*\*** |
| 07/29/2005 | | | $2,531.22 | | **\*\*\*\* DAILY BALANCE \*\*\*\*** |
| 07/29/2005 | | $1.07 | | | INTEREST |

Disclosure/Error Resolution

Copyright © 2005 Fifth Third Bank, Member FDIC, ⌂ Equal Housing Lender, All Rights Reserved

Contact Us | Service Center | Help | FAQs | Privacy & Security

**\*** Joint Account — ½ = 1,256.61

RECEIVED

SEP 1 2 2005

OMWBE

00070

Account Listing

  


## Midwest Bank and Trust Company
A Subsidiary of Midwest Banc Holdings Inc.

Welcome to online banking at Midwest Bank and Trust Company

**Contact**     **Help**     **Exit**

**NetTeller   Bill Payment   Options**
**Main   |   Order Checks**

MIDWEST BANK AND TRUST COMPANY

Online Bill Pay Service makes paying your bills a breeze!
Please contact us for more information regarding this time-
saving service. Our email address is: netteller@midwestbank.
com or call Customer Service at: (708) 865-2500.
THANK YOU FOR BANKING THE MIDWEST WAY!

**Hello MARTIN DUKLERI**

**Account Listing**

| Account | Balance | Status |
|---|---|---|
| CHECKING ▮ | 40,511.76 | |

Select Activity ...

**Customer Summary Information**
1 Deposit accounts with a total balance of 40,511.76
0 Loan accounts with a total balance of 0.00

You last accessed your NetTeller Internet Banking account on Aug 30, 2005 14:58:34
You have visited 29 times since Mar 16, 2004 16:22:37

*※ Joint Account*
*My ½ = $20,255.50*

**RECEIVED**

SEP 1 2 2005

**OMWBE**

00071

https://www.netteller.com/midwestbankandtrust/hbMain.cfm

8/31/2005

# TAB 2

# ATTACHMENT XII

RECEIVED

SEP 1 2 2005

OMWBE

00351

**LEASE AGREEMENT #:**    Dated: 



N E T W O R K I N G

| CUSTOMER NAME | PURCHASE OPTION | MONTHLY PAYMENT* | TOTAL ADVANCE (MO. PAY.)* |
|---|---|---|---|
| The Grove Natural Snacks | FMV | $281.98 | |
| DBA NAME (IF ANY) | EQUIPMENT DESCRIPTION | LEASE TERM | # OF ADVANCE (MO. PAY.) |
| | Kyocera 4035, Print, Scan, Fax | 36 | |
| ADDRESS | EQUIPMENT LOCATION | DOCUMENTATION FEE | SECURITY DEPOSIT (IF ANY) |
| 3 Westhawk Center | Westchester, Il. 60154 | $50.00 | $563.96 |

*Plus applicable taxes to be billed

**DEAR CUSTOMER:** This Lease Agreement (the "Lease") contains the terms of your agreement with us. Please read it carefully and ask us any questions you may have. The words You, Your and Lessee mean you, our customer. The words We, Us, Our and the Lessor, mean CIT Technology Financing Services, Inc.

1. **EQUIPMENT LEASED; TERM, RENT AND FEES:** We agree to lease to you and you agree to lease from us the equipment ("Equipment") identified above. You certify that the Equipment will be used for a business purpose, and not for personal, family or household purposes. You agree to pay the Documentation Fee, the Total Advance and the Security Deposit (if any) when you sign this Lease. All Advances in excess of one month will be applied to the end of the Term. This Lease shall commence on the date that any of the Equipment is delivered to you ("Commencement Date"). Your first Monthly Payment shown above ("Monthly Payment"), is due 30 days from the Commencement Date, and your remaining Monthly Payments shall be due on the same day of each subsequent month until you have paid all the Monthly Payments due under this Lease. You will execute a Certificate Of Acceptance upon receipt of the Equipment, if we provide one to you and if not, you expressly agree that you accepted the Equipment no later than 14 days after it was shipped to you. You agree that this Lease is a net lease which may not be terminated or cancelled; that you have an unconditional obligation to make all payments due under the Lease according to the terms set forth in the Schedule, and that you can not withhold, set off or reduce such payments for any reason. You authorize us to adjust the Monthly Payment by not more than 15% if the actual total cash price for the Equipment differs from the estimated total cash price.
2. **SUPPLY CONTRACT:** If you have entered into any purchase or supply contract ("Supply Contract") with any supplier, you assign to us your rights under such Supply Contract, but none of your obligations (other than the obligation to pay for the Equipment if it is accepted by you). If you have not entered into a Supply Contract, you authorize us to enter into a Supply Contract on your behalf. You will arrange for the delivery of the Equipment to you. Neither the supplier nor any salesperson are our agent. Their statements will not affect your rights or obligations under this Lease.
3. **ASSIGNMENT:** YOU MAY NOT SELL, PLEDGE, TRANSFER, ASSIGN OR SUBLEASE THE EQUIPMENT OR THIS LEASE. We may sell, assign, transfer or grant a security interest in all or any part of this Lease and/or the Equipment without your consent or without notifying you. The new owner will have the same rights that we have, but not our obligations. You agree you will not assert against the new owner any claims, defenses or set-offs that you may have against the supplier.
4. **NO WARRANTIES:** We are leasing the Equipment to you "AS-IS". YOU ACKNOWLEDGE THAT WE DO NOT MANUFACTURE THE EQUIPMENT, WE DO NOT REPRESENT THE MANUFACTURER OR THE SUPPLIER, AND YOU HAVE SELECTED THE EQUIPMENT AND SUPPLIER BASED UPON YOUR OWN JUDGMENT. WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. We transfer to you for the term of this Lease any warranties made by the manufacturer or supplier under a Supply Contract. You agree that you will not assert against us any claim or defense that you have against the supplier.
5. **EQUIPMENT LOCATION; USE AND REPAIR; RETURN:**    We are the owner of the Equipment. You agree to keep the Equipment free from liens and encumbrances. You will keep and use the Equipment only at the address set forth above. You may not move the Equipment without our prior written consent. At your own cost, you will keep the Equipment eligible for any manufacturer's certification, in compliance with all applicable laws and in good condition, except for ordinary wear and tear. You will not make any alterations, additions or replacements to the Equipment without our prior written consent. All permitted alterations, additions and replacements will become our property at no cost to us. We may inspect the Equipment during normal business hours. Unless you purchase the Equipment at the end of this Lease, you will immediately deliver the Equipment to the party and location directed by us in as good condition as when you received it, except for ordinary wear and tear. You will pay all shipping and other expenses, and you will insure the Equipment for its full replacement value during shipping.
6. **TAXES:** You agree to pay when due or reimburse us for all taxes, fines, and penalties relating to the use or ownership of the Equipment or to this Lease, now or hereafter imposed, or assessed by any state, federal or local government or agency. To the extent you are legally permitted to do so, you agree to file all required tax returns and reports concerning the Equipment with all appropriate governmental agencies and, within 45 days after the due date of such filing, to send us evidence of such filing in a form satisfactory to us. *(CONTINUED ON NEXT PAGE – ALL PARTIES AGREE, INCLUDING GUARANTOR(S), THAT THE CORRECT VERSION OF THE NEXT PAGE IS THE FORM ATTACHED TO OUR COPY AND SHALL BE BINDING ON ALL PARTIES)*

**ACCEPTANCE**    **THIS LEASE MAY NOT BE CANCELED**

(LESSEE)    CIT Technology Financing Services, Inc.

By X _____ X Free    By: _____
Authorized Signer    Title:    Date:
Print Name X Michelle Dubee

**FAX EXECUTION:** A fax version of this Lease when received by us shall be binding on you for all purposes as if originally signed. However, the Lease shall only become effective and binding against us when originally signed by us in one of our corporate offices. You agree that the only version of the Lease that is the original for all purposes is the version containing your fax signature and our original signature. If you elect to sign and transmit a Lease by fax, you waive notice of our acceptance of this Lease and receipt of a copy of the originally signed Lease.

**PERSONAL GUARANTY**

When we use the words you and your in this Guaranty, we mean the Guarantor(s) indicated below. When we use the words we, us and our in this Guaranty, we mean CIT Technology Financing Services, Inc. All other terms shall have the same meanings as used in the Lease. You guaranty that the Lessee will make all payments and perform all other obligations under the Lease until completed. Your obligations shall be non cancelable, continuing, direct and unconditional. You waive notice of Lessee's default, acceptance, demand and protest and you consent to any modifications to the Lease and/or release of any obligations. You are not entitled to subrogation. You shall not assign this Guaranty. This Guaranty shall be binding upon your permitted successors and assigns and inure to the benefit of our successors and assigns. If there is more than one Guarantor, your obligations are joint and several. You authorize us or any of our affiliates to obtain credit bureau reports regarding your credit and make other credit inquiries that we determine are necessary. THIS GUARANTY IS GOVERNED BY THE LAWS OF THE STATE OF MASSACHUSETTS. YOU CONSENT TO THE JURISDICTION OF ANY COURT LOCATED WITHIN MASSACHUSETTS. YOU EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY.

Guarantor (Signature) X _____    Guarantor (Signature) _____
    Do not include title    Do not include title
Print Name _____ Date X _____    Print Name _____ Date X _____

RECEIVED

SEP 1 2 2005    00352    (SL040300)

OMWRF

# TAB 3

# ATTACHMENT XV

RECEIVED

SEP 1 2 2005

OMWBE

00379





*Consolidated Financial Statements*

# *THE GROVE, INC. AND SUBSIDIARIES*

*December 31, 2004, 2003 and 2002*

*Together with Independent Auditors' Report*

RECEIVED

SEP 1 2 2005

OMWBE

Financials

00380

 

**THE GROVE, INC.**
**AND SUBSIDIARIES**

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| **Independent Auditors' Report** | 1 |
| **Financial Statements** | |
| Consolidated Balance Sheets | 2 - 3 |
| Consolidated Statements of Income | 4 |
| Consolidated Statements of Changes in Stockholders' Equity (Deficit) | 5 |
| Consolidated Statements of Cash Flows | 6 - 7 |
| Notes to Consolidated Financial Statements | 8 - 18 |

RECEIVED
SEP 1 2 2005
OMWBE

00381







*Certified Public Accountants/Business Consultants*

*An independent member
of AGN International NA*

## INDEPENDENT AUDITORS' REPORT

To the Board of Directors of:

**The Grove, Inc. and Subsidiaries:**

We have audited the accompanying consolidated balance sheets of **The Grove, Inc. and Subsidiaries** as of December 31, 2004 and 2003 and the related consolidated statements of income, changes in stockholders' equity and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. The financial statements of **The Grove, Inc. and Subsidiaries** for the year ended December 31, 2002 were audited by other auditors whose report, dated March 20, 2003, expressed an unqualified opinion on those statements.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the 2004 and 2003 financial statements referred to above present fairly, in all material respects, the financial position of **The Grove, Inc. and Subsidiaries** as of December 31, 2004 and 2003 and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Nykiel, Carlin & Co., LTD.*

NYKIEL, CARLIN & CO, LTD.
Schaumburg, IL

March 30, 2005

RECEIVED

SEP 1 2 2005

OMWBE

00382




**THE GROVE, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**DECEMBER 31, 2004, 2003 AND 2002**

## ASSETS

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| **CURRENT ASSETS** | | | |
| Cash and cash equivalents | $ 608,550 | $ 115,190 | $ 404,738 |
| Receivables | 143,686 | 114,784 | 84,079 |
| Inventory | 368,354 | 335,968 | 329,671 |
| Prepaid expenses | 495,090 | 240,947 | 219,491 |
| Deferred income taxes | 395,400 | 52,000 | - |
| Total Current Assets | 2,011,080 | 858,889 | 1,037,979 |
| **PROPERTY AND EQUIPMENT** | | | |
| Furniture, fixtures and equipment | 2,655,510 | 2,614,460 | 2,667,631 |
| Computer equipment | 293,243 | 302,579 | 246,406 |
| Leasehold improvements | 5,916,726 | 4,975,837 | 4,882,829 |
| Machinery and equipment | 1,770,588 | 1,675,986 | 1,235,905 |
| Construction in process | 215,923 | 897,504 | 299,215 |
|  | 10,851,990 | 10,466,366 | 9,331,986 |
| Less - accumulated depreciation and amortization | 6,701,799 | 6,247,951 | 5,934,685 |
| Net Property and Equipment | 4,150,191 | 4,218,415 | 3,397,301 |
| **OTHER ASSETS** | | | |
| Intangible assets, net | 117,965 | 129,193 | 121,404 |
| Goodwill, net | 515,812 | 515,812 | 515,812 |
| Deferred income taxes | 13,100 | 528,500 | 627,000 |
| Other assets | 150,469 | 164,590 | 159,445 |
| Total Other Assets | 797,346 | 1,338,095 | 1,423,661 |
|  | $ 6,958,617 | $ 6,415,399 | $ 5,858,941 |

**RECEIVED**

SEP 1 2 2005

**OMWBE**

The accompanying notes to consolidated financial statements
are an integral part of these Balance Sheets.

- 2 -

00383




**THE GROVE, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**DECEMBER 31, 2004, 2003 AND 2002**

### LIABILITIES AND STOCKHOLDERS' EQUITY

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| **CURRENT LIABILITIES** | | | |
| Accounts payable and accrued expenses | $ 1,132,016 | $ 1,771,406 | $ 1,105,376 |
| Account payable - former stockholders | 466,861 | 371,358 | 313,604 |
| Notes payable - bank | - | 100,000 | 48,067 |
| Current maturities of long-term debt | 342,983 | 518,911 | 416,992 |
| Total Current Liabilities | 1,941,860 | 2,761,675 | 1,884,039 |
| **LONG-TERM LIABILITIES** | | | |
| Long-term debt, net of current maturities | 2,037,823 | 630,807 | 728,433 |
| **MINORITY INTEREST** | 268,880 | 202,545 | 130,199 |
| **STOCKHOLDERS' EQUITY** | | | |
| Common stock, no par value, 100 shares authorized and issued | 2,000 | 2,000 | 2,000 |
| Additional paid-in capital | 6,819,529 | 6,819,529 | 6,819,529 |
| Treasury stock, 28.5 shares | (3,557,501) | (3,090,640) | (2,719,282) |
| Retained earnings (deficit) | (553,974) | (910,517) | (963,507) |
| Accumulated other comprehensive income (loss) | - | - | (22,470) |
| Total Stockholders' Equity | 2,710,054 | 2,820,372 | 3,116,270 |
|  | $ 6,958,617 | $ 6,415,399 | $ 5,858,941 |

RECEIVED

SEP 1 2 2005

OMWBE

The accompanying notes to consolidated financial statements
are an integral part of these Balance Sheets.

- 3 -

00384



**THE GROVE, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2003 AND 2002**

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| **REVENUES** | $ 19,331,602 | $ 17,797,315 | $ 16,597,084 |
| **COST OF GOODS SOLD** | 4,968,737 | 4,758,769 | 4,366,346 |
| **GROSS PROFIT** | 14,362,865 | 13,038,546 | 12,230,738 |
| **OPERATING COSTS AND EXPENSES** |  |  |  |
| Payroll and other employee benefits | 7,044,566 | 6,405,175 | 5,923,333 |
| Occupancy | 4,414,589 | 4,007,600 | 3,768,556 |
| General and administrative expenses | 1,027,758 | 956,663 | 863,930 |
| Depreciation and amortization | 1,183,375 | 1,311,270 | 1,369,874 |
| Total Operating Costs and Expenses | 13,670,288 | 12,680,708 | 11,925,693 |
| **INCOME FROM OPERATIONS** | 692,577 | 357,838 | 305,045 |
| **OTHER INCOME (EXPENSE)** |  |  |  |
| Interest expense | (117,345) | (93,347) | (108,691) |
| Other income (loss), net | 94,646 | (34,185) | (193,073) |
| Total Other Income (Expense), net | (22,699) | (127,532) | (301,764) |
| **INCOME BEFORE PROVISION FOR INCOME TAXES** | 669,878 | 230,306 | 3,281 |
| Provision for income taxes | 172,000 | 46,500 | 33,000 |
| **INCOME (LOSS) BEFORE MINORITY INTEREST IN INCOME OF SUBSIDIARIES** | 497,878 | 183,806 | (29,719) |
| **MINORITY INTEREST IN INCOME OF SUBSIDIARIES** | 141,335 | 108,346 | 89,952 |
| **NET INCOME (LOSS)** | $ 356,543 | $ 75,460 | $ (119,671) |

RECEIVED

SEP 1 2 2005

OMWBE

The accompanying notes to consolidated financial statements
are an integral part of these statements.

- 4 -

00385

 

**THE GROVE, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2003 AND 2002**

| | Common Stock | Additional Paid-in Capital | Treasury Stock | Retained Earnings (Deficit) | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|---|
| **BALANCE AT JANUARY 1, 2002** | $ 2,000 | $ 6,819,529 | $ (2,405,678) | $ (843,836) | $ (25,560) |
| Net loss | - | - | - | (119,671) | - |
| Foreign currency translation adjustment | - | - | - | - | 3,090 |
| Purchase of treasury stock | - | - | (313,604) | - | - |
| **BALANCE AT DECEMBER 31, 2002** | 2,000 | 6,819,529 | (2,719,282) | (963,507) | (22,470) |
| Net income | - | - | - | 75,460 | - |
| Realized other comprehensive loss | - | - | - | (22,470) | 22,470 |
| Purchase of treasury stock | - | - | (371,358) | - | - |
| **BALANCE AT DECEMBER 31, 2003** | 2,000 | 6,819,529 | (3,090,640) | (910,517) | - |
| Net income | - | - | - | 356,543 | - |
| Purchase of treasury stock | - | - | (466,861) | - | - |
| **BALANCE AT DECEMBER 31, 2004** | $ 2,000 | $ 6,819,529 | $ (3,557,501) | $ (553,974) | $ - |

RECEIVED

SEP 1 2 2005

OMWBE

The accompanying notes to consolidated financial statements
are an integral part of these statements.

- 5 -

00386



**THE GROVE, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2003 AND 2002**

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net income (loss) | $ 356,543 | $ 75,460 | $ (119,671) |
| Adjustments to reconcile net income (loss) to net | | | |
| cash provided by operating activities: | | | |
| Depreciation and amortization | 1,183,375 | 1,311,270 | 1,369,874 |
| Minority interest in income of subsidiaries | 141,335 | 108,346 | 89,952 |
| Provision for bad debts | 4,673 | 2,021 | 7,607 |
| Deferred income taxes | 172,000 | 46,500 | 33,000 |
| Loss on dispositions of property and equipment | 27,769 | 111,703 | 262,651 |
| Changes in operating assets and liabilities: | | | |
| (Increase) decrease in assets - | | | |
| Receivables | (33,575) | (32,726) | 21,151 |
| Inventory | (32,386) | (6,297) | 40,363 |
| Prepaid expenses | (254,143) | (21,456) | (91,242) |
| Increase (decrease) in liabilities - | | | |
| Accounts payable and accrued expenses | (639,390) | 666,030 | 109,113 |
| Income taxes payable | - | - | (7,127) |
| Net Cash Provided By Operating Activities | 926,201 | 2,260,851 | 1,715,671 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Cash paid for property and equipment | (1,129,320) | (2,200,285) | (594,614) |
| Proceeds from dispositions of property and equipment | 14,092 | 2,325 | 14,115 |
| Increase in intangible assets | (16,464) | (53,916) | - |
| Decrease (increase) in other assets | 14,121 | (5,145) | 72,925 |
| Net Cash Used In Investing Activities | (1,117,571) | (2,257,021) | (507,574) |

**RECEIVED**

**SEP 1 2 2005**

**OMWBE**

The accompanying notes to consolidated financial statements
are an integral part of these statements.

- 6 -

00387



**THE GROVE, INC. AND SUBSIDIARIE**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2004, 2003 AND 2002**

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| **CASH FLOWS FROM FINANCING ACTIVITIES** |  |  |  |
| Advances from (repayments of) line of credit, net | (100,000) | 51,933 | (90,179) |
| Repayments of long-term debt | (518,912) | (416,991) | (1,063,799) |
| Proceeds from long-term debt | 1,750,000 | 421,285 | 154,361 |
| Minority interest distributions | (75,000) | (36,000) | (26,827) |
| Payments to former stockholders | (371,358) | (313,605) | (470,149) |
| Net Cash Provided By (Used In) Financing Activities | 684,730 | (293,378) | (1,496,593) |
| **EFFECT OF EXCHANGE RATE CHANGES ON CASH** | - | - | 1,194 |
| **NET INCREASE (DECREASE) IN CASH** | 493,360 | (289,548) | (287,302) |
| **CASH AND CASH EQUIVALENTS BEGINNING OF YEAR** | 115,190 | 404,738 | 692,040 |
| **CASH AND CASH EQUIVALENTS END OF YEAR** | $  608,550 | $  115,190 | $  404,738 |

**SUPPLEMENTAL SCHEDULE OF CASH FLOW ACTIVITY**

| | | | |
|---|---|---|---|
| Interest paid | $  115,552 | $  93,347 | $  123,209 |

RECEIVED

SEP 1 2 2005

OMWBE

The accompanying notes to consolidated financial statements
are an integral part of these statements.

- 7 -

00388

 

**THE GROVE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004, 2003 AND 2002**

1.     **Operations**

    The Grove, Inc. and Subsidiaries (the Company) is primarily engaged in retail sales of snack foods under the trade name of "The Grove." At December 31, 2004, the Company operates 60 units at airports throughout the United States. The units range from freestanding carts to full in-line stores. The fifteen active airports at December 31, 2004 are as follows: Atlanta, Boston, Chicago, Cincinnati, Dallas-Fort Worth, Dulles, Houston, Jacksonville, John F. Kennedy, La Guardia, New Orleans, Newark, Orlando, Salt Lake City, and Seattle. In addition, the Company operates one unit in a train station.

2.     **Summary of significant accounting policies**

    **Principles of consolidation**

    The consolidated financial statements include the accounts of The Grove, Inc. and the following investments: Natural Energy Unlimited of Chicago (70% partnership interest), Natural Energy Unlimited of Philadelphia (90% partnership interest, 100% as of July 1, 2002), and a fully-owned interest in The Grove (Canada) Inc. Intercompany transactions and accounts have been eliminated. During 2002, the units in Philadelphia were closed and the partnership was terminated. Also during 2002, the units in Canada were closed. The Canadian corporation is currently inactive.

    **Use of Estimates**

    The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

    **Cash and cash equivalents**

    All cash-related items maturing three months or less from the date of acquisition are classified as cash in the accompanying consolidated financial statements. Restricted cash is not included as a cash equivalent but is included with other assets.

    **Concentration of credit risk**

    At certain times during the years, the Company had funds deposited at a financial institution which exceeded the amount federally insured.

RECEIVED

SEP 1 2 2005

OMWBE

00389

 

**THE GROVE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004, 2003 AND 2002**

2.    **Summary of significant accounting policies (continued)**

**Accounts Receivable**

The Company records receivables at outstanding principal amounts adjusted for charge-offs and an allowance for doubtful accounts. The Company grants credit to airlines in the form of vouchers that are given to the airline customers. When the vouchers are redeemed by the airline customers at the stores, the receivable is established. Other receivables include advances to employees, and rebates from vendors. No interest is charged on receivables that are in arrears. The Company provides an allowance for doubtful collections based on a review of outstanding receivables, historical collections, economic conditions, and the economic condition of the airline. Delinquency status is based on the age of the account. Accounts are charged off when deemed uncollectible, and recoveries are recorded when recovered. Based on management's review of accounts receivable, an allowance for doubtful collections of $7,148, $5,440 and $7,607 has been provided at December 31, 2004, 2003 and 2002 respectively.

**Inventory**

Inventory, consisting of nuts, candy, yogurt, coffee and other food and supply items, is carried at the lower of cost determined on the first-in, first-out basis (FIFO) or market.

**Property and Equipment**

Property and equipment are stated at cost, less an allowance for depreciation. Additions, improvements, and betterments to property and equipment are capitalized. Expenditures for maintenance and repairs are charged to expense as incurred. When property and equipment are removed from service the resulting gain or loss is credited to or charged against income.

Depreciation is provided in amounts sufficient to allocate the cost of depreciable assets to operations over their estimated service lives using accelerated and straight-line depreciation methods. Leasehold improvements are amortized over the life of the lease. The estimated useful lives used in computing depreciation are as follows:

| | |
|---|---|
| Furniture and fixtures | 5-7 years |
| Information systems | 5 years |
| Leasehold improvements | Life of lease |
| Machinery and equipment | 5-7 years |

RECEIVED

SEP 1 2 2005

OMWBE

- 9 -

 

**THE GROVE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004, 2003 AND 2002**

2.    **Summary of significant accounting policies (continued)**

**Goodwill and Intangible Assets**

Goodwill represents the excess of cost over fair value of net assets acquired through acquisitions. Prior to January 1, 2002 goodwill was being amortized over its estimated economic life on a straight-line basis. Effective January 1, 2002 amortization of goodwill ceased in accordance with FASB No. 142 Goodwill and Other Intangible Assets. Presently, the Company evaluates the goodwill on an annual basis for potential impairment.

Intangible assets consist of the value of purchased leases that are being amortized over the lives of the leases and franchise agreements which are being amortized over the lives of the agreements.

**Revenue Recognition**

Revenue is recognized at the point of sale.

**Income Taxes**

The Company follows FASB Statement No. 109, Accounting for Income Taxes, which requires an asset and liability approach to financial accounting and reporting for income taxes. Deferred income tax assets and liabilities are computed annually for temporary differences between the financial statement and tax bases of assets and liabilities that will result in taxable or deductible amounts in the future based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred tax assets to the amount expected to be realized. Income tax expense is the tax payable or refundable for the period plus or minus the change during the period in deferred tax assets and liabilities.

**Advertising**

The Company expenses the production costs of advertising the first time the advertising takes place. Certain advertising expenses are required under contracts with the airports or the airport concession organizations. Advertising expense was $118,842, $104,287, and $72,657 for the years ended December 31, 2004, 2003 and 2002, respectively.

**Reclassifications**

Certain 2002 amounts have been reclassified to conform with 2003 and 2004 classifications. These classifications had no effect on reported net income or loss.

RECEIVED

SEP 1 2 2005

OMWBE

- 10 -

00391

 

**THE GROVE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004, 2003 AND 2002**

3.    **Goodwill and Intangibles**

Intangibles consist of the following at December 31, 2004, 2003 and 2002:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Leasehold interests and other | $  249,256 | $  266,154 | $  244,550 |
| Less - accumulated amortization | (131,291) | (136,961) | (123,146) |
|  | $  117,965 | $  129,193 | $  121,404 |

Amortization for the year ended December 31, 2004 was $27,692.

Estimated future amortization is as follows:

| | |
|---|---|
| 2005 | $    29,116 |
| 2006 | 24,384 |
| 2007 | 15,543 |
| 2008 | 8,792 |
| 2009 | 8,255 |
| Thereafter | 31,875 |
| | $  117,965 |

During the years ended December 31, 2004, 2003 and 2002, the Company has reviewed the goodwill for possible impairment under the provisions of FASB No. 142, and has determined that no impairment adjustment is necessary. In years prior to 2002 the Company had amortized the goodwill. Accumulated amortization of goodwill is $365,268.

4.    **Restricted Cash**

The Company has certificates of deposit totaling $67,000 at December 31, 2004, 2003 and 2002 and $6,000 of cash deposits at December 31, 2004 and $11,000 of cash deposits at December 31, 2003 and 2002 that are held by Banks as collateral against various letters of credit, all of which are reported in the accompanying financial statements as other assets.

RECEIVED
SEP 1 2 2005
OMWBE

00392



**THE GROVE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004, 2003 AND 2002**

5. **Long-Term Debt**

Long-term debt consists of the following at December 31, 2004, 2003 and 2002:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Installment notes payable to former partners, payable in monthly installments of $2,650. Final maturity in December 2003. | $ - | $ - | $ 28,180 |
| Notes payable to bank on $2,500,000 Loan and Security Agreement bearing variable interest at lender's prime rate minus .50% (4.75% at December 31, 2004), due February 17, 2006. Loan advances may be converted into term loans to be amortized in monthly installments over a period of not more than five years. | 1,750,000 | - | - |
| Notes payable to stockholders, variable interest at Wall Street Journal Prime plus 2% (7.00% at December 31, 2004), adjusted monthly, with a final payment of $199,073 in May 2005. (Debt previously due on demand, renegotiated in 2002). | 199,072 | 574,073 | 874,073 |
| Notes payable on $1,000,000 revolving credit agreement with a stockholder, bearing variable interest at Wall Street Journal Prime, maturing December 31, 2005. The remaining outstanding balance was paid during 2003. | - | - | 88,811 |
| Notes payable on $600,000 credit agreement with an affiliate of a stockholder, bearing monthly interest at 8%, payable in 16 quarterly installments of approximately $35,977 plus interest beginning January 1, 2004, collateralized by point-of-sale hardware and software. | 431,734 | 575,645 | 154,361 |
| Total long-term debt | 2,380,806 | 1,149,718 | 1,145,425 |
| Less current maturities | 342,983 | 518,911 | 416,992 |
| | $ 2,037,823 | $ 630,807 | $ 728,433 |

RECEIVED

SEP 1 2 2005

OMWBE

- 12 -

00393

 

**THE GROVE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004, 2003 AND 2002**

**5.    Long-Term Debt (continued)**

Maturities of long-term at December 31, 2004 are as follows:

| | |
|---|---:|
| 2005 | $   342,983 |
| 2006 | 1,893,912 |
| 2007 | 143,911 |
| | $ 2,380,806 |

The notes payable to bank on the $2,500,000 Loan and Security Agreement are secured by substantially all assets of the Company and guaranteed by a stockholder of the Company. The notes payable are subject to certain financial covenants all of which the Company was in compliance with at December 31, 2004.

**6.    Notes Payable - Bank**

The Company was indebted on the following short-term notes payable at December 31, 2004, 2003 and 2002:

| Creditor | Collateral | 2004 | 2003 | 2002 |
|---|---|---|---|---|
| Bank One | Accounts, chattel paper, general intangibles, instruments, inventory, and certain equipment. | $          - | $ 100,000 | $          - |
| Bank of Louisiana | $100,000 certificate of deposit (included in cash and cash equivalents), and personal guarantees of certain stockholders | $          - | $          - | $ 48,067 |

Effective February 2004, the Company has an agreement with a bank for a $500,000 (before its reduction related to the outstanding letters of credit) revolving line of credit with interest payable monthly at the bank's prime rate (5.25% at December 31, 2004). The line of credit is secured by substantially all the assets of the Company and guaranteed by a stockholder of the Comapny. The revolving line of credit matures February 17, 2006 and was unused at December 31, 2004. The Company has outstanding letters of credit with the bank totaling $315,500 at December 31, 2004.

The note due to Bank One represented draws made on a $600,000 line of credit with interest payable monthly at the bank's prime rate (4% at December 31, 2003). This line of credit was terminated by the Company in February, 2004. The note due to the Bank of Louisiana represented draws made on a $300,000 line of credit that expired in July, 2003.

RECEIVED

SEP 1 2 2005

OMWBE

- 13 -

 

**THE GROVE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004, 2003 AND 2002**

7.  **Contractual obligations – construction in process**

At December 31, 2004, the Company had contractual obligations to purchase equipment and improvements amounting to approximately $462,000.

8.  **Lease Commitments and Rent Expense**

The Company primarily leases space for its concession units, storage, and store offices, from airports or subleases through an airport concession organization. These leases contain clauses for rent based on fixed rates, percentage of sales, or square footage. Some leases have expired and are continuing on a month-to-month basis. The remaining leases expire through December, 2014. Airport rentals (including contingent and percentage rents) for the years ended December 31, 2004, 2003 and 2002 were $3,110,916, $2,847,085, and $2,689,673 respectively and are included as occupancy expenses in the consolidated statement of operations. Separation of the contingent and percentage rents was impracticable.

The Company rents office space in New Orleans, Louisiana and Westchester, Illinois. Rent expense was $227,533, $213,328, and $259,199 for the years ended December 31, 2004, 2003 and 2002, respectively, and is included in general and administrative expenses in the consolidated statement of operations.

The Company has subleased a portion of the Westchester offices to another company under a noncancellable agreement which expires on December 31, 2008, and requires rentals of $86,263 in 2005.

Future minimum lease payments are as follows:

| | |
|---|---|
| 2005 | $ 1,318,278 |
| 2006 | 1,125,974 |
| 2007 | 1,062,077 |
| 2008 | 972,953 |
| 2009 | 480,822 |
| Thereafter | 540,190 |
| | $ 5,500,294 |

The preceding minimum rental commitment amounts have not been reduced by the minimum rentals totaling $362,499 which are to be received in the future under the sublease mentioned in the above paragraph.

RECEIVED

SEP 1 2 2005

OMWBE

- 14 -

00395

 

**THE GROVE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004, 2003 AND 2002**

**9.     Treasury Stock and Commitment**

During the year ended December 31, 1999, the Company purchased 28.5 shares of common stock from its stockholders. The stock was purchased for notes of $1,200,000 plus certain future contingent payments. The final contingent payment aggregating $425,000 is payable in an annual installment for fiscal year 2005 based on an adjusted earnings before interest, tax and depreciation targets of $1,536,375. Contingent payments of $466,861, $371,358, and $313,604 were required for the years ended December 31, 2004, 2003 and 2002 respectively.

**10.     Income Taxes**

The net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes are reflected in deferred income taxes.

The net current deferred tax benefit in the accompanying balance sheets includes the following amounts as of December 31, 2004, 2003 and 2002:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Deferred income tax assets: |  |  |  |
| Accrued bonuses and vacation | $ 71,000 | $ 42,300 | $         - |
| Net operating loss carryforwards | 315,000 | - | - |
| Other | 9,400 | 9,700 | - |
| Current deferred income tax assets | $ 395,400 | $ 52,000 | $         - |

The net noncurrent deferred tax asset (net of valuation allowance) in the accompanying balance sheets includes the following amounts as of December 31, 2004, 2003 and 2002:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Deferred income tax assets: |  |  |  |
| Depreciation | $ 94,000 | $ 70,000 | $ 108,000 |
| Net operating loss carryforwards | 253,000 | 802,000 | 829,000 |
| Deferred income tax liabilities: |  |  |  |
| Intangible assets | (112,000) | (105,000) | (97,000) |
| Other | (12,900) | (29,500) | (4,000) |
|  | 222,100 | 737,500 | 836,000 |
| Valuation allowance | (209,000) | (209,000) | (209,000) |
| Net noncurrent deferred income tax assets | $ 13,100 | $ 528,500 | $ 627,000 |

RECEIVED

SEP 1 2 2005

OMWBE

- 15 -

00396

 

**THE GROVE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004, 2003 AND 2002**

### 10.  Income Taxes (continued)

The Company has a valuation allowance for deferred tax assets arising from foreign operating loss carry-forwards for which the company believes it is more likely than not that the operating loss carry-forwards will not be realized. The valuation allowance for deferred tax assets as of December 31, 2004, 2003 and 2002 was $209,000. The net change in the total valuation allowance for the year ended December 31, 2002 was $72,000. There was no change in the total valuation allowance in 2003 and 2004.

As of December 31, 2004, the Company has available for income tax purposes approximately $946,000 of federal operating losses, $1,507,000 of various state operating losses and $498,000 of Canadian operating losses. Federal loss carry-forwards begin to expire in 2019. Canadian operating loss carry-forwards begin to expire in 2007.

The provision for (benefit from) income taxes consists of the following for the years ended December 31, 2004, 2003 and 2002:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Current |  |  |  |
| Federal | $           - | $           - | $           - |
| State |           - |           - |           - |
|  |           - |           - |           - |
| Deferred |  |  |  |
| Federal | 146,500 | 39,500 | 28,000 |
| State | 25,500 | 7,000 | 5,000 |
|  | $ 172,000 | $ 46,500 | $ 33,000 |

The federal and state tax provisions differ from the expected tax expense computed by applying the statutory federal corporate tax rate of 34% to income before the provision for income taxes. This difference is due to state income taxes, permanent differences between pre-tax book income and taxable income, minority interest's share of the income being taxed at the partner level and the graduated federal income tax schedule. Permanent differences are primarily limitations on the deductions for meal and entertainment expenses.

### 11.  Pension

Effective May 1, 2000, the Company adopted a qualified profit sharing plan with a 401(k) deferred compensation provision. All employees are eligible to participate in the Company's profit sharing plan and 401(k) plan as long as they are 21 years of age and have completed one year of employment and at least 1000 hours of service.

The Company's contribution is discretionary and is determined by its Board of Directors on an annual basis. The Company made contributions of $38,215, $35,142, and $35,173 for the years ending December 31, 2004, 2003 and 2002 respectively.

RECEIVED

SEP 1 2 2005

OMWBE

- 16 -

00397



**THE GROVE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004, 2003 AND 2002**

**12.    Related Party Transactions**

The Company purchased approximately 48% of products for resale in 2002 from an affiliated company which is 50% owned by former officers and former stockholders of The Grove, Inc. At December 31, 2002, the Company owed approximately $131,000 to this vendor which is included in accounts payable and accrued expenses. This arrangement was discontinued in early 2003.

"The Grove" trademark is owned by the majority stockholder of the Company. During the years ended December 31, 2004, 2003, and 2002, the Company expensed approximately $279,000, $267,000, and $244,000, respectively, in license fees for the use of this trademark.

The Company leased office space in New Orleans, Louisiana on a month-to-month basis from a company owned by a stockholder. This lease ended March 1, 2004.

See Note 9 for treasury stock transaction.

**13.    Non-Cash Investing and Financing Transactions**

For 2004, 2003 and 2002 additional payments for treasury stock were recorded as accounts payable to former stockholders for $466,861, $371,358, and $313,604 respectively.

During 2002 the Company purchased the 10% minority interest in the Natural Energy Unlimited of Philadelphia partnership. See Note 15.

**14.    Stockholders agreement**

In February, 2004 the Company and its stockholders entered into a stockholders agreement. A provision in the stockholder agreement provides for the payment of a management and directors fee payable in monthly installments of $6,667 to the sole director of the Board of Directors. The agreement restricts the transfer of stock to certain permitted transferees that would be bound to the terms and conditions of the stockholders agreement.

RECEIVED

SEP 1 2 2005

OMWBE

00398

 

**THE GROVE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2004, 2003 AND 2002**

**15.    Purchase of Minority Interests**

In 2002, the Company purchased the 10% partnership interest in Natural Energy Unlimited of Philadelphia from the minority partner following a capital call. The purchase method was used to account for the acquisition and the purchase price was allocated as follows:

| | |
|---|---|
| Property and equipment | $    7,867 |
| Goodwill (expected to be fully deductible for tax) | 70,795 |
| | $   78,662 |

The partnership was dissolved and the operation was subsequently included as a department.

The accompanying 2002 financial statements include the operations of the partnership since the beginning of the year; however, the minority share of earnings or losses prior to the purchase are attributed to the minority interest.

**16.    Unit Closures**

In February 2002 the Company closed its Canadian operation and terminated its lease for its remaining Canadian stores. The loss on disposal of the Canadian assets was $95,272. In July 2002 the Company terminated its lease for its Philadelphia locations. The loss on disposal of the Philadelphia assets was $169,878. In December 2003, the lease expired for the Company's Tulsa locations. The loss on the disposal of the Tulsa assets was $18,638. Also in December 2003, the Company and its landlord in Oklahoma City agreed to an early lease termination. The loss on disposal of the Oklahoma City assets was $9,481.  These losses are included in Other Income (Loss) on the Consolidated Statement of Operations. The revenues related to these operations were not significant during the years in operation.

RECEIVED

SEP 1 2 2005

OMWBE

00399



## The Grove, Inc.
## Income Statements
## For the years ended 1999-2004

| | 1999 The Grove Consolidated Income | 2000 The Grove Consolidated Income | 2001 The Grove Consolidated Income | 2002 The Grove Consolidated Income | 2003 The Grove Consolidated Income | 2004 The Grove Consolidated Income |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Sales | 12,519,871.68 | 16,751,561.36 | 16,560,757.97 | 16,597,084.64 | 17,797,314.91 | 19,331,601.90 |
| Other Revenues (Admin Fee,) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Revenue | 12,519,871.68 | 16,751,561.36 | 16,560,757.97 | 16,597,084.64 | 17,797,314.91 | 19,331,601.90 |
| Cost of Sales | 3,773,332.78 | 4,706,663.02 | 4,390,176.44 | 4,366,346.17 | 4,758,768.31 | 4,968,727.93 |
| Gross Profit | 8,746,538.90 | 12,044,898.34 | 12,170,581.53 | 13,230,738.47 | 13,038,546.60 | 14,362,873.97 |
| **Direct Expense** | | | | | | |
| Payroll | 4,009,209.99 | 5,314,242.28 | 5,396,980.76 | 5,161,463.96 | 5,565,503.16 | 6,203,599.01 |
| Payroll Expenses | 481,973.32 | 649,038.33 | 663,225.88 | 761,868.82 | 839,671.90 | 840,968.58 |
| Controlled Expenses | 986,175.72 | 1,461,265.93 | 1,302,476.03 | 863,930.50 | 956,665.05 | 1,022,762.46 |
| Occupancy Expenses | 3,241,764.37 | 3,846,310.56 | 3,814,264.48 | 3,768,556.03 | 4,007,599.66 | 4,414,589.82 |
| Depreciation | 1,084,408.16 | 1,487,282.38 | 1,549,422.58 | 1,369,873.90 | 1,311,270.15 | 1,183,379.43 |
| Direct Expense | 9,804,131.56 | 12,758,139.48 | 12,726,369.73 | 11,925,693.21 | 12,680,708.91 | 13,670,299.32 |
| Operating Margin | (1,057,592.66) | (713,241.14) | (555,788.20) | 305,045.26 | 357,838.49 | 692,574.65 |
| **Other Operating Expense/(Revenue)** | | | | | | |
| Partnership (Profit)/Loss | 0.00 | 0.00 | (0.00) | 0.00 | 0.00 | 0.00 |
| Interest Expense | 130,818.50 | 294,189.91 | 183,865.29 | 108,691.12 | 93,346.79 | 117,345.28 |
| Loss on Disposal of Assets | 16,699.00 | 0.00 | 59,213.94 | 262,590.75 | 111,703.38 | 27,767.14 |
| Other (Revenue) Expense | (50,448.95) | (46,525.51) | (64,703.21) | (77,517.92) | (77,517.82) | (122,415.83) |
| Other Operating Expense | 97,068.95 | 247,664.40 | 178,376.01 | 301,764.27 | 127,532.35 | 22,696.59 |
| Net Before Income Tax | (1,154,661.21) | (960,905.54) | (734,164.21) | 3,280.99 | 230,306.14 | 669,878.06 |
| Provision for Income Tax | (400,958.00) | (275,000.00) | (175,000.00) | 33,000.00 | 46,500.00 | 172,000.00 |
| Net After Tax | (753,703.21) | (685,905.54) | (559,164.21) | (29,719.01) | 183,806.14 | 497,878.06 |
| Minority Interest in Net Income | (10,575.42) | (21,778.91) | 34,026.14 | 89,952.20 | 108,346.44 | 141,334.73 |
| Net Income after Minority Interest | (743,127.79) | (664,126.63) | (593,190.35) | (119,671.21) | 75,459.70 | 356,543.33 |
| EBITDA (before minority interest) | 77,264.45 | 820,566.75 | 1,058,337.59 | 1,744,496.76 | 1,746,626.46 | 1,988,369.91 |
| EBITDA percent to sales | 0.62% | 4.90% | 6.39% | 10.51% | 9.81% | 10.34% |

RECEIVED

SEP 1 2 2005

OMWBE

INCOME

# TAB 4

# ATTACHMENT XVII

RECEIVED

SEP 1 2 2005

OMWBE

00405

| The Grove, Inc. DBE/MBE Certifications Effective 08-18-05 | |
|---|---|
| **Certifying Agency/City** | **Application Status** |
| State of Georgia-ATL | Certified |
| MASSPORT-BOS | Certified |
| Kenton County A/P -CVG | Certified |
| North Central TX -DAL | Certified |
| Port Authority NY-NJ-EWR | Certified |
| Metro Wash A/P Auth-IAD | Certified |
| City of Houston-IAH | Certified |
| Jacksonville Port Auth-JAX | Certified |
| Port Authority NY-NJ-JFK | Certified |
| Port Authority NY-NJ-LGA | Certified |
| Met Airports Comm-MINN | Certified |
| New Orleans Aviation Board-MSY | Certified |
| City of Chicago-ORD | Certified |
| Orlando-ORL | Certified |
| Richmond-RIC | Applying |
| Salt Lake City-SLC | Certified |
| Seattle | Applying |
| St. Louis | Certified |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

RECEIVED

SEP 1 2 2005

JMWBE

00406

## Section 1 - Item B - Prior/Other Applications and Priviliges

| Date | State | Certifying Agency | Explanation |
|---|---|---|---|
| 6/11/2004 | IL | City of Chicago Department of Procurement Services | City of Chicago denied certification on August 13, 2004. The Grove appealed this decision to The Department of Transportation on October 28, 2004. On June 2, 2005, the DOT overturned the City of Chicago's decision and mandated the City of Chicago to re-establish our certification. On July 1, 2005, the City of Chicago issued The Grove, Inc. a DBE Certification. |
| 8/25/2004 | WA | Office of Minority and Women's Business Enterprises | The Grove, Inc. withdrew its application due to the denial set forth by the City of Chicago. All of our certifications in progress at the time of this denial by the City of Chicago were suspended until a decision was to be rendered by the Department of Transportation as a result of The Grove's appeal. We were advised by the OMWBE office to withdraw our application until that DOT appeal decision was made and then initiate a fresh application. |
| 6/20/2005 | TX | South Central Texas Regional Certification Agency | The Grove, Inc. requested to have its status withdrawn. We no longer had a presence in Austin, TX nor any plans for future business there. |
| 8/3/2005 | MI | Wayne County Human Relations | The Grove, Inc. requested to have its status withdrawn. We no longer had a presence in Detroit, MI nor any plans for future business there. |

RECEIVED

SEP 1 2 2005

OMWBE

00407

# TAB 5



August 2, 2005

Michelle Dukler
**The Grove, Inc.**
3 Westbrook Corporate Center, Suite 500
Westchester, IL 60154

**City of Chicago**
**Richard M. Daley, Mayor**

**Department of**
**Procurement Services**

Mary A. Dempsey
Interim Chief Procurement Officer

City Hall, Room 403
121 North LaSalle Street
Chicago, Illinois 60602
(312) 744-4900
(312) 744-2949 (TTY)
http://www.cityofchicago.org/

## 5th Anniversary Certification:
## Annual Certificate Expires:         July 1, 2006

Dear Ms. Dukler:

We are pleased to inform you that **The Grove, Inc.** has been certified as an **DBE** by the City of Chicago. This **DBE** certification is valid until **July 1, 2006**; however your firm must be re-validated annually.

As a condition of continued certification during this five-year period, you must file a new DBE application within 60 days prior to the date of expiration. You must also notify the City of Chicago of any changes in ownership or control of your firm or any other matters or facts affecting your firm's eligibility for certification.

The City may commence actions to remove your firm's eligibility if you fail to notify us of any changes of facts affecting your firm's certification or if your firm otherwise fails to cooperate with the City in any inquiry or investigation. Removal of eligibility procedures may also be commenced if your firm is found to be involved in bidding or contractual irregularities.

Your firm's name will be listed in the Illinois Unified Certification Program (ILUCP) Directory of Disadvantaged Business Enterprises in the specialty area(s) of:

### Retail Food; Snacks

Your firm's participation on City contracts will be credited only toward **DBE** goals in your area(s) of specialty. While your participation on City contracts is not limited to your specialty, credit toward **DBE** goals will be given only for work done in the specialty category.

Thank you for your continued interest in the City's Disadvantaged Business Enterprise Program.

Sincerely,

David Grossman
Managing Deputy, Certification and Compliance

DG/rg

RECEIVED

SEP 1 2 2005

OMWBE





00412

# TAB 6

# ATTACHMENT XXV

RECEIVED

SEP 1 2 2005

OMWBE



# WAIVER OF NOTICE OF
# SPECIAL MEETING OF
# BOARD OF DIRECTORS
# OF THE GROVE, INC.

I, undersigned, being all of the Directors of THE GROVE, INC., a corporation

organized under the laws of the State of Louisiana, do hereby waive all notice of

this Special Meeting of the Shareholders of The Grove, Inc., whether provided by

statute or otherwise, and consent and agree that such meeting be held by phone

on the 1st day of April 2005 at 10:30 o'clock a.m. and I consent to the transaction

of any and all business regarding the purpose for which this special meeting was

called.

**Michelle Dukler**
**PRESIDENT/DIRECTOR/**
**SHAREHOLDER**

RECEIVED

SEP 1 2 2005

OMWBE

# MINUTES OF THE SPECIAL MEETING OF
# THE BOARD OF DIRECTORS
# OF
# THE GROVE, INC.

A special meeting of the Board of Directors of the corporation was held on

the 1st day of April 2005 at 10:30 a.m.

The meeting was called to order by Michelle Dukler.

00464

 

It was then reported that the meeting had been called pursuant to a waiver of notice thereof in accordance with the articles. It was ordered that a copy of the waiver of notice be appended to the minutes of the meeting.

The sole member of the Board of Directors being present, a quorum was established. The purpose of the meeting was to amend compensation of the President and sole Director of The Grove, Inc.

It was approved that the compensation of the President shall be increased to $10,421.84 per week.

No change was made to the quarterly compensation related to Director services.

There being no further business, the Director closed the special meeting of the Board of Directors and at 1:00 p.m. on the afternoon of the 1st day of April 2005, the meeting was adjourned.

**Michelle Dukler**
**PRESIDENT/DIRECTOR/**
**SHAREHOLDER**

**RECEIVED**
SEP 1 2 2005
**OMWBE**

00465

# TAB 7




## MINUTES OF THE SPECIAL MEETING OF STOCKHOLDERS/DIRECTORS
### OF
## NATURAL ENERGY UNLIMITED, INC.

The special meeting of the stockholders/directors of the corporation was held at their offices on the 7th day of July 1999 at 4:00 pm.

The meeting was called to order by Ruth Ann Menutis.

It was then reported that the meeting had been called pursuant to a waiver of notice thereof in accordance with the articles. It was ordered that a copy of the waiver of notice be appended to the minutes of the meeting.

The roll of stockholders/directors having been read, and, all being present and a quorum being established. The meeting began by Ruth Ann Menutis and Paul Valteau reviewing with the fiscal staff of Natural Energy Unlimited, Inc. the financial position of the company. It was clear that by mid year sales once again were flat and there was no hope of getting beyond the revenue number which The Grove appeared to have been stuck on for the last three years. That being gross revenues of around $12.4 million.

Fiscal staff further advised Ruth Ann and Paul that commitments made for growth and expansion in 1999 would drain all cash from the company and leave the company short by over $1 million. Fiscal staff further advised that short of a dramatic increase in revenues, loans would have to be made to salvage the company. Staff believed strongly that this situation was created by poor decisions on airport investments, chronic and serious under-performance and the continuing need to finance local partner's investment in Grove expansion. After the report was completed and all questions were answered Ruth Ann and Paul went into executive session to discuss remedies.

It was decided in executive session that the Grove should seek to negotiate and develop a long term relationship with Star Foods to solve its short term cash flow problems and to assist in the long term in the growth and development of a stronger and more viable Grove organization. This suggestion was put in the form of a motion and carried unanimously by the board of directors.

Both corporate officers additionally have been given the authority to negotiate and sign any agreed which might accomplish the above stated purpose.

There being no further business, a motion was entertained to close the special meeting of the Shareholders/Directors. The motion was seconded and approved, and at 5:00 pm on the evening of July 7, 1999, the meeting was adjourned.

Ruth Ann Menutis
**PRESIDENT**

Paul R. Valteau, Jr.
**EXECUTIVE VICE PRESIDENT**

RECEIVED
SEP 1 2 2005
OMWBE

00482



# TAB 8

# ATTACHMENT XXXIV

RECEIVED

SEP 1 2 2005

OMWBE

00594



# STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "**Agreement**") is made as of this 6th day of February, 2004 (the "**Closing Date**"), by and among Star Foods, L.L.C. ("**Star Foods**"), a Delaware limited liability company, the owner of approximately 49% of the issued and outstanding capital stock of The Grove, Inc., a Louisiana corporation ("**The Grove**"), and Michelle Dukler, a resident of Illinois ("**Dukler**").

## RECITALS

A.    The Grove holds a partnership interest and is the general partner in a certain partnership (the "**Partnership**") (such partnership interest held by The Grove, the "**Partnership Interest**").

B.    The Grove is engaged, both directly and through the Partnership, in the business of marketing, distributing and selling food products, including without limitation dried fruits and nuts (the "**Business**").

C.    Pursuant to the terms and subject to the conditions of this Agreement, Dukler desires to acquire from Star Foods, and Star Foods desire to sell to Dukler, all of the stock of The Grove held by Star Foods, which constitutes approximately 49% of all of the issued and outstanding stock of The Grove.

NOW THEREFORE, in consideration of the foregoing recitals, which are hereby incorporated herein, the mutual promises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## AGREEMENT

## 1.    DEFINITIONS

The capitalized terms not otherwise defined herein have the meanings given to such terms below:

"**Knowledge**" means, in the case of any individual, knowledge that a reasonable person under similar circumstances would have after reasonable investigation and inquiry, and in the case of an entity, the knowledge (under the same standard as described immediately above) of the directors, officers, managers and other principals of such entity, as the case may be, and the employees of such entity having responsibility for the particular subject matter at issue.

"**Material Adverse Effect**" means with respect to any Person, a material adverse effect or impact upon (i) the assets, financial condition, results of operations, or business of such Person or its affiliates, if any, or (ii) in any case, on the ability of the Parties to consummate the transactions contemplated hereby.

RECEIVED

SEP 1 2 2005

OMWBE

00595




"**The Grove Stock**" means the shares of common stock, no par value per share, of The Grove, representing 100% of the issued and outstanding capital stock of The Grove.

"**Party**" means each of Star Foods and Dukler, individually, and "**Parties**" means Star Foods and Dukler, collectively.

"**Person**" means any individual, trust, corporation, partnership, limited partnership, limited liability company, or other business association or entity, court, governmental body, or governmental agency.

"**Security Interest**" means any mortgage, pledge, security interest, charge, lien, option, or other encumbrance or restriction.

## 2.   PURCHASE AND SALE OF STOCK

2.1.   On the Closing Date:

(a)   Dukler shall purchase from Star Foods, and Star Foods shall sell, transfer, assign, and deliver to Dukler, 35 shares (representing approximately 49%) of The Grove Stock, free and clear of all Security Interests (the "**Purchased Stock**").

(b)   In consideration of Star Foods' delivery of the Purchased Stock pursuant to Section 2.1(a) hereof, and the other covenants and agreements of Dukler herein, Dukler is hereby paying to Star Foods the purchase price of Two Million Five Hundred Thousand Dollars ($2,500,000).

## 3.   REPRESENTATIONS AND WARRANTIES OF STAR FOODS

As a material inducement to Dukler to enter into this Agreement and consummate the transactions contemplated hereby, Star Foods hereby represents and warrants to Dukler that all of the statements contained in this Section 3 are correct and complete as of the Closing Date, except as set forth in the disclosure schedules attached to this Agreement disclosing exceptions to the representations and warranties set forth herein.

3.1.   **Title**. Star Foods has good and marketable title to the Purchased Stock free and clear of any and all Security Interests. Neither The Grove, the Partnership nor Star Foods has agreed or committed to, the sale, transfer, or assignment of the Business or any portion thereof, the capital stock of The Grove or the Partnership Interest to any party other than Dukler.

RECEIVED

SEP 1 2 2005

OMWBF

3.2.   **Star Foods' Power and Authority**. Star Foods has the full right, power, and authority to execute and deliver this Agreement, and to perform all its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Star Foods, enforceable against it in accordance with its terms (except to the extent that such enforceability may be limited by bankruptcy,

00596

206480/0001/609448/Version #:.3

 

insolvency, fraudulent conveyance, reorganization, moratorium, or other similar laws of general applicability relating to or affecting creditors' rights generally). The execution and delivery of this Agreement, and performance by Star Foods of its obligations hereunder have been duly authorized by all necessary action on the part of Star Foods in accordance with its Certificate of Formation and Operating Agreement and applicable law, and this Agreement constitutes a valid agreement, binding upon and enforceable against Star Foods in accordance with its terms. No consent, approval, or authorization of any governmental authority or any other person or entity is required for the execution and delivery of this Agreement by Star Foods and the performance by Star Foods of its obligations hereunder.

3.3. **The Grove's Corporate Status.** The Grove is a corporation duly organized, legally existing and in good standing under the laws of the State of Louisiana, and has filed all licenses or qualifications to do business in all foreign jurisdictions in connection with the Business wherever it is required to do so. The Grove has all requisite power to own, lease, license and operate the assets owned, leased, licensed, and operated by it, and to carry on the Business in the manner and in the places where the Business is conducted. True and correct copies of The Grove's Articles of Incorporation and By-Laws, in each case as amended to date, have been made available for inspection by Dukler.

3.4. **Partnership.** Star Foods has provided to Dukler a true and correct description of the Partnership, including without limitation the locations where the Partnership engages in the Business, the partnership interest in the Partnership other than the Partnership Interest and the outside owner of such interest. To the knowledge of Star Foods, the Partnership is duly organized, legally existing and in good standing under the laws of their respective states of formation. To the knowledge of Start Foods, the Partnership has all requisite power to own, lease, license and operate the assets owned, leased, licensed, and operated by it and to carry on the Business in the manner and in the places where it conducts the Business. A true and correct copy of the Partnership's Partnership Agreement, as amended to date, has been previously made available to Dukler.

3.5. **Noncontravention.** Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate or conflict in any way with any applicable statute, regulation, law, rule, common law doctrine, judgment, order, decree, stipulation, injunction, charge, or other restriction of any governmental body, governmental agency, or court to which The Grove, the Partnership or Star Foods is subject, or result in the creation of any Security Interest upon The Grove Stock or the Partnership Interest or any asset of The Grove or the Partnership, (ii) conflict with, result in a breach of, constitute a default under (with or without notice or lapse of time or both), result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, require any notice under, or result in the creation of any Security Interest upon The Grove Stock or the Partnership Interest or any asset of The Grove or the Partnership pursuant to the terms of, any contract, agreement, lease, sublease, license, sublicense, franchise, permit, indenture, or other arrangement to which The

RECEIVED

SEP 1 2 2005

OMWBE

00597

3                                    206480/0001/609448/Version #::3

 

Grove, the Partnership or Star Foods is a party or by which The Grove, the Partnership or Star Foods or any of their respective assets are bound or subject, or (iii) conflict with the partnership agreement of the Partnership or the Articles of Incorporation or By-Laws of The Grove or the Certificate of Formation or Operating Agreement of Star Foods. Neither The Grove, the Partnership nor Star Foods is required to give any notice to, make any filing with, nor obtain any authorization, consent, or approval of any government, governmental agency, or court, or any other Person in order for the Parties to consummate the transactions contemplated by this Agreement and in order that such transactions not constitute a breach or violation of, or result in a right of termination or acceleration of, or result in the creation of any Security Interest in The Grove Stock or the Partnership Interest or any asset of The Grove or the Partnership or cause a termination of the Minority Business Enterprise or Disadvantaged Business Enterprise ("**MBE/DBE**") status of The Grove or the Partnership pursuant to the provisions of, any agreement, arrangement, or understanding, or any license, franchise, or permit, or any law or regulation.

3.6. **No Prohibition**. Star Foods is not a party to, subject to, nor bound by any agreement or any judgment, order, writ, prohibition, injunction, or decree of any court or other governmental body which would prevent the execution or delivery of this Agreement by Star Foods, or the performance of its obligations hereunder.

3.7. **Capitalization**. The Purchased Stock constitutes approximately 49% of all of The Grove Stock, and The Grove has not authorized, offered, sold, or issued capital stock other than The Grove Stock. All offerings, sales, and issuances by The Grove of its capital stock have been conducted in compliance with, in accordance with, or in reliance upon exemptions from all applicable federal and state securities laws and all applicable state corporation laws. All of the shares of The Grove Stock have been duly authorized, validly issued, fully paid, and are nonassessable, and not subject to any preemptive rights. There are no currently outstanding or authorized options, warrants, rights, contracts, rights of first refusal or first offer, calls, puts, rights to subscribe, conversion rights, or other agreements or commitments to which The Grove or the Partnership is a party or which are binding upon The Grove or the Partnership providing for the issuance, disposition, or acquisition of any of the capital stock of The Grove or partnership interests in the Partnership or securities convertible into or exchangeable for capital stock of The Grove or partnership interests of the Partnership. There are no outstanding or authorized stock or partnership interest appreciation, phantom stock or partnership interest, or similar rights with respect to The Grove or the Partnership, and there are no contractual or statutory preemptive rights or similar restrictions with respect to the issuance or transfer of any shares of capital stock of The Grove or any partnership interests in the Partnership. There are no voting trusts, proxies, or any other agreements, restrictions, or understandings with respect to the voting of any of the capital stock of The Grove or the partnership interests in the Partnership, except for those agreements expressly contemplated hereby.

RECEIVED

SEP 1 2 2005

OMWBE

00598

4

206480/0001/609448/Version #:3



3.8.     **Notices and Consents.** Star Foods, The Grove and the Partnership have timely made all notices to governmental authorities and others and obtained any governmental clearances and consents of other third parties as may be necessary or desirable to permit consummation of the transactions contemplated hereunder.

3.9.     **Disclosure.** This Agreement does not contain any untrue statement of a material fact by Star Foods, and Star Foods has not failed to disclose to Dukler any material fact necessary to make the statements contained herein, in light of the circumstances in which they were made, not misleading. There is no material fact of which Star Foods has Knowledge which has not been disclosed to Dukler which results in, or could reasonably be anticipated to result in, a Material Adverse Effect.

4.     **REPRESENTATIONS AND WARRANTIES OF DUKLER**

As a material inducement to Star Foods to enter into and perform its obligations under this Agreement, Dukler hereby represents and warrants to Star Foods as follows:

4.1.     **Authority for Agreement.** Dukler has the full right, power, and authority to execute and deliver this Agreement, and to perform her obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Dukler, enforceable against her in accordance with its terms (except to the extent that such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, or other similar laws of general applicability relating to or affecting creditors' rights generally).

4.2.     **Noncontravention.** Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate or conflict in any way with any applicable statute, regulation, law, rule, common law doctrine, judgment, order, decree, stipulation, injunction, charge, or other restriction of any governmental body, governmental agency, or court to which Dukler is subject, or result in the creation of any Security Interest upon any asset of Dukler, (ii) conflict with, result in a breach of, constitute a default under (with or without notice or lapse of time or both), result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, require any notice under, or result in the creation of any Security Interest upon any asset of Dukler pursuant to the terms of, any contract, agreement, lease, sublease, license, sublicense, franchise, permit, indenture, or other arrangement to which Dukler is a party or by which Dukler or any of her assets are bound or subject. Dukler is not required to give any notice to, make any filing with, nor obtain any authorization, consent, or approval of any government, governmental agency, or court, or any other Person in order for the Parties to consummate the transactions contemplated by this Agreement and in order that such transactions not constitute a breach or violation of, or result in a right of termination or acceleration of, or result in the creation of any Security Interest in any asset of Dukler pursuant to the provisions of, any agreement, arrangement, or understanding, or any license, franchise, or permit, or any law or regulation.

RECEIVED

SEP 1 2 2005

OMWBE

00599

 

4.3.    **Disclosure.**  This Agreement does not contain any untrue statement by Dukler of a material fact, and Dukler has not failed to state a material fact necessary in order to make the statements herein not misleading.

## 5.    CLOSING

5.1.    **Closing.**  The Closing of the purchase and sale of the Purchased Stock (the "**Closing**") will take place at 10:00 a.m. on the Closing Date, at the offices of Sachnoff & Weaver, Ltd., 30 South Wacker Drive, Suite 2900, Chicago, Illinois, unless another time, date, or place is agreed to by the parties hereto.

5.2.    **Deliveries by Star Foods.**  At Closing, Star Foods shall execute and/or deliver to Dukler all of the following:

(i)    certificates representing the Purchased Stock, duly endorsed or accompanied by assignments separate from such certificates in a form sufficient to effect the transfer thereof to Dukler;

(ii)    a certificate of good standing for The Grove dated after October 1, 2003 from the Secretary of State of Louisiana; and

(iii)    such other instruments and documents as are (i) reasonably necessary, in the opinion of Dukler's counsel, to effect or evidence performance of this Agreement by the Star Foods, or (ii) required by any other provisions of this Agreement.

5.3.    **Dukler's Deliveries.**  At Closing, Dukler shall execute and/or deliver to Star Foods all of the following:

(i)    the purchase price by cash, wire transfer or other immediately available funds; and

(ii)    such other instruments and documents as are (i) reasonably necessary, in the opinion of Star Foods' counsel, to effect or evidence performance of this Agreement by Dukler, or (ii) required by any other provisions of this Agreement.

## 6.    POST-CLOSING OBLIGATIONS OF THE PARTIES

6.1.    **Further Obligations of the Parties.**  On and after the date hereof, each Party shall execute all certificates, instruments, and other documents and take all actions reasonably requested by the other Parties to effectuate this Agreement and to consummate the transactions contemplated hereunder.

RECEIVED

SEP 1 2 2005

OMWBE

## 7.    MISCELLANEOUS PROVISIONS

7.1.    **Notices.**  All notices, requests, demands, or other communications hereunder (including notices of all asserted claims or liabilities) shall be in writing and

00600

    206480/0001/609448/Version #:3

 

shall be either delivered personally, by messenger service, or by prepaid guaranteed overnight delivery service, or mailed by U.S. mail, certified or registered, with appropriate postage prepaid, to the addressees and addresses herein designated, or such other address as may be designated in writing by notice given in the manner provided herein, and shall be effective (a) upon personal delivery thereof, if delivered personally or by messenger service, (b) one (1) business day after delivery to the overnight delivery service for next business day delivery, if delivered by overnight delivery service, or (c) three (3) days following deposit in the U.S. mail if sent by mail, whether or not delivery is accepted:

| | |
|---|---|
| If to Star Foods: | c/o Durandal, Inc. |
| | 676 North Michigan Ave. |
| | Suite 3450 |
| | Chicago, Illinois 60611 |
| | |
| If to Dukler: | 6756 Fieldstone |
| | Burr Ridge, IL 60527 |
| | |
| With copy to: | Sachnoff & Weaver, Ltd. |
| | Suite 2900 |
| | 30 South Wacker Drive |
| | Chicago, Illinois 60606 |
| | Attention: Lance R. Rodgers |

7.2.    **Assignability**.  This Agreement may not be assigned.

7.3.    **Governing Law; Jurisdiction**.  This Agreement shall be construed and governed in accordance with the internal laws of the State of Illinois, without regard to its choice of law principles.  Each of the Parties hereby submits to the exclusive jurisdiction and venue of the federal and state courts presiding in Cook County, Illinois, with respect to any dispute concerning or arising out of this Agreement.

7.4.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

7.5.    **Entire Agreement**.  This Agreement constitutes the entire agreement among the Parties hereto with respect to the subject matter hereof and supersedes all prior communications, writings, and other documents with regard thereto.  No modification, amendment, or waiver of any provision hereof shall be binding upon any Party hereto unless it is in writing and executed by all of the parties hereto or, in the case of a waiver, by the Party waiving compliance.

RECEIVED

SEP 1 2 2005

OMWBE

7.6.    **Waiver**.  The waiver by any Party hereto of any breach, default, misrepresentation, or breach of any warranty or covenant hereunder, whether intentional or not, shall not be deemed to extend to any prior or subsequent breach, default,

00601

206480/0001/609448/Version #:3

 

misrepresentation, or breach of any warranty or covenant hereunder and shall not affect in any way any rights arising by virtue of any such prior or subsequent occurrence.

7.7.    **Construction**.  Each of the Parties has been represented or has had the opportunity to be represented by separate counsel with respect to this Agreement, and the language herein represents the language chosen by the Parties after consultation with such counsel.  Thus, no rule of strict construction shall be applied against either Party in interpreting this Agreement. Any reference to any Federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. Each gender-specific term used herein has a comparable meaning whether used in a masculine, feminine or gender-neutral form. The term "include" and its derivatives shall have the same construction as the phrase "include, without limitation," and its derivatives. The section headings contained in this Agreement are inserted for convenience or reference only and shall not affect in any way the meaning or interpretation of this Agreement.

7.8.    **Allocation of Fees and Expenses**.  Except as otherwise expressly provided in this Agreement, each of the Parties hereto shall be responsible for their own fees, expenses, and other charges incurred in connection with the transactions contemplated hereby.

*[Remainder of page intentionally left blank]*

**RECEIVED**

SEP 1 2 2005

**OMWBE**

00602

8    206480/0001/609448/Version #:.3

 

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

STAR FOODS, L.L.C.

By: Durandal, Inc.
Its: Manager

By: _____
Name: _____
Its: _____


_____
MICHELLE DUKLER

RECEIVED

SEP 1 2 2005

OMWBE

00603

9                              206480/0001/609448/Version #:.3

Feb 04 04 11:57a      Ca' ◄ Cowell  Geri Kay      561P  9004        Page 5    P.5
Sent By: Durandal,                 312 943 3598;    Feb-4-0    44AM;



IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

STAR FOODS, L.L.C.

By: Durandal, Inc.
Its: Manager

By: _____
Name: _____
Its: _____

MICHELLE DUKLER

RECEIVED

SEP 1 2 2005

OMWBE

9

206480/0001/807446/Version 0.3

00604




**MARTIN DULKER**
**MICHELLE DUKLER**
6756 FIELDSTONE
BURR RIDGE, IL 60521

70-2295/719
04306626703

**2248**

DATE 2-6-05

PAY TO THE
ORDER OF  Starz Foods, LLC                     $ 2,500,000.—

Two million five hundred thousand & 00/100  DOLLARS

**Midwest Bank and Trust Company**
Hinsdale Banking Center

MEMO  Stock Purchase

⑆071922955⑆ 04306626703⑆ 2248

RECEIVED
SEP 1 2 2005
OMWBE

# TAB 9

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, Star Foods, L.L.C. does hereby sell, assign, transfer and
convey unto Michelle Dukler 35 shares of common stock, no par value, of The Grove, Inc., a
Louisiana corporation (the "Corporation"), standing in its name on the books of the Corporation
represented by Certificate No. 25, and does hereby constitute and appoint the Corporation's
Secretary as its attorney-in-fact and agent to transfer the said stock on the books of the
Corporation with full power of substitution in the premises.

Dated: February 6, 2004

STAR FOODS, L.L.C.

By: Durandal, Inc.
Its: Manager

By: _____
Name: _____
Its: _____

RECEIVED

SEP 1 2 2005

OMWBE

206480/000/617938/Version #.1

00606

 

## ASSIGNMENT SEPARATE FROM CERTIFICATE

**FOR VALUE RECEIVED,** Star Foods, L.L.C. does hereby sell, assign, transfer and convey unto Michelle Dukler 35 shares of common stock, no par value, of The Grove, Inc., a Louisiana corporation (the "**Corporation**"), standing in its name on the books of the Corporation represented by Certificate No. 25, and does hereby constitute and appoint the Corporation's Secretary as its attorney-in-fact and agent to transfer the said stock on the books of the Corporation with full power of substitution in the premises.

Dated: February 6, 2004

STAR FOODS, L.L.C.

By: Durandal, Inc.
Its: Manager

By: _____
Name: _____
Its: _____

RECEIVED

SEP 1 2 2005

UMWBE

00607

206480/0001/612938/Version #:.1

# TAB 10

 

P A I D AUG 1 9 2004

# TERM NOTE
## (Stock Purchase)

$2,500,000                     Chicago, Illinois                     February 5, 2004

**FOR VALUE RECEIVED**, Michelle Dukler, a resident of Illinois (the "**Maker**") promises to pay to the order of Casey Cowell, a resident of Illinois (the "**Payee**"), at such place or places as the Payee may from time to time designate in writing, the principal sum of Two Million Five Hundred Thousand Dollars ($2,500,000) or such lesser principal sum as may then be owed by Maker to the Payee hereunder.  Except as hereinafter provided, Maker's obligations and liabilities to the Payee under this Note ("**Maker's Liabilities**") unpaid and outstanding from time to time shall bear interest from the date hereof until paid, at a rate of two percent (2%) per annum ("**Regular Rate**") computed on the basis of a 365-day year and charged for actual number of days elapsed.

Maker may from time to time prepay the principal of this Note in whole or in part without premium, provided however, any partial prepayment shall be applied first to accrued interest and the balance to principal.

Interest on the principal balance from time to time remaining unpaid and outstanding shall be paid monthly on the first day of each calendar month commencing on the first day of March, 2004.

On October 31, 2006 (the "**Maturity Date**") all unpaid principal, together with accrued interest thereon, will be due and payable in its entirety; provided if The Grove, Inc., a Louisiana corporation, is earlier dissolved, the Maturity Date shall be accelerated to such earlier date of dissolution.

If any of Maker's Liabilities are not paid when due and payable or are declared due and payable, interest shall accrue thereon from the due date of the same until paid, at a rate equal to the Regular Rate plus five percent (5%) per annum (the "**Default Rate**").

The occurrence of any one of the following events shall constitute an "Event of Default" by Maker under this Note:  (a) Maker fails to pay the principal or interest due under this Note as it becomes due and such failure is not cured within ten (10) days after notice thereof, or (b) Maker shall (i) generally not pay Maker's debts as they become due (or generally be unable to, or admit in writing Maker's general inability to pay Maker's debts as such debts become due); (ii) make an assignment for the benefit of creditors, or petition or apply to any tribunal for the appointment of a custodian, receiver or trustee for all or a substantial part of Maker's assets; (iii) commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of


RECEIVED
SEP 1 8 ....
u. Purchase
00608
206480/0001/609175/Version #::2




debt, dissolution or liquidation; (iv) have any such petition filed or any such proceeding commenced against Maker, in which an adjudication is made or order for relief is entered or which remains undismissed for a period of sixty (60) days; (v) have had a receiver, custodian or trustee appointed for all or a substantial part of Maker's property; or (vi) take any action effectuating, approving or consenting to any of the events described in clauses (i) through (v).

Upon the occurrence of an Event of Default, without notice by the Payee to or demand by the Payee of Maker, all of Maker's Liabilities shall be immediately due and payable. The acceptance by the Payee of any partial payment made hereunder after the time when any obligation under this Note becomes due and payable will not establish a custom or waive any right of the Payee to enforce the prompt payment hereof. Maker waives presentment, demand and protest and notice of presentment, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of this Note.

If any provision of this Note or the application thereof to any part or circumstance is held invalid or unenforceable, the remainder of this Note and the application of such provision to other parties or circumstances will not be affected thereby and the provisions of this Note shall be severable in any such instance.

This Note is for a business purpose and shall be governed and controlled by the laws of the State of Illinois as to interpretation, enforcement, validity, construction, effect, choice of law and in all other respects.

If this Note is placed in the hands of an attorney for collection or is collected through any legal proceeding, Maker promises to pay all costs and expenses (including without limitation reasonable attorneys' fees incurred by the Payee).

To induce the Payee to accept this Note, Maker, irrevocably, agrees that, subject to the Payee's sole and absolute election, all actions or proceedings in any way, manner or respect, arising out of or from or related to this Note, shall be litigated in courts having situs within the City of Chicago, State of Illinois. Maker hereby consents and submits to the jurisdiction of any local, state or federal court located within said city and state. Maker hereby waives any right Maker may have to transfer or change the venue of any litigation brought against Maker by the Payee in accordance with this paragraph.

IN WITNESS WHEREOF, the undersigned has duly executed this Note as of the date first written above.

MICHELLE DUKLER

RECEIVED
SEP 1 2 2005
OMWBE

00609

2

206480/0001/609175/Version #: 2

 

# OPTION ASSIGNMENT AGREEMENT

This Option Assignment Agreement is dated as of the 6th day of February, 2004 by and between Star Foods, L.L.C., a Delaware limited liability company ("**Star Foods**") and Michelle Dukler, a resident of Illinois ("**Dukler**").

## Recitals

A.     Star Foods holds an option to purchase 36.5 shares of the Common Stock, no par value, of The Grove, Inc., a Louisiana corporation, from Paul Valteau and Ruth Ann Menutis for an exercise price of $100,000 cash (the "**Valteau/Menutis Option**") pursuant to that certain Stock Option Agreement dated July 26, 1999.

B.     Dukler desires to purchase from Star Foods, and Star Foods desires to sell to Dukler, a portion of the rights granted to Star Foods pursuant to the Valteau/Menutis Option.

## Agreement

In consideration of the mutual promises and covenants made herein and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     Star Foods shall assign to Dukler the right to purchase 1.5 shares pursuant to the Valteau/Menutis Option (the "**Dukler Portion**") subject to the terms and conditions of the Valteau/Menutis Option and this Agreement.

2.     Dukler shall exercise her portion of the Valteau/Menutis Option only upon the exercise by Star Foods of its portion of the Valteau/Menutis Option. Upon Dukler's receipt of notice by Star Foods of its intention to exercise the Valteau/Menutis Option, Dukler shall consent to exercise her portion of the Valteau/Menutis Option and shall promptly deliver to Star Foods $4,110, representing her pro rata portion of the exercise price under the Valteau/Menutis Option. Star Foods shall thereupon undertake to deliver to Valteau and Menutis the notice of exercise and the full exercise price with respect to the Valteau/Menutis Option and, upon the closing of the purchase pursuant to the exercise of the Option, deliver to Dukler the shares represented by the Dukler Portion.

3.     In consideration of the Dukler Portion, Dukler is hereby paying to Star Foods $100,000 (the "**Dukler Portion Purchase Price**").

4.     The assignment of the Dukler Portion and the payment of the Dukler Portion Purchase Price shall take place as of the date hereof.

5.     All notices, requests, demands, or other communications hereunder (including notices of all asserted claims or liabilities) shall be in writing and shall be either delivered personally, by messenger service, or by prepaid guaranteed overnight

**RECEIVED**

SEP 1 2 2005

OMWbE

00610

 

delivery service, or mailed by U.S. mail, certified or registered, with appropriate postage prepaid, to the addressees and addresses herein designated, or such other address as may be designated in writing by notice given in the manner provided herein, and shall be effective (a) upon personal delivery thereof, if delivered personally or by messenger service, (b) one (1) business day after delivery to the overnight delivery service for next business day delivery, if delivered by overnight delivery service, or (c) three (3) days following deposit in the U.S. mail if sent by mail, whether or not delivery is accepted:

|  |  |
|---|---|
| If to Star Foods: | c/o Durandal, Inc.<br>676 North Michigan Ave.<br>Suite 3450<br>Chicago, Illinois 60611 |
| If to Dukler: | 6756 Fieldstone<br>Burr Ridge, IL 60527 |
| With copy to: | Sachnoff & Weaver, Ltd.<br>Suite 2900<br>30 South Wacker Drive<br>Chicago, Illinois 60606<br>Attention: Lance R. Rodgers |

6.     This Agreement may not be assigned.

7.     This Agreement shall be construed and governed in accordance with the internal laws of the State of Illinois, without regard to its choice of law principles. Each of the parties hereby submits to the exclusive jurisdiction and venue of the federal and state courts presiding in Cook County, Illinois, with respect to any dispute concerning or arising out of this Agreement.

8.     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

9.     This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior communications, writings, and other documents with regard thereto. No modification, amendment, or waiver of any provision hereof shall be binding upon any party hereto unless it is in writing and executed by all of the parties hereto or, in the case of a waiver, by the party waiving compliance.

10.     The waiver by any party hereto of any breach, default, misrepresentation, or breach of any warranty or covenant hereunder, whether intentional or not, shall not be deemed to extend to any prior or subsequent breach, default, misrepresentation, or breach of any warranty or covenant hereunder and shall not affect in any way any rights arising by virtue of any such prior or subsequent occurrence.

RECEIVED

SEP 1 2 2005

OMWBE

00611

2

206480/0001/609169/Version #:.2




11.    Each of the parties has been represented or has had the opportunity to be represented by separate counsel with respect to this Agreement, and the language herein represents the language chosen by the parties after consultation with such counsel. Thus, no rule of strict construction shall be applied against either party in interpreting this Agreement. Any reference to any Federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. Each gender-specific term used herein has a comparable meaning whether used in a masculine, feminine or gender-neutral form. The term "include" and its derivatives shall have the same construction as the phrase "include, without limitation," and its derivatives.

IN WITNESS WHEREOF, the undersigned parties have executed this Option Assignment Agreement as of the date first written above.

STAR FOODS, L.L.C.

By:    Durandal, Inc.
Its:    Manager


By:_____
Name:_____
Its:_____


MICHELLE DUKLER

RECEIVED

SEP 1 2 2005

OMWBE

00612

3                              206480/0001/609169/Version #:.2

Feb 04 04 11:57a          Ca      Cowell Geri Kay      5618   0004      Page 4   P.4
Sent By: Durandal,                 312 943 3596;        Feb-4-04   11AM;



11.     Each of the parties has been represented or has had the opportunity to be represented by separate counsel with respect to this Agreement, and the language herein represents the language chosen by the parties after consultation with such counsel. Thus, no rule of strict construction shall be applied against either party in interpreting this Agreement. Any reference to any Federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. Each gender-specific term used herein has a comparable meaning whether used in a masculine, feminine or gender-neutral form. The term "include" and its derivatives shall have the same construction as the phrase "include, without limitation," and its derivatives.

IN WITNESS WHEREOF, the undersigned parties have executed this Option Assignment Agreement as of the date first written above.

STAR FOODS, L.L.C.

By:     Durandal, Inc.
Its:    Manager

By: _____
Name: _____
Its: _____

_____
MICHELLE DUKLER

RECEIVED
SEP 1 2 2005
OMWBE

3

206480/0001/409168/Version #:2

00613

 

## ASSIGNMENT OF OPTION

The undersigned, Star Foods, L.L.C. ("**Star**") does, effective as of February 6, 2004, hereby assign, transfer and convey unto Michelle Dukler (the "**Assignee**"), subject to the terms and conditions of that certain Option Assignment Agreement between Star and the Assignee dated February 6, 2004 (the "**Assignment Agreement**"), the Dukler Portion (as such term is defined in the Assignment Agreement), and Assignee hereby accepts such assignment.

STAR FOODS, L.L.C.

By: Durandal, Inc.
Its: Manager

By:_____
Name:_____
Its:_____

Accepted:

MICHELLE DUKLER

RECEIVED
SEP 1 2 2005
OMWBE

00614

Feb 04 04 11:57a    Car~ Cowell Geri Kay    5618~?9004    p.7
Sent By: Durandal,    312 943 3596;    Feb-4-0    ;AM;    Page 7



## ASSIGNMENT OF OPTION

The undersigned, Star Foods, L.L.C. ("Star") does, effective as of February 6, 2004, hereby assign, transfer and convey unto Michelle Dukler (the "**Assignee**"), subject to the terms and conditions of that certain Option Assignment Agreement between Star and the Assignee dated February 6, 2004 (the "**Assignment Agreement**"), the Dukler Portion (as such term is defined in the Assignment Agreement), and Assignee hereby accepts such assignment.

STAR FOODS, L.L.C.

By: Durandal, Inc.
Its: Manager

By:_____
Name:_____
Its:_____

Accepted:

MICHELLE DUKLER

206480/0001/609131/Version #.1

RECEIVED

SEP 1 2 2005

OMWBE

00615





**P A I D** AUG 1 9 2004

RECEIVED

SEP 1 2 2005

OMWBE

**TERM NOTE**
(Option)

$100,000                    Chicago, Illinois          February 5, 2004

      **FOR VALUE RECEIVED**, Michelle Dukler, a resident of Illinois (the "Maker") promises to pay to the order of Casey Cowell, a resident of Illinois (the "Payee"), at such place or places as the Payee may from time to time designate in writing, the principal sum of One Hundred Thousand Dollars ($100,000) or such lesser principal sum as may then be owed by Maker to the Payee hereunder.  Except as hereinafter provided, Maker's obligations and liabilities to the Payee under this Note ("**Maker's Liabilities**") unpaid and outstanding from time to time shall bear interest from the date hereof until paid, at a rate of two percent (2%) per annum ("**Regular Rate**") computed on the basis of a 365-day year and charged for actual number of days elapsed.

      Maker may from time to time prepay the principal of this Note in whole or in part without premium, provided however, any partial prepayment shall be applied first to accrued interest and the balance to principal.

      Interest on the principal balance from time to time remaining unpaid and outstanding shall be paid monthly on the first day of each calendar month commencing on the first day of March, 2004.

      On October 31, 2006 (the "**Maturity Date**") all unpaid principal, together with accrued interest thereon, will be due and payable in its entirety; provided, if The Grove, Inc., a Louisiana corporation, is earlier dissolved, the Maturity Date shall be accelerated to such earlier date of dissolution.

      If any of Maker's Liabilities are not paid when due and payable or are declared due and payable, interest shall accrue thereon from the due date of the same until paid, at a rate equal to the Regular Rate plus five percent (5%) per annum (the "**Default Rate**").

      The occurrence of any one of the following events shall constitute an "Event of Default" by Maker under this Note:  (a) Maker fails to pay the principal or interest due under this Note as it becomes due and such failure is not cured within ten (10) days after notice thereof, or (b) Maker shall (i) generally not pay Maker's debts as they become due (or generally be unable to, or admit in writing Maker's general inability to pay Maker's debts as such debts become due); (ii) make an assignment for the benefit of creditors, or petition or apply to any tribunal for the appointment of a custodian, receiver or trustee for all or a substantial part of Maker's assets; (iii) commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of

00616

20648/0001/609265/Version #:

 

debt, dissolution or liquidation; (iv) have any such petition filed or any such proceeding commenced against Maker, in which an adjudication is made or order for relief is entered or which remains undismissed for a period of sixty (60) days; (v) have had a receiver, custodian or trustee appointed for all or a substantial part of Maker's property; or (vi) take any action effectuating, approving or consenting to any of the events described in clauses (i) through (v).

Upon the occurrence of an Event of Default, without notice by the Payee to or demand by the Payee of Maker, all of Maker's Liabilities shall be immediately due and payable. The acceptance by the Payee of any partial payment made hereunder after the time when any obligation under this Note becomes due and payable will not establish a custom or waive any right of the Payee to enforce the prompt payment hereof. Maker waives presentment, demand and protest and notice of presentment, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of this Note.

If any provision of this Note or the application thereof to any part or circumstance is held invalid or unenforceable, the remainder of this Note and the application of such provision to other parties or circumstances will not be affected thereby and the provisions of this Note shall be severable in any such instance.

This Note is for a business purpose and shall be governed and controlled by the laws of the State of Illinois as to interpretation, enforcement, validity, construction, effect, choice of law and in all other respects.

If this Note is placed in the hands of an attorney for collection or is collected through any legal proceeding, Maker promises to pay all costs and expenses (including without limitation reasonable attorneys' fees incurred by the Payee).

To induce the Payee to accept this Note, Maker, irrevocably, agrees that, subject to the Payee's sole and absolute election, all actions or proceedings in any way, manner or respect, arising out of or from or related to this Note, shall be litigated in courts having situs within the City of Chicago, State of Illinois. Maker hereby consents and submits to the jurisdiction of any local, state or federal court located within said city and state. Maker hereby waives any right Maker may have to transfer or change the venue of any litigation brought against Maker by the Payee in accordance with this paragraph.

IN WITNESS WHEREOF, the undersigned has duly executed this Note as of the date first written above.

MICHELLE DUKLER

RECEIVED

SEP 1 2 2005

OMWBE

00617

2    206480/0001/609265/Version #:.2




MARTIN DULKER
MICHELLE DULKER
6756 FIELDSTONE
BURR RIDGE, IL 60521

70-2295/719
04306626703

2249

DATE 2-6-04

PAY TO THE
ORDER OF Starz Foods LLC                    $ 100,000.—

One Hundred Thousand & 00/100                    DOLLARS

Midwest Bank and Trust Company
Hinsdale Banking Center

MEMO Option Purchase

⑆071922955⑆ 04306626703⑈ 2249

RECEIVED

SEP 1 2 2005

OMWBE

00618




P A I D AUG 1 9 2004

# MORTGAGE AND SECURITY AGREEMENT

THIS MORTGAGE AND SECURITY AGREEMENT (this **"Agreement"**) is dated as of February 5, 2004 by Michelle Dukler (**"Borrower"**), in favor of Casey Cowell (**"Lender"**).

R E C I T A L S

A.     Borrower has made those certain Term Notes dated as of like date herewith in the original principal amounts of $2,500,000 and $100,000, respectively (together, the **"Notes"**).

B.     The Notes and this Agreement, together with all other agreements, instruments and documents, given to evidence or secure the liabilities and obligations evidenced by the Notes and all amendments, modifications, supplements, extensions, replacements, and restatements thereof and thereto, and all agreements, documents or instruments delivered in substitution therefor or in lieu thereof whether heretofore, now or hereafter executed by or on behalf of Borrower to Lender are collectively referred to herein as the **"Loan Documents."** All references in this Agreement and every other Loan Document to the Notes and each and every other Loan Document shall mean the Notes and each other Loan Document and all modifications, amendments, supplements, extensions, replacements or restatements thereof or thereto.

E.     Lender requires as a condition precedent to its making the Loan that Borrower enter into this Agreement and Borrower wishes to grant to Lender a security interest, mortgage, lien, encumbrance and charge upon the Collateral, defined below.

NOW THEREFORE, for and in consideration of the making of the Loan and as an inducement to Lender to do so, and for and in consideration of the mutual promises, covenants and agreements hereinafter set forth, Borrower and Lender agree as follows:

1.     GRANT OF SECURITY INTEREST.  To secure indefeasible payment and performance in full of the Secured Obligations (defined below), Borrower hereby grants to Lender a security interest in and does hereby collaterally assign, pledge, mortgage, convey and set over unto Lender all of Borrower's right, title and interest, in, to and under the assets consisting of both the real and personal property listed on <u>Exhibit A</u> attached hereto and made a part hereof (the **"Collateral"**).

2.     BORROWER'S OBLIGATIONS.

(a)     Payment of Secured Obligations.  The security interest created herein is given as security to secure payment and performance of the Secured Obligations.  As used herein, **"Secured Obligations"** means all indebtedness evidenced by the Notes, together with all obligations, liabilities and covenants of Borrower to Lender arising under or relating to all other Loan Documents, whether now existing or hereafter arising, absolute or contingent.

RECEIVED

SEP 1 2 2005

DMWBE

00619

206480/0001/648719/Version #:.2



(b)    Good and Marketable Title. Borrower covenants and agrees that it has and will have at all times during the term hereof rights in or the power to transfer the Collateral and good and marketable title to all Collateral of any nature whatsoever, free of all security interests, other than those set forth on Exhibit B attached hereto (the "**Permitted Exceptions**").

(c)    Protection of Collateral.  Borrower shall take any and all steps required to protect the Collateral and Borrower agrees that the Collateral:

(i)    shall be kept and located, at all times during the term hereof, only at its current location, or such other location as may from time to time be approved by Lender;

(ii)    shall not be misused, wasted or allowed to deteriorate, except for the ordinary wear and tear resulting from its use, as aforesaid, or loss or damage from fire or casualty;

(iii)    shall at all times be insured against loss, damage, theft, as Lender may reasonably require in such amounts, with such companies, under such policies, in such form and for such periods as shall be reasonably satisfactory to Lender;

(iv)    shall not be used in violation of any statute, law, rule, regulation or ordinance applicable thereto; and

(v)    is not subject to any lien, other than the Permitted Exceptions.

(d)    Protection of Security Interest.  Borrower shall take any and all steps reasonably necessary to protect the priority of the security interest granted herein and Borrower agrees that:

(i)    Borrower shall not, nor does Lender authorize Borrower to, sell, transfer, license, lease or otherwise dispose of any of the Collateral or any interest therein or offer to do so without the prior written consent of Lender, or permit anything to be done that may impair the value of any of the Collateral or the security intended to be afforded by this Agreement;

(ii)    Borrower shall pay promptly when due all taxes and assessments upon the Collateral or for its use or operation and, if requested in writing by Lender, shall deliver to Lender, within ten (10) days after such request, a receipt or other evidence satisfactory to Lender of the payment thereof;

(iii)    Borrower shall sign and execute alone or with Lender any mortgages, financing statements or other documents or procure any documents and pay all connected costs, expenses and fees, including reasonable attorneys' fees, necessary to perfect and protect the security interest and maintain control, as appropriate, under this Agreement against the rights, interests or claims of third persons;

RECEIVED

SEP 1 2 2005

OMWBE

00620

2                                                206480/0001/648719/Version #:.2



    (iv)    Borrower authorizes Lender to file all mortgages and financing statements and amendments thereto, deemed appropriate by Lender in connection with the perfection of a security interest in the Collateral (and will pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Lender), and will, upon request of the Lender, execute such mortgages and financing statements and other documents (and pay the cost of filing or recording the same in all public offices reasonably deemed appropriate by Lender) and do such other acts and things, all as Lender may from time to time reasonably request, to establish and maintain a valid security interest in the Collateral to secure the payment of the Secured Obligations;

    (v)    Borrower shall reimburse Lender for all costs, expenses and fees, including without limitation court costs and reasonable attorneys' fees, incurred for any action taken by Lender to remedy an Event of Default under this Agreement;

    (vi)    Borrower shall (A) from time to time promptly execute and deliver to Lender all such other mortgages, assignments, certificates, supplemental writings, and financing statements, and do all other acts or things as Lender may reasonably request in order to more fully evidence and perfect the security interest created herein and to grant Lender control with respect to the Collateral hereunder; (B) promptly furnish Lender with any information or writings which Lender may reasonably request concerning the Collateral; and (C) promptly notify Lender of any material change in any facts or circumstances warranted or represented by Borrower in this Agreement or in any other writing furnished by Borrower to Lender in connection with the Collateral;

    (vii)    Borrower shall not, without the prior written consent of Lender create any other security interest in, mortgage, pledge, or otherwise encumber the Collateral, or any part thereof, or permit the same to be or become subject to any lien, attachment, execution, sequestration, other legal or equitable process, or any encumbrance of any kind or character; and

    (viii)    Should the Collateral, or any part thereof ever be in any manner converted into another type of property or any money or other proceeds ever be paid or delivered to Borrower as a result of Borrower's rights in the Collateral, then, in any such event, all such property, money and other proceeds shall become part of the Collateral, and Borrower covenants to immediately upon receipt thereof pay or deliver to Lender all of the same which is susceptible of delivery and, at the same time, if Lender deems it necessary and so requests, Borrower will properly endorse or assign the same. With respect to any of such property of a kind requiring any additional mortgage, security agreement, financing statement or other writing to perfect a security interest therein in favor of Lender, Borrower will immediately upon request by Lender, execute and deliver to Lender whatever Lender shall deem necessary or proper for such purpose.

RECEIVED

SEP 1 2 2005

OMWBE

00621

 

3.     EVENT OF DEFAULT.  The occurrence of any one or more of the following shall be an "**Event of Default**" for purposes of this Agreement:

(a)     Any event of default occurs under the terms of either of the Notes or any other Loan Document, including but not limited to any event of default arising from failure to pay principal, interest or any other Secured Obligation or failure to perform any other covenant, or agreement under the Notes or any other Loan Document, within the time period provided therefor, or any representation or warranty contained in the Notes or any other Loan Document is false or misleading in any material respect when made or deemed made.  .;

(b)     The levy against the Collateral, or any portion thereof, or any execution, attachment, sequestration or other writ; or

(c)     Any sale, transfer, lease, assignment, conveyance, pledge, lien or encumbrance of the Collateral, or any portion thereof, in violation of the provisions of this Agreement.

4.     ACCELERATION UPON AN EVENT OF DEFAULT.  Upon the occurrence of any Event of Default, Lender may, at its option, declare all Secured Obligations to be immediately due and payable to Lender without demand or notice of any kind whatsoever, and such Secured Obligations shall immediately become due and payable to Lender without demand or notice.

5.     LENDER'S RIGHTS AND REMEDIES.

(a)     Remedies.  In addition to all other remedies at law or in equity, upon the occurrence of any  Event of Default, or at any time thereafter while such Event of Default continues to exist, Lender shall have available to it the following rights and remedies:

(i)     Right of Enforcement.  Lender shall have and may exercise any and all rights of enforcement and remedies before or after default afforded to a lender under the Uniform Commercial Code in force in the State of Illinois (collectively, the "**Uniform Commercial Code**") or other law, together with any and all other rights and remedies otherwise provided and available to Lender at law or in equity as of the date of this Agreement or the date of Borrower's default; and, in conjunction with, in addition to, or substitution for those rights and remedies, at Lender's discretion, Lender may:

(A)     To the extent permitted by law, enter upon Borrower's property to take possession of, assemble and collect the Collateral; and/or

(B)     Remedy any default in any reasonable manner, without waiving its rights and remedies upon default and without waiving any other prior or subsequent default.

(ii)     Right of Sale.

(A)     Upon the occurrence of an Event of Default and during the continuation thereof, Lender may, at its option, sell or dispose of the Collateral at public or private sale without any previous demand of performance or notice to

RECEIVED

SEP 1 2 2005

OMWBE

00622

4                                         206480/0001/648719/Version #:2



Borrower of any such sale whatsoever, except as provided under the Uniform Commercial Code or other law, and from the proceeds of sale retain: (A) all costs and charges incurred by Lender in taking and causing the sale of said property, including such reasonable attorneys' fees as shall have been incurred by Lender; (B) all sums due pursuant to the Notes and the other Loan Documents and all accrued interest thereon; and (C) all monies due from Borrower to Lender under any other indebtedness or obligation and all accrued interest thereon. Any surplus of such proceeds remaining shall be paid to Borrower.

(B)    At any sale or sales made pursuant to this Agreement or in a suit to foreclose the same, the Collateral may be sold en masse or separately, at the same or at different times, at the option of Lender or its assigns. Such sale may be public or private, with notice as required by the Uniform Commercial Code or other law, and the Collateral need not be present at the time or place of sale. At any such sale, Lender or the holder of the Notes hereby secured may bid for and purchase any of the property sold, notwithstanding that such sale is conducted by Lender or its attorneys, agents, or assigns, and no irregularity in the manner of sale or of giving notice shall operate to preclude Lender from recovering the Secured Obligations. Lender has no obligation to clean up or otherwise prepare the Collateral for sale.

(C)    If any notification of intended sale or other disposition of the Collateral or any part thereof is required under the Uniform Commercial Code or other law, such notification, if mailed, shall be deemed reasonably and properly given if mailed to Borrower at least ten (10) days before such sale or disposition.

(D)    In the event of any sale by Lender of the Collateral:

    (x)    Lender may comply with any applicable state and/or federal law requirement in connection with the disposition of such Collateral;

    (y)    Lender may sell any and all of the Collateral without giving warranties as to such Collateral and Lender may specifically disclaim any warranties of title or the like; and

    (z)    if Lender sells any of the Collateral upon credit, Borrower shall be credited only with payments actually made by the purchaser thereof, received by Lender and applied to the indebtedness of such purchaser, provided that if the purchaser of any Collateral fails to pay for such Collateral, Lender may resell such Collateral and Borrower shall be credited with the proceeds of such sale.

In no event shall any of the foregoing be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

RECEIVED
SEP 1 2 2005
OMWBE

00623

206480/0001/648719/Version #:2




(b)    Miscellaneous.  Lender shall have the right at all times to enforce the provisions of this Agreement in strict accordance with the terms hereof, notwithstanding any conduct or custom on the part of Lender in refraining from so doing at any time or times.  The failure of Lender at any time or times to enforce its rights under said provisions strictly in accordance with the same shall not be construed or operate as a waiver of any of the rights and remedies granted Lender hereunder or as having created a custom in any way or manner contrary to the specific provisions of this Agreement or as having in any way or manner modified the same.  All rights and remedies of Lender are cumulative and concurrent, and the exercise of one right or remedy by Lender shall not be deemed a waiver or release of any other right or remedy.  Except as otherwise specifically required herein, notice of the exercise of any right, remedy or power granted to Lender by this Agreement is not required to be given.  Lender shall have no obligation to attempt to satisfy Borrower's obligations and liabilities to Lender by making demand upon or by pursuing or exhausting any of its rights or remedies against any other person, and Borrower hereby waives any rights Borrower may have to require Lender to make any such demand or pursue or exhaust any such remedy.

(c)    Right to Discharge Borrower's Obligations.  Lender may, at its option, discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral; may remedy or cure any default of Borrower under the terms of any lease, rental agreement, or other document which in any way pertains to or affects Borrower's title to or interest in any of the Collateral, may pay for insurance on the Collateral, and may pay for the maintenance and preservation of the Collateral, and Borrower agrees to reimburse Lender for any payment made or any expense incurred by Lender, including reasonable attorneys' fees, pursuant to the foregoing authorization.

6.    MUTUAL AGREEMENTS.  Borrower and Lender mutually agree as follows:

(a)    "Borrower" and "Lender" as used in this Agreement include the permitted successors and permitted assigns of those parties.

(b)    To the extent permitted by law, Borrower hereby waives any and all rights to require marshaling of assets by Lender.

(c)    Borrower hereby agrees that no liability shall be asserted or enforced by Borrower against Lender in its exercise of the powers and rights herein granted, all such liability being hereby expressly waived and released by Borrower. Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all liability, expense, cost or actual damage which may be incurred by, asserted against or imposed upon Lender at any time which relate to or arise from the use, operation or lease of any of the Collateral or the exercise by Lender of the powers and rights herein granted.

*The remainder of this page is intentionally left blank.*

RECEIVED
SEP 1 2 2005
OMWBE

00624

6                                206480/0001/648719/Version #:.2




IN WITNESS WHEREOF, Borrower has executed this Security Agreement dated for reference purposes only as of the date first written above.

MICHELLE DUKLER

RECEIVED

SEP 1 2 2005

OMWBE

00625

206480/0001/648719/Version #:.2




**EXHIBIT A**

| Asset | Value |
|---|---|
| 6756 Fieldstone Dr. (residence) | $  580,000[1] |
| Antiques (Attachment A) | 700,050 |
| Art (Attachment B) | 375,875 |
| Schlitz Studios Other (Attach C) | 142,000 |
| Schlitz Furnaces (Attachment D) | 606,500 |
| Merrill Lynch and AIG brokerage accts. | 250,000 |
|  |  |
| **Total** | $2,654,425 |

RECEIVED

SEP 1 2 2005

OMWBE

---

[1] This is the net value ($1,120,000 gross value subject to a $540,000 first mortgage).

00626

206480/0001/648719/Version #:2

 

**ATTACHMENT A**

| Antiques | Value | Total |
|---|---|---|
| 24" Dogwood | $130,000.00 | $130,000.00 |
| Jr. Floor twisted vine bronze base | $7,500.00 | $137,500.00 |
| 24" tulip | $150,000.00 | $287,500.00 |
| Bronze Greek key base | $10,000.00 | $297,500.00 |
| 16" Geometric | $5,500.00 | $303,000.00 |
| 16" Geometric | $5,500.00 | $308,500.00 |
| Bronze Fern base | $5,000.00 | $313,500.00 |
| Bronze stick base | $2,500.00 | $316,000.00 |
| 3 Light Lily – gold | $5,000.00 | $321,000.00 |
| 3 Light Lily – Blue | $5,000.00 | $326,000.00 |
| 2 light lily – gold | $3,000.00 | $329,000.00 |
| bronze lily mirror | $2,500.00 | $331,500.00 |
| 14" blown glass shade on a student base | $5,000.00 | $336,500.00 |
| single light feathered vase | $3,200.00 | $339,700.00 |
| Bronze mandarin lotus base | $16,700.00 | $356,400.00 |
| Magnolia Pendant | $6,000.00 | $362,400.00 |
| Parrot Window | $175,000.00 | $537,400.00 |
| 18 light lily on bronze floor base | $26,000.00 | $563,400.00 |
| Galle lamp 24" | $8,500.00 | $571,900.00 |
| Galle base 10" | $1,200.00 | $573,100.00 |
| 2 Bronze Queen Anne's lace candlesticks w/ blow outs | $2,500.00 | $575,600.00 |
| Bronze double candlestick | $1,250.00 | $576,850.00 |
| Bronze candlestick with blowout | $750.00 | $577,600.00 |
| Roseville hanging basket | $300.00 | $577,900.00 |
| Roseville hanging basket | $300.00 | $578,200.00 |

RECEIVED

SEP 1 2 2005

OMWBE




**ATTACHMENT A (Continued)**

| Antiques | Value | Total |
|---|---|---|
| Roseville hanging basket | $300.00 | $578,500.00 |
| Roseville bowl | $250.00 | $578,750.00 |
| Roseville ashtray | $150.00 | $578,900.00 |
| Roseville ashtray | $200.00 | $579,100.00 |
| Roseville bowl 12" dia | $400.00 | $579,500.00 |
| 2 - Roseville candlesticks | $250.00 | $579,750.00 |
| Roseville rectangular planter 6x14x6 | $300.00 | $580,050.00 |
| Roseville lamp base | $2,000.00 | $582,050.00 |
| 5 Lotton Paperweights c1978 | $5,000.00 | $587,050.00 |
| 13" C. Lotton Vase c1978 | $5,500.00 | $592,550.00 |
| 8" C.Lotton Vase c1978 | $1,200.00 | $593,750.00 |
| 6" C.Lotton Vase c1978 | $500.00 | $594,250.00 |
| 3" C. Lotton Vase c1978 | $400.00 | $594,650.00 |
| 10 Orient and Flume Paperweights c1972 | $4,000.00 | $598,650.00 |
| 5 Tiffany tiles | $5,000.00 | $603,650.00 |
| Stem Vase | $1,200.00 | $604,850.00 |
| Stem Vase | $1,200.00 | $606,050.00 |
| Cast Daum Figure (1 of 3) | $12,000.00 | $618,050.00 |
| Fulper Vase | $800.00 | $618,850.00 |
| 6-Bronze Tiffany Sconce and shade | $4,800.00 | $623,650.00 |
| 19th Century German Oil 17"x 35" | $6,500.00 | $630,150.00 |
| 22 Star US Navy Jack Flag Pre- Civil War w/ History | $15,000.00 | $645,150.00 |
| Pre-Civil War NY Renaissance Revival Bed w/prov | $35,000.00 | $680,150.00 |
| Pre-Civil War NY Renaissance Revival Dresser w/prov | $14,000.00 | $694,150.00 |
| Pre-Civil War NY RR Chair w/original paint and caneing w/p | $2,200.00 | $696,350.00 |
| Misc Pottery | $2,500.00 | $698,850.00 |
| 4 1930 Original pen and ink French Quarter Drawings | $1,200.00 | $700,050.00 |

RECEIVED
SEP 1 2 2005
OMWR

00628

206480/0001/648719/Version #:.2

 

**ATTACHMENT A (Continued)**

| Antiques | Value | Total |
|----------|-------|-------|
| Total | | $700,050.00 |

RECEIVED
SEP 1 2 2005
OMWBE

00629

206480/0001/648719/Version #:2

 

**ATTACHMENT B**

| Art Assets | | Value |
|---|---|---|
| | | |
| | | |
| Framed Rufino Tamayo lito | $ | 9,000 |
| Patrick Wadley glass head | $ | 15,000 |
| Stephen Ray Litho Fresh Print | $ | 5,500 |
| Stephen Ray Litho Carnival III | $ | 6,500 |
| Schneuer print | $ | 12,000 |
| Bobo Alligator 1 of 5 BOBOs | $ | 1,500 |
| Bob Water Buffalo 2 of 5 | $ | 1,500 |
| Bobo Bird 3 of 5 | $ | 1,500 |
| New Guinea wood carving of man in ceremonial mask | $ | 3,500 |
| New Guinea word carving of man w/ spears | $ | 2,200 |
| Bobo Antelope 4 of 5 | $ | 1,500 |
| Reed basket brown w/ blue top | $ | 2,200 |
| Paul Jenkins print abstract in orange and blue vertical lines | $ | 12,000 |
| Curtis Brock blown glass group | $ | 12,600 |
| Carla Wilson neon - large | $ | 800 |
| Carolyn Brice Brooks 12" diameter bowl | $ | 3,400 |
| Art deco glass bowl | $ | 700 |
| Felloz 1984 abstract swirl bowl | $ | 600 |
| Etching by Micossi of two roads and church | $ | 8,200 |
| Damian Prior glass fan | $ | 3,500 |
| Fused blue on blue glass bowl by Sasaki | $ | 300 |
| Lebadang print | $ | 4,800 |
| Ulricha Vallien Open Mind 14" | $ | 350 |
| African carved pounding stands (2) | $ | 1,500 |
| Bonnie linch wall vases (2) | $ | 1,800 |
| Carolyn Brice Brooks fused clay bowl - yellow, purple, blue  6"" tall 7"" diameter | $ | 800 |
| Carolyn Brice Brooks Striped w/ square w/ pink rim | $ | 800 |
| Open basket weave ceramic bowl - peach | $ | 400 |
| Pre-columbian polychrome - dome shaped 8" diameter 1 of 10 | $ | 1,200 |
| Pre-columbian polychrome - painted geometric triangular designs 5.5" diameter 2 of 10 | $ | 1,200 |
| Pre-columbian bowl 5" diamter 3 of 10 | $ | 1,200 |
| Pre-columbian bowl 6" diameter 4 of 10 | $ | 1,200 |
| Pre-columbian bowl 6.5" diameter geometric medallian in bottom 5 of 10 | $ | 1,200 |
| Wadley glass etching/painting - Red Pumps | $ | 3,750 |
| Dali litho Adam | $ | 4,500 |
| Bensley aqua | $ | 600 |
| Steve Ray "Reverse Rainbow | $ | 4,250 |
| Mary stewart multilayer swirl ceramic bowl 4" tall 8" diameter | $ | 500 |
| Etched glass flower platter in geometric designs 15X15" | $ | 500 |
| Karel Appel litho | $ | 12,500 |
| Briss print | $ | 6,250 |
| Vallien pedestall glass bowl blue w/ white | $ | 600 |

RECEIVED

SEP 1 2 2005

OMWBE

00630

206480/0001/648719/Version #:.2




## ATTACHMENT B (Continued)

| Art Assets | Value | |
|---|---|---|
| Brass samovar | $ | 1,500 |
| Claudia Reese ceramic piece - ceramic tray w/ geometric design 15/5X11/75 | $ | 400 |
| Claudia Reese bowl w/ ring design | $ | 400 |
| Reese dish w/ multicolored line design | $ | 400 |
| Reese oval ceramic dish w/ green striped design | $ | 400 |
| ER Witter print abstract | $ | 3,200 |
| Baskin litho - bird | $ | 4,550 |
| New Guinea wood horned man on pedestal | $ | 625 |
| Bobo bronze fish 5 of 5 | $ | 1,500 |
| Seven small aschanti bronzes | $ | 350 |
| Dali Eve | $ | 6,500 |
| Precolumbian bowl buff w/ polychrome rim 2.5" deep 6 of 10 | $ | 1,200 |
| Precolumbian ceramic bowl w/ design - cracked w/ piece missing 8.25 diameter 7 of 10 | $ | 1,200 |
| Precolumbian ceramic bowl w/ three looped feet 6" diameter 8 of 10 | $ | 1,200 |
| Round ceramic bowl dark clay on 3 pierced feet | $ | 1,200 |
| Baskin bird on man's profile | $ | 3,750 |
| Herb Mears oil | $ | 25,000 |
| precolumbian bowl on pierced feet 8" diamter 9 of 10 | $ | 1,200 |
| Precolumbian bowl buff background cracked 5.125 diameter 10 of 10 | $ | 1,200 |
| Ben Shahn Martin Luther King | $ | 9,000 |
| Rabel Litho of small child | $ | 7,550 |
| Wadley ink and wash of chair w/ figures | $ | 7,000 |
| Baskin woodblock of bearded man | $ | 9,500 |
| Proszinska abstract w/ figures of man and male nude | $ | 7,600 |
| Wadley black and white of tropical scene | $ | 6,000 |
| Wadley face w/ Red in Pantry | $ | 3,500 |
| Pear Litho from Sears | $ | 1,200 |
| Kurtis Brock Glass and Wood Sculpture | $ | 6,550 |
| Frances boob oil | $ | 12,000 |
| Matta oil | $ | 17,500 |
| Pat Hidson Horse | $ | 3,500 |
| ivory coast horse head | $ | 450 |
| Velasavaloc unframed print (screaming people) | $ | 1,000 |
| Fallon posters framed 4 | $ | 250 |
| Rembrant | $ | 24,000 |
| D Coffee African Woman | $ | 1,500 |
| Mora Tehuana planchando una iguana | $ | 750 |
| Yoruba woman holding mojo bowl | $ | 1,200 |
| Metal Heart sculpture | $ | 350 |
| african mask w/ brass pieces - Yoruba tribe | $ | 900 |
| Matisse | $ | 15,000 |
| Glass olives | $ | 800 |
| Miro Litho | $ | 1,500 |
| Chagal Floral | $ | 3,700 |
| Chagall Floral 2 | $ | 3,700 |
| Calder | $ | 7,500 |

RECEIVED

SEP 1 2 2005

OMWBE

 

**ATTACHMENT B (Continued)**

| Art Assets | | Value |
|---|---|---|
| Appel | $ | 6,500 |
| Kostabi Oil | $ | 3,500 |
| Dali - Evil Man series | $ | 2,700 |
| | | |
| | | |
| | | |
| Total | $ | 375,875 |

RECEIVED

SEP 1 2 2005

OMWBE

00632

206480/0001/648719/Version #:.2

 

## **EXHIBIT B**

### **Permitted Exceptions**

The residence at 6756 Fieldstone Drive has an existing mortgage in place.

The residence may be sold as long as the total assets secured by this agreement are not decreased.

**RECEIVED**

SEP 1 2 2005

**OMWBE**

00633

206480/0001/648719/Version #:.2




**ATTACHMENT C**

## Schlitz Studios Assets

| Asset | Value | Total |
|---|---|---|
|  |  |  |
| Buffalo Studios Note Payable to Schlitz | $70,000.00 | $70,000.00 |
| 22 molds and patterns | $33,000.00 | $103,000.00 |
| Antique Books | $5,000.00 | $108,000.00 |
| Antique drawings | $2,500.00 | $110,500.00 |
| equipment and machinery | $6,500.00 | $117,000.00 |
| Antique Glass | $25,000.00 | $142,000.00 |

RECEIVED

SEP 1 2 2005

OMWBE

00634

 

023 - FTCH

**EB** **Fifth Third Bank**

**Consumer Note**

OFFICER No. 04325
$2,600,000.00

NOTE No. _____._____
August 19, 2004
(Effective Date)
Personal Purpose Note

1.    PROMISE TO PAY. On or before August 19, 2006 (the "Maturity Date"), the undersigned, Michelle Aimee Dukler, an individual residing at 6756 Fieldstone, Hinsdale, Dupage County, Illinois 60527 ("Borrower") for value received, hereby promises to pay to the order of Fifth Third Bank (Chicago), a Michigan banking corporation located at 1701 W. Golf Road, Rolling Meadows, Cook County, Illinois 60008 for itself and as agent for any affiliate of Fifth Third Bancorp (together with its successors and assigns, the "Lender") the sum of Two Million Six Hundred Thousand and 00/100 Dollars ($2,600,000.00) (the "Borrowing"), plus interest as provided herein, less such amounts as shall have been repaid in accordance with this Note. The outstanding balance of this Note shall appear on a supplemental bank record and is not necessarily the face amount of this Note, which record shall evidence the balance due pursuant to this Note at any time. As used herein, "Local Time" means the time at the office of Lender specified in this Note. The maximum interest rate payable under this Note will not exceed 25% per annum or the state usury ceiling, whichever is less.

The entire outstanding principal balance, together with all accrued and unpaid interest and any other charges, advances and fees, if any, outstanding hereunder shall be due and payable in full on the earlier of the Maturity Date or upon acceleration of the Note.

The principal sum outstanding shall bear interest at a floating rate per annum equal to the rate of interest per annum established from time to time by Fifth Third Bank at its principal office as its "Prime Rate", whether or not Fifth Third Bank shall at times lend to borrowers at lower rates of interest or, if there is no such prime rate, then such other rate as may be substituted by Fifth Third Bank for the prime rate (the "Interest Rate"). In the event of a change in said Prime Rate, the Interest Rate shall be changed immediately to such new Prime Rate. Interest shall be calculated based on a 360-day year and charged for the actual number of days elapsed, and shall be payable on the 19th day of each calendar month beginning on September 19, 2004.

Principal and interest payments shall be made at Lender's address above unless otherwise designated by Lender in writing. Each payment hereunder shall be applied first to advanced costs, charges and fees, then to accrued interest, and then to principal.

2.    SECURITY AGREEMENT. To secure repayment of this Note and all other Obligations (as defined below) together with all modifications, extensions and renewals thereof, Borrower hereby grants and conveys to Lender a continuing security interest in all right, title and interest of Borrower in and to the following property, whether now owned or hereafter acquired (collectively, the "Collateral"): (i) any and all property in which Lender is at any time granted a lien for any Obligation including, without limitation, all collateral specified in any of the documents executed in connection with this Note, (ii) all property in possession of Lender and/or any affiliate of Fifth Third Bancorp (including, without limitation, Fifth Third Securites, Inc.) including, without limitation, money, securities, instruments, documents, letters of credit, chattel paper, or other property delivered to Lender and/or any affiliate of Fifth Third Bancorp (including, without limitation, Fifth Third Securites, Inc.) in transit, for safekeeping, or for collection or exchange for other property, (iii) all rights to payment from, and claims against, Lender, and (iv) any and all additions, substitutions, dividends, distributions (in the form of cash, property, stock or other securities) and other rights related or in addition to the foregoing, and any and all proceeds therefrom (the "Distributions"). Borrower agrees to immediately deliver to Lender all documents, certificates and instruments evidencing the Distributions and any additional documentation requested by Lender to perfect and protect Lender's security interest therein, and until such delivery Borrower shall hold the same in trust for Lender.

Borrower also grants Lender a security interest in all of the Collateral as agent for all affiliates of Fifth Third Bancorp for all Obligations of Borrower, or either or any of them, to such affiliates. Said security interest shall not be enforced to the extent prohibited by the Truth in Lending Act as implemented by Federal Reserve Regulation Z.

**RECEIVED**

00635

CONS-NOTE © Fifth Third Bancorp 2001

34540- -1-1

SEP 1 2 2005

**OMWBE**

34540-6-1-P.LING

 

Borrower agrees that any present or future agreement securing any other debt Borrower owes Lender or any other affiliate of Fifth Third Bancorp will also secure the payment of this Note. However, an agreement securing any other debt will not secure this Note if either of the following applies:

Lender fails to make a disclosure required by law of the existence of such security agreement; or

Lender fails to provide (to any person entitled) any notice of right of rescission required by law for this transaction.

     3.     LATE CHARGES.  If any installment stipulated herein is not paid on or before ten days after the due date thereof, (whether by acceleration or otherwise) in addition to all other rights and remedies of Lender given by law or the terms of this Note, Borrower promises to pay to Lender a delinquent charge of 5% of the payment amount.  Acceptance of such delinquent charge by Bank shall not constitute a waiver of any default or any rights of Lender hereunder.

     4.     PREPAYMENT CHARGE.  Borrower may prepay the obligation under this Note in full at any time prior to maturity.  Borrower agrees to pay an early payment charge of 1% of the outstanding principal balance with a minimum charge of $150.00 and a maximum charge of $500.00 if Borrower prepays in full more than six months prior to the scheduled final payment date.  If this obligation is secured by a mortgage on residential real estate there is no charge for prepayment.  Partial prepayments shall not excuse any subsequent payment due.

     5.     INTEREST AFTER MATURITY.  Interest after maturity shall continue at the rate then in effect or as thereafter adjusted in accordance with the variable rate disclosures.  In addition, after maturity or other default, Borrower agrees to pay Lender a fixed charge of $25.00 or Borrower agrees that Lender may, without notice, increase the interest rate by 6% per annum, whichever is greater.

     6.     RETURNED ITEM FEE.  A fee of $25.00 may, at Bank's discretion, be imposed whenever a check or other item offered in payment on this Note is returned to the Bank unpaid for any reason.  This fee is subject to change without notice to the Borrower, and the Borrower agrees to pay the fee actually charged by Bank at the time the check is returned.

     7.     DEFINITIONS.  Certain capitalized terms have the meanings set forth herein, in the Security Agreement, or any other Loan Document.  All financial terms used in this Note but not defined herein, in the Security Agreement (if applicable), or any other Loan Document have the meanings given to them by generally accepted accounting principles.  All other undefined terms have the meanings given to them in the Uniform Commercial Code as adopted in the state whose law governs this instrument.  The following definitions are used herein:

     (a)     "Lien" means any security interest, mortgage, pledge, assignment, lien or other encumbrance of any kind.

     (b)     "Loan Documents" means each and every document or agreement executed by any party evidencing, guarantying or securing any of the Obligations; and "Loan Document" means any one of the Loan Documents.

     (c)     "Loans" means any loans from time to time between Lender and Borrower relating to the Obligations.

     (d)     "Notes" shall refer collectively to any note entered into from time to time by Borrower in favor of Lender to evidence an Obligation.

     (e)     "Obligation(s)" means all loans, advances, indebtedness and each and every other obligation or liability of Borrower, or either or any of them, owed to each of Lender and/or any affiliate of Fifth Third Bancorp, however created, of every kind and description whether now existing or hereafter arising and whether direct or indirect, primary or as guarantor or surety, absolute or contingent, liquidated or unliquidated, matured or unmatured, participated in whole or in part, created by trust agreement, lease overdraft, agreement or otherwise, whether or not secured by additional collateral, whether originated with Lender or owed to others and acquired by Lender by purchase, assignment or otherwise, and including, without limitation, all loans, advances, indebtedness and each and every obligation or liability arising under the Loan Documents, letters of credit now or hereafter issued by Lender or any affiliate of Fifth Third Bancorp for the benefit of or at the request of Borrower, or either or

RECEIVED

SEP 1 2 2005

OMWBE

CONS-NOTE © Fifth Third Bancorp 2001

34540- -1-

34540-8-1-P.LING

00636

 

any of them, all obligations to perform or forbear from performing acts, and agreements, instruments and documents evidencing, guarantying, securing or otherwise executed in connection with any of the foregoing, together with any amendments, modifications and restatements thereof, and all expenses and attorneys' fees incurred or other sums disbursed by Lender hereunder or any other document, instrument or agreement related to any of the foregoing.

8.    REPRESENTATIONS AND WARRANTIES. Borrower hereby warrants and represents to Lender the following:

(a)    Litigation. There are no suits or proceedings pending or threatened against or affecting Borrower, and no proceedings before any governmental body are pending or threatened against Borrower.

(b)    Laws and Taxes. Borrower is in material compliance with all laws, regulations, rulings, orders, injunctions, decrees, conditions or other requirements applicable to or imposed upon Borrower by any law or by any governmental authority, court or agency. Borrower has filed all required tax returns and reports that are now required to be filed by it in connection with any federal, state and local tax, duty or charge levied, assessed or imposed upon Borrower or its assets, including unemployment, social security, and real estate taxes. Borrower has paid all taxes which are now due and payable. No taxing authority has asserted or assessed any additional tax liabilities against Borrower which are outstanding on this date, and Borrower has not filed for any extension of time for the payment of any tax or the filing of any tax return or report.

(c)    Financial Condition. All financial statements and information relating to Borrower which have been or may hereafter be delivered by Borrower to Lender are true and correct and have been prepared in accordance with past practices consistently applied. Borrower has no material obligations or liabilities of any kind not disclosed in that financial information, and there has been no material adverse change in the financial condition of Borrower nor has Borrower suffered any damage, destruction or loss which has adversely affected its business or assets since the submission of the most recent financial information to Lender.

9.    COVENANTS. Borrower covenants with, and represents and warrants to, Lender that, from and after the execution date of the Loan Documents until the Obligations are paid and satisfied in full:

(a)    Financial Statements. Borrower shall furnish to Lender: (i) an annual personal financial statement within 90 days after the end of each calendar year; and/or (ii) copies of all federal, state and local income tax returns for such calendar year within 90 days of the filing thereof. Upon the reasonable request of Lender, Borrower shall provide Lender with any additional information

(b)    Taxes. Borrower shall pay when due all taxes, assessments and other governmental charges imposed upon it or its assets, franchises, business, income or profits before any penalty or interest accrues thereon, and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums which by law might be a lien or charge upon any of its assets, provided that (unless any material item or property would be lost, forfeited or materially damaged as a result thereof) no such charge or claim need be paid if it is being diligently contested in good faith, if Lender is notified in advance of such contest and if Borrower establishes an adequate reserve or other appropriate provision required by generally accepted accounting principles and deposits with Lender cash or bond in an amount acceptable to Lender.

(c)    Other Amounts Deemed Loans. If Borrower fails to pay any tax, assessment, governmental charge or levy or to maintain insurance within the time permitted or required by this Note, or to discharge any Lien prohibited hereby, or to comply with any other Obligation, Lender may, but shall not be obligated to, pay, satisfy, discharge or bond the same for the account of Borrower. To the extent permitted by law and at the option of Lender, all monies so paid by Lender on behalf of Borrower shall be deemed Obligations and Borrower's payments under this Note may be increased to provide for payment of such Obligations plus interest thereon.

(d)    Further Assurances. Borrower shall execute, acknowledge and deliver, or cause to be executed, acknowledged or delivered, any and all such further assurances and other agreements or instruments,

RECEIVED

SEP 1 2 2005

OMWBE




and take or cause to be taken all such other action, as shall be reasonably necessary from time to time to give full effect to the Loan Documents and the transactions contemplated thereby.

10.   DEFAULTS. Upon the occurrence of any of the following events (each, an "Event of Default"), Lender may, at its option, without any demand or notice whatsoever, declare this Note and all Obligations to be fully due and payable in their aggregate amount, together with accrued interest and all fees and charges applicable thereto:

(a)     The nonpayment, when the same shall be due, of any installment or other payment on account of the principal or interest of this Note;

(b)     The breach of any warranty or agreement by Borrower herein contained, or contained in any mortgage or security agreement executed by Borrower in connection herewith;

(c)     The death or incompetency of any individual Borrower;

(d)     The default of Borrower under the terms of any lease of, or mortgage on, the premises upon which the Collateral may be located;

(e)     Any assignment for the benefit of the creditors of, or the commencement of any bankruptcy, receivership, reorganization, foreclosure, insolvency or liquidation proceedings by or against the Borrower, or any guarantor hereof;

(f)     The reasonable determination by Bank at any time that it is inadequately secured hereby with respect to any of Borrower's obligations to Lender;

(g)     The creation of any other lien or the issuance of any attachment against the Collateral or the entry of judgment against Borrower;

(h)     The occurrence of a default under any other obligation of Borrower, individually or jointly, to Lender or to any other affiliate of Fifth Third Bancorp;

(i)     Seizure, levy or confiscation under any legal or governmental process against any Collateral or;

(j)     Any sale, conveyance or transfer of any rights in the Collateral securing the Obligations, or any destruction, loss or damage of or to the Collateral in any material respect.

11.   REMEDIES. In addition to any other remedy permitted by law, Lender may at any time, without notice, apply the Collateral to this Note or such other Obligations, whether due or not, and Lender may, at its option, proceed to enforce and protect its rights by an action at law or in equity or by any other appropriate proceedings; provided that this Note and the Obligations shall be accelerated automatically and immediately if the Event of Default is a filing under the Bankruptcy Code. Notwithstanding any other legal or equitable rights of Lender, Lender, in the Event of Default, is (a) hereby irrevocably appointed and constituted attorney-in-fact, with full power of substitution, to exercise all rights of ownership with respect to the Collateral including, but not limited to, the right to collect all income or other distributions arising therefrom and to exercise all voting rights connected with the Collateral; and (b) is hereby given full power to collect, sell, assign, transfer and deliver all of said Collateral or any part thereof, or any substitutes therefore, or any additions thereto, through any private or public sale without either demand or notice to Borrower, or any advertisement, the same being hereby expressly waived, at which sale Lender is authorized to purchase said property or any part thereof, free from any right of redemption on the part of Borrower, which is hereby expressly waived and released. In case of sale for any cause, after deducting all costs and expenses of every kind, Lender may apply, as it shall deem proper, the residue of the proceeds of such sale toward the payment of any one or more or all of the Obligations of Borrower, whether due or not due, to Lender; after such application and the return of any surplus, Borrower agrees to be and remains liable to Lender for any and every deficiency after application as aforesaid upon this and any other Obligation. Borrower shall pay all costs of collection incurred by Lender, including its attorney's fees, if this Note is referred to an attorney for collection, whether or not payment is obtained before entry of judgment, which costs and fees are Obligations secured by the Collateral.

Lender's rights and remedies hereunder are cumulative, and may be exercised together, separately, and in any order. No delay on the part of Lender in the exercise of any such right or remedy shall operate as a waiver. No single or partial exercise by Lender of any right or remedy shall preclude any other further exercise of it or the exercise of any other right or remedy. No waiver or indulgence by Lender of any Event of Default shall be effective unless in writing and signed by Lender, nor shall a waiver on one occasion be construed as a waiver of any other occurrence in the future.

12.   MULTIPLE OBLIGORS. Each and every reference to and any and all representations, warranties, covenants and undertakings of, Borrower herein including but not limited to the Events of Default, shall be deemed to apply to each of the undersigned and any and all guarantors of any of the Obligations, jointly and separately.

RECEIVED

SEP 1 2 2005

OMWBE

 

13.   ENTIRE AGREEMENT.  Borrower agrees that there are no conditions or understandings which are not expressed in this Note and the documents referred to herein.

14.   SEVERABILITY.  The declaration of invalidity of any provision of this Note shall not affect any part of the remainder of the provisions.

15.   ASSIGNMENT.  Borrower agrees not to assign any of Borrower's rights, remedies or obligations described in this Note without the prior written consent of Lender, which consent may be withheld in Lender's sole discretion.  Borrower agrees that Lender may assign some or all of its rights and remedies described in this Note without notice to, or prior consent from, the Borrower.

16.   MODIFICATION; WAIVER OF LENDER.  The modification or waiver of any of Borrower's obligations or Lender's rights under this Note must be contained in a writing signed by Lender.  Lender may perform Borrower's obligations, or delay or fail to exercise any of its rights or remedies, without causing a waiver of those obligations or rights.  A waiver on one occasion shall not constitute a waiver on another occasion.  Borrower's obligations under this Note shall not be affected if Lender amends, compromises, exchanges, fails to exercise, impairs or releases (i) any of the obligations belonging to any co-borrower, endorser or guarantor (ii) any of its rights against any co-borrower, guarantor or endorser, or (iii) the Collateral or any other property securing the Obligations.

17.   WAIVER OF BORROWER.  Demand, presentment, protest and notice of dishonor, notice of protest and notice of default are hereby waived by Borrower, and any endorser or guarantor hereof.  Each of Borrower, including but not limited to all co-makers and accommodation makers of this Note, hereby waives all suretyship defenses including but not limited to all defenses based upon impairment of Collateral and all suretyship defenses described in Section 3-605 of the Uniform Commercial Code (the "UCC").  Such waiver is entered to the full extent permitted by Section 3- 605 (i) of the UCC.

18.   LOAN CHARGES AND FEES.  Lender shall have the authority to impose fees and charges to perform services requested by Borrower or on Borrower's behalf, or to otherwise administer and service this Note. The fees and charges may include administrative costs incurred by Lender and/or in reimbursement of payments made by Lender to third parties. Such fees and charges may include, without limitation, any and all costs or fees associated with the origination and/or servicing of this Note, document copy or preparation fees, transmittal, facsimile or delivery fees, reconveyance and release fees, property inspections and returned check or insufficient funds charges in connection with payments made by Borrower or on Borrower's behalf under this Note and all other such fees for ancillary services performed by Lender for Borrower or at Borrower's request or for services necessitated by or resulting from Borrower's default or malfeasance relating to the Collateral or this Note or incurred by Lender or assessed upon Borrower pursuant to the provisions of this Note or any other document executed in connection herewith.  Such fees and charges shall be secured by the Collateral and, unless Lender and Borrower agree to other terms of payment, shall bear interest from the date assessed by Lender at the rate stated in this Note, and in effect from time to time, and shall be payable, with interest, immediately following written demand from Lender to Borrower requesting payment thereof.

19.   GIVING OF NOTICES.  Any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class or certified mail or by prepaid overnight delivery service addressed to Borrower at Borrower's address above.  A notice will be delivered or mailed to Borrower at a different address if Borrower gives Lender written notice of Borrower's different address provided that Lender shall not be required to deliver notice to more than one address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower may report a change of address only through that specified procedure.  Any notice that must be given to Lender under this Note will be given by first class or certified mail to Lender at the address stated above or to any other address that Lender designates by written notice to Borrower.

20.   GOVERNING LAW; CONSENT TO JURISDICTION.  Except to the extent otherwise specifically required by applicable law, this Note shall be construed and interpreted in accordance with, and governed by, federal law and the law of the State of Illinois, without reference to its conflict of law provisions, and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws.  Borrower agrees that service of process in any such proceeding shall be effective if mailed to Borrower at the address set forth herein.  In the event that any provision of this Note is limited, restricted, prohibited or unenforceable under applicable law, such provision shall be construed and

34540- -1-5     **RECEIVED**     00639

SEP 1 9 2005

 

enforced as if it had been more narrowly drawn so as not to be in conflict with applicable law. The validity, legality and enforceability of the remaining provisions of this Note shall not in any way be affected or impaired thereby. If any part of this Note is determined to be invalid, then Lender may enforce the remainder of this Note as if the invalid provision did not exist. Lender shall be afforded the full benefit of all of Borrower's waivers and contractual agreements made in connection with the Loan that are permitted to be given under applicable law.

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from Borrower which exceeded permitted limits will be refunded. Lender may choose to make this refund by reducing the principal owed under this Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without penalty.

21.    **JURY WAIVER.** BORROWER, AND ANY ENDORSER OR GUARANTOR HEREOF, WAIVE THE RIGHT TO A TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

> BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS NOTE AND THE ABOVE INFORMATION AT THE TIME OF SIGNING.

> NOTICE TO COSIGNER: You are being asked to become liable on this debt. Think carefully before you do. If Borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility. You may have to pay up to the full amount of the debt if the Borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount. The Bank can collect this debt from you without first trying to collect from the Borrower. The Bank can use the same collection methods against you that can be used against the Borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become part of YOUR credit record.

The following notice is applicable if this agreement involves a purchase of goods or services to which the FTC HOLDER in DUE COURSE RULE applies.

> IF THE COLLATERAL IS TO BE USED PRIMARILY FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES:
> NOTICE
> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF THE GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

If you believe information we report about the credit history on your account(s) is incomplete, inaccurate or outdated, you must provide us with clear written documentation including the name on the account, the account number and the nature of the disputed information. Please write to us at:

Fifth Third Bank (Chicago)
1701 W. Golf Road
Rolling Meadows, Illinois 60008
Cook County, Illinois

NAME AND ADDRESS:

Michelle Aimee Dukler
6756 Fieldstone
Hinsdale, IL 60527

BORROWER:

(Signature)

Michelle Aimee Dukler
(Print Name)

**RECEIVED**

SEP 1 2 2005

34540- -1- -    OMWBE

00640




ACKNOWLEDGEMENT

The assignment set forth above has been recorded on the books of the undersigned bank on ___August 17___, 2004. The undersigned bank by its signature below acknowledges and agrees by its signature below to hold the Collateral pledged hereby as bailee for the benefit of, and as agent for, the Secured Party for purposes of perfecting a first priority security interest in the Collateral as set forth therein, except for normal administrative expenses of the undersigned bank relating to the Collateral. The undersigned shall comply with the orders and instructions of Secured Party with respect to the Collateral and Secured Party shall be deemed to "control" such Collateral.

Fifth Third Bank

_____
Vice President

RECEIVED

SEP 1 2 2005

OMWBE




Return to
Bob

**LOAN AND SECURITY AGREEMENT**

between

**FIFTH THIRD BANK**

and

**THE GROVE, INC.**

**Dated As Of February 17, 2004**

RECEIVED

SEP 1 2 2005

OMWBE

00643

 

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (the "**Agreement**") is made as of the 17th day of February, 2004 between FIFTH THIRD BANK (the "**Lender**"), and THE GROVE, INC., a Louisiana corporation, having its principal place of business at 3 Westbrook Corporate Center, Suite 500, Westchester, Illinois 60154 ("Borrower").

### W I T N E S S E T H:

WHEREAS, Borrower may, from time to time, request Loans from Lender, and the parties wish to provide for the terms and conditions upon which such Loans or other financial accommodations, if made by Lender, shall be made;

NOW, THEREFORE, in consideration of any Loan (including any Loan by renewal or extension) hereafter made to Borrower by Lender, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Borrower, the parties agree as follows:

1.  **DEFINITIONS.**

    (a)    "**Account**", "**Account Debtor**", "**Chattel Paper**", "**Commercial Tort Claims**", "**Deposit Accounts**", "**Documents**", "**Electronic Chattel Paper**", "**Equipment**", "**Fixtures**", "**General Intangibles**", "**Goods**", "**Instruments**", "**Inventory**", "**Investment Property**", "**Letter-of-Credit Right**", "**Proceeds**" and "**Tangible Chattel Paper**" shall have the respective meanings assigned to such terms in the Illinois Uniform Commercial Code, as the same may be in effect from time to time.

    (b)    "**Business Day**" shall mean any day other than a Saturday, a Sunday or (i) with respect to all matters, determinations, fundings and payments in connection with LIBOR Rate Loans, any day on which banks in London, England or Chicago, Illinois are required or permitted to close, and (ii) with respect to all other matters, any day that banks in Chicago, Illinois are required or permitted to close.

    (c)    "**Capital Expenditures**" shall mean with respect to any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including expenditures for capitalized lease obligations) by Borrower during such period that are required by generally accepted accounting principles, consistently applied, to be included in or reflected by the property, plant and equipment or similar fixed asset accounts (or intangible accounts subject to amortization) on the balance sheet of Borrower.

    (d)    "**Collateral**" shall mean all of the property of Borrower described in Section 5 hereof, together with all other real or personal property of any other Person now or hereafter pledged to Lender to secure, either directly or indirectly, repayment of any of the Liabilities.

    (e)    "**Debt Service**" shall mean, with respect to any period the aggregate amount of Borrower's short-term debt, long term debt, and capitalized lease obligations plus any

RECEIVED

SEP 1 2 2005

OMWBE

Loan Docs

00644

 

prepayments on indebtedness owed to any Person (except trade payables) and paid during such period.

(f)  "**EBITDA**" shall mean, with respect to any period, Borrower's net income after taxes for such period (excluding any after-tax gains or losses on the sale of assets (other than the sale of Inventory in the ordinary course of business) and excluding other after-tax extraordinary gains or losses) plus interest expense, income tax expense, depreciation and amortization for such period.

(g)  "**Environmental Laws**" shall mean all federal, state, district, local and foreign laws, rules, regulations, ordinances, and consent decrees relating to health, safety, hazardous substances, pollution and environmental matters, as now or at any time hereafter in effect, applicable to Borrower's business or facilities owned or operated by Borrower, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or hazardous, toxic or dangerous substances, materials or wastes into the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

(h)  "**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, modified or restated from time to time.

(i)  "**Event of Default**" shall have the meaning specified in Section 15 hereof.

(j)  "**Fiscal Year**" shall mean each twelve (12) month accounting period of Borrower, which ends on December 31 of each year.

(k)  "**Hazardous Materials**" shall mean any hazardous, toxic or dangerous substance, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (including, without limitation any that are or become classified as hazardous or toxic under any Environmental Law).

(l)  "**Indemnified Party**" shall have the meaning specified in Section 18 hereof.

(m)  "**Interest Period**" shall have the meaning specified in subsection 4(a)(ii)(y) hereof.

(n)  "**Liabilities**" shall mean any and all obligations, liabilities and indebtedness of Borrower to Lender or to any parent, affiliate, or subsidiary of Lender of any and every kind and

2

RECEIVED

SEP 1 2 2005

OMWBE

00645





nature, howsoever created, arising or evidenced and howsoever owned, held or acquired, whether now or hereafter existing, whether now due or to become due, whether primary, secondary, direct, indirect, absolute, contingent or otherwise, whether several, joint or joint and several, and whether arising or existing under written or oral agreement or by operation of law.

(o)     **"LIBOR Rate"** shall mean, with respect to any LIBOR Rate Loan for any Interest Period, a rate per annum equal to (a) the offered rate for deposits in United States dollars for a period equal to such Interest Period as it appears on Telerate page 3750 as of 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period. "Telerate page 3750" means the display designated as "Page 3750" on the Telerate Service (or such other page as may replace page 3750 of that service or such other service as may be nominated by the British Bankers' Association as the vendor for the purpose of displaying British Bankers' Association interest settlement rates for United States dollar deposits) divided by (b) a number equal to 1.0 minus the maximum reserve percentages (expressed as a decimal fraction) including, without limitation, basic supplemental, marginal and emergency reserves under any regulations of the Board of Governors of the Federal Reserve System or other governmental authority having jurisdiction with respect thereto, as now and from time to time in effect, for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) which are required to be maintained by Lender by the Board of Governors of the Federal Reserve System. The LIBOR Rate shall be adjusted automatically on and as of the effective date of any change in such reserve percentage.

(p)     **"LIBOR Rate Loans"** shall mean the Project Loans bearing interest with reference to the LIBOR Rate.

(q)     **"Loans"** shall mean all loans and advances made by Lender to or on behalf of Borrower hereunder.

(r)     **"Lock Box"** and **"Lock Box Account"** shall have the meanings specified in subsection 8(a) hereof.

(s)     **"Material Adverse Effect"** shall mean a material adverse effect on the business, property, assets, prospects, operations or condition, financial or otherwise, of a Person.

(t)     **"Maximum Letter of Credit Obligation"** shall have the meaning specified in Section 3 hereof.

(u)     **"Net Income"** shall mean, with respect to any period, Borrower's net income or similarly captioned item on the financial statements of Borrower prepared in accordance with generally accepted accounting principles consistently applied.

(v)     **"Obligor"** shall mean Borrower and each other Person who is or shall become primarily or secondarily liable for any of the Liabilities.

(w)     **"Original Term"** shall have the meaning specified in Section 10 hereof.

3

RECEIVED

SEP 1 2 2005

OMWBE

00646




(x)     "**Other Agreements**" shall mean all agreements, instruments and documents, other than this Agreement, including, without limitation, promissory notes, guaranties, mortgages, trust deeds, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, rate management agreement, financing statements and all other writings heretofore, now or from time to time hereafter executed by or on behalf of Borrower or any other Person and delivered to Lender or to any parent, affiliate, or subsidiary of Lender in connection with the Liabilities or the transactions contemplated hereby, as each of the same may be amended, modified or supplemented from time to time.

(y)     "**PBGC**" shall have the meaning specified in subsection 12(b)(v) hereof.

(z)     "**Permitted Liens**" shall mean (i) statutory liens of landlords, carriers, warehousemen, processors, mechanics, materialmen or suppliers incurred in the ordinary course of business and securing amounts not yet due or declared to be due by the claimant thereunder; (ii) liens or security interests in favor of Lender; (iii) zoning restrictions and easements, licenses, covenants and other restrictions affecting the use of real property that do not individually or in the aggregate have a material adverse effect on Borrower's ability to use such real property for its intended purpose in connection with Borrower's business; (iv) liens in connection with purchase money indebtedness and capitalized leases otherwise permitted pursuant to this Agreement, provided, that such liens attach only to the assets the purchase of which was financed by such purchase money indebtedness or which is the subject of such capitalized leases; (v) liens set forth on Schedule 1; and (vi) liens specifically permitted by Lender in writing.

(aa)     "**Person**" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or foreign or United States government (whether federal, state, county, city, municipal or otherwise), including, without limitation, any instrumentality, division, agency, body or department thereof.

(bb)     "**Plan**" shall have the meaning specified in subsection 12(b)(v) hereof.

(cc)     "**Prime Rate**" shall mean Lender's publicly announced prime rate (which is not intended to be Lender's lowest or most favorable rate in effect at any time) in effect from time to time.

(dd)     "**Project Loan**" shall have the meaning specified in Section 2(a) hereof.

(ee)     "**Project Loan Limit**" shall have the meaning specified in Section 2(a) hereof.

(ff)     "**Prime Rate Loans**" shall mean the Project Loans bearing interest with reference to the Prime Rate.

(gg)     "**Rate Management Agreement**" means any agreement, device or arrangement providing for payments which are related to fluctuations of interest rates, exchange rates, forward rates, or equity prices, including, but not limited to, dollar-denominated or cross-

RECEIVED

SEP 1 2 2005

OMWBE

4

00647

 

currency interest rate exchange agreements, forward currency exchange agreements, interest rate cap or collar protection agreements, forward rate currency or interest rate options, puts and warrants, and any agreement pertaining to equity derivative transactions (e.g., equity or equity index swaps, options, caps, floors, collars and forwards), including without limitation any ISDA Master Agreement between Borrower and Lender or any parent, affiliate, or subsidiary of Lender, and any schedules, confirmations and documents and other confirming evidence between the parties confirming transactions thereunder, all whether now existing or hereafter arising, and in each case as amended, modified or supplemented from time to time.

(hh)  **"Rate Management Obligations"** means any and all obligations of Borrower to Lender or any parent, affiliate, or subsidiary of Lender, whether absolute, contingent or otherwise and howsoever and whensoever (whether now or hereafter) created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefore), under or in connection with (i) any and all Rate Management Agreements, and (ii) any and all cancellations, buy-backs, reversals, terminations or assignments of any Rate Management Agreement.

(ii)  **"Tangible Net Worth"** shall have the meaning specified in <u>subsection 14(a)</u> hereof.

(jj)  **"Tax"** shall mean, in relation to any LIBOR Rate Loans and the applicable LIBOR Rate, any tax, levy, impost, duty, deduction, withholding or charges of whatever nature required to be paid by Lender and/or to be withheld or deducted from any payment otherwise required hereby to be made by Borrower to Lender; provided, that the term "Tax" shall not include any taxes imposed upon the net income of Lender.

(kk)  **"Term Loan"** shall have the meaning specified in Section 2(b)(i) hereof.

2.  **LOANS.**

(a)  **Project Loans.**

Subject to the terms and conditions of this Agreement and the Other Agreements, during the Original Term Lender may, in its sole discretion, make loans and advances (the **"Project Loans"**) in an amount up to the sum of Two Million Five Hundred Thousand Dollars ($2,500,000) (the **"Project Loan Limit"**).

Borrower hereby authorizes Lender, in its sole discretion, to charge any of Borrower's accounts or advance Project Loans to make any payments of principal, interest, fees, costs or expenses required to be made under this Agreement or the Other Agreements.

A request for a Project Loan shall be made or shall be deemed to be made, each in the following manner:  Borrower shall give Lender same day notice, no later than 1:00 P.M. (determined based on the local time of Borrower at its principal place of business) for such day, of its request for a Project Loan as a Prime Rate Loan or as a LIBOR Rate Loan, in which notice

5

RECEIVED

SEP 1 2 2005

OMWBE

00648

 

Borrower shall specify the amount of the proposed borrowing and the proposed borrowing date; provided, however, that no such request may be made at a time when there exists an Event of Default or an event which, with the passage of time or giving of notice, will become an Event of Default. As an accommodation to Borrower, Lender may permit telephone requests for Project Loans and electronic transmittal of instructions, authorizations, agreements or reports to Lender by Borrower. Unless Borrower specifically directs Lender in writing not to accept or act upon telephonic or electronic communications from Borrower, Lender shall have no liability to Borrower for any loss or damage suffered by Borrower as a result of Lender's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it telephonically or electronically and purporting to have been sent to Lender by Borrower and Lender shall have no duty to verify the origin of any such communication or the authority of the Person sending it.

Borrower hereby irrevocably authorizes Lender to disburse the proceeds of each Project Loan requested by Borrower, or deemed to be requested by Borrower, as follows: the proceeds of each Project Loan requested under <u>Section 2(a)</u> shall be disbursed by Lender in lawful money of the United States of America in immediately available funds by wire transfer or Automated Clearing House (ACH) transfer to such bank account as may be agreed upon by Borrower and Lender from time to time, or elsewhere if pursuant to a written direction from Borrower.

**(b)     Repayment.**

The Project Loans shall be repaid as follows:

(i)     Borrower shall pay interest only on the Project Loan(s) on the 1st day of each month until the first to occur of (a) payment in full of the Project Loan(s), (b) conversion of the Project Loan(s) into Term Loan(s) in accordance with Section 2(b)(ii) hereof, or (c) the expiration of the Original Term.

(ii)     <u>Conversion of Project Loans into Term Loans</u>. Any one or more of the Project Loans may be converted into a Term Loan amortized in monthly installments over a period of not more than five (5) years, and Lender shall not make any Term Loan except in connection with the conversion of one of more Project Loans. A request for a Term Loan shall be made or shall be deemed to be made, each in the following manner: Borrower shall give Lender same day notice, no later than 1:00 P.M. (determined based on the local time of Borrower at its principal place of business) for such day, of its request for a Term Loan as a Prime Rate Loan or as a LIBOR Rate Loan, in which notice Borrower shall specify the amount of the Project Loan(s) proposed to be converted into a Term Loan, and the proposed conversion date; provided, however, that no such request may be made at a time when there exists an Event of Default or an event which, with the passage of time or giving of notice, will become an Event of Default. As an accommodation to Borrower, Lender may permit telephone requests for Term Loans and electronic transmittal of instructions, authorizations, agreements or reports to Lender by Borrower. Unless Borrower specifically directs Lender in writing not to accept or act upon telephonic or electronic communications from Borrower, Lender shall have no liability to Borrower for any loss or damage suffered by Borrower as a result of Lender's honoring of any

6

RECEIVED

SEP 1 2 2005

OMWBE

00649



requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it telephonically or electronically and purporting to have been sent to Lender by Borrower and Lender shall have no duty to verify the origin of any such communication or the authority of the Person sending it.

(iii)     Voluntary Prepayment.  The Borrower may prepay the Project Loan, in whole or in part, at any time without premium or penalty.   The Borrower may prepay the Term Loan which is not governed by a Rate Management Agreement, in whole or in part, at any time without premium or penalty.

**(c)     Notes.**

The Loans shall, in Lender's sole discretion, be evidenced by one or more promissory notes in form and substance satisfactory to Lender.  However, if such Loans are not so evidenced, such Loans may be evidenced solely by entries upon the books and records maintained by Lender.

**3.     LETTERS OF CREDIT.**

Subject to the terms and conditions of this Agreement and upon the execution by the Borrower and the Lender of a Master Letter of Credit Agreement and, upon the execution and delivery by the Borrower, and the acceptance by the Lender, in its sole and absolute discretion, of an application for letter of credit, the Lender agrees from time to time during the term of this Agreement, to issue for the account of the Borrower documentary and standby Letters of Credit in the standard form of the Lender and otherwise in form and substance acceptable to the Lender, provided that the aggregate Letter of Credit obligations may not at any time exceed the sum of $500,000 (the "Maximum Letter of Credit Obligation") and provided, further, that no Letter of Credit shall have an expiration date later than the expiration of the Original Term.  The Borrower's obligations to repay to the Lender the amount of any payments made by the Lender with respect to draws made by a beneficiary under a Letter of Credit shall be evidenced by one or more promissory notes in form and substance satisfactory to Lender bearing interest at the Prime Rate.

**4.     INTEREST, FEES AND CHARGES.**

**(a)     Interest Rates for Project Loans.**

Subject to the terms and conditions set forth below, each Project Loan shall bear interest at one of the per annum rates of interest set forth in subsection (i), (ii) or (iii) below:

(i)   The Prime Rate in effect from time to time minus fifty (50) basis points, payable on the first Business Day of each month in arrears.  Said rate of interest shall increase or decrease by an amount equal to each increase or decrease in the Prime Rate effective on the effective date of each such change in the Prime Rate.

RECEIVED

SEP 1 2 2005

OMWBE

7




(ii) the LIBOR Rate for the applicable Interest Period plus two hundred (200) basis points, such rate to remain fixed for such Interest Period. "**Interest Period**" shall mean any continuous period of thirty (30), sixty (60) or ninety (90) days, as selected from time to time by Borrower by irrevocable notice (in writing, by telecopy, telex, electronic mail, or cable) given to Lender not later than the first day of each respective Interest Period; provided that: (A) each such period occurring after such initial period shall commence on the day on which the immediately preceding period expires; (B) the final Interest Period shall be such that its expiration occurs on or before the end of the Original Term; and (C) if for any reason Borrower shall fail to timely select a period, then such Project Loans shall continue as, or revert to, Prime Rate Loans.  Interest shall be payable on the first Business Day of each month in arrears and on the last Business Day of such Interest Period.

(iii)  Upon the occurrence of an Event of Default and during the continuance thereof, the Project Loans shall bear interest at the rate of four percent (4.0%) per annum in excess of the interest rate otherwise payable thereon, which interest shall be payable on demand.  All interest shall be calculated on the basis of a 360-day year.

**(b)**      **Interest Rates for Term Loans.**

Subject to the terms and conditions set forth below, except as set forth in Section 3 above, each Term Loan shall bear interest at one of the per annum rates of interest set forth in subsection (i), (ii) or (iii) below:

(i)   The Prime Rate in effect from time to time minus twenty-five (25) basis points, payable on the first Business Day of each month in arrears.  Said rate of interest shall increase or decrease by an amount equal to each increase or decrease in the Prime Rate effective on the effective date of each such change in the Prime Rate.

(ii) the LIBOR Rate for the applicable Interest Period plus two hundred and twenty-five (225) basis points, such rate to remain fixed for such Interest Period. "**Interest Period**" shall mean any continuous period of thirty (30), sixty (60) or ninety (90) days, as selected from time to time by Borrower by irrevocable notice (in writing, by telecopy, telex, electronic mail, or cable) given to Lender not less than the first day of each respective Interest Period; provided that: (A) each such period occurring after such initial period shall commence on the day on which the immediately preceding period expires; (B) the final Interest Period shall be such that its expiration occurs on or before the end of the Original Term; and (C) if for any reason Borrower shall fail to timely select a period, then such Project Loans shall continue as, or revert to, Prime Rate Loans.  Interest shall be payable on the first Business Day of each month in arrears and on the last Business Day of such Interest Period.

RECEIVED

SEP 1 2 2005

OMWBE

00651




(iii)    a fixed rate of interest by means of an interest rate swap pursuant to the standard form of Rate Management Agreement to be entered into by Borrower and Lender's Corporate Finance Department.  Under the Rate Management Agreement, the Borrower will receive the proposed variable rate index and pay a fixed rate to Lender.  The variable rate received by the Borrower will be applied to the proposed credit facility's variable rate index.  The proposed effective all-in fixed rate of interest to be paid by the Borrower will be the fixed rate paid under the Rate Management Agreement plus, if applicable, the proposed credit spread over the variable rate index.  Borrower shall have the right to select a fixed rate of interest by means of an interest rate swap only for a Term Loan in the amount of not less than $1,000,000.

(iv)  Upon the occurrence of an Event of Default and during the continuance thereof, the Term Loans shall bear interest at the rate of four percent (4.0%) per annum in excess of the interest rate otherwise payable thereon, which interest shall be payable on demand.  All interest shall be calculated on the basis of a 360-day year.

**(c)    Other LIBOR Provisions.**

(i)    Subject to the provisions of this Agreement, Borrower shall have the option (A) as of any date, to convert all or any part of the Prime Rate Project Loans to, or request that new Project Loans be made as, LIBOR Rate Loans of various Interest Periods, (B) as of the last day of any Interest Period, to continue all or any portion of the relevant LIBOR Rate Loans as LIBOR Rate Loans; (C) as of the last day of any Interest Period, to convert all or any portion of the LIBOR Rate Loans to Prime Rate Loans; and (D) at any time, to request new Loans as Prime Rate Loans; provided, that Loans may not be continued as or converted to LIBOR Rate Loans, if the continuation or conversion thereof would violate the provisions of subsections 4(b)(ii) or 4(b)(iii) of this Agreement or if an Event of Default has occurred.

(ii)    Lender's determination of the LIBOR Rate as provided above shall be conclusive, absent manifest error.  Furthermore, if Lender determines, in good faith (which determination shall be conclusive, absent manifest error), prior to the commencement of any Interest Period that (A) U.S. Dollar deposits of sufficient amount and maturity for funding the Loans are not available to Lender in the London Interbank Eurodollar market in the ordinary course of business, or (B) by reason of circumstances affecting the London Interbank Eurodollar market, adequate and fair means do not exist for ascertaining the rate of interest to be applicable to the Loans requested by Borrower to be LIBOR Rate Loans or the Loans bearing interest at the rates set forth in subsection 4(a)(ii) of this Agreement shall not represent the effective pricing to Lender for U.S. Dollar deposits of a comparable amount for the relevant period (such as for example, but not limited to, official reserve requirements required by Regulation D to the extent not given effect in determining the rate), Lender shall promptly notify Borrower and (1) all existing LIBOR Rate Loans shall convert to Prime Rate Loans upon the end of the applicable Interest Period, and (2) no additional LIBOR Rate Loans shall be made until such circumstances are cured.

9

RECEIVED

SEP 1 2 2005

~~NRF

00652



(iii)    If, after the date hereof, the introduction of, or any change in any applicable law, treaty, rule, regulation or guideline or in the interpretation or administration thereof by any governmental authority or any central bank or other fiscal, monetary or other authority having jurisdiction over Lender or its lending offices (a "**Regulatory Change**"), shall, in the opinion of counsel to Lender, make it unlawful for Lender to make or maintain LIBOR Rate Loans, then Lender shall promptly notify Borrower and (A) the LIBOR Rate Loans shall immediately convert to Prime Rate Loans on the last Business Day of the then existing Interest Period or on such earlier date as required by law and (B) no additional LIBOR Rate Loans shall be made until such circumstance is cured.

(iv)    If, for any reason, a LIBOR Rate Loan is paid prior to the last Business Day of any Interest Period or if a LIBOR Rate Loan does not occur on a date specified by Borrower in its request (other than as a result of a default by Lender), Borrower agrees to indemnify Lender against any loss (including any loss on redeployment of the deposits or other funds acquired by Lender to fund or maintain such LIBOR Rate Loan) cost or expense incurred by Lender as a result of such prepayment.

(v)    If any Regulatory Change (whether or not having the force of law) shall (A) impose, modify or deem applicable any assessment, reserve, special deposit or similar requirement against assets held by, or deposits in or for the account of or loans by, or any other acquisition of funds or disbursements by, Lender; (B) subject Lender or the LIBOR Rate Loans to any Tax or change the basis of taxation of payments to Lender of principal or interest due from Borrower to Lender hereunder (other than a change in the taxation of the overall net income of Lender); or (C) impose on Lender any other condition regarding the LIBOR Rate Loans or Lender's funding thereof, and Lender shall determine (which determination shall be conclusive, absent any manifest error) that the result of the foregoing is to increase the cost to Lender of making or maintaining the LIBOR Rate Loans or to reduce the amount of principal or interest received by Lender hereunder, then Borrower shall pay to Lender, on demand, such additional amounts as Lender shall, from time to time, determine are sufficient to compensate and indemnify Lender from such increased cost or reduced amount.

(vi)    Lender shall receive payments of amounts of principal of and interest with respect to the LIBOR Rate Loans free and clear of, and without deduction for, any Taxes. If (A) Lender shall be subject to any Tax in respect of any LIBOR Rate Loans or any part thereof or, (B) Borrower shall be required to withhold or deduct any Tax from any such amount, the LIBOR Rate applicable to such LIBOR Rate Loans shall be adjusted by Lender to reflect all additional costs incurred by Lender in connection with the payment by Lender or the withholding by Borrower of such Tax and Borrower shall provide Lender with a statement detailing the amount of any such Tax actually paid by Borrower. Determination by Lender of the amount of such costs shall be conclusive, absent manifest error. If after any such adjustment any part of any Tax paid by Lender is subsequently recovered by Lender, Lender shall reimburse Borrower to the extent of the amount so recovered. A certificate of an officer of Lender setting forth the amount of such recovery and the basis therefore shall be conclusive, absent manifest error.

**RECEIVED**

SEP 1 2 2005

**OMWBE**

10

00653



(vii)   The initial request for a LIBOR Rate Loan shall be in an amount not less than Two Hundred and Fifty Thousand and No/100 Dollars ($250,000), and each request for a LIBOR Rate Loan thereafter shall be in an amount not less than One Hundred Thousand and No/100 Dollars ($100,000).

(viii)   Unless otherwise specified by Borrower, all Loans shall be Prime Rate Loans.

(ix)   No more than three (3) Interest Periods may be in effect with respect to outstanding LIBOR Rate Loans at any one time.

**(d)     Costs, Expenses, And Charges.**

(i)     <u>Costs and Expenses.</u>  Borrower shall reimburse Lender for all costs and expenses, including, without limitation, legal expenses and reasonable attorneys' fees (whether for internal or outside counsel), incurred by Lender in connection with the (A) documentation and consummation of this transaction and any other transactions between Borrower and Lender, including, without limitation, Uniform Commercial Code and other public record searches and filings, overnight courier or other express or messenger delivery, appraisal costs, surveys, title insurance and environmental audit or review costs; (B) collection, protection or enforcement of any rights in or to the Collateral; (C) collection of any Liabilities; and (D) administration and enforcement of any of Lender's rights under this Agreement or any Other Agreement.  Borrower shall also pay all normal service charges with respect to all accounts maintained by Borrower with Lender and any additional services requested by Borrower from Lender.  All such costs, expenses and charges shall constitute Liabilities hereunder, shall be payable by Borrower to Lender on demand, and until paid, shall bear interest at the highest rate then applicable to Loans hereunder.  Notwithstanding the foregoing, Borrower shall not be obligated to reimburse Lender for costs and expenses incurred by Lender in connection with the documentation and consummation of this transaction in excess of $5,000 in the aggregate.

(ii)     <u>Capital Adequacy Charge</u>.  If Lender shall have determined that the adoption of any law, rule or regulation regarding capital adequacy, or any change therein or in the interpretation or application thereof, or compliance by Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any central bank or governmental authority enacted after the date hereof, does or shall have the effect of reducing the rate of return on such party's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by a material amount, then from time to time, after submission by Lender to Borrower of a written demand therefor ("**Capital Adequacy Demand**") together with the certificate described below, Borrower shall pay to Lender such additional amount or amounts ("**Capital Adequacy Charge**") as will compensate Lender for such reduction, such Capital Adequacy Demand to be made with reasonable promptness following such determination.  A certificate of Lender claiming entitlement to payment as set forth above shall be conclusive in the absence of manifest error.  Such certificate shall set forth the nature of the occurrence giving rise to such reduction, the

11

RECEIVED

SEP 1 2 2005

OMWBE

00654




amount of the Capital Adequacy Charge to be paid to Lender, and the method by which such amount was determined. In determining such amount, Lender may use any reasonable averaging and attribution method, applied on a non-discriminatory basis.

(e)    **Maximum Interest.**

It is the intent of the parties that the rate of interest and other charges to Borrower under this Agreement and the Other Agreements shall be lawful; therefore, if for any reason the interest or other charges payable under this Agreement are found by a court of competent jurisdiction, in a final determination, to exceed the limit which Lender may lawfully charge Borrower, then the obligation to pay interest and other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be refunded to Borrower.

5.    **COLLATERAL.**

(a)    **Grant of Security Interest to Lender.**

For the payment or other satisfaction of all other Liabilities, Borrower hereby assigns to Lender and grants to Lender a continuing security interest in the following property of Borrower, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located: (a) all Accounts and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Borrower; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, payment intangibles, security interests, security deposits and rights to indemnification); (c) all Inventory; (d) all Goods (other than Inventory), including, without limitation, Equipment, vehicles and Fixtures; (e) all Investment Property; (f) all Deposit Accounts, bank accounts, deposits and cash; (g) all Letter-of-Credit Rights; (h) Commercial Tort Claims listed on Exhibit C hereto; (i) any other property of Borrower now or hereafter in the possession, custody or control of Lender or any agent or any parent, affiliate, or subsidiary of Lender or any participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise); and (j) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of Borrower's books and records relating to any of the foregoing and to Borrower's business.

(b)    **Other Security.**

Lender, in its sole discretion, without waiving or releasing any obligation, liability or duty of Borrower under this Agreement or the Other Agreements or any Event of Default, may at any time or times hereafter, but shall not be obligated to, pay, acquire or accept an assignment of

12

RECEIVED

SEP 1 2 2005

OMWBE




any security interest, lien, encumbrance or claim asserted by any Person in, upon or against the Collateral. All sums paid by Lender in respect thereof and all costs, fees and expenses including, without limitation, reasonable attorney fees, all court costs and all other charges relating thereto incurred by Lender shall constitute Liabilities, payable by Borrower to Lender on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

(c)     **Possessory Collateral.**

Immediately upon Borrower's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including, without limitation, any Tangible Chattel Paper and any Investment Property consisting of certificated securities, Borrower shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance acceptable to Lender). If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as Borrower's attorney and agent-in-fact, to endorse or assign the same on Borrower's behalf.

(d)     **Electronic Chattel Paper.**

To the extent that Borrower obtains or maintains any Electronic Chattel Paper, Borrower shall create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that (i) a single authoritative copy of the record or records exists which is unique, identifiable and except as otherwise provided in clauses (iv), (v) and (vi) below, unalterable, (ii) the authoritative copy identifies Lender as the assignee of the record or records, (iii) the authoritative copy is communicated to and maintained by the Lender or its designated custodian, (iv) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Lender, (v) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and (vi) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

6.     **PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY INTERESTS THEREIN.**

Borrower shall, at Lender's request, at any time and from time to time, authenticate, execute and deliver to Lender such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Lender) and do such other acts and things or cause third parties to do such other acts and things as Lender may deem necessary or desirable in its sole discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Lender (free and clear of all other liens, claims, encumbrances and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens) to secure payment of the Liabilities, and in order to facilitate the collection of the Collateral. Borrower irrevocably hereby makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as Borrower's true and lawful attorney and agent-in-fact to execute

13

RECEIVED

SEP 1 2 2005

OMWBE




and file such financing statements, documents and other agreements and instruments and do such other acts and things as may be necessary to preserve and perfect Lender's security interest in the Collateral. Borrower further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement shall be sufficient as a financing statement. Borrower further ratifies and confirms the prior filing by Lender of any and all financing statements which identify the Borrower as debtor, Lender as secured party and any or all Collateral as collateral.

### 7.    POSSESSION OF COLLATERAL AND RELATED MATTERS.

Until an Event of Default has occurred, Borrower shall have the right, except as otherwise provided in this Agreement, in the ordinary course of Borrower's business, to (a) sell, lease or furnish under contracts of service any of Borrower's Inventory normally held by Borrower for any such purpose; and (b) use and consume any raw materials, work in process or other materials normally held by Borrower for such purpose; provided, however, that a sale in the ordinary course of business shall not include any transfer or sale in satisfaction, partial or complete, of a debt owed by Borrower.

### 8.    COLLECTIONS FOLLOWING AN EVENT OF DEFAULT.

*After the occurrence and continuing event of default MV*

(i)    Borrower shall direct all of its Account Debtors to make all payments on the Accounts directly to a post office box (the "**Lock Box**") designated by, and under the exclusive control of, Lender, at a financial institution acceptable to Lender. Borrower shall establish an account (the "**Lock Box Account**") in Lender's name with a financial institution acceptable to Lender, into which all payments received in the Lock Box shall be deposited, and into which Borrower will immediately deposit all payments received by Borrower on Accounts in the identical form in which such payments were received, whether by cash or check. If Borrower, any parent, affiliate, or subsidiary of Borrower, any shareholder, officer, director, employee or agent of Borrower or any parent, affiliate, or subsidiary of Borrower, or any other Person acting for or in concert with Borrower shall receive any monies, checks, notes, drafts or other payments relating to or as Proceeds of Accounts or other Collateral, Borrower and each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Lender and, immediately upon receipt thereof, shall remit the same (or cause the same to be remitted) in kind to the Lock Box Account. The financial institution with which the Lock Box Account is established shall acknowledge and agree, in a manner satisfactory to Lender, that the amounts on deposit in such Lock Box and Lock Box Account are the sole and exclusive property of Lender, that such financial institution will follow the instructions of Lender with respect to disposition of funds in the Lock Box and Lock Box Account without further consent from Borrower, that such financial institution has no right to setoff against the Lock Box or Lock Box Account or against any other account maintained by such financial institution into which the contents of the Lock Box or Lock Box Account are transferred, and that such financial institution shall wire, or otherwise transfer in immediately available funds to Lender in a manner satisfactory to Lender, funds deposited in the Lock Box Account on a daily basis as such funds are collected. Borrower agrees that all payments made to such Lock Box Account or otherwise received by Lender, whether in respect of the Accounts or as Proceeds of other Collateral or otherwise, will be

14

RECEIVED

SEP 1 2 2005

OMWBE




applied on account of the Liabilities in accordance with the terms of this Agreement; provided, that so long as no Event of Default has occurred, payments received by Lender shall not be applied to the unmatured portion of the LIBOR Rate Loans, but shall be held in a cash collateral account maintained by Lender, until the earlier of (i) the last Business Day of the Interest Period applicable to such LIBOR Rate Loan and (ii) the occurrence of an Event of Default. Borrower agrees to pay all fees, costs and expenses in connection with opening and maintaining the Lock Box and Lock Box Account. All of such fees, costs and expenses if not paid by Borrower, may be paid by Lender and in such event all amounts paid by Lender shall constitute Liabilities hereunder, shall be payable to Lender by Borrower upon demand, and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder. All checks, drafts, instruments and other items of payment or Proceeds of Collateral shall be endorsed by Borrower to Lender, and, if that endorsement of any such item shall not be made for any reason, Lender is hereby irrevocably authorized to endorse the same on Borrower's behalf. For the purpose of this section, Borrower irrevocably hereby makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as Borrower's true and lawful attorney and agent-in-fact (i) to endorse Borrower's name upon said items of payment and/or Proceeds of Collateral and upon any Chattel Paper, Document, Instrument, invoice or similar document or agreement relating to any Account of Borrower or Goods pertaining thereto; (ii) to take control in any manner of any item of payment or Proceeds thereof and (iii) to have access to any lock box or postal box into which any of Borrower's mail is deposited, and open and process all mail addressed to Borrower and deposited therein.

(ii)     Lender may, at any time and from time to time after the occurrence and during the continuance of an Event of Default, whether before or after notification to any Account Debtor and whether before or after the maturity of any of the Liabilities, (i) enforce collection of any of Borrower's Accounts or other amounts owed to Borrower by suit or otherwise; (ii) exercise all of Borrower's rights and remedies with respect to proceedings brought to collect any Accounts or other amounts owed to Borrower; (iii) surrender, release or exchange all or any part of any Accounts or other amounts owed to Borrower, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder; (iv) sell or assign any Account of Borrower or other amount owed to Borrower upon such terms, for such amount and at such time or times as Lender deems advisable; (v) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or other similar document against any Account Debtor or other Person obligated to Borrower; and (vi) do all other acts and things which are necessary, in Lender's sole discretion, to fulfill Borrower's obligations under this Agreement and the Other Agreements and to allow Lender to collect the Accounts or other amounts owed to Borrower. In addition to any other provision hereof, Lender may at any time, after the occurrence and during the continuance of an Event of Default, at Borrower's expense, notify any parties obligated on any of the Accounts to make payment directly to Lender of any amounts due or to become due thereunder. After the occurrence and during the continuance of an Event of Default, Lender is hereby irrevocably authorized to endorse all checks, drafts, instruments and other items of payment or Proceeds of Collateral on Borrower's behalf. For the purpose of this section, Borrower irrevocably hereby makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as Borrower's true and lawful attorney and agent-in-fact (i) to endorse Borrower's name upon said items of payment and/or Proceeds of

15

RECEIVED

SEP 1 2 2005

00658

 

Collateral and upon any Chattel Paper, Document, Instrument, invoice or similar document or agreement relating to any Account of Borrower or Goods pertaining thereto; (ii) to take control in any manner of any item of payment or Proceeds thereof and (iii) to have access to any lock box or postal box into which any of Borrower's mail is deposited, and open and process all mail addressed to Borrower and deposited therein.

(iii)    After the occurrence and during the continuance of an Event of Default, upon receipt by Lender of cash or other immediately available funds from collections of items of payment and Proceeds of any Collateral, Lender may apply the whole or any part of such collections or Proceeds against the Liabilities in such order as Lender shall determine in its sole discretion. For purposes of determining the amount of Loans available for borrowing purposes, checks and cash or other immediately available funds from collections of items of payment and Proceeds of any Collateral shall be applied in whole or in part against the Liabilities, in such order as Lender shall determine in its sole discretion, on the day of receipt, subject to actual collection.

(iv)    On a monthly basis, Lender shall deliver to Borrower an account statement showing all Loans, charges and payments, which shall be deemed final, binding and conclusive upon Borrower unless Borrower notifies Lender in writing, specifying any error therein, within thirty (30) days of the date such account statement is sent to Borrower and any such notice shall only constitute an objection to the items specifically identified.

(v)    After the occurrence and during the continuance of an Event of Default, immediately upon Borrower's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including, without limitation, any Chattel Paper, Borrower shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance acceptable to Lender). If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as Borrower's attorney and agent-in-fact, to endorse or assign the same on Borrower's behalf.

## 9.    COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND SCHEDULES.

**(a)    Financial Statements.**

Borrower shall deliver to Lender the following financial information, all of which shall be prepared in accordance with generally accepted accounting principles consistently applied and shall be accompanied by a compliance certificate in the form of <u>Exhibit B</u> hereto, which compliance certificate shall include a calculation of all the financial covenants contained in Section 14 (as required):

(i)    Within 30 days after the end of each month (except the end of the fiscal year), the Borrower's internally prepared monthly financial statement package which includes at least an income statement, statement of retained earnings, balance sheet and cash flow schedule; and

16

RECEIVED

SEP 1 2 2005

OMWBE

00659




(ii)     Within 120 days of the end of each fiscal year, the Borrower's annual financial statements as audited by independent certified public accountants satisfactory to Lender which financial statements shall be accompanied by copies of any management letters sent to the Borrower by such accountants.

**(b)     Annual Budget and Projections.**

Borrower shall deliver to Lender, within 90 days following the end of fiscal year, an annual budget and projections for the then current fiscal year.

**(c)     Public Reporting.**

Promptly upon the filing thereof, Borrower shall deliver to Lender copies of all registration statements and annual, quarterly, monthly or other regular reports which Borrower or any of its Subsidiaries files with the Securities and Exchange Commission, as well as promptly providing to Lender copies of any reports and proxy statements delivered to its shareholders.

**(d)     Other Information.**

Promptly following request therefore by Lender, such other business or financial data, reports, appraisals and projections as Lender may reasonably request.

**10.     TERMINATION; AUTOMATIC RENEWAL.**

**THIS AGREEMENT SHALL BE IN EFFECT FROM THE DATE HEREOF UNTIL THE SECOND ANNIVERSARY OF THE DATE HEREOF (THE "ORIGINAL TERM") UNLESS THE DUE DATE OF THE LIABILITIES IS ACCELERATED PURSUANT TO SECTION 16 HEREOF.** Upon expiration of this Agreement (i) Lender shall not make any additional Loans on or after such expiration date; and (ii) this Agreement shall terminate on the date thereafter that the Liabilities are paid in full.  At such time as Borrower has repaid all of the Liabilities and this Agreement has terminated, Borrower shall deliver to Lender a release, in form and substance satisfactory to Lender, of all obligations and liabilities of Lender and its officers, directors, employees, agents, and parent, affiliates, or subsidiaries of Borrower.

**11.     REPRESENTATIONS AND WARRANTIES.**

Borrower hereby represents and warrants to Lender, which representations and warranties (whether appearing in this Section 11 or elsewhere) shall be true at the time of Borrower's execution hereof and the closing of the transactions described herein or related hereto, shall remain true until the repayment in full and satisfaction of all the Liabilities and termination of this Agreement, and shall be remade by Borrower at the time each Loan is made pursuant to this Agreement.

RECEIVED

SEP 1 2 2005

OMWBE

17

00660




**(a)    Financial Statements and Other Information.**

The financial statements and other information delivered or to be delivered by Borrower to Lender at or prior to the date of this Agreement accurately reflect the financial condition of Borrower, and there has been no adverse change in the financial condition, the operations or any other status of Borrower since the date of the financial statements delivered to Lender most recently prior to the date of this Agreement. All written information now or heretofore furnished by Borrower to Lender is true and correct as of the date with respect to which such information was furnished.

**(b)    Locations.**

The office where Borrower keeps its books, records and accounts (or copies thereof) concerning the Collateral, Borrower's principal place of business and all of Borrower's other places of business, locations of Collateral and post office boxes and locations of bank accounts are as set forth in Exhibit A and at other locations within the continental United States of which Lender has been advised by Borrower in accordance with subsection 12(b)(i). The Collateral, including, without limitation, the Equipment (except any part thereof which Borrower shall have advised Lender in writing consists of Collateral normally used in more than one state) is kept, or, in the case of vehicles, based, only at the addresses set forth on Exhibit A, and at other locations within the continental United States of which Lender has been advised by Borrower in writing in accordance with subsection 12(b)(i) hereof.

**(c)    Loans by Borrower.**

Borrower has not made any loans or advances to any parent, affiliate, or subsidiary or other Person except for advances authorized hereunder to employees, officers and directors of Borrower for travel and other expenses arising in the ordinary course of Borrower's business and loans permitted pursuant to subsection 13(e) hereof.

**(d)    Liens.**

Borrower is the lawful owner of all Collateral now purportedly owned or hereafter purportedly acquired by Borrower, free from all liens, claims, security interests and encumbrances whatsoever, whether voluntarily or involuntarily created and whether or not perfected, other than the Permitted Liens.

**(e)    Organization, Authority and No Conflict.**

Borrower is a corporation duly organized, validly existing and in good standing in the State of Louisiana, and Borrower is duly qualified and in good standing in all states where the nature and extent of the business transacted by it or the ownership of its assets makes such qualification necessary. Borrower has the right and power and is duly authorized and empowered to enter into, execute and deliver this Agreement and the Other Agreements and

18

**RECEIVED**

SEP 1 2 2005

**OMWBE**

 

perform its obligations hereunder and thereunder. Borrower's execution, delivery and performance of this Agreement and the Other Agreements does not conflict with the provisions of the organizational documents of Borrower, any statute, regulation, ordinance or rule of law, or any agreement, contract or other document which may now or hereafter be binding on Borrower, and Borrower's execution, delivery and performance of this Agreement and the Other Agreements shall not result in the imposition of any lien or other encumbrance upon any of Borrower's property under any existing indenture, mortgage, deed of trust, loan or credit agreement or other agreement or instrument by which Borrower or any of its property may be bound or affected.

**(f)    Litigation.**

There are no actions or proceedings which are pending or threatened against Borrower which might have a Material Adverse Effect on Borrower, and Borrower shall, promptly upon becoming aware of any such pending or threatened action or proceeding, give written notice thereof to Lender. Borrower has no Commercial Tort Claims pending other than those set forth on Exhibit C hereto as Exhibit C may be amended from time to time.

**(g)    Compliance with Laws and Maintenance of Permits.**

Borrower has obtained all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on Borrower. Borrower is in compliance in all material respects with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety) the failure to comply with which would have a Material Adverse Effect on Borrower.

**(h)    Affiliate Transactions.**

Except as set forth on Schedule 11(h) hereto or as permitted pursuant to subsection 11(c) hereof, Borrower is not conducting, permitting or suffering to be conducted, transactions with any parent, affiliate, or subsidiary other than transactions with a parent, affiliate, or subsidiary for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to Borrower than the terms upon which such transactions would have been made had they been made to or with a Person that is not a parent, affiliate, or subsidiary.

**(i)    Names and Trade Names.**

Borrower uses no trade names, assumed names, fictitious names or division names in the operation of its business, except as set forth on Schedule 11(i) hereto.

19

RECEIVED

SEP 1 2 2005

OMWBE

00662

 

**(j)    Equipment.**

Borrower has good and indefeasible and merchantable title to and ownership of all Equipment. No Equipment is a Fixture to real estate unless such real estate is owned by Borrower and is subject to a mortgage in favor of Lender, or if such real estate is leased, is subject to a landlord's agreement in favor of Lender on terms acceptable to Lender, or an accession to other personal property unless such personal property is subject to a first priority lien in favor of Lender.

**(k)    Enforceability.**

This Agreement and the Other Agreements to which Borrower is a party are the legal, valid and binding obligations of Borrower and are enforceable against Borrower in accordance with their respective terms.

**(l)    Solvency.**

Borrower is, after giving effect to the transactions contemplated hereby, solvent, able to pay its debts as they become due, has capital sufficient to carry on its business, now owns property having a value both at fair valuation and at present fair saleable value greater than the amount required to pay its debts, and will not be rendered insolvent by the execution and delivery of this Agreement or any of the Other Agreements or by completion of the transactions contemplated hereunder or thereunder.

**(m)    Indebtedness.**

Except as set forth on <u>Schedule 11(m)</u> hereto, Borrower is not obligated (directly or indirectly), for any loans or other indebtedness for borrowed money other than the Loans.

**(n)    Margin Security and Use of Proceeds.**

Borrower does not own any margin securities, and none of the proceeds of the Loans hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

**(o)    Parent, Subsidiaries and Affiliates.**

Except as set forth on <u>Schedule 11(o)</u> hereto, Borrower has no parent, subsidiaries, affiliates, or divisions, nor is Borrower engaged in any joint venture or partnership with any other Person.

RECEIVED

SEP 1 2 2005

OMWBE

20



(p)    **No Defaults.**

Borrower is not in default under any material contract, lease or commitment to which it is a party or by which it is bound, nor does Borrower know of any dispute regarding any contract, lease or commitment which would have a Material Adverse Effect on Borrower.

(q)    **Employee Matters.**

There are no controversies pending or threatened between Borrower and any of its employees, agents or independent contractors other than employee grievances arising in the ordinary course of business which would not, in the aggregate, have a Material Adverse Effect on Borrower, and Borrower is in compliance with all federal and state laws respecting employment and employment terms, conditions and practices except for such non-compliance which would not have a Material Adverse Effect on Borrower.

(r)    **Intellectual Property.**

Borrower possesses adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and trade names to continue to conduct its business as heretofore conducted by it.

(s)    **Environmental Matters.**

Borrower has not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates any Environmental Law or any license, permit, certificate, approval or similar authorization thereunder and the operations of the Borrower comply in all material respects with all Environmental Laws and all licenses, permits, certificates, approvals and similar authorizations thereunder. There has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any governmental authority or any other Person, nor is any pending or to the best of the Borrower's knowledge threatened with respect to any non-compliance with or violation of the requirements of any Environmental Law by the Borrower or the release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter, which affects the Borrower or its business, operations or assets or any properties at which the Borrower has transported, stored or disposed of any Hazardous Materials. Borrower has no material liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials.

(t)    **ERISA Matters.**

Borrower has paid and discharged all obligations and liabilities arising under ERISA of a

21

RECEIVED

SEP 1 2 2005

OMWBE

00664

 

character which, if unpaid or unperformed, might result in the imposition of a lien against any of its properties or assets.

## 12.    AFFIRMATIVE COVENANTS.

Until payment and satisfaction in full of all Liabilities and termination of this Agreement, unless Borrower obtains Lender's prior written consent waiving or modifying any of Borrower's covenants hereunder in any specific instance, Borrower covenants and agrees as follows:

**(a)    Maintenance of Records.**

Borrower shall at all times keep accurate and complete books, records and accounts with respect to all of Borrower's business activities, in accordance with sound accounting practices and generally accepted accounting principles consistently applied, and shall keep such books, records and accounts, and any copies thereof, only at the addresses indicated for such purpose on Exhibit A.

**(b)    Notices.**

Borrower shall:

(i)    Locations.  Promptly (but in no event less than ten (10) days prior to the occurrence thereof) notify Lender of the opening of an new place of business or new location of Collateral, the closing of any existing place of business or location of Collateral, any change of in the location of Borrower's books, records and accounts (or copies thereof), the opening or closing of any post office box, the opening or closing of any bank account or, if any of the Collateral consists of Goods of a type normally used in more than one state, the use of any such Goods in any state other than a state in which Borrower has previously advised Lender that such Goods will be used.

(ii)    Litigation and Proceedings.  Promptly upon becoming aware thereof, notify Lender of any actions or proceedings which are pending or threatened against Borrower which might have a Material Adverse Effect on Borrower and of any Commercial Tort Claims of Borrower which may arise, which notice shall constitute Borrower's authorization to amend Exhibit C to add such Commercial Tort Claim.

(iii)    Names and Trade Names.  Notify Lender within ten (10) days of the change of its name or the use of any trade name, assumed name, fictitious name or division name not previously disclosed to Lender in writing.

(iv)    ERISA Matters. Promptly notify Lender of (x) the occurrence of any "reportable event" (as defined in ERISA) which might result in the termination by the Pension Benefit Guaranty Corporation (the **"PBGC"**) of any employee benefit plan (**"Plan"**) covering any officers or employees of the Borrower, any benefits of which are, or are required to be, guaranteed by the PBGC, (y) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor or (z) its intention to terminate or withdraw from any Plan.

22

RECEIVED

SEP 1 2 2005



(v)  Environmental Matters.  Immediately notify Lender upon becoming aware of any investigation, proceeding, complaint, order, directive, claim, citation or notice with respect to any non-compliance with or violation of the requirements of any Environmental Law by Borrower or the generation, use, storage, treatment, transportation, manufacture handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter which affects Borrower or its business operations or assets or any properties at which Borrower has transported, stored or disposed of any Hazardous Materials.

(vi)  Default; Material Adverse Change.  Promptly advise Lender of any material adverse change in the business, property, assets, prospects, operations or condition, financial or otherwise, of Borrower, the occurrence of any Event of Default hereunder or the occurrence of any event which, if uncured, will become an Event of Default after notice or lapse of time (or both).

All of the foregoing notices shall be provided by Borrower to Lender in writing.

(c)  **Compliance with Laws and Maintenance of Permits.**

Borrower shall maintain all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on Borrower and Borrower shall remain in compliance with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety) the failure with which to comply would have a Material Adverse Effect on Borrower. Following any determination by Lender that there is non-compliance, or any condition which requires any action by or on behalf of Borrower in order to avoid non-compliance, with any Environmental Law, at Borrower's expense cause an independent environmental engineer acceptable to Lender to conduct such tests of the relevant site(s) as are appropriate and prepare and deliver a report setting forth the results of such tests, a proposed plan for remediation and an estimate of the costs thereof.

(d)  **Inspection and Audits.**

Borrower shall permit Lender, or any Persons designated by it, to call at Borrower's places of business at any reasonable times, and, without hindrance or delay, to inspect the Collateral and to inspect, audit, check and make extracts from Borrower's books, records, journals, orders, receipts and any correspondence and other data relating to Borrower's business, the Collateral or any transactions between the parties hereto, and shall have the right to make such verification concerning Borrower's business as Lender may consider reasonable under the circumstances. Borrower shall furnish to Lender such information relevant to Lender's rights under this Agreement and the Other Agreements as Lender shall at any time and from time to time request.  Lender, through its officers, employees or agents shall have the right, at any time and from time to time, in Lender's name, to verify the validity, amount or any other matter relating to any of Borrower's Accounts, by mail, telephone, telecopy, electronic mail, or otherwise.  Borrower authorizes Lender to discuss the affairs, finances and business of Borrower with any officers, employees or directors of

RECEIVED

SEP 1 2 2005

OMWBE

23

00666

 

Borrower or with its parent or any affiliate or subsidiary or the officers, employees or directors of its parent or any affiliate or subsidiary, and to discuss the financial condition of Borrower with Borrower's independent public accountants. Any such discussions shall be without liability to Lender or to Borrower's independent public accountants. Borrower shall pay to Lender all reasonable fees and all costs and out-of-pocket expenses incurred by Lender in the exercise of its rights hereunder, and all of such fees, costs and expenses shall constitute Liabilities hereunder, shall be payable on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder. All inspections and audits shall be performed by Lender so as not to unreasonably interfere with the business of Borrower.

(e)     **Insurance.**

Borrower shall:

(i)     Keep the Collateral properly housed and insured for the full insurable value thereof against loss or damage by fire, theft, explosion, sprinklers, collision (in the case of motor vehicles) and such other risks as are customarily insured against by Persons engaged in businesses similar to that of Borrower, with such companies, in such amounts, with such deductibles, and under policies in such form, as shall be satisfactory to Lender. Original (or certified) copies of such policies of insurance have been or shall be, within ninety (90) days of the date hereof, delivered to Lender, together with evidence of payment of all premiums therefor, and shall contain an endorsement, in form and substance acceptable to Lender, showing loss under such insurance policies payable to Lender. Such endorsement, or an independent instrument furnished to Lender, shall provide that the insurance company shall give Lender at least thirty (30) days written notice before any such policy of insurance is altered or canceled and that no act, whether willful or negligent, or default of Borrower or any other Person shall affect the right of Lender to recover under such policy of insurance in case of loss or damage. In addition, Borrower shall cause to be executed and delivered to Lender an assignment of proceeds of its business interruption insurance policies. Borrower hereby directs all insurers under all policies of insurance to pay all proceeds payable thereunder directly to Lender. After the occurrence and during the continuance of an Event of Default, Borrower irrevocably makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender) as Borrower's true and lawful attorney (and agent-in-fact) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing the name of Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and making all determinations and decisions with respect to such policies of insurance at any time after an Event of Default has occurred.

(ii)     Maintain, at its expense, such public liability and third party property damage insurance as is customary for Persons engaged in businesses similar to that of Borrower with such companies and in such amounts, with such deductibles and under policies in such form as shall be satisfactory to Lender and original (or certified) copies of such policies have been or shall be, within ninety (90) days after the date hereof, delivered to Lender, together with evidence of payment of all premiums therefor; each such policy shall contain an endorsement showing Lender as additional insured thereunder and providing that the insurance company shall give Lender at least thirty (30) days written notice before any such policy shall be altered or canceled.

RECEIVED

SEP 1 2 2005

OMWBE

24




(iii)    If Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium relating thereto, then Lender, without waiving or releasing any obligation or default by Borrower hereunder, may (but shall be under no obligation to) obtain and maintain such policies of insurance and pay such premiums and take such other actions with respect thereto as Lender deems advisable.  Such insurance, if obtained by Lender, may, but need not, protect Borrower's interests or pay any claim made by or against Borrower with respect to the Collateral.  Such insurance may be more expensive than the cost of insurance Borrower may be able to obtain on its own and may be cancelled only upon Borrower providing evidence that it has obtained the insurance as required above.  All sums disbursed by Lender in connection with any such actions, including, without limitation, court costs, expenses, other charges relating thereto and reasonable attorneys' fees, shall constitute Loans hereunder, shall be payable on demand by Borrower to Lender and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

**(f)    Collateral.**

Borrower shall keep the Collateral in good condition, repair and order and shall make all necessary repairs to the Equipment and replacements thereof so that the operating efficiency and the value thereof shall at all times be preserved and maintained.  Borrower shall permit Lender to examine any of the Collateral at any time and wherever the Collateral may be located and, Borrower shall, immediately upon request therefor by Lender, deliver to Lender any and all evidence of ownership of any of the Equipment including, without limitation, certificates of title and applications of title.  Borrower shall, at the request of Lender, indicate on its records concerning the Collateral a notation, in form satisfactory to Lender, of the security interest of Lender hereunder.

**(g)    Use of Proceeds.**

All monies and other property obtained by Borrower from Lender pursuant to this Agreement shall be used solely to (a) support the issuance of standby and documentary letters of credit and for working capital needs up to the amount of the Maximum Letter of Credit Obligation, and (b) to construct improvements to Borrower's new and existing retail stores up to the Project Loan Limit.

**(h)    Taxes.**

Borrower shall file all required tax returns and pay all of its taxes when due, including, without limitation, taxes imposed by federal, state or municipal agencies, and shall cause any liens for taxes to be promptly released; provided, that Borrower shall have the right to contest the payment of such taxes in good faith by appropriate proceedings so long as (i) the amount so contested is shown on Borrower's financial statements; (ii) the contesting of any such payment does not give rise to a lien for taxes; (iii) Borrower keeps on deposit with Lender an amount of money which, in the sole judgment of Lender, is sufficient to pay such taxes and any interest or penalties that may accrue thereon; and (iv) if Borrower fails to prosecute such contest with reasonable diligence, Lender may apply the money so deposited in payment of such taxes.  If Borrower fails to pay any such taxes and in the absence of any such contest by Borrower, Lender may (but shall be

25

RECEIVED

SEP 1 2 2005

OMWBE

 

under no obligation to) advance and pay any sums required to pay any such taxes and/or to secure the release of any lien therefor, and any sums so advanced by Lender shall constitute Loans hereunder, shall be payable by Borrower to Lender on demand, and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

**(i)    Intellectual Property.**

Borrower shall maintain adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and trade names to continue its business as heretofore conducted by it or as hereafter conducted by it.

**(j)    Deposit Accounts.**

Borrower shall maintain its general checking/controlled disbursement account and other deposit accounts with Lender.  Normal charges shall be assessed thereon.

**(k)    Right of First Refusal for Additional Funding.**

Borrower hereby grants to Lender a right of first refusal to provide Borrower with additional credit facilities or other financial accommodations upon the same terms and conditions offered to the Borrower by any other financial institution.  Borrower shall deliver to Lender any written commitment with respect thereto, and Lender shall have a period of five (5) days from its receipt thereof to deliver to Borrower its written commitment to provide Borrower with additional credit facilities or other financial accommodations upon the same terms and conditions as are contained therein.  Nothing contained in this paragraph shall be deemed to limit Borrower's ability to change its banking relationship upon repayment of the Loans in full.

**13.    NEGATIVE COVENANTS.**

Until payment and satisfaction in full of all Liabilities and termination of this Agreement, unless Borrower obtains Lender's prior written consent waiving or modifying any of Borrower's covenants hereunder in any specific instance, Borrower agrees as follows:

**(a)    Guaranties.**

Borrower shall not assume, guarantee or endorse, or otherwise become liable in connection with, the obligations of any Person which is not a parent, subsidiary, or affiliate, except by endorsement of instruments for deposit or collection or similar transactions in the ordinary course of business.

**(b)    Indebtedness.**

Borrower shall not create, incur, assume or become obligated (directly or indirectly), for any loans or other indebtedness for borrowed money other than the Loans, except that Borrower may (i) borrow money from a Person other than Lender on an unsecured and subordinated basis if a

26

 RECEIVED

SEP 1 2 2005

OMWBE

 

subordination agreement in favor of Lender and in form and substance satisfactory to Lender is executed and delivered to Lender relative thereto; (ii) maintain its present indebtedness listed on Schedule 11(m) hereto; (iii) incur unsecured indebtedness to trade creditors, purchase money indebtedness, capitalized lease obligations and operating lease obligations in the ordinary course of business.

(c)     **Liens.**

Borrower shall not grant or permit to exist (voluntarily or involuntarily) any lien, claim, security interest or other encumbrance whatsoever on any of its assets, other than Permitted Liens.

(d)     **Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside the Ordinary Course of Business.**

Borrower shall not (i) enter into any merger or consolidation; (ii) change the state of Borrower's organization or enter into any transaction which has the effect of changing Borrower's state of organization (except that Borrower may change its state of incorporation to Illinois or Delaware upon ten (10) days prior written notice to the Lender); (iii) sell, lease or otherwise dispose of any of its assets other than in the ordinary course of business; (iv) purchase the stock, other equity interests or all or a material portion of the assets of any Person or division of such Person; or (v) enter into any other transaction outside the ordinary course of Borrower's business, including, without limitation, any purchase, redemption or retirement of any shares of any class of its stock or any other equity interest, and any issuance of any shares of, or warrants or other rights to receive or purchase any shares of, any class of its stock or any other equity interest.

(e)     **Investments; Loans.**

Borrower shall not purchase or otherwise acquire, or contract to purchase or otherwise acquire, the obligations or stock of any Person, other than direct obligations of the United States; nor shall Borrower lend or otherwise advance funds to any Person except for advances made to employees, officers and directors for travel and other expenses arising in the ordinary course of business.

(f)     **Fundamental Changes, Line of Business.**

Borrower shall not amend its organizational documents or change its Fiscal Year or enter into a new line of business materially different from Borrower's current business.

(g)     **Equipment.**

Borrower shall not (i) permit any Equipment to become a Fixture to real property unless such real property is owned by Borrower and is subject to a mortgage in favor of Lender, or (ii) permit any Equipment to become an accession to any other personal property unless such personal property is subject to a first priority lien in favor of Lender.

RECEIVED

SEP 1 2 2005

OMWBE

27

00670




(h)    **Affiliate Transactions.**

Except as set forth on Schedule 11(h) hereto or as permitted pursuant to subsection 11(c) hereof, Borrower shall not conduct, permit or suffer to be conducted, transactions with its parent or any affiliate or subsidiary other than transactions for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to Borrower than the terms upon which such transactions would have been made had they been made to or with a Person that is not its parent. affiliate, or subsidiary.

(i)    **Settling of Accounts.**

Borrower shall not settle or adjust any Account with respect to which the Account Debtor is its parent, affiliate, or subsidiary without the consent of Lender.

(j)    **Dividends and Distributions.**

Borrower shall not declare or pay any dividend or other distribution (whether in cash or in kind) on account of any equity interest in Borrower. Notwithstanding the foregoing, if the Borrower is in compliance with the financial covenants contained in this Agreement, and if no other Event of Default has occurred and no other Event of Default will not occur as a result of the distribution, Borrower may make distributions to its shareholders provided that the Borrower gives Lender sufficient documentation to verify compliance with this paragraph not less than fifteen (15) days prior to the making of such distribution.

**14.    FINANCIAL COVENANTS.**

Borrower shall maintain and keep in full force and effect each of the financial covenants set forth below:

(a)    **Tangible Net Worth.**

Borrower's Tangible Net Worth shall not at any time be less than the Minimum Tangible Net Worth. **"Minimum Tangible Net Worth"** is defined for purposes of this subsection as (i) $1,800,000 as of the date hereof; and (ii) $2,050,000 as of December 31, 2004, and as of the last day of each fiscal year thereafter until all of the Liabilities have been paid in full. **"Tangible Net Worth"** is defined for purposes of this subsection as Borrower's shareholders' equity (including retained earnings) less the book value of all intangible assets as determined solely by Lender on a consistent basis plus the amount of any LIFO reserve plus the amount of any debt subordinated to Lender, all as determined under generally accepted accounting principles applied on a basis consistent with the financial statement dated December 31, 2002.

(b)    **Cash Flow Coverage.**

Borrower's "Cash Flow Coverage Ratio" shall not, as of March 31, June 30, September 30, and December 31 of each year, be less than 1.50:1.00. **"Cash Flow Coverage Ratio"** for is defined

28


RECEIVED
SEP 1 2 2005
OMWBE

00671



for purposes of this subsection as the ratio of Borrower's EBITDA to the sum of interest expense and the current portion of long-term debt paid or payable for such period.

**(c)    Maximum Debt to Tangible Net Worth.**

Borrower's "Maximum Debt to Tangible Net Worth" shall not, as of March 31, June 30, September 30, and December 31 of each year, exceed 2.5:1.0. **"Maximum Debt to Tangible Net Worth"** is defined for purposes of this subsection as the ratio of the Borrower's Debt Service to Tangible Net Worth.

## 15.    DEFAULT.

The occurrence of any one or more of the following events shall constitute an **"Event of Default"** by Borrower hereunder:

**(a)    Payment.**

The failure of any Obligor to make any scheduled payment of any Liability within ten (10) days of the due date therefor, or the failure of any Obligor to pay any amount declared due demanded by Lender within three (3) days of the date such Liability is so declared due or demanded.

**(b)    Rate Management Obligations.**

The failure of any Obligor to pay, within three (3) Business Days of when due or declared due by Lender, any of the Rate Management Obligations.

**(c)    Breach of this Agreement and the Other Agreements.**

The failure of any Obligor to perform, keep or observe any of the covenants (other than the covenants set forth in Section 14 hereof), conditions, promises, agreements or obligations of such Obligor under this Agreement, the Rate Management Agreement, or any of the Other Agreements, and the continuance thereof for ten (10) Business Days after written Notice thereof to Borrower.

**(d)    Breaches of Other Obligations.**

The failure of any Obligor to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Obligor under any other agreement with any Person if such failure might have a Material Adverse Effect on such Obligor and the continuance thereof for ten (10) Business Days after written Notice thereof to Borrower.

**(e)    Breach of Representations and Warranties.**

The making or furnishing by any Obligor to Lender of any representation, warranty, certificate, schedule, report or other communication within or in connection with this Agreement or the Other Agreements or in connection with any other agreement between such Obligor and Lender,

29



RECEIVED
SEP 1 2 2005
OMWBE

00672




which is untrue or misleading in any material respect.

**(f)    Loss of Collateral.**

The uninsured loss, theft, damage or destruction of, or (except as permitted hereby) sale, lease or furnishing under a contract of service of, any of the Collateral having an aggregate fair market value in excess of Fifty Thousand Dollars ($50,000).

**(g)    Levy, Seizure or Attachment.**   material   MD

The making by any Person of any levy, seizure or attachment upon any of the Collateral.

**(h)    Bankruptcy or Similar Proceedings.**

The commencement of any proceedings in bankruptcy by or against any Obligor or for the liquidation or reorganization of any Obligor, or alleging that such Obligor is insolvent or unable to pay its debts as they mature, or for the readjustment or arrangement of any Obligor's debts, whether under the United States Bankruptcy Code or under any other law, whether state or federal, now or hereafter existing, for the relief of debtors, or the commencement of any analogous statutory or non-statutory proceedings involving any Obligor; provided, however, that if such commencement of proceedings against such Obligor is involuntary, such action shall not constitute an Event of Default unless such proceedings are not dismissed within thirty (30) days after the commencement of such proceedings , though Lender shall have no obligation to make Loans to Borrower during such thirty (30) days period, or earlier, until such appointment is revoked or such proceedings are dismissed.

**(i)    Appointment of Receiver.**

The appointment of a receiver or trustee for any Obligor, for any of the Collateral or for any substantial part of any Obligor's assets or the institution of any proceedings for the dissolution, or the full or partial liquidation, or the merger or consolidation, of any Obligor which is a corporation, limited liability company or a partnership; provided, however, that if such appointment or commencement of proceedings against such Obligor is involuntary, such action shall not constitute an Event of Default unless such appointment is not revoked or such proceedings are not dismissed within thirty (30) days after the commencement of such proceedings , though Lender shall have no obligation to make Loans to Borrower during such thirty (30) days period, or earlier, until such appointment is revoked or such proceedings are dismissed.

**(j)    Judgment.**

The entry of any judgment or order against any Obligor in excess of the sum of $50,000 which remains unsatisfied or undischarged and in effect for thirty (30) days after such entry without a stay of enforcement or execution.


RECEIVED
SEP 1 2 2005
OMWBE

00673




**(k)     Death or Dissolution of Obligor.**

The death of any Obligor who is a natural Person, or of any general partner who is a natural Person of any Obligor which is a partnership, or any member who is a natural Person of any Obligor which is a limited liability company or the dissolution of any Obligor which is a partnership, limited liability company, corporation or other entity.

**(l)     Default or Revocation of Guaranty or Other Agreements.**

The occurrence of an event of default under, or the revocation or termination of, any agreement, instrument or document executed and delivered by any Person to Lender pursuant to which such Person has guaranteed to Lender the payment of all or any of the Liabilities or has granted Lender a security interest in or lien upon some or all of such Person's real and/or personal property to secure the payment of all or any of the Liabilities.

**(m)     Criminal Proceedings.**

The institution in any court of a criminal proceeding against any Obligor, or the indictment of any Obligor for any crime.

**(n)     Change of Control.**

The failure of Martin and Michelle Dukler to own and have voting control of at least fifty percent (50%) of the issued and outstanding voting equity interests of Borrower.

**(o)     Material Adverse Change.**

Any material adverse change in the Collateral, business, property, assets, prospects, operations or condition, financial or otherwise of any Obligor, as determined by Lender in its sole judgment or the occurrence of any event which, in Lender's sole judgment, could have a Material Adverse Effect and the continuance thereof for ten (10) Business Days after written notice thereof to Borrower.

**16.     REMEDIES UPON AN EVENT OF DEFAULT.**

Upon the occurrence of an Event of Default described in subsection 15(h) hereof, all of the Liabilities shall immediately and automatically become due and payable, without notice of any kind. Upon the occurrence of any other Event of Default, all Liabilities may, at the option of Lender, upon notice and without demand, or legal process of any kind, be declared, and immediately shall become, due and payable.

Upon the occurrence of an Event of Default, Lender may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code and any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement or


RECEIVED
SEP 1 2 2005
OMWBE

31

00674



in any of the Other Agreements and all of Lender's rights and remedies shall be cumulative and non-exclusive to the extent permitted by law. In particular, but not by way of limitation of the foregoing, Lender may, without notice, demand or legal process of any kind, take possession of any or all of the Collateral (in addition to Collateral of which it already has possession), wherever it may be found, and for that purpose may pursue the same wherever it may be found, and may enter onto any of Borrower's premises where any of the Collateral may be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of, and Lender shall have the right to store the same at any of Borrower's premises without cost to Lender. At Lender's request, Borrower shall, at Borrower's expense, assemble the Collateral and make it available to Lender at one or more places to be designated by Lender and reasonably convenient to Lender and Borrower. Borrower recognizes that if Borrower fails to perform, observe or discharge any of its Liabilities under this Agreement or the Other Agreements, no remedy at law will provide adequate relief to Lender, and agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages. Any notification of intended disposition of any of the Collateral required by law will be deemed to be a reasonable authenticated notification of disposition if given at least ten (10) days prior to such disposition and such notice shall (i) describe Lender and Borrower, (ii) describe the Collateral that is the subject of the intended disposition, (iii) state the method of the intended disposition, (iv) state that Borrower is entitled to an accounting of the Liabilities and state the charge, if any, for an accounting and (v) state the time and place of any public disposition or the time after which any private sale is to be made. Lender may disclaim any warranties that might arise in connection with the sale, lease or other disposition of the Collateral and has no obligation to provide any warranties at such time. Any Proceeds of any disposition by Lender of any of the Collateral may be applied by Lender to the payment of expenses in connection with the Collateral, including, without limitation, legal expenses and reasonable attorneys' fees, and any balance of such Proceeds may be applied by Lender toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect.

## 17.    CONDITIONS PRECEDENT.

The obligation of Lender to fund the initial Project Loan is subject to the satisfaction or waiver on or before the date hereof of the following conditions precedent:

(a)    Lender shall have received each of the agreements, opinions, reports, approvals, consents, certificates and other documents set forth on the closing document list attached hereto as Schedule 17(a) (the "**Closing Document List**") in each case in form and substance satisfactory to Lender;

(b)    Lender shall be satisfied, in its sole discretion, with the results of any field or other audits;

(c)    Since December 31, 2002, no event shall have occurred which has had or could reasonably be expected to have a Material Adverse Effect on any Obligor, as determined by Lender in its sole discretion;


RECEIVED
SEP 1 2 2005
OMWBE

32

 

(d)     Star Foods, LLC, an Illinois limited liability company, shall have executed and delivered to Lender a guaranty of the obligations of the Borrower hereunder in form and substance satisfactory to Lender.

(e)     Each Obligor shall have executed and delivered to Lender all such other documents, instruments and agreements which Lender determines are reasonably necessary to consummate the transactions contemplated hereby.

## 18.     INDEMNIFICATION.

Borrower agrees to defend (with counsel satisfactory to Lender), protect, indemnify and hold harmless Lender, each affiliate or subsidiary of Lender, and each of their respective officers, directors, employees, attorneys and agents (each an "**Indemnified Party**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature (including, without limitation, the disbursements and the reasonable fees of counsel for each Indemnified Party in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnified Party shall be designated a party thereto), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including, without limitation, securities laws and regulations, Environmental Laws and commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Agreement or any Other Agreement, or any act, event or transaction related or attendant thereto, the making or issuance and the management of the Loans or the use or intended use of the proceeds of the Loans; provided, however, that Borrower shall not have any obligation hereunder to any Indemnified Party with respect to matters caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall satisfy such undertaking to the maximum extent permitted by applicable law.  Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party on demand and, failing prompt payment, shall, together with interest thereon at the highest rate then applicable to Loans hereunder from the date incurred by each Indemnified Party until paid by Borrower, be added to the Liabilities of Borrower and be secured by the Collateral.  The provisions of this Section 18 shall not survive the satisfaction and payment of the other Liabilities and the termination of this Agreement unless there is then pending an indemnification claim hereunder.

## 19.     NOTICE.

All written notices and other written communications with respect to this Agreement shall be sent by ordinary, certified or overnight mail, by telecopy or delivered in person, and in the case of Lender shall be sent to it at 990 S. Waukegan Road, Lake Forest, Illinois 60045, attention: Mr. Larry Barr facsimile number: 847-810-5545, and in the case of Borrower shall be sent to it at its principal place of business set forth on Exhibit A hereto or as otherwise directed by Borrower in writing.  All notices shall be deemed received upon actual receipt thereof or refusal of delivery.



33




**20.    CHOICE OF GOVERNING LAW; CONSTRUCTION; FORUM SELECTION.**

This Agreement and the Other Agreements are submitted by Borrower to Lender for Lender's acceptance or rejection at Lender's principal place of business as an offer by Borrower to borrow monies from Lender now and from time to time hereafter, and shall not be binding upon Lender or become effective until accepted by Lender, in writing, at said place of business. If so accepted by Lender, this Agreement and the Other Agreements shall be deemed to have been made at said place of business. THIS AGREEMENT AND THE OTHER AGREEMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS, INCLUDING, WITHOUT LIMITATION, THE LEGALITY OF THE INTEREST RATE AND OTHER CHARGES, BUT EXCLUDING PERFECTION OF THE SECURITY INTERESTS IN COLLATERAL LOCATED OUTSIDE OF THE STATE OF ILLINOIS, WHICH SHALL BE GOVERNED AND CONTROLLED BY THE LAWS OF THE RELEVANT JURISDICTION IN WHICH SUCH COLLATERAL IS LOCATED. If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or remaining provisions of this Agreement.

To induce Lender to accept this Agreement, Borrower irrevocably agrees that, subject to Lender's sole and absolute election, ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER AGREEMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY OF CHICAGO, STATE OF ILLINOIS. BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED. BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST BORROWER BY LENDER IN ACCORDANCE WITH THIS SECTION.

**21.    MODIFICATION AND BENEFIT OF AGREEMENT.**

This Agreement and the Other Agreements may not be modified, altered or amended except by an agreement in writing signed by Borrower or such other Person who is a party to such Other Agreement and Lender. Borrower may not sell, assign or transfer this Agreement, or the Other Agreements or any portion thereof, including, without limitation, Borrower's rights, titles, interest, remedies, powers or duties hereunder and thereunder. Borrower hereby consents to Lender's sale, assignment, transfer or other disposition, at any time and from time to time hereafter, of this Agreement, or the Other Agreements, or of any portion thereof, or participations therein, including,

34



RECEIVED
SEP 1 2 2005
OMWBE

00677

 

without limitation, Lender's rights, titles, interest, remedies, powers and/or duties and agrees that it shall execute and deliver such documents as Lender may request in connection with any such sale, assignment, transfer or other disposition.

## 22.    HEADINGS OF SUBDIVISIONS.

The headings of subdivisions in this Agreement are for convenience of reference only, and shall not govern the interpretation of any of the provisions of this Agreement.

## 23.    POWER OF ATTORNEY.

Borrower acknowledges and agrees that its appointment of Lender as its attorney and agent-in-fact for the purposes specified in this Agreement is an appointment coupled with an interest and shall be irrevocable until all of the Liabilities are satisfied and paid in full and this Agreement is terminated.

## 24.    CONFIDENTIALITY.

Lender hereby agrees to use commercially reasonable efforts to assure that any and all information relating to Borrower which is (i) furnished by Borrower to Lender (or to any affiliate or subsidiary of Lender); and (ii) non-public, confidential or proprietary in nature, shall be kept confidential by Lender or such affiliate or subsidiary in accordance with applicable law; provided, however, that such information and other credit information relating to Borrower may be distributed by Lender or such affiliate or subsidiary to Lender's or such affiliate or subsidiary's directors, officers, employees, attorneys, affiliates, or subsidiaries, assignees, participants, auditors, agents and regulators, and upon the order of a court or other governmental agency having jurisdiction over Lender or such affiliate or subsidiary, to any other party. Borrower and Lender further agree that this provision shall survive the termination of this Agreement. Notwithstanding the foregoing, Borrower hereby consents to Lender publishing a tombstone or similar advertising material relating to the financing transaction contemplated by this Agreement.

## 25.    COUNTERPARTS.

This Agreement, any of the Other Agreements, and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which counterparts together shall constitute but one agreement.

## 26.    ELECTRONIC SUBMISSIONS.

Upon not less than thirty (30) days' prior written notice (the "**Approved Electronic Form Notice**"), Lender may permit or require that any of the documents, certificates, forms, deliveries or other communications, authorized, required or contemplated by this Agreement or the Other Agreements, be submitted to Lender in "**Approved Electronic Form**" (as hereafter defined), subject to any reasonable terms, conditions and requirements in the applicable Approved Electronic

35


RECEIVED
SEP 1 2 2005
OMWBE

00678




Forms Notice. For purposes hereof **"Electronic Form"** means e-mail, e-mail attachments, data submitted on web-based forms or any other communication method that delivers machine readable data or information to Lender, and **"Approved Electronic Form"** means an Electronic Form that has been approved in writing by Lender (which approval has not been revoked or modified by Lender) and sent to Borrower in an Approved Electronic Form Notice. Except as otherwise specifically provided in the applicable Approved Electronic Form Notice, any submissions made in an applicable Approved Electronic Form shall have the same force and effect that the same submissions would have had if they had been submitted in any other applicable form authorized, required or contemplated by this Agreement or the Other Agreements.

27.    **WAIVER OF JURY TRIAL; OTHER WAIVERS.**

      **BORROWER AND LENDER EACH HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, ANY OF THE OTHER AGREEMENTS, THE LIABILITIES, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY BORROWER OR LENDER OR WHICH, IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISES OUT OF OR RELATES TO THE RELATIONSHIP BETWEEN BORROWER AND LENDER. IN NO EVENT SHALL LENDER BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.**

      Except as otherwise specifically provided herein, Borrower hereby waives demand, presentment, protest and notice of nonpayment, and further waives the benefit of all valuation, appraisal and exemption laws.

      Borrower hereby waives the benefit of any law that would otherwise restrict or limit Lender or any affiliate or subsidiary of Lender in the exercise of its right, which is hereby acknowledged and agreed to, to set-off against the Liabilities, without notice at any time after the occurrence of an Event of Default, any indebtedness, matured or owing by Lender or such affiliate or subsidiary of Lender to Borrower, including, without limitation any deposit account at Lender or such affiliate or subsidiary.

      Lender's failure, at any time or times hereafter, to require strict performance by Borrower of any provision of this Agreement or any of the Other Agreements shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by Lender of an Event of Default under this Agreement or any default under any of the Other Agreements shall not suspend, waive or affect any other Event of Default under this Agreement or any other default under any of the Other Agreements, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character. No delay on the part of Lender in the exercise of any right or remedy under this Agreement or any Other Agreement shall preclude other or further exercise thereof or the exercise of any right or remedy. None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the Other Agreements and no Event of Default under this Agreement or default under any of the Other Agreements shall be deemed to have been suspended or waived by Lender unless such suspension or waiver is in writing, signed by a duly authorized officer of Lender and directed to Borrower specifying such suspension or waiver.

**RECEIVED**

SEP 1 2 2005

**OMWBE**

36

00679

 

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

**THE GROVE, INC.**

By: _____

Name: _____

Title: _____

**FIFTH THIRD BANK**

By: _____

Name: _____

Title: _____

F:\LJG\5-3 Grove\Loan & Sec Agmt 4.wpd February 17, 2004

RECEIVED
SEP 1 2 2005
OMWBE

00680




## EXHIBIT A – BUSINESS AND COLLATERAL LOCATIONS

1.) Atlanta Hartsfield International Airport
   3 stores located in Terminal A, C, and D, and
   office/storage in Terminal C.

2.) Boston Logan

   See Enterprise Hierarchy Attached

RECEIVED
SEP 1 2 2005
OMWBE

00681




*Enterprise Hierarchy*

| Parent | X | Y | ID Cont | Description |
|---|---|---|---|---|
| **100 - Hartsfield International Airport** | | | | |
| | | | 10001 - | 10001 ATL A-12 Snack |
| | | | 10002 - | 10002 ATL C Center Snack/Candy |
| | | | 10003 - | 10003 ATL D-16 Froz |
| | | | 10051 - | 10051 ATL Office/Storage C |
| **139 - Logan International Airport** | | | | |
| | | | 13901 - | 13901 BOS C-27 Snack/Yogt |
| | | | 13902 - | 13902 BOS C-14 Snack/Yogt |
| | | | 13951 - | 13951 BOS Office/Storage D |
| **180 - Cincinnati N. Kentucky Int'l Airport** | | | | |
| | | | ~~18001 -~~ | ~~18001 CVG A-14 CLOSED 9/11/03~~ |
| | | | 18002 - | 18002 CVG B FdCt Snack/Yogt/Coffee |
| | | | 18007 - | 18007 CVG C North Snack/Froz/Coffee/Fudge |
| | | | 18008 - | 18008 CVG B Snack/Froz/Coffee/Fudge |
| | | | 18009 - | 18009 CVG A Snack/Yogt |
| | | | 18051 - | 18051 CVG Office/Storage B FdCt |
| | | | 18052 - | 18052 CVG Storage C |
| **217 - Dallas/Ft Worth International Airport** | | | | |
| | | | 21701 - | 21701 DFW E-7 Snack |
| | | | 21702 - | 21702 DFW E-31 Snack/Coffee |
| | | | 21703 - | 21703 DFW A-13 Yogt |
| | | | 21704 - | 21704 DFW A-18 Snack |
| | | | 21705 - | 21705 DFW A-25 Yogt |
| | | | 21706 - | 21706 DFW C-14 Snack |
| | | | 21707 - | 21707 DFW C-22 |
| | | | ~~21708 -~~ | ~~21708 DFW C Connectr CLOSED~~ |
| | | | 21709 - | 21709 DFW A-39 Snack/Yogt/Coffee |
| | | | 21711 - | 21711 DFW B-29 Snack |
| | | | 21751 - | 21751 DFW Office/Storage A-1 |
| | | | 21752 - | 21752 DFW Storage C-10 |
| | | | 21753 - | 21753 DFW Storage E-31 |
| **219 - Washington Dulles International Airport** | | | | |
| | | | 21901 - | 21901 IAD C-9 Snack/Yogt |
| | | | 21902 - | 21902 IAD C-2 Snack/Yogt |
| | | | 21903 - | 21903 IAD C-26 Snack/Yogt |
| | | | 21904 - | 21904 IAD D-5 Snack/Yogt |
| | | | 21951 - | 21951 IAD Office/Storage C-2 |

RECEIVED
SEP 1 2 2005
OMWBE





*Enterprise Hierarchy*

| Parent | X | Y | ID Cont | Description |
|---|---|---|---|---|
| | | | 21952 - | 21952 IAD Storage Lower |
| **373 - George Bush Intercontinental Airport** | | | | |
| | | | 37301 - | 37301 IAH C-34 South Snack |
| | | | 37302 - | 37302 IAH C-23 North Snack |
| | | | 37303 - | 37303 IAH A South Snack/Yogt/Coffee |
| | | | 37304 - | 37304 IAH B Snack/Froz/Coffee |
| | | | 37305 - | 37305 IAH A North Snack/Yogt/Coffee |
| | | | ~~37306 -~~ | ~~37306 IAH E West~~ |
| | | | 37351 - | 37351 IAH Office/Storage C-South |
| | | | 37352 - | 37352 IAH Storage A South |
| | | | 37353 - | 37353 IAH Storage A North |
| | | | 37354 - | 37354 IAH Storage B |
| **451 - Jacksonville International Airport** | | | | |
| | | | 45101 - | 45101 JAX Courtyard Snack |
| | | | 45102 - | 45102 JAX C Cart |
| | | | 45103 - | 45103 JAX Courtyard Froz |
| | | | 45151 - | 45151 JAX Office/Storage Courtyard Froz |
| | | | 45152 - | 45152 JAX Storage Ground |
| **454 - JFK International Airport** | | | | |
| | | | 45401 - | 45401 JFK BA 7 Snack/Froz |
| | | | ~~45402 -~~ | ~~45402 JFK~~ |
| | | | 45403 - | 45403 JFK Jet Blue (6) Gate 9 Snack |
| | | | 45404 - | 45404 JFK AA(9) D-47 Snack |
| | | | 45405 - | 45405 JFK Jet Blue (6) Center Yogt |
| | | | 45406 - | 45406 JFK Delta (2) Gate 28 Snack |
| | | | 45407 - | 45407 JFK AA(8) B Snack |
| | | | 45408 - | 45408 JFK AA - A Snack/Coffee/Yogt |
| | | | 45409 - | 45409 JFK Jet Blue (6) Snack |
| | | | 45451 - | 45451 JFK Office AA(9) D-46 |
| | | | 45452 - | 45452 JFK Storage AA Lower near Credit Union |
| | | | 45453 - | 45453 JFK Storage Jet Blue |
| **529 - LaGuardia Airport** | | | | |
| | | | 52903 - | 52903 LGA Delta Bodega Arr Snack/Yogt/Coffee |
| | | | 52905 - | 52905 LGA Delta Food Ct Snack/Yogt |
| | | | 52906 - | 52906 LGA US Air Snack |
| | | | 52907 - | 52907 LGA Delta-1 Cart Snack |
| | | | 52951 - | 52951 LGA Office/Storage CTB |
| **607 - New Orleans International Airport** | | | | |
| | | | 60701 - | 60701 MSY D-5 Snack/Yogt |



RECEIVED

SEP 1 2 2005

OMWBE

00683




*Enterprise Hierarchy*

| Parent | X | Y | ID Cont | Description |
|---|---|---|---|---|
| | | | 60702 - 60702 | MSY C-1 Snack/Yogt |
| | | | 60703 - 60703 | MSY B-5 Snack/Yogt |
| | | | 60704 - 60704 | MSY A-7 Snack/Yogt |
| | | | 60751 - 60751 | MSY Office/Storage Ticket Dr 3 |
| | | | 60752 - 60752 | MSY Storage Terminal C |
| 609 - Newark International Airport | | | | |
| | | | 60901 - 60901 | EWR C-83 Snack/Yogt |
| | | | 60902 - 60902 | EWR C-94 Snack/Yogt |
| | | | 60903 - 60903 | EWR C-106 Snack/Yogt |
| | | | 60904 - 60904 | EWR C-102 Fudge Cart |
| | | | 60905 - 60905 | EWR C Baggage Snack/Sand/Soup/Yogt/Coffee/Ba |
| | | | 60906 - 60906 | EWR C2-C3 PassThru Snack/Bakery/Popcorn |
| | | | 60951 - 60951 | EWR Office/Storage C-87 |
| | | | 60952 - 60952 | EWR Storage Lower Conc C |
| | | | 60953 - 60953 | EWR Storage NEW |

*↘ opening February, 2004*

| Parent | X | Y | ID Cont | Description |
|---|---|---|---|---|
| ~~646 - Will Rogers World Airport~~ | | | | |
| | | | ~~64601 - 64601~~ | ~~OKC B-4 Snack~~ |
| | | | ~~64602 - 64602~~ | ~~OKC C-3 Snack~~ |
| | | | ~~64603 - 64603~~ | ~~OKC C-3 Snack/Yogt~~ |
| | | | ~~64604 - 64604~~ | ~~OKC B-4 Snack/Yogt~~ |
| | | | ~~64651 - 64651~~ | ~~OKC Office/Storage C~~ |
| 649 - Orlando International Airport | | | | |
| | | | 64902 - 64902 | MCO Airside 2 |
| | | | 64903 - 64903 | MCO Airside 4 |
| | | | 64951 - 64951 | MCO Office/Storage center snack |
| | | | 64952 - 64952 | MCO Storage Lower |
| 678 - Chicago O'Hare International Airport | | | | |
| | | | 67801 - 67801 | ORD B-9 Snack |
| | | | 67802 - 67802 | ORD C-18 Snack |
| | | | 67803 - 67803 | ORD E-2 Snack |
| | | | 67804 - 67804 | ORD B-6 Snack |
| | | | 67851 - 67851 | ORD Office/Storage B-6 |
| | | | 67852 - 67852 | ORD Storage - Basement |
| 689 - Penn Station | | | | |
| | | | 68901 - 68901 | PEN Amtrack Snack/Yogt/Coffee |
| | | | 68951 - 68951 | PEN Office/Storage |
| | | | 68952 - 68952 | PEN Storage |
| ~~711 - TEST LOCATION~~ | | | | |
| | | | ~~71101 - A TEST (71101)~~ | |

RECEIVED
SEP 1 2 2005
OMWBE




| Parent | X | Y | ID Cont | Description |
|--------|---|---|---------|-------------|
| **802 - Salt Lake City Int'l Airport** | | | | |
| | | | 80201 | 80201 SLC B Snack |
| | | | 80202 | 80202 SLC C Snack |
| | | | 80203 | 80203 SLC D Snack |
| | | | 80251 | 80251 SLC Office/Storage Parking 1, 3rd Fl |
| | | | 80252 | 80252 SLC Storage 2-E Basement |
| **815 - Lambert St. Louis Int'l Airport** | | | | |
| | | | 81501 | 81501 STL B-3 |
| | | | 81502 | 81502 STL C-25 |
| | | | 81503 | 81503 STL D-6 |
| | | | 81504 | 81504 STL E-12 |
| | | | 81505 | 81505 STL A |
| | | | 81506 | 81506 STL C-17 |
| | | | 81551 | 81551 STL Office |
| | | | 81552 | 81552 STL Storage |
| **841 - Tulsa International Airport** | | | | |
| | | | 84101 | 84101 TUL A-25 Snack |
| | | | 84102 | 84102 TUL B-56 Snack/Froz |
| | | | 84103 | 84103 TUL A-20 Froz |
| | | | 84151 | 84151 TUL Office/Storage B-56 |
| **9,000 - Mid/West** | | | | |
| | | | 646 | Will Rogers World Airport |
| | | | 678 | Chicago O'Hare International Airport |
| | | | 802 | Salt Lake City Int'l Airport |
| | | | 815 | Lambert St. Louis Int'l Airport |
| | | | 841 | Tulsa International Airport |
| **9,001 - Northeast** | | | | |
| | | | 139 | Logan International Airport |
| | | | 180 | Cincinnati N. Kentucky Int'l Airport |
| | | | 454 | JFK International Airport |
| | | | 529 | LaGuardia Airport |
| | | | 609 | Newark International Airport |
| | | | 689 | Penn Station |
| **9,002 - Southern** | | | | |
| | | | 100 | Hartsfield International Airport |
| | | | 217 | Dallas/Ft Worth International Airport |
| | | | 219 | Washington Dulles International Airport |
| | | | 373 | George Bush Intercontinental Airport |
| | | | 451 | Jacksonville International Airport |
| | | | 607 | New Orleans International Airport |

RECEIVED

SEP 1 2 2005

OMWBE

00685





***Enterprise Hierarchy***

| Parent | X | Y | ID Cont | Description |
|---|---|---|---|---|
| | | | 649 | Orlando International Airport |
| | | | 711 | TEST LOCATION |
| 9,004 - Corporate | | | | |
| | | | 151 | Westchester, IL |
| | | | 152 | New Orleans, LA |
| 9,999 - The Grove, Inc. | | | | |
| | | | 9000 | Mid/West |
| | | | 9001 | Northeast |
| | | | 9002 | Southern |
| | | | 9004 | Corporate |

*3 Westbrook Corporate Center*
*Suite 500*
*Westghester, IL 60154*

*Records Center/Storage*          *2000 S. 25th Ave.*
*Broadview, IL 60155*

RECEIVED
SEP 1 2 2005
OMWBE






## EXHIBIT B – COMPLIANCE CERTIFICATE

The undersigned is the _Treasurer and CFO_ of Borrower.

There exists no event or circumstance which is or which with the passage of time, the giving of notice, or both would constitute an Event of Default, as that term is defined in the Agreement, or, if such an event of circumstance exists, a writing attached hereto specifies the nature thereof, the period of existence thereof and the action that Borrower has taken or proposes to take with respect thereto.

No material adverse change in the condition, financial or otherwise, business, property, or results of operations of Borrower has occurred since _December 31, 2003_ [date of last Compliance Certificate/last financial statements delivered prior to closing], or, if such a change has occurred, a writing attached hereto specifies the nature thereof and the action that Borrower has taken or proposes to take with respect thereto.

Borrower is in compliance with the representations, warranties and covenants in the Agreement, or, if Borrower is not in compliance with any representations, warranties or covenants in the Agreement, a writing attached hereto specifies the nature thereof, the period of existence thereof and the action that Borrower has taken or proposes to take with respect thereto.

The financial statements of Borrower being concurrently delivered herewith have been prepared in accordance with generally accepted accounting principles consistently applied and there have been no material changes in accounting policies or financial reporting practices of Borrower since _December 31, 2003_ [date of the last Compliance Certificate/date of last financial statements delivered prior to closing] or, if any such change has occurred, such changes are set forth in a writing attached hereto.

Attached hereto is a true and correct calculation of the financial covenants contained in the Agreement.

**THE GROVE, INC.**

By _Robert L. Ireland_

Its _Chief Financial Officer — Treasurer._

RECEIVED
SEP 1 2 2005
OMWBE

00687




Consolidated Company
Consolidated Income Statement
12 Months Ended 12/31/2003

|  | The Grove Consolidated Income Income |
|---|---|
| **Revenue** | |
| Sales | 17,797,314.91 |
| Other Revenues | 0 |
| Total Revenue | 17,797,314.91 |
| | |
| Cost of Sales | 4,758,768.31 |
| | |
| Gross Profit | 13,038,546.60 |
| | |
| **Direct Expense** | |
| Payroll | 5,565,503.16 |
| Payroll Expenses | 839,671.90 |
| Controllable Expenses | 956,663.05 |
| Occupancy Expenses | 4,007,599.85 |
| Depreciation | 1,311,270.15 |
| Direct Expense | 12,680,708.11 |
| | |
| Operating Margin | 357,838.49 |
| | |
| **Other Operating Expense/(Revenue)** | |
| Interest Expense | 95,183.38 |
| (Gain)/Loss on Disposal-Assets | 100,318.23 |
| Other (Revenue) Expense | -77,517.82 |
| Other Operating Expense | 117,983.79 |
| | |
| Net Before Income Tax | 239,854.70 |
| | |
| Provision for Income Tax | 49,500.00 |
| | |
| Net After Tax | 190,354.70 |
| | |
| Minority Interest in Net Income | 108,346.44 |
| | |
| Net Income after Minority Interest | 82,008.26 |
| | |
| EBITDA (before minority interest) | 1,746,626.46 |

RECEIVED
SEP 1 2 2005
OMWBE

00688

 

Consolidated Company

Consolidating Worksheet and Consolidated Balance Sheet
Month Ended 12/31/2003

|  | The Grove, Inc Consolidated Balances |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| Cash | 115,189.87 |
| Receivable Due from Partnerships | - |
| Accounts Receivable | 114,784.10 |
| Inventory | 335,968.12 |
| Prepaid Expenses | 270,946.52 |
| Total Current Assets | 836,888.61 |
| **Fixed Assets, Gross** | |
| Furniture & Fixtures | 2,614,460.46 |
| Machinery & Equipment | 1,675,989.47 |
| Information Systems | 302,579.17 |
| Leasehold Improvements | 4,973,998.49 |
| Projects WIP | 897,503.33 |
| Total Fixed Assets, Gross | 10,464,530.92 |
| Accumulated Depreciation | (6,247,952.15) |
| Total Fixed Assets, Net | 4,216,578.77 |
| **Other Assets** | |
| Org Costs & L/H Interest | 260,966.10 |
| Accum. Ammort. | (157,888.01) |
| Org Costs & L/H Interest, Net | 103,078.09 |
| Goodwill | 888,579.09 |
| Accum. Ammort. | (365,267.66) |
| Goodwill, Net | 523,311.43 |
| Other Assets | 164,590.26 |
| Deferred Tax Assets | 577,500.00 |
| Investment in Entities | |
| Total Other Assets | 1,368,479.78 |
| Total Assets | 6,421,947.16 |



RECEIVED
SEP 1 2 2005
OMWBE

00689




LIABILITES
_____

| Current Liabilities | |
|---|---|
| Accounts Payable | 1,424,799.50 |
| Payable to Partnerships(Flow) | - |
| Accrued Expenses | 618,072.74 |
| Accrued Taxes | 99,892.02 |
| Current Portion L-T-D | 618,911.48 |
| Total Current Liabilities | 2,761,675.74 |
| | |
| Long Term Liabilities | |
| Notes Payable | 630,807.00 |
| Total Long Term Liabilities | 630,807.00 |
| | |
| Total Liabilities | 3,392,482.74 |
| | |
| CAPITAL | |
| Common Stock | 2,000.00 |
| Paid-in-Capital | 6,819,528.94 |
| Treasury Stock | (3,090,639.98) |
| Partners' Capital | |
| Retained Earnings | (963,507.93) |
| Translation Adjustment | (22,470.41) |
| Year-To-Date Profit(Loss) | 82,008.26 |
| | 2,826,918.88 |
| Minority Interest in Partnerships | 202,545.54 |
| Total stockholders' equity | 3,029,464.42 |
| | |
| Total Liabilities & Capital | 6,421,947.16 |

RECEIVED
SEP 1 2 2005
OMWBE

 

Financial Covenants                                              p. 1 of 2

14(a)  Tangible Net Worth

Total Equity                                          $3,029,464.42

Less:

Organization Costs & L/H Interest - net              (103,078.09)
Goodwill - net                                       (523,311.43)

Tangible Net Worth at 12/31/03                       $2,403,074.90

14(b)  Cash Flow Coverage for year ended 12/31/03

EBITDA                                               $1,746,626.46

Debt paid or payable in 2003                          465,058.48
Interest Expense                                      100,318.23
                                                      565,376.71

Ratio - Cash Flow Coverage                            3.09

RECEIVED
SEP 1 2 2005
OMWBE

00691

<u>Financial Covenants</u>                                                                p. 2 of 2

14 (c)    Debt                                            $1,249,718.48

          Tangible Net Worth per 14(a)                    2,403,074.90

          Debt to Tangible Net Worth                          .52

RECEIVED

SEP 1 2 2005

OMWBE

00692



**EXHIBIT C – COMMERCIAL TORT CLAIMS**

*None*

RECEIVED

SEP 1 2 2005

**OMWBE**

00693




## SCHEDULE 1 – PERMITTED LIENS

Borrowings for new store and remodel Financing for which Lender does not exercise its right of First refusal under Section 12(k).

MKW Partners, LP   First Security Interest on Point of Sale Equipment and software related to Loan Agreement dated December 11, 2002.

**RECEIVED**

SEP 1 2 2005

**OMWBE**



## SCHEDULE 11(h) – AFFILIATE TRANSACTIONS

1.) The Grove Inc. makes License Fee payments to Star Foods.

2.) The Grove Inc. may make payments on behalf of Star Foods and/or Georgia's Grove and charge Star Foods and/or Georgia's Grove for such payments.

3.) The Grove Inc. may make payments to Star Foods and/or Georgia's Grove for payments Star Foods and/or Georgia's Grove have made on The Grove, Inc's behalf.

4.) The Grove Inc. may perform accounting, administrative, or marketing functions for Star Foods and/or Georgia's Grove for which it may or may not be directly or indirectly reimbursed.



5.) Any transactions of The Grove, Inc. related to its 70% interest and Managing Partner status for Natural Energy Unlimited of Chicago

RECEIVED

SEP 1 2 2005

OMWBE

00695

**SCHEDULE 11(i) – NAMES & TRADE NAMES**

1.) The Grove, Inc.

2.) Natural Energy Unlimited, Natural Energy Unlimited of Chicago

3.) The Grove Natural Snacks

4.) The Grove Frozen Treats

5.) The Grove

6.) The Grove Sweet Shop

7.) Plankers/Grove

8.) The Grove operates stores displaying the names ICBIY, Swensen's, Smoothie King, and Subway.

9.) J.J. Cashew, Mr. Cashew

10.) The Grove Organic Coffee

11.) The Grove Gourmet Popcorn

12.) The Grove Canada, Inc., The Grove (Canada) Inc.

RECEIVED

SEP 1 2 2005

OMWBE



## SCHEDULE 11(m) – INDEBTEDNESS

1.) Promissory Note to Paul B. Valteau, Jr. dated September 1, 2002.

2.) Promissory note to Ruth Ann Menutis dated September 1, 2002.

3.) Loan from MKW Partners, LP pursuant to loan agreement dated December 11, 2002,

4.) Borrowing on revolving line of credit from Bank One, N.A.

**RECEIVED**

SEP 1 2 2005

**OMWBE**

00697




**SCHEDULE 11(o) – PARENT, SUBSIDIARIES AND AFFILIATES**

Affiliates

1.) Star Foods, LLC

2.) Georgia's Grove, LLC        ~~Aire of Chicago~~

3) Natural Energy Unlimited of Chicago (a Partnership)

Parents

None

Subsidiaries

~~Star~~ ~~Natural Energy Unlimited of Chicago (a Partnership)~~
The Grove Canada, Inc.

RECEIVED

SEP 1 2 2005

OMWBE

00698




# PROJECT LOAN
## PROMISSORY NOTE

$2,500,000                                                              February 17, 2004

Reference is hereby made to that certain Loan and Security Agreement dated February 17, 2004 (the "Loan Agreement"), between FIFTH THIRD BANK (the "Lender"), and THE GROVE, INC., a Louisiana corporation (the "Borrower"). Capitalized terms not otherwise herein defined shall have the meanings ascribed to them in the Loan Agreement.

FOR VALUE RECEIVED, the Borrower hereby promises to pay to the order of the Lender or its assigns, the principal sum of up to TWO MILLION FIVE HUNDRED THOUSAND and No/100 DOLLARS ($2,500,000), or such lesser amount as may be due and owing to the Lender by the Borrower, plus interest thereon at the rate set forth in the Loan Agreement. Until the first to occur of (a) payment in full of the Project Loan(s), (b) conversion of the Project Loan(s) into Term Loan(s) in accordance with the Loan Agreement, or (c) the expiration of the Original Term, interest only shall be paid in arrears on the 1st day of each month.

Payments of principal and interest shall be made at such place as the legal holder hereof may from time to time in writing appoint and in the absence of such appointment, to the legal holder hereof at 990 S. Waukegan Rd., Lake Forest, Illinois 60045.

All unpaid principal hereunder, together with all accrued and unpaid interest, shall become immediately due and payable on the happening of any one or more Events of Default as set forth in the Loan Agreement.

**WAIVER OF RIGHT TO JURY TRIAL. THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS NOTE OR UNDER ANY AGREEMENT RELATED HERETO WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES, AND THEREFORE, THE UNDERSIGNED AGREES THAT ANY COURT PROCEEDING ARISING OUT OF ANY SUCH CONTROVERSY WILL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.**

This Note is the Note referred to in the Loan Agreement.

This Note shall be deemed to have been made in the State of Illinois, and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of Illinois,

The Borrower may pre-pay all or any part of this Note at any time and from time to time, without premium or penalty, provided that any such payment is accompanied by all accrued and unpaid interest through the date of such pre-payment.

The Borrower hereby waives presentment for payment, notice of dishonor and protest.

RECEIVED
SEP 1 2 2005
OMWBE

00699

THE GROVE, INC.

By: _____

Name: _____

Title: _____

F:\LJG\5-J Grove\Project Loan Promissory Note 1.wpd February 17, 2004

RECEIVED

SEP 1 2 2005

OMWBE

-2-

00700

 

## REVOLVING PROMISSORY NOTE

$500,000                                                                February 17, 2004

Reference is hereby made to that certain Loan and Security Agreement dated February 17, 2004 (the "Loan Agreement"), between FIFTH THIRD BANK (the "Lender"), and THE GROVE, INC., a Louisiana corporation (the "Borrower"). Capitalized terms not otherwise herein defined shall have the meanings ascribed to them in the Loan Agreement.

FOR VALUE RECEIVED, the Borrower hereby promises to pay to the order of the Lender or its assigns, the principal sum of up to FIVE HUNDRED THOUSAND and No/100 DOLLARS ($500,000), or such lesser amount as may be due and owing to the Lender by the Borrower, plus interest thereon at the rate set forth in the Loan Agreement. Interest only shall be paid in monthly in arrears on the 1ˢᵗ day of each month, with the unpaid portion of the principal sum, plus all accrued and unpaid interest thereon, due and payable on the last day of the Original Term.

Payments of principal and interest shall be made at such place as the legal holder hereof may from time to time in writing appoint and in the absence of such appointment, to the legal holder hereof at 990 S. Waukegan Rd., Lake Forest, Illinois 60045.

All unpaid principal hereunder, together with all accrued and unpaid interest, shall become immediately due and payable on the happening of any one or more Events of Default as set forth in the Loan Agreement.

**WAIVER OF RIGHT TO JURY TRIAL. THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS NOTE OR UNDER ANY AGREEMENT RELATED HERETO WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES, AND THEREFORE, THE UNDERSIGNED AGREES THAT ANY COURT PROCEEDING ARISING OUT OF ANY SUCH CONTROVERSY WILL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.**

This Note is the Note referred to in the Loan Agreement.

This Note shall be deemed to have been made in the State of Illinois, and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of Illinois.

The Borrower may pre-pay all or any part of this Note at any time and from time to time, without premium or penalty, provided that any such payment is accompanied by all accrued and unpaid interest through the date of such pre-payment.

The Borrower hereby waives presentment for payment, notice of dishonor and protest.

THE GROVE, INC.

RECEIVED
SEP 1 2 2005
OMWBE

00701

By:
Name: MICHELE DUBLER
Title: PRESIDENT

F:\LJG\S-3 Grove\Revolving Promissory Note 1.wpd  February 17, 2004

RECEIVED

SEP 1 2 2005

OMWBE

-2-

00702

 

# TERM LOAN
## PROMISSORY NOTE

$_____                                      _____, 200__

Reference is hereby made to that certain Loan and Security Agreement dated February 17 2004 (the "Loan Agreement"), between FIFTH THIRD BANK (the "Lender"), and THE GROVE, INC., a Louisiana corporation (the "Borrower"). Capitalized terms not otherwise herein defined shall have the meanings ascribed to them in the Loan Agreement.

FOR VALUE RECEIVED, the Borrower hereby promises to pay to the order of the Lender or its assigns, the principal sum of _____ DOLLARS ($_____), plus interest thereon at the rate set forth in the Loan Agreement. Principal and interest shall be paid in sixty (60) monthly installments, beginning on the ____ day of _____, and on the ____ day of each of the next succeeding fifty-nine (59) months, with the unpaid portion of the principal sum, plus all accrued and unpaid interest thereon, due and payable on _____.

Payments of principal and interest shall be made at such place as the legal holder hereof may from time to time in writing appoint and in the absence of such appointment, to the legal holder hereof at 990 S. Waukegan Rd., Lake Forest, Illinois 60045.

All unpaid principal hereunder, together with all accrued and unpaid interest, shall become immediately due and payable on the happening of any one or more Events of Default as set forth in the Loan Agreement.

**WAIVER OF RIGHT TO JURY TRIAL. THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS NOTE OR UNDER ANY AGREEMENT RELATED HERETO WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES, AND THEREFORE, THE UNDERSIGNED AGREES THAT ANY COURT PROCEEDING ARISING OUT OF ANY SUCH CONTROVERSY WILL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.**

This Note is the Note referred to in the Loan Agreement.

This Note shall be deemed to have been made in the State of Illinois, and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of Illinois.

The Borrower may pre-pay all or any part of this Note at any time and from time to time, without premium or penalty, provided that any such payment is accompanied by all accrued and unpaid interest through the date of such pre-payment.

The Borrower hereby waives presentment for payment, notice of dishonor and protest.

RECEIVED

SEP 1 2 2005

OMWBE

00703




THE GROVE, INC.

By: _____

Name: _____

Title: _____

F:\LJG\5-3 Grove\Term Loan Promissory Note 1.wpd  February 17, 2004

RECEIVED

SEP 1 2 2005

OMWBE

-2-

00704




Attachment XXXIV, Section I:

In an effort to expedite this transaction, Mr. Cowell requested that I transfer this amount to his Savings Account at his bank. He had full access to his funds through this account.

RECEIVED
SEP 1 2 2005
OMWBE

00705





**Fifth Third Bank (Chicago)**
Michelle A. Dukler

No. *1001*

PAY TO THE
ORDER OF *Casey Cowell*                    Date *8-17-04*

$ *2,600,000.—*

*Two million six hundred thousand & 00/100* ——————— DOLLARS

PLEASE ENTER ACCOUNT NUMBER HERE

7 2 3 2 7 3 3 0 0 1

⑆071905985⑆        512

CREDIT TO THE ACCOUNT
OF WITHIN NAMED PAYEE
ENDORSEMENT GUARANTEED
**Fifth Third Bank**
CHICAGO, IL

923 20 84 484

---

Rev 3/01                          **Fifth Third Bank (Chicago)**          Date

For Deposit
to the account
of:

*Casey Cowell*
PLEASE PRINT

| | LIST EACH CHECK SEPARATELY | | DOLLARS | CENTS |
|---|---|---|---|---|
| | CASH | | | |
| | CHECKS | | 2600000 | — |
| Fifth Third Bank | | | | |
| AUG 1 8 2004 | | | | |
| 6355-02 | SUB TOTAL | | 2600000 | — |
| | TRANSFER TO | | — | — |
| | CASH RECEIVED BY CUSTOMER | | — | — |
| | NET DEPOSIT | | 2600000 | — |

ORIGINAL COPY

23002
SAVINGS deposit

SAVINGS
ACCOUNT
NUMBER   9 2 3 2 0 8 4 4 8 4

⑆555560 23⑈  RECEIVED

SEP 1 2 2005

**OMWBE**

00706

# TAB 11



## WRITTEN CONSENT OF THE MANAGER OF
## STAR FOODS, L.L.C.

Durandal, Inc., being the sole Manager (the "**Manager**") of Star Foods, L.L.C. a

Delaware limited liability company (the "**Company**"), hereby adopts the following

recitals and resolutions:

**Exercise of Valteau/Menutis Option;**

**WHEREAS**, the Company was previously accorded an option to purchase stock pursuant to that certain Stock Option Agreement dated July 26, 1999 among Paul Valteau, Ruth Ann Menutis and the Company (the "**Valteau/Menutis Option**");

**WHEREAS**, it is deemed advisable and in the best interests of the Company that it exercise the Valteau/Menutis Option in full;

**FURTHER RESOLVED**, that the Manager be, and it hereby is, authorized, empowered and directed to exercise the Valteau/Menutis Option.

**FURTHER RESOLVED**, that the Manager is hereby authorized, empowered and directed on behalf of the Company to execute, deliver and obtain any and all other certificates, documents, or other instruments on behalf of the Company and to do or cause to be done any and all such other acts, as in the judgment of the officers so acting may be deemed necessary or advisable, to effect the exercise the Valteau/Menutis Option and consummate the transactions contemplated thereby;

Dated this 9th day of February, 2004.

Durandal, Inc., as Manager

By: _____
Casey Cowell, President

2064800001/512780/Version #.1

RECEIVED
SEP 1 2 2005
OMWBE

00707

 

# WRITTEN CONSENT OF THE MANAGER OF
# STAR FOODS, L.L.C.

Durandal, Inc., being the sole Manager (the "**Manager**") of Star Foods, L.L.C. a Delaware limited liability company (the "**Company**"), hereby adopts the following recitals and resolutions;

**Exercise of Valteau/Menutis Option;**

**WHEREAS,** the Company was previously accorded an option to purchase stock pursuant to that certain Stock Option Agreement dated July 26, 1999 among Paul Valteau, Ruth Ann Menutis and the Company (the "**Valteau/Menutis Option**");

**WHEREAS,** it is deemed advisable and in the best interests of the Company that it exercise the Valteau/Menutis Option in full;

**FURTHER RESOLVED,** that the Manager be, and it hereby is, authorized, empowered and directed to exercise the Valteau/Menutis Option.

**FURTHER RESOLVED,** that the Manager is hereby authorized, empowered and directed on behalf of the Company to execute, deliver and obtain any and all other certificates, documents, or other instruments on behalf of the Company and to do or cause to be done any and all such other acts, as in the judgment of the officers so acting may be deemed necessary or advisable, to effect the exercise the Valteau/Menutis Option and consummate the transactions contemplated thereby;

Dated this 9th day of February, 2004.

Durandal, Inc., as Manager

By: _____
Casey Cowell, President

**RECEIVED**

SEP 1 2 2005

**OMWBE**

00708

# TAB 12

 

**Star Foods, L.L.C.**
676 North Michigan Avenue
Suite 3450
Chicago, IL 60611

February 9, 2004

Michelle Dukler
6756 Fieldstone
Burr Ridge IL 60527

Re.: Exercise of Valteau/Menutis Option

Dear Michelle:

Attached are copies of the two Notices of Stock Option Exercise we intend to deliver to Paul Valteau and Ruth Ann Menutis. Pursuant to the Option Assignment Agreement between us dated February 6, 2004, you are required to exercise the Dukler Portion, and in connection therewith, to transfer $4,110 to us, representing your portion of the exercise price of the Valteau/Menutis Option. Accordingly, please deliver a check to us in the aforesaid amount, and we will proceed with the exercise of the Valteau/Menutis Option.

Thank you for following up on this request.

Very truly yours,

Star Foods L.L.C.

By: Durandal, Inc.
Its: Manager

By: _____
Its: _____

RECEIVED
SEP 1 2 2005
OMWBE

00709

206480/0001/609181/Version #:.1

Feb 04 04 11:59a    Cas~4 Cowell  Geri Kay    5618339004    p.14
Sent By: Durandal,    3i2 943 3596;    Feb-4-0    6AM;    Page 14/16



Star Foods, L.L.C.
676 North Michigan Avenue
Suite 3450
Chicago, IL 60611

February 9, 2004

Michelle Dukler
6756 Fieldstone
Burr Ridge IL 60527

Re.: Exercise of Valteau/Menutis Option

Dear Michelle:

Attached are copies of the two Notices of Stock Option Exercise we intend to deliver to Paul Valteau and Ruth Ann Menutis. Pursuant to the Option Assignment Agreement between us dated February 6, 2004, you are required to exercise the Dukler Portion, and in connection therewith, to transfer $4,110 to us, representing your portion of the exercise price of the Valteau/Menutis Option. Accordingly, please deliver a check to us in the aforesaid amount, and we will proceed with the exercise of the Valteau/Menutis Option.

Thank you for following up on this request.

Very truly yours,

Star Foods L.L.C.

By: Durandal, Inc
Its: Manager

By:
Its:

PAID  2-6-04
Cki# ZZ47

RECEIVED

SEP 1 2 2005

OMWBE

206480/0001/469481/Version #: 1

00710

# TAB 13




# WAIVER OF NOTICE OF
# SPECIAL MEETING OF
# BOARD OF DIRECTORS AND SHAREHOLDERS
# OF THE GROVE, INC.

WE, the undersigned, being all of the Stockholders/Directors of THE GROVE, INC., a corporation organized under the laws of the State of Louisiana, do hereby waive all notice of this Special Meeting of the Shareholders of The Grove, Inc., whether provided by statute or otherwise, and consent and agree that such meeting be held by phone on the 30th day of July, 2004 at 10:30 o'clock a.m. and we consent to the transaction of any and all business regarding the purpose for which this special meeting was called.

Michelle Dukler
PRESIDENT/DIRECTOR/
SHAREHOLDER          7·30·04

Casey Cowen
SHAREHOLDER    7/29/2004

RECEIVED
SEP 1 2 2005
OMWBE

00717




# MINUTES OF THE SPECIAL MEETING OF THE BOARD OF DIRECTORS
## OF
## THE GROVE, INC.

A special meeting of the Board of Directors and Shareholders of the corporation was held at by phone on the 30th day of July, 2004 at 10:30am.

The meeting was called to order by Michelle Dukler.

It was then reported that the meeting had been called pursuant to a waiver of notice thereof in accordance with the articles. It was ordered that a copy of the waiver of notice be appended to the minutes of the meeting.

The sole member of the Board of Directors being present, a quorum was established. The purpose of the meeting to amend the Stockholders Agreement was stated.

The Shareholders and Director discussed the general financial condition of the company.

The Shareholders and Director then reviewed performance of key operations.

The Shareholders and Directors then reviewed an approved the following amendments to the Stockholders Agreement that had been signed on February 17, 2004.

Section 5.10. Termination. All wording in this section is struck and replaced with the following.

The Agreement shall terminate upon the written agreement of the Holders of a majority of the Stock covered hereby.

Section 5.13. Amendments; Waivers. All wording in this section is struck and replaced with the following.

Any provision hereof may be amended, modified or supplemented upon the consent in writing by the Company and the Holders of a majority of the Stock, and upon the effectiveness of such amendment, modification or supplement, all of the Holders will be deemed to be bound thereby, provided, however, no such amendment shall disenfranchise, disproportionately disadvantage, or discriminate against any Holder not consenting thereto.

There being no further business, a motion was entertained to close the special meeting of the Shareholders and Board of Directors. The motion was seconded and approved, and at 1:00 pm on the evening of the 30th of July, 2004, the meeting was adjourned.

Michelle Dukler    7·30·04
**PRESIDENT/DIRECTOR**
**SHAREHOLDER**

Casey Cowell    7/30/2004
**SHAREHOLDER**

RECEIVED
SEP 1 2 2005

00718

# TAB 14



## STOCKHOLDERS AGREEMENT

THIS STOCKHOLDERS AGREEMENT, dated as of February 17, 2004 (this "**Agreement**"), by and among The Grove, Inc., a Louisiana corporation (whose principal place of business is in the State of Illinois) ("**Company**"), Michelle Dukler, a resident of Illinois ("**Dukler**"), Star Foods, L.L.C., a Delaware limited liability company (whose principal place of business is in the State of Illinois) ("**Star Foods**"), and such other Persons that become parties hereto after the date of this Agreement in accordance with the terms and provisions contained herein (collectively, "**Holders**").

### RECITALS

A.    Upon the terms and subject to the conditions of the Stock Purchase Agreement (as defined below), Dukler has purchased from Star Foods shares of Common Stock, no par value ("**Stock**"), of the Company.

B.    The Company, Dukler and Star Foods mutually desire to regulate certain aspects of their relationship, including certain agreements regarding voting for directors and certain restrictions with respect to transferring of Stock by Dukler all as hereinafter set forth.

In consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

### AGREEMENT

1.    DEFINITIONS

As used in this Agreement, the following terms herein shall have the following meanings:

"**Board**" means the Board of Directors of the Company.

"**Permitted Transferee**" means any Person who is the spouse or a lineal ancestor or descendant of a Holder or a Holder's Permitted Transferees, a trust for the benefit of a Holder or a Holder's Permitted Transferees, or the estate of a Holder or a Holder's Permitted Transferees, <u>provided</u>, (i) that any such Person has agreed in writing to be bound and has become bound by the terms and conditions of this Agreement to the same extent and in the same manner as the Holder or Permitted Transferee transferring Stock to such Person; (ii) that the Transfer to any such Person will not result in the decertification of the Company as a Minority Business Enterprise or Disadvantaged Business Enterprise in any jurisdiction where the Company then has such certification; and (iii) that the Transfer to any such Person is effected in compliance with the registration requirements of all applicable securities laws (or exemptions therefrom) and that the transferor or Permitted Transferee shall have paid any costs incurred by the Company in connection with the Transfer.


RECEIVED
SEP 1 2 2005
CMWBE

00719

1

206480/0001/609167/Version #: 2

 

**"Person"** means an individual, partnership, corporation, business trust, limited liability company, joint stock company, trust, unincorporated association, joint venture, or other entity of whatever nature.

**"Securities"** means any debt or equity securities of the Company, whether now or hereafter authorized or issued, and any instrument convertible into, or exercisable or exchangeable for, any such Securities or Security.

**"Stock Purchase Agreement"** means the Stock Purchase Agreement between Star Foods and Dukler dated as of February 6, 2004.

**"Subsidiary"** means any corporate entity, at least 80% of which is owned by the Company.

**"Transfer"** means any sale, assignment, transfer, negotiation, pledge, hypothecation, other disposition, and any event or transaction in which a lien is created.

2.      RESTRICTIONS ON TRANSFER

      2.1.    Restrictions on Holders

          (a)      Each Holder agrees that it will not Transfer any interest in any Stock held by it except to a Permitted Transferee. Any Transfer of any Stock sought to be made in violation of this Agreement shall be null and void, and neither the Company nor any transfer agent shall give any effect in the Company's stock records to such attempted Transfer.

          (b)      Prior to the termination of this Agreement, no Stock held by any Holder (the **"Restricted Stock"**) may be Transferred to any Permitted Transferee unless such Permitted Transferee, prior to such sale, transfer or other disposition, agrees to the extent required hereunder in writing, in form and substance satisfactory to the Company, to be bound by the terms hereof and by any other agreements such Holder's holding of Stock or any rights thereto to the same extent and in the same manner as the transferor of such Restricted Stock, a copy of which writing shall be maintained on file with the Secretary of the Company and shall include the address of such Permitted Transferee to which notices hereunder shall be sent. Each such supplementary agreement shall become effective upon its execution by the Company and the Permitted Transferee, and it shall not require the signatures or the consent of any other party hereto. Upon such execution, such Permitted Transferee shall be bound by all the restrictions placed on such Holder hereby, shall be subject to any additional restrictions set forth in such supplementary agreement and shall enjoy only such rights as are specifically set forth in such supplementary agreement.

      2.2.    New Issuance of Securities.   The Holders agree that any future issuance of Securities shall require the affirmative approval of at least two-thirds (2/3) of the members of the Board and accord preemptive rights to each Holder.

**RECEIVED**

**SEP 1 2 2005**

**OMWBE**

2

00720

206480/0001/609167/Version #

 

3.    MATTERS INVOLVING DIRECTORS

3.1.    Election of Directors.

(a)    The Company and each of the Holders agree that, so long as the voting agreement set forth in this Section 3.1 remains in effect, each of them shall take all action necessary from time to time (including, without limitation, the voting of Stock, the execution of written consents, the calling of special meetings, the removal of directors, the filling of vacancies on the Board, the waiving of notice and attendance at meetings, the amendment of the Company's by-laws and the like) necessary to maintain the membership of the Board as follows:

(i)    The number of directors composing the Board shall be fixed at one (1); and

(ii)    Such director shall be elected by Holders of a majority of the Stock covered hereby.

By their execution of this Agreement, the Holders agree that (A) the initial Board shall consist of Dukler and that (B) so long as Dukler serves as sole director, Dukler shall be entitled to an annual Management and Directors Fee for managing the Company and its business in the amount of $80,000 per year, payable monthly.

(b)    The Holders agree and shall vote all of their Stock to assure that the Board elected pursuant to this Section 3.1 shall also serve as the Board (or the equivalent governing body) of any Subsidiary of the Company.

(c)    During the term of this Agreement, no Holder will Transfer Stock unless the proposed transferee agrees to be bound by the provisions of this Article 3. The Company shall not permit the Transfer of any Stock on its books unless or until the proposed transferee shall have executed a written agreement pursuant to which said transferee agrees to be bound by the provisions of this Article 3.

3.2.    Reimbursement of Expenses. The Company agrees to reimburse each director for the reasonable out-of-pocket expenses incurred by any director in performing his or her services as a director of the Company or any Subsidiary, including expenses incurred in connection with attendance at meetings of the Board.

4.    NOTICE OF CORPORATE ACTION

The Company hereby agrees to keep all Holders owning no less than 20% of the Stock reasonably apprised in advance of Significant Corporate Actions the Company contemplates undertaking, by providing notice to all such Holders at least ten (10) days prior to their taking. "Significant Corporate Actions" shall mean any action or series of related actions by the Company directly, or indirectly as to any business the Company owns via its partnership ownership or otherwise, where the aggregate amount involved (whether to be represented by the actual expenditure of, or commitment to expend, funds, the incurring of risk, the distribution or

RECEIVED

SEP 1 2 2005

OMWBF

00721

3

206480/0001/609167/Version #:.2

 

disbursement of cash or other assets, or any combination of the foregoing) exceeds $25,000. Such notice shall set forth the proposed action or actions, the business reasons for taking such action or actions, and the Company's good-faith estimate of the aggregate amount involved.

5.    MISCELLANEOUS

5.1.    Dividends in Stock. If a stock dividend is paid on any Stock held by any Holder, or if any Stock held by any Holder is exchanged for Securities of a different class or series, or for voting trust certificates evidencing any beneficial interest in such Securities, or if any other event (such as a stock split, reclassification, or similar event) shall occur so that any Holders receive additional or replacement Securities of the Company (whether of the same or a different class or series); then such Securities of the same or a different class or series, or such voting trust certificates, as the case may be, shall thereupon become subject to the provisions of this Agreement upon the same terms and conditions as the Stock originally covered by this Agreement.

5.2.    Legends. Each certificate evidencing any Stock that is issued to any Holder shall bear a legend in substantially the following form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY OTHER STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, OR TRANSFERRED EXCEPT IN COMPLIANCE THEREWITH. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER AS SET FORTH IN A STOCKHOLDERS AGREEMENT, DATED AS OF _____ __, 2003, COPIES OF WHICH WILL BE FURNISHED BY THE COMPANY UPON REQUEST.

5.3.    Headings. The headings in this Agreement are for convenience of reference only and shall not control or affect the meaning or construction of any provisions hereof.

5.4.    Pronouns. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, singular and plural as the identity of that Person referred to requires.

5.5.    Remedies. The parties acknowledge that the Stock is a unique chattel and possesses a special, unique and extraordinary character which would make it difficult to assess the monetary damage which any party hereto would sustain in the event of a breach hereof by another party hereto, and that in the event of any such breach by any Holder or the Company, the other parties would be irreparably harmed and could not be made whole by monetary damages. The Company and each Holder accordingly agree (a) to waive the defense in any action for specific performance that a remedy at law would be adequate, and (b) that an aggrieved party hereunder shall be entitled to compel specific performance of this Agreement, in addition to any other remedy to which they may be entitled at law or in equity.

RECEIVED

SEP 1 2 2005

OMWBE

00722

4

206480/0001/609167/Version #:.2

 

5.6.   Entire Agreement.  This Agreement and the other documents and agreements executed by the parties hereto on this date or referred to herein together constitute the entire agreement and understanding of the parties hereto in respect of the subject matter referred to herein and therein, and there are no restrictions, promises, representations, warranties, covenants, or undertakings with respect to the subject matter hereof, other than those expressly set forth or referred to herein or therein.   This Agreement supersedes all prior agreements and understandings between the parties hereto with respect to the subject matter hereof.

5.7.   Notices.  All communications in connection with this Agreement shall be in writing and shall be deemed properly given if hand delivered or sent by telecopier (provided that such communication is confirmed by same-day deposit in the United States mail first class postage prepaid) or overnight courier with adequate evidence of delivery or sent by registered or certified mail return receipt requested to the addresses for notices set forth below:

| | |
|---|---|
| If to the Company: | 3 Westbrook Corporate Center<br>Westchester, IL  60154 |
| If to Dukler: | 6756 Fieldstone<br>Burr Ridge, IL  60527 |
| If to Star Foods: | c/o Durandal, Inc.<br>676 North Michigan Avenue<br>Suite 3450<br>Chicago, Illinois 60611 |
| With a copy to: | Sachnoff & Weaver, Ltd.<br>Suite 2900<br>30 South Wacker Drive<br>Chicago, Illinois  60606<br>Attention:  Lance R. Rodgers |

or such other addresses or Persons as the recipient shall have designated to the sender by a written notice given in accordance with this Section.  Any notice called for hereunder shall be deemed given when received.

5.8.   Governing Law; Jurisdiction.   This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.  The Company and the Holders hereby submit to the exclusive jurisdiction and venue of the federal and state courts presiding in Cook County, Illinois with respect to any dispute concerning or arising out of this Agreement.

5.9.   Severability.  The invalidity or unenforceability of any provisions hereof in any jurisdiction shall not affect the validity, legality or enforceability of the remainder hereof in such jurisdiction or the validity, legality or enforceability hereof, including any such provision, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforced to the fullest extent permitted by law.

RECEIVED
SEP 1 2 2005
OMWBE

00723

5

 

5.10.  Termination.  This Agreement shall terminate and be of no further force or effect upon (i) the written agreement of the Holders of 80% of the Stock covered hereby; or (ii) the exercise of the Option by Star Foods.

5.11.  Successors, Assigns, Transferees.   All rights and obligations conferred and imposed upon the parties as contained in this Agreement or made in writing in connection herewith shall, except as otherwise provided herein, inure to the benefit of and be binding upon their respective successors and permitted assigns.

5.12.  Further Assurances.  The Holders, by the signing hereof, hereby agree to execute and deliver such other documents and agreements, including but not limited to assignments, bills of sale, stock powers, or resolutions, as may be reasonably necessary, desirable or convenient in order to effect the purposes hereof.

5.13.  Amendments; Waivers.  Any provision hereof may be amended, modified or supplemented upon the consent in writing by the Company and the Holders of at least 80% of the Stock, and upon the effectiveness of such amendment, modification or supplement, all of the Holders will be deemed to be bound thereby; provided, however, no such amendment shall disenfranchise, disproportionately disadvantage, or discriminate against any Holder not consenting thereto.

5.14.  Counterparts.  This agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same Agreement.

5.15.  Construction and Representation.  The parties understand and acknowledge that they have each been represented by (or have had the opportunity to be represented by) counsel in connection with the preparation, execution and delivery of this Agreement.  This Agreement shall not be construed against any party for having drafted it.

* * * * * *

RECEIVED

SEP 1 2 2005

OMWBE

00724

206480/0001/609167/Version #:.2

Feb 04 04 11:56a    Casey Cowell  Geri Kay     5618339004         p.2
Sent By: Durandal,              312 943 3596;    Feb-4-0/  ·44AM;        Page 2

IN WITNESS WHEREOF, the parties hereto have executed this Stockholders'
Agreement as of the date first above written.

THE COMPANY:

THE GROVE, INC., a Louisiana corporation

By:  _____

Name:  _____Michelle Dukler_____

Its:  _____President_____

HOLDERS:

_____

_____MICHELLE DUKLER_____

STAR FOODS, L.L.C., a Delaware limited
liability company

By: Durandal, Inc.
Its: Manager

By:  _____

Name:  _____

Its:  _____

RECEIVED

SEP 1 2 2005

OMWBE

7

206488/0081/689167/Version #: 2

**TAB 15**

# ATTACHMENT XXXV

RECEIVED

SEP 1 2 2005

OMWBE

00726

 

## EXCLUSION OF CERTAIN PROPERTY FROM MARITAL PROPERTY

WHEREAS, 750 ILCS 5/503 ("**Section 5/503**") defines non-marital property as including property excluded from marital property by agreement of the parties;

WHEREAS, Martin Dukler ("**Martin**") wishes to exclude 36.5 shares of the common stock of The Grove, Inc., a Louisiana corporation (the "**Assets**") from marital property and irrevocably to renounce, transfer and relinquish all his right, title and interest in and to the Assets so that his wife, Michelle Dukler ("**Michelle**") may hold the Assets as her separate and exclusive property;

NOW THEREFORE, Martin, for himself, his heirs, executors, administrators, and representatives, hereby agrees that the Assets (i) shall be excluded from marital property and shall be separate property for purposes of Section 5/503; (ii) shall hereafter maintain their status as separate property and in no event be treated as having been commingled with marital property and (iii) to the extent the Assets are considered to have been commingled with marital property, Martin irrevocably renounces, transfers and relinquishes all his right, title and interest in and to the Assets.

This instrument shall be governed by and construed in accordance with Illinois law.

RECEIVED

SEP 1 2 2005

OMWBE

00727

206480/0001/648848/Version " ·

Separate
2 ....

 

IN WITNESS WHEREOF, this Exclusion of Certain Property from Marital Property is duly executed as of February 5, 2004:

_____
Martin Dukler

## ACKNOWLEDGEMENT AND ACCEPTANCE OF RECEIPT OF EXCLUSION OF CERTAIN PROPERTY FROM MARITAL PROPERTY

The undersigned hereby acknowledges and accepts receipt of the above Exclusion of Certain Property from Marital Property as of the day and year above written.

_____
Michelle Dukler

State of Illinois
County of Cook
This 5th day of February, 2004

Anna M Taylor

OFFICIAL SEAL
ANNA M TAYLOR
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. JUNE 21,2006

RECEIVED
SEP 1 2 2005
OMWBE

00728

206480/0001/648848/Version #:.1

# TAB 16

# ATTACHMENT XLV

RECEIVED

SEP 1 2 2005

OMWBE

00750

 

Star Foods, LLC is 49% stockholder in The Grove, Inc.


Star Foods, LLC is owned by:

Casey Cowell – 85% - 680 shares ( 800 out of 1000 shares distributed)
Martin Dukler – 15% - 120 shares

Neither owner of Star Foods,LLC  sits on the board of The Grove, Inc., has voting rights
in The Grove, Inc. ,or  is employed by The Grove, Inc.

RECEIVED

SEP 1 2 2005

OMWBE

00751

Star Foods, LLC

# TAB 17

# ATTACHMENT XLVI

RECEIVED

SEP 1 2 2005

OMWBE




Page 1 of 2

State of Illinois
County of Cook

BEFORE ME, the undersigned Notary, Anna Taylor on this 6th day of September, 2005, personally appeared, Martin A. Dukler, known to me to be a credible person and of lawful age, who being by me first duly sworn, on his oath, deposes and says:

1.  I am Martin A. Dukler, a natural person of lawful age and a legal resident of the State of Illinois.

2.  I am the spouse of Michele Dukler.

3.  Since August 1, 1999 to the present, I have been continuously employed by Star Foods, LLC, an Illinois limited liability corporation ("Star Foods" or "the Corporation"). I am a member of the Corporation. I own 20 percent of the economic interests of Star Foods. I am employed by the Corporation.

4.  Star Foods is a minority shareholder of The Grove, Inc ("The Grove" or "the company"). The Corporation owns 49 percent of The Grove's stock. Star Foods acquired its ownership in The Grove in July 1999 from Ruth Ann Menutis and Paul Valteau, Board Chair/ President and Executive Vice President, respectively, and who at the time were the only shareholders. Upon information and belief, The Grove (formerly known as Natural Energy Unlimited, Inc.) is a "C" corporation and is incorporated in the State of Louisiana.

5.  During the period January 2000 through February 13, 2004, I served as a director of The Grove. During this period, at the request of Ms. Menutis and due to her personal illness, I was asked by her to assist with the management of the company. I did so on an uncompensated basis. My work in this regard was directed and approved by Ms. Menutis and/or Mr. Valteau.

6.  On February 2004, my spouse Michelle Dukler acquired a controlling interest in The Grove. Contemporaneously with the closing of this transaction, in a writing I irrevocably renounced any right or interest that I might have in my spouse's controlling interest as a spouse under Illinois law and transferred all such rights or interests, if any, to my spouse.

7.  On February 13, 2004, I resigned as a director of The Grove and since that date I have had no role in the management of the company as a director, an officer or as an, employee. Further, I am not an authorized signatory on The Grove's bank accounts and do not have authority to legally bind the company or otherwise act as its agent.

[SIGNATURE ON FOLLOWING PAGE]

RECEIVED
SEP 1 2 2005
OMWBE

00753

STATEMENT OF

 

Page 2 of 2

Martin Dukler

226 Justina Street
Hinsdale, IL 60521

Subscribed and sworn to before me, this _____ 8th _____ [day of month] day of
_____ sept _____ [month], 2005

[Notary Seal:]

_____ Anna M Taylor _____
[signature of Notary]

| OFFICIAL SEAL |
| ANNA M TAYLOR |
| NOTARY PUBLIC STATE OF ILLINOIS |
| MY COMMISSION EXP. JUNE 21,2006 |

Anna M. Taylor
[typed name of Notary]

RECEIVED

SEP 1 2 2005

OMWBE

00754

# TAB 18

# ATTACHMENT XLVIII

RECEIVED

SEP 1 2 2005

OMWBE

00777

# CITY OF CHICAGO
# DEPARTMENT OF PROCUREMENT SERVICES

## SITE VISIT REPORT

**COMPANY NAME: THE GROVE, INC.**
**ADDRESS: O'HARE AIRPORT**

TYPE OF BUSINESS: RETAIL FOOD & BEVERAGE; AIRPORT
CONCESSIONAIRE

DATE: 5-18-04
OFFICER'S NAME: ROBERT CUNNIFF

1.  Does the business OPERATE their principal activities from the above address? ☐Yes   X☐No

    Residential location: ☐
    Commercial location: X☐
    Home Office: ☐

2.  Other Locations: THE HOME OFFICE IS IN WESTCHESTER.

3.  Is there another business operating out of the same location?    ☐Yes X☐No
    If yes, what is the name of the business?
    What type of business is the other business?
    Do the businesses share employees?    ☐ Yes ☐No

4.  Does the business use its own equipment (observed)? X☐Yes   ☐No
    If no, who owns equipment?
    Does the business use it own equipment (applicant response)    X☐Yes ☐No

5.  Inventory available (observed)       X☐Yes ☐No
    Inventory available (applicant response) X☐Yes ☐No
    a.     Type observed: DIFFERENT FOOD ITEMS FOR DIFFERENT STORES.
    b.     Estimated Dollar Amount $ 750,000 {FOR ALL STORES}
6.  Total employee count (observed)       4 FT    0 PT
    Total employee count (reported)      331 FT  PT
    THERE ARE 30 – 35 AT O'HARE AIRPORT.

7.  List the name and Position of significant person(s) OBSERVED at site visit.
    Name: SHEHNAZ BACHCHA        Position/Title: SUPERVISOR

8.  List the name and position of person(s) INTERVIEWED at site visit.
    Name: MARY SCHOENHOFF        Position/Title: AREA MANAGER
    MICHELLE DUKLER             PRES.

9.  Who makes the day-to-day decisions on matters of management, policy and operations of the
    business?
    (OBSERVED) Name: MICHELLE DUKLER    Position/Title: PRES.

    (APPLICANT RESPONSE)
        Name: MICHELLE DUKLER    Position/Title: PRES.

RECEIVED

SEP 1 2 2005

OMWBE

00778

ON- SITE

 

## Applicant Response:

10. .    What certification status is the firm applying for? ☐MBE   ☐WBE   X☐DBE

11.    As President of the corporation what are your duties and responsibilities? MICHELLE DUKLER HAS STORES IN SEVERAL STATES: ILLINOIS, TEXAS, AND NEW JERSEY. I WENT TO HER STORES AT O'HARE AIRPORT, AND PHONED HER IN HER OFFICE IN WESTCHESTER. HER ANSWERS WERE STOREWIDE, LIKE INVENTORY AMOUNTS {SEE #5}. SHE HAS 5 REGIONAL MANAGERS INCLUDING ONE, MARY SCHOENHOFF, WHO ONLY HANDLES O'HARE.  MICHELLE DUKLER SAID THAT SHE WOULD VISIT EACH LOCATION AND REVIEW THE COST OF GOODS SOLD, P & L, AND THE STAFFING. SHE MENTIONED ONE STAFF MEMBER, RUHSANE PATEL, WHO HAS BEEN WITH THE FIRM FOR 16 YEARS.

12.    Where did you obtain the experience to operate this type of firm?  SHE WAS IN WITH A MARKETING FIRM FOR A COUPLE OF YEARS, AND SHE HAS HAD TWO BUSINESSES OF HER OWN FOR 15 YEARS.  ONE WAS A MANUFACTURING FIRM AND THE OTHER WAS A RETAIL COMPANY.

13.    Are you paid a salary    X☐Yes   ☐No    If yes, what is your salary$200,000/YR.

14.    Who is responsible for maintaining office work?  THERE ARE 16 PEOPLE ON HER STAFF IN WESTCHESTER.  SHE WILL REVIEW FILES WITH HER CFO AND HER CONTROLLER.

15.    How did you come into ownership of the business?  THE PREVIOUS 51% OWNER DECIDED TO RETIRE AFTER REACHING HER 60'S.  MICHELLE DUKLER SAID THAT SHE IS ONLY IN HER 40'S, AND SHE IS LOOKING TO DO THAT MUCH MORE.

16.    How did you arrange the financing to start this business?  SHE SOLD THE ASSETS OF HER TWO FIRMS AND DISSOLVED THEM.  SHE ALSO HAS A VERY VALUABLE ART COLLECTION.  THIS ALLOWED HER TO GET A LINE OF CREDIT FOR $2.6 MILLION.

17.    Do you have any current loans outstanding? X☐Yes    ☐No.  If so, to whom? $2.6 MILLION WITH DURANDAL IN CHICAGO.
       Line of Credit? YES, FOR $3 MILLION
       Secured/Guaranteed by:  5TH 3RD BANK

18.    Are you presently employed by anyone other  than your firm?
       ☐Yes  X☐No
       If yes, by whom:                         What capacity?

19.    How do you determine the cost of your services?  MICHELLE DUKLER SAID THAT HER COST OF GOODS IS OVERSEEN BY "STREET PRICING FOR THE AIRPORT".  SHE SAID THAT EVERY VENDOR IN EVERY AIRPORT, EXCEPT LOS VEGAS, IS NOW RESTRICTED BY A LOT MORE SCRUTINY.  THEIR PRICES MUST CONFORM TO THE MARKET PRICES IN THE NEIGHBORING SHOPPING MALLS.

20.    How do you market your goods and services?  SHE HIRED TONYA PASTORELLA FROM THE AIRPORT RETAIL MANAGEMENT {ARM}.  HER STORES ARE RESTRICTED FOR SIGNAGE AND GRAPHICS.

21.    Who is responsible for contract negotiations?  THIS WILL DEPEND UPON THE LOCATION. SHE WILL INCLUDE THE SENIOR VP OF DEVELOPMENT AND THE CFO.

22.    Do you subcontract any of your company work? ☐ Yes          X☐No

RECEIVED
SEP 1 2 2005
OMWBE

00779

23.    List t... ...stome.... ...e contractors? SHE ONLY WORKS IN ...IRPORT... ...ND SHE DEALS WITH... ...MASTE... CONCESSIONARIES. ONE IS *HOST* AN... ...NOTHER IS... ...FIELD. SOMETIMES THE STORES ARE UNDER THE AIRLINES AUTHORITY AND OTHERS ARE UNDER THE CONTROL OF THE CITY.

24.    CONCLUSIONS: *(State all observations that resulted in conclusions about the decision-making. Include a physical description of the premises and equipment observed. Indicate whether the firm's principal activities were observed and provide description of observed activities).*

This is an unusual site visit for a firm that has been previously certified with the city.   They were certified because the 51% owner was a woman.  Now that woman has retired, and she has sold her stock to another woman.  I went to O'Hare Airport after checking with the main office for the locations for their stores.  I saw two stores.  They were both in terminal #1, and both on the B concourse.

The store at B6 is the *Planter's* location, and I'm told it is their biggest store at O'Hare.  For airport standards there is ample room here for displaying a variety of nuts, beverages, and other packaged goods.  At first I talked with the store supervisor, Shehnaz Bachcha.  She phoned the front office in Westchester, and I spoke at first to Mary Schoenhoff, the area supervisor.  Then I asked for the President, Michelle Dukler.

Michelle Dukler could easily answer the questions on the site visit form.  She could offer detail with the stores located at O'Hare, and she mentioned that she does travel to the stores in other states too.  For a company this size it offers a different perspective on the site visit.  She said that she has 331 employees, but that will change almost everyday.  I was told that she had 60 some employees at O'Hare, but she corrected me to a number between 30 and 35.

The number for inventory value was given at: $750,000.  This, of course, was across the states.  Michelle Dukler said that she has different lines of food items in many stores.  She is planning on teaming up with *Subway* to open a store in New Jersey.  It is terminal A in Newark, and she has to deal with the Port Authority of New Jersey.  She faxed me her certification for her Texas locations.  The certifying agency is the North Central Texas Regional Certification Agency.

I told her that it was great that she has secured the certification of the NCTRCA, but we would have to process all of her paperwork ourselves.  This is her home state; her home office is in Westchester.  If the paperwork is complete, I would recommend DBE certification.

RECEIVED

SEP 1 2 2005

OMWBE

00780

# TAB 19

# ATTACHMENT XLIX

RECEIVED
SEP 1 2 2005
OMWBE

00781

# CITY OF CHICAGO
# DEPARTMENT OF PROCUREMENT SERVICES

## SITE VISIT REPORT

**COMPANY NAME: THE GROVE, INC.**
**ADDRESS: O'HARE AIRPORT & 3 WESTBROOK CORPORATE**
**CENTER, SUITE 500, WESTBROOK, IL, 708-531-1694 X 3214**
TYPE OF BUSINESS: RETAIL FOOD & BEVERAGE; AIRPORT
CONCESSIONAIRE

DATE: 5-18-04 & 7-15-04
OFFICER'S NAME: ROBERT CUNNIFF

1. Does the business OPERATE their principal activities from the above address? ☐Yes    X☐No

   Residential location: ☐
   Commercial location: X☐
   Home Office: ☐

2. Other Locations: THE HOME OFFICE IS IN WESTCHESTER.

3. Is there another business operating out of the same location?    ☐Yes X☐No
   If yes, what is the name of the business?
   What type of business is the other business?
   Do the businesses share employees?    ☐ Yes ☐No

4. Does the business use its own equipment (observed)? X☐Yes   ☐No
   If no, who owns equipment?
   Does the business use it own equipment (applicant response)    X☐Yes ☐No

5. Inventory available (observed)        X☐Yes ☐No
   Inventory available (applicant response) X☐Yes ☐No
   a.    Type observed: DIFFERENT FOOD ITEMS FOR DIFFERENT STORES.
   b.    Estimated Dollar Amount $ 750,000 {FOR ALL STORES}

6. Total employee count (observed)        4 FT    0 PT
   Total employee count (reported)        331 FT  PT
   THERE ARE 30 –35 AT O'HARE AIRPORT.

7. List the name and Position of significant person(s) OBSERVED at site visit.
   Name: SHEHNAZ BACHCHA        Position/Title: SUPERVISOR

8. List the name and position of person(s) INTERVIEWED at site visit.
   Name: MARY SCHOENHOFF        Position/Title: AREA MANAGER
   MICHELLE DUKLER              PRES.

9. Who makes the day-to-day decisions on matters of management, policy and operations of the
   business?
   (OBSERVED)  Name: MICHELLE DUKLER    Position/Title: PRES.

   (APPLICANT RESPONSE)
                Name: MICHELLE DUKLER    Position/Title: PRES.



RECEIVED
SEP 1 2 2005
OMWBE

ON-SITE

00782

 

## Applicant Response:

10. . What certification status is the firm applying for? □MBE   □WBE   X□DBE

11.   As President of the corporation what are your duties and responsibilities? MICHELLE DUKLER HAS STORES IN SEVERAL STATES: ILLINOIS, TEXAS, AND NEW JERSEY. I WENT TO HER STORES AT O'HARE AIRPORT, AND PHONED HER IN HER OFFICE IN WESTCHESTER. HER ANSWERS WERE STOREWIDE, LIKE INVENTORY AMOUNTS {SEE #5}. SHE HAS 5 REGIONAL MANAGERS INCLUDING ONE, MARY SCHOENHOFF, WHO ONLY HANDLES O'HARE. MICHELLE DUKLER SAID THAT SHE WOULD VISIT EACH LOCATION AND REVIEW THE COST OF GOODS SOLD, P & L, AND THE STAFFING. SHE MENTIONED ONE STAFF MEMBER, RUHSANE PATEL, WHO HAS BEEN WITH THE FIRM FOR 16 YEARS.

12.   Where did you obtain the experience to operate this type of firm? SHE WAS IN WITH A MARKETING FIRM FOR A COUPLE OF YEARS, AND SHE HAS HAD TWO BUSINESSES OF HER OWN FOR 15 YEARS. ONE WAS A MANUFACTURING FIRM AND THE OTHER WAS A RETAIL COMPANY.

13.   Are you paid a salary   X□Yes  □No   If yes, what is your salary$200,000/YR.

14.   Who is responsible for maintaining office work? THERE ARE 16 PEOPLE ON HER STAFF IN WESTCHESTER. SHE WILL REVIEW FILES WITH HER CFO AND HER CONTROLLER.

15.   How did you come into ownership of the business? THE PREVIOUS 51% OWNER DECIDED TO RETIRE AFTER REACHING HER 60'S. MICHELLE DUKLER SAID THAT SHE IS ONLY IN HER 40'S, AND SHE IS LOOKING TO DO THAT MUCH MORE.

16.   How did you arrange the financing to start this business? SHE SOLD THE ASSETS OF HER TWO FIRMS AND DISSOLVED THEM. SHE ALSO HAS A VERY VALUABLE ART COLLECTION. THIS ALLOWED HER TO GET A LINE OF CREDIT FOR $2.6 MILLION.

17.   Do you have any current loans outstanding? X□Yes    □No. If so, to whom? $2.6 MILLION WITH DURANDAL IN CHICAGO.
        Line of Credit? YES, FOR $3 MILLION
        Secured/Guaranteed by: 5TH 3RD BANK

18.   Are you presently employed by anyone other  than your firm?
        □Yes X□No
        If yes, by whom:                    What capacity?

19.   How do you determine the cost of your services? MICHELLE DUKLER SAID THAT HER COST OF GOODS IS OVERSEEN BY "STREET PRICING FOR THE AIRPORT". SHE SAID THAT EVERY VENDOR IN EVERY AIRPORT, EXCEPT LOS VEGAS, IS NOW RESTRICTED BY A LOT MORE SCRUTINY. THEIR PRICES MUST CONFORM TO THE MARKET PRICES IN THE NEIGHBORING SHOPPING MALLS.

20.   How do you market your goods and services?  SHE HIRED TONYA PASTORELLA FROM THE AIRPORT RETAIL MANAGEMENT {ARM}. HER STORES ARE RESTRICTED FOR SIGNAGE AND GRAPHICS.

21.    Who is responsible for contract negotiations?  THIS WILL DEPEND UPON THE LOCATION. SHE WILL INCLUDE THE SENIOR VP OF DEVELOPMENT AND THE CFO.

22.   Do you subcontract any of your company work? □ Yes          X□No

RECEIVED
SEP 1 2 2005
OMWBE

00783

23.  List __5 customers/prime contractors?  SHE ONLY WORKS IN THE AIRPORT. SHE DEALS WITH THE MASTER CONCESSIONAIRES.  ONE IS *HOST* AND ANOTHER IS *WE__*. SOMETIMES THE STORES ARE UNDER THE AIRLINES AUTHORITY AND OTHERS ARE __ THE CONTROL OF THE CITY.

24.  **CONCLUSIONS:**  *(State all observations that resulted in conclusions about the decision-making. Include a physical description of the premises and equipment observed. Indicate whether the firm's principal activities were observed and provide description of observed activities).*

This is an unusual site visit for a firm that has been previously certified with the city.  They were certified because the 51% owner was a woman.  Now that woman has retired, and she has sold her stock to another woman.  I went to O'Hare Airport after checking with the main office for the locations for their stores.  I saw two stores.  They were both in terminal #1, and both on the B concourse.

The store at B6 is the *Planter's* location, and I'm told it is their biggest store at O'Hare.  For airport standards there is ample room here for displaying a variety of nuts, beverages, and other packaged goods.  At first I talked with the store supervisor, Shehnaz Bachcha.  She phoned the front office in Westchester, and I spoke at first to Mary Schoenhoff, the area supervisor.  Then I asked for the President, Michelle Dukler.

Michelle Dukler could easily answer the questions on the site visit form.  She could offer detail with the stores located at O'Hare, and she mentioned that she does travel to the stores in other states too.  For a company this size it offers a different perspective on the site visit.  She said that she has 331 employees, but that will change almost everyday.  She added that she has between 30 and 35 employees at O'Hare.

The number for inventory value was given at:  $750,000.  This, of course, was across the states.  Michelle Dukler said that she has different lines of food items in many stores.  She is planning on teaming up with *Subway* to open a store in New Jersey.  It is terminal A in Newark, and she has to deal with the Port Authority of New Jersey.  She faxed me her certification for her Texas locations.  The certifying agency is the North Central Texas Regional Certification Agency.

I told her that it was great that she has secured the certification of the NCTRCA, but we would have to process all of her paperwork ourselves.  This is her home state; her home office is in Westchester.  If the paperwork is complete, I would recommend DBE certification.

**7-15-04**

This day I went, unannounced, to the corporate offices in Westbrook.  I met Michelle Dukler, the President, and everybody else in the office {business cards enclosed}.  They have space on the 5th floor of a huge office complex.  Michelle Dukler said that they realized that they have too much space on this floor, and they sublet some space to a computer firm.  They do not share employees or anything else with them.

Since I have already gone through the standard site visit form with Michelle Dukler, I walked with her throughout the office area meeting all of the staff.  Not that it is necessary for certification, but most of the office staff are women.  Michelle Dukler added that she does have over 300 people on the payroll.  Ms. Dukler introduced me to each of the staff members and she gave me a list of their duties.  She not only knows all of the staff, she feels comfortable working with them.  Michelle Dukler again told me how they would have meetings and review all of the company procedures and strategic plans.  She said that the final word is hers.

From a site visit prospective, this is certainly a certifiable entity.  There are some problems, however, with the paperwork.  This is reflective of a lack of true ownership.  We talked about her ownership of the firm.  She said that she has written agreements about her authority in this company excluding her husband.  She added that she is, in fact, wealthy.  She could get a loan from the 5th 3rd Bank that would cover the money that she borrowed for her ownership.

From what she is saying about her personal possessions, perhaps she is not within the DBE standards for personal net worth.  It appears that her ownership is a real problem with certification.

**RECEIVED**

SEP 1 2 2005

**OMWBE**

00784






The Grove, Inc. d/b/a NEU of Chicago/O'H
3 West Brook Corporate Center #500
Westchester, IL 60154
708-531-1694

## SCHEDULE A
## Final Denial Summary

Date: 7/26/04        Officer: P. Brooks        Signature: _____        Phone: 4-9759

| COMPANY OWNERSHIP: | CERTIFICATION CATEGORY: | CERTIFICATION RECOMMENDATION |
|---|---|---|
| White 100%<br>Male 49%<br>Female 51% | DBE  X<br>WBE  X | Final Denial  X |

| NAMES | | | | |
|---|---|---|---|---|
| PRINCIPALS/DIRECTORS | TITLE | INDIVIDUAL OWNERSHIP | GENDER | ETHNICITY |
| Michelle Dukler | President, Director | 51% | Female | White |
| Star Foods, LLC<br>  Casey Cowell<br>  Martin Dukler | Entity<br>Shareholder<br>Shareholder | 49%<br>(80%)<br>(20%) | Male<br>Male | White<br>White |

| REQUESTED SPECIALTY AREA: | Airport Concessions |
|---|---|

| RECOMMENDED SPECIALTY AREA | None |
|---|---|

Site Visit Date: 5/18/04        Expiration Date of Previous Certification: N/A  and/or Date of Denials: N/A

Gross Receipts (Last 3 years)

2001: $16,560,758.00            2002: $16,597,084.00        2003: $17,797,315.00

ISSUES:        Joint equity contribution.
               Ownership
               Reliance
               Expertise
               Interlocking Business Relationship
               Control

SUMMARY:    Michelle Dukler, a non-minority female, President, Director and 51% shareholder, and Star Foods, LLC, the 49% shareholder and an entity 80% owned by Casey Cowell, a non-minority male with Martin Dukler, a non-minority male and spouse of the 51% shareholder Michelle Dukler. Mr. Martin Dukler is also the 20% owner of Star Foods, LLC. The applicant is seeking DBE certification with the Illinois Unified Certification Program and WBE with the City of Chicago. The firm has been in business for 23 years and is currently under new ownership as recently as February 4, 2004. With the purchase of the company in February, 2004, 36.5 shares where issued to Michelle Dukler, thereby a 51% ownership was established. The previous name of the firm, Natural Energy, Unlimited, originally, was 51% owned by Ruth Ann Menutis and Paul R. Valteau, Jr. and Star Foods, LLC owned the remaining 49%. The firm was incorporated in the State of Louisiana on January 15, 1981. Natural Energy Unlimited, Inc. domiciled at New Orleans, Louisiana changed the corporate name to The Grove, Inc. on October 1, 1999. Natural Energy Unlimited, d/b/a The Grove was DBE certified by the City of Chicago, however, it appears that this firm lapsed on June 30, 2002?

Ms. Dukler has provided a list of The Grove, Inc.'s DBE/WBE national certifications. It appears that Ms. Dukler is submitting this information to the DBE organizations in an attempt to inform these organizations that The Grove, Inc. has received continued certification as a DBE firm, since the change in ownership. It

RECEIVED

SEP 1 2 2005

OMWBE        Chicago Denial

1

00786

is th⬛⬛cer's o⬛    ⬛that all state organizations, which hold ⬛    ⬛t and lapp⬛⬛⬛rtifications of The
Gro⬛⬛⬛c. shou⬛    ⬛ informed as to the current pending certific⬛⬛⬛on and sub⬛⬛⬛t DBE
recommendation concerning the applicant firm.

Michelle Dukler's written response was received by this office and dated June 22, 2004, attempting to
refute the issues of the preliminary determination.

Ms. Dukler submits a statement referring to her initial and individual equity contribution per a Mortgage
and Security Agreement, in which she states that she has secured a loan in the amount of $2,600,000.00
and $100,000.00 respectively, which is obligated by a list of collateral presumably owned individually by
Michelle Dukler, the 51% shareholder. The list (Exhibit A) indicates property and assets owned by the
female, however insufficient proof of her individual ownership has been provided. Ms. Dukler indicates
ownership of a residence at 6756 Fieldstone Drive and other assets combining the total amount of
$2,654,425.00, however Ms. Dukler has failed to provide any documentation substantiating the value and
individual ownership of these assets. Attached to the Mortgage and Security Agreement, Exhibits and
Attachments included an Exclusion of Certain Property from Martial Property. This agreement, executed
by Martin and Michelle Dukler, stipulated that the 36.5 shares of the common stock of The Grove, Inc., a
Louisiana corporation, is excluded from the martial property, however the collateral of the Mortgage and
Security Agreement appears to be jointly held by the shareholders and insufficient evidence has been
submitted to support the individual ownership of the assets. Therefore the applicant has failed to refute
the issue of joint equity contribution. Additionally, the $2.5 Million Dollar promissory note lender is Casey
Cowell, a non-minority male, and 80 % owner of Star Foods, LLC, which is the 49% shareholder of The
Grove, Inc. Submitted documentation did not demonstrate an independent 51% equity contribution from
the female owner, Michelle Dukler. The submitted documentation, canceled checks in the sums of $2.5
Million and $100,000.00, where from joint assests of Michelle Dukler and Martin Dukler, a non-minority
male and husband of Michell Dukler, and the 20% owner of Star Foods, LLC. Funds derived from joint
assets cannot conclusively be identified as funds belonging to an individual.

It appears that Natural Energy Unlimited, d/b/a The Grove was DBE certified by the City of Chicago,
however, it appears  that this firm lapsed on June 30, 2002. Ms. Dukler has provided an "Explanation of
the Transfer of Ownership of the Grove, Inc., whereas Ruth Ann Menutis and Paul R. Valteau Jr., each
held 18.25 shares totally a 50%/50% combined ownership interest of 36.50 shares  and Star Foods, LLC
owned 35 shares of The Grove, Inc.  In review of this "Explanation", the only restriction on the sale of
Michelle Dukler's shares is that "such sale cannot affect the company's ongoing certification as an airport
DBE concession. Additionally, the Option Assignment Agreement indicates that Ms. Dukler agreed to the
option price of $100,000.00 in the form of a promissory note. Ms. Dukler has failed to provide evidence of
re-payment of the promissory note, therefore has failed to refute the issue of ownership.

The arrangement of the 51% purchase and ownership of the company and the documentation indicating
that the previous ownership and most recent revision and resolutions of the By-laws of the company
where specifically made to support the continued DBE certification, therefore the issue of proforma
applies. Additionally, the company has failed to provide Amendments to the By-laws stipulating changes
in the control of the company. [T]he By-laws indicate there are two directors, however the "Explanation of
the Transfer of Ownership" states that all board members, including Casey Cowell, have either resigned or
have been removed from their seats, again specifically for continued proforma DBE certification.

The applicant in order to refute the issue of Joint Management has forwarded revised copies of the
company's bank signature cards indicating that one signature is required by anyone of the, now three (3)
signatories that include the CFO of The Grove, Inc., Robert Ireland, a non minority male. The original
bank signature cards held four (4) signatories including the current three and Martin Dukler. It appears
that the applicant has revised the bank signature cards, since they are dated February 11, 2004, the same
date of the initially submitted bank signature cards presented as supporting documentation with the IUCP
application.

Ms. Dukler's resume and W-2 forms indicates that she was employed by The Grove, Inc.  Previous to 2000
Ms. Dukler was President and Sole Owner of Schitz Studios, Inc., Milwaukee, WI, as a Glass Art Dealer.
Although Ms. Dukler has considerable experience in the area of art management and distribution, it does not
support her abilities to manage and direct the applicant firm, an airport concessionaire specializing in the
snack and food industry with 70 locations across the country and 300 employees.  By comparison, Mr.
Dukler's and Mr. Cowell's experience and current employment with Star Foods indicates that they possesses
the expertise to manage and operate the company.  Ms. Dukler purchased The Grove, Inc. on February 13,
2004 and appears to be reliant upon her husband, Martin Dukler, previous owner and 20% owner of Star

RECEIVED
SEP 1 2 2005
OMWBE

2

00787

Foods, the 49% eholder of the applicant and CEO of The ____, Inc. along ____ Casey Cowell, 80% shareh____ of Star H____ s and 100% owner of Durandals, Inc., the ____ ____nent comp____ nd lender of the $2.5 Million Doll____. and $100,000.00 loans for the purchase of the shares of The Grove, Inc. The collateral for the loans appears to be joint assets of the applicant and her husband. Additionally, the applicant has forwarded copies of checks representing the loan payment, however, these checks have been drawn from the joint account of Martin and Michelle Dukler.

The applicant has provided the requested information however has submitted a 2003 extension for the corporate tax returns for The Grove, Inc. and an extension for the joint individual income tax returns for Michelle Dukler and Martin Dukler and an extension for 2003 Durandal, Inc. however, the applicant has failed to provide copies of supplier agreements, contracts, invoices and purchase orders as requested. Additionally, it was requested to provide information substantiating the value of the collateral used as the equity contribution. This information was not provided.

In an interview with Ms. Dukler, she admitted that she has been involved with The Grove, Inc. since 1999 when her husband, Mr. Martin Dukler and Casey Cowell negotiated the purchase and changed the name from Natural Energy Unlimited to The Grove, Inc. It appears that from the conversation with Ms. Dukler, that she and Star Foods, Inc. have been involved in the critical operations of the firm since the purchase in 1999, thereby supporting the issue of joint management with Martin Dukler and Casey Cowell.

It is this Officer's opinion that The Grove, Inc. , has not meet the requirements and criteria of the Illinois Unified Certification Program and the City of Chicago Municipal Regulations, based on the issues listed above. The applicant has attempted to refute the issues and has provided some of the requested information, however supported by the City of Chicago WBE and DBE regulations (49 CFR 23-26) and SBA regulations (Sec. 124.112 (b) (4), the applicant has failed to substantiate that the firm is economically and socially disadvantaged.

Based on the submitted documentation, and the question of the ownership of the 30 shares of Treasury Stock, the Applicant has failed to meet the eligibility requirements and additionally, has failed to provide the necessary information required for review and evaluation for DBE/WBE certification, i.e, executed contracts, supplier agreement, purchase orders and invoices, therefore, this Officer does not recommend DBE/WBE certification at this time.

**Attachments:**

**IUCP application, Schedule A application, Applicant Response Letter, PD Summary, Preliminary Determination Letter, List of Officers and Managers, Structure of Company, Resumes and birth certificate, Explanation of Star Foods Role in The Grove operations, Mortgage and Security Agreement, Marital Exclusion, 13 CFR Part 124.105, Past Ownership Information, Durandal, Inc., business information, Site Visit Report, Copies of cancelled checks representing initial equity contributions and cancelled checks representing repayment of the loan, Michelle Dukler's W-2 forms, past DBE certification letter, Certifications of The Grove, Inc., 2002 Corporate Tax Returns, Bank Signature Cards-original and revised, Leased Locations Statement**

RECEIVED
SEP 1 2 2005
OMWBE

3

 

# WRITTEN CONSENT OF THE MANAGER OF
# STAR FOODS, L.L.C.

Durandal, Inc., being the sole Manager (the "**Manager**") of Star Foods, L.L.C. a Delaware limited liability company (the "**Company**"), hereby adopts the following recitals and resolutions;

### Sale of Stock in The Grove, Inc.

**WHEREAS**, it is deemed advisable and in the best interests of the Company that it enter into agreements with Michelle Dukler ("**Dukler**") to sell to Dukler (the "**Stock Purchase**") an equity interest in The Grove, Inc., a Louisiana corporation ("**The Grove**"); and

**WHEREAS**, there has been presented to and reviewed by the Manager forms of Stock Purchase Agreement by and between the Company and Dukler (the "**Stock Purchase Agreement**"); and

**WHEREAS**, in connection with the consummation of the Stock Purchase, the Manager has been presented with and reviewed forms of (i) a Stockholders Agreement among the Company, The Grove, Inc. and Dukler (the "**Stockholders Agreement**"), (ii) and a Stock Option Agreement between the Company and Dukler (the "**Option Agreement**").

**NOW, THEREFORE, BE IT RESOLVED**, that the Stock Purchase on the terms and conditions set forth in the form of Stock Purchase Agreement, be, and it hereby is approved;

**FURTHER RESOLVED**, that the Stock Purchase Agreement and the Option Agreement, substantially in the forms presented to and reviewed by the Manager, the terms and conditions thereof and their performance by the Company, be, and they hereby are, authorized and approved;

**FURTHER RESOLVED**, that the Manager be, and it hereby is, authorized, empowered and directed to execute and deliver on behalf of the Company, the Stock Purchase Agreement and the Option Agreement, substantially in the forms reviewed by the undersigned Manager, together with such changes, additions and omissions thereto as the officer(s) of Manager signing such agreements shall approve, such approval to be conclusively evidenced by such officer's execution and delivery of such agreements, and such changes, additions and omissions are hereby further authorized and approved; and

**FURTHER RESOLVED**, that the Manager is hereby authorized, empowered and directed on behalf of the Company to execute, deliver and obtain any and all

RECEIVED

SEP 1 2 2005

OMWBE

00789

 

other certificates, documents, or other instruments on behalf of the Company and to do or cause to be done any and all such other acts, as in the judgment of the officers so acting may be deemed necessary or advisable, to effect the compliance by the Company with the terms and conditions of the Stock Purchase Agreement and the Option Agreement and consummate the transactions contemplated thereby.

### Assignment of Portion of Valteau/Menutis Option;

**WHEREAS,** it is deemed advisable and in the best interests of the Company that it enter into an agreement with Michelle Dukler ("**Dukler**") to sell to Dukler (the "**Option Assignment**") a portion of the Company's rights under that certain Stock Option Agreement dated July 26, 1999 among Paul Valteau, Ruth Ann Menutis and the Company (the "**Valteau/Menutis Option**"); and

**WHEREAS,** there has been presented to and reviewed by the Manager forms of Option Assignment Agreement by and between the Company and Dukler (the "**Option Assignment Agreement**").

**NOW, THEREFORE, BE IT RESOLVED,** that the Option Assignment on the terms and conditions set forth in the form of Option Assignment Agreement, be, and it hereby is, approved;

**FURTHER RESOLVED,** that the Option Assignment Agreement substantially in the form presented to and reviewed by the Manager, the terms and conditions thereof and its performance by the Company, be, and it hereby is, authorized and approved;

**FURTHER RESOLVED,** that the Manager be, and it hereby is, authorized, empowered and directed to execute and deliver on behalf of the Company, the Option Assignment Agreement substantially in the form reviewed by the undersigned Manager, together with such changes, additions and omissions thereto as the officer(s) of Manager signing such agreement shall approve, such approval to be conclusively evidenced by such officer's execution and delivery of such agreement, and such changes, additions and omissions are hereby further authorized and approved; and

**FURTHER RESOLVED,** that the Manager is hereby authorized, empowered and directed on behalf of the Company to execute, deliver and obtain any and all other certificates, documents, or other instruments on behalf of the Company and to do or cause to be done any and all such other acts, as in the judgment of the officers so acting may be deemed necessary or advisable, to effect the compliance by the Company with the terms and conditions of the Option Assignment Agreement and consummate the transactions contemplated thereby.

RECEIVED

SEP 1 2 2005

OMWBE

2

00790

206480/0001/612794/Version #: 1

Feb 04 04 11:58a    Casey Cowell  Geri Kay    5618339004    P.9
Sent By: Durandal,                312 943 3596;        Feb-4-0    45AM;      Page 9

Dated this day of 4th day of February, 2004.

Durandal, Inc., as Manager

By: _____

Casey Cowell, President

3

RECEIVED

SEP 1 2 2005

OMWBE

# TAB 20

# ATTACHMENT LI

RECEIVED

SEP 1 2 2005

OMWBE

00792





**Thelen Reid & Priest LLP**
*Attorneys At Law*

William A. Kirk, Jr.
202.508.4353 Direct Dial
202.654.1863 Direct Fax
wkirk@thelenreid.com

701 Pennsylvania Avenue, N.W., Suite 800
Washington, DC 20004-2608

Tel. 202.508.4000
Fax 202.508.4321
www.thelenreid.com

**THIS DOCUMENT, INCLUDING
THE EXHIBITS, CONTAINS
CONFIDENTIAL AND BUSINESS
INFORMATION PROTECTED
FROM DISCLOSURE UNDER
5 U.S.C. §552 AND THE PRIVACY ACT**

**RECEIVED**

**SEP 1 2 2005**

**OMWBE**
Office of Civil Rights
Certification Appeals Branch
U.S. Department of Transportation
Room 5414
400 Seventh Street, SW
Washington, DC 20590

October 28, 2004

Re:    **Appeal by The Grove, Inc. of the City of Chicago's Decision Removing The Grove's DBE Eligibility**

Dear Sir/Madam :

We are counsel to The Grove, Inc. ("The Grove" or "the Company"), a woman-owned and -controlled firm that operates specialty retail food concessions in airports and other locations around the country. On behalf of our client and pursuant to applicable Department of Transportation ("DOT" or the "Department") regulations (49 C.F.R. § 26.89),[1] we respectfully submit this appeal of the decision by the City of Chicago Department of Procurement Services ("Chicago") denying Disadvantaged Business Enterprise ("DBE") certification.[2]

## I. SUMMARY OF ARGUMENT.

The Grove has been a certified DBE for more than 20 years and has also been certified by more than 20 state and local agencies. As further discussed below, in February 2004 Michelle

---

[1] As used in this appeal, unless otherwise noted, references to the Department's regulations shall mean the regulations set forth in 49 Code of Federal Regulations, Part 26.

[2] In accordance with 49 C.F.R § 26.89(c)(1), Exhibit 1 lists the names and addresses of entities which have either certified The Grove as a DBE, rejected The Grove's application for certification, or have The Grove's application for certification pending before it.

DC #175474 *Appeal -*

Office of Civil Rights
October 28, 2004
Page 2



Dukler[3] purchased a controlling interest in the Company, restructured the Company's board of

directors (and is the Company's sole director) and assumed day-to-day management

responsibilities as The Grove's President and Chief Executive Officer.

Ms. Dukler is a resident of Illinois and resides in the Chicago metropolitan area. In

compliance with DOT rules regarding changes in ownership, she advised Chicago of her

acquisition of controlling ownership interest in the Company and new management role as

President and Chief Executive Officer. Upon receipt of Ms. Dukler's notice, Chicago

improperly treated The Grove as if it were a brand new applicant and required the Company to

submit a new certification filing.

Chicago was obligated to review this matter. However, under DOT regulation, if

Chicago had reasonable grounds to question The Grove's DBE status, it should have commenced

a proceeding under § 26.87 to remove The Grove's DBE eligibility. Under such a proceeding,

The Grove is entitled to a hearing and Chicago has the burden of proof. Instead, Chicago

improperly treated The Grove as a new applicant, required the Company to submit a new

certification application, provided no hearing, imposed the burden of proof on The Grove, and

rejected the Company's application without citing specific evidence to support its actions.

For the reasons set forth herein, Chicago's decision should be reversed because it is

unsupported by substantial evidence and is inconsistent with substantive and procedural

provisions of the Department's regulations. § 26.89(f)(2). Alternatively, this case should be

remanded to Chicago for further proceedings consistent with the proper application of the

RECEIVED

SEP 1 2 2005

OMWBE

---

[3] As further discussed in this appeal, Ms. Dukler is an established entrepreneur and a former employee of The Grove.

00794

DC #175474 v4

Office of Civil Rights
October 28, 2004
Page 3



**Thelen Reid & Priest LLP**

Department's regulations.  The Grove reserves the right to supplement this submission upon receipt of Chicago's administrative record.[4]  § 26.89(d).

Chicago also improperly applied the Department's tests for ownership and control and ignored the clear evidence of Ms. Dukler ownership of 51% of The Grove's shares, her role as President and Chair of the Board, her 20 years of experience in retail operations, including managing and owning her own companies, and Ms. Dukler's previous employment as the Director of Marketing for The Grove.

## II. BACKGROUND AND STATEMENT OF FACTS.

The Grove began operations in 1981 with a concession contract to operate a specialty food retail store in the New Orleans International Airport.  It was certified by New Orleans as a DBE firm.  At present, the Company operates 60 specialty food stores at 14 airports nationwide and has more than 350 employees.[5]  The Grove has existing DBE certifications from more than 20 state and local agencies from around the country, including the City of Chicago.  See Exhibits 1 and 2.

From 1982 through 1999, Ms. Ruth Ann Menutis, a female, and Mr. Paul Valteau, an African-American, managed The Grove's day-to-day operations and owned 100 percent of its equity ownership interests.  Ms. Menutis was a director of The Grove and served as the Company's President.  Mr. Valteau was a director and served as the Company's Vice President.

Based on information and belief, Ms. Menutis and Mr. Valteau sought to obtain additional capital from investors to support the Company's operations and to pursue growth opportunities.  In 1999, Ms. Menutis and Mr. Valteau sold 49% of The Grove's stock to Star

---

[4] By letter dated September 16, 2004, counsel requested that Chicago, as required by § 26.86(a), provide a copy of all documents and other information on which Chicago's decision was based.  Chicago has not provided the documents.

[5] The locations of The Grove's stores are set forth in Exhibit 3.

RECEIVED

SEP 1 2 2005

OMWBE

00795

DC #175474 v4

Office of Civil Rights
October 28, 2004
Page 4



Foods, an investment company that specializes in the snack foods industry[6].  As part of this

transaction, the board of directors of the Company was expanded to include two representatives

of Star Foods.  After the transaction, Ms. Menutis and Mr. Valteau continued to manage the

Company's affairs and The Grove continued to be certified as a DBE firm.  Also, as further

discussed below, in 2000 Ms. Dukler began working for The Grove and served as the Director of

Marketing for over two years.

Early in 2004, Ms. Michelle Dukler entered into an agreement with the shareholders of

The Grove to acquire a controlling interest in the Company.  Specifically, in February 2004,

Ms. Dukler acquired all of the shares owned by Ms. Menutis and Mr. Valteau.  Upon acquiring a

majority of the Company's stock, Ms. Dukler restructured the Company's  board of directors—

the existing directors resigned and Ms. Dukler was elected as the sole director—and she assumed

day-to-day management of the Company as President and Chair of the Board.  The stock

ownership, the composition of the board of directors, and the key officers of The Grove prior to,

and subsequent to, Ms. Dukler's acquisition are set forth below.

### Stock Ownership

| Before | | | After | | |
|---|---|---|---|---|---|
| **Name** | **Shares** | **Percentage** | **Name** | **Shares** | **Percentage** |
| Ruth Ann Menutis | 18.25 | 25.5% | Michelle Dukler | 36.5 | 51% |
| Paul Valteau | 18.25 | 25.5% | Star Foods | 35 | 49% |
| Star Foods | 35 | 49% | | | |

RECEIVED

SEP 1 2 2005

OMWBE

---

[6] The principals of Star Foods are Casey Cowell and Martin Dukler.  The Grove is one of several portfolio investments.

DC #175474 v4



Office of Civil Rights
October 28, 2004
Page 5



Thelen Reid & Priest LLP

## Directors

| Before | After |
|---|---|
| Ruth Ann Menutis | Michelle Dukler, Sole Director and Chairperson |
| Paul Valteau | |
| Martin Dukler | |
| Casey Cowell | |

## Officers

| Before | After |
|---|---|
| Ruth Ann Menutis, President | Michelle Dukler, President and CEO |
| Martin Dukler, CEO | |
| Paul Valteau, Executive V.P. | |
| Robert Ireland, Secretary | Robert Ireland, Secretary |
| Robert Ireland, Treasurer | Robert Ireland, Treasurer |

Thus, while The Grove was a DBE-controlled and -managed firm before Ms. Dukler acquired control, the resignations of Mr. Cowell and Mr. Dukler made it even more of a DBE-controlled and -managed firm after Ms. Dukler acquired control.

Pursuant to DOT rules pertaining to a material change in ownership, § 26.83, Ms. Dukler advised the agencies that had certified The Grove that she had purchased the controlling shares of the Company previously held by Ms. Menutis and Mr. Valteau. The City of Houston, the North Central Texas Regional Certification Authority, and the New Orleans Airport Authority have reviewed the change in ownership and have since confirmed The Grove's DBE status.[7]

Upon receipt of the change of ownership information, Chicago directed Ms. Dukler to submit a new application for DBE certification for The Grove and she did. Chicago issued a

---

[7] Exhibit 4.

RECEIVED
SEP 1 2 2005
OMWBE

00797

DC #175474 v4




Office of Civil Rights
October 28, 2004
Page 6



Preliminary Determination on June 11, 2004 indicating that it intended to deny The Grove's

application for DBE certification. Exhibit 5. In response, Ms. Dukler submitted a substantial

amount of supplemental information by letter dated June 22, 2004 that fully responded to matters

that Chicago suggested were of concern. Exhibit 6. Chicago issued its Final Decision by letter

dated August 13, 2004, stating that it would not certify The Grove as a DBE. Exhibit 7. The

Final Decision did not cite any evidence in the record to support its certification denial and

completely ignored the substantial amount of supplemental information that The Grove provided

in its June 22, 2004 submission.

### III. CHICAGO DID NOT COMPLY WITH THE PROCEDURAL REQUIREMENTS OF DOT REGULATIONS.

**A. Chicago Denied The Grove the Due Process Rights Provided by 49 C.F.R. § 26.87 for Removing DBE Eligibility.**

Section 26.87 of the DOT regulations sets forth the specific procedures that a recipient of

DOT financial assistance, such as Chicago, must follow to review a change in circumstances for

a DBE certified firm. The DOT procedures must be followed prior to any removal of the firm's

DBE eligibility. These procedures have two important purposes. They are intended to advance

and support the goal of DBE program integrity. At the same time, the procedures are intended

to provide a DBE firm with due process rights and safeguards against arbitrary action by a

recipient.

The provisions of § 26.87 address ineligibility complaints from third parties, DOT-

directed proceedings, and recipient-initiated proceedings. As provided by the rule, if arising

from one these sources Chicago has "reasonable cause" to believe that a currently certified DBE

firm is ineligible because of a change in its circumstances, Chicago must notify the firm in

writing and, citing specific evidence in the record, provide the basis for its proposed action to

RECEIVED

SEP 1 2 2005

OMWBE

00798



Office of Civil Rights
October 28, 2004
Page 7



Thelen Reid & Priest LLP

decertify. Further, it must affirmatively give the DBE firm the opportunity for an informal hearing. Importantly, in such a proceeding the rule states that "you [i.e., Chicago] bear the burden of proof, by a preponderance of the evidence, that the firm does not meet the certification standards" and that "you must maintain a complete [verbatim] record of the hearing". Thus, an existing DBE-certified firm is accorded a presumption of continuing eligibility unless the recipient can rebut and prove otherwise by a preponderance of the evidence.

In this instance, Chicago initiated the review based on The Grove's voluntary notification that Ms. Dukler had acquired a majority of the Company's shares and had assumed management control of its day-to-day business operations. The Grove has been a DBE for many years and, at the time Ms. Dukler obtained majority ownership and control in February 2004, The Grove was certified as a DBE by more than 20 entities. In particular, Chicago had certified The Grove as a DBE and the certification was valid through June 30, 2006. Exhibit 8. The DOT regulations clearly state that once a firm has been certified as a DBE "it shall remain certified for a period of at least three years unless and until its certification has been removed through the procedures of § 26.87." See § 26.83(h).

Once Chicago became aware of the change in circumstances at The Grove due to Ms. Dukler's acquisition of majority ownership and her management control, Chicago was obligated to follow the Department's specific procedural requirements before removing The Grove's longstanding DBE eligibility including, as noted above:

- An opportunity for an informal hearing. § 26.87(d).

- A complete verbatim record of the hearing. § 26.87(d)(2).

- Written notice of the decision and the reasons for it, including specific references to the evidence in the record that supports each reason for the decision. § 26.87(g).

RECEIVED

SEP 1 2 2005

OMWBE

00799

DC #175474 v4

Office of Civil Rights
October 28, 2004
Page 8


**Thelen Reid & Priest LLP**

- Proof by a preponderance of the evidence that The Grove did not meet the certification standards. § 26.87(d)(1).

However, Chicago did not comply with any of these requirements.

**1. Chicago did not give Ms. Dukler notice of her right to have an informal hearing.**
Attached to this appeal as Exhibit 5 is Chicago's letter dated June 11, 2004 to Ms. Dukler as President of The Grove. This letter constitutes Chicago's Preliminary Determination to deny DBE certification to the Company. The letter states that The Grove could appeal the decision in writing, but nowhere in the letter does Chicago advise Ms. Dukler of the Company's right to have an informal, on-the-record hearing as specifically required by § 26.87(d).

**2. Chicago met with the Grove only at the firm's insistence.** After the June 11, 2004 Preliminary Determination, Chicago officials did meet with Ms. Dukler on June 29, 2004. However, the meeting was only held at Ms. Dukler's insistence and was not the hearing required by § 26.87(d).

**3. Chicago did not make a verbatim record of the meeting.** Even if the June 29, 2004 meeting were to be considered to be the required hearing, there is no evidence that it was held on the record and Chicago has never provided The Grove a copy of the complete, verbatim record required by § 26.87(d)(2).

**4. Chicago's Decision did not cite specific references in the record that support each reason for denying certification.** As shown in more detail in Section III.B, below, Chicago's Decision is cursory and conclusory and does not meet the Department's requirements for providing evidentiary support for denying certification. § 26.87(g).

RECEIVED

SEP 1 2 2005

OMWBE

00800

DC #175474 v4



Office of Civil Rights
October 28, 2004
Page 9



Thelen Reid & Priest LLP

**5. Chicago has not proven its case by a preponderance of the evidence.** Chicago's

Decision provides no evidence to support its conclusions and certainly fails to prove its case by a

preponderance of the relevant facts. In fact, Chicago's August 13, 2004 letter states that:

> "[T]he City of Chicago cannot certify The Grove, Inc. as a DBE
> since it [i.e., The Grove] has not proven to meet the eligibility
> standards." Exhibit 5. (Emphasis added)

Thus, Chicago improperly put the burden of proof on The Grove when, under the DOT's

regulations, the burden of proof to remove The Grove's DBE eligibility is on Chicago. Having

failed to provide these procedural safeguards under § 26.87, Chicago's Final Decision removing

The Grove's DBE eligibility should be reversed.

    **B.    Chicago's Decision Did Not Provide Adequate Reasons for the Denial of DBE**

**Certification Under § 26.86.** Even if one were to assume that Chicago properly treated The

Grove as an initial applicant rather than a longstanding, certified DBE, Chicago nonetheless

failed to meet the Department's procedural requirements under § 26.86. In particular, Chicago

was required to provide a written explanation of "the reasons for the denial, specifically

referencing the evidence in the record that supports each reason for the denial." § 26.86(a).

Chicago's Preliminary Determination and Final Decision do not comply with this requirement.

    The Preliminary Determination is only four pages long, and most of it is simply a

restatement of the rules and a request for further information. The only "reasons" are stated on

the bottom half of page 3 and are simply conclusory without any "specific reference to the

evidence in the record that supports each reason." See Exhibit 5. Given that The Grove has been

a DBE for 20 years, has been certified as a DBE by more than 20 agencies, and has more than

350 employees, Chicago certainly should have provided a thorough, careful analysis, rather than

a half page of conclusions.

RECEIVED

SEP 1 2 2005

OMWBE

00801

Office of Civil Rights
October 28, 2004
Page 10


Thelen Reid & Priest LLP

In response to the Preliminary Determination, The Grove sent Chicago a letter dated June 22, 2004 that provided a detailed response to each allegation and numerous documents in support. Yet, Chicago's Final Decision is only one page long and it simply cites the Preliminary Determination without any "specific reference to the evidence." Thus, even under the standards of § 26.86, rather than § 26.87, Chicago failed to meet the Department's procedural requirements and the Final Decision should be reversed.

## IV. THE GROVE MEETS THE DEPARTMENT'S DBE REQUIREMENTS.

Chicago's decision appears to be based on five issues, none of which is properly addressed in the Preliminary Determination or the Final Decision. Even assuming that The Grove was a new applicant and bore the burden of proof, the preponderance of the evidence with respect to each of these issues fully supports its DBE certification.

### A. Joint Equity Contribution.

The Preliminary Decision states:

> "The funds contributed as the initial equity contribution is [sic] from the joint funds and assets of Martin and Michelle Dukler."
> Preliminary Decision at 3.

In order to purchase the 51% ownership of The Grove, Ms. Dukler borrowed $2.6 million from Mr. Casey Cowell pursuant to a written Mortgage and Security Agreement. Exhibit 9.[8] As security for the loan, Ms. Dukler provided collateral worth $2,654,425. The specific items of collateral are listed in Attachments A through D of the Mortgage and Security Agreement. The list of assets pledged as security for the loan is not a complete list of all the assets owned by Ms. Dukler. While some items of collateral listed in the attachments are jointly owned (i.e., acquired during their marriage), many items were acquired by Ms. Dukler prior to her 1999 marriage and

---

[8] The Grove's June 22, 2004 submission to Chicago included the Mortgage and Security Agreement. See Exhibit 6.

RECEIVED

SEP 1 2 2005

00802

Office of Civil Rights
October 28, 2004
Page 11



Thelen Reid & Priest LLP

Ms. Dukler separately owned assets in excess of $2.6 million.[9]  Thus, on her own, Ms. Dukler

had the independent financial capability to acquire 51% ownership of The Grove.[10]  Moreover, on

February 5, 2004, contemporaneously with the closing of the loan and Ms. Dukler's acquisition

of a controlling interest in The Grove, Martin Dukler irrevocably renounced any ownership

interest that he might have in the Company by virtue of his position as a spouse.  Exhibit 10.[11]

    Notwithstanding the applicable DOT regulations and its burden of proof, Chicago either

failed to take any of this information into account and/or failed to inquire fully into these facts.

For example, with respect to marital assets and the analysis of business ownership, pursuant to

§ 26.69(i)(1), DOT regulations provide:

RECEIVED

SEP 1 2 2005

OMWBE

> "When marital assets (other than the assets of the business in
> question) held jointly or as community property by both spouses,
> are used to acquire the ownership interest asserted by one spouse,
> <u>you must deem the ownership interest in the firm</u> to have been
> acquired by that spouse with his or her own individual resources,
> <u>provided that the other spouse irrevocably renounces and transfers
> all rights in the ownership interest</u> in the manner sanctioned by the
> laws of the state in which either spouse or the firm is domiciled."
> § 26.69(i) (Emphasis added)

In accordance with the above, Martin Dukler "irrevocably renounced and transferred all rights in

the ownership interest" in The Grove.  Exhibit 10.  Chicago ignored the DOT's regulation and

the documented evidence of Mr. Dukler's irrevocable renunciation.

    In as much as Chicago's Decision denying DBE certification does not explain the

rationale for its action, we infer that Chicago may have based its Decision on the use of a joint

---

[9] For example, an art collection owned by Ms. Dukler prior to her marriage had an appraised  value of
approximately $2 million.
[10] This fact is further evidenced by the loan negotiated and obtained by Ms. Dukler from a commercial bank to pay
off the loan from Casey Cowell—and to address a concern raised by Chicago.
[11] The Grove's June 22, 2004 submission to Chicago included the Exclusion of Certain Property from Marital
Property.  See Exhibit 6.

DC #175474 v4



Office of Civil Rights
October 28, 2004
Page 12

account to make payments on the loan. However, the DOT regulations clearly permit the use of

a joint account. Pursuant to § 26.69(j), the regulations advise Chicago that:

> "You must not regard a contribution of capital as failing to be real
> and substantial, or find a firm ineligible, solely because ... (2)
> There is a provision for the co-signature of a spouse who is not the
> socially and economically disadvantaged individual on financing
> agreements, contracts for the purchase or sale of real or personal
> property, bank signature cards, or other documents. . ." §
> 26.69(j)(2)

Further, the fact that the proceeds of the February 5, 2004, loan were deposited into a joint

Dukler account was simply a matter of convenience and is not sufficient to override the clear

intent of all the parties to these transactions. Ms. Menutis and Mr. Valteau clearly were selling

their interest in the Company to Ms. Dukler; the lender clearly intended to lend funds to Ms.

Dukler as documented in a written loan agreement; and Mr. Dukler intended to, and did,

renounce any ownership interest in the stock acquired by Ms. Dukler.

While the Final Decision is silent on the matter, Chicago may have been concerned that

the loan funds for acquiring ownership in The Grove were from Mr. Cowell, who is an investor

in Star Foods. As noted previously, Martin Dukler is also an investor in Star Foods. However,

Michelle Dukler's friendship with Mr. Cowell is of long standing and pre-dates her relationship

and marriage to Mr. Dukler. Moreover, had Chicago investigated, it would have found that Mr.

Cowell is an accredited investor (as that term is defined by Federal securities laws) and that he is

an active equity investor in small companies and/or regularly lends money to entrepreneurs for

transactions, such as Ms. Dukler's purchase of a controlling interest in The Grove.

Further, Mr. Cowell was the co-founder of U.S. Robotics, one of the world's leading

suppliers of communications products and systems. He was head of that company until its

merger in 1997 with 3Com Corp. Currently, Mr. Cowell serves as a director of two publicly

RECEIVED
SEP 1 2 2005
OMWBE



Office of Civil Rights
October 28, 2004
Page 13



Thelen Reid & Priest LLP

traded firms and of several privately held companies. Included as Exhibit 11 is information

concerning Mr. Cowell that demonstrates that he regularly provides (or participates in providing)

capital to small businesses.[12]

In any event, even though Ms. Dukler properly acquired her 51% interest in The Grove,

she took the extra step of addressing Chicago's apparent concern by obtaining financing from a

bank, and paying off the loan from Mr. Cowell. Exhibit 12 is a copy of Ms. Dukler's promissory

note to Fifth Third Bank in the principal amount of $2.6 million. Included as Exhibit 13 is a

copy of Ms. Dukler's check paying off the loan from Mr. Cowell. The collateral for the bank

loan is Ms. Dukler's stock in The Grove. The Department's regulations specifically allow such

financing.

> "Debt instruments from financial institutions or other organizations
> that lend funds in the normal course of their business do not render
> a firm ineligible, even if the debtor's ownership is security for the
> loan." § 26.69(e).

Prior to issuance of the Final Decision, Ms. Dukler advised Chicago that she had a commitment

from a bank for this financing and was in the process of consummating this loan and paying off

the Cowell loan, but Chicago ignored it. Exhibit 14.

In summary, Ms. Dukler met the Department's requirements in acquiring control of The

Grove.

**B. Ownership.**

RECEIVED

SEP 1 2 2005

OMWBE

In its Preliminary Determination, Chicago states, without further elaboration, that:

> "The applicant has not established that The Grove, Inc. is 51%
> owned by Michelle Dukler, the female 51% shareholder."

---

[12] Further, given Mr. Cowell's responsibilities, it would be unreasonable to believe that he intended to be or is
involved with the day-to-day operations of The Grove.

00805

DC #175474 v4

Office of Civil Rights
October 28, 2004
Page 14



As this statement again illustrates and, as we have previously shown, Chicago has

improperly shifted the burden of proof with respect to this matter to Ms. Dukler.

Notwithstanding this, the fact is that Ms. Dukler has title to, and legally owns, 36.5 shares of The

Grove's 71.5 outstanding shares. Forwarded with this appeal as Exhibit 15 is the stock ledger for

the Company as of March 30, 2004, as well as copies of the stock certificates.[13] As evidenced by

the stock ledger and the stock certificates (and as a matter of corporate law), Ms. Dukler owns

51% of The Grove's outstanding shares and thus meets the Department's requirements under §

26.69(b). The Final Decision cites no evidence in the record, no principle of corporate law, and

no DOT regulation to support a finding that Ms. Dukler does not legally own 36.5 shares of the

Company's stock—and thus majority ownership of The Grove.

### C. Reliance.

The Preliminary Decision states:

> "Michelle Dukler has considerably less experience in the
> management of operations of the firm, in comparison to Martin
> Dukler, spouse and shareholder of the applicant firm and CEO of
> Star Foods LLC." Preliminary Determination at 3.

Chicago's statement is inaccurate on its face because, as shown in Exhibit 15, Martin

Dukler is not a "shareholder of the applicant." The Decision also ignores the fact that Martin

Dukler has resigned as an officer and director of The Grove. See Exhibit 16. More importantly,

Chicago's Decision ignores Ms. Dukler's substantial expertise, consisting of her 21 years of

experience in retail operations, her 11 years of owning and managing her own companies, and

her three years experience in management positions at The Grove itself.

RECEIVED

SEP 1 2 2005

DMWBE

The Grove's June 22, 2004 submission to Chicago included this information.

00806

DC #175474 v4



Office of Civil Rights
October 28, 2004
Page 15



Thelen Reid & Priest LLP

As shown in Exhibits 18 and 19, Ms. Dukler worked with two retail firms during an eight-year span from 1981 to 1988, and for eleven years, 1989 to 1999, was the President and owner of a manufacturing company that sold products to individual customers and on a wholesale and retail basis.[14] Ms. Dukler also owned a related retail company. In 1998, Ms. Dukler's business expertise and capabilities were recognized by the Milwaukee Business Journal, which named her one of the top business and community leaders under the age of 40 in the region.[15] Chicago ignored this substantial management experience and also ignored Ms. Dukler's direct experience at The Grove.

Ms. Dukler began working with The Grove in 2000 and served as Director of Marketing for two and a half years. In this position, Ms. Dukler developed new products, new vendor relationships, standards for new store design and new store openings and addressed issues related to product quality, costs and packaging. As President, Director, and Chairperson of The Grove, Ms. Dukler works 45 to 65 hours per week and has personally:

(a)     Negotiated and signed leases for new retail spaces in Seattle (2 spaces) and Newark (1space).

(b)     Negotiated and signed a Subway franchise agreement for retail space in Newark.

(c)     Negotiated and signed a Smoothie King franchise agreement for one of the retail spaces in Seattle.

(d)     Negotiated a new extension on leases for 5 stores in Newark.

(e)     Interviewed and hired Area General Managers for Seattle, Newark and Salt Lake City.

(f)     Completed mid-year performance reviews of HQ accounting, technology support and marketing staff.

RECEIVED

SEP 1 2 2005

OMWBE

---

[14] Exhibit 18 was included in The Grove's April 6, 2004 submission and Exhibit 19 was sent to Chicago by e-mail on August 11, 2004.
[15] See The Grove's June 22, 2004 submission. Exhibit 6.

DC #175474 v4



Office of Civil Rights
October 28, 2004
Page 16



Thelen Reid & Priest LLP

(g)     Renegotiated The Grove's health and life insurance policies.

(h)     Negotiated The Grove's line of credit.

(i)     Reviewed and approved an outside auditor's annual audit of The Grove, Inc.

(j)     Reviewed and approved proposals to Cincinnati, Minneapolis, Chicago, Memphis and Dallas/Ft. Worth for new retail locations.

(k)     Reviewed and approved all capital spending on all store build-outs that are in process.

(l)     Participated in providing strategic direction to the participants in Grove University, Spring 2004 and organized an internal managers meeting in the Fall of 2004.

(m)     Reviews all payroll checks and all corporate checks cut and signs all checks over $50,000.[16]

The Department's rules state that the socially and disadvantaged owner must have:

RECEIVED

SEP 1 2 2005

OMWBE

"[A]n overall understanding, and managerial and technical competence and experience directly related to, the type of business [i.e., retail] in which the firm is engaged and the firm's operations." § 26.71(g).

The substantial evidence clearly establishes that Ms. Dukler meets this requirement.

Chicago simply ignored all of this evidence. Instead, Chicago appears to have based its decision

on the fact that Martin Dukler also has experience in retail operations and unreasonably assumed

that somehow Ms. Dukler, despite her own 20 years' experience, is reliant on this.

Chicago's argument is wrong for several reasons. First, as noted above, it ignores Ms.

Dukler's significant, independent experience. Second, Martin Dukler was never a paid employee

or paid consultant of The Grove and he is no longer an officer or director of The Grove. Third,

the Department's regulations clearly state that the owner is not required to "have greater

experience or expertise in a given field than managers or key employees." § 26.71(g). Thus,

---

[16] See The Grove's June 22, 2004 submission.

00808

DC #175474 v4



Office of Civil Rights
October 28, 2004
Page 17



some level of reliance would be permissible even if Martin Dukler were a paid employee, which

he is not, and even if Ms. Dukler did not have extensive experience, which she does.

    **D. Control.**

    The Preliminary Determination simply states:

> "There is insufficient evidence that the firm is controlled by the
> female shareholder." Preliminary Decision at 3.

    Chicago ignored the clear and substantial evidence establishing that Ms. Dukler controls

The Grove and Chicago offered no evidence to contradict Ms. Dukler's control.

        (n)    Ms. Dukler owns 51% of the outstanding shares.

        (o)    Ms. Dukler is the President and the Company's Chief Executive Officer.

        (p)    Ms. Dukler is the Chair of the Board and the only Board member.

        (q)    Ms. Dukler has the necessary experience and capabilities.

    Chicago apparently based its Decision on Star Food's ownership stake in The Grove

(49%). The Department's regulations clearly allow non-DBE firms to be shareholders provided

they do not possess or exercise the power to control the firm or be disproportionately responsible

for its operation. See § 26.71(e). Moreover, officers of Star Foods who were directors or

officers of The Grove prior to Ms. Dukler's acquisition of control have since resigned as officers

and directors. See Exhibits 16 and 17. Thus, it is inconsistent for The Grove to have been a

DBE certified by Chicago and 20 other agencies for many years when Ms. Menutis and Mr.

Valteau were the majority owners along with Mr. Cowell and Mr. Dukler as officers and

directors, but not eligible for DBE certification after Ms. Dukler has taken control and Mr.

Cowell and Mr. Dukler have resigned and are no longer directors or officers.

**RECEIVED**

SEP 1 2 2005

**OMWBE**

00809

DC #175474 v4



Office of Civil Rights
October 28, 2004
Page 18



**E. Joint Management.**

The Preliminary Decision states:

> "The financial responsibilities of the firm is [sic] shared with
> ineligible males, including the spouse of the female majority
> shareholder, with unrestricted access to corporate funds."
> Preliminary Determination at 3.

Chicago provided no evidence for this statement, including the allegation that Martin Dukler has

"unrestricted access to corporate funds." While Michelle Dukler and Martin Dukler have a joint

personal account, Martin Dukler has no access to The Grove's corporate bank account. To

confirm this, Ms. Dukler submitted The Grove's Bank Signature Cards and Resolutions by letter

dated June 22, 2004, which clearly show that only Ms. Dukler and Mr. Ireland, The Grove's

Secretary and Treasurer, have access to corporate funds. See Exhibit 20. Chicago's Decision

ignored this evidence.

Ms. Dukler also stated that she is solely responsible for the following key financial

aspects of The Grove:

(r)    Sole signature authority for checks over $50,000.

(s)    Sole signature authority for any loan payments over $5,000.

(t)    Sole signature authority for any check over $100.00 made to the Chief
Financial Officer.

(u)    Sole authority to negotiate, approve and sign all leases.

(v)    Final approval for all capital expenditures and budgets.

(w)    Right to remove and hire the Chief Financial Officer.[17]

RECEIVED

SEP 1 2 2005

OMWBE

---

[17] See The Grove's June 22, 2004 submission. Exhibit 6.

00810

Office of Civil Rights
October 28, 2004
Page 19



This evidence, along with Ms. Dukler's key management positions and the resignations of Mr. Cowell and Mr. Dukler, clearly establish that Ms. Dukler has sole management responsibility. Chicago's Decision ignored this evidence.

## V. CONCLUSION

The Grove has been a DBE for more than 20 years and has been certified as a DBE by more than 20 agencies. The Grove continued to be a DBE after Ms. Dukler acquired ownership and control by purchasing 51% of the shares and becoming President and Chair of the Board of Directors. Ms. Dukler has the necessary experience to manage The Grove, having spent 20 years in retail operations, 11 years owning and managing her own companies, and three years in management positions at The Grove.

Chicago's Decision violated the Department's rules by removing The Grove's DBE eligibility without complying with § 26.87. Chicago's Decision is also unsupported by substantial evidence and is inconsistent with the Department's rules concerning ownership and control.

The Grove respectfully requests that the Department reverse Chicago's Decision and determine that The Grove is a DBE. Alternatively, The Grove requests that this case be remanded to Chicago for further proceedings consistent with § 26.87 and a proper application of the Department's substantive regulations on ownership and control.

The Grove also requests that the Department issue its decision as soon as possible. As a result of Chicago's Decision, other certifying agencies are delaying action on The Grove's pending applications and awaiting the Department's decision. These delays are having detrimental effects on The Grove.

RECEIVED

SEP 1 2 2005

OMWRE

00811

DC #175474 v4

 Office of Civil Rights
October 28, 2004
Page 20

 Thelen Reid & Priest LLP

We appreciate your consideration of this appeal.

Respectfully Submitted,

*William A. Kirk*

William A. Kirk, Jr.
Richard J. Leidl

Counsel for
The Grove, Inc.

Attachments

RECEIVED

SEP 1 2 2005

OMWBE

00812

DC #175474 v4




## List of Exhibits

1.  Entities that Have Certified The Grove, Inc. as a Disadvantaged Business Enterprise, Rejected The Grove's Application or Have The Grove's Application for Certification Under Review.

2.  Letters Certifying The Grove as a DBE.

3.  Locations of The Grove's Stores.

4.  Certifications of The Grove as a DBE Subsequent to Ms. Dukler's Acquisition of Ownership and Control.

5.  Chicago's Preliminary Determination (June 11, 2004).

6.  Letter from Ms. Dukler, President, The Grove, to Ms. Lillie Cooper, Director of Certification, Chicago Office of Business Development (June 22, 2004).

7.  Chicago's Final Decision: Letter from Michael McMurray, Managing Deputy Procurement Officer, to Ms. Michelle Dukler, President, The Grove (August 13, 2004).

8.  Chicago's DBE Certification of The Grove.

9.  Mortgage and Security Agreement.

10. Exclusion of Certain Property from Marital Property.

11. Background on Casey Cowell

12. Fifth Third Bank Consumer Note.

13. Payment to Casey Cowell.

14. Fax dated August 11, 2004 Notifying Chicago of the Loan Commitment.

15. The Grove's Stock Ledger and Active Certificates.

16. Resignation of Martin Dukler from The Grove's board of directors and administrative functions (Feb. 13, 2004).

17. Resignation of Casey Cowell from The Grove's board of directors and administrative functions (Feb. 13, 2004).

18. Resume of Michelle Dukler.

19. Business Background of Michelle Dukler.

20. The Grove's Deposit Account Resolution.

**RECEIVED**

*SEP 1 2 2005*

**OMWBE**

00813

DC #175474 v4

# TAB 21

# ATTACHMENT LVI

---

RECEIVED

SEP 1 2 2005

JMWBE



August 23, 2005

Mr. David Grossman
Managing Deputy, Certification and Compliance
City of Chicago
Department of Procurement Services
City Hall, Room 403
121 N. LaSalle St.
Chicago, IL 60602

Re: Your Letter of August 2, 2005

Dear Mr. Grossman:

Thank you for your letter of August 2, 2005 in which the City of Chicago ("COC")
acknowledges and ratifies the certification of The Grove, Inc. ("the Company" of "The
Grove") as a Disadvantaged Business Enterprise ("DBE") firm pursuant to the U.S.
Department of Transportation's (DOT) DBE airport concessions program regulations.

This letter is in reply to your correspondence dated August 2, 2005 requesting certain
personal information, documents and information pertaining to the Company and to its
minority shareholder. Below are responses to your questions and enclosed with this
letter are copies of certain documents requested by you. These documents include my
personal tax returns and tax returns of the Company as well as other financial
information. Given the private and proprietary nature of this material, I trust that this
information will be reviewed and handled accordingly.

I believe that the responses and the accompanying information are not only responsive
to your questions but should also resolve any questions that COC might have regarding
my acquisition of a controlling interest in The Grove and my control and management of
the Company thereafter. To address questions that you might have regarding the
responses contained in this letter and the enclosed documents or other issues that COC
might have regarding the Company or my leadership of the firm, I am requesting an
opportunity to meet with you in the near future. I will contact you to arrange a mutually
convenient time.

I note in your letter that you state, "the City of Chicago had significant concerns
regarding the ownership and control of The Grove. These concerns continue." Frankly,
I am troubled and perplexed by this statement and equally concerned by the wording of
one of your questions that speaks of the "alleged investment of Michele Dukler". Not
only does this phrase question my veracity and integrity, it connotes a preconception
about this matter. Accordingly, I am requesting a meeting with you and your staff to
avoid a repetition of the situation that led to the Company's appeal to the DOT.

RECEIVED
SEP 1 2 2005
OMWBE

*The Grove, Inc.*                                                      00830
*3 Westbrook Corporate Center, Suite 500, Westchester, IL 60154*
*Phone (708) 531-1694 • Fax (708) 531-0619*

 

Michelle Dukler
The Grove, Inc.

Page 2

Respectfully, the fact that an appeal was necessary was/is very unfortunate, time consuming and in my view, avoidable.

In good faith, I have been, and will continue to be, responsive to information requests. Notwithstanding that, as Chief Executive Officer ("CEO") of The Grove, please understand that I will exercise all of the legal rights to which The Grove is entitled. In this regard, my counsel is available to meet with your legal advisors to discuss any legal issues pertaining to my acquisition or the DOT regulations.

The responses below are keyed to the order of the questions or document requests in your August 2 correspondence.

1.  **Copies of the 2003 and 2004 Federal Corporate Income Tax Returns for The Grove.**
    A copy of The Grove's 2003 Federal corporate income tax return is enclosed as *Exhibit 1*. A copy of IRS Form 7004, Application for Automatic Extension of Time to File Corporation Income Tax Return, is also enclosed as *Exhibit 2*. The extension is for the filing of the Company's 2004 Federal corporate income tax return. The Grove's tax returns are prepared by the Company's independent auditors and tax advisors and will be submitted to the IRS by the required date.

2.  **A copy of Michelle Dukler's Personal Income Tax Returns for 2003 and 2004.**
    A copy of my 2003 personal Federal income tax return is enclosed as *Exhibit 3*. As you will note, this is a joint return of my spouse and me. A copy of IRS Form 4868, Application for Automatic Extension of Time to File US Individual Income Tax Return, is also enclosed as *Exhibit 4*. The extension refers to the filing of our 2004 Federal joint return. Our return is prepared by our personal accountant and will be submitted to the IRS by the required date.

3.  **A complete record of Star Foods, LLC investments in The Grove.**

    Star Foods, LLC ("Star Foods") is a minority shareholder of the Company. Due diligence conducted prior to my acquisition and a review of the Company's books and records shows that Star Foods has made both debt and equity investments in The Grove.

    The Grove's corporate records indicate Star Foods original investment in the Company was made in July 1999. That investment included the purchase of a minority equity stake, a line of credit, the receipt of rights to certain of the Company's intellectual property and a license agreement for the Company's use of the transferred trademark(s) and copyright(s). Specifically, Star Foods purchased a 49% equity stake in The Grove for $1.32 million from Ruth Ann Menutis, a female, and Paul Valteau, an African-American, who at the time were the shareholders of the Company. At that time, the Company had done business as Natural Energy Unlimited, Inc. ("NEU"). Simultaneous with its stock purchase, Star Foods agreed to provide the Company with a $4 million revolving line of credit ("LOC") for working capital purposes. The credit arrangement was memorialized in a written Credit Agreement between NEU and Durandal, Inc., a company related to Star Foods. In addition, as further consideration for the

RECEIVED

SEP 1 2 2005

OMWBE

00831



Michelle Dukler
The Grove, Inc.

 Page 3

equity infusion and the LOC, Ms. Menutis and Mr. Valteau apparently also transferred to Star Foods certain intellectual property rights owned by another corporation owned by Ms. Menutis and Mr. Valteau. A copy of the Credit Agreement is enclosed as *Exhibit 5*.

Toward the end of 1999, it appears that the owners of Star Foods and Ms. Menutis and Mr. Valteau reached an agreement to restructure the LOC. In January 2000, Star Foods and the Company entered into a Restructure Agreement. In the agreement, Star Foods assumed the Company's outstanding indebtedness under the LOC and agreed to release the Company from any repayment obligations to it. In exchange, the Company agreed to credit the debt assumption as an addition to capital. Star Foods subsequently provided other paid in capital for a total of $6.8 million. However, no additional shares of stock were issued to Star Foods and there is no agreement to do so in the future. A copy of the Restructure Agreement is enclosed as *Exhibit 6*. As noted under Recital G of the Restructure Agreement, as part of the original purchase transaction, Star Foods had agreed to "furnish Grove with the funding that was deemed reasonably adequate to operate the business". Also enclosed for your review are pages from the Company's audited financial statements for 2000 and 2001 that reflect these transactions. It should also be noted, that at the time of these transactions, The Grove was certified as a DBE and Ms. Menutis and Mr. Valteau managed its day-to-day operations. The Company's DBE certification continued after this transaction, as did its management.

All of these transactions took place prior to my acquisition of a controlling interest in 2004. You will note that they materially benefited Ms. Menutis and Mr. Valteau and the Company. Also of importance, in light of COC stated concerns, they do not confer any special rights directly or indirectly to Star Foods as a minority shareholder nor do they, in any way, affect my ability to run the company as CEO.

4.     **Any agreements, options or documents pertaining to Star Foods, Michelle Dukler, and or The Grove, which may be relevant in order for the City of Chicago to make a decision whether the alleged investment of Michelle Dukler is real and substantial as required by 49 CFR 26.**

**Documents related to the purchase of Michelle Dukler's 51% of the stock of The Grove, Inc. are enclosed as follows:**

- Michelle Dukler's Stock Purchase Agreement to acquire a controlling interest in The Grove. *Exhibit 7*
- Option Assignment Agreement. *Exhibit 8*
- Written Mortgage and Security Agreement dated February 5, 2004 between Michelle Dukler, as borrower, and Casey Cowell, as lender. *Exhibit 9*
- Fifth Third Bank Consumer Promissory Note in the principal amount of $ 2.6 million dated August 19, 2004 with Michelle Dukler as maker and the bank as note holder. *Exhibit 10*. As you will note, I am personally liable for repayment of the note.

RECEIVED

SEP 1 2 2005

OMWBE

00832

 

Michelle Dukler                                                    Page 4
The Grove, Inc.

- Copy of Bank Statement by Michelle Dukler to Fifth Third Bank
  evidencing payments pursuant to the above referenced Consumer Note.
  *Exhibit 11*
- The Grove's Stock Ledger and Active Certificates. *Exhibit 12*
- Exclusion of Certain Property from Marital Property dated February 5
  executed by Martin Dukler. *Exhibit 13*

**Documents Related to Star Foods Investments in The Grove:**

- Star Foods Stock Purchase Agreement to acquire shares of Grove stock
  from Ruth Ann Menutis and Paul R. Valteau in June of 1999. *Exhibit 14*
- *Exhibits 5-7* referenced above.

5. **A copy of the deed to the property at 6756 Fieldstone Drive, Burr Ridge, IL
   60154**

At the time of my acquisition of a controlling interest in the Company, the
property located at 6756 Fieldstone Drive in Burr Ridge was the personal
residence of my spouse and me and was owned jointly by us. My interest in the
property was used as partial collateral to borrow $2.6 million from an individual
lender to make the acquisition. The loan was evidenced by a written agreement
and negotiated at arms-length. However, as COC is aware, to address any
concerns regarding the lender, I secured replacement financing from Fifth Third
Bank and paid off the original indebtedness in full. As mentioned above, a copy
of the promissory note to the bank is included with this letter. Also included is a
copy of my check paying off the original indebtedness. *Exhibit 15*

To the extent that marital assets were partially pledged to obtain the original
financing for The Grove stock, DOT regulations state that this is permissible
provided that the other spouse (in this case, my husband) irrevocably renounced
and transferred any ownership in the Company stock that he might assert as a
matter of Illinois State law. In pertinent part the DOT regulations state: "When
marital assets (other than the assets of the business in question) held jointly or
as community property by both spouses, are used to acquire the <u>ownership
interest</u> asserted by one spouse, you must deem the ownership interest in the
firm to have been acquired by the spouse with his or her own individual
resources, provided that the other spouse irrevocably renounces and transfers all
rights <u>in the ownership interest</u> in the manner sanctioned by the laws of the state
in which either spouse or the firm is domiciled." 49 CFR § 26.69(i)(1)(Emphasis
added).

Please note that, contemporaneously with the closing of the transaction, my
spouse irrevocably renounced any ownership interest that he might otherwise
have in The Grove stock that I acquired. Included as Exhibit 13, is a copy of his
renunciation. In any event, given that the plain meaning of the underscored
phrase "ownership interest" refers to my acquired ownership interest in The
Grove stock, whether or not my husband was listed on the deed to our personal
residence after the purchase does not seem to be relevant.

RECEIVED

SEP 1 2 2005

OMWBE

 Michelle Dukler
The Grove, Inc.

 Page 5

The Fieldstone Drive residence of the Dukler family was sold on July 5, 2005. A copy of the settlement agreement from the title company is enclosed as *Exhibit 17*. The proceeds from this sale were then committed in an agreement to purchase a new home. A copy of this agreement enclosed as *Exhibit 16*. Title to the land has yet to be delivered. My spouse, child and I currently reside in a rental property.

6. **Copies of the 2004 and 2005 (to-date) audited Corporate Financials for The Grove, including balance sheet, profit and loss and income statements.**

   A copy of the 2004 audited financials is enclosed. A copy of the 2005 July unaudited financials are enclosed. *Exhibit 17*

7. **An explanation as to why The Grove still owes $574,000 in outstanding loans to the former owners.**

   The prior shareholders Ms. Menutis and Mr. Valteau made personal loans to the Company prior to my acquisition. These loans have been fully repaid and, as of May 2005, The Grove has no loans, outstanding or otherwise from the former owners. The July 2005 financials of the Company reflect that there is no outstanding indebtedness to either Ms. Menutis or Mr. Valteau.

8. **An explanation as to why the Stockholder's Agreement restricts Michelle Dukler's ability to issue stock to a new owner or purchase additional stock without the consent of Star Foods.**

   The Stockholder's Agreement <u>does not</u> prevent Michelle Dukler from taking any action regarding any matter of the company. As first drafted, the original Stockholders Agreement contained certain errors that have been corrected. The Stockholder's Agreement that is in force states that that decisions may be made by vote of a simple majority of the shares giving me full control over the Company. A copy of the signed revisions to the Stockholder's Agreement is enclosed. *Exhibit 18*

In closing, again I believe that the responses in this letter and the documents enclosed are responsive to your request and should resolve any remaining questions that you may have regarding my ownership and control of The Grove. My purchase of a controlling interest in the Company was/is real and substantial as a matter of law and as that phrase is used in the DOT regulations. The agreed upon purchase price was based on arms-length negotiations and reflected the company's financial status at the time, which included significant operating losses from 1999 thru 2003.

I have spent nearly 20 years in retail sales operations including 11 years owning and managing other companies and three years in a senior management position in The Grove itself. I have the unfettered prerogative to exercise my rights as the majority shareholder and sole director and I actively manage the Company on a day-to-day basis as President and CEO.

RECEIVED
EP 1 2 2005
OMWBE



Michelle Dukler
The Grove, Inc.

 Page 6

I look forward to meeting with you in the near future.

Sincerely,

Michelle Dukler
President
The Grove, Inc.

Enclosures: Exhibits 1-18

- Letter Delivery via fax on August 23, 2005 at 4:45 pm
- Letter and Exhibits via FedEx on August 23, 2005 at

RECEIVED
SEP 1 2 2005
OMWBE

00835

 



DATE MAILED

DEC 0 1 2005

INITIALS

### STATE OF WASHINGTON
# OFFICE OF MINORITY AND WOMEN'S BUSINESS ENTERPRISES
*406 South Water • Post Office Box 41160 • Olympia, Washington 98504-1160*
*(360) 753-9693 • FAX (360) 586-7079*

November 30, 2005

Ms. Michelle Dukler
THE GROVE INC
3 Westbrook Corporate Center, Suite 500
Westchester, Illinois 60154

File Number: 19323

Dear Ms. Dukler:

Thank you for completing and submitting the application for certification as a federal Airport Concessionaire Disadvantaged Business Enterprise (ACDBE). Unfortunately, the information contained in your application package shows that your firm currently does not meet the certification requirements for this program.

To qualify for certification as an ACDBE, an applicant firm must be a small business and demonstrate <u>all</u> of the following:

1. Eligible persons own at least 51 percent of the firm.

2. Eligible owners exert managerial control over the firm's day-to-day operations.

3. Eligible owners exert managerial control over the firm's long-term operations.

4. Eligible owners have technical expertise in the field of the firm's operations.

5. The firm operates independently of other companies.

6. The firm has capacity to perform the work it claims to perform. This means the firm must have all the equipment, employees, materials, facilities, licenses, etc. it needs to conduct business in Washington State.

Ownership, control, expertise, independence, and capacity must all be real and substantial. That means that both the written arrangements and the firm's "real-world" operations must demonstrate the firm's eligibility. If the firm does not provide sufficient documentation to establish every one of the elements listed above, we cannot certify the company.

The information your firm provided with its application does not establish eligibility for the following reasons:

00836

Ms. Michelle Dukle 
November 30, 2005
Page 2

A. In order to qualify for certification, the firm must demonstrate that it is owned at least 51 percent by eligible persons and the ownership must be real, substantial and continuing. The firm applied for certification on two separate occasions with this office. The first application was received on July 10, 2003 and withdrawn November 11, 2003. The second application was received on May 20, 2004 and withdrawn August 30, 2004. The third and current application was received on September 12, 2005 and is being considered as a whole and on it's own merits. A review of the documentation submitted with the firm's OMWBE Certification Application shows that the firm does not meet the ownership criteria to qualify as an ACDBE. The purchase of ownership interest in the firm by Ms. Michelle Dukler is not real and substantial.

   a) On February 5, 2004, Ms Dukler borrowed $2,600,000 from Mr. Casey Cowell, former director of the firm and owner and director of Star Foods, LLC. Star Foods, LLC is current 49 percent owner of the firm. According to documents supplied by Ms. Dukler, this loan was secured by Ms. Dukler's separate assets totaling over $2,600,000.
   b) On February 6, 2004, Ms. Dukler purchased her ownership interest in the firm from Star Foods, LLC with $2,600,000 from a joint account with Mr. Martin Dukler – ineligible spouse of Ms. Dukler, former director and officer of the firm, and current officer and director of Star Foods, LLC.
   c) On February 17, 2004, the firm borrowed $2,600,000 from First Fifth Bank.
   d) On August 17, 2004, Ms. Dukler deposited into Mr. Cowell's personal account $2,600,000 for the purpose of repaying the February 5, 2004 loan. No documentation is provided to show from what account these funds came from. No documentation is provided to show Ms. Dukler had made any previous payments to Mr. Cowell.
   e) On August 18, 2004, Mr. Cowell processed the $2,600,000 paid to him by Ms. Dukler.
   f) On August 19, 2004, Ms. Dukler obtained a loan in the amount of $2,600,000 from First Fifth Bank. Collateral is identified as all assets owned by Ms. Dukler at the time of the loan. As Ms. Dukler had purchased ownership interest in the firm at this point, her ownership in the firm is considered collateral on the bank loan.

Ms. Dukler obtained a loan from an ineligible person using secured assets for the purpose of purchasing the business. This is not expressly against ACDBE regulations. However, the funds paid to Star Foods, LLC came from a joint checking account with an ineligible spouse who has a history of involvement with the firm as both an officer and a director, is a current owner, officer and director of Star Foods, LLC, and works in the same or similar industry. As such, Ms. Dukler's ownership of the firm is not real and substantial. The firm does not qualify for certification as an ACDBE for the federal program.

B. In order to qualify for certification, a firm must be owned by an eligible person who is both socially and economically disadvantaged. The Personal Financial Statement submitted by Ms. Dukler identifies assets that total $2,027,225. When Ms. Dukler repaid Mr. Cowell on August 17, 2004, those assets were no longer encumbered. However, on her Personal Financial Statement Ms. Dukler identifies $2,600,000 of encumbered assets linked to the personal loan of August 19, 2004. Ms. Dukler does not identify any payments made on that loan. Even though Ms. Dukler took out another loan for $2,600,000 from First Fifth Bank, the firm was used as collateral, not Ms. Dukler's other assets. In addition, since Ms. Dukler had already purchased her ownership interest

00837



Ms. Michelle Dukler
November 30, 2005
Page 3

in the firm and paid off Mr. Cowell for his loan, this loan is a contingent liability, not an encumbered asset. According to program regulations, contingent liabilities may not be used to reduce the value of an individual's personal net worth. Ms. Dukler has at least $2,600,000 of unencumbered assets that have not been claimed on her Personal Financial Statement. As such, Ms. Dukler is not an eligible person under the rules of the DBE program.

C. In order to qualify for certification, eligible persons must maintain managerial and operational control over the operations of the firm. There must be no restrictions placed on the eligible owner that prevent the eligible owner from making any business decisions. According to the amendments to the bylaws passed July 20, 2001, a quorum of the firm's shareholders consists of 60 percent of the outstanding shares, a supermajority requirement. This amendment creating a supermajority requirement was put into place when Mr. Dukler and Mr. Cowell, through Star Foods, LLC, purchased ownership interest in the firm in 1999. Ms. Dukler is currently owner of 51 percent of the firm. Ms. Dukler cannot convene a meeting of the shareholders on her own. The shareholders elect officers and appoint directors. As such, Ms. Dukler does not control the operations of the firm as required by regulation.

D. In order to qualify for certification, a firm must be independent and not intertwined with non-certified firms. According to documents submitted to OMWBE, the firm is intertwined with Star Foods, LLC, a non-certified business, which is owned by Mr. Dukler and Mr. Cowell. Mr. Dukler and Mr. Cowell are both former owners of the firm, former directors of the firm, and former officers of the firm. Star Foods, LLC is current 49 percent owner of the firm. The firm operates in the same or similar industry. Based on the previous and current relationships between the firm and Star Foods, LLC, the firm is not an independent business as required by regulation.

E. The firm operates as a family owned and operated business. While Ms. Dukler participates significantly in the firm's activities, the firm has not met its burden of proof to show that the eligible owner – as distinct from the family as a whole – controls the firm as required by regulation.

F. Although not a basis for our decision, the office has noted other issues that must be addressed should the firm appeal this office's decision. Affiliates must be considered together in determining whether a concern meets small business size criteria. As the firm and Star Foods, LLC are affiliates, this office would need to collect complete business taxes for Star Foods, LLC for each of the last three years should the firm appeal this office's decision.

The documents we relied on in making this determination were:

i. OMWBE DBE Application.

ii. Minutes Amending the Bylaws of The Grove, Inc. dated July 20, 2001.

iii. Resume of Casey Cowell.

iv. Resume of Martin Dukler.

00838

 

Ms. Michelle Dukler
November 30, 2005
Page 4

    v.  Loan and Security Agreement between Fifth Third Bank and The Grove, Inc.

    vi.  "All Sources, Amounts, and Purposes of Money Loaned to the Firm."

    vii.  Location Lease between EOP – Westbrook Corporate Center, L.L.C. and The Grove, Inc.

    viii.  Location Lease Addendum between Broadview Palace and The Grove, Inc.

    ix.  Schedule of Salaries Paid to Officers, Managers, Owners.

    x.  Restated Articles of Incorporation of Natural Energy Unlimited, Inc. dated August 1, 1999.

    xi.  Stock Ledger and Active Certificates of The Grove, Inc. dated March 30, 2004.

    xii.  Waiver of Notice of Annual Meeting of Board of Directors of The Grove, Inc. dated March 19, 2003.

    xiii.  Minutes of the Annual Meeting of Board of Directors of The Grove, Inc. dated March 19, 2003.

    xiv.  Waiver of Notice of Annual Meeting of Board of Directors of The Grove, Inc. dated March 19, 2002.

    xv.  Minutes of the Annual Meeting of Board of Directors of The Grove, Inc. dated March 19, 2002.

    xvi.  Waiver of Notice of Annual Meeting of Board of Directors of The Grove, Inc. dated March 19, 2001

    xvii.  Minutes of the Annual Meeting of Board of Directors of The Grove, Inc. dated March 19, 2001.

    xviii.  Minutes of the Special Meeting of the Board of Directors of The Grove, Inc. dated July 20, 2001.

    xix.  Minutes of the Special Meeting of Stockholders/Directors of Natural Energy Unlimited, Inc. dated September 10, 1999.

    xx.  Minutes of the Special Meeting of Stockholders/Directors of Natural Energy Unlimited, Inc. dated July 7, 1999.

    xxi.  Bylaws of Natural Energy Unlimited, Inc.

    xxii.  Stock Purchase Agreement between Star Foods, L.L.C. and Michelle Dukler for The Grove, Inc. dated February 6, 2004.

    xxiii.  Assignment Separate from Certificate between Star Foods, L.L.C. and Michelle Dukler for The Grove, Inc. dated February 6, 2004.

00839

 

Ms. Michelle Dukl
November 30, 2005
Page 5

xxiv. Term Notice between Michelle Dukler and Casey Cowell in the amount of $2,500,000 dated February 5, 2004.

xxv. Option Assignment Agreement between Star Foods, L.L.C. and Michelle Dukler dated February 6, 2004.

xxvi. Term Notice between Michelle Dukler and Casey Cowell in the amount of $100,000 dated February 5, 2004.

xxvii. Mortgage and Security Agreement by Michelle Dukler in favor of Casey Cowell dated February 5, 2004.

xxviii. Promissory Note between Fifth Third Bank and Michelle Dukler dated August 19, 2004.

xxix. Written Consent of the Manager of Star Foods, L.L.C. dated February 4, 2004.

xxx. Written Consent of the Manager of Star Foods, L.L.C. dated February 9, 2004.

xxxi. Notice of Stock Option Exercise Dated February 6, 2004.

xxxii. Minutes of the Special Meeting of the Board of Directors of The Grove, Inc. dated July 30, 2004.

xxxiii. Stockholders Agreement dated February 17. 2004.

xxxiv. Document identifying ownership of Star Foods, LLC received September 12, 2005.

xxxv. On-Site Report conducted by the City of Chicago Department of Procurement Services dated May 18, 2004.

xxxvi. On-Site Report conducted by the City of Chicago Department of Procurement Services dated July 15, 2004.

xxxvii. "Schedule A - Final Denial Summary" of the City of Chicago Department of Procurement Services dated July 26, 2004.

Because the firm has not proven that it is currently eligible, we must deny your application. If your firm's situation changes in the future, you may reapply at that time. For your convenience, I have included an attachment with this letter that provides the actual text of the applicable regulations. While there may be other regulations that apply to your firm, the regulations listed on "Attachment A" are the basis for this determination.

If you believe this determination was reached in error, you may file an appeal with this office. I have included a second "Attachment B" with this letter, which is an explanation of the appeal process you should use.

00840

Ms. Michelle Dukl
November 30, 2005
Page 6

If you have questions about program rules or why your firm does not meet the requirements, please call me at the number listed below. If you think your firm might be eligible in the future, I'd also be happy to talk with you about what changes you might need to make. Again, thank you for applying and good luck with your business.

Sincerely,

Vicky Schiantarelli, Manager
Certification Division

By: Joshua Anander
MWBE Program Specialist
Telephone Number (360) 704-1185

VS/ja

Enclosures:    Attachment A
               Attachment B

cc:    Brenda Nnambi, WSDOT

00841

 

# ATTACHMENT A
# APPLICABLE REGULATIONS

<u>Federal DBE Program Regulations</u>

**49 CFR Part 23.3** Airport Concession Disadvantaged Business Enterprise (ACDBE) means a concession that is a for-profit small business concern --

    (1) That is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which 51 percent of the stock is owned by one or more such individuals; and

    (2) Whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it.

**49 CFR Part 23.35** What is the personal net worth standard for disadvantaged owners of ACDBEs?

    The personal net worth standard used in determining eligibility for purposes of this **part** is $750,000. Any individual who has a personal net worth exceeding this amount is not a socially and economically disadvantaged individual for purposes of this **part,** even if the individual is a member of a group otherwise presumed to be disadvantaged.

**49 CFR Part 23.95(h) of Subpart D** Businesses operating under the following arrangements are not eligible for certification as DBE's under this subpart:

    (1)    Limited partnerships, in which a non-DBE is the general partner.

    (2)    Other arrangements that do not provide for ownership and control by the socially and economically disadvantaged owners.

**49 CFR Part 26.5** <u>Affiliation</u> has the same meaning the term has in the Small Business Administration (SBA) regulations, 13 CFR part 121.

    (1)    Except as otherwise provided in 13 CFR part 1121, concerns are affiliates of each other when, either directly or indirectly:

        (i)    One concern controls or has the power to control the other; or

        (ii)    A third party or parties controls or has the power to control both; or

        (iii)    An identity of interest between or among parties exists such that affiliation may be found.

    (2)    In determining whether affiliation exists, it is necessary to consider all appropriate factors, including common ownership, common management, and contractual relationships. Affiliates must be considered together in determining whether a concern meets small business size criteria and the statutory cap on the participation of firms in the DBE program.

**49 CFR Part 26.5** <u>Disadvantaged business enterprise</u> or <u>DBE</u> means a for-profit small business concern --

    (1)    That is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which 51 percent of the stock is owned by one or more such individuals; and

00842

 

(2)    Whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it.

**49 CFR Part 26.61(b) of Subpart D** The firm seeking certification has the burden of demonstrating to you, by a preponderance of the evidence, that it meets the requirements of this subpart concerning group membership or individual disadvantage, business size, ownership, and control.

**49 CFR Part 26.61(c) of Subpart D** You must rebuttably presume that members of the designated groups identified in §26.67(a) are socially and economically disadvantaged. This means they do not have the burden of proving to you that they are socially and economically disadvantaged. In order to obtain the benefit of the rebuttable presumption, individuals must submit a signed, notarized statement that they are a member of one of the groups in §26.67(a). Applicants do have the obligation to provide you information concerning their economic disadvantage (see §26.67).

**49 CFR Part 26.61(e) of Subpart D** You must make determinations concerning whether individuals and firms have met their burden of demonstrating group membership, ownership, control, and social and economic disadvantage (where disadvantage must be demonstrated on an individual basis) by considering all the facts in the record, viewed as a whole.

**49 CFR Part 26.67(a)(2)(i) of Subpart D**    You must require each individual owner of a firm applying to participate as a DBE (except a firm applying to participate as a DBE airport concessionaire) whose ownership and control are relied upon for DBE certification to certify that he or she has a personal net worth that does not exceed $750,000.

**49 CFR Part 26.67(a)(2)(iii) of Subpart D** In determining an individual's net worth, you must observe the following requirements:
(A)    Exclude an individual's ownership interest in the applicant firm;
(B)    Exclude the individual's equity in his or her primary residence (except any portion of such equity that is attributable to excessive withdrawals from the applicant firm).
(C)    Do not use a contingent liability to reduce an individual's net worth.
(D)    *With respect to assets held in vested pension plans, Individual Retirement Accounts, 401(k) accounts, or other retirement savings or investment programs in which the assets cannot be distributed to the individual at the present time without significant adverse tax or interest consequences, include only the present value of such assets, less the tax and interest penalties that would accrue if the asset were distributed at the present time.*

**49 CFR Part 26.67(b)(4) of Subpart D** When an individual's presumption of social and/or economic disadvantage has been rebutted, his or her ownership and control of the firm in question cannot be used for purposes of DBE eligibility under this subpart unless and until he or she makes an individual showing of social and/or economic disadvantage. If the basis for rebutting the presumption is a determination that the individual's personal net worth exceeds

Attachment A
Page 2

00843



$750,000, the individual is no longer eligible for participation in the program and cannot regain eligibility by making an individual showing of disadvantage.

**49 CFR Part 26.69(a) of Subpart D** In determining whether the socially and economically disadvantaged participants in a firm own the firm, you must consider all the facts in the record, viewed as a whole.

**49 CFR Part 26.69(b) of Subpart D** To be an eligible DBE, a firm must be at least 51 percent owned by socially and economically disadvantaged individuals.

**49 CFR Part 26.69(c) of Subpart D** The firm's ownership by socially and economically disadvantaged individuals must be real, substantial, and continuing, going beyond pro forma ownership of the firm as reflected in ownership documents. The disadvantaged owners must enjoy the customary incidents of ownership, and share in the risks and profits commensurate with their ownership interests, as demonstrated by the substance, not merely the form, of arrangements.

**49 CFR Part 26.69(e) of Subpart D** The contributions of capital or expertise by the socially and economically disadvantaged owners to acquire their ownership interests must be real and substantial. Examples of insufficient contributions include a promise to contribute capital, an unsecured note payable to the firm or an owner who is not a disadvantaged individual, or mere participation in a firm's activities as an employee. Debt instruments from financial institutions or other organizations that lend funds in the normal course of their business do not render a firm ineligible, even if the debtor's ownership interest is security for the loan.

**49 CFR Part 26.69(h)(1) of Subpart D**    You must presume as not being held by a socially and economically disadvantaged individual, for purposes of determining ownership, all interests in a business or other assets obtained by the individual as the result of a gift, or transfer without adequate consideration, from any non-disadvantaged individual or non-DBE firm who is --

    (i)    Involved in the same firm for which the individual is seeking certification, or an affiliate of that firm;

    (ii)    Involved in the same or a similar line of business; or

    (iii)    Engaged in an ongoing business relationship with the firm, or an affiliate of the firm, for which the individual is seeking certification.

**49 CFR Part 26.69(h)(2) of Subpart D**   To overcome this presumption and permit the interests or assets to be counted, the disadvantaged individual must demonstrate to you, by clear and convincing evidence, that--

    (i)    The gift or transfer to the disadvantaged individual was made for reasons other than obtaining certification as a DBE; and

    (ii)    The disadvantaged individual actually controls the management, policy, and operations of the firm, notwithstanding the continuing participation of a non-disadvantaged individual who provided the gift or transfer.

**49 CFR Part 26.69(i) of Subpart D**   You must apply the following rules in situations in which marital assets form a basis for ownership of a firm:

Attachment A
Page 3                                                    00844

 

(1) When marital assets (other than the assets of the business in question), held jointly or as community property by both spouses, are used to acquire the ownership interest asserted by one spouse, you must deem the ownership interest in the firm to have been acquired by that spouse with his or her own individual resources, provided that the other spouse irrevocably renounces and transfers all rights in the ownership interest in the manner sanctioned by the laws of the state in which either spouse or the firm is domiciled. You do not count a greater portion of joint or community property assets toward ownership than state law would recognize as belonging to the socially and economically disadvantaged owner of the applicant firm.

(2) A copy of the document legally transferring and renouncing the other spouse's rights in the jointly owned or community assets used to acquire an ownership interest in the firm must be included as part of the firm's application for DBE certification.

**49 CFR Part D 26.71(a) of Subpart D**    In determining whether socially and economically disadvantaged owners control a firm, you must consider all the facts in the record, viewed as a whole.

**49 CFR Part 26.71(b) of Subpart D** Only an independent business may be certified as a DBE. An independent business is one the viability of which does not depend on its relationship with another firm or firms.

(1)    In determining whether a potential DBE is an independent business, you must scrutinize relationships with non-DBE firms, in such areas as personnel, facilities, equipment, financial and/or bonding support, and other resources.

(2)    You must consider whether present or recent employer/employee relationships between the disadvantaged owner(s) of the potential DBE and non-DBE firms or persons associated with non-DBE firms compromise the independence of the potential DBE firm.

(3)    You must examine the firm's relationships with prime contractors to determine whether a pattern of exclusive or primary dealings with a prime contractor compromises the independence of the potential DBE firm.

(4)    In considering factors related to the independence of a potential DBE firm, you must consider the consistency of relationships between the potential DBE and non-DBE firms with normal industry practice.

**49 CFR Part 26.71(c) of Subpart D** A DBE firm must not be subject to any formal or informal restrictions which limit the customary discretion of the socially and economically disadvantaged owners.  There can be no restrictions through corporate charter provisions, by-law provisions, contracts or any other formal or informal devices (e.g., cumulative voting rights, voting powers attached to different classes of stock, employment contracts, requirements for concurrence by non-disadvantaged partners, conditions precedent or subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights) that prevent the socially and economically disadvantaged owners, without the cooperation or vote of any non-disadvantaged individual, from making any business decision of the firm.  This paragraph does not preclude a spousal co-signature on documents as provided for in §26.69(j)(2).

**49 CFR Part 26.71(d) of Subpart D** The socially and economically disadvantaged owners must possess the power to direct or cause the direction of the management and policies of the firm and

Attachment A
Page 4                                                                                    00845



to make day-to-day as well as long-term decisions on matters of management, policy and operations.

    (1) A disadvantaged owner must hold the highest officer position in the company (e.g., chief executive officer or president).

    (2) In a corporation, disadvantaged owners must control the board of directors.

    (3) In a partnership, one or more disadvantaged owners must serve as general partners, with control over all partnership decisions.

**49 CFR Part 26.71(e) of Subpart D** Individuals who are not socially and economically disadvantaged may be involved in a DBE firm as owners, managers, employees, stockholders, officers, and/or directors. Such individuals must not, however, possess or exercise the power to control the firm, or be disproportionately responsible for the operation of the firm.

**49 CFR Part 26.71(j) of Subpart D** In order to be viewed as controlling a firm, a socially and economically disadvantaged owner cannot engage in outside employment or other business interests that conflict with the management of the firm or prevent the individual from devoting sufficient time and attention to the affairs of the firm to control its activities. For example, absentee ownership of a business and part-time work in a full-time firm are not viewed as constituting control. However, an individual could be viewed as controlling a part-time business that operates only on evenings and/or weekends, if the individual controls it all the time it is operating.

**49 CFR Part 26.71(k)(2) of Subpart D**    If you cannot determine that the socially and economically disadvantaged owners--as distinct from the family as a whole--control the firm, then the socially and economically disadvantaged owners have failed to carry their burden of proof concerning control, even though they may participate significantly in the firm's activities.

**49 CFR Part 26.71(l) of Subpart D** Where a firm was formerly owned and/or controlled by a non-disadvantaged individual (whether or not an immediate family member), ownership and/or control were transferred to a socially and economically disadvantaged individual, and the non-disadvantaged individual remains involved with the firm in any capacity, the disadvantaged individual now owning the firm must demonstrate to you, by clear and convincing evidence, that:

    (1)    The transfer of ownership and/or control to the disadvantaged individual was made for reasons other than obtaining certification as a DBE; and

    (2)    The disadvantaged individual actually controls the management, policy, and operations of the firm, notwithstanding the continuing participation of a non-disadvantaged individual who formerly owned and/or controlled the firm.

**49 CFR Part 26.71(o) of Subpart D** A business operating under a franchise or license agreement may be certified if it meets the standards in this subpart and the franchiser or licenser is not affiliated with the franchisee or licensee. In determining whether affiliation exists, you should generally not consider the restraints relating to standardized quality, advertising, accounting format, and other provisions imposed on the franchisee or licensee by the franchise agreement or license, provided that the franchisee or licensee has the right to profit from its efforts and bears the risk of loss commensurate with ownership. Alternatively, even though a franchisee or licensee may not be controlled by virtue of such provisions in the franchise




agreement or license, affiliation could arise through other means, such as common management or excessive restrictions on the sale or transfer of the franchise interest or license.

**49 CFR Part 26.73(a)(2) of Subpart D**    You may consider, in making certification decisions, whether a firm has exhibited a pattern of conduct indicating its involvement in attempts to evade or subvert the intent or requirements of the DBE program.

**49 CFR Part 26.73(f) of Subpart D** Recognition of a business as a separate entity for tax or corporate purposes is not necessarily sufficient to demonstrate that a firm is an independent business, owned and controlled by socially and economically disadvantaged individuals.

 

# ATTACHMENT B
# APPEAL PROCESS

If your application for certification was denied, you may appeal. Your appeal can cover denial of federal certification, state certification, or both. If you want to appeal, you must follow the procedures listed below.

Federal DBE Program Appeal Process

A.      Informal Show Cause Review

Pursuant to 49 Code of Federal Regulation (CFR), Part 26.86, you may request an informal review of this determination. If you request an informal review, you still have the right to appeal to the U.S. Department of Transportation (USDOT) if the results of the informal review are not in your favor.

If you choose to request an informal review, your request must be made in writing and must be received by the Office within twenty (20) calendar days from the date of this letter. The request must explain in detail the reasons you believe the Office's determination should be reversed and include copies of all documents that support your argument. The informal review will be based only on the written record contained in the firm's application file (which will include your review request). The informal review process does not provide for a meeting or other hearing unless the members of the Certification Committee request one.

Please direct your request to:

> Certification Committee
> Office of Minority and Women's Business Enterprises
> P.O. Box 41160
> Olympia, Washington  98504-1160

If, after the informal show cause review process, the Office decides to affirm the denial and you wish to further appeal the decision, you may then appeal to the USDOT by following the procedure explained below under the title "USDOT Review."

B.      USDOT Review

Pursuant to 49 CFR 26.89, you may choose to appeal this determination directly to the USDOT. If you do so, you may not request an informal review as described above. If you choose to appeal directly to USDOT, your request must be in writing and mailed to the address below within ninety (90) days from the date of the denial letter. The request must explain in detail the reasons you believe the Office's determination should be reversed and include copies of all documents that support your argument.

Please direct your request to:

> Department of Transportation
> Office of Civil Rights
> 400 – 7th Street SW, Room 5414
> Washington, DC  20590

If you do not submit an appeal, following one of the procedures above, the federal program denial will be final and you will have no further appeal rights.

Attachment B
Page 1                                                                                              00848

FROM                                    (FRI)12.16'05 16:5   T. 16:56/NO.4862319029 P  1



**Preston|Gates|Ellis &**
**Rouvelas|Meeds** LLP

RECEIVED
DEC 1 6 2005
OMWBE

| | | | |
|---|---|---|---|
| **TO:** | Vicky Schianterelli | **FAX NO:** | (360) 586-7079 |
| **COMPANY:** | Office of Minority and Women Business Enterprise | **CONFIRMATION NO:** | (360) 704-1197 |
| **FROM:** | William A. Kirk | **CLIENT-MATTER NO:** | #52717-99999 |
| **DATE:** | December 16, 2005  4:43 PM | **TOTAL NUMBER OF PAGES INCLUDING THIS COVER SHEET:** | 24 |

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CONTACT:   [  ] FAX OPERATOR:
                                                          [  ] NAME:
                                                              EXT:

**COMMENTS**

Attached please find the Request for Informal Review letter for The Grove, Inc.  The hard copy
with exhibits will follow via Federal Express.

The information contained in this facsimile is confidential and may also be attorney-privileged. The information is intended only for
the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent
responsible for delivering it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of
this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by a collect
telephone call to (202) 628-1700, and return the original message to us via the U.S. Postal Service. Thank you.

A LAW FIRM    A LIMITED LIABILITY PARTNERSHIP INCLUDING OTHER LIMITED LIABILITY ENTITIES

1735 NEW YORK AVENUE NW   SUITE 500   WASHINGTON, DC 20006   TEL: (202) 628-1700   FAX: (202) 331-1024   www.prestongates.com
Anchorage   Coeur d'Alene   Hong Kong   Orange County   Portland   San Francisco   Seattle   Spokane   Washington, DC

00849

FROM

**Preston|Gates|Ellis &
Rouvelas|Meeds LLP**

(FRI)12.16'05 16:5 .T. 16:56/? 4862319029 P 2

RECEIVED
DEC 1 6 2005
OMWBE

December 16, 2005

**BY FEDERAL EXPRESS**

Certification Committee
Office of Minority and Women's Business
Enterprises
State of Washington
406 South Water Street
Olympia, WA 98504-1160

Re:    **The Grove Inc. - Request for Informal Review**

Dear Sir/Madam:

On behalf of The Grove, Inc. ("The Grove" or the "Company"), we respectfully request

(1) an informal review of the Washington State Office of Minority and Women's Business

Enterprise's ("OMWBE") denial, by letter dated November 30, 2005 ("Denial"), of The Grove's

application for certification as a Disadvantaged Business Enterprise ("DBE") and (2) a

determination that The Grove's application for DBE certification is approved.

## I. SUMMARY

The DOT requires a certifying agency to:

- "consider all the facts in the record, viewed as a whole."
  §§ 26.69(a) and 26.71 (a).

- "evaluate the eligibility of a firm on the basis of **present**
  circumstances." § 26.73(b). (Emphasis added.)

- apply the rules under Part 26.

A LAW FIRM    A LIMITED LIABILITY PARTNERSHIP INCLUDING OTHER LIMITED LIABILITY ENTITIES            00850

1735 NEW YORK AVENUE NW, SUITE 500    WASHINGTON, DC 20006-5209    TEL: (202) 628-1700    FAX: (202) 331-1024    www.prestongates.com
Anchorage   Coeur d'Alene   Hong Kong   Orange County   Portland   San Francisco   Seattle   Spokane   Washington, DC

FROM

(FRI)12.16'05 16:5    T.16:56/№:862319029 P  3

Certification Committee
December 16, 2005
Page 2

RECEIVED
DEC 1 6 2005
OMWBE

Based on the present circumstances, the facts in the record, viewed as a whole, and the DOT's

regulations, The Grove has clearly shown by a preponderance of the evidence that it qualifies as

a DBE.

- Ms. Dukler acquired 51% ownership through a real and
  substantial payment of $2,600,000.

- Ms. Dukler's liability for the loan for stock ownership is not a
  contingent liability.

- The Articles of Incorporation allow Ms. Dukler, the majority
  shareholder, to exercise control.

- Ms. Dukler controls The Grove as the majority shareholder,
  Board Chairperson, sole Director and President.

- Ms. Dukler has the expertise to manage The Grove and in fact
  does so on a day-to-day basis.

- Ms. Dukler's husband is not presently an officer, director or
  shareholder of The Grove, though the DOT rules would
  nonetheless allow this.

- The Grove is an independent business and is not a "family"
  owned and operated business nor an affiliate of Star Foods.

The Denial's allegations are (1) based on suppositions, not the facts in the record, (2) are

based on previous circumstances, rather than present circumstances, and (3) do not comply with

the DOT's specific rules for certifying firms as DBEs.  Accordingly, we respectfully request that

the OMWBE review the November 30, 2005 denial and certify The Grove as a DBE.

## II. BACKGROUND

The Grove is a woman-owned and –controlled firm that operates specialty retail food

concessions in airports and other locations around the country.  The Grove has been a certified

DBE for more than 20 years and has also been certified by more than 20 state and local agencies.

The Grove began operations in 1981 with a concession contract to operate a specialty

food retail store in the New Orleans International Airport.  It was certified by New Orleans as a

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00851

FROM

(FRI)12.16'05 16:50  /.16:56/NO.4862319029 P  4

Certification Committee
December 16, 2005
Page 3

RECEIVED
DEC 1 6 2005
OMWBE

DBE firm.  At present, the Company operates 60 specialty food stores at 14 airports nationwide
and has more than 340 employees, most of whom are minority and/or women.

From 1982 through 1999, Ms. Ruth Ann Menutis, a female, and Mr. Paul Valteau, an
African-American, managed The Grove's day-to-day operations and owned 100 percent of its
equity ownership interests.  Ms. Menutis was a director of The Grove and served as the
Company's President.  Mr. Valteau was a director and served as the Company's Vice President.

Based on information and belief, Ms. Menutis and Mr. Valteau sought to obtain
additional capital from investors to support the Company's operations and to pursue growth
opportunities.  In 1999, Ms. Menutis and Mr. Valteau sold 49% of The Grove's stock to Star
Foods, an investment company.  As part of this transaction, the board of directors of the
Company was expanded to include two representatives of Star Foods.  After the transaction, Ms.
Menutis and Mr. Valteau continued to manage the Company's affairs and The Grove continued
to be certified as a DBE firm.  In 2000, Ms. Michelle Dukler was recruited by Ms. Menutis to
serve as the Company's Director of Marketing and served in this key management position for
over two years.

In February 2004, Ms. Dukler entered into an agreement with the shareholders of The
Grove to acquire a controlling interest in the Company.  Upon acquiring a majority of the
Company's stock, Ms. Dukler restructured the Company's board of directors—the existing
directors resigned and Ms. Dukler was elected as the sole director—and she assumed day-to-day
management of the Company as President and Chair of the Board.  The stock ownership, the
composition of the board of directors, and the key officers of The Grove prior to, and subsequent
to, Ms. Dukler's acquisition are set forth below.

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00852

FROM                                    (FRI)12.16'05 16:5   T. 16:56/№ 4862319029 P  5

Certification Committee
December 16, 2005
Page 4

RECEIVED

DEC 1 6 2005

OMWBE

### Stock Ownership

| | Before | | | After | |
|---|---|---|---|---|---|
| Name | Shares | Percentage | Name | Shares | Percentage |
| Ruth Ann Menutis | 18.25 | 25.5% | Michelle Dukler | 36.5 | 51% |
| Paul Valteau | 18.25 | 25.5% | Star Foods | 35 | 49% |
| Star Foods | 35 | 49% | | | |

### Directors

| Before | After |
|---|---|
| Ruth Ann Menutis | Michelle Dukler, Sole Director and Chairperson |
| Paul Valteau | |
| Martin Dukler | |
| Casey Cowell | |

### Officers

| Before | After |
|---|---|
| Ruth Ann Menutis, President | Michelle Dukler, President and CEO |
| Martin Dukler, CEO | |
| Paul Valteau, Executive V.P. | |
| Robert Ireland, Secretary | Robert Ireland, Secretary |
| Robert Ireland, Treasurer | Robert Ireland, Treasurer |

Thus, while The Grove was a DBE-controlled and -managed firm before Ms. Dukler acquired

ownership and control, the resignations of Mr. Cowell and Mr. Dukler made it even more of a

DBE-controlled and -managed firm after Ms. Dukler acquired ownership and control.

### III.  MS. DUKLER'S OWNERSHIP IS REAL AND SUBSTANTIAL.

Section A of the Denial questions whether Ms. Dukler's ownership is real and

substantial.  In determining ownership, the DOT requires that the OMWBE consider "all the

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00853

FROM                                    (FRI)12.16'05 16:5   (.16:56/N) 4862319029 P   6

Certification Committee
December 16, 2005
Page 5

facts in the record, viewed as a whole." § 26.69(a). In this case, the facts "viewed as a whole,"

clearly show that Ms. Dukler's ownership of The Grove is real and substantial, both in terms of

her capital contribution and her expertise.

The Denial acknowledges that it was acceptable for Ms. Dukler to obtain a loan from

Mr. Cowell in order to purchase the 51% ownership of The Grove. The only concern expressed

is that:

> the funds paid to Star Foods, LLC came from a joint checking
> account with an ineligible spouse who has a history of involvement
> with the firm as both an officer and a director, as a current owner,
> officer and director of Star Foods, LLC and works in the same or
> similar industry. As such, Ms. Dukler's ownership of the firm is
> not real and substantial. Denial at 2. (Emphasis added).

RECEIVED

DEC 1 6 2005

OMWBE

The Denial's assertion has two components: (1) the joint account and (2) the prior

involvement of Ms. Dukler's spouse with the firm.

**A.     Joint Account.**

The record shows that Ms. Dukler borrowed $2,600,000 from Mr. Cowell on February 5,

2004. The funds went into an account that also included her husband. Ms. Dukler's acquisition

of the controlling block of the Company's stock closed the very next day. Specifically, Ms.

Dukler purchased the stock for $2,600,000 on the very next day, February 6, 2004, using the

same account into which she had deposited the $2,600,000 loan proceeds. The fact that the

borrowed funds went into and came out of a "joint" account does not obscure the fact that Ms.

Dukler used the same borrowed funds to acquire the stock. While the use of a joint account in

other cases may make it difficult to confirm that the disadvantaged individual(s) used their own

funds, that is certainly not the situation here. The deposit into the joint account was simply a

matter of convenience. The funds stayed in the account for approximately a day. Accordingly,

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00854

FROM    (FRI)12.16'05 16:5.  .:16:56/№ *862319029 P  7

Certification Committee
December 16, 2005
Page 6

this sequence of events does not support the conclusion that Ms. Dukler's contribution of

$2,600,000 in capital was not real and substantial.

The Denial also ignored the fact that § 26.69(j)(2) of the DOT rules clearly allows the use

of a joint account.

> [Y]ou must not regard a contribution of capital as failing to be real
> or substantial, or find a firm ineligible solely because
>
> . . .
>
> (2) There is a provision for the co-signature of a spouse who is not
> socially and economically disadvantaged individual on financing
> agreements, contracts for the purchase or sale of real or personal
> property, bank signature cards, or other documents. (Emphasis
> added).

RECEIVED
DEC 1 6 2005
OMWBE

Thus, the use of the joint account is acceptable in this case.

Moreover, to the extent that the deposit of the borrowed funds could be deemed to make

the funds jointly owned or marital assets, the DOT regulation provide a specific rule of

interpretation to OMWBE regarding the analysis of business ownership.  §26.69(i)(1) of the

DOT rules provide:

> When marital assets (other than the assets of the business in
> question) held jointly or as community property by both spouses,
> are used to acquire the ownership interest asserted by one spouse,
> you must deem the ownership interest in the firm to have been acquired
> by that spouse with his or her own individual resources, provided that
> the other spouse irrevocably renounces and transfers all rights in the
> ownership interest in the manner sanctioned by the laws of the state in which
> either spouse or the firm is domiciled (Emphasis added).

In accordance with the above cited regulation, contemporaneous with Ms. Dukler's stock

purchase, her spouse executed a written and irrevocable renunciation of any ownership in the

acquired stock in the manner provided by Illinois, the state of the couple's domicile.  A copy o

the renunciation was included as with the Company's application OMWBE as Attachment

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00855

Certification Committee
December 16, 2005
Page 7

XXXV, "Exclusion of Certain Property from Marital Property". The Denial improperly ignores

the renunciation and the requirements of § 26.69(i).

**B.**    **Ms. Dukler's Expertise Constitutes a Real and Substantial Contribution
Notwithstanding Martin Dukler's Experience.**

The Denial refers to Martin Dukler's role as an officer and director of The Grove and his

role at Star Foods and uses this as a basis for determining that "Ms. Dukler's ownership of the

firm is not real and substantial." The Denial's analysis violates the DOT rules and is contrary to

the facts in the record.

RECEIVED

DEC 1 6 2005

OMWBE

      **1.**    **Martin Dukler's Prior Experience Is Not Relevant to Ms. Dukler's
Contribution.**

The Denial refers to Martin Dukler's "history of involvement with the firm as both an

officer and a director", Denial at 2 and suggests that he continues to be involved with its

management and operations. It should be noted that Mr. Dukler served in a managerial post on a

temporary, uncompensated basis and at the request of Ms. Menutis, The Grove's President, due

to a prolonged illness that she experienced. In any event, contemporaneous with Ms. Dukler's

stock purchase Martin Dukler relinquished any management role in the Company and also

resigned his position as a Company director. These actions were done in February 2004, almost

two years ago. This reliance on past circumstances is prohibited by the DOT's regulations,

which clearly state:

> You must evaluate the eligibility of a firm on the basis of present
> circumstances. § 26.73(b) (emphasis added).

The Denial's analysis also does not comply with the DOT's rule under § 26.69 for

determining whether the contribution of capital or expertise is real and substantial. Section

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00856

FROM                              (FRI)12.16'05 16:59    .16:56/N?.#862519029 P  9

Certification Committee
December 16, 2005
Page 8

26.69(e) focuses <u>only</u> on the expertise of the socially and economically disadvantaged owner, <u>not</u>

third parties.  Section 26.69(f) states:

> The following requirements apply to situations in which expertise
> is relied upon as part of a <u>disadvantaged owner's</u> contribution to
> acquire ownership.  (Emphasis added)

RECEIVED

DEC 1 6 2005

OMWBE

Also, Martin Dukler <u>does not</u> personally own any Grove stock.  He has a mere 20%

ownership interest in another company, Star Foods, which, in turn, is a minority shareholder of

The Grove's stock.[1]  Martin Dukler's prior involvement in The Grove has no effect on Ms.

Dukler's present ownership of 51% of the Company's stock and does not negate the fact that Ms.

Dukler is the President, CEO, and the sole director.  Moreover, as demonstrated above, Ms.

Dukler paid $2.6 million for the stock and, as discussed below, she has the requisite background,

knowledge and experience to manage the Company.

While the Denial appears to focus on Martin Dukler, the DOT regulations do not prohibit

a spouse's prior or present involvement in a company.  In fact, § 26.71(k) explicitly allows a

spouse to participate as a manager, employee or owner.  Nonetheless, Martin Dukler <u>presently</u>

holds no position with The Grove and has no direct ownership.

The Denial also suggests that Martin Dukler's involvement in the "same or similar

industry" is a concern.  This statement is factually incorrect.  The Grove is involved in the highly

specialized area of retail food stores at airports.  Star Foods is an investment company and does

not have retail stores and does not operate in airports.[2]  Accordingly, under the DOT rules the

information regarding Martin Dukler's prior involvement in the Company (or for that matter as a

---

[1] Exhibit 1; Application, Section 3B.
[2] Exhibit 1; Application, Section 2D.

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

FROM                                             (FRI)12. 16' 05 16:5{    :16:56/N° 4862319029 P 10

Certification Committee
December 16, 2005
Page 9

passive role as an investor in the Company's minority shareholder) is not a justification for

denigrating Ms. Dukler's expertise or for denying the Company certification.

RECEIVED
DEC 1 6 2005
OMWBE

### 2.  Michelle Dukler Has The Necessary Expertise.

As set forth in Section VI, below, "all the facts in the record, viewed as a whole "

establish that Ms. Dukler's expertise is real and substantial.  The Denial erred in not considering

these facts in the record.

## IV. MS. DUKLER MEETS THE PERSONAL NET WORTH REQUIREMENTS.

The Denial may have misunderstood Ms. Dukler's Personal Net Worth Statement.  In

reading Section B of the Denial, it is difficult to determine precisely what concerns the OMWBE

has.  One concern appears to involve the nature of Ms. Dukler's August 2004 loan and this is

addressed below.  If, however, the OMWBE has other questions or concerns, we request a

clarification of them and an opportunity to provide a response.

Section B of the Denial mistakenly determined that Ms. Dukler's August 2004 loan from

Fifth Third Bank is a "contingent liability" and apparently disregarded this amount as a liability.

In August 2004, Ms. Dukler borrowed $2,600,000 from Fifth Third Bank and used these funds to

pay the previous $2,600,000 loan from Mr. Cowell.  The loan documentation is entitled

"Consumer Note" and is signed by Ms. Dukler as the "Borrower."  The Consumer Note states:

> On or before August 19, 2006 . . . Michelle Aimee Dukler . . .
> promises to pay . . . Fifth Third Bank . . . $2,600,000, plus interest
> . . . less amounts as shall have been repaid.  Note, ¶ 1.[3]

---

[3] Exhibit 2; Application, Attachment XXXIV.

Preston|Gates|Ellis a
Reuvelas|Meeds ω

FROM                                    (FRI) 12. 16' 05 17:00    . 16:56/NO. 4862319029 P 11

Certification Committee
December 16, 2005
Page 10

This is a direct liability of Ms. Dukler. She is personally obligated to pay $2,600,000 to the bank. This is not a contingent liability and the Denial is simply mistaken in characterizing it as such.

Section B of the Denial also states that Ms. Dukler did not list any payments made on the loan. Since the Consumer Note is clearly a "liability" rather than a "contingent liability," a list of payments was not considered necessary. Attached as Exhibit 3 is a list of such payments that Ms. Dukler has made to Fifth Third Bank from her personal bank account..

RECEIVED
DEC 1 6 2005
OMWBE

## V. MS. DUKLER CONTROLS THE GROVE NOTWITHSTANDING THE QUORUM PROVISION OF THE BY-LAWS.

Section C of the Denial incorrectly asserts that "Ms. Dukler does not control the operations of the firm as required by regulations." Denial at 3. The assertion is based only on a by-law provision that a quorum for a shareholder meeting is 60%. Once again, we note that the DOT regulations require that OMWBE consider "all the facts in the record, viewed as a whole." § 26.71(a). The Denial did not comply with this requirement.

**A.    Michelle Dukler's Control as the Majority Shareholder.**

On July 20, 2001, an amendment was adopted to change the by-law provision regarding a quorum for shareholder meetings. The quorum was reduced from 100% of the shareholders to 60%.[4] For the following reasons, the 60% quorum has no practical effect on Ms. Dukler's control of The Grove.

Article XI of the By-laws states:

---

[4] The Denial mistakenly asserts that the supermajority was put in place after Star Foods purchased its interest in 1999. In fact, the original by-laws in 1981 had a quorum of 100% of the shares. The change in 2001 reduced this to 60%.

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00859

FROM

(FRI) 12. 16' 05 17:00    .16:56/№ 4862319029 P 12

Certification Committee
December 16, 2005
Page 11

These by-laws may be altered, amended or repealed and new by-
laws may be adopted by a vote of a stockholders representing a
majority of all the shares issued and outstanding at any annual
stockholders' meeting or at any special stockholders' meeting
when the proposed amendment has been set out in the notice of
such meeting.  (Emphasis added).

RECEIVED
DEC 1 6 2005
OMWBE

While the by-law provision refers to a majority vote at a stockholders' meeting, the

Denial failed to consider Article V of the Restated Articles of Incorporation, which states:

Whenever the affirmative vote of the shareholders at a meeting is
required to authorize or constitute corporate action under any
provision of the Business Corporation Law or the Articles of
Incorporation or By-Laws of the Corporation, any such action may
be authorized or constituted by a consent in writing, without a
meeting, signed by the shareholders having at least that proportion
of voting power which would be necessary under any such
provision to authorize or constitute the action by the affirmative
vote at a meeting; provided, that nay [sic] such written consent
shall be filed with the record of proceedings of the shareholders;
and provided, further, that prompt notice shall be given to all of the
shareholders having voting power on the question, other than those
who signed the consent, of the action taken pursuant to such
written consent.  (Emphasis added).[5]

Article V thus gives Ms. Dukler the power, as majority shareholder, to change the by-laws

through a "consent in writing, without a meeting."  Since she has the power to take any

shareholder action through a written consent, she can simply amend Article II.7 of the by-laws to

eliminate the 60% quorum rule should that provision restrict her ability to operate The Grove.

Consequently, the Denial erred in using the quorum provision as a basis for determining that Ms.

Dukler does not control The Grove.[6]

**B.    Michelle Dukler Controls The Grove, as Chairperson, Sole Director and President.**

In relying solely on the quorum provision, the Denial also violates the DOT requirement

to "consider all the facts in the record, viewed as a whole." § 26.71(a).  As shown below, all the

---

[5] Exhibit 4; Application, Attachment XXII.

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00860

FROM    (FRI)12.16'05 17:00    .16:56/NO 4862319029 P 13

Certification Committee
December 16, 2005
Page 12

RECEIVED
DEC 1 6 2005
OMWBE

facts viewed as a whole establish that Ms. Dukler does control the operations of the firm as required by DOT regulations.

Ms. Dukler is the Chair and sole member of the Board of Directors. Article IV.1 of the by-laws states:

> The business affairs of the corporation shall be managed by its board of directors. The directors ... may adopt such rules and regulations for ... the management of the corporation, as they may deem proper.... (Emphasis added).[7]

As Chair and sole Director, Ms. Dukler manages "the business affairs" of The Grove.

Ms. Dukler is the President of The Grove. Article IV.5 of the by-laws states:

> The president ... shall in general supervise and control all of the business affairs of the corporation. ... He may sign ... certificates of shares of the corporation, any deeds, mortgages bonds, contracts or other instruments which the directors have authorized to be executed ...[8]

As President of The Grove, Ms. Dukler supervises and controls all of the business affairs of The Grove.

## VI. THE GROVE IS AN INDEPENDENT BUSINESS.

**A.    The Denial Mistakenly Determined That The Grove Is Not an Independent Business.**

Section D of the Denial states:

> Based on the previous and current relationships between the firm and Star Foods, LLC, the firm is not an independent business as required by regulation. Denial at 3 (Emphasis added).

As noted above, the reliance on "previous" relationships is prohibited by the DOT's regulations, which state:

---

[6] Even though the current quorum requirement does not restrict Ms. Dukler's control as the majority shareholder, to the extent OWMBE still has concerns on this point, Ms. Dukler is willing to amend the by laws to provide that a quorum is a simple majority.
[7] Application, Attachment XXVI.

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

FROM    (FRI)12.16'05 17:00    16:56/No. 4862319029 P 14

Certification Committee
December 16, 2005
Page 13

RECEIVED
DEC 1 6 2005
OMWBE

> You must evaluate the eligibility of a firm on the basis of _present_ circumstances. § 26.73(b) (Emphasis added).

In this case, Mr. Cowell and Martin Dukler resigned their positions as directors of The Grove almost two years ago. These "previous" relationships are not relevant to the "present" circumstances and the Denial mistakenly considered these as factors. The only present circumstances cited by the Denial are that Star Foods owns 49 percent of the shares and operates in the "same or similar industry." Denial at 3. The DOT rules clearly permit a 49% ownership share by third parties. § 26.69(b). In this case, Ms. Dukler has the requisite 51% share and thus complies with the DOT's requirements. The DOT rule does not prohibit a shareholder of a DBE from being in the same or similar industry and, in any case, The Grove and Star Foods are different business entities. The Grove is a company engaged in direct operations. The Company operates highly specialized retail food stores at airports. By contrast, Star Foods is an investment company that makes investments in operating firms. Star Foods does not operate retail food stores at airports or other locations.[9]

**B.    The Grove Meets the DOT Criteria for an Independent Business.**

Sections D, E and F of the Denial contain allegations that The Grove is improperly dependent on Star Foods. The assertion is based on unsubstantiated allegations, not "facts in the record." As shown below, a detailed review of the specific regulations under § 26.71 for determining whether a firm is independent shows that the Denial did not comply with the DOT's rules.

Pursuant to § 26.71(b),

---

[8] Application, Attachment XXVI.
[9] Exhibit 1: Application, § 2D.

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

FROM

(FRI) 12. 16' 05 17:0    T. 16:56/No. 6962319029 P 15

Certification Committee
December 16, 2005
Page 14

RECEIVED

DEC 1 6 2005

OMWBE

> An independent business is one the viability of which does not depend on its relationship with another firm or firms. (Emphasis added).

The Denial does not provide any factual evidence that the Grove "depends" on Star Foods. The DOT's regulations provide several factors to consider in showing that a firm is independent. When, as the DOT rules require, consideration is given to "all the facts in the record, viewed as a whole," it is clear that The Grove is independent. § 26.71(a).

### 1. § 26.71(b)(1).

Section 26.71(b)(1) lists several factors for determining whether a firm is independent. The Grove satisfies each one and the Denial provides no facts to the contrary.

- Personnel. The Grove and Star Foods do not have common personnel.
- Facilities. The Grove and Star Foods do not have common facilities.
- Equipment. The Grove and Star Foods do not have common equipment.
- Financial and/or Banking Support. Except for its minority stock ownership, which is permitted, Star Foods does not provide financial or banking support to The Grove.[10]

### 2. § 26.71(b)(2).

Under § 26.71(b)(2), consideration may be given to:

> whether present or recent employer/employee relationships between the disadvantaged owner(s) of [The Grove] and non-DBE firms or persons associated with the non-DBE firms compromise the independence of [The Grove]. Section 26.71(b)(2).

There are no facts in the record that any relationships "compromise the independence of" The Grove. As noted above, it has been almost two years since Mr. Cowell and Martin Dukler resigned their positions at The Grove. Accordingly, these are not "present or recent" relationships.

---

[10] Exhibit 1; Application, § 2C (Sublease with Itrocs, Inc., not Star Foods); Application §§ 4B and 4C.

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00863

Certification Committee
December 16, 2005
Page 15

Ms. Dukler works independently as the President and CEO and Board Chair in managing

the day-to-day operations of the Company, including (as further discussed below) negotiating

leases and supply contracts, arranging financing, setting budgets and strategic plans and hiring

key employees. The Denial cites no evidence to the contrary.

### 3. § 26.71(b)(3).

Section 26.71(b)(3) requires consideration of relationships with prime contractors and

whether there is a pattern of exclusive dealings that compromise independence. There are no

facts in the record that show such a pattern. To the contrary, The Grove's prime contracts are

with various entities involved in leasing space in airports, not with Star Foods.[11]

### 4. § 26.71(b)(4).

Section 26.71(b)(4) requires consideration of:

> the consistency of relationships between [The Grove] and non-
> DBE firms with normal industry practice.

There are no facts in the record pertinent to the Company's application that show any

relationship between The Grove and Star Foods is anything other than that of a company and an

investor. In that regard, there are no facts that show a relationship that is inconsistent with

"normal industry practice." To the contrary, the fact that a non-disadvantaged person or firm has

a minority ownership position in an airport concessions company is certainly not unusual or

inconsistent with "normal industry practice" in the airport concessions industry—such minority

ownership is explicitly permitted by DOT regulations.

### 5. § 26.71(c).

Section 26.71(c) requires that the firm:

RECEIVED
DEC 16 2005
OMWBE

---

[11] Exhibit 1; Application, §§ 4I, 4J.

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

Certification Committee
December 16, 2005
Page 16

> not be subject to any formal or informal restrictions which limit the
> customary discretion of the socially and economically
> disadvantaged individual.

There are no facts in the record that show any such restrictions. As shown above, the by-law

provision regarding a 60% quorum can be amended by Ms. Dukler through a simple written

consent.

**RECEIVED**
**DEC 1 6 2005**
**OMWBE**

### 6. § 26.71(d).

Ms. Dukler meets the requirements of § 26.71(d). As the CEO, the Board Chair and sole

board member, she directs the management of The Grove and makes day-to-day decisions.[12]

There are no facts in the record to the contrary and supposition and assertion are not fair to Ms.

Dukler nor do they provide a reasonable basis to draw a contrary conclusion.

### 7. § 26.71(e).

Under Section 26.71(e), the DOT specifically allows non-disadvantaged individuals to be

involved in a firm, provided they do not control the firm or are disproportionately responsible for

its operation. In this case, Ms. Dukler, the CEO, Chair of the Board, and majority shareholder,

controls The Grove. Even though § 26.71(e) would allow it, Mr. Cowell and Martin Dukler are

not officers or directors. Moreover, since the 49% share is held by Star Foods, Mr. Cowell and

Martin Dukler are not even direct shareholders. There are no facts in the record to show that Mr.

Cowell or Martin Dukler control the firm or are responsible for its operation.

### 8. § 26.71(f).

Section 26.71(f) allows Ms. Dukler to delegate certain responsibilities. Yet, there are no

facts in the record showing that any responsibilities have been delegated to an individual that is

not a Company employee—and there are no facts in the record supporting or showing Mr.

FROM                                          (FRI)12. 16' 05 17:    ST. 16:56/No. 4862319029 P 18

Certification Committee
December 16, 2005
Page 17

Cowell, Martin Dukler or anyone at Star Foods have been given or have assumed any

management responsibility. To the contrary, the facts in the record establish that Ms. Dukler,

President and CEO, runs the day-to-day management.[13]

**RECEIVED**
**DEC 1 6 2005**
**OMWBE**

   9.   § 26.71(g).

   Section 26.71(g) requires that the owner's experience and competence be related to the

business of the firm. Ms. Dukler's resume clearly establishes her qualifications, consisting of

her 21 years of experience in retail operations, her 11 years of owning and managing her own

companies, her two years experience in management positions at The Grove prior to acquiring

ownership, and running The Company for almost two years.

   As her resume shows,[14] Ms. Dukler worked with two retail firms during an eight-year

span from 1981 to 1988, and for eleven years, 1989 to 1999, as the President and owner of a

manufacturing company that sold products to individual customers and on a wholesale and retail

basis. Ms. Dukler also owned a related retail company. In 1998, Ms. Dukler's business

expertise and capabilities were recognized by the Milwaukee Business Journal, which named her

one of the top business and community leaders under the age of 40 in the region. These are facts

in the record. Yet, the Denial ignored this substantial management experience and also ignored

Ms. Dukler's direct experience at The Grove.

   Ms. Dukler began working with The Grove in 2000 and served as Director of Marketing

for two and a half years. In this position, Ms. Dukler developed "new products, vendor

---

[12] Exhibit 1; Application, § 4B.
[13] Exhibit 1; Application, § 4B; Exhibit 4, Application, Attachment V (Ms. Dukler's Resume).
[14] Exhibit 5; Application, Attachment V.

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

Certification Committee
December 16, 2005
Page 18

relationships, in-store merchandising and graphics, standards for new store design and new store

openings and addressed issues related to product quality, costs and packaging."[15]

For the past 22 months, Ms. Dukler has served as President, Director, and Chairperson of

The Grove. As the facts in the record show, she works 45 to 65 hours per week managing the

Company and has personally:

RECEIVED
DEC 1 6 2005
OMWBE

- Negotiated and signed leases for new retail spaces at 11 airports.

- Negotiated and signed a Subway franchise agreement for retail space in Newark.

- Negotiated and signed Smoothie King franchise agreement for spaces in Seattle and Dallas.

- Interviewed and hired Managers for Seattle, Newark, Salt Lake City, Dallas, Cincinnati, and Atlanta.

- Completed performance reviews of HQ accounting, technology support and marketing staff.

- Evaluated all senior staff yearly performance reviews.

- Renegotiated The Grove's health and life insurance policies.

- Negotiated The Grove's line of credit.

- Reviewed and approved the outside auditor's annual audit of The Grove, Inc.

- Reviewed and approved proposals for locations at 13 airports.

- Reviewed and approved all capital spending on all store build-outs that are in process.

- Participated in providing strategic direction to the participants in Grove University, and organized a managers meeting in 2004 and 2005.

- Reviews all payroll checks and all corporate checks cut and signs all checks over $50,000.

---

[15] Exhibit 1; Application, Attachment V.

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00867

FROM    (FRI)12. 16' 05 17. ST. 16:56/№ 4862319029 P 20

Certification Committee
December 16, 2005
Page 19

These facts in the record establish that Ms. Dukler has the "management and technical competence and experience" to run The Grove. The Denial ignored these facts and cites no facts to the contrary. Moreover, the assertion on this matter contained in the Denial runs counter to experience of those who regularly do business with Ms. Dukler. For example, Ms. Dukler's management control and expertise is confirmed by the attached letters included as Exhibits 6 and 7 from the Arnold L. Mayersohn, Associate General Counsel of Westfield Management, Inc. ("Westfield") and from James DeCock, the manager of Commercial and Business Development at the Kenton County Airport Board (Cincinnati/Northern Kentucky International Airport). The letter from Westfield, the concessions developer at airports such as Orlando, Houston Intercontinental, New York's Kennedy and Newark, is quite telling. Mr. Mayersohn writes:

> Since February 2004, Michelle Dukler has been the only member of the Dukler family I have had contact with at The Grove. Mrs. Dukler has been personally involved in lease/sublease negotiations and has been the decision-maker in all material matters regarding the legal documents between our two companies since her purchase of The Grove . . . From my dealings with Mrs. Dukler, she has had the final authority in any legal documentation issues I have had with The Grove since her purchase in February 2004 along with the ability and expertise to do so . . . it is apparent that Mrs. Dukler is responsible for all aspects of the business conducted by The Grove (Emphasis added).

**10. § 26.71(i).**

Under § 26.71(i), the DOT would allow individuals at The Grove to receive greater compensation than Ms. Dukler. Yet, The Grove has not taken this step.

**11. § 26.71(j).**

The DOT prohibits an individual from engaging in outside employment that prevents sufficient time being spent on the firm. Given that Ms. Dukler spends 45 to 65 hours a week

RECEIVED
DEC 1 6 2005
OMWBE

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00868

Certification Committee
December 16, 2005
Page 20

running The Grove, there is clear compliance with this requirement. This fact is in the record,[16] but the Denial does not mention it.

### 12. § 26.71(k).

The DOT explicitly allows an immediate family member to:

> participate in the firm as manager, employee, owner or in another capacity.

RECEIVED
DEC 1 6 2005
OMWBE

The Denial raises unsubstantiated concerns about Martin Dukler's role. Nonetheless, the DOT regulation would clearly allow him to be a "manager, employee or owner of The Grove." Thus, the Denial's assertions are invalid as a matter of law. Furthermore, the Denial's assertions are invalid as a matter of fact since Martin Dukler is not a manager or employee of The Grove and his only ownership interest is a 20% share of Star Foods, not The Grove.[17]

Section § 26.71(k)(2) states:

> If you cannot determine that the socially and disadvantaged owners – as distinct from the family as a whole – control the firm, then the socially and economically disadvantaged owners have failed to carry the burden of proof concerning control, even though they may participate significantly in the firm's activities.

Section E of the Denial somehow concludes that the "firm operates as a family owned and operated business." Yet, the foregoing analysis shows that where consideration is properly given to "all the facts in the record, viewed as whole," Ms. Dukler meets the requirements of the provisions of § 26.71 and clearly controls The Grove. The mere minority ownership by Star Foods (which is allowed) and Mr. Dukler's previous position dating back two years ago (which is not relevant) are not sufficient to overcome the vast amount of evidence, i.e., "all the facts in the record, viewed as a whole." The Grove is not a "family owned business" in any legal or

---

[16] Exhibit 5; Application Attachment V.
[17] Exhibit 1; Application, § 3 B.

Certification Committee
December 16, 2005
Page 21

common sense understanding of this concept. The Company it is a corporation with both

individual and entity stockholders. No other Dukler family member is a direct shareholder and

there are no other family members of Ms. Dukler involved in the business.

In summary, the record shows that The Grove is clearly independent and is not reliant on

its minority shareholder (Star Foods), Mr. Cowell or Martin Dukler.

RECEIVED
DEC 1 6 2005
OMWBE

## VII.  THE GROVE AND STAR FOODS ARE NOT AFFILIATES

Section F of the Denial alleges that The Grove and Star Foods are affiliates. The

definition in the DOT rules provide that affiliation is found when there is common ownership,

common management and contractual relationships that demonstrate that one concern controls or

has the power to control the other (or a third party has the power to control both). In this case,

there is no common or cross ownership between the Company and any other firm. The Grove

does not have common management with any other firm nor is it a party to any contact that gives

control directly or indirectly to another company. The Denial cites no facts in the record and no

specific regulation to support this allegation. To the contrary, the facts in the record, as

discussed in Section VI, above, show that The Grove is an independent firm and is not an

affiliate of its minority shareholder (Star Foods) or of any other company.

FROM                                          (FRI)12. 16'05 17:   ST. 16:56/NO.4862319029 P 23

Certification Committee
December 16, 2005
Page 22

## VIII.  CONCLUSION

The facts in the record establish that Ms. Dukler owns and controls The Grove and that

The Grove meets the DOT's stated DBE requirements.  The Denial is based on misinformation

(or pertinent information that has been ignored) and unsubstantiated suppositions rather than "all

facts in the record, taken as a whole."  Based on the foregoing, we respectfully request that the

OMWBE grant The Grove's application for certification as a DBE.

Sincerely,

William A. Kirk
Counsel for
The Grove, Inc.

RECEIVED
DEC 1 6 2005
OMWBE

WAK/ylj

cc:   Vicky Schianterelli (By Federal Express and Fax)
      Michelle Dukler
      Richard J. Leidl, Esq.

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00871

FROM                              (FRI) 12. 16' 05 17:    ST. 16:56/NO. 4862319029 P 24

## List of Exhibits

1. The Grove's Uniform Certification Application (Aug. 26, 2005).
2. Ms. Dukler's Consumer Note with Fifth Third Bank.
3. List of Ms. Dukler's Payments to Fifth Third Bank.
4. Restated Articles of Incorporation of Natural Energy Unlimited Inc. (presently known as The Grove).
5. Resume of Michelle Dukler.
6. Letter from Westfield Management Inc.
7. Letter from the Kenton County Airport Board (Cincinnati/Northern Kentucky International Airport).

RECEIVED
DEC 1 6 2005
OMWBE

Preston|Gates|Ellis &
Rouvelas|Meeds LLP

00873




RECEIVED
DEC 1 9 2005
OMWBE



**WASHINGTON STATE**
**OFFICE OF MINORITY & WOMEN'S BUSINESS ENTERPRISES**

# FEDERAL APPLICATION ONLY
(green packet)

Congratulations on your choice to apply for certification with our office. Listed below are the different designations you can apply for. If you are unsure of the designation you want to apply for, please refer to the definitions on Page 2 of this application.

1. **This firm is applying for federal certification as a (check one):**

   ✓ **DBE** Disadvantaged Business Enterprise (Please complete all sections of the DBE 49 C.F.R. Part 26 Uniform Certification Application)

   ____ **DBE-FAA** Disadvantaged Business Enterprise for Concessionaires located at airports (Please complete all sections of the DBE 49 C.F.R. Part 26 Uniform Certification Application except the PERSONAL FINANCIAL STATEMENT)

If you checked any designation under 1., please complete all sections of the DBE 49 C.F.R. Part 26 Uniform Certification Application identified above and provide us with all documents requested on Pages 16 and 17 of this application.

2. ____ **EPA** Non-Profit Registration (Please complete the QwikChek available online at www.omwbe.wa.gov)

3. ____ **SEDBE** Socially and Economically Disadvantaged Business Enterprise (The SEDBE Personal Net Worth Statement and SEDBE Supplemental Form must also be completed with supporting documentation)

Please mail the completed application with supporting documentation and non-refundable processing fee to:

**OMWBE**
**406 South Water Street**
**P.O. Box 41160**
**Olympia, WA 98504-1160**

If you have any questions or need assistance in completing the application packet, please call (360) 753-9693 or 1-866-208-1064.

A **NONREFUNDABLE** processing fee, payable to OMWBE, must be received in order to process any application package. (See attached fee schedule)

1

*ATTACHMENT I*

00874





RECEIVED
DEC 1 9 2005
OMWBE



**WASHINGTON STATE**
**OFFICE OF MINORITY & WOMEN'S BUSINESS ENTERPRISES**

## CUSTOMER SURVEY

For OMWBE to better serve you, please complete the following optional survey. The information you provide will assist OMWBE in identifying specific business development, financing, bonding and other training opportunities for your firm.

1. Has the business ever applied for a Linked Deposit Loan?   Yes _____   No ✓_____
   If Yes, Name and Branch of bank at which you made application(s) _____
   Date (s) of application _____
   Status of application(s) _____
   Loan amount(s) $ _____   Interest rate charged _____ %

2. Is your business registered with the Washington State General Administration's Office of State Procurement Vendor Registration?
   Yes _____   No ✓_____   If No, would you like to be?   Yes ✓_____   No _____

3. Contract size firm is capable of performing: *We are airport concessionaires*
   ___ Up to $10,000   ___ Up to $50,000   ___ Up to $100,000   ___ Up to $500,000   ___ More than $500,000

4. Identify which government jurisdictions with which you intend to do business:  (Check all that apply)
   ___ School districts                              ✓ King County/METRO            ___ City of Seattle
   ___ State agencies & educational institutions     ___ Spokane County             ___ City of Spokane
   ✓ Sound Transit                                   ___ Pierce County              ___ City of Tacoma
   ✓ Port of Seattle                                 ___ Yakima County              ___ City of Yakima
   ___ Port of Tacoma                                ___ Other(s) (Be Specific) *Seattle-Tacoma Airport*

5. Geographical area where the firm wants to do business in Washington:
   ___ State-wide                       ___ Only in Eastern Washington
   ✓ Only in Western Washington         ___ Only in Central Washington

6. From whom did you learn about the state M/WBE and/or federal DBE programs?  (Check all that apply)
   ___ State agency                     ___ Community organization      ___ Attended conference
   ✓ Other government entity            ___ Another business            ___ Other
   ___ Bank
   ___ For each checked item, please provide the name of the entity ___ *USDOT* ___

7. Identify which of the following business development, marketing or other training/technical assistance you would like to receive if your business is certified:  (Check all that apply)
   ___ Bidding/Estimating               ___ Construction Plan Review    ___ Financial Management
   ___ Blueprint Reading/Take-offs      ___ Contract Administration     ___ Loan Application
   ___ Bonding/Insurance Application     ___ Doing Business with         ___ Office Management
   ___ Business Plan                         State/Federal Agencies

*ATTACHMENT II*

00875



DISADVANTAGED BUSINESS ENTERPRISE PROGRAM
**49 C.F.R. PART 26**

Exhibit 

SEA

# UNIFORM CERTIFICATION APPLICATION

RECEIVED
DEC 1 9 2005
OMWBE

## ROADMAP FOR APPLICANTS

1.  **Should I apply?**
    o   Is your firm at least 51%-owned by a socially and economically disadvantaged individual(s) who also controls the firm?
    o   Is the disadvantaged owner a U.S. citizen or lawfully admitted permanent resident of the U.S.?
    o   Is your firm a small business that meets the Small Business Administration's (SBA's) size standard and does not exceed $17.42 million in gross annual receipts?
    o   Is your firm organized as a for-profit business?

    ⇒   If you answered "Yes" to all of the questions above, you may be eligible to participate in the U.S. DOT DBE program.

2.  **Is there an easier way to apply?**
    If you are currently certified by the SBA as an 8(a) and/or SDB firm, you may be eligible for a streamlined certification application process. Under this process, the certifying agency to which you are applying will accept your current SBA application package in lieu of requiring you to fill out and submit this form. **NOTE: You must still meet the requirements for the DBE program, including undergoing an on-site review.**

3.  Be sure to attach all of the required documents listed in the <u>Documents Check List</u> at the end of this form with your completed application.

4.  **Where can I find more information?**
    o   U.S. DOT – http://osdbuweb.dot.gov/business/dbe/index.html (this site provides useful links to the rules and regulations governing the DBE program, questions and answers, and other pertinent information)
    o   SBA – http://www.ntis.gov/naics (provides a listing of NAICS codes) and http://www.sba.gov/size/indextableofsize.html (provides a listing of SIC codes)
    o   49 CFR Part 26 (the rules and regulations governing the DBE program)

Under Sec. 26.107 of 49 CFR Part 26, dated February 2, 1999, if at any time, the Department or a recipient has reason to believe that any person or firm has willfully and knowingly provided incorrect information or made false statements, the Department may initiate suspension or debarment proceedings against the person or firm under 49 CFR Part 29, take enforcement action under 49 CFR Part 31, Program Fraud and Civil Remedies, and/or refer the matter to the Department of Justice for criminal prosecution under 18 U.S.C. 1001, which prohibits false statements in Federal programs.

*ATTACHMENT III*

00876

 

RECEIVED
DEC 1 9 2005
OMWBE

## Section 1: CERTIFICATION INFORMATION

**A.    Prior/Other Certifications**

| Is your firm currently certified for any of the following programs? *(If Yes, check appropriate box(es))* | ☒ DBE | Name of certifying agency: *City of Chicago* |
|---|---|---|
| | | Has your firm's state UCP conducted an on-site visit? *5/18/04* |
| | | ☒ Yes, on *7/15/04* State: *IL*    ☐ No |
| | ☐ 8(a) | ⊛ STOP! If you checked either the 8(a) or SDB box, you may not have to complete this application. Ask your state UCP about the streamlined application process under the SBA-DOT MOU. |
| | ☐ SDB | |

**B.    Prior/Other Applications and Privileges**

Has your firm (under any name) or any of its owners, Board of Directors, officers or management personnel, ever withdrawn an application for any of the programs listed above, or ever been denied certification, decertified, or debarred or suspended or otherwise had bidding privileges denied or restricted by any state or local agency, or Federal entity?

☒ Yes, on *8/13/04* ☐ No

If Yes, identify State and name of state, local, or Federal agency and explain the nature of the action:

*See Attached Document*

## Section 2: GENERAL INFORMATION

**A.    Contact Information**

| (1) Contact person and Title: *Michelle Dukler President* | (2) Legal name of firm: *The Grove, Inc.* |
|---|---|
| (3) Phone #: *708-531-1694* | (4) Other Phone #: *630-660-8920* | (5) Fax #: *708-531-0619* |

(6) E-mail: *michelle.dukler@grovesnacks.com* (7) Website *(if have one):* *www.grovesnacks.com*

(8) Street address of firm *(No P.O. Box):*    City:    County/Parish:    State:    Zip:

*3 Westbrook Corporate Center Ste 500 Westchester Cook IL 60154*

(9) Mailing address of firm *(if different):*    City:    County/Parish:    State:    Zip:

*Same as above*

**B.    Business Profile**

| (1) Describe the primary activities of your firm: *Airport Concessionaire* | (2) Federal Tax ID (if any): *72-090 2131* |
|---|---|

(3) This firm was established on *3/27/81* (4) I/We have owned this firm since: *2/13/2004*

(5) Method of acquisition *(check all that apply):*
☐ Started new business    ☒ Bought existing business    ☐ Inherited business    ☐ Secured concession
☐ Merger or consolidation    ☐ Other *(explain)*

| (6) Is your firm "for profit"? ☒ Yes ☐ No | ⊛ STOP! If your firm is NOT for-profit, then you do NOT qualify for this program and do NOT need to fill out this application. |
|---|---|

9




RECEIVED
DEC 1 9 2005
OMWBE

(7) Type of firm *(check all that apply):*
- ☐ Sole Proprietorship
- ☐ Partnership
- ☒ Corporation
- ☐ Limited Liability Partnership
- ☐ Limited Liability Corporation
- ☐ Joint Venture
- ☐ Other, Describe:

(8) Has your firm ever existed under different ownership, a different type of ownership, or a different name?
☒ Yes ☐ No
If Yes, explain: *I purchased this firm in February 2004 from previous owners. See documentation included in this application.*

(9) Number of employees: Full-time _189_   Part-time _179_   Total _368_

(10) Specify the gross receipts of the firm for the last 3 years: Year _2004_ Total receipts $ _19,307,516_
Year _2003_ Total receipts $ _16,187,174_
Year _2002_ Total receipts $ _13,676,079_

## C.   Relationships with Other Businesses

(1) Is your firm co-located at any of its business locations, or does it share a telephone number, P.O. Box, office space, yard, warehouse, facilities, equipment, or office staff, with any other business, organization, or entity?
☒ Yes ☐ No

If Yes, identify: Other Firm's name: *ITracs, Inc.*
Explain nature of shared facilities: *We sublease office space in our corporate office suite to ITracs Inc.*

| (2) At present, or at any time in the past, has your firm: | (a) been a subsidiary of any other firm? | ☐ Yes ☒ No |
| | (b) consisted of a partnership in which one or more of the partners are other firms? | ☐ Yes ☒ No |
| | (c) owned any percentage of any other firm? | ☒ Yes ☐ No |
| | (d) had any subsidiaries? | ☐ Yes ☒ No |
| (3) Has any other firm had an ownership interest in your firm at present or at any time in the past? | | ☒ Yes ☐ No |

(4) If you answered "Yes" to any of the questions in (2)(a)-(d) and/or (3), identify the following for each *(attach extra sheets, if needed)*:

| | Name | Address | Type of Business |
|---|---|---|---|
| 1. | (2c) NEU of Chicago O'Hare | O'Hare Airport Terminal 1, Concourse B | Chgo IL Concessions |
| 2. | (3) Star Foods, LLC | 676 N. Michigan Ave Chgo IL | Investment |
| 3. | | | |

## D.   Immediate Family Member Businesses

Do any of your immediate family members own or manage another company? ☒ Yes ☐ No
If Yes, then list *(attach extra sheets, if needed)*:

| | Name | Relationship | Company | Type of Business | Own or Manage? |
|---|---|---|---|---|---|
| 1. | Martin Dukler | Husband | Star Foods LLC | Investment | One of several investors |
| 2. | Martin Dukler | Husband | Georgia's Grove LLC | Wholesale | Manage |

**Section 3: OWNERSHIP**

10

00878




RECEIVED
DEC 1 9 2005
OMWBE

Identify all individuals or holding companies with any ownership interest in your firm, providing the information requested below (*If more than one owner, attach separate sheets for each additional owner*):

**A.    Background Information**

| (1) Name: Michelle Dukler | (2) Title: President | (3) Home Phone #: 630-920-0977 |
|---|---|---|

| (4) Home Address (*street and number*): 226 Justina St. | City: Hinsdale | State: IL | Zip: 60581 |
|---|---|---|---|

| (5) Gender: ☐ Male ☒ Female | (6) Ethnic group membership (*Check all that apply*): |
|---|---|

| (7) U.S. Citizen: ☒ Yes ☐ No | ☐ Black | ☐ Hispanic | ☐ Native American |
|---|---|---|---|
| (8) Lawfully Admitted Permanent Resident: ☐ Yes ☒ No | ☐ Asian Pacific | ☐ Subcontinent Asian | |
| | ☒ Other (*specify*)  Caucasian | | |

**B.    Ownership Interest**

| (1) Number of years as owner: 1.5 years | (2) Initial investment to acquire ownership interest in firm: | Type | Dollar Value |
|---|---|---|---|
| (3) Percentage owned: 51% | | Cash | $ 2,600,000 |
| (4) Familial relationship to other owners: | | Real Estate | $ |
| Husband owns 20% interest in Star Foods, LLC | | Equipment | $ |
| | | Other | $ |

| (5) Shares of Stock: | Number | Percentage | Class | Date acquired | Method Acquired |
|---|---|---|---|---|---|
| | 37.5 | 51.02% | Com | 2-13-04 | Purchase |

(6) Does this owner perform a management or supervisory function for any other business? ☐ Yes ☒ No
If Yes, identify: Name of Business: _____ Function/Title: _____

(7) Does this owner own or work for any other firm(s) that has a relationship with this firm (*e.g. ownership interest, shared office space, financial investments, equipment, leases, personnel sharing, etc.*)? ☐ Yes ☒ No

If Yes, identify: Name of Business: _____ Function/Title: _____
Nature of Business Relationship: _____

**C.    Disadvantaged Status – NOTE:** Complete this section only for each owner applying for DBE qualification (**i.e.** for each owner claiming to be socially and economically disadvantaged)

(1) What is the Personal Net Worth (PNW) of the owner(s) applying for DBE qualification? (*Use and attach the Personal Financial Statement form at the end of this application; attach additional sheets if more than one owner is applying*)

   See Attached PNW Form          157

(2) Has any trust been created for the benefit of this disadvantaged owner(s)? ☐ Yes ☒ No
If Yes, explain (*attach additional sheets if needed*):

**Section 4: CONTROL**

11

00879




RECEIVED
DEC 1 9 2005
OMWBE

**Identify all individuals or holding companies with any ownership interest in your firm, providing the information requested below** (If more than one owner, attach separate sheets for each additional owner):

**A.    Background Information**

| (1) Name: Star Foods, LLC | (2) Title: | (3) Home Phone #: |
|---|---|---|

(4) Home Address (street and number):      City:      State:      Zip:

676 N. Michigan Ave Ste 3450 Chicago IL    60611

| (5) Gender: ☐ Male ☐ Female x Company | (6) Ethnic group membership (Check all that apply): |
|---|---|

(7) U.S. Citizen: ☐ Yes ☐ No   N/A

☐ Black        ☐ Hispanic        ☐ Native American
☐ Asian Pacific    ☐ Subcontinent Asian
☒ Other (specify)  LLC

(8) Lawfully Admitted Permanent Resident: ☐
Yes ☐ No    N/A

**B.    Ownership Interest**

| (1) Number of years as owner: 5.5 yrs | (2) Initial investment to | Type | Dollar Value |
|---|---|---|---|
| (3) Percentage owned: 49% | acquire ownership interest in firm: | Cash $ 1,320,000 |  |
| (4) Familial relationship to other owners: | | Real Estate $ | |
| Martin Dubler | | Equipment $ | |
| Casey Cowell | | Other $ | |

| (5) Shares of Stock: | Number | Percentage | Class | Date acquired | Method Acquired |
|---|---|---|---|---|---|
| | 35 | 49% | COM | 7/23/1999 | Stock Purchase |

(6) Does this owner perform a management or supervisory function for any other business? ☒ Yes ☐ No
If Yes, identify: Name of Business: Star Foods LLC      Function/Title: Company

(7) Does this owner own or work for any other firm(s) that has a relationship with this firm (e.g. ownership interest, shared office space, financial investments, equipment, leases, personnel sharing, etc.)? ☐ Yes ☒ No

If Yes, identify: Name of Business: _____    Function/Title: _____
Nature of Business Relationship:

**C.    Disadvantaged Status – NOTE: Complete this section only for each owner applying for DBE qualification** (i.e. for each owner claiming to be socially and economically disadvantaged)

(1) What is the Personal Net Worth (PNW) of the owner(s) applying for DBE qualification? (Use and attach the Personal Financial Statement form at the end of this application; attach additional sheets if more than one owner is applying)

N/A

(2) Has any trust been created for the benefit of this disadvantaged owner(s)? ☐ Yes ☐ No
If Yes, explain (attach additional sheets if needed):

N/A

**Section 4: CONTROL**

11

00880

 

RECEIVED
DEC 1 9 2005
OMWBE

**A.** Identify your firm's Officers & Board of Directors *(if additional space is required, attach a separate sheet):*

| | | Name | Title | Date Appointed | Ethnicity | Gender |
|---|---|---|---|---|---|---|
| (1) Officers of the Company | (a) | Michelle Dukler | President | 2-13-04 | Caucasian | F |
| | (b) | Robert Ireland | CFO | 6-1-00 | Caucasian | M |
| | (c) | | | | | |
| | (d) | | | | | |
| | (e) | | | | | |
| (2) Board of Directors | (a) | Michelle Dukler | President | 2-13-04 | Caucasian | F |
| | (b) | | | | | |
| | (c) | | | | | |
| | (d) | | | | | |
| | (e) | | | | | |

(3) Do any of the persons listed in (1) and/or (2) above perform a management or supervisory function for any other business? ☐ Yes ☒ No
If Yes, identify for each: Person: _____    Title: _____
         Business: _____    Function: _____

(4) Do any of the persons listed (1) and/or (2) above own or work for any other firm(s) that has a relationship with this firm (e.g., ownership interest, shared office space, financial investments, equipment, leases, personnel sharing, etc.)? ☐ Yes ☒ No

If Yes, identify for each: Firm Name: _____    Person: _____
Nature of Business Relationship: _____

**B.** Identify your firm's management personnel who control your firm in the following areas *(if more than two persons, attach a separate sheet):*

| | Name | Title | Ethnicity | Gender |
|---|---|---|---|---|
| (1) Financial Decisions (responsibility for acquisition of lines of credit, surety bonding, supplies, etc.) | a. Michelle Dukler | President | C | F |
| | b. Robert Ireland | CFO | C | M |
| (2) Estimating and bidding | a. Michelle Dukler | President | C | F |
| | b. Paul Loupakos | Sr VP Development | C | M |
| (3) Negotiating and Contract Execution | a. Michelle Dukler | President | C | F |
| | b. Paul Loupakos | Sr VP Development | C | M |
| (4) Hiring/firing of management personnel | a. Michelle Dukler | President | C | F |
| | b. | | C | |
| (5) Field/Production Operations Supervisor | a. Michelle Dukler | President | C | F |
| | b. Regional Mgmt Team | - See Attachment - | | |
| (6) Office management | a. Michelle Dukler | President | C | F |
| | b. Paula Hendrickson | Controller | C | |
| (7) Marketing/Sales | a. Michelle Dukler | President | C | F |
| | b. Tonja Pastorelle | Director Marketing | C | F |
| (8) Purchasing of major equipment | a. Michelle Dukler | President | C | F |
| | b. Paul Loupakos | Sr VP Development | C | M |
| (9) Authorized to Sign Company Checks (for any purpose) | a. Michelle Dukler | President | C | F |
| | b. Robert Ireland | CFO | C | M |
| (10) Authorized to make Financial Transactions | a. Michelle Dukler | President | C | F |
| | b. Robert Ireland | CFO | C | M |

(11) Do any of the persons listed in (1) through (10) above perform a management or supervisory function for any other business? ☐ Yes ☒ No
If Yes, identify for each: Person: _____    Title: _____

12

00881

 

RECEIVED
DEC 1 9 2005
OMWBE

| Business: | Function: |
|---|---|

(12) Do any of the persons listed in (1) through (10) above own or work for any other firm(s) that has a relationship with this firm (e.g., ownership interest, shared office space, financial investments, equipment, leases, personnel sharing, etc.)?
☐ Yes ☒ No

If Yes, identify for each: Firm Name: _____ Person: _____
Nature of Business Relationship:

**C.    Indicate your firm's inventory in the following categories (attach additional sheets if needed):**

**(1)    Equipment**

| Type of Equipment | Make/Model | Current Value | Owned or Leased? |
|---|---|---|---|
| (a) Store Equipment | See Attached | $673,568 | Owned |
| (b) Office Equipment | | $21,972 | Owned (Leased – Copier) |
| (c) Computer Equipment | | $93,627 | Owned |

**(2)    Vehicles**

| Type of Vehicle | Make/Model | Current Value | Owned or Leased? |
|---|---|---|---|
| (a) Van | Ford/2004 | $14,880 | Owned |
| (b) | See Attached | | |
| (c) | | | |

**(3)    Office Space**

| Street Address | Owned or Leased? | Current Value of Property or Lease |
|---|---|---|
| (a) 3 Westbrook Corporate Center | Leased | See attached – $223,633 |
| (b) | | |

**(4)    Storage Space**

| Street Address | Owned or Leased? | Current Value of Property or Lease |
|---|---|---|
| (a) 2000 S. 25th Avenue | Leased | See attached – $23,869 |
| (b) | | |

**D.    Does your firm rely on any other firm for management functions or employee payroll?** ☒ Yes ☐ No

If Yes, explain:
PAYCHEX. For payroll processing

**E.    Financial Information**

(1) Banking Information:

(a) Name of bank: Fifth Third Bank     (b) Phone No: 847 810-5545

(c) Address of bank: 990 S Waukegan Rd   City: Lake Forest  State: IL  Zip: 60045

(2) Bonding Information: If you have bonding capacity, identify:   (a) Binder No: N/A

(b) Name of agent/broker: We use Letters of   (c) Phone No: (   )

(d) Address of agent/broker: Credit   City:   State:   Zip:

13

00882

 

RECEIVED
DEC 1 9 2005
OMWBE

(e) Bonding limit: Aggregate limit $ ___          Project limit $ ___

F.    Identify all sources, amounts, and purposes of money loaned to your firm, including the names of any persons or firms securing the loan, if other than the listed owner:

| Name of Source | Address of Source | Name of Person Securing the Loan | Original Amount | Current Balance | Purpose of Loan |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | *See Attachment* | | | | |
| 3. | | | | | |

G.    List all contributions or transfers of assets to/from your firm and to/from any of its owners over the past two years (attach additional sheets if needed):

| Contribution/Asset | Dollar Value | From Whom Transferred | To Whom Transferred | Relationship | Date of Transfer |
|---|---|---|---|---|---|
| 1. | *NONE* | | | | |
| 2. | | | | | |
| 3. | | | | | |

H.    List current licenses/permits held by any owner and/or employee of your firm (e.g. contractor, engineer, architect, etc.)(attach additional sheets if needed):

| Name of License/Permit Holder | Type of License/Permit | Expiration Date | License Number and State |
|---|---|---|---|
| 1. | | | |
| 2. | *See Attachment* | | |
| 3. | | | |

I.    List the three largest contracts completed by your firm in the past three years, if any:

| Name of Owner/Contractor | Name/Location of Project | Type of Work Performed | Dollar Value of Contract |
|---|---|---|---|
| 1. Radius Construction | CVG Construction | Concession Development | 500,000 |
| 2. EDI Construction | EWR Construction | Concession Development | 300,000 |
| 3. HW Davis Construction | MCO Construction | Concession Development | 300,000 |

J.    List the three largest active jobs on which your firm is currently working:

| Name of Prime Contractor and Project Number | Location of Project | Type of Work | Project Start Date | Anticipated Completion Date | Dollar Value of Contract |
|---|---|---|---|---|---|

14

00883

RECEIVED
DEC 1 9 2005
OMWBE

| | | | | Annual sales |
|---|---|---|---|---|
| 1. Dallas-Ft Worth Airport | Concessions | Pre-1998 | N/A | $ 687,000 |
| 2. O'Hare Airport | Concessions | Pre-1998 | N/A | $ 662,000 |
| 3. Atlanta, Hartsfield Airport | Concessions | Pre-1998 | N/A | 617,000 |

We are not contractors These above represent our three
largest producers in the corporation and their annual sales

15

00884





RECEIVED
DEC 1 9 2005
OMWBE

## AFFIDAVIT OF CERTIFICATION

*This form must be signed and notarized for **each** owner upon which disadvantaged status is relied.*

**A MATERIAL OR FALSE STATEMENT OR OMISSION MADE IN CONNECTION WITH THIS APPLICATION IS SUFFICIENT CAUSE FOR DENIAL OF CERTIFICATION, REVOCATION OF A PRIOR APPROVAL, INITIATION OF SUSPENSION OR DEBARMENT PROCEEDINGS, AND MAY SUBJECT THE PERSON AND/OR ENTITY MAKING THE FALSE STATEMENT TO ANY AND ALL CIVIL AND CRIMINAL PEALTIES AVAILABLE PURSUANT TO APPLICABLE FEDERAL AND STATE LAW.**

I _Michelle Dukler_ (full name printed), swear or affirm under penalty of law that I am _President_ (title) of applicant firm _The Grove, Inc_ (firm name) and that I have read and understood all of the questions in this application and that all of the foregoing information and statements submitted in this application and its attachments and supporting documents are true and correct to the best of my knowledge, and that all responses to the questions are full and complete, omitting no material information. The responses include all material information necessary to fully and accurately identify and explain the operations, capabilities and pertinent history of the named firm as well as the ownership, control, and affiliations thereof.

I recognize that the information submitted in this application is for the purpose of inducing certification approval by a government agency. I understand that a government agency may, by means it deems appropriate, determine the accuracy and truth of the statements in the application, and I authorize such agency to contact any entity named in the application, and the named firm's bonding companies, banking institutions, credit agencies, contractors, clients, and other certifying agencies for the purpose of verifying the information supplied and determining the named firm's eligibility.

I agree to submit to government audit, examination and review of books, records, documents and files, in whatever form they exist, of the named firm and its affiliates, inspection of its places(s) of business and equipment, and to permit interviews of its principals, agents, and employees. I understand that refusal to permit such inquiries shall be grounds for denial of certification.

If awarded a contract or subcontract, I agree to promptly and directly provide the prime contractor, if any, and the Department, recipient agency, or federal funding agency on an ongoing basis, current, complete and accurate information regarding (1) work performed on the project; (2) payments; and (3) proposed changes, if any, to the foregoing arrangements.

I agree to provide written notice to the recipient agency or Unified Certification Program (UCP) of any material change in the information contained in the original application within 30 calendar days of such change (e.g., ownership, address, telephone number, etc.).

I acknowledge and agree that any misrepresentations in this application or in records pertaining to a contract or subcontract will be grounds for terminating any contract or subcontract which may be awarded; denial or revocation of certification; suspension and debarment; and for initiating action under federal and/or state law concerning false statement, fraud or other applicable offenses.

I certify that I am a socially and economically disadvantaged individual who is an owner of the above-referenced firm seeking certification as a Disadvantaged Business Enterprise (DBE). In support of my application, I certify that I am a member of one or more of the following groups, and that I have held myself out as a member of the group(s) (circle all that apply):

(Female) Black American   Hispanic American
Native American   Asian- Pacific American
Subcontinent Asian American
Other(specify) _____

17

*ATTACHMENT IV*

00885





RECEIVED
DEC 1 9 2005
DMWBE

I certify that I am socially disadvantaged because I have been subjected to racial or ethnic prejudice or cultural bias, or have suffered the effects of discrimination, because of my identity as a member of one or more of the groups identified above, without regard to my individual qualities.

I further certify that my personal net worth does not exceed $750,000, and that I am economically disadvantaged because my ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially and economically disadvantaged.

I declare under penalty of perjury that the information provided in this application and supporting documents is true and correct.

Executed on 8-26-05 (Date)

Signature _____
(DBE Applicant)

## NOTARY CERTIFICATE

Subscribed and sworn to before me this 26 day of August, 20 05.

Notary Public in and for the State of: _____

Residing at: Westchester, Illinois

My Commission Expires: 9/3/05

OFFICIAL SEAL
SHARON M KOPP
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/03/08

Sharon m. Kopp

18

00886

00887

U.S. Department of
Transportation

Office of the Secretary
of Transportation

400 Seventh St. S.W.
Washington, D.C. 20590

Official Business
Penalty for Private Use, $300

The Grove, Inc. v. US Dept. of Transportation
CA No. 07-1591

Administrative Record Vol. 3 of 3

023 - FTCH





## Fifth Third Bank

### Consumer Note



RECEIVED
DEC 1 9 2005
OMWBE

OFFICER No. 04325
$2,600,000.00

NOTE No. _____-_____
August 19, 2004
(Effective Date)
Personal Purpose Note

1.   **PROMISE TO PAY.** On or before August 19, 2006 (the "Maturity Date"), the undersigned, Michelle Aimee Duxler, an individual residing at 6756 Fieldstone, Hinsdale, Dupage County, Illinois 60527 ("Borrower") for value received, hereby promises to pay to the order of Fifth Third Bank (Chicago), a Michigan banking corporation located at 1701 W. Golf Road, Rolling Meadows, Cook County, Illinois 60008 for itself and as agent for any affiliate of Fifth Third Bancorp (together with its successors and assigns, the "Lender") the sum of Two Million Six Hundred Thousand and 00/100 Dollars ($2,600,000.00) (the "Borrowing"), plus interest as provided herein, less such amounts as shall have been repaid in accordance with this Note. The outstanding balance of this Note shall appear on a supplemental bank record and is not necessarily the face amount of this Note, which record shall evidence the balance due pursuant to this Note at any time. As used herein, "Local Time" means the time at the office of Lender specified in this Note. The maximum interest rate payable under this Note will not exceed 25% per annum or the state usury ceiling, whichever is less.

The entire outstanding principal balance, together with all accrued and unpaid interest and any other charges, advances and fees, if any, outstanding hereunder shall be due and payable in full on the earlier of the Maturity Date or upon acceleration of the Note.

The principal sum outstanding shall bear interest at a floating rate per annum equal to the rate of interest per annum established from time to time by Fifth Third Bank at its principal office as its "Prime Rate", whether or not Fifth Third Bank shall at times lend to borrowers at lower rates of interest or, if there is no such prime rate, then such other rate as may be substituted by Fifth Third Bank for the prime rate (the "Interest Rate"). In the event of a change in said Prime Rate, the Interest Rate shall be changed immediately to such new Prime Rate. Interest shall be calculated based on a 360-day year and charged for the actual number of days elapsed, and shall be payable on the 19th day of each calendar month beginning on September 19, 2004.

Principal and interest payments shall be made at Lender's address above unless otherwise designated by Lender in writing. Each payment hereunder shall be applied first to advanced costs, charges and fees, then to accrued interest, and then to principal.

2.   **SECURITY AGREEMENT.** To secure repayment of this Note and all other Obligations (as defined below) together with all modifications, extensions and renewals thereof, Borrower hereby grants and conveys to Lender a continuing security interest in all right, title and interest of Borrower in and to the following property, whether now owned or hereafter acquired (collectively, the "Collateral"): (i) any and all property in which Lender is at any time granted a lien for any Obligation including, without limitation, all collateral specified in any of the documents executed in connection with this Note, (ii) all property in possession of Lender and/or any affiliate of Fifth Third Bancorp (including, without limitation, Fifth Third Securites, Inc.) including, without limitation, money, securities, instruments, documents, letters of credit, chattel paper, or other property delivered to Lender and/or any affiliate of Fifth Third Bancorp (including, without limitation, Fifth Third Securites, Inc.) in transit, for safekeeping, or for collection or exchange for other property, (iii) all rights to payment from, and claims against, Lender, and (iv) any and all additions, substitutions, dividends, distributions (in the form of cash, property, stock or other securities) and other rights related or in addition to the foregoing, and any and all proceeds therefrom (the "Distributions"). Borrower agrees to immediately deliver to Lender all documents, certificates and instruments evidencing the Distributions and any additional documentation requested by Lender to perfect and protect Lender's security interest therein, and until such delivery Borrower shall hold the same in trust for Lender.

Borrower also grants Lender a security interest in all of the Collateral as agent for all affiliates of Fifth Third Bancorp for all Obligations of Borrower, or either or any of them, to such affiliates. Said security interest shall not be enforced to the extent prohibited by the Truth in Lending Act as implemented by Federal Reserve Regulation Z.





RECEIVED
DEC 1 9 2005
OMWBE

Borrower agrees that any present or future agreement securing any other debt Borrower owes Lender or any other affiliate of Fifth Third Bancorp will also secure the payment of this Note. However, an agreement securing any other debt will not secure this Note if either of the following applies:

Lender fails to make a disclosure required by law of the existence of such security agreement; or

Lender fails to provide (to any person entitled) any notice of right of rescission required by law for this transaction.

3. LATE CHARGES. If any installment stipulated herein is not paid on or before ten days after the due date thereof, (whether by acceleration or otherwise) in addition to all other rights and remedies of Lender given by law or the terms of this Note, Borrower promises to pay to Lender a delinquent charge of 5% of the payment amount. Acceptance of such delinquent charge by Bank shall not constitute a waiver of any default or any rights of Lender hereunder.

4. PREPAYMENT CHARGE. Borrower may prepay the obligation under this Note in full at any time prior to maturity. Borrower agrees to pay an early payment charge of 1% of the outstanding principal balance with a minimum charge of $150.00 and a maximum charge of $500.00 if Borrower prepays in full more than six months prior to the scheduled final payment date. If this obligation is secured by a mortgage on residential real estate there is no charge for prepayment. Partial prepayments shall not excuse any subsequent payment due.

5. INTEREST AFTER MATURITY. Interest after maturity shall continue at the rate then in effect or as thereafter adjusted in accordance with the variable rate disclosures. In addition, after maturity or other default, Borrower agrees to pay Lender a fixed charge of $25.00 or Borrower agrees that Lender may, without notice, increase the interest rate by 6% per annum, whichever is greater.

6. RETURNED ITEM FEE. A fee of $25.00 may, at Bank's discretion, be imposed whenever a check or other item offered in payment on this Note is returned to the Bank unpaid for any reason. This fee is subject to change without notice to the Borrower, and the Borrower agrees to pay the fee actually charged by Bank at the time the check is returned.

7. DEFINITIONS. Certain capitalized terms have the meanings set forth herein, in the Security Agreement, or any other Loan Document. All financial terms used in this Note but not defined herein, in the Security Agreement (if applicable), or any other Loan Document have the meanings given to them by generally accepted accounting principles. All other undefined terms have the meanings given to them in the Uniform Commercial Code as adopted in the state whose law governs this instrument. The following definitions are used herein:

(a) "Lien" means any security interest, mortgage, pledge, assignment, lien or other encumbrance of any kind.

(b) "Loan Documents" means each and every document or agreement executed by any party evidencing, guarantying or securing any of the Obligations; and "Loan Document" means any one of the Loan Documents.

(c) "Loans" means any loans from time to time between Lender and Borrower relating to the Obligations.

(d) "Notes" shall refer collectively to any note entered into from time to time by Borrower in favor of Lender to evidence an Obligation.

(e) "Obligation(s)" means all loans, advances, indebtedness and each and every other obligation or liability of Borrower, or either or any of them, owed to each of Lender and/or any affiliate of Fifth Third Bancorp, however created, of every kind and description whether now existing or hereafter arising and whether direct or indirect, primary or as guarantor or surety, absolute or contingent, liquidated or unliquidated, matured or unmatured, participated in whole or in part, created by trust agreement, lease overdraft, agreement or otherwise, whether or not secured by additional collateral, whether originated with Lender or owed to others and acquired by Lender by purchase, assignment or otherwise, and including, without limitation, all loans, advances, indebtedness and each and every obligation or liability arising under the Loan Documents, letters of credit now or hereafter issued by Lender or any affiliate of Fifth Third Bancorp for the benefit of or at the request of Borrower, or either or

34540- -1-

00889




RECEIVED
DEC 1 9 2005
OMWBE

any of them, all obligations to perform or forbear from performing acts, and agreements, instruments, documents evidencing, guarantying, securing or otherwise executed in connection with any of the foregoing, together with any amendments, modifications and restatements thereof, and all expenses and attorneys' fees incurred or other sums disbursed by Lender hereunder or any other document, instrument or agreement related to any of the foregoing.

8.    REPRESENTATIONS AND WARRANTIES. Borrower hereby warrants and represents to Lender the following:

(a)    Litigation.    There are no suits or proceedings pending or threatened against or affecting Borrower, and no proceedings before any governmental body are pending or threatened against Borrower.

(b)    Laws and Taxes.    Borrower is in material compliance with all laws, regulations, rulings, orders, injunctions, decrees, conditions or other requirements applicable to or imposed upon Borrower by any law or by any governmental authority, court or agency. Borrower has filed all required tax returns and reports that are now required to be filed by it in connection with any federal, state and local tax, duty or charge levied, assessed or imposed upon Borrower or its assets, including unemployment, social security, and real estate taxes. Borrower has paid all taxes which are now due and payable. No taxing authority has asserted or assessed any additional tax liabilities against Borrower which are outstanding on this date, and Borrower has not filed for any extension of time for the payment of any tax or the filing of any tax return or report.

(c)    Financial Condition.    All financial statements and information relating to Borrower which have been or may hereafter be delivered by Borrower to Lender are true and correct and have been prepared in accordance with past practices consistently applied. Borrower has no material obligations or liabilities of any kind not disclosed in that financial information, and there has been no material adverse change in the financial condition of Borrower nor has Borrower suffered any damage, destruction or loss which has adversely affected its business or assets since the submission of the most recent financial information to Lender.

9.    COVENANTS.    Borrower covenants with, and represents and warrants to, Lender that, from and after the execution date of the Loan Documents until the Obligations are paid and satisfied in full:

(a)    Financial Statements.    Borrower shall furnish to Lender:  (i) an annual personal financial statement within 90 days after the end of each calendar year; and/or (ii) copies of all federal, state and local income tax returns for such calendar year within 90 days of the filing thereof.  Upon the reasonable request of Lender, Borrower shall provide Lender with any additional information.

(b)    Taxes.    Borrower shall pay when due all taxes, assessments and other governmental charges imposed upon it or its assets, franchises, business, income or profits before any penalty or interest accrues thereon, and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums which by law might be a lien or charge upon any of its assets, provided that (unless any material item or property would be lost, forfeited or materially damaged as a result thereof) no such charge or claim need be paid if it is being diligently contested in good faith, if Lender is notified in advance of such contest and if Borrower establishes an adequate reserve or other appropriate provision required by generally accepted accounting principles and deposits with Lender cash or bond in an amount acceptable to Lender.

(c)    Other Amounts Deemed Loans.    If Borrower fails to pay any tax, assessment, governmental charge or levy or to maintain insurance within the time permitted or required by this Note, or to discharge any Lien prohibited hereby, or to comply with any other Obligation, Lender may, but shall not be obligated to, pay, satisfy, discharge or bond the same for the account of Borrower. To the extent permitted by law and at the option of Lender, all monies so paid by Lender on behalf of Borrower shall be deemed Obligations and Borrower's payments under this Note may be increased to provide for payment of such Obligations plus interest thereon.

(d)    Further Assurances.    Borrower shall execute, acknowledge and deliver, or cause to be executed, acknowledged or delivered, any and all such further assurances and other agreements or instruments,

34540-  -1-3




RECEIVED
DEC 1 9 2005
OMWBE

and take or cause to be taken all such other action, as shall be reasonably necessary from time to time to give full effect to the Loan Documents and the transactions contemplated thereby.

10.    DEFAULTS.  Upon the occurrence of any of the following events (each, an "Event of Default"), Lender may, at its option, without any demand or notice whatsoever, declare this Note and all Obligations to be fully due and payable in their aggregate amount, together with accrued interest and all fees and charges applicable thereto:

(a)    The nonpayment, when the same shall be due, of any installment or other payment on account of the principal or interest of this Note;

(b)    The breach of any warranty or agreement by Borrower herein contained, or contained in any mortgage or security agreement executed by Borrower in connection herewith;

(c)    The death or incompetency of any individual Borrower;

(d)    The default of Borrower under the terms of any lease of, or mortgage on, the premises upon which the Collateral may be located;

(e)    Any assignment for the benefit of the creditors of, or the commencement of any bankruptcy, receivership, reorganization, foreclosure, insolvency or liquidation proceedings by or against the Borrower, or any guarantor hereof;

(f)    The reasonable determination by Bank at any time that it is inadequately secured hereby with respect to any of Borrower's obligations to Lender;

(g)    The creation of any other lien or the issuance of any attachment against the Collateral or the entry of judgment against Borrower;

(h)    The occurrence of a default under any other obligation of Borrower, individually or jointly, to Lender or to any other affiliate of Fifth Third Bancorp;

(i)    Seizure, levy or confiscation under any legal or governmental process against any Collateral or;

(j)    Any sale, conveyance or transfer of any rights in the Collateral securing the Obligations, or any destruction, loss or damage of or to the Collateral in any material respect.

11.    REMEDIES.  In addition to any other remedy permitted by law, Lender may at any time, without notice, apply the Collateral to this Note or such other Obligations, whether due or not, and Lender may, at its option, proceed to enforce and protect its rights by an action at law or in equity or by any other appropriate proceedings; provided that this Note and the Obligations shall be accelerated automatically and immediately if the Event of Default is a filing under the Bankruptcy Code.  Notwithstanding any other legal or equitable rights of Lender, Lender, in the Event of Default, is (a) hereby irrevocably appointed and constituted attorney-in-fact, with full power of substitution, to exercise all rights of ownership with respect to the Collateral including, but not limited to, the right to collect all income or other distributions arising therefrom and to exercise all voting rights connected with the Collateral; and (b) is hereby given full power to collect, sell, assign, transfer and deliver all of said Collateral or any part thereof, or any substitutes therefore, or any additions thereto, through any private or public sale without either demand or notice to Borrower, or any advertisement, the same being hereby expressly waived, at which sale Lender is authorized to purchase said property or any part thereof, free from any right of redemption on the part of Borrower, which is hereby expressly waived and released.  In case of sale for any cause, after deducting all costs and expenses of every kind, Lender may apply, as it shall deem proper, the residue of the proceeds of such sale toward the payment of any one or more or all of the Obligations of Borrower, whether due or not due, to Lender; after such application and the return of any surplus, Borrower agrees to be and remains liable to Lender for any and every deficiency after application as aforesaid upon this and any other Obligation. Borrower shall pay all costs of collection incurred by Lender, including its attorney's fees, if this Note is referred to an attorney for collection, whether or not payment is obtained before entry of judgment, which costs and fees are Obligations secured by the Collateral.

Lender's rights and remedies hereunder are cumulative, and may be exercised together, separately, and in any order.  No delay on the part of Lender in the exercise of any such right or remedy shall operate as a waiver.  No single or partial exercise by Lender of any right or remedy shall preclude any other further exercise of it or the exercise of any other right or remedy.  No waiver or indulgence by Lender of any Event of Default shall be effective unless in writing and signed by Lender, nor shall a waiver on one occasion be construed as a waiver of any other occurrence in the future.

12.    MULTIPLE OBLIGORS.  Each and every reference to and any and all representations, warranties, covenants and undertakings of, Borrower herein, including but not limited to the Events of Default, shall be deemed to apply to each of the undersigned and any and all guarantors of any of the Obligations, jointly and separately.

34540- -1-4

00891




RECEIVED
DEC 1 9 2005
OMWBE

13.  ENTIRE AGREEMENT.  Borrower agrees that there are no conditions or understandings which are not expressed in this Note and the documents referred to herein.

14.  SEVERABILITY.  The declaration of invalidity of any provision of this Note shall not affect any part of the remainder of the provisions.

15.  ASSIGNMENT.  Borrower agrees not to assign any of Borrower's rights, remedies or obligations described in this Note without the prior written consent of Lender, which consent may be withheld in Lender's sole discretion.  Borrower agrees that Lender may assign some or all of its rights and remedies described in this Note without notice to, or prior consent from, the Borrower.

16.  MODIFICATION; WAIVER OF LENDER.  The modification or waiver of any of Borrower's obligations or Lender's rights under this Note must be contained in a writing signed by Lender.  Lender may perform Borrower's obligations, or delay or fail to exercise any of its rights or remedies, without causing a waiver of those obligations or rights. A waiver on one occasion shall not constitute a waiver on another occasion.  Borrower's obligations under this Note shall not be affected if Lender amends, compromises, exchanges, fails to exercise, impairs or releases (I) any of the obligations belonging to any co-borrower, endorser or guarantor (II) any of its rights against any co-borrower, guarantor or endorser, or (iii) the Collateral or any other property securing the Obligations.

17.  WAIVER OF BORROWER.  Demand, presentment, protest and notice of dishonor, notice of protest and notice of default are hereby waived by Borrower, and any endorser or guarantor hereof.  Each of Borrower, including but not limited to all co-makers and accommodation makers of this Note, hereby waives all suretyship defenses including but not limited to all defenses based upon impairment of Collateral and all suretyship defenses described in Section 3-605 of the Uniform Commercial Code (the "UCC").  Such waiver is entered to the full extent permitted by Section 3- 605 (i) of the UCC.

18.  LOAN CHARGES AND FEES.  Lender shall have the authority to impose fees and charges to perform services requested by Borrower or on Borrower's behalf, or to otherwise administer and service this Note. The fees and charges may include administrative costs incurred by Lender and/or in reimbursement of payments made by Lender to third parties. Such fees and charges may include, without limitation, any and all costs or fees associated with the origination and/or servicing of this Note, document copy or preparation fees, transmittal, facsimile or delivery fees, reconveyance and release fees, property inspections and returned check or insufficient funds charges in connection with payments made by Borrower or on Borrower's behalf under this Note and all other such fees for ancillary services performed by Lender for Borrower or at Borrower's request or for services necessitated by or resulting from Borrower's default or malfeasance relating to the Collateral or this Note or incurred by Lender or assessed upon Borrower pursuant to the provisions of this Note or any other document executed in connection herewith.  Such fees and charges shall be secured by the Collateral and, unless Lender and Borrower agree to other terms of payment, shall bear interest from the date assessed by Lender at the rate stated in this Note, and in effect from time to time, and shall be payable, with interest, immediately following written demand from Lender to Borrower requesting payment thereof.

19.  GIVING OF NOTICES.  Any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class or certified mail or by prepaid overnight delivery service addressed to Borrower at Borrower's address above.  A notice will be delivered or mailed to Borrower at a different address if Borrower gives Lender written notice of Borrower's different address provided that Lender shall not be required to deliver notice to more than one address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower may report a change of address only through that specified procedure.  Any notice that must be given to Lender under this Note will be given by first class or certified mail to Lender at the address stated above or to any other address that Lender designates by written notice to Borrower.

20.  GOVERNING LAW; CONSENT TO JURISDICTION.  Except to the extent otherwise specifically required by applicable law, this Note shall be construed and interpreted in accordance with, and governed by, federal law and the law of the State of Illinois, without reference to its conflict of law provisions, and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws.  Borrower agrees that service of process in any such proceeding shall be effective if mailed to Borrower at the address set forth herein.  In the event that any provision of this Note is limited, restricted, prohibited or unenforceable under applicable law, such provision shall be construed and



RECEIVED
DEC 1 9 2005
OMWBE

enforced as if it had been more narrowly drawn so as not to be in conflict with applicable law. The validity, legality and enforceability of the remaining provisions of this Note shall not in any way be affected or impaired thereby. If any part of this Note is determined to be invalid, then Lender may enforce the remainder of this Note as if the invalid provision did not exist. Lender shall be afforded the full benefit of all of Borrower's waivers and contractual agreements made in connection with the Loan that are permitted to be given under applicable law.

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from Borrower which exceeded permitted limits will be refunded. Lender may choose to make this refund by reducing the principal owed under this Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without penalty.

21.    **JURY WAIVER.** BORROWER, AND ANY ENDORSER OR GUARANTOR HEREOF, WAIVE THE RIGHT TO A TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

> BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS NOTE AND THE ABOVE INFORMATION AT THE TIME OF SIGNING.

> NOTICE TO COSIGNER: You are being asked to become liable on this debt. Think carefully before you do. If Borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility. You may have to pay up to the full amount of the debt if the Borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount. The Bank can collect this debt from you without first trying to collect from the Borrower. The Bank can use the same collection methods against you that can be used against the Borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become part of YOUR credit record.

The following notice is applicable if this agreement involves a purchase of goods or services to which the FTC HOLDER in DUE COURSE RULE applies.

> IF THE COLLATERAL IS TO BE USED PRIMARILY FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES:
> NOTICE
> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF THE GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF.  RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

If you believe information we report about the credit history on your account(s) is incomplete, inaccurate or outdated, you must provide us with clear written documentation including the name on the account, the account number and the nature of the disputed information. Please write to us at:

Fifth Third Bank (Chicago)
1701 W. Golf Road
Rolling Meadows, Illinois 60008
Cook County, Illinois

NAME AND ADDRESS:                         BORROWER:

                                          _____
                                          (Signature)

Michelle Aimee Dukler
6756 Fieldstone
Hinsdale, IL 60527                        Michelle Aimee Dukler
                                          _____
                                          (Print Name)

34540- -1- -

00893



RECEIVED
DEC 1 9 2005
OMWBE

## ACKNOWLEDGEMENT

The assignment set forth above has been recorded on the books of the undersigned bank on August 17 , 20 4. The undersigned bank by its signature below acknowledges and agrees by its signature below to hold the Collateral pledged hereby as bailee for the benefit of, and as agent for, the Secured Party for purposes of perfecting a first priority security interest in the Collateral as set forth therein, except for normal administrative expenses of the undersigned bank relating to the Collateral. The undersigned shall comply with the orders and instructions of Secured Party with respect to the Collateral and Secured Party shall be deemed to "control" such Collateral.

Fifth Third Bank

_____

Vice President

34540-1-1-5-

00894

00895



Exhibit

RECEIVED
DEC 1 9 2005
OMWBE

**Fifth Third Bank**

· Contact Us · Service Center · Help · FAQs · Security

🔒 ▸Log Out    Summary    Manage Accounts    Make Payments    Transfer Funds

☑ Account Balances  ☑ Account Nicknames

Welcome MICHELLE A DUKLER          **Account Activity**          Tuesday
                                                                 December 13, 2005



**Account Activity**  Account Summary  Account Statements

Account:                    Description
                            Keyword:

COMMERCIAL LOAN / (X0018) ▾                          ▸ Go

**Displaying Account Activity for:** COMMERCIAL LOAN XXXXXXXXXX0018

| Date Posted | Effective Date | Description | Total Amount | Principal | Interest | Fees | Action |
|---|---|---|---|---|---|---|---|
| 11/21/2005 | 11/21/2005 | INTEREST PMT 100 | $15,437.50 | $0.00 | $15,437.50 | $0.00 | |
| 11/14/2005 | 11/14/2005 | STATEMENT | $15,437.50 | $0.00 | $15,437.50 | $0.00 | |
| 11/01/2005 | 11/01/2005 | RATE CHANGE 100 | | | NEW RATE | 7.0000 | |
| 11/01/2005 | 09/20/2005 | RATE CHANGE 100 | | | NEW RATE | 6.7500 | |
| 10/19/2005 | 10/19/2005 | INTEREST PMT 100 | $14,606.95 | $0.00 | $14,606.95 | $0.00 | |
| 10/16/2005 | 10/16/2005 | STATEMENT | $14,606.95 | $0.00 | $14,606.95 | $0.00 | |
| 09/21/2005 | 08/09/2005 | RATE CHANGE 100 | | | NEW RATE | 6.5000 | |
| 09/19/2005 | 09/19/2005 | INTEREST PMT 100 | $14,552.77 | $0.00 | $14,552.77 | $0.00 | |
| 09/14/2005 | 09/14/2005 | STATEMENT | $14,552.77 | $0.00 | $14,552.77 | $0.00 | |
| 08/19/2005 | 08/19/2005 | INTEREST PMT 100 | $14,173.62 | $0.00 | $14,173.62 | $0.00 | |
| 08/14/2005 | 08/14/2005 | STATEMENT | $14,173.62 | $0.00 | $14,173.62 | $0.00 | |
| 08/10/2005 | 06/30/2005 | RATE CHANGE 100 | | | NEW RATE | 6.2500 | |
| 07/19/2005 | 07/19/2005 | INTEREST PMT 100 | $13,343.05 | $0.00 | $13,343.05 | $0.00 | |
| 07/14/2005 | 07/14/2005 | STATEMENT | $13,343.05 | $0.00 | $13,343.05 | $0.00 | |
| 06/30/2005 | 05/03/2005 | RATE CHANGE 100 | | | NEW RATE | 6.0000 | |
| 06/20/2005 | 06/20/2005 | INTEREST PMT 100 | $13,433.33 | $0.00 | $13,433.33 | $0.00 | |
| 06/14/2005 | 06/14/2005 | STATEMENT | $13,433.33 | $0.00 | $13,433.33 | $0.00 | |
| 05/19/2005 | 05/19/2005 | INTEREST PMT 100 | $12,747.23 | $0.00 | $12,747.23 | $0.00 | |
| 05/15/2005 | 05/15/2005 | STATEMENT | $12,747.23 | $0.00 | $12,747.23 | $0.00 | |

 

RECEIVED
DEC 1 9 2005
OMWBE

| 05/04/2005 | 03/22/2005 | RATE CHANGE 100 | | | NEW RATE | 5.7500 |
| 04/19/2005 | 04/19/2005 | INTEREST PMT 100 | $12,819.44 | $0.00 | $12,819.44 | $0.00 |
| 04/14/2005 | 04/14/2005 | STATEMENT | $12,819.44 | $0.00 | $12,819.44 | $0.00 |
| 03/22/2005 | 02/02/2005 | RATE CHANGE 100 | | | NEW RATE | 5.5500 |
| 03/21/2005 | 03/21/2005 | INTEREST PMT 100 | $11,122.22 | $0.00 | $11,122.22 | $0.00 |
| 03/14/2005 | 03/14/2005 | STATEMENT | $11,122.22 | $0.00 | $11,122.22 | $0.00 |
| 02/22/2005 | 02/22/2005 | INTEREST PMT 100 | $12,061.11 | $0.00 | $12,061.11 | $0.00 |
| 02/14/2005 | 02/14/2005 | STATEMENT | $12,061.11 | $0.00 | $12,061.11 | $0.00 |
| 02/02/2005 | 12/14/2004 | RATE CHANGE 100 | | | NEW RATE | 5.2500 |
| 01/19/2005 | 01/19/2005 | INTEREST PMT 100 | $11,754.17 | $0.00 | $11,754.17 | $0.00 |
| 01/17/2005 | 01/17/2005 | STATEMENT | $11,754.17 | $0.00 | $11,754.17 | $0.00 |
| 12/20/2004 | 12/20/2004 | INTEREST PMT 100 | $10,923.61 | $0.00 | $10,923.61 | $0.00 |
| 12/14/2004 | 12/14/2004 | STATEMENT | $10,923.61 | $0.00 | $10,923.61 | $0.00 |
| 12/14/2004 | 11/10/2004 | RATE CHANGE 100 | | | NEW RATE | 5.0000 |
| 11/19/2004 | 11/19/2004 | INTEREST PMT 100 | $10,797.22 | $0.00 | $10,797.22 | $0.00 |
| 11/14/2004 | 11/14/2004 | STATEMENT | $10,797.22 | $0.00 | $10,797.22 | $0.00 |
| 11/10/2004 | 09/21/2004 | RATE CHANGE 100 | | | NEW RATE | 4.7500 |
| 10/19/2004 | 10/19/2004 | INTEREST PMT 100 | $10,255.56 | $0.00 | $10,255.56 | $0.00 |
| 10/14/2004 | 10/14/2004 | STATEMENT | $10,255.56 | $0.00 | $10,255.56 | $0.00 |

00897



Exhibit 4

RECEIVED
DEC 1 9 2005
OMWBE

# RESTATED ARTICLES OF INCORPORATION

## OF

## NATURAL ENERGY UNLIMITED, INC.

Natural Energy Unlimited, Inc., a corporation organized and existing under the laws of the State of Louisiana, hereby certifies as follows:

1.    The name of the corporation is Natural Energy Unlimited, Inc. The date of incorporation was March 27, 1981. The date of the restatement of the Articles of Incorporation was August ___, 1999.

2.    This Restated Articles of Incorporation restates and accurately copies the Articles of Incorporation, and all amendments thereto, in effect at the date of restatement without substantive change except as made by the new amendments herein and further amends the Articles of Incorporation of this corporation by (i) restating and amending Article II and Article III (ii) deleting Article IV through Article XI and (iii) adding new Articles IV, V and VI to deny preemptive rights, enable the shareholders of the Cororation to act by written consent without unanimity, and limit the liability of the directors [and officers] of the Corporation, respectively. Each amendment has been effected in conformity with Louisiana Law.

3.    The text of the Articles of Incorporation, as amended, is further amended hereby to read in full as set forth below:

"I

The name of the corporation is Natural Energy Unlimited, Inc.

II

The purpose of the Corporation and the nature of the business to be conducted or promoted is to engage in any lawful act or activity for which corporations may be formed under the Business Corporation Law of the State of Louisiana.

III

The aggregate number of shares of stock which the Corporation shall have authority to issue is One Hundred (100) shares of common stock, no par value per share.

IV

No holder of any of the shares of any class of the corporation shall be entitled as of right to subscribe for, purchase, or otherwise acquire any shares of any class of the corporation which the corporation proposes to issue or any rights or options which the corporation proposes to grant for the purchase of shares of any class of the corporation or for the

00899




RECEIVED
DEC 1 9 2005
OMWBE

purchase of any shares, bonds, securities, or obligations of the corporation which are convertible into or exchangeable for, or which carry any rights, to subscribe for, purchase, or otherwise acquire shares of any class of the corporation; and any and all of such shares, bonds, securities, or obligations of the corporation, whether now or hereafter authorized or created, may be issued, or may be reissued or transferred if the same have been reacquired and have treasury status, and any and all of such rights and options may be granted by the Board of Directors to such persons, firms, corporations, and associations, and for such lawful consideration, and on such terms, as the Board of Directors in its discretion may determine, without first offering the same, or any thereof, to any said holder.

V

Whenever the affirmative vote of the shareholders at a meeting is required to authorize or constitute corporate action under any provision of the Business Corporation Law or the Articles of Incorporation or By-Laws of the Corporation, any such action may be authorized or constituted by a consent in writing, without a meeting, signed by the shareholders having at least that proportion of voting power which would be necessary under any such provision to authorize or constitute the action by the affirmative vote at a meeting; provided, that nay such written consent shall be filed with the record of proceedings of the shareholders; and provided, further, that prompt notice shall be given to all of the shareholders having voting power on the question, other than those who signed the consent, of the action taken pursuant to such written consent.

VI

The personal liability of the directors [and officers] of the corporation is eliminated to the fullest extent permitted by the provisions of Section 12:24(c)(4) of the Business Corporation Law, as the same may be amended and supplemented."

4.    This Restated Articles of Incorporation was duly authorized by the board of directors in accordance with R.S. 12:34, La. Rev. Stats., 1950.

5.    That in lieu of a meeting and vote of shareholders, the shareholders have given written consent to any amendment set forth herein in accordance with the provisions of R.S. 12:76, La. Rev. Stats., 1950,*

*  *  *  *  *

00900

2                                    203966/0005/266970/Version #:.1



RECEIVED
DEC 1 9 2005
OMWBE

IN WITNESS WHEREOF, this instrument has been signed on behalf of Natural Energy Unlimited, Inc. by its President and Secretary on this __1ˢᵗ__ day of August, 1999.

Natural Energy Unlimited, Inc.

By: _____
Ruth Ann Menutis, President

By: _____, Secretary

00901

3                    203966/0005/266970/Version #:.1



RECEIVED
DEC 1 9 2005
OMWBE

STATE OF_____

COUNTY OF_____

BE IT KNOWN that on this _____1st_____ day of August, 1999, before me the undersigned, a Notary Public in and for the County and State aforesaid, duly commissioned and qualified, there came and appeared Ruth Ann Menutis, known to me, Notary and known by me to be the President of Natural Energy Unlimited, Inc., who signed the within and foregoing instrument before me, and who acknowledged to me, Notary, that she signed, executed, and delivered said instrument in her capacity as President of Natural Energy Unlimited, Inc. for the uses and purposes therein set forth and apparent.

IN WITNESS WHEREOF the said appearer has signed these presents and I have hereunto affixed my official hand and seal, on the day and date first hereinabove written, after due reading of the whole.

_____          _____
                                                          (NOTARY SEAL)

                                            _____
                                                          NOTARY PUBLIC

00902

4                                              203966/0005/266970/Version #:.1




RECEIVED
DEC 1 9 2005
OMWBE

STATE OF_____

COUNTY OF_____

    BE IT KNOWN that on this _____1st_____ day of August, 1999, before me the undersigned, a Notary Public in and for the County and State aforesaid, duly commissioned and qualified, there came and appeared _____, known to me, Notary and known by me to be the Secretary of Natural Energy Unlimited, Inc., who signed the within and foregoing instrument before me, and who acknowledged to me, Notary, that she signed, executed, and delivered said instrument in his capacity as Secretary of Natural Energy Unlimited, Inc. for the uses and purposes therein set forth and apparent.

    IN WITNESS WHEREOF the said appearer has signed these presents and I have hereunto affixed my official hand and seal, on the day and date first hereinabove written, after due reading of the whole.

_____          _____
                                        (NOTARY SEAL)

_____
                                        NOTARY PUBLIC

00903

203966/0005/266970/Version #:.1



Exhibit 5

**Business Background of
Michelle Dukker**

<u>**Professional Background**</u>

**The Grove, Inc.**

**President, Director and Board Chairwoman (2/13/04 – Present)**
Owner and chief executive of all retail operations encompassing 60 stores in 15 airports.
Hands-on management of all team of senior staff who are responsible for all aspects of the
company includes:
- Strategic operational and financial planning
- Oversight of daily field operations including financial, customer service and sales
  performance
- Oversight of all product purchasing and selections
- Oversight of all headquarters support including finance, banking, human resources,
  lease administration, payroll, development, information systems, field support etc.
- Oversight of all real estate development for new or remodeled stores
- Responsible for all banking relationships
- Responsible for all landlord relationships
- Signing all official documents of The Company.

Management Accomplishments during tenure:
- Hands-on full time management (45-65 hours / week) of The Company
- Travel to locations on a weekly basis
- Negotiated and signed leases for new retail spaces in Dallas (1 new space and
  extensions for 7 spaces), Houston (1 new space), Orlando (product extension to
  include frozen treats), Cincinnati (1 new space and remodel of 1 space for lease
  extension), Salt Lake City (remodel for lease extensions for 3 spaces), Jacksonville
  (remodel for lease extension for 1 space), La Guardia (remodel for lease extensions
  for 2 spaces), New Orleans (1 new space) Seattle (2 new spaces), Newark (4 new
  spaces and remodel agreement for extension to 2 spaces) and JFK (3 new spaces)
- Negotiated and signed Subway franchise agreement for retail space in Newark.
  Pending franchise agreement has been negotiated for a retail space in La Guardia.
- Negotiated and about to sign Smoothie King franchise agreements for one of the
  retail spaces in Seattle and another retail space in Dallas.
- Interviewed and hired Area General Manager for Seattle
- Interviewed and hired Area General Manager for Newark
- Interviewed and hired Area General Manager for Salt Lake City
- Interviewed and hired Area Manager for Dallas
- Interviewed and hired Area Manager for Cincinnati
- Interviewed and hired Area Manager for Atlanta
- Interviewed and hired Regional Manager for East Coast
- Interviewed and hired Executive Assistant
- Personally oversaw the openings of 3 new stores, our first store in Seattle, new
  gourmet popcorn concept store and our largest ever store and new concept, Grove/
  Subway in Newark
- Directing the development of new retail design concept for The Grove's retail stores
  to be released in 2006

00905



RECEIVED
DEC 1 9 2005
OMWBE


- Completed review of all mid-year performance reviews of HQ accounting, technology support and marketing staff
- Evaluated all senior staff yearly performance reviews
- Renegotiated company's new health and life insurance policies
- Negotiated new company line of credit and changed banks
- Reviewed and approved outside auditors annual audit of The Grove, Inc.
- Reviewed and approved proposals to Cincinnati, Dallas, Richmond, Salt Lake City, Houston, La Guardia, Jacksonville, Orlando, New Orleans, Minneapolis, Chicago, Memphis and Newark for new retail locations
- Reviewed and approved all capital spending on all store build-outs that are in process
- Reviewed case file of Assistant Manager in Dallas and approved her forced termination
- Participated in providing company strategic direction to the participants in Grove University Spring 2004 and National Management Meeting Fall 2004. Participated in Grove University 2005 and overseeing planning for National Management Meeting Fall 2005
- Weekly review of all payroll checks out
- Weekly review of all corporate checks out (signing of all checks over $50,000, rents, licenses and permits)
- Exceptional financial performance in 2004 and 2005. Sales above plan and earnings above plan. This is due to:
  - Weekly calls to Area General Managers
  - Daily contact with Regional Managers
  - Store visits to all locations
  - Active involvement by President in providing leadership and direction to the company
- Participation and membership in: AMAC, Embry Riddle, ACI-NA, AAAE, NIAAMC, NASFT and Global Shop.

**Director of Marketing, The Grove, Inc. (4/1/00 – 9/1/02)**
Working under the direction of the President, Ruth Ann Menutis, set up and ran the marketing department for The Grove, Inc. Developed new products, vendor relationships, in-store merchandising and graphics, standards for new store design and new store openings, and addressed issues related to product quality, costs and packaging.

**Management Accomplishments during tenure:**
Created the first marketing/advertising oriented sales program for The Grove's 45 stores including:
- Seasonal product promotions
- New in-store signage announcing promotions and product offerings
- Change of menu boards
- Change of pricing signs to reinforce brand consistency
- Definition of advertising color palette
Organized the product development initiatives of the company to include:
- Organized focus group taste profiling for new products
- Structured review of new product offerings from all the national specialty and gourmet food shows
- Organized product release programs coupled with in store advertising



RECEIVED
DEC 1 9 2005
OMWBE

Customer analysis
- Organized and executed a customer analysis effort to ensure that the company understood whom its customer was and what he/she wanted.

Customer complaints analysis
- Pulled all of the customer complaints and contacts into a single database to enable the company to look at trends.

Employee Incentive Program
- Created the "Platinum Customer Service" program that recognized exceptional customer service and salesmanship with custom-made Grove Platinum Customer Service Coins. The coins were convertible into prizes (radios, CD's, trips, gift cards, cash). This program later developed into the SAMPLES program in place today.

Consultant to The Grove, Inc., (2/00 – 4/00)
Working under the direction of The President, Ruth Ann Manutis, organized and implemented a revised "Grove University" for new store managers and assistant managers. Updated The Grove's employee training material. Coordinated Grove regional management meetings and workshops.

Accomplishments during tenure:
Grove University – Management Training Program
- Revised the Grove University curriculum. This curriculum had not been revised in over 7 years and was out of date and inaccurate. This effort required learning all aspects of the Grove's retail operations and all the management-operating practices in order to redevelop the training materials for new managers and assistant managers.

Employee Training
- The customer service, safety and cash handling training of sales/customer service employees had not been revised in over 5 years. This project included the review and modification of all training materials and manager's training checklists.

Regional Operations Meetings
- The senior staff of the company met every quarter. This project included developing a focused agenda for the three-day meetings, which included review of financial operations, new store development, marketing and product development, operating policies and more.

Schiltz Studios, Inc., Milwaukee, WI
Schiltz Furnaces, Inc., Milwaukee, WI

President and sole owner (1989-1999)
Owner and chief executive of large glass manufacturing plant and its related design studio, retail store and wholesale operations. Hands-on management of a team of senior staff who were responsible for all aspects of the two companies including:
- Strategic operational and financial planning
- Responsible for all daily operations including financial, manufacturing, inventory, creative designs and execution, shipping and or installation, retail store and wholesale operations, customer service, etc.
- Created all glass formulas and manufacturing techniques
- Responsible for the design and building of all glass manufacturing equipment and machinery
- Responsible for all product purchasing and selections



Exhibit 6



WESTFIELD CONCESSION MANAGEMENT, INC.

**Office of Legal Counsel**
**500 Northwest Plaza, Suite 700**
**St. Ann, MO 63074**

RECEIVED
DEC 1 9 2005
OMWBE

December 9, 2005

To Whom It May Concern:

I am the Associate General Counsel for Westfield Concession Management, Inc. and have the responsibility for negotiating all concession leases or subleases on behalf of Westfield for all airport concession programs in which we are involved.

Since February, 2004, Michelle Dukler has been the only member of the Dukler family I have had contact with at The Grove. Mrs. Dukler has been personally involved in lease/sublease negotiations and has been the decision-maker in all material matters regarding the legal documents between our two companies since her purchase of The Grove.

From my dealings with Mrs. Dukler, she has had the final authority in any legal documentation issues I have had with The Grove since her purchase in February, 2004 along with the ability and expertise to do so. From such perspective, it is apparent that Mrs. Dukler is responsible for all aspects of the business conducted by The Grove.

Sincerely,

Arnold L. Mayersohn, Jr.
Associate General Counsel

00909




Exhibit 7 RECEIVED
DEC 1 9 2005
OMWBE



**CINCINNATI/NORTHERN KENTUCKY INTERNATIONAL AIRPORT**

P.O. BOX 752000  CINCINNATI, OH 45275-2000  (859) 767-3151  FAX (859) 767-3080

With regard to The Grove's operations at the Cincinnati/ Northern Kentucky International Airport, ("CVG"), my primary corporate contact in matters involving the Grove, Inc, since approximately February 2004, has been Ms. Michelle Dukler. From my experience, Mrs. Dukler has been the decision-maker in most material business matters between our two entities. She has instructed her staff to follow through on decisions we have made in discussions regarding aspects of The Grove's stores at CVG.

From my dealings with Ms. Michelle Dukler, it is my understanding that she has final authority in the major business decisions relating to the company. However I will add that with regard to the everyday operations of the Grove's business I deal primarily with the onsite manager here at CVG.

James DeCock
Commercial and Business Development
Kenton County Airport Board

# TAB 22



**STATE OF WASHINGTON**

# OFFICE OF MINORITY AND WOMEN'S BUSINESS ENTERPRISES

406 SOUTH WATER • POST OFFICE BOX 41160 • OLYMPIA, WASHINGTON 98504-1160
*(360) 753-9693 • FAX (360) 586-7079*

DATE MAILED

JUN 2 8 2006

INITIALS

June 28, 2006

Ms. Michelle Dukler
THE GROVE INC
3 Westbrook Corporate Center, Suite 500
Westchester, Illinois  60154

File Number: 19323

Dear Ms. Dukler:

This is your notification regarding The Grove Inc.'s show cause review.  The Certification Committee has affirmed its previous decision to deny certification as a federal Airport Concessionaire Disadvantaged Business Enterprise (ACDBE).  Enclosed is a copy of OMWBE's written determination.

This decision is administratively final.  You have the right to appeal this decision.  The following outlines the appeal procedure.

**USDOT Review**

Pursuant to 49 Code of Federal Regulation (CFR), Part 26.89 of Subpart E, you may choose to appeal this determination directly to the USDOT.  If you choose to appeal directly to USDOT, your request must be in writing and mailed to the address below within ninety (90) days from the date of the denial letter. The request must explain in detail the reasons you believe the Office's determination should be reversed and include copies of all documents that support your argument.

Please direct your request to:

Department of Transportation
Office of Civil Rights
400 – 7th Street SW, Room 5414
Washington, DC  20590

If you do not submit an appeal, following the procedure above, the denial will be final and you will have no further appeal rights.

A copy of the appeal to the U.S. Department of Transportation should be mailed to the Office of Minority and Women's Business Enterprises.

00913

# TAB 23

 

## CERTIFICATION ISSUES SUMMARY AND DETERMINATION
## THE GROVE, INC.

The Firm was denied certification based upon five separate reasons:

1) Ownership by the eligible individual is not real and substantial;
2) The eligible owner exceeded the federal program's personal net worth cap making the individual no longer economically disadvantaged, and thus not presumptively eligible;
3) The Firm is not controlled to the extent required under 49 CFR Part 26;
4) The Firm is not independent as required by 49 CFR Part 26; and
5) The Firm is family owned and operated, not allowed under 49 CFR Part 26.

Each reason, on its own, is sufficient to deny certification. The Office had additional concerns regarding the Firm's eligibility as a small business concern; however, the Firm did not provide sufficient information for the Office to make a determination.

The Certification Committee has reviewed the additional information submitted and determines there is not sufficient basis to reverse the Office's earlier determination.

1) *Ownership of the firm is not real and substantial*

Michelle Dukler, the eligible owner of 51 percent of the Firm, obtained a loan from an ineligible person for the purpose of acquiring the funds to purchase her ownership interest in the Firm. This is not expressly prohibited by the federal regulations. However, the funds paid to Star Foods, LLC to purchase her ownership interest came from a joint checking account with Ms. Dukler's ineligible spouse, Martin Dukler. He has a history of involvement with the Firm as both an officer and a director; is a current owner, officer and director of Star Foods, LLC (current 49 percent owner of the Firm); and works in the same or similar industry as the Firm. He is also the CEO of Georgia's Grove, LLC. Accordingly, Ms. Dukler's ownership is not real and substantial as required by the federal regulations. (See 49 CFR 26.69(h).)

The Firm disagrees with OMWBE's analysis, citing 49 CFR 26.69(j)(2). It claims the borrowed funds did not lose their separate property character as a result of being deposited into the joint account of Ms. Dukler and her spouse. The Firm contends Ms. Dukler used the same borrowed funds to acquire the stock, but does not provide documentation that satisfactorily traces the disposition of the borrowed funds to establish its claim. See also 49 CFR 26.69(j)(3).

The Firm also contends Mr. Dukler's experience and past history with the Firm has no bearing on Ms. Dukler's contribution. The Firm argues the Office has made an error and is "violating DOT rules" in its analysis. The Firm cites 49 CFR §26.73(b) in support of its argument. This argument is not persuasive in view of 49 CFR §26.71(l). The Office must consider Mr. Dukler's past and current interactions with the Firm. The Firm has not submitted clear and convincing evidence to refute the Office's determination that Mr.



SHOW CAUS... EW. FILE#: 19323



TH... VE INC.

Dukler's past and present interactions compromise Ms. Dukler's ownership for the purposes of certification.

The Firm also contends Ms. Dukler's expertise is real and substantial. (Note: This Office has made no contention that Ms. Dukler fails to have the necessary expertise to control the firm.) Notwithstanding, there is no information contained in the Certification Application to indicate that Ms. Dukler's contribution is based upon anything other than cash. The Firm has not submitted documentation as required by 49 CFR 26.69(f)(1) for the Office to recognize Ms. Dukler's expertise as a contribution made to acquire her ownership interest.

The Firm also claims Mr. Dukler's involvement with Star Foods, LLC does not qualify as a "same or similar industry." The Firm contends "Star Foods is an investment company and does not have retail stores and does not operate in airports." In its appeal to USDOT on October 28, 2004, the Firm identifies Star Foods as "an investment company that specializes in the snack foods industry." However, based upon the information submitted, it appears Star Foods owns and manages businesses operating in the snack food/concessionaire industry. Prior to submitting the Firm's application, both owners of Star Foods were members of the Firm's board of directors. Further, Mr. Dukler is the founder of and currently acts as the Chief Executive Office of "Georgia's Grove, LLC." According to Mr. Dukler's resume, Georgia's Grove, LLC, owned in part or in whole by Star Foods, LLC, is a "snack food manufacturing and wholesale distribution company." This is the exact same industry that the firm operates in. The Firm has failed to provide further documentation. While not a basis for this Office's decision, the failure to provide complete and accurate information is a violation of §26.73(c) and is grounds for denial of certification on its own merit. However, the office has chosen to instead review the documents the Firm previously provided. Under §26.61(b), the Firm has the burden of proof to demonstrate that it meets the requirements of certification. Based on the documentation supplied regarding both Star Foods, LLC and Georgia's Grove, LLC, the Office has no basis to change its earlier determination.


2) *Ms. Dukler fails to meet the Personal Net Worth Requirements*

A review of Ms. Dukler's personal financial documentation submitted with the Certification Application determined Ms. Dukler's personal net worth exceeds the program cap of $750,000. Ms. Dukler obtained a loan of $2,600,000 from Mr. Casey Cowell, secured by personal assets. Ms. Dukler repaid that loan on August 17, 2004, making those assets no longer encumbered. As stated in the USDOT Decision on June 2, 2005, Ms. Dukler used her assets in the Firm in order to secure her loan from Fifth Third Bank. If, as Ms. Dukler contends, the assets used to secure the loan from Mr. Cowell are in fact separate property, the value of those assets alone would cause Ms. Dukler's personal net worth to exceed the personal net worth cap inasmuch as they are no longer encumbered. Note: If Ms. Dukler did not use separate assets to collateralize the loan from Mr. Cowell, she would not be able to successfully establish her claim of separate

00916

 SHOW CAUSE REVIEW: FILE #. 19323

 THE GROVE INC.

property ownership of the Firm. The Firm was unsuccessful in addressing this issue initially, and has not provided sufficient additional information for the Office to reconsider its determination on this issue.

### 3) *Ms. Dukler fails to maintain operational and managerial control of the Firm*

A review of the Certification Application and supporting documents failed to show that Ms. Dukler controlled the Firm as required by the federal regulations. According to the amendments to the bylaws, a quorum of the shareholders consists of 60 percent of the Firm's shareholders. The shareholders elect officers and appoint directors. Ms. Dukler only owns 51 percent of the Firm. Accordingly, she cannot convene a quorum of the shareholders on her own. This is a restriction on Ms. Dukler's ability to control the Firm, rendering the Firm ineligible for certification.

The Firm contends this bylaw provision does not restrict Ms. Dukler's ability to control. In support of this argument, the Firm references Article XI of the bylaws, which provides that the bylaws may be altered, amended, or repealed by a vote of the majority of shareholders. In addition, Article V of the Firm's Restated Articles of Incorporation allow for corporate action without a meeting of shareholders if written consent by shareholders having "at least that proportion of voting power which would be necessary . . . to authorize or constitute the action by affirmative vote." Essentially, the Firm contends that the quorum restriction placed on shareholders does not prevent Ms. Dukler from controlling the Firm.

The Office acknowledges that it is possible for Ms. Dukler to amend the bylaws. However, following the Firm's reasoning, Ms. Dukler would have to amend the bylaws every time she is unable to convene a quorum. If Ms. Dukler has to amend the bylaws on a regular basis, the Office believes this illustrates her inability to control the Firm as required by the federal regulations. Amendment of bylaws should be the exception and not the rule. If the eligible person has to resort to extraordinary measures to conduct its ordinary business operations, then the eligible person does not have the ability to control the business as contemplated by the federal regulations.

### 4) *The Grove, Inc. does not operate as an independent business*

The Firm is intertwined with Star Foods, LLC, a non-certified business. Star Foods, LLC is owned by Mr. Cowell and Mr. Dukler. Both Mr. Cowell and Mr. Dukler are former owners, directors and officers of the Firm. Star Foods, LLC currently owns 49 percent of the Firm. Star Foods, LLC owns, in whole or in part, Georgia's Grove, LLC, a snack food manufacturing and wholesale distributor. Based on the previous and current relationship between the Firm and Star Foods, LLC and its owners, the Firm is not an independent business as required by the federal regulations.

00917




The Firm contends that Mr. Cowell and Mr. Dukler resigned their positions as directors and officers and that these "previous" relationships are not relevant to "present" circumstances. In addition, the Firm claims that ownership by a shareholder who is involved in the same or similar industry is not prohibited. The Firm is mistaken in this contention. 49 CFR Part 26.71(b)(2) specifically directs the certifying authority to "consider whether present or recent employer/employee relationships between the disadvantaged owner(s) of the potential DBE and non-DBE firms or persons associated with non-DBE firms compromise the independence of the potential DBE firm."

Moreover, and as the Office previously determined, Ms. Dukler did not purchase her ownership interest in the Firm directly from the previously presumed eligible owners. Ms. Dukler purchased her ownership interest from Star Foods, LLC. As such, the Firm must demonstrate that all conditions of 49 CFR Part 26.71(l) have been met; i.e., 1) the transfer of ownership and/or control to the disadvantaged individual was made for reasons other than obtaining certification as a DBE; and 2) The disadvantaged individual actually controls the management, policy, and operations of the firm, notwithstanding the continuing participation of a non-disadvantaged individual who formerly owned and/or controlled the Firm. The Firm has failed to demonstrate by clear and convincing evidence these conditions have been met. Accordingly, the Office cannot determine that the Firm is an independent business.

The Firm contends the "two year" time period since Mr. Cowell's and Mr. Dukler's resignations from the Firm is significant. The Office disagrees. The current application submitted by the Firm was submitted to this Office September 12, 2005, after USDOT remanded the Firm's file back to the City of Chicago. Since then, other jurisdictions have reconsidered the Firm's certification eligibility since the resignations of Mr. Cowell and Mr. Dukler.[1] The Office has considered the recent decisions of these other jurisdictions, but finds they are not determinative.

Regardless, this argument does not address Mr. Dukler's other current employment as the CEO of Georgia's Grove, LLC, a position he has held since 2002.

---

[1] The Office considered the recent certification letters submitted by the Firm evidencing certifications issued by Greater Orlando Aviation Authority, Virginia Department of Minority Business Enterprise, Metropolitan Nashville Airport Authority and City of Chicago. The Office contacted each agency. Two of the jurisdictions based their certification determinations largely upon the USDOT's decision in favor of the Firm. However, USDOT's decision was based upon procedural grounds; it was not a substantive review of the Firm's eligibility. As well, the Virginia Department of Minority Business Enterprise did not consider the issue of the owner's personal net worth; it did not review Ms. Dukler's financial documents. Similarly, while the City of Chicago recently withdrew its proposed removal of eligibility of the Firm, it did so without resolving its "continuing concerns regarding the proper calculation of Ms. Dukler's personal net worth. (See City of Chicago May 24, 2006 letter.)

 SHOW CAUS...EW. FILE#: 19323

 TH..RVE INC.

The Firm also contends that Star Foods, LLC does not operate in the same or similar industry. However, Georgia's Grove, LLC, owned in part or in whole by Star Foods, LLC, operates as a snack food manufacturing and wholesale distribution company. This is the same industry in which the Firm operates, showing that in fact the firms do operate in the same or similar industry.

Finally, the Firm argues that Ms. Dukler's expertise is real and substantial. Again, the Office agrees with this contention, having never questioned Ms. Dukler's expertise in the industry. However, this argument is not determinative of the Firm's eligibility.

*5) The Firm operates as a family owned business*

The Office is unable to determine, based on the information provided, that the Firm is controlled by the eligible owner as distinct from the family as a whole. Ms. Dukler's ownership was acquired with community funds. Mr. Dukler is a former owner, board member, and officer of the Firm; a current owner of Star Foods, LLC and current CEO of Georgia's Grove, LLC; and is also the spouse of Ms. Dukler. The Firm operates in the same or similar industry as Star Foods, LLC and Georgia's Grove, LLC. As such, the office is unable to determine that the Firm is controlled by the eligible owner

The Firm contends Ms. Dukler controls the Firm; that it does not operate as a family owned and operated business. However, no additional information has been provided to cause the Office to change its earlier determination.

*The Firm is affiliated with Star Foods, LLC*

When determining whether a Firm is a small business concern as defined by the U.S. Small Business Administration (SBA), the Office must consider the gross receipts of all affiliates. The Firm failed to provide the income tax records of Star Foods, LLC. Accordingly, this office cannot determine if the Firm is a small business as defined by the federal regulations. As noted in its November 30, 2005 letter to the Firm, this Office would need to collect complete business taxes from Star Foods, LLC in order to make a determination, should the Firm appeal.

The Firm argues that Star Foods, LLC and the Firm are not affiliates, claiming there is "no common or cross ownership." The information submitted by the Firm lead to a contrary conclusion based upon 49 CFR Section 26.5. The Firm is directly owned by Star Foods, LLC. Additionally, affiliation exists when an identity of interest between or among parties exists such that affiliation may be found. The individual owners of Star Foods, LLC have had significant control of the Firm in the past. Mr. Dukler, spouse of the eligible owner and owner of Star Foods, LLC, is CEO of Georgia's Grove, LLC, which is also owned by Star Foods, LLC and which performs in the same industry as the Firm. (NOTE: Because of the lack of sufficient information, this office can make no determination other than its determination that the firms are affiliated.)

00919

 

## APPLICABLE FEDERAL REGULATIONS

**49 CFR Part 23.3** Airport Concession Disadvantaged Business Enterprise (ACDBE) means a concession that is a for-profit small business concern—

    (1) That is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which 51 percent of the stock is owned by one or more such individuals; and

    (2) Whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it.

**49 CFR Part 23.35** What is the personal net worth standard for disadvantaged owners of ACDBEs? The personal net worth standard used in determining eligibility for purposes of this part is $750,000. Any individual who has a personal net worth exceeding this amount is not a socially and economically disadvantaged individual for purposes of this part, even if the individual is a member of a group otherwise presumed to be disadvantaged.

**49 CFR Part 23.95(h)** Businesses operating under the following arrangements are not eligible for certification as DBE's under this subpart:

    (1) Limited partnerships, in which a non-DBE is the general partner.

    (2) Other arrangements that do not provide for ownership and control by the socially and economically disadvantaged owners.

**49 CFR Part 26.5** Affiliation has the same meaning the term has in the Small Business Administration (SBA) regulations, 13 CFR part 121.

    (1) Except as otherwise provided in 13 CFR part 1121, concerns are affiliates of each other when, either directly or indirectly:

        (i)    One concern controls or has the power to control the other; or

        (ii)    A third party or parties controls or has the power to control both; or

        (iii)    An identity of interest between or among parties exists such that affiliation may be found.

    (2) In determining whether affiliation exists, it is necessary to consider all appropriate factors, including common ownership, common management, and contractual relationships. Affiliates must be considered together in determining whether a concern meets small business size criteria and the statutory cap on the participation of firms in the DBE program.

**49 CFR Part 26.61(b) of Subpart D** The firm seeking certification has the burden of demonstrating to you, by a preponderance of the evidence, that it meets the requirements of this subpart concerning group membership or individual disadvantage, business size, ownership, and control.

**49 CFR Part 26.69(f) of Subpart D** The following requirements apply to situations in which expertise is relied upon as part of a disadvantaged owner's contribution to acquire ownership:

    (1) The owner's expertise must be --

        (i)    In a specialized field;

        (ii)    Of outstanding quality;

        (iii)    In areas critical to the firm's operations;

        (iv)    Indispensable to the firm's potential success;

        (v)    Specific to the type of work the firm performs; and

        (vi)    Documented in the records of the firm. These records must clearly show the contribution of expertise and its value to the firm.

**49 CFR Part 26.69(h)(1) of Subpart D**    You must presume as not being held by a socially and economically disadvantaged individual, for purposes of determining ownership, all interests in a

00920

 

business or other assets obtained by the individual as the result of a gift, or transfer without adequate consideration, from any non-disadvantaged individual or non-DBE firm who is --

 (i)  Involved in the same firm for which the individual is seeking certification, or an affiliate of that firm;

 (ii)  Involved in the same or a similar line of business; or

 (iii)  Engaged in an ongoing business relationship with the firm, or an affiliate of the firm, for which the individual is seeking certification.

**49 CFR Part 26.69(h)(2) of Subpart D**  To overcome this presumption and permit the interests or assets to be counted, the disadvantaged individual must demonstrate to you, by clear and convincing evidence, that--

 (i)  The gift or transfer to the disadvantaged individual was made for reasons other than obtaining certification as a DBE; and

 (ii)  The disadvantaged individual actually controls the management, policy, and operations of the firm, notwithstanding the continuing participation of a non-disadvantaged individual who provided the gift or transfer.

**49 CFR Part 26.69(J) of Subpart D** You may consider the following factors in determining the ownership of a firm. However, you must not regard a contribution of capital as failing to be real and substantial, or find a firm ineligible, solely because--

(1) A socially and economically disadvantaged individual acquired his or her ownership interest as the result of a gift, or transfer without adequate consideration, other than the types set forth in paragraph (h) of this section;

(2) There is a provision for the co-signature of a spouse who is not a socially and economically disadvantaged individual on financing agreements, contracts for the purchase or sale of real or personal property, bank signature cards, or other documents; or

(3) Ownership of the firm in question or its assets is transferred for adequate consideration from a spouse who is not a socially and economically disadvantaged individual to a spouse who is such an individual. In this case, you must give particularly close and careful scrutiny to the ownership and control of a firm to ensure that it is owned and controlled, in substance as well as in form, by a socially and economically disadvantaged individual.

**49 CFR Part 26.71(b) of Subpart D** Only an independent business may be certified as DBE.  An independent business  is one the viability of which does not depend on its relationship with another firm or firms.

(1) In determining whether a potential DBE is an independent business, you must scrutinize relationships with non-DBE firms, in such areas as personnel, facilities, equipment, financial and/or bonding support, and other resources.

(2) You must consider whether present or recent employer/employee relationships between the disadvantaged owner(s) of the potential DBE and non-DBE firms or persons associated with non-DBE firms compromise the independence of the potential DBE firm.

(3) You must examine the firm's relationships with prime contractors to determine whether a pattern of exclusive or primary dealings with a prime contractor compromises the independence of the potential DBE firm.

(4) In considering factors related to the independence of a potential DBE firm, you must consider the consistency of relationships between the potential DBE and non-DBE firms with normal industry practice.

**49 CFR Part 26.71(l) of Subpart D** Where a firm was formerly owned and/or controlled by a non-disadvantaged individual (whether or not an immediate family member), ownership and/or control were transferred to a socially and economically disadvantaged individual, and the non-disadvantaged individual remains involved with the firm in any capacity, the disadvantaged individual now owning the firm must demonstrate to you, by clear and convincing evidence, that:

00921




(1) The transfer of ownership and/or control to the disadvantaged individual as made for reasons other than obtaining certification as a DBE; and

(2) The disadvantaged individual actually controls the management, policy, and operations of the firm, notwithstanding the continuing participation of a non-disadvantaged individual who formerly owned and/or controlled the firm.

**49 CFR Part 26.73(b) of Subpart D**  You must evaluate the eligibility of a firm on the basis of present circumstances. You must not refuse to certify a firm based solely on historical information indicating a lack of ownership or control of the firm by socially and economically disadvantaged individuals at some time in the past, if the firm currently meets the ownership and control standards of this part. Nor must you refuse to certify a firm solely on the basis that it is a newly formed firm.

**49 CFR Part 26.73(c) of Subpart D** DBE firms and firms seeking DBE certification shall cooperate fully with your requests (and DOT requests) for information relevant to the certification process.  Failure or refusal to provide such information is a ground for a denial or removal of certification.

00922

00923





Preston|Gates|Elli
Rouvelas|Meeds LLP

William Kirk
WKirk@prestongates.com
202.661.3814

September 26, 2006

**VIA HAND DELIVERY
AND E-MAIL**

RECEIVED

OCT 0 2 2006

OMWBE

Certification Appeals Branch
Office of Civil Rights
U.S. Department of Transportation
Room 5414
400 Seventh Street, S.W.
Washington, D.C. 20590

Re:    Appeal by The Grove, Inc. of the Washington State Office of Minority and
Women's Business Enterprise Decision Denying ACDBE Certification

Dear Sir/Madam:

We are counsel to The Grove, Inc. ("The Grove" or "the Company"), a woman-owned and controlled firm that operates specialty retail food concessions in airports around the country. In written correspondence dated November 30, 2005, the Washington State Office of Minority and Women's Business Enterprises ("OMWBE" or "Washington") denied the Company's application for certification as an Airport Concessionaire Disadvantaged Business Enterprise ("ACDBE") (the "Application"). On December 16, 2005 the Company filed a written request for review of the decision. More than six months later, in correspondence dated June 28, 2006, the Company received OMWBE's decision re-affirming its original certification denial action.[1] On behalf of our client, and pursuant to applicable Department of Transportation ("DOT" or "the Department") regulations (49 C.F.R. § 26.89),[2] we respectfully submit and transmit The Grove's appeal of Washington's refusal to certify the Company as an ACDBE.

---

[1] As used in the Appeal, unless otherwise noted, references to the OMWBE "Denial" shall mean Washington's correspondence dated June 28, 2006. A copy of Washington's November 30, 2005 initial decision and a copy of its June 28, 2006 final decision are included as Exhibits 1 and 2 of the Appeal.

[2] As used in the Appeal, unless otherwise noted, references to the Department's regulations shall mean the regulations set for in 49 Code of Federal Regulations, Parts 23 and 26.

A LAW FIRM    A LIMITED LIABILITY PARTNERSHIP INCLUDING OTHER LIMITED LIABILITY ENTITIES

00924

1735 NEW YORK AVENUE NW, SUITE 500   WASHINGTON, DC 20006-5209   TEL:(202) 628-1700   FAX:(202) 331-1024   www.prestongates.com
Anchorage   Coeur d'Alene   Hong Kong   Orange County   Portland   San Francisco   Seattle   Spokane



Certification Appeals Branch
September 26, 2006
Page 2

While the Company's appeal comprehensively addresses the issues raised by Washington's Denial, we request an opportunity to review Washington's administrative record and to submit a response based on such review. Furthermore, as counsel to The Grove, we request an opportunity to meet with the Certification Appeals Branch to discuss these issues and respond to any questions. As noted in the appeal, The Grove has been in business for 25-plus years and has 340 employees. Washington's erroneous Denial is harming The Grove's operations and it is critical that the Company have a full opportunity to present its case.

In accordance with 49 C.F.R. § 26.89(c)(1), included as Exhibit 3 in the Appeal is a schedule of the names and addresses of entities that have either newly certified The Grove as an ACDBE, re-affirmed the Company's continuing ACDBE eligibility (in light of certain new ACDBE eligibility requirements), have the Company's application for certification pending before it or have rejected The Grove's application for certification. Overall, as reflected in Exhibit 3, the Company has been certified as an ACDBE by twenty (20) jurisdictions, including the City of Chicago ("the City" or "Chicago"), the area where the Grove is based. Included in this number are three (3) new certifications in 2006.

We note that Washington is the only jurisdiction that has denied The Grove certification. We believe that the Appeal clearly demonstrates that because the Denial is not supported by the information and evidence in the Company's Application and the record, Washington had no rational basis to deny the Company ACDBE certification--and therefore, as a matter of law, Washington's action is unreasonable and arbitrary. Accordingly, as further discussed in the Appeal, The Grove respectfully requests that the Department (1) reverse Washington's Denial and (2) direct Washington to certify The Grove as an ACDBE, as has been done by twenty (20) other jurisdictions.

Very truly yours,

PRESTON GATES ELLIS
& ROUVELAS MEEDS LLP

By
William Kirk

cc:    Michelle Dukler, The Grove, Inc.
       Robert Ashby, USDOT
       Michael Freilich, USDOT/FAA

 

**Appeal by The Grove, Inc. of the Washington State
Office of Minority and Women Business Enterprise
Decision Denying Airport Concessions
Disadvantaged Business Enterprise Certification**

**September 26, 2006**

**THIS DOCUMENT, INCLUDING THE EXHIBITS, CONTAINS
CONFIDENTIAL AND BUSINESS INFORMATION PROTECTED
FROM DISCLOSURE UNDER 5 U.S.C § 552 AND THE PRIVACY ACT**



# TABLE OF CONTENTS

I.   REQUEST FOR RELIEF ................................................................. 3

II.  SUMMARY OF ARGUMENT ......................................................... 4

III. BACKGROUND AND STATEMENT OF FACTS ............................ 7

IV.  PRESENTATION OF THE RECORD AND REBUTTAL OF OMWBE DECISION ....... 13

V.   ADDITIONAL MATTERS .............................................................. 51

VI.  BURDEN OF PROOF; ADMINISTRATIVE LAW AND DUE PROCESS ..................... 59

VII. CONCLUSION .............................................................................. 62

i

00927

 

## LIST OF EXHIBITS

1. Washington State's Preliminary Determination (Nov. 30, 2005).

2. Washington State's Denial (June 28, 2006).

3. List pursuant to § 26.89 of entities that have certified The Grove, Inc. as a Disadvantaged Business Enterprise, rejected The Grove's Application for Certification or have The Grove's Application under review.

4. The Grove's Application for Certification.

5. Exclusion of Certain Property from Marital Property.

6. Fifth Third Bank Consumer Note

7. Ms. Dukler's Payment to Casey Cowell.

8. Letter from the U.S. Department of Transportation to Chicago (June 2, 2005).

9. Small Business Administration Size Standards, 13 C.F.R. § 121.201.

10. List of documents submitted to Washington State.

11. The Grove's Earnings (1999-2003).

12. The Grove's Locations and Lease Expiration Dates as of February 2004.

00928

 

# INTRODUCTION

In written correspondence dated November 30, 2005, the Washington State Office of Minority and Women's Business Enterprises ("OMWBE" or "Washington") denied The Grove , Inc.'s ("The Grove" or "the Company") Application for certification as an Airport Concessionaire Disadvantaged Business Enterprise ("ACDBE") (the "Application"). On December 16, 2005 the Company filed a written request for review of the decision. More than six months later, in correspondence dated June 28, 2006, the Company received OMWBE's decision re-affirming its original certification denial action.[1] Pursuant to applicable Department of Transportation ("DOT" or "the Department") regulations (49 C.F.R. § 26.89),[2] The Grove respectfully submits this appeal of Washington's refusal to certify the Company as an ACDBE.

In accordance with 49 C.F.R. § 26.89(c)(1), included as Exhibit 3 is a schedule of the names and addresses of entities that have either newly certified The Grove as an ACDBE, re-affirmed the Company's continuing ACDBE eligibility (in light of certain new ACDBE eligibility requirements), have the Company's Application for certification pending before it or have rejected The Grove's Application for certification. Overall, as reflected in Exhibit 3, the Company has been certified as an ACDBE by the twenty (20) jurisdictions, including the City of Chicago ("the City" or "Chicago"), the area where the Grove is based. Included in this number

---

[1] As used in this Appeal, unless otherwise noted, references to the OMWBE "Denial" shall mean Washington's correspondence dated June 28, 2006. A copy of Washington's November 30, 2005 initial decision and a copy of its June 28, 2006 final decision are included as Exhibits 1 and 2.

[2] As used in this Appeal, unless otherwise noted, references to the Department's regulations shall mean the regulations set for in 49 Code of Federal Regulations, Parts 23 and 26.

1



are three (3) new certifications in 2006:  Metropolitan Nashville Airport Authority; the Virginia Department of Minority Business Enterprise; and the Georgia Department of Transportation

Washington is the <u>only</u> jurisdiction that has denied The Grove certification.

2

00930

 

## I. REQUEST FOR RELIEF

For the reasons set forth herein and based on the administrative record, Washington had no rational basis for the Denial and accordingly failed in its obligation to act reasonably in reviewing the Company's Application. The Denial is unsupported by substantial evidence and is inconsistent with the substantive and procedural provisions of the Department's Part 23 and Part 26 rules. Therefore, as a matter of law, Washington's Denial action was unreasonable and arbitrary. Accordingly, pursuant to § 26.89(f)(2), The Grove respectfully requests that the Department:

1. Reverse Washington's Denial, and

2. Direct Washington to certify The Grove as a DBE, as has been done by 20 other jurisdictions.

Washington's arbitrary Denial is harming The Grove's operations at Seattle-Tacoma International Airport and causes The Grove difficulties in opening operations in new jurisdictions.[3] The Grove faced similar problems when Chicago mistakenly refused to re-affirm the Company's continuing DBE status two years ago. The Department upheld The Grove's appeal and Chicago ultimately reaffirmed the Company's DBE status and more recently has recertified The Grove in light of certain new eligibility requirements.. However, it took a year and a half to resolve this issue during which time the operations of The Grove, a qualified DBE, were harmed. Accordingly, The Grove respectfully requests that the Department review this Appeal on an expedited basis and issue a decision as soon as possible.

---

[3] The Company is a subtenant of HMS Host ("Host") at the Seattle-Tacoma International Airport. Host alleges that the Company is in breach of its sub-tenancy agreement because of Washington's Denial. The Company disputes this interpretation of the sub-tenancy agreement and the issue may ultimately be resolved by litigation. However, suffice it to say the issue arises because of Washington's arbitrary decision.

3

00931

 

## II. SUMMARY OF ARGUMENT

**A. Washington's Denial Decision Is Not Supported By The Overwhelming Evidence In The Record Demonstrating The Grove's ACDBE Eligibility.**

OMWBE mistakenly bases its decision to deny the Company certification as an ACDBE on the following grounds:

- The controlling ownership interest of Michelle Dukler, the President and Chief Executive Officer of the Company, "is not real and substantial".

- Ms. Dukler's personal net worth exceeds the requirements of the ACDBE regulations.

- Ms. Dukler does not have managerial and operational control of The Grove.

- The Company does not operate as an independent business.

- The Company operates as a "family-owned" business.

Based on the facts in the record, viewed as a whole, the Company's present circumstances, and the DOT's regulations, The Grove has clearly shown by a preponderance of the evidence that it qualifies as a DBE.

- Ms. Dukler acquired controlling ownership through a real and substantial payment of $2,600,000.

- The borrowed funds used by Ms. Dukler to acquire her stock ownership (and its refinancing) and the assets used as loan collateral in each instance were and are permissible under DOT regulations. Further, Ms. Dukler is personally liable for the loan used to finance her stock ownership and this substantial debt is not an obligation of the Company.

- Ms. Dukler's personal net worth ("PNW") does not exceed the PNW standard applicable to owners of ACDBE firms.

- The Company's Articles of Incorporation, bylaws (and corporate action taken in conformity therewith) allow Ms. Dukler, the majority shareholder, to exercise unfettered control.

4

00932

 

- Ms. Dukler does, in fact, control The Grove as the majority shareholder, Board Chairperson, sole Director and the Company's President and Chief Executive Officer ("CEO").

- Ms. Dukler has the expertise to serve as the Company's CEO and to manage The Grove and, in fact, has done so on a day-to-day basis for nearly three years.

- Ms. Dukler's husband is not an officer, director, employee or shareholder of The Grove, though the DOT rules would nonetheless allow this. Further, he is not involved in the governance, management or operations of the Company.

- The Grove is an independent business and is not an affiliate of any other business.

**B. Washington's Denial Decision is Contrary to Law**

The DOT rules requires a certifying agency to:

- "consider all the facts in the record, viewed as a whole." § 26.69(a) and 26.71(a).

- "evaluate the eligibility of a firm on the basis of <u>present circumstances</u>." §26.73(b). (Emphasis added.)

- apply the rules under Part 26.

OMWBE failed to comply with the regulatory requirements set forth in the DOT rules and it consistently misinterpreted and misapplied the relevant provisions of those rules. OMWBE ignored common law doctrines and statutory corporate law. In addition, the Denial evidences that OMWBE either ignored or did not understand well settled accounting principles and well as usual and customary business practices. As a consequence, the Denial shows that OMWBE's understanding of the DOT rules is wanting and that its legal analysis (such as it is) is seriously flawed and without merit.

**C. Washington Failed To Observe And/or Adhere to DOT Regulatory And General Administrative Law Procedural Due Process Requirements**

In reviewing the Company's ACDBE certification Application, Washington failed to observe and follow applicable administrative law and due process requirements. As further

5

00933

 

discussed later in this Appeal, the DOT rules and applicable common law, statutes and case law require a certifying agency to act reasonably and to have a rational basis for its decisions that is grounded in substantial, relevant and probative evidence in the record. With respect to The Grove's Application, Washington has not acted reasonably. The OMWBE Denial does not meet the rational basis legal standard. Rather, Washington's Denial is baseless. It is grounded on suppositions, not the facts in the record. Moreover, Washington's "reasons" for denial are cursory, are not based on current information pertaining to the Company or that is relevant or pertinent to the Company's ownership, governance and management and operations

Accordingly, for all of the reasons outlined above, OMWBE's Denial should be reversed and DOT should direct OMWBE to certify the Company as an ACDBE.

00934

 

## III. BACKGROUND AND STATEMENT OF FACTS

**A.    Company History:  Pre-Stock Purchase.**

The Company first started in Denver, Colorado at the now-closed Stapleton Airport.  A

franchise was sold to Ruth Ann Menutis, a female, and Paul Valteau, an African-American.  The

Company's corporate records indicate that it was incorporated in Louisiana as Natural Energy

Unlimited, Inc., dba "The Grove".  The Company was certified by the City of New Orleans as a

DBE and Ms. Menutis and Mr. Valteau began operations in The New Orleans International

Airport in 1981 with a concession contract to operate a specialty food retail store.

Ms. Menutis and Mr. Valteau were directors of the Company and managed its operations,

serving as the Company's President and Vice-President, respectively.  From its founding until

1999, Ms. Menutis and Mr. Valteau also owned one hundred percent (100%) of the Company's

stock.

The corporate records of the Company indicate that in July 1999, Ms. Menutis and Mr.

Valteau sold forty-nine percent (49%) of the Company's stock to Star Foods, LLC, a Delaware

limited liability corporation and an investment company ("the minority shareholders"), for a sale

price of approximately $1.32 million and other consideration, including provision of a working

capital financing facility and the transfer of certain intellectual property used by the Company

and owned by Ms. Menutis and Mr. Valteau in another corporation called Exit, Inc..

Contemporaneously with the stock sale, Ms. Menutis and Mr. Valteau elected two

representatives of the minority shareholders as Company directors.[4]  In addition, on behalf of the

Company, Ms. Menutis and Mr. Valteau negotiated a license for the Company's continued use of

---

[4]  As further discussed herein, one of the persons elected as a director (Martin Dukler) was Ms. Dukler's husband.



The Grove trademarks, copyrights and other intellectual property. These transactions were memorialized in written agreements.

It is important to note that these transactions pre-date Ms. Dukler's purchase of her controlling interest in The Grove by some four years and that following the transactions Ms. Menutis and Mr. Valteau continued their respective management responsibilities and continued to serve as the Company's President and Vice-President. Moreover, the Company retained its DBE certification.

**B.    Company History: Post-Stock Purchase**

In February 2004, in an arms-length transaction, Ms. Dukler purchased the controlling block of the Company's stock, fifty-one percent (51%), for the negotiated purchase price of $2.6 million. Also, the restructuring of the Company's board of directors to effect Ms. Dukler's control of the board (as further described below) was a condition of the purchase.

In order to purchase the 51% ownership of The Grove, Ms. Dukler borrowed $2.6 million from Mr. Casey Cowell pursuant to a written Mortgage and Security Agreement. See Exhibit 4, which was submitted to OMWBE. As security for the loan, Ms. Dukler provided collateral, the specific items of which are listed in Attachments A through D of the Mortgage and Security Agreement. While some of the items of collateral listed in the attachments are/were jointly owned by Ms. Dukler and her spouse (i.e., acquired during their marriage), the bulk of the items were owned by Ms. Dukler prior to her marriage.

Contemporaneously with her acquisition of a majority of the stock, Ms. Dukler systematically began to take control of the governance and day-to-day management and the business affairs of the Company as the Grove's President and Chief Executive Officer. Exercising her authority and prerogative as the controlling shareholder (and pursuant to the terms of the stock purchase agreement), Ms. Dukler immediately reduced and restructured the

00936



Company's board of directors. The directors representing the minority shareholders resigned and currently Ms. Dukler is the Company's sole director. She also effected changes to the stockholders agreement to further ensure that she had complete discretion as the majority shareholder, sole board member and board chair. These actions were permitted by, and taken in conformity with, the requirements of the Louisiana Business Corporations Law and the Company's Article of Incorporation, its bylaws and board resolutions. Further, upon assuming board level and operational control of the Company, Ms. Dukler conducted senior management reviews and subsequently made key personnel changes.

Contemporaneously with her purchase of The Grove's stock, Ms. Dukler's spouse formally renounced in writing any ownership interest that he might have in, or assert with respect to, the purchased stock under the domestic relations laws of the State of Illinois as a spouse. Exhibit 5 is a copy of the written renunciation, which was provided to OMWBE.

In August 2004, Ms. Dukler obtained a personal bank loan from Fifth Third Bank and used the proceeds of this loan to fully repay her loan to Mr. Cowell. The principal amount of this bank loan is $2.6 million. Additional collateral for the bank loan is Ms. Dukler's stock in the Company and her personal guarantee of the debt. Exhibit 6 is a copy of Ms. Dukler's promissory note to Fifth Third Bank. As the maker of the note, Ms. Dukler is personally liable for this debt. Exhibit 7 is a copy of Ms. Dukler's check paying off the loan from Mr. Cowell. These two exhibits were previously provided to OMWBE. In addition, included are bank statements from Fifth Third Bank listing interest repayments on the loan and showing Ms. Dukler's personal funds as the source of those payments.

00937

 

The stock ownership of the Company, the composition of its the board of directors and the persons holding senior management positions before and after Ms. Dukler's stock purchase is shown below. This information was submitted to OMWBE.

### Stock Ownership

| Before | | | After | | |
|---|---|---|---|---|---|
| **Name** | **Shares** | **Percentage** | **Name** | **Shares** | **Percentage** |
| Ruth Ann Menutis | 18.25 | 25.5% | Michelle Dukler | 36.5 | 51% |
| Paul Valteau | 18.25 | 25.5% | Star Foods | 35 | 49% |
| Star Foods | 35 | 49% | | | |

### Directors

| Before | After |
|---|---|
| Ruth Ann Menutis | Michelle Dukler, Sole Director |
| Paul Valteau | and Chairperson |
| Martin Dukler | |
| Casey Cowell | |

### Officers

| Before[5] | After |
|---|---|
| Ruth Ann Menutis, President | Michelle Dukler, President and CEO |
| Paul Valteau, Executive V.P. | |
| Robert Ireland, Secretary | Robert Ireland, Secretary |
| Robert Ireland, Treasurer | Robert Ireland, Treasurer |

Thus, while The Grove was a DBE-controlled and -managed firm before Ms. Dukler acquired ownership and control, the resignations of the persons representing the Company's minority shareholders made it even more of a DBE-controlled and -managed firm following Ms. Dukler's acquisition of ownership and control.

---

[5] For a short period prior to February 2004, at the request of Ms. Menutis, Martin Dukler served in a senior managerial post as was authorized by her to take certain actions on behalf of the Company.

00938

 

Prior to her stock purchase, Ms. Dukler was personally very familiar with The Grove's business and its potential entrepreneurial opportunities. In February 2000, The Grove retained Ms. Dukler as a consultant to work on employee training and development. Ms. Dukler successfully completed this project and as part of her work she developed and implemented a new training module and curriculum for the Company's store managers and assistant managers-- referred to now as "Grove University"—and the Company continues to use this program. As a consequence of this excellent work, the Company recruited and hired Ms. Dukler to serve as its Director of Marketing, a position that Ms. Dukler held for two and a half years. In this position, Ms. Dukler established the Company's first formal Marketing Department and ran that department's operations on a day-to-day basis. During Ms. Dukler's tenure in this position, she was immersed in the key aspects of the Company's business operations and was a member of the Company's senior management team. Further, as Director of Marketing she developed new products, new vendor relationships, standards for new store designs and store openings and addressed a variety of issues related to product quality, cost, pricing and packaging.

Currently, Ms. Dukler manages the affairs of The Grove on a full-time basis. Since assuming the role as President and Chief Executive Officer of the Company, she is personally involved in all facets of the business. For example, among other things, Ms. Dukler:

- Establishes the Company's budgets and strategic plans.
- Reviews and approves all capital spending on all store build-outs that are in process and helps craft, review and approve new business proposals for new retail locations at airports.
- Reviews payrolls and approves and signs all corporate checks for rent and capital expenditures as well as checks over $50,000.
- Negotiates, approves and executes all major agreements legally obligating the Company.
- Has negotiated the Company's lines of credit with its banks.

11

00939

 

- Has renegotiated the Company's health, property and casualty and life insurance policies.

- Organizes and conducts weekly senior management headquarters meetings.

- Has negotiated and signed new leases and lease extensions for all retail spaces at airports at which The Grove does business.

- Has negotiated the new franchise agreements with Smoothie King and Subway.

- Has interviewed and hired senior area managers and conducted performance reviews for the Company's headquarters accounting, business development, human resources and technology support and marketing staff.

Thus, the record clearly establishes that Ms. Dukler owns and controls The Grove and that The Grove is an independent business.

12

00940



## IV. PRESENTATION OF THE RECORD AND REBUTTAL OF OMWBE DECISION

The Denial lists independent grounds for denying certification to The Grove.

1.  Ms. Dukler's ownership of the firm is not real and substantial.

2.  Ms. Dukler fails to meet the Personal Net Worth requirements.

3.  Ms. Dukler fails to maintain operational and managerial control of the firm.

4.  The Grove, Inc. does not operate as an independent business.

5.  The Grove operates as a family owned business.

The Denial also alleges that The Grove is affiliated with Star Foods, LLC and that the affiliated firms might not meet the ACDBE size standards.

The analysis below addresses and refutes each one of these alleged grounds for the Denial. Although several of the alleged grounds are interrelated, each allegation is discussed separately in order to respond to specific misstatements of fact and substantive regulatory and legal errors made by OMWBE. Further, the Appeal addresses certain additional matters that while not directly cited by Washington as a basis for its Denial, have nevertheless been raised at times by it and others regarding the Company's eligibility as an ACDBE. Although we understand that DOT is obligated to evaluate the OMWBE's action and the Company's appeal on the basis of the administrative record (and not *de novo*), we believe it is important that the issues set forth below are also specifically discussed. We believe that this is particularly important since, in large measure, these additional matters emanate principally from correspondence from DOT's Office of Civil Rights to Chicago, the Company's home certifying jurisdiction. (See Exhibit 8, Correspondence dated June 2, 2005 from DOT's Office of Civil Rights to the City (the "DOT Letter")). It is our understanding that OMWBE reviewed a copy of

13

00941



the DOT Letter and that it may have played a role its evaluation of the Company's ACDBE

Application.

## A.    Ms. Dukler's Ownership is Real and Substantial

As noted previously, Ms. Dukler obtained a secured loan for $2.6 million from Mr.

Cowell to finance the purchase of her ownership interest in the Company.  The Denial rightly

acknowledges that this loan and its purpose was acceptable and is not prohibited by the DOT

regulations.[6]  In fact, § 26.69(e) allows such loans.  The Denial also acknowledges that, using the

proceeds of this loan, Ms. Dukler paid $2.6. million in cash consideration for the stock.

Nevertheless, the Denial summarily concludes that Ms. Dukler's purchase was neither "real" nor

"substantial" because:

- The loan funds were briefly deposited into, and withdrawn from, a joint account that she maintained with her husband;

- Martin Dukler had a <u>prior</u> involvement with the Company;[7]

- Documentation of Ms. Dukler's expertise was not submitted in accordance with § 26.69(f)(1);[8] and

- Martin Dukler is in the same industry as Ms. Dukler.

OMWBE's "analysis" with respect to each of these four issues is flawed in several

respects and each of the above points is discussed in term..  In determining ownership, the DOT

requires that the OMWBE consider "all the facts in the record, viewed as a whole." § 26.69(a).

Washington did not do so.  In this case, the facts "viewed as a whole," clearly show that Ms.

---

[6] Denial at 2.

[7] ". . . the funds paid to Star Foods, LLC came from a joint checking account with an ineligible spouse who has a history of involvement with the firm as both an officer and a director, as a current owner, officer and director of Star Foods, LLC and works in the same or similar industry.  <u>As such</u>, Ms. Dukler's ownership of the firm is not real and substantial." Denial at 2. (Emphasis added).

[8] Denial at 2.

 

Dukler's ownership of The Grove is real and substantial, both in terms of her capital contribution and her expertise and management and control of the Company.

### 1. Source of Funds For The Stock Purchase; Effect of A Joint Account on DBE Eligibility.

The undisputed facts set forth in the record are as follows:

- On February 5, 2005, Ms. Dukler obtained the $2.6 million loan to purchase The Grove stock. The $2.6 million was deposited by wire transfer into the account.

- On February 6, 2005, the very next day and less than 24 hours later, Ms. Dukler purchased the shares for $2.6 million, using the $2.6 million that had been deposited in the account the previous day.

Yet, despite these facts in the record (and even though it acknowledges that the loan proceeds were deposited into a joint account with her spouse), Washington argues that it can not reasonably "trace" the disposition of the borrowed funds (*i.e.*, the source of the funds used to buy the stock). At the same time, erroneously citing §26.69(j)(3), OMWBE argues that the use of the funds deposited in the Dukler's joint account means that the majority ownership interest purchased by Ms. Dukler's ownership was not "real and substantial" for purposes of ACDBE certification. See Denial at 1. Ignoring for the moment the inconsistency of these positions, Washington's comments regarding the source of the purchase funds belies common sense and its analysis regarding a joint account is similarly wanting.

The deposit into the joint account was simply a matter of convenience. The actions of the parties involved in this transaction make absolutely clear their respective intentions—Ms. Menutis and Mr. Valteau were clearly selling their ownership in the Company; the lender (Mr. Cowell) clearly intended to lend funds to Ms. Dukler for the express and sole purpose of purchasing the stock; and Ms. Dukler clearly intended to and, in fact, did use the loan funds to purchase the Company stock. Washington even acknowledges that the purpose of the $2.6

00943

 

million loan was for Ms. Dukler to purchase her ownership interest, but then tries to argue that

the funds somehow came from elsewhere.

> Michelle Dukler, the eligible owner of 51 percent of the Firm,
> obtained a loan from an ineligible person for the purpose of
> acquiring the funds to purchase her ownership interest in the Firm.
> This is not expressly prohibited by the federal regulations.  Denial
> at 1.  (Emphasis added).

The fact that the borrowed funds went into and came out of a "joint" account does not

obfuscate the fact that Ms. Dukler used these same borrowed funds to acquire the stock.  While

the use of a joint account in other cases may make it difficult to confirm that a disadvantaged

individual used his or her own funds, when the facts of this case are considered in a reasonable

and common sense manner, that is certainly not the situation here.  The amount borrowed exactly

matches the price paid for the stock and the funds stayed in the account for less than 24 hours.

Accordingly, the preponderance of the evidence pertaining to this sequence of events does not

support Washington's erroneous conclusion that the source of the purchase funds was not

established—let alone that the $2.6 million of cash consideration paid by Ms. Dukler for the

stock was not "real and substantial".

Moreover, OMWBE completely ignores the DOT's rule under § 26.69(j)(2), which

clearly allows the use of a joint account.  This rule directs a certifying entity that:

> [Y]ou must not regard a contribution of capital as failing to be real
> or substantial, or find a firm ineligible solely because -
>
> . . .
>
> (2) There is a provision for the co-signature of a spouse who is not
> socially and economically disadvantaged individual on financing
> agreements, contracts for the purchase or sale of real or personal
> property, bank signature cards, or other documents.  (Emphasis
> added).

00944

 

Washington also improperly cites § 26.69(h) as support for its assertions. This section of the DOT rule establishes the rebuttable presumption that an ownership interest in a DBE-firm (or potential DBE-firm) is not held by an eligible person if it is the result of a gift, or a transfer without adequate consideration, from a non-disadvantaged individual or non-DBE firm. However, Washington cites no evidence that Ms. Dukler obtained her ownership interest in the Company as the result of a gift of transfer without adequate consideration from an ineligible person or a non-DBE firm.[9] In this case, the record clearly shows that Ms. Dukler used the proceeds of a loan that was memorialized in a written loan agreement and that was secured by a written promissory note and the grant of a security interest in certain of Ms. Dukler's assets. Nowhere in the Denial does Washington present any evidence to the contrary. It is certainly unreasonable for Washington to cite this subsection of the DOT rules in support of its actions without any showing that it is applicable based on the factual record.

As noted previously, in the same section of the Denial OMWBE also asserts that the Company "does not provide documentation that satisfactorily traces the disposition of the borrowed funds", and remarkably cites in support of this assertion § 26.69(j)(3). Denial at 1.[10] Yet, this subsection of the DOT rules specifically and unambiguously pertains to the transfer of ownership of a firm from an ineligible spouse to an eligible spouse person·for <u>adequate</u> consideration (and as Washington knows Martin Dukler did not own any Company stock). In essence, OMWBE makes contradictory arguments and, without any rational basis, cites sections of the DOT regulations that are inapplicable to the facts. Nevertheless, on this point the

---

[9] Although appropriately not an issue for OMWBE, the purchase price paid by Ms. Dukler has been raised in another context by others. This matter will be specifically addressed later in this Appeal.
[10] This OMWBE statement belies common sense and the citation of § 26.69(j)(3) as support is another example of Washington's legal analysis is arbitrary and inconsistent with the Department's rules.

 

information in the record is clear and any reasonable person applying common sense can easily

conclude the source of the funds used by Ms. Dukler to purchase her Company stock.

Finally, to the extent that the use of a joint account could be deemed to make the funds

jointly owned or marital assets, the DOT regulations provide a specific rule of interpretation to

OMWBE regarding the analysis of business ownership. Section 26.69(i)(1) of the DOT rules

provides:

> When marital assets (other than the assets of the business in
> question) held jointly or as community property by both spouses,
> are used to acquire the ownership interest asserted by one spouse,
> <u>you must deem the ownership interest in the firm</u> to have been
> acquired by that spouse with his or her own individual resources,
> <u>provided that the other spouse irrevocably renounces and transfers
> all rights in the  ownership interest in the manner sanctioned by the
> laws of the state in which either spouse or the firm is domiciled</u>
> (Emphasis added).

In accordance with the above regulation, contemporaneous with Ms. Dukler's stock purchase,

her spouse executed a written and irrevocable renunciation of any ownership in the acquired

stock in the manner provided by Illinois, the state of the couple's domicile.  A copy of the

renunciation was included as with the Company's Application OMWBE as Attachment XXXV,

"Exclusion of Certain Property from Marital Property".  The Denial improperly ignores the

renunciation and the requirements of § 26.69(i).  (Additional information on this issue is

discussed later in this Appeal.)

### 2.  Martin Dukler's Prior Experience Is Not Relevant to Ms. Dukler's Contribution.

The Denial states that Martin Dukler's "has a history of involvement with the firm as

both an officer and a director", Denial at 2, and suggests that, regardless of the current

circumstances, positions that he held in 2004, nearly three years ago, somehow provide a rational

and reasonable basis for making an eligibility determination in 2006.  The Denial also

00946

erroneously implies that Martin Dukler is currently involved with the Company's management and operations and is a stockholder.

Under DOT rules, a certifying agency may consider the past association or activities of an ineligible person with a potential DBE firm. In this case, however, there is no evidence in the record to support OMWBE's inference of past participation by an ineligible person (Mr. Dukler or anyone else) that was not permitted by the DOT rules—or that is relevant to a present day ACDBE eligibility determination. In fact, OMWBE's supposition is directly contradicted by facts in the record. Further, OMWBE does not cite any evidence or principle of law to refute these facts. Therefore, as further discussed below, there is no rational ground for Washington to base a certification denial on Mr. Dukler's past association with the Company. Washington's attempt to do so is inconsistent with the applicable DOT rules and is arbitrary and unreasonable. Each element of OMWBE's erroneous supposition is addressed below.

**a. Martin Dukler is not a Company director or officer** - Prior to Ms. Dukler's stock purchase in February 2004, Martin Dukler was a Company director. Prior to February 2004, he also served in a senior managerial post on a temporary, uncompensated basis, and at the request of Ms. Menutis, The Grove's President, due to a prolonged illness that she experienced. Although Mr. Dukler was authorized to take certain actions on behalf of the Company, Ms. Menutis retained her corporate officer position as President of the Company and the ultimate authority commensurate with this position under The Grove's bylaws.

When Ms. Dukler purchased her controlling interest in February 2004, Martin Dukler relinquished any management role in the Company and since then he has played no role in the Company's operations. At this same time he also resigned his position as a Company director and the resignation was accepted by the Company's Board in the manner provided for by the

19



Company's bylaws.  Again, these actions were taken in February 2004, more than two and one-half years ago.  The Company provided clear and accurate information regarding its governance and management with its Application—and evidencing that Mr. Dukler does not have any present role in the Company's affairs.  Accordingly, there is no factual or legal basis for Washington to assert, suggest, imply or surmise that Martin Dukler has any authority or involvement with the governance or management of The Grove today.  Any such assertion or supposition to the contrary is not supported by the evidence in the record and is contrary to Washington's obligation to act reasonably and have a rational basis for its "findings".

Washington's reliance on past circumstances to the exclusion of present day facts is also clearly prohibited by the DOT's regulations, which clearly state:

> You <u>must</u> evaluate the eligibility of a firm on the basis of <u>present</u> circumstances.  § 26.73(b) (emphasis added).

This subsection goes on to say:

> You must not refuse to certify a firm based solely on historical information indicating a lack of ownership or control of the firm by socially and economically disadvantaged individuals at some time in the past, if the firm <u>currently</u> meets the ownership and control standards.  Id. (emphasis added).

Even with respect to this part of the rule and the facts pertaining to The Grove, Washington does not cite any evidence indicating that the Company was not owned and controlled by socially and economically disadvantaged individuals at the time of Ms. Dukler's purchase (<u>i.e.,</u> by anyone other than Ms. Menutis and Mr. Valteau).  Further, as previously noted, the Denial does not cite or present any information to contradict the clear, unambiguous information in the record demonstrating Ms. Dukler's majority ownership of The Grove's stock and her full and unfettered control of the Company's affairs.  Again, its patently unfair, unreasonable and arbitrary for OMWBE to make certification decisions on the basis of supposition rather than the factual record.

00948

 

Further compounding its error (and the harm to the Company), Washington attempts to hold The Grove to a different standard of proof that is required by the DOT rules. Although the information submitted with the Company's Application more than meets its burden of proof (preponderance of the evidence), OMWBE argues that The Grove has not submitted "clear and convincing" evidence to refute its "determination" that Ms. Dukler's majority stock ownership and control of the Company is "compromised" because of her spouse's prior involvement with the Company. OMWBE cites §26.71(l) as support for this assertion.

Subsection 26.71(l) of the DOT rules provides:

> Where a firm <u>was formerly owned and/or controlled by a non-disadvantaged individual</u> (whether or not an immediate family member), <u>ownership and control were transferred to a socially and economically disadvantaged individual, and the non-disadvantaged individual remains involved with the firm in any capacity,</u> the disadvantaged individual now owning the firm must demonstrate to you, by clear and convincing evidence, that:
>
> (1) The transfer of ownership and/or control was made to the disadvantaged individual was made for reasons other than obtaining certification as a DBE; <u>and</u>
>
> (2) The disadvantaged individual actually controls the management, policy, and operations of the firm, not withstanding the continuing participation of a non-disadvantaged individual who formerly owned and/or controlled the firm. (Emphasis added).

We state this subsection in its entirety in order to illustrate another example of Washington's misapplication of the DOT rules. Subsection 26.71(l) is clear and unambiguous. It applies to circumstances where an <u>ineligible person</u> owns and/or controls a firm, then subsequently transfers ownership or control to an <u>eligible person</u> <u>and</u> remains involved in the firm in any way. This is also the predicate for the remaining portions of the rule. However, as OMWBE knows, these circumstances did not apply in any way to The Grove at the time of Ms. Dukler's stock purchase. The facts in the record, and that are not disputed by Washington, are that (i) at the time of Ms. Dukler's stock purchase, fifty-one percent of its stock was owned by

00949



eligible persons (Ms. Menutis and Mr. Valteau), (ii) eligible persons controlled The Company's management and operations and (iii) the Company was certified as a DBE. There is no information in the record to the contrary and no contrary evidence or finding by OMWBE in the Denial--and by definition, if an ineligible person owned and/or controlled the firm prior to the stock sale it could not have been certified as a DBE. Moreover, as discussed below, the information in the record demonstrates to any reasonable person (clearly and convincingly, or otherwise) that Martin Dukler did not, and does not, own stock in the Company, that he never had sole or unfettered control of The Grove and that he ceased any involvement with its management or operations in <u>February 2004</u>. Yet, OMWBE cites this subsection as its justification for concluding that "Mr. Dukler's past and present interactions compromise Ms. Dukler's ownership for purposes of certification". Washington's statement in this regard is simply arbitrary and unreasonable. The inapplicability of this subsection to this case is so clear that Washington's attempt to base its Denial on its provisions evidences an alarming misunderstanding of the rules and/or a totally unacceptable lack of care in applying DOT rules to the facts in this case. In either case, Washington's conduct is wrong and hurtful to The Grove.

    **b. Martin Dukler is not an owner of the Company** - Martin Dukler <u>does not</u> own any Grove stock and never has. At the time of Michelle Dukler's acquisition of the controlling interest in the Company, Martin Dukler was simply a minority owner (20%) in another company, Star Foods, which itself, in turn, was a minority shareholder of The Grove.[11] Not only is Martin Dukler's "prior involvement" in The Grove in this regard inconsequential under the DOT rules, it:

> • Does not negate or effect Ms. Dukler's majority ownership of the
>   Company's stock;

---

[11] Exhibit 4; Application, Section 3B.

 

- Does not negate or effect Ms. Dukler positions as the President and CEO of the Company, her position as the firm's sole Director or her exercise of control as the majority shareholder; and

- Does not negate or effect the fact that Ms. Dukler has the requisite background, knowledge and experience to manage the Company.

Again, OMWBE does not cite any facts or legal principle to the contrary—and certainly not to support a claim that Ms. Dukler's stock ownership is "compromised".[12]

**c. DOT rules permit spousal involvement in an ACDBE firm** - The Denial erroneously suggests that prior or current involvement of a spouse (or other family member) who is an ineligible person is prohibited by the DOT rules or requires a finding that a socially and economically disadvantaged person does not control the firm. Again, Washington's legal analysis is completely inconsistent with the Department's rules. In fact, far from prohibiting a spouse's prior or present involvement in an ACDBE firm, § 26.71(k)(1) explicitly allows a spouse to participate as a manager, employee or owner of an ACDBE firm. Yet, Martin Dukler holds none of these positions.

Even if this was an issue in this case, § 26.71(k)(2) directs the certifying agency to review the facts confirming that the socially and economically disadvantaged owners—as distinct from the family as a whole—controls the firm and, as a matter of law, its review of this issue must be reasonable and there must be a rational basis for its findings grounded in the record. The overwhelming evidence contained in the record clearly and convincingly indicates that Michelle Dukler does not simply participate in the Company's activities. By every legal, meaningful and usual and customary indicia, it conclusively demonstrates that she in fact controls its governance and management and directs its operations. Thus, again even if this were an issue in this case, which it is not, the Company (and Ms. Dukler) has met its burden of proof on this matter and it

---

[12] OMWBE assertion is analogous to saying because I own shares in a mutual fund that invests in Company A, that I directly own the stock of Company A.

00951

 

was unreasonable and arbitrary for Washington to find otherwise. Again, Martin Dukler presently holds no position with The Grove and has no direct ownership of the Company.[13]

  **d. Martin Dukler no longer holds an ownership interest in Star Foods** - Finally with respect to this matter, Martin Dukler no longer holds an ownership interest in Star Foods. He disposed of his ownership interest in the second quarter of 2006. While this was subsequent to the issuance of Washington's Denial, it is nonetheless, probative information that further corroborates the evidence in the record that Martin Dukler has played no governing or management role in the Company following Ms. Dukler's majority stock purchase more than two and one-half years ago. Following that transaction, he was simply a minority investor in an investment firm that itself held a minority ownership position in The Grove.

  **3. Ms. Dukler's Expertise, On Its Own, Constituted a Real and Substantial Contribution Pursuant to § 26.69(f).**

  OMWBE's attempt to use § 26.69(f) in support of its assertions regarding Ms. Dukler's contributions to acquire majority ownership of the Company is unsupported by the evidence. The Denial's legal analysis on this point is also inconsistent with the DOT's rule under § 26.69 for determining whether the contribution of capital or expertise is real and substantial. As shown above, Ms. Dukler's $2.6 million payment for the controlling interest was "real and substantial" in accordance with § 26.69(e). OMWBE acknowledges Ms. Dukler's payment of cash consideration for the Company stock but nevertheless attempts to denigrate its significance. Next, while not directly contending that she lacks the expertise to run the Company, OMWBE inappropriately cites § 26.69(f) and disingenuously states that it did not receive sufficient

---

[13] Washington could have also confirmed these facts by conducting a site visit as provided in §26.83(c)(1). However, it chose not to do so and apparently disregarded the results of Chicago's site visit that confirmed Ms. Dukler's control of the Company.

 

information on the matter.[14]  OMWBE's assertion is not credible nor reasonable and is

unsupported by substantial evidence.  The Grove's Application provided this information.  In

fact, for example, The Grove's Application contained Ms. Dukler's resume and The Grove's

December 16, 2005 appeal also contained Ms. Dukler's resume.  Her resume makes several key

points that Washington has simply chosen to ignore:

- 21 years of experience in retail operations.

- 11 years of experience in owning and managing her own companies.

- 3 years of prior senior level experience with The Grove's operations.

- Recognition by the 1998 Milwaukee Business Journal as one of 40 outstanding
  business people under 40 years of age who would be the next generation of business
  and community leaders

- One of the first women to be inducted into the Downtown Milwaukee Rotary Club.

- Former consultant to The Grove and subsequently hired as the Company's Director of
  Marketing (responsible for new product development, new vendor relationships, and
  store designs, sales training, product quality and packaging, etc.) and immersed in key
  aspects of the Company's operations.

Section 26.69(f) states:

> The following requirements apply to situations in which <u>expertise</u>
> <u>is relied upon as part of a disadvantaged owner's contribution to</u>
> <u>acquire ownership.</u>  (Emphasis added)

In this case, Ms. Dukler did not have to rely upon her expertise as part of the consideration

proffered for acquiring controlling ownership of the Company.  There was no need to do because

of the cash consideration paid by her in a manner permissible under the DOT rules.  Nonetheless,

even if this were an issue (and it is not), any reasonable evaluation of Ms. Dukler's expertise, on

---

[14] Washington mistakenly stated, "The Firm also contends Ms. Dukler's expertise is real and substantial.  (Note: This office has made no contention that Ms. Dukler fails to have the necessary expertise to control the firm).  Notwithstanding, there is <u>no information</u> contained in the Certification Application to indicate that Ms. Dukler's contribution is based upon anything other than cash.  <u>The Firm has not submitted documentation</u> as required by 49 CFR 26.69(f) for the Office to recognize Ms. Dukler's expertise as a contribution made to acquire her membership interest."  Denial at 2 (emphasis added).

00953



its own, establishes that it is substantial, specific to the products sold by The Grove, important to the firm's operations and directly relevant to the management of the Company's airport concessions business. Accordingly, the cash consideration paid by Ms. Dukler and her background expertise qualify as a "real and substantial" contribution by more than a preponderance of the evidence under § 26.69(e) and (f). Washington's supposition otherwise is neither rational nor reasonable.

### 4. Ms. Dukler and Martin Dukler Are Not in the Same Industry.

The Denial also mistakenly argues that Martin Dukler's ownership interest in Star Foods, Inc. and position with Georgia's Grove LLC constitutes involvement in the "same or similar industry" as the business of the Company and that this a basis for denying The Grove ACDBE certification. Denial at 2. As further discussed below, this contention is unsupported by substantial evidence and denotes OMWBE's lack of understanding of the applicable law and regulations.

The Grove is an operating company in the business of retail sales of specialty food items in airports. The Company manages food concessions stores at airports. The DOT has specific rules dealing with this particular industry and defines a "concession" as:

> a for-profit business enterprise located on an airport subject to this subpart, that is engaged in the sale of consumer goods or services to the public under an agreement with the [airport] sponsor, another concessionaire, or the owner of a terminal, if other than the [airport] sponsor. § 23.89.

The Grove meets this narrow definition. Star Foods and Georgia's Grove clearly do not. By contrast, Star Foods does not directly operate retail stores nor is it engaged in the sale of consumer goods at airports  In fact, Star Foods does not operate any facilities at airports. Star Foods is an investment firm that makes investments in operating companies primarily involved in the snack food industry. Denial at 2. Moreover, with the exception of The Grove, to the best

 

of our information and belief, none of the portfolio investments of Star Foods are involved in retail sales. For this reason, we take great exception to OMWBE's statement that "based on the information submitted, it appears Star Foods owns and manages businesses in the snack food/concessionaire industry" (emphasis added). This is pure supposition by Washington or, at worst, a disingenuous statement. In either case, Washington's contention is contradicted and unsupported by the actual facts in the record.

Section 3(D) (page 10) of The Grove's Application to Washington mentions that Martin Dukler is a minority investor in Star Foods and is involved with Georgia's Grove LLC, one of its portfolio companies. Georgia's Grove LLC, is a manufacturer and wholesaler of goods. As noted above, it has no airport facilities or retail outlets. However, Washington erroneously says that "this is the exact same industry that the firm operates in". Denial at 2 (emphasis added). This statement belies common sense. It is analogous, for example, to equating a soft drink bottler with a retailer that sells soft drinks on a retail basis. Each firm is generally involved in an aspect of the soft drink industry, but clearly each is involved in a different line of business.

Under the DOT rules, a certifying entity is required to look to regulations of the U.S. Small Business Administration ("SBA") for guidance regarding business classifications and size. § 26.65. The SBA rules incorporate the North American Industry Classification System ("NAICS") for categorizing firms in the same or similar industries. If, as Washington alleges, the Company, Star Foods and Georgia's Grove, LLC are the same or similar industries, then they would have the same SBA/NAICS designation. However, NAICS designations in the SBA regulations under 13 CFR § 121.201 make it absolutely clear that retail, wholesale, manufacturing and investment are completely different industries and even operate under different size standards. Exhibit 9.

00955

 

| Industry | NAICS Subsection | SBA Size Standard |
|---|---|---|
| Retail Food and Beverage | 445 | $30 million[15] |
| Wholesale Food | 424 | 100 employees |
| Food Manufacturing | 311 | 500 employees |
| Investment Banking | 523 | $6.5 million |

Accordingly, these are not the "same" or "similar" industries. Washington's allegations are factually incorrect and inconsistent with Federal regulations. This is illustrative of one more instance where OMWBE failed to make a reasonable judgment because of its misunderstanding of the applicable regulations or because it is simply distorting the record. Moreover, the Company strongly objects to OMWBE's insinuation that it did not provide complete and accurate information concerning this matter. Finally, as previously noted above, Martin Dukler no long has an ownership interest in Star Foods and, as a consequence, he also no longer has any involvement with Georgia's Grove.

**B.    Ms. Dukler Meets the Personal Net Worth Requirements.**

The Denial incorrectly alleges that Ms. Dukler's personal net worth ("PNW") "exceeds the program cap of $750,000." Denial at 2. The "basis" for Washington's conclusion appears to be the fact that Ms. Dukler paid off the original loan she obtained to purchase her Company stock. The Denial states, "Ms. Dukler obtained a loan of $2,600,000 from Mr. Casey Cowell, secured by personal assets. Ms. Dukler repaid that loan on August 17, 2004, making those assets no longer encumbered . . . Ms. Dukler used her assets in the firm in order to secure her loan from Fifth Third Bank. If, as Ms. Dukler contends, the assets used to secure the loan from Mr. Cowell are in fact separate property, the value of those assets alone would cause Ms. Dukler's

---

[15] Size standard for airport concessions. § 23.33.

 

personal net worth to exceed the personal net worth cap inasmuch as they are no longer encumbered." Once again, Washington misunderstands the relevant DOT rule applicable to ACDBE certification and improperly applies it to this case.

Section 23.35 of the DOT regulations states the general rule PNW standard of $750,000. However, in calculating PNW DOT guidance follows usual and customary accounting rules that reduce the value of an individual's assets by the individual's personal debt(s)[16] and further, in defining in defining the phrase "personal net worth" §23.3 states that an individual's PNW does not include the following:

> "The individual's ownership interest in an ACDBE firm or a firm that is applying for ACDBE certification; the individual's equity in his or her primary place of residence; and <u>other assets that the individual can document are necessary to obtain financing or a franchise agreement for the initiation or expansion of his or her ACDBE firm (or have in fact been encumbered to support existing financing for the individual's ACDBE business to a maximum of $3 million.</u> An individual's personal net worth includes only his or her own share of assets held jointly or as community property with the individual's spouse." (Emphasis added).[17]

Washington failed to follow the DOT guidance or the definition of PNW set forth in §23.3. In this case, while Washington acknowledged that in order to pay off the loan from Mr. Cowell, Ms. Dukler borrowed $2.6 million from Fifth Third Bank. However, Washington simply chose to ignore that this was a personal loan secured by Ms. Dukler's personal promissory note. In addition, the Fifth Third Bank required Ms. Dukler to execute a security agreement in which she pledged all of her assets and personal property (<u>i.e.,</u> including the personal assets mentioned by Washington in the Denial) as security for the loan. Information and evidence of this personal loan was provided to OMWBE as well as documentary evidence of

---

[16] As well as other encumbrances such documented personal guarantees, pledges or grants of security interests in assets.

[17] Applying this definition of PNW, DOT officials has advised publicly that, as a practical matter the ACDBE standard is in fact $3.750 million.

00957



the loan agreement, the security agreement, Ms. Dukler's promissory note, and of interest

payments on the debt from her personal bank account.  In addition, Ms. Dukler has personally

guaranteed other Company debt and airport lease obligations of the Company.  Applying the

Fifth Third debt (and her other personal debt(s)) (i.e.; reducing her the value of her assets by

these obligations) demonstrates that Ms. Dukler's PNW does not exceed the standard for the

owner of an ACDBE firm.  This is even more true if one also applies the Company obligations

for which she is personally liable.  Washington's failure to do so was wrong.  Accordingly,

Washington had no rational basis to conclude that Ms. Dukler's PNW exceeded the standard for

an owner of a ACDBE firm.  Its alleged finding in this regard is unreasonable.

**C.    Ms. Dukler Controls The Grove Notwithstanding the Quorum Provision of the By-Laws.**

The Denial incorrectly asserts that Ms. Dukler does not control The Grove because of a

by-law provision that a quorum for a shareholder meeting is 60%.  Denial at 3.  Once again, we

note that the DOT regulations require that OMWBE consider "all the facts in the record, viewed

as a whole."  § 26.71(a).  The Denial did not comply with this requirement.

**1.    Michelle Dukler's Control as the Majority Shareholder.**

On July 20, 2001, an amendment was adopted to change the by-law provision regarding a

quorum for shareholder meetings.  The quorum was reduced from 100% of the shareholders to

60%.[18]  For the following reasons, the 60% quorum has no practical effect on Ms. Dukler's

control of The Grove.

Article XI of the By-laws states:

> These by-laws may be altered, amended or repealed and new by-
> laws may be adopted by a vote of a stockholders representing a
> <u>majority</u> of all the shares issued and outstanding at any annual

---

[18] The Denial mistakenly asserts that the supermajority was put in place after Star Foods purchased its interest in 1999.  In fact, the original by-laws in 1981 had a quorum of 100% of the shares.  The change in 2001 reduced this to 60%.




> stockholders' meeting or at any special stockholders' meeting when the proposed amendment has been set out in the notice of such meeting. (Emphasis added).

While the by-law provision refers to a majority vote at a stockholders' meeting, the Denial failed to consider Article V of the Restated Articles of Incorporation, which states:

> Whenever the affirmative vote of the shareholders at a meeting is required to authorize or constitute corporate action under any provision of the business Corporation Law or the Articles of Incorporation or By-Laws of the Corporation, <u>any such action may be authorized or constituted by a consent in writing, without a meeting, signed by the shareholders having at least that proportion of voting power which would be necessary under any such provision to authorize or constitute the action by the affirmative vote at a meeting</u>; provided, that nay [sic] such written consent shall be filed with the record of proceedings of the shareholders; and provided, further, that prompt notice shall be given to all of the shareholders having voting power on the question, other than those who signed the consent, of the action taken pursuant to such written consent. (Emphasis added).[19]

The correct analysis of these provisions under corporate law is as follows:

- The By-laws set a <u>quorum</u> of 60% for an action at a <u>shareholders</u> meeting.

- The By-laws may be amended by the affirmative vote of shareholders representing a <u>majority</u> of the Company's stock at a meeting.

- The Articles of Incorporation allows shareholders representing a majority of the Company's stock (<u>i.e.,</u> Ms. Dukler) to take <u>any</u> corporate action by a consent in writing without a meeting.

- Thus, the Articles of Incorporation allow Ms. Dukler to reduce the quorum requirement from 60% to 51% permanently and at any time through a simple written consent without a meeting.

Washington acknowledges that Ms. Dukler can amend the by-laws, but illustrates either its woeful misunderstanding of corporate law or an arbitrary decision to ignore the plain meaning of the Company's Restated Articles of Incorporation by stating:

> Ms. Dukler would have to amend the by-law <u>every time</u> she is unable to convene a quorum. Denial at 3. (Emphasis added).

---

[19] Exhibit 4; Application, Attachment XXII.

00959

 

In fact, under the Louisiana Business Corporations Law and the Company's Articles of Incorporation and bylaws, Ms. Dukler only had to amend the by-law <u>only once</u> to reduce the quorum to stockholders with 51% of the outstanding shares. Once done, legally no further amendments to the quorum requirements is necessary. Consequently, the Denial erred in using the quorum provision as a basis for determining that Ms. Dukler does not control The Grove.[20] However, given than she owns 51% of the Company's stock, even such an amendment is not necessary since the Company's Restated Articles of Incorporation permit Ms. Dukler to take any corporate action through a simple written consent. (See highlighted Restated Articles of Incorporation above). Note that the notice language contained in the quoted section of the Restated Articles (". . . prompt notice shall be given . . .of the action taken pursuant to such written consent") is further evidence that Ms. Dukler (as the majority shareholder) can take any corporate action using a written consent.

Washington's conclusion, based on its flawed legal analysis, is that:

> If the eligible person has to resort to <u>extraordinary measures</u> to conduct its ordinary business operations, then the eligible person does not have the ability to control the business as contemplated by the federal regulations. Denial at 3. (Emphasis added).

However, as a matter of corporate law, if anything is "extraordinary", it is the OMWBE statement above. It reveals either an unacceptable attempt to ignore corporate law or woeful misunderstanding of basic corporate governance and management.. As further discussed below, The Grove's bylaws provide that the Company's President shall supervise and control its day-to-day (i.e., "ordinary") business affairs. As the Company's President and Chief Executive Officer, Ms. Dukler has all of the authority required to conduct or manage its ordinary business

---

[20] Even though the current quorum requirement does not restrict Ms. Dukler's control as the majority shareholder, to the extent OWMBE still has concerns on this point, Ms. Dukler is willing to amend the by laws to provide that a quorum is a simple majority.

 

operations. Moreover, Ms. Dukler can use a simple written consent to authorize corporate acts

that may require Board or stockholder consideration (i.e., corporate matters that do not pertain to

ordinary day-to-day business affairs or operations).[21]

### 2. Michelle Dukler Controls The Grove, as Chairperson, Sole Director and President.

In relying solely on a single provision involving a quorum, the Denial also violates the

DOT requirement to "consider all the facts in the record, viewed as a whole." § 26.71(a). All

the facts viewed as a whole clearly establish that Ms. Dukler does control the operations of the

firm as required by DOT regulations.

Ms. Dukler is the Chair and sole member of the Board of Directors. Article IV.1 of the

by-laws states:

> The business affairs of the corporation shall be managed by its
> board of directors. The directors ... may adopt such rules and
> regulations for ... the management of the corporation, as they may
> deem proper.... (Emphasis added).

As Chair and sole Director, Ms. Dukler manages "the business affairs" of The Grove.

Ms. Dukler is the President of The Grove. Article IV. 5 of the by-laws states:

> The president ... shall in general supervise and control all of the
> business affairs of the corporation ... He may sign ... certificates
> of shares of the corporation, any deeds, mortgages bonds, contracts
> or other instruments which the directors have authorized to be
> executed...

As President of The Grove, Ms. Dukler supervises and controls all of the business affairs of The

Grove. Moreover, since Ms. Dukler is the Company's President and sole director she has the

authority to act on behalf of the Company with respect to "other instruments which the directors

have authorized to be executed". Washington's assertion that she doe not control the Company

is thus unsupported by substantial evidence and inconsistent with the Department's rules.

---

[21] Further, as OMWBE should know, it is not particularly unusual for a the Articles of Incorporation of a closely held corporation to authorize corporation action to be taken by written consent.

00961

 

Finally, with respect to matters of corporate governance, we note that the Denial does not evidence any effort by Washington to review the Louisiana Business Corporations Law. We find this oversight both shocking and troubling. How can Washington in good faith make so-called conclusions of law pertaining to corporate governance without reading or referencing the applicable business corporation statute? The answer is obvious; it cannot and it is patently unreasonable to attempt to do so.

**D.    Washington Is Wrong in Asserting that The Grove Does Not Operate as an Independent Business.**

Washington argues that The Grove is not an independent business. Washington is wrong on both the facts and the law.

Section 26.71(b) states:

> An independent business is one the viability of which does not <u>depend</u> on its relationship with another firm or firms. (Emphasis added).

Although the Denial contains the supposition that The Grove is "intertwined" with Star Foods, Washington does not present <u>any facts</u> to support its allegation or, as required by the Department's rules, that The Grove "depends" on its relationship with Star Foods. In fact, the Denial does not present or cite any facts from the record to refute the clear information in the Application that demonstrates that the Company is an independent business.

Section 26.71(b) of the DOT rules provides a certifying agency with clear guidance in reviewing the independence of a potential ACDBE. Applying a step-by-step analysis of the criteria under § 26.71(b) to the record in this case this case further establishes that The Grove is independent—and further shows that OMWBE performed no factual or legal analysis.

**1.    Subsection 26.71(b)(1). Business Relationships Between DBE and Non-DBE Firms or Persons.**

 

This subsection states that the agency must scrutinize the extent to which a potential ACDBE has relationships with non-DBEs regarding business resources such as:

- Personnel
- Facilities
- Equipment
- Financial and/or Bonding Support

**a. Personnel** - The Grove has approximately 340 employees. The Grove does not share any personnel with Star Foods or Georgia's Grove.

**b. Facilities** - The Grove has its own headquarters and 60 stores nationwide. The Grove does not share or lease any facilities with Star Foods or Georgia's Grove.

**c. Equipment** - The Grove purchases or leases its own equipment. The Grove does not purchase or lease any equipment from Star Foods or Georgia's Grove nor does it share any equipment with these companies.

**d. Financial and/or Bonding Support** - The Grove receives financing from several commercial banks. The Grove does not borrow funds or obtain bonding support from Star Foods or Georgia's Grove.

Accordingly, applying the facts in this case and the information in the Application to the factors in Subsection 26.71(b)(1) fully supports a finding that The Grove is independent. OMWBE's Denial does not cite any facts to the contrary and simply makes an arbitrary and unsupported allegation. What is equally troubling is that the Denial does not evidence any effort that OMWBE even attempted to go through the factors outlined in the DOT regulations. Moreover, Star Foods position as a minority shareholder of the Company does not constitute "dependence" under the DOT rules. Neither does a recantation that Mr. Cowell and Martin Dukler were _former_ directors of the Company—positions that they resigned more than two and

35



one half years ago. Moreover, as has been clearly shown above, neither Mr. Cowell nor Martin Dukler have any present role in the management or operations of the Company.

OMWBE cannot simply concoct an alleged basis for denying the Company certification. Again, Washington's failure to provide (or event attempt to provide) any analysis of the of the facts and information in the record pertaining to this matters is yet another striking example of its arbitrary, unreasonable and capricious conduct with respect to the Company's ACDBE Application.

### 2. Subsection 26.71(b)(2). Past or Current Employer/Employee Relationships.

Under this subsection, the agency is to

> consider whether present or recent employer/employee
> relationships between the disadvantaged owner(s) of the potential
> DBE and non-DBE firms or persons associated with the non-DBE
> firms compromise the independence of the potential DBE firm.

As used in this subsection, the phrase "compromise the independence" focuses on whether any past employer/employee relationships prevent eligible persons from controlling the affairs of the potential ACDBE firm. It is only in this sense that these past relationships are relevant to certification. A mere past employer/employee relationship between an eligible person and a non-DBE firm standing alone is not sufficient to find automatically that a potential ACDBE firm is not independent. See § 26.71(e).

Washington cites §26.71(b)(2) as support for its supposition that The Grove is not independent, but, just as with §26.71(b)(1), the Denial offers no analysis of the facts in the record to support its allegation that The Grove's independence has somehow been "compromised" (i.e., that Ms. Dukler does not have the authority to control the Company's affairs). An analysis of the facts below and as measured by the DOT's regulations clearly show by more than the

00964

 

preponderance of the evidence that The Grove's independence is, and has not been, compromised.

    **a. Mr. Cowell and Martin Dukler are not employees of The Grove** - Subsection 26.71(b)(2) refers plainly and specifically to any present or prior employer/employee relationships "between the <u>disadvantaged owner(s) of the potential [ACDBE firm]</u> and non-DBE firms or persons associated with non-DBE firms". (Emphasis added). In this case, the disadvantaged owner of the potential ACDBE firm is Michelle Dukler. Yet inexplicably and erroneously OMWBE ignores the clear languague of the regulation and instead states that this subsection of the rules is relevant with respect to Mr. Cowell and Martin Dukler who were/are neither disadvantaged owners of the Company. As OMWBE knows, they owned economic interests in an investment entity that was a minority owner the Company's stock and they were Company directors—positions that they resigned more than two and a half years ago at the time of Ms. Dukler's purchase of a majority of the Company's stock

    Applying the subsection to Ms. Dukler' past employment, the record is clear that she never has been an employee of Star Foods, of Georgis's Grove, or of any other business owned by Mr. Cowell or her spouse. Four years prior to her stock purchase, Ms. Dukler (an eligible person) had been employed by The Grove. At this time, the Company was certified as a DBE and the majority of its stock was owned and controlled by eligible persons. The Denial does not state any facts or point to any information in the Application that would support a finding that Ms. Dukler's prior employment history as the Company's Director of Marketing" compromises" the independence of The Grove or her ability to control its affairs. If anything, her prior position as Director of Marketing only enhances her management capability.

00965

 

**b. Mr. Cowell's and Martin Dukler's Former Directorships** – While subsection (b)(2), by its terms, applies only to employer/employee relationships,. Washington mistakenly applies this subsection to facts involving stock ownership and directorships. Though the subsection is not applicable to the facts, responses to Washington's mistaken allegations are below.

The Grove previously qualified as a DBE when Mr. Cowell and Martin Dukler were directors. They resigned as directors when Ms. Dukler took control. Yet, Washington somehow alleges and surmises that their positions as directors more than <u>two years ago</u> supports a finding that The Grove's independence is compromised <u>today</u>. Once again, if anything, The Grove is "more independent" since Ms. Dukler took over the Company. Mr. Cowell and Martin Dukler no longer have any authority as directors to participate in the corporate governance, let alone management operations. Ms. Dukler, as the sole director, is the person responsible for governance. Ms. Dukler, as the Chief Executive Officer, is responsible for The Grove's management and day-to-day operations. Legally binding changes to the Company's governance and management were made contemporaneous with Ms. Dukler's stock purchase in accordance with the Louisiana Business Corporations Law and the Company's bylaws. These are facts, facts that Washington ignored, and Washington presented no evidence to the contrary.

Washington also mistakenly states that both Mr. Cowell and Martin Dukler were corporate officers. Mr. Cowell was not an officer and, as noted above, Mr. Dukler served on an uncompensated basis for a short time as a senior executive while Ms. Menutis was ill, though she continued to be President, which, under the by-laws, means that she had the authority to supervise him and to control the business affairs of The Grove. Moreover, the DOT's rules specifically allow individuals who are not socially and economically disadvantaged to be

<center>38</center>

 

involved in the DBE firm as "owners, managers, employees, stockholders, officers and/or directors." § 26.71(e).

Most importantly for this case, Mr. Cowell and Martin Dukler are not presently "owners, managers, employees, stockholders, officers or directors." Mr. Cowell is also not a shareholder of The Grove. He is one step removed in he is a shareholder of Star Foods, Inc., which is a minority shareholder of The Grove. (Note, as previously mentioned Martin Dukler no longer has any ownership interest in Star Foods).

While § 26.71(b) directs the agency to consider whether past or present employee/employer relationship may compromise a DBE's independence, the agency cannot simply make up a conclusion. In this case, the Denial does not examine or evaluate the facts in the record nor does it evidence that OMWBE made a good faith attempt to apply the criteria in § 26.71(b) to these facts. The Denial evidences that OMWBE also ignored § 26.71(e) and simply jumped to the conclusion that independence of The Grove has somehow been compromised. OMWBE's supposition is thus unsupported by substantial evidence and is inconsistent with the Department's rules and its failure to apply the evaluation criteria in the DOT rules is unreasonable.

c. **Share Ownership** – Washington acknowledges that Ms. Dukler , an eligible person, owns 51% of The Grove's stock. Under the general rule in § 26.69(b) of the DOT regulations, majority ownership (at least 51%) by an eligible person is the standard for ACDBE eligibility. Under the regulations and under standard corporate law it also *prima fascia* establishes that the majority shareholder(s) have control of the company. Thus, if under the DOT rules 51% stock ownership is permissible, then by definition another party (an ineligible person) may own 49% of the stock. In this case, Star Foods has a 49% stock ownership share.

00967

 

Since the DOT's regulations allow this, Washington was wrong to regard Star Food's 49%
ownership position as indicator that The Grove's independence is compromised.

### 3.   Subsection 26.71(b)(3). Relationships with Prime Contractors.

Subsection 26.71(b)(3) concerns the firm's relationships with prime contractors.  In this
case, The Grove's prime contractors are firms such as HMS Host, Westfield and other large
companies that operate airport concessions.  In addition, the Company has direct concession
contracts/leases with airports.  Washington makes no allegations that these relationships
compromise The Grove's independence.

### 4.   Subsection 26.71(b)(4). Relationships with Other Firms.

This provision concerns the "consistency of relationships between other potential DBE
and non-DBE firms with normal industry practice".  Washington's only allegation is that Star
Foods owns 49% of The Grove.  The DOT's rules allow such minority ownership.

### 5.   Subsection 26.71(l).

Washington erroneously cites § 26.71(l) as support for its conclusion that The Grove is
not independent.  Denial at 4.  By its express terms, § 26.71(l) is clearly not applicable to The
Grove's situation.  This subsection clearly states in pertinent part:

> Where a firm was formerly owned and/or controlled by a non-
> disadvantaged individual . . ., ownership and/or control were
> transferred to a socially and economically disadvantaged
> individual, and the non-disadvantaged individual remains involved
> in the firm in any capacity.  (Emphasis added).

The subsection applies only to a former non-DBE firm.  In this case, at the time of Ms. Dukler's
stock purchase The Grove was a certified DBE and there is no finding in the record to the
contrary; nor is there any finding in the record that it was not controlled by its DBE owners (Ms.
Menutis and Mr. Valteau).  Thus, § 26.71(l) is not applicable and Washington's reliance on it as
a basis for denying the Application is inconsistent with the Department's rules.

 

6.  **Washington Misinterprets the Rules Governing the "Same or Similar Industry".**

In seeking to show that The Grove is not independent, Washington alleges that Star Foods and Georgia's Grove are in the same or similar industry. First of all, § 26.71(b), which governs a determination of independence, makes no mention of a concern that a ACDBE firm may be in the "same or similar industry" as a non-ACDBE firm. Thus, substantively and as a matter of regulatory construction, there is no basis for OMWBE to make this a factor in determining whether The Grove is independent. Second, as previously discussed above, The Grove is in the airport concession industry and qualifies under the DOT's specific rules governing this industry. Further, also discussed previously, the applicable DOT and SBA rules clearly do not classify or regard the Company's business as similar to, or the same as, the manufacturing, wholesale or investment industry classifications of Georges Grove or of Star Foods. Accordingly, not only are Washington's allegations inconsistent with these Federal rules, it is arbitrary and unreasonable for OMWBE to ignore them.

E.  **Washington Erred in Determining that The Grove Operates as a "Family-Owned Business".**

As a separate basis for denying The Grove's Application, Washington states that it cannot determine that The Grove is controlled by eligible persons as distinct from "the family as a whole" and alleges that the Company is operated as a "family-owned" business. This statement is quite telling and frankly OMWBE's lack of good faith effort in evaluating the Company's Application. Not only does the preponderance of the facts in this case belie this assertion, OMWBE offers no rational basis or relevant evidence support its allegation.

As the record shows, and as restated here, Ms. Dukler, as President and CEO:, manages the affairs of The Grove on a full-time basis. Since assuming the role as President and Chief

41

 

Executive Officer of the Company, she is personally involved in all facets of the business. For example, among other things, Ms. Dukler:

- Establishes the Company's budgets and strategic plans.
- Reviews and approves all capital spending on all store build-outs that are in process and helps craft, review and approve new business proposals for new retail locations at airports.
- Reviews payrolls and approves and signs all corporate checks for rent and capital expenditures as well as checks over $50,000.
- Negotiates and executes all major agreements legally obligating the Company.
- Has negotiated the Company's lines of credit with its banks.
- Has renegotiated the Company's health, property and casualty and life insurance policies.
- Organizes and conducts weekly senior management headquarters meetings, quarterly senior field operations meetings as well as the Company's annual national management meeting.
- Has negotiated and signed new leases and lease extensions for all Company retail spaces at airports.
- Has negotiated the new franchise agreements with Smoothie King, Dunkin Doughnuts and Subway.
- Has interviewed and hired senior area managers and conducted performance reviews for the Company's headquarters accounting, development, human resources and technology support and marketing staff.

By any reasonable measure, these activities demonstrate Ms. Dukler controls the management and the Company's day-to-day operations. In addition, also as previously discussed, as the Company's majority shareholder she is its sole director and under The Grove's Article of Incorporation and bylaws, she has the authority on her own to take any and all actions that may require shareholder and/or board involvement. Moreover, with its Application the Company submitted documents pertaining to its governance and management as required by OMWBE. So we ask a rhetorical question—what other indicia of governance and management control is OMWBE looking for? What other indicia of governance and management control is reasonable or required by DOT rules? OMWBE's statement that it "is unable to determine that

 

the firm is controlled by the eligible owner" is simply not credible. Further addressing

Washington's unsubstantiated statement and further elaborating on the information above, we

note the following:

**1.   Washington erred in determining that The Grove is not controlled by Ms. Dukler as distinct from the family as a whole.**

The facts presented by The Grove clearly establish that Ms. Dukler, not her family,

controls The Grove.

- Ms. Dukler individually owns 51% of the shares; Martin Dukler has renounced any ownership in these shares and owns no other shares of The Grove.

- Ms. Dukler is the Chairperson and sole Director; Martin Dukler resigned his directorship and is not presently on the Board.

- Ms. Dukler is the President and CEO; Martin Dukler is not an officer or even an employee.

- No family members are employed by the Company.

Washington should not be permitted to ignore the legal principles of well-established corporate

law and DOT rules that clearly state that these facts constitute "control" for Ms. Dukler. In so

doing, OMWBE violated its obligation to act reasonably.

**2.   Washington erred on the facts and the law in stating that Martin Dukler is a former owner, board member and officer.**

The Denial states that "Martin Dukler is a former owner, board member and officer of the

Firm." Denial at 5.

Even though we have previously addressed his past association with the Company,

nevertheless we note that the DOT rules explicitly acknowledge that family members may

participate in a DBE firm.

A socially and economically disadvantaged individual may control
a firm even though one or more of the individual's immediate
family members . . . participate in the firm as a manager,
employee, owner or in another capacity.  § 26.71(k)(l).

00971

 

In this case, Martin Dukler would be entitled to be a manager, employee, or owner of The Grove. He is none of these. Martin Dukler is not a manager; he is not an employee; and he is not an owner. While the DOT rule allows Martin Dukler to be an owner, Martin Dukler was not and is not an owner of shares of The Grove and he has even renounced any marital rights that he might be able to assert with respect to Ms. Dukler's shares—and he no longer holds any ownership interest in Star Foods.

Martin Dukler <u>was</u> a board member. Section 26.71(k) clearly allow him to have been a previous director and even allows him to be a current director. Thus, the fact that Martin Dukler is not a director today should carry substantial weight. Moreover, the fact that he used to be a director is irrelevant to the question of who controls The Grove today. Since he is not a director today, he has no role in the Company, and, hence, no control.

Washington states that Martin Dukler was a corporate officer erroneously implying that at sometime in the past he controlled the Company. Although he held a senior management position on a temporary (and uncompensated) basis, before Michelle Dukler took control, Ms. Menutis and Mr. Valteau were the corporate officers under the By-laws. Moreover, § 26.71(k) would allow him to be an officer and, in any case, he is not an officer today. Thus, it is unreasonable for OMWBE to cite or consider this past role as a factor in determining whether The Grove is a "family-owned" business.

### 3.   Washington erred considering that Ms. Dukler's ownership was acquired with community funds.

As noted above, on February 5, 2004, Ms. Dukler borrowed $2.6 million and on February 6, 2004, Ms. Dukler paid $2.6 million for a 51% interest in The Grove. The funds are clearly traceable and were not "community funds". Moreover, even if the loan proceeds were determined to be joint assets (<u>i.e.</u>, "community funds"), §26.69(j)(2) permits joint assets to be

 

used by a eligible person and §26.69(i)(1) provides a clear rule of interpretation with respect to business ownership. Martin Dukler followed this DOT rule and renounced any ownership interest that he might assert in Ms. Dukler's share of stock, which further reinforces that she is the legal and sole owner of the stock.

### 4. Washington erred in considering Martin Dukler's own business operations with Georgia's Grove LLC.

Given that §26.71(k) of the DOT rules allows a spouse to work for the DBE and to own shares in the DBE, the facts in this case are even stronger than those allowed. In this case, the investment, manufacturing and wholesale business activities of Ms. Dukler's spouse were separate and distinct from the airport retail sales business of The Grove. Further, because Mr. Dukler has no role in the Company (and no longer has any ownership interest in Star Foods or Georges Grove), there is no legal or factual support for Washington's allegation that Martin Dukler's unrelated personal business activity causes The Grove to be a "family-owned" business. Washington's misinterpretation of the DOT rules turns § 26.71(k) upside down by actually prohibiting a spouse from working for or owning stock in any other companies, not just the DBE firm. This is an extraordinary and shocking misreading of the DOT's DBE regulations.

### 5. Washington erred in determining The Grove operates in the same business as Star Foods and Georgia's Grove.

As noted above, these three companies are not in the same or similar industries under the Federal government's rules. The information in the Application and this Appeal demonstrate beyond a preponderance of the evidence that the Company has met its burden of proof on this matter. Pursuant to § 26.65, Washington is required to follow these rules.

In conclusion, Washington cites several factors in reaching its erroneous conclusion that The Grove is a "family-owned" business. A careful review of each factor shows that OMWBE had no rational basis for this erroneous "finding". Washington is wrong on the facts and the law.

00973

 

This is yet another illustration of OMWBE's arbitrary and unreasonable conduct. The Grove is clearly an independent business, owned and controlled by Ms. Dukler and is not a family-owned business.

**F.    Washington acted unreasonably and arbitrarily on the issue of the Company's size and it erred in claiming that The Grove is affiliated with Star Foods.**

OMWBE's statements with respect to the issues of business size and affiliation are yet another example of its unreasonable and arbitrary conduct with respect to the Company's Application. Washington's Denial dated November 30, 2005, restates the general rule that affiliates (i.e., their gross receipts) are considered together in a small business size determination. However, it states that affiliation is not a basis for its decision. (Emphasis added) (See Denial at Page 3, Subparagraph F). However, in the same paragraph, again engaging in supposition and without a rational basis, Washington makes unsubstantiated claim that The Grove and Star Foods are "affiliates". After making this claim, not surprisingly (given its conduct with respect to the Application) OMWBE then threatens the Company saying that if The Grove appeals the Denial decision, Washington will make affiliation a ground for denial. Further, it would require that the Company to comply with an information request regarding other corporate entities with respect to which Washington knows that The Grove has no legal authority.

As previously noted, the Company did appeal Washington's November 30, 2005 Denial decision. In that appeal, The Grove pointed out the legal/regulatory standard pertaining to affiliation and the facts in the Application that demonstrate by more than a preponderance of the evidence that The Grove is an independent small business and is not an affiliate of Star Foods or of any other company.

<div align="center">46</div>

 

Although § 26.65 of the DOT regulations provide guidance regarding to affiliation as it pertains to business size determinations, Washington cited 49 CFR §26.5, which does not exist, as support for its supposition regarding the affiliation between the Company and Star Foods. Denial at 5. In any event, assuming OMWBE intended to cite §26.65, Washington's misstatements of fact and erroneous legal "analysis" and Application of this subsection of the DOT rules is addressed below.

With regard to how business affiliation pertains to firm size, Subsection 26.65 of the DOT rules advises a certifying agency to apply the SBA guidance contained in 13 CFR Part 121.[22] The SBA rules state that:

> "Concerns are affiliates of each other when one concern <u>controls or has the power to control the other, or a third party or parties controls or has the power to control both</u>". (Emphasis added).
> "SBA considers factors such as ownership, management, previous relationships with or ties to another concern, and contractual relationships, in determining whether affiliation exits"
>
> "Individuals or firms that have identical or substantially identical business or economic interests, such as family members, persons with common investments, or firms that are economically dependent through contractual or other relationships may be treated as one party with such interests aggregated." 13 CFR §121.103(a)(1)(2) and (3)

Many of the concepts contained in the SBA rule have previously been addressed in this Appeal (<u>e.g.</u>, "control", "past relationships", "dependence", etc.)—and we have shown that the record proves the fallacy of OMWBE's suppositions by more than a preponderance of the evidence. Briefly summarizing and restating this information and applying the SBA guidance, several key Washington misstatements and mistakes are:

1. **Washington erred in stating that there is cross ownership between The Grove and Star Foods.**

---

[22] Because the Company is involved in airport concessions the gross revenue limits in the SBA rules are not applicable.

00975



The information in the Application clearly shows that The Grove does not own any stock in Star Foods. OMWBE states that "the information submitted by the Firm lead to a contrary conclusion based on 49 CFR Section 26.5. Yet, the Denial does not indicate any factual information upon which it is basing this statement. As we have pointed out before, OMWBE can not simply concoct information. Moreover, the fact that Ms. Dukler's husband no longer holds any economic interest in Star Foods means that there is no argument (however tenuous) that his ownership interest could have been attributed to her and somehow to the Company.

**2.     Washington erred (and is being disingenuous) in stating that The Grove is "directly owned" by Star Foods.**

The record clearly shows that Star Foods is a minority shareholder of The Grove's and OMWBE does not state any facts to the contrary. In fact, in numerous instances in the Denial Washington acknowledges that Ms. Dukler owns the majority and controlling block of the Company's shares. Further, with regard to stock ownership under the SBA guidance, it is unreasonable to make a finding of affiliation if Star Foods does not own or control, or has the power to control, 50% or more of the Company's voting stock. As the information in the Application and this Appeal have demonstrated clearly and convincingly, Star Foods does not have any such ownership interest or power.

**3.     Washington erred in stating that there is an identity of interest between the Company and Star Foods amounting to affiliation.**

Under the SBA's guidance, the concept of "identity of interest" pertains to circumstances where there are common investments between the firms involved or the firms are economically dependent through contractual or similar relationships. As has been previously discussed in this Appeal, The Grove and Star Foods do not have common investments and there is no contrary information in the record . Moreover, The Grove is not economically dependent on Star Foods as has been thoroughly demonstrated applying the facts of this case to all of the standards

 

articulated in the DOT rules[23]. The Grove is interested in operating a successful business and

making a profit; and, as a minority investor, Star Foods has an interest in protecting and

increasing the value of its investment. To suggest, as OMWBE seems to, that this standing alone

constitutes identity of economic interests within the intent of the SBA guidance is frankly

nonsensical.[24]

> ### 4. Washington erred in stating that the individual owners of Star Foods had significant control of The Grove in the past.

As support for its finding of affiliation, Washington states that the "individual owners of

Star Foods, LLC have had significant control of the Firm in the past." Denial at 5. As discussed

previously, Washington's assertion is factually and legally incorrect. Martin Dukler served as a

key management executive for a short time at the request of the then President of The Grove,

Ruth Ann Menutis, during a period of illness. Ms. Menutis did not relinquish her position as the

Company's President which, under the Company's bylaws, is the firm's Chief Executive Officer.

Mr. Dukler carried out his work pursuant to Ms. Menutis' supervision and subject to a board of

directors where eligible persons had the controlling block of Company shares. OMWBE has not

presented any facts to the contrary.

Second, OMWBE's musings and allegations about any "control" by individual owners of

Star Foods "in the past" is irrelevant to determining whether any such owners have the ability to

control the Company "in the present". Washington is required to base its decision on "present

circumstances", not the past. § 26.73(b). The information in the record and this Appeal clearly

and convincingly show and establish that Ms. Dukler controls The Grove. Moreover, Martin

---

[23] The SBA rules contemplate circumstances where family relationships might be sufficient to raise a presumption of "identity of interest". However, the rules also provide that such a presumption is rebuttable—based on facts similar to the facts in this case. Also, see *Avantra Corporation*, SBA No. 4225, 1996 WL 659010 (Nov. 8, 1966) (holding that the firm was not affiliated with firms owned and controlled by a family member where the firms operated as separate businesses and the family member had not worked for the small firm for a period of years.)

[24] To accept OMWBE's logic, for example, would necessitate a finding of affiliation in a joint venture between a DBE and a non-DBE since, as joint investors in the venture they have the same interest in making a profit.

 

Dukler no longer holds any management position with Georgia's Grove, no longer has any economic interest in or is involved with, Star Foods, and no longer has any business in common with Casey Cowell.

Third, Washington's assertion that Star Foods (or individual owners of Star Foods) had control in the past is also legally wrong since, prior to Ms. Dukler's acquisition of control, The Grove was a certified DBE controlled by two socially and economically disadvantaged individuals.

 

# V. ADDITIONAL MATTERS

This section of the Appeal addresses certain additional matters that, while not directly cited by Washington as a basis for its denial decision, have nevertheless been raised with respect to the Company's eligibility as an ACDBE

**A.      Consideration Paid By Ms. Dukler for 51% of The Grove's Stock. (§26.69(e).**

As noted previously, Ms. Dukler is a resident of the State of Illinois and resides in the Chicago metropolitan areas. The headquarters of the Company is also located in the Chicago metropolitan area. Following her purchase of the controlling block of the Company's stock and assumption of control of its Board and day-to-day operations, in compliance with applicable DOT rules, Ms. Dukler advised Chicago and other jurisdictions of this change of ownership and control. At one stage of its review of the Company's continuing DBE status, Chicago suggested that the $2.6 million in cash consideration that Ms. Dukler paid for the Company's stock was insufficient or insubstantial for purposes of §26.69(e) of the DOT rules. Following discussion with Ms. Dukler and Company counsel, however, the City has since acknowledged that this was an erroneous argument and Chicago has "recertified" the Company as an ACDBE. Again, although this matter was not cited by OMWBE as a basis for its Denial decision, the merits of the matter and the information provided to Chicago is discussed below.

As noted above, originally Chicago sought to portray the $2.6 million that Ms. Dukler paid for the controlling block of the Company's stock as not "substantial enough" for purposes of §26.69(e). Chicago sought to base this supposition by reference to the Company's financial statements prior to Ms. Dukler's stock purchase--in particular to the Company's "paid-in-

51

00979

 

capital". In essence, believing that the purchase price paid in relation to the Company's paid-in capital, was a valid indicator of the Company's value, Chicago was saying that Ms. Dukler did not pay enough for the stock that she purchased. As pointed out and discussed with Chicago, attempting to utilize the concept of paid-in-capital for business valuation is fatally flawed. Not only is at odds with long-standing financial accounting concepts, but it also was at variance with the well established concept of "fair market value" ("FMV").

1. **Business Valuation Fundamentals.** - Valuing a business (and accordingly a reasonable price for a block of its stock) requires an analysis of many factors. In particular, it requires an analysis, of the company's income potential (e.g. cash flow and gross and net revenues), of its assets and the quality thereof, of the firm's liabilities and consideration of the market in which it operates. Second, financial statements are tools of analysis. By themselves they do not establish the value of a company (or of its stock). Rather, the purpose of financial statements is provide shareholders and others with data combined with other critical information that can be used to analyze a company's financial condition. Third, a well established set of accounting concepts, standards and procedures—referred to as "General Accepted Accounting Principles" or "GAAP"—have been developed and are the standards of practice for accountants and business valuation experts in reporting on, and analyzing the financial condition of, companies and for valuation purposes. From the Company's discussions with Chicago it was apparent that the City did not understand these accounting concepts and standards and their relevance to evaluating the cash consideration paid by Ms. Dukler.

Further, the Company pointed out to Chicago that the Internal Revenue Service ("IRS") has published widely used guidance on the valuation of closely-held companies like The Grove. (See IRS Revenue Ruling 59-60). As noted in the IRS guidance (and by GAAP), "paid-in-

 

capital" is basically a record of the contributed capital received from investors—nothing more and nothing less. It is a historical number and a data entry on a company's balance sheet and is not particularly meaningful in determining the performance or the financial condition of a company (i.e., a company's value).[25]

**2. The Grove's Financial Condition.** - As further discussed below, in fact at the time of Ms. Dukler's purchase of The Grove's stock, the Company was not in particularly good financial health.

(a) <u>Earnings</u>. Under accounting standards and the IRS Revenue Ruling, earnings and future income potential are the critical factors for valuing the stock of firm's that sell products or services to the public. In the five years prior to Ms. Dukler's my stock purchase, the Company's financial statements indicate that its earnings were very weak. In fact, as shown in Exhibit 11 the Company experienced an accumulated loss of more than $2 million during the period 1999 through 2003. In 2003, the Company's earnings were slightly positive for the year, however, the cash flow of the Company was a negative $289, 548—that followed a negative cash flow of $287,302 in 2002. (See Exhibit 11). Moreover, if the capital that was spent on necessary store refurbishments (as mandated by airport leases) is included, the Company's negative cash flow was even worse—a negative $636, 437.

(b) <u>Assets</u>. Perhaps the Company's most critical assets are its airport concession contracts and related leases. At the time of Ms. Dukler's stock purchase, the Company had leases for 62 locations. Exhibit 12 is a schedule of all of the Company's locations and the

---

[25] To illustrate this point, the paid-in capital shown on the financial statements of Enron just prior to its collapse would have recorded that billions of dollars had been invested in the company. Clearly, this entry on the balance sheet was anything but an indicator of that company's financial condition or its worth. Similarly, as further discussed, in the case of The Grove this balance sheet entry in financial statements before Ms. Dukler's stock purchase was even less meaningful.

00981

 

respective lease expiration dates as of the time of Ms. Dukler's stock purchase. Analysis of this information reveals that:

- Leases for 7 locations were set to expire or had expired.
- Lease for 23 additional locations had 1 year or less on the lease term.
- In the aggregate, more than fifty percent (50%) of all the Company's locations had lease terms of two years or less.

(c) <u>Market Conditions</u>. The airport concessions business can be very volatile. A major risk factor is the condition of the airline industry. Concession operators like The Grove rely on passenger traffic from the airlines and airport decisions regarding terminal usage and similar factors over which we have no control. Literally overnight, The Grove and other concession operators can, and have been, adversely impacted by government decisions, by an airline's decision to reduce flights at an airport or by an airport's decision to close a terminal.

Airline bankruptcies and consolidations can cause the loss of flights and passenger traffic (<u>e.g.</u>, American Airlines acquisition of Trans World Airlines; Delta Airlines decision to "de-hub" at the Dallas-Ft. Worth Airport.). Moreover, the industry is very susceptible to labor problems and strikes by airline personnel that have caused severe sales losses in several instances. Further, not only did the Company suffer a significant reduction in sales following the tragic events of September 11, 2001, the cost of doing business went up substantially (<u>e.g.</u>, insurance rates, the cost of bonding, the price of inventory, the price of building materials and increased costs related to security).

**3. The Fair Market Value Standard**. - As noted above, the FMV standard is well settled. IRS Ruling 59-60 incorporates the standard stating that FMV is the price that would be demanded and paid in a sale involving a willing buyer under no compulsion to buy and a willing seller under no compulsion to sell, assuming both buyer and seller have reasonable knowledge of

 

the relevant facts about the asset. That statement of FMV has been reaffirmed many times by courts in Illinois and other jurisdictions. A 1991 Illinois Court of Appeals case is a prime example. The Court explicitly stated that "it is elementary that book value rarely equals fair market value" (emphasis added) (See *In re Marriage of Parker*, 216 Ill. App. 3d 672, 682 (Ill. App. Ct. 1991).

In summary, in looking at the Company's historical net earnings the financial data shows major losses prior to Ms. Dukler's stock purchase. The financial data indicates negative cash flows with continuing significant capital expenditure demands. Lease terms were a key issue as well as increased market risk. Again, from the Company's discussions with Chicago is was apparent that the City had not considered the relevant regulatory guidance or GAAP standards. Suffice to say Chicago's subsequent action rescinding a proposed challenge to the Company's continuing eligibility as a ACDBE is a tacit acknowledgement that characterizing the consideration paid by Ms. Dukler as "insubstantial" was not appropriate or credible.

Although not relevant to this proceeding, given the financial condition of the Company in February 2004, some might ask why Ms. Dukler's made the purchase. Ms. Dukler is an entrepreneur at heart and despite challenges, she believes that The Grove is a good brand and with a strategic vision and tough management it can be an even better company. In the two-and one-half years since she took control, Ms. Dukler has crafted a business plan oriented toward growth in the number of store locations and revenues. She has renegotiated most of the airport leases that were most at risk, made strategic investments in new technologies, has worked on new product offerings, new store designs, and has pursued potential partnering opportunities.

 

**B. Policy and Purpose Underlying DOT Standards of Ownership and Control. §26.69(i)(1) and (2).**

1.    **Purpose of §26.69.** - A matter discussed with Chicago (and alluded to in the DOT Letter) is the policy and purposes embodied in §26.69 of the DOT rules. This section of the rules provides the basic standards and principles of business ownership in the DOT DBE program-- that disadvantaged individuals (as defined by DOT rules) must own at least fifty-one percent (51%) of the firm. As a corollary, by virtue of his or her ownership, the disadvantaged individual's control of the firm must be "real and substantial."

In Section 26.69, DOT recognizes that stock or equity ownership of a firm can be acquired in a variety of ways. For example the rule addresses equity acquired by gift or transfer, by inheritance or as the result of a property settlement (e.g., the property settlement in a divorce proceeding). DOT also recognizes that equity can be purchased in a sale between a buyer and a seller. In the instance of a purchase, DOT rules also address the source of the funds used to make the purchase and permit debt financing to be employed by the disadvantaged purchaser.

The intent of these provisions pertaining to "ownership and control" and the various methods of acquiring equity (as has been stated time and again by DOT and FAA officials) is for a certifying agency to determine whether or not, post-transaction, a non-disadvantaged person can legally assert an ownership interest in the equity acquired and an entitlement to exercise any attribute of ownership pertaining to governance of the firm (e.g., a claim on a share or dividends, the right to vote on governance issues as a stockholder, etc.). <u>Accordingly, with regard to a disadvantaged person's purchase of stock and the DOT regulations, the fundamental and relevant question is whether any non-disadvantaged person can legally claim an ownership interest in the stock because of the manner in which it was bought. As further explained below, the answer to that question in this instance is unreservedly and unequivocally NO.</u> However, prior to its discussions with the Company, Chicago had expressed concerns about this matter.

**2. Michelle Dukler and Her Spouse's Compliance With the DOT Rules.** - As has been noted previously, Michelle Dukler is married and was so at the time of her purchase of The

<div align="center">56</div>

 

Grove stock. To effect the purchase, she secured financing pursuant to a written Mortgage and Security Agreement and used her personal assets (i.e., assets that she acquired prior to her marriage) as the primary collateral for the loan. As is common in commercial transactions, lenders often insist on over-collateralizing loans to afford them greater security. Accordingly, the list of assets pledged as security when the loan closed also included some items of property that Ms. Dukler jointly owned with her spouse—including the couple's personal residence.[26]

Contemporaneously with the closing of the loan and her purchase of the stock with the loan proceeds, Ms. Dukler's spouse irrevocably renounced any ownership interest that he might assert/have in the stock by virtue of his position as my spouse or the assets used as security for the loan. Martin Dukler's renunciation is effective as a matter of law and it unambiguously answers the relevant question posed by §26.69(i)—whether Ms. Dukler's spouse, a non-disadvantaged person—has any ownership claim to The Grove stock that she owns. He does not.

Prior to subsequent discussions with the Company on this point, the City suggested an erroneous interpretation of the DOT rule asserting that the interest that should have been renounced was Mr. Dukler's ownership in the couple's residence.[27] The Company accurately pointed out, and Chicago now understands, that this interpretation of the rule would actually undermine and would be inimical its purpose. The Company pointed out that renouncing an ownership in the couple's home was legally irrelevant for the purpose of determining ownership of The Grove stock. In addition, the Company pointed out that Chicago's purported interpretation of the rule ran directly counter to the DOT admonition in §26.7(b) which states in

---

[26] Assets worth $2,654,425 were used as collateral. Ms. Dukler's share of the collateral was 89%. This is certainly "real and substantial". Her spouses husband's share of the total collateral was small.

[27] "While Mr. Dukler has renounced his interest in Ms. Dukler's ownership interest in the Grove, he has, in fact, renounced the wrong interest. The regulations required Mr. Dukler to renounce his interest in the residence" (emphasis added). (See City's Letter of October 2, 2005 to the Company)

00985

 

pertinent part "in administering your DBE program, you must not, directly or through contractual

or other arrangements, use criteria or methods of administration that have the effect of defeating

or substantially impairing accomplishment of the objectives of the program".[28]

**3. The Matter is Moot and the Requirements of §26.73(b).** - The Company also

pointed out that this matter is in reality moot and a non-issue. In §26.73(b), the DOT rules

admonish a certifying entity that "you must evaluate the eligibility of a firm on the basis of the

present circumstances" (emphasis added). In this instance, as discussed previously, Ms. Dukler

has taken the extra step of obtaining a new replacement loan from a bank (Fifth First Bank) in

the principal amount of $2.6 million. No joint assets were used as security for this loan. Ms.

Dukler personally signed a promissory note and, as permitted by DOT regulations, pledged her

Company stock as collateral. (See §Section 26.69(e). She fully retired the obligations to the first

lender with the loan proceeds. Accordingly, even assuming the first financing of the stock

purchase (which used joint assets as collateral) was problematic (something that we do not

concede), under § 26.73(b) it is clear that the current facts are controlling.

---

[28] It should also be noted that the house in question was sold by the Dukler's in June 2005.

00986

 

## VI.  BURDEN OF PROOF; ADMINISTRATIVE LAW
## AND DUE PROCESS

**A.  The Grove Has More Than Met Its Burden of Proof.**

As provided by §26.61(b), The Grove, as a firm seeking ACDBE certification, is

obligated to demonstrate by a "preponderance of the evidence" that it meets the ACDBE

eligibility requirements.  "A claim proven by a preponderance of the evidence is one where the

party with the burden of proof provides evidence that is more likely true than not and when

balanced against opposing evidence, tips the scale in favor of that party."  Blossom v. CSX

Transportation, 13 F. 3rd 1477, 1480 (11th Cir. 1994).  The Company has more than met this

standard on each of the program eligibility factors:

- **Group Membership**.  Ms. Dukler is a woman--a group defined as socially
  disadvantaged.
- **Ownership and Control of Firm**.  Applying DOT review criteria, the record and
  this Appeal contains overwhelming evidence demonstrating that Ms. Dukler owns
  a majority of the Company's stock, controls the firm's board of directors and as
  President and Chief Executive Office, manages and controls the Company's day-
  to-day-operations.
- **Business Size**.  Applying DOT's review criteria, the record and this Appeal
  clearly and unequivocally proves that The Grove is an independent company and
  a firm that falls within the DOT's size standards for an ACDBE.
- **Personal Net Worth**.  The record and this Appeal clearly and unambiguously
  show that Ms. Dukler's meets the Personal Net Worth requirements applicable to
  owners of ACDBEs.

**B.  Washington Acted In An Arbitrary and Unreasonable Manner.**

**1.  Washington's Failure to Consider All of the Facts in the Record.** - Subsection

26.61(e) of the DOT rules provides that a certifying agency must make "determinations

concerning whether individuals and firms have met their burden of demonstrating group

membership, ownership, control, and social and economic disadvantage . . . by considering all

   

the facts in the record, viewed as whole". (Emphasis added). In fact, this ac

and reinforced in §§26.69(a) and 26.71(a). However, as the Appeal points o

OMWBE failed to do so.

**2. Washington's Failure to Evaluate the Present Circumstances**

Subsection §26.73(b) of the DOT rules also explicitly obligates a certifying

eligibility of a firm on the basis of present circumstances". Further, the rule

certifying agency from "[refusing] to certify a firm based solely on historica

indicating a lack of ownership or control of the firm by socially and econom

individuals at some time in the past, if the firm currently meets the ownershi

standards of this part." However, OMWBE failed to comply with these DO

Even though not relevant legally or factually to the Company's present circu

articulated in this Appeal, concerns regarding the past ownership of the Con

involvement of ineligible persons in its affairs is at the very essence of the D

**3. Washington's Failure to Abide by General Administrative La
requirements.**

Well-established principles of administrative review and due proces

certifying agency's findings (as well as reviews undertaken by the Office of

based on substantial competent evidence. One State Supreme Court has arti

of this standard as follows: "Substantial evidence is such legal and relevant

reasonable person might accept as being sufficient to support a conclusion."

stated that: "Arbitrary or capricious conduct may be show where an admini

supported by substantial evidence". <u>Robert A. Sokol v. Kansas Department</u>

<u>Rehabilitation Services.</u> (KS Supreme Court 1999)

00988

 

    This fundamental principle of law was also articulated in a 2005 District of Columbia

Circuit U.S. Court of Appeals case, Morall, M.D. v. U.S. Drug Enforcement Administration

(U.S. Ct. App. 2005; Case No. 04-1367). The case involved a review of the Drug Enforcement

Agency's ("DEA") revocation of a certificate of registration (i.e., a license) to a medical doctor

was justified. In finding that DEA acted in an arbitrary and capricious matter, Judge Edwards

states: "Our lodestar is the question whether the record as a whole provides substantial evidence

to support the agency action. We conclude that it does not, because the decision of [agency]

gives no indication whatsoever that the decision maker considered any of [petitioner's] testimony

bearing directly on each of the purported [issues]." The opinion also cites several additional

court cases supporting this principle of law including, El Rio Santa Cruz Neighborhood Health

Ctr. V. U.S. Dep't of Health and Human Servs., 396 F. 3d at 1278 (finding agency action

arbitrary and capricious in failing to address relevant evidence before it); Robinson v. Nat'l

Transportation Safety Bd. 28 F. 3d at 216 (finding agency may not ignore testimony bearing on

critical facts in the case); Lakeland Bus Lines, Inc. v. NLRB, 347 F. 3rd at 962 (finding court

cannot find substantial evidence solely on the basis of evidence that supports the result, without

considering contradictory evidence).

    Washington consistently violated the above discussed principles of law. As pointed out

in this Appeal, OMWBE 's Denial does not have a rational basis as defined by the Courts and

required by law.. It is not based on "substantial and competent" evidence nor does it show any

effort by Washington to reasonably consider the overwhelming evidence included in the

Application that demonstrated the Company's ACDBE eligibility.

61

00989

 

## VII. CONCLUSION

Washington's Denial alleged five independent grounds for denying The Grove's Application for ACDBE certification. This Appeal has responded to each of the five reasons separately and has specifically and comprehensively addressed the relevant facts in the record and the law applicable to each point raised by Washington. As established herein and as shown by the administrative record, in each instance, Washington's assertions are unsupported by the substantial evidence and inconsistent with the Department's rules and provide no rational basis for denying The Grove's ACDBE Application. By more than the preponderance of the evidence, this Appeal demonstrates and proves that The Grove more than meets the eligibility criteria for certification as a ACDBE in the State of Washington.

Accordingly, The Grove again respectfully requests that The Department reverse Washington's Denial and direct Washington to certify The Grove as an ACDBE.

00990



OMWBE
PO Box 41160
Olympia WA 98504-1160

Mr. Joseph E. Austin, Chief
External Policy & Program Development Division
Departmental Office of Civil Rights
U.S. Department of Transportation
400 Seventh Street S.W.
Washington, D.C. 20590

00992

DEC-01-2005 THU 08:02 AM          FAX NO.        5  7079          P. 02



**STATE OF WASHINGTON**

# OFFICE OF MINORITY AND WOMEN'S BUSINESS ENTERPRISES

*406 South Water • Post Office Box 41160 • Olympia, Washington 98504-1160*
*(360) 753-9693 • FAX (360) 586-7079*

November 30, 2005

Ms. Michelle Dukler
THE GROVE INC
3 Westbrook Corporate Center, Suite 500
Westchester, Illinois 60154

File Number: 19323

Dear Ms. Dukler:

Thank you for completing and submitting the application for certification as a federal Airport Concessionaire Disadvantaged Business Enterprise (ACDBE). Unfortunately, the information contained in your application package shows that your firm currently does not meet the certification requirements for this program.

To qualify for certification as an ACDBE, an applicant firm must be a small business and demonstrate all of the following:

1. Eligible persons own at least 51 percent of the firm.

2. Eligible owners exert managerial control over the firm's day-to-day operations.

3. Eligible owners exert managerial control over the firm's long-term operations.

4. Eligible owners have technical expertise in the field of the firm's operations.

5. The firm operates independently of other companies.

6. The firm has capacity to perform the work it claims to perform. This means the firm must have all the equipment, employees, materials, facilities, licenses, etc. it needs to conduct business in Washington State.

Ownership, control, expertise, independence, and capacity must all be real and substantial. That means that both the written arrangements and the firm's "real-world" operations must demonstrate the firm's eligibility. If the firm does not provide sufficient documentation to establish every one of the elements listed above, we cannot certify the company.

The information your firm provided with its application does not establish eligibility for the following reasons:

00993

DEC-01-2005 THU 08:02 AM          RF                    FAX NO.                7079                    P. 03

Ms. Michelle Dukler
November 30, 2005
Page 2

A.  In order to qualify for certification, the firm must demonstrate that it is owned at least 51 percent
by eligible persons and the ownership must be real, substantial and continuing.  The firm applied
for certification on two separate occasions with this office.  The first application was received on
July 10, 2003 and withdrawn November 11, 2003.  The second application was received on May
20, 2004 and withdrawn August 30, 2004.  The third and current application was received on
September 12, 2005 and is being considered as a whole and on it's own merits.  A review of the
documentation submitted with the firm's OMWBE Certification Application shows that the firm
does not meet the ownership criteria to qualify as an ACDBE.  The purchase of ownership interest
in the firm by Ms. Michelle Dukler is not real and substantial.

   a) On February 5, 2004, Ms Dukler borrowed $2,600,000 from Mr. Casey Cowell, former
      director of the firm and owner and director of Star Foods, LLC.  Star Foods, LLC is
      current 49 percent owner of the firm.  According to documents supplied by Ms. Dukler,
      this loan was secured by Ms. Dukler's separate assets totaling over $2,600,000.
   b) On February 6, 2004, Ms. Dukler purchased her ownership interest in the firm from Star
      Foods, LLC with $2,600,000 from a joint account with Mr. Martin Dukler -- ineligible
      spouse of Ms. Dukler, former director and officer of the firm, and current officer and
      director of Star Foods, LLC.
   c) On February 17, 2004, the firm borrowed $2,600,000 from First Fifth Bank.
   d) On August 17, 2004, Ms. Dukler deposited into Mr. Cowell's personal account
      $2,600,000 for the purpose of repaying the February 5, 2004 loan.  No documentation is
      provided to show from what account those funds came from.  No documentation is
      provided to show Ms. Dukler had made any previous payments to Mr. Cowell.
   e) On August 18, 2004, Mr. Cowell processed the $2,600,000 paid to him by Ms. Dukler.
   f) On August 19, 2004, Ms. Dukler obtained a loan in the amount of $2,600,000 from First
      Fifth Bank.  Collateral is identified as all assets owned by Ms. Dukler at the time of the
      loan.  As Ms. Dukler had purchased ownership interest in the firm at this point, her
      ownership in the firm is considered collateral on the bank loan.

Ms. Dukler obtained a loan from an ineligible person using secured assets for the purpose of
purchasing the business.  This is not expressly against ACDBE regulations.  However, the funds
paid to Star Foods, LLC came from a joint checking account with an ineligible spouse who has a
history of involvement with the firm as both an officer and a director, is a current owner, officer
and director of Star Foods, LLC, and works in the same or similar industry.  As such, Ms. Dukler's
ownership of the firm is not real and substantial.  The firm does not qualify for certification as an
ACDBE for the federal program.

B.  In order to qualify for certification, a firm must be owned by an eligible person who is both
socially and economically disadvantaged.  The Personal Financial Statement submitted by Ms.
Dukler identifies assets that total $2,027,225.  When Ms. Dukler repaid Mr. Cowell on August 17,
2004, those assets were no longer encumbered.  However, on her Personal Financial Statement Ms.
Dukler identifies $2,600,000 of encumbered assets linked to the personal loan of August 19, 2004.
Ms. Dukler does not identify any payments made on that loan.  Even though Ms. Dukler took out
another loan for $2,600,000 from First Fifth Bank, the firm was used as collateral, not Ms.
Dukler's other assets.  In addition, since Ms. Dukler had already purchased her ownership interest

# TAB 24

JUN-29-2006 THU 07:AM OMWBE                    FAX       360 587079                    P. 02



**STATE OF WASHINGTON**

# OFFICE OF MINORITY AND WOMEN'S BUSINESS ENTERPRISES
406 SOUTH WATER • POST OFFICE BOX 41160 • OLYMPIA, WASHINGTON 98504-1160
*(360) 753-9693 • FAX (360) 586-7079*

June 28, 2006

Ms. Michelle Dukler
THE GROVE INC
3 Westbrook Corporate Center, Suite 500
Westchester, Illinois 60154

File Number: 19323

Dear Ms. Dukler:

This is your notification regarding The Grove Inc.'s show cause review. The Certification Committee has affirmed its previous decision to deny certification as a federal Airport Concessionaire Disadvantaged Business Enterprise (ACDBE). Enclosed is a copy of OMWBE's written determination.

This decision is administratively final. You have the right to appeal this decision. The following outlines the appeal procedure.

**USDOT Review**

Pursuant to 49 Code of Federal Regulation (CFR), Part 26.89 of Subpart E, you may choose to appeal this determination directly to the USDOT. If you choose to appeal directly to USDOT, your request must be in writing and mailed to the address below within ninety (90) days from the date of the denial letter. The request must explain in detail the reasons you believe the Office's determination should be reversed and include copies of all documents that support your argument.

Please direct your request to:

Department of Transportation
Office of Civil Rights
400 – 7th Street SW, Room 5414
Washington, DC 20590

If you do not submit an appeal, following the procedure above, the denial will be final and you will have no further appeal rights.

A copy of the appeal to the U.S. Department of Transportation should be mailed to the Office of Minority and Women's Business Enterprises.

If you have any questions, please call me at (360) 753-9693.

Sincerely,

CERTIFICATION COMMITTEE

By

Juan Huey-Ray, Manager

JHR:jm

cc:  William Kirk, Attorney
     Brenda Nnambi, WSDOT
     Christine Whitehead, FAA

Enclosures

01008

# TAB 25



**The Grove, Inc.**

**Airport Concessions Disadvantaged
Business Enterprise Certifications**

**(As of September 26, 2006)**

<u>**Current Certifications**</u>

Georgia Department of Transportation
Office of Equal Opportunity
2 Capital Square, SW
Atlanta, GA 30334
Contact: Winston Hill
Hartsfield-Jackson Atlanta International Airport

Massachusetts Port Authority
One Harborside Drive, Suite 200S
East Boston, MA 02128
Contact: Sandra Casey Buford
Boston Logan International Airport

Kenyon County Airport Board
P.O. Box 752000
Cincinnati, OH 45275
Contact: Dale Huber
Cincinnati Northern Kentucky International Airport

North Central Texas Regional Certification Agency
624 Six Flags Dr., Suite 216
Arlington, TX 76011
Contact: John Kelly
Dallas/Fort Worth International Airport

City of Houston, Texas
Office of Affirmative Action and Contract Compliance
611 Walker St., 7th Floor
Houston, TX 77002
Contact: Velma Laws
Houston Intercontinental Airport

01018



Florida Unified Certification Program
DBE Certification Office
Florida Department of Transportation
605 Suwannee St., Mail Stop 65
Tallahassee, FL 32399
Contact: John Goodeman
Miami International Airport
Jacksonville International Airport
Orlando International Airport

New Orleans Aviation Board
P.O. Box 20007
New Orleans, LA 70141
Contact: Phillistine Ferrand
Louis Armstrong New Orleans International Airport

Metropolitan Nashville Airport Authority
One Terminal Drive, Suite 501
Nashville, TN 37214
Contact: Michelle Tatom
Nashville International Airport

Metropolitan Washington Airports Authority
1 Aviation Circle
Washington, D.C. 20001
Contact: Richard Gordon
Washington Dulles International Airport

Metropolitan Airports Commission
Office of Diversity
6040 28th Avenue South
Minneapolis, MN 55450
Contact: Anita Bellant
Minneapolis-St. Paul International Airport

City of St. Louis Airport Authority
Lambert-St. Louis International Airport
13723 Riverport Drive
Maryland Heights, MO 63043
Contact: Jackie Taylor
Lambert-St. Louis International Airport

01019

Commonwealth of Virginia Department
Of Minority Business Enterprise
200-202 Ninth Street, 11th Floor
Richmond, VA 23219
Contact: Evelyn Henson
Richmond International Airport

## Pending New Certification Applications

Arizona Unified Certification Program
City of Phoenix
Office of Equal Opportunity Programs
252 W. Washington Street, 7th Floor
Phoenix, AZ 85003
Contact: Debra Hinegardner
Tucson International Airport

## Certification Denials

Washington State Office of Minority
and Women's Business Enterprises
406 South Water Street
Olympia, WA 98504
Contact: Juan Iluey-Ray
Seattle-Tacoma International Airport

# TAB 26

## EXCLUSION OF CERTAIN PROPERTY FROM MARITAL PROPERTY

WHEREAS, 750 ILCS 5/503 ("**Section 5/503**") defines non-marital property as including property excluded from marital property by agreement of the parties;

WHEREAS, Martin Dukler ("**Martin**") wishes to exclude 36.5 shares of the common stock of The Grove, Inc., a Louisiana corporation (the "**Assets**") from marital property and irrevocably to renounce, transfer and relinquish all his right, title and interest in and to the Assets so that his wife, Michelle Dukler ("**Michelle**") may hold the Assets as her separate and exclusive property;

NOW THEREFORE, Martin, for himself, his heirs, executors, administrators, and representatives, hereby agrees that the Assets (i) shall be excluded from marital property and shall be separate property for purposes of Section 5/503; (ii) shall hereafter maintain their status as separate property and in no event be treated as having been commingled with marital property and (iii) to the extent the Assets are considered to have been commingled with marital property, Martin irrevocably renounces, transfers and relinquishes all his right, title and interest in and to the Assets.

This instrument shall be governed by and construed in accordance with Illinois law.

01052

IN WITNESS WHEREOF, this Exclusion of Certain Property from Marital Property is duly executed as of February 5, 2004:

Martin Dukler

## ACKNOWLEDGEMENT AND ACCEPTANCE OF RECEIPT OF EXCLUSION OF CERTAIN PROPERTY FROM MARITAL PROPERTY

The undersigned hereby acknowledges and accepts receipt of the above Exclusion of Certain Property from Marital Property as of the day and year above written.

Michelle Dukler

State of Illinois
County of Cook
This 5th day of February, 2004

Anna M Taylor

> OFFICIAL SEAL
> ANNA M TAYLOR
> NOTARY PUBLIC STATE OF ILLINOIS
> MY COMMISSION EXP. JUNE 21,2006

01053

2

206480/0001/648848/Version #:.1

# TAB 27



01063

**SAVINGS deposit**

Rev 3/01 230082

Checks and other items received for deposit are subject to the rules and regulations of this bank.

Fifth Third Bank (Chicago)

Date

For Deposit to the account of:

Casey Cowell

PLEASE PRINT

Fifth Third Bank
AUG 1 8 2004
6355-02

| LIST EACH CHECK SEPARATELY | DOLLARS | CENTS |
|---|---|---|
| CASH | | |
| CHECKS | 2600000 | — |
| | | |
| | | |
| SUB TOTAL | 2600000 | — |
| TRANSFER TO | — | — |
| CASH RECEIVED BY CUSTOMER | — | — |
| NET DEPOSIT | 2600000 | — |

ORIGINAL COPY

SAVINGS ACCOUNT NUMBER 9232084484

⑆555560231⑆

---

Fifth Third Bank (Chicago)
Michelle A. Dukler

No. 1001

Date 8.17.04

PAY TO THE ORDER OF Casey Cowell $2,600,000.—

Two million six hundred thousand & no/100 DOLLARS

PLEASE ENTER ACCOUNT NUMBER HERE
7232733001

[signature]

⑆071905985⑆ 512

CREDIT TO THE ACCOUNT
OF WITHIN NAMED PAYEE
ENDORSEMENT GUARANTEED
Fifth Third Bank
CHICAGO, IL

# TAB 28

The Grove, Inc.
Net Income History
1999-2003

| Year | Net Income (Loss) | |
|------|------------------|---|
| 1999 | $ (743,128) | See Exhibit 1-B |
| 2000 | $ (664,126) | See Exhibit 1-B |
| 2001 | $ (593,190) | See Exhibit 1-C |
| 2002 | $ (119,671) | See Exhibit 1-C |
| 2003 | $ 75,460 | See Exhibit 1-C |
| Total | $ (2,044,655) | |



The Grove, Inc.
Long Term Debt and Working Capital Deficit
As of December 31, 2003

|  | 12/31/2003 | |
|---|---|---|
| Current Assets | $ 858,889 | Exhibit 5-B |
| Current Libilities | $ 2,761,675 | Exhibit 5-C |
| Working Capital Deficit | $ (1,902,786) | |
| Long Term Debt | $ (630,807) | Exhibit 5-C |
| Long Term Debt and Working Capital Deficit | $ (2,533,593) | |

The Grove, Inc.
EBITDA Calculation
2001-2003

| | 2001 | 2002 | 2003 |
|---|---|---|---|
| Net Income | $ (593,190) | $ (119,671) | $ 75,460 |
| Addback Minority Interest in Net Income | $ 34,026 | $ 89,952 | $ 108,346 |
| Addback Income Tax Provision | $ (175,000) | $ 33,000 | $ 46,500 |
| Addback Interest Expense | $ 183,865 | $ 108,691 | $ 93,347 |
| Addback Depreciation and Amortzation | $ 1,549,423 | $ 1,369,874 | $1,311,270 |
| Addback Loss on Dispisal of assets | $ 59,214 | $ 262,651 | $ 111,703 |
| Less Minority Shareholder Interest in EBITDA | $ (46,615) | $ (117,309) | $ (126,042) |
| EBITDA (Earnings Before Interest, Taxes. Depreciation, and Amortization) | $ 1,011,723 | $ 1,627,188 | $1,620,584 |



The Grove, Inc.
Calculation of Average Free Cash Flow 2001-2003

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| EBITDA after Minority Interest | $ 1,011,723 | $ 1,627,188 | $ 1,620,584 |
| Less Net Cash Used in Investing Activities (Exhibit 4-B) | $ (801,623) | $ (507,574) | $ (2,257,021) |
| Free Cash Flow | $ 210,100 | $ 1,119,614 | $ (636,437) |

| Average Free Cash Flow 2001-2003 |  |  | $ 231,092 |
|---|---|---|---|

# TAB 29



**Airport Lease Contracts as of March 2004**

| Airport | Expiration Date | Store # | Landlord. |
|---|---|---|---|
| ATL-100 | 11/12/2012 | 1 | Host Marriott-Concourse A |
| ATL-100 | 11/12/2012 | 3 | Host Marriott-Concourse D |
| ATL-100 | 1/7/2012 | 2 | Concession Paschals-Concourse C |
| BOS-139 | 12/31/2008 | 1 | Westfield Corp Unit 1  C-27 |
| BOS-139 | 12/31/2008 | 2 | Westfield Corp Unit 2  C-29 |
| CVG-180 | 12/31/2009 | 2 | Cin/No. Kentucky Airport B (#2) |
| CVG-180 | 12/31/2009 | 7 | Cin/No. Kentucky Airport C (#3) |
| CVG-180 | 1/31/2011 | 9 & 8 | Cin/No. Kentucky Airport A & B Frozen Treats |
| DFE 1-217 | 12/31/2004 | 1 | DFW-Intl Airport Board  The Grove E-09 |
| DFE 2-217 | 12/31/2004 | 2 | DFW-Intl Airport Board  The Grove E51a |
| DFA 1-217 | 12/31/2004 | 3 | DFW-Intl Airport Board  ICBIY A-11 |
| DFA 2-217 | 12/31/2004 | 4 | DFW-Intl Airport Board  The Grove A-22 |
| DFA 3-217 | 12/31/2004 | 5 | DFW-Intl Airport Board   ICBIY A-41 |
| DFC 1-217 | 12/31/2004 | 6 | DFW-Intl Airport Board   ICBIY C-31 |
| DFC 2-217 | 12/31/2004 | 7 | DFW-Intl Airport Board   ICBIY C-53 |
| DFA 4-217 | 12/31/2004 | 9 | DFW-Intl Airport Board   ICBIY A-78 |
| DFE 3-217 | 12/31/2004 | 11 | DFW-Intl Airport Board   ICBIY B-27 |
| IAD-219 | 3/31/2004 | 1 | Host Marriott Corporation C-9 |
| IAD-219 | 3/31/2004 | 2 | Host Marriott Corporation C-2 |
| IAD-219 | 3/31/2004 | 3 | Host Marriott Corporation C-26 |
| IAD-219 | 3/31/2004 | 4 | Host Marriott Corporation D-5 |
| IAH-373 | 6/30/2007 | 1 & 2 | Entertainment One  CN and CS |
| IAH-373 | 6/30/2008 | 3 | CA-1  A-South |
| IAH-373 | 6/30/2008 | 4 | CA-1  Terminal B |
| IAH-373 | 6/30/2008 | 5 | CA-1  Terminal 5A-N |
| JAX-451 | 9/12/2012 | 1 & 2 | Host Marriott |
| JAX-451 | 9/15/2005 | 3 | Jacksonville Port Authority |
| JFA-454 | 12/31/2003 | 4 | LSG/SkyChefs, Inc.   D47 |
| JFA-454 | 12/31/2003 | 7 | SkyChefs, Inc.   Concourse B |
| JFA-454 | 12/31/2003 | 8 | LSG/SkyChefs, Inc.  Concourse A |
| JFA-454 | Month-to-Month | 9 | Port Authority NY/NJ    B-9 |
| JFA-454 | 13/31/03 | 4,7,8 | LSG/SkyChefs, Inc. |
| JFA-454 | 6/30/2006 | 6 | Port Authority of NY & NJ |
| JFA-454 | 6/30/2006 | 6 | Delta Airlines |
| JFA-454 | 12/31/2009 | 1 | British Airways - Kiosk - Terminal 7 |
| JFA-454 | 12/31/2009 | 1 | Port Authority of NY & NJ - Terminal 7 |
| LAG-529 | 6/30/2005 | 1 | Port Authority (#3, #5 Delta, #7 Delta Cart) |
| LAG-529 | 6/30/2005 | 2 | Delta Airlines (#3, #5 Delta, #7 Delta Cart) |
| LAG-529 | 6/30/2005 | 3 | Port Authority (#6 US Air) |
| LAG-529 | 6/30/2003 | 4 | US Air Airlines (#6 US Air) Food Court |
| MSY-607 | 10/4/2009 | 1,2,3,4 | CA-1 Services |
| EWR-609 | 5/31/2004 | 1 | Westfield Management  Space 50 |
| EWR-609 | 5/31/2004 | 2 | Westfield Management  Space 36 |
| EWR-609 | 5/31/2004 | Closed 4/11/04 | Westfield Management  Space 57 |
| EWR-609 | 5/31/2004 | | Westfield Management  Baggage Claim |
| EWR-609 | 3/15/2004 | Closed 3/15/04 | Westfield Mgmt Light/Fudge Space 213 |
| EWR-609 | 8/31/2008 | | Westfield Mgmt  Space 87 |
| OKC-646 | 10/30/2006 | Closed | CA-1 Services |
| ORD-678 | 4/30/2004 with 2-yr Option | 1,2,3,4 | City of Chicago |
| ORL-649 | 9/30/2008 | 2  &  3 | Greater Orlando Aviation Dept |
| TUL-841 | 7/31/2003 | Closed | CA-1 |
| SLC-802 | 6/30/2006 | 1,2,3 | SLC Int'l Airport |
| PEN-889 | 7/5/2005 | 1 | Nat'l Railroad Passenger Corp |
| Westchester | 12/31/2008 | | Equity Office Properties - Corporate Office Suite |
| Broadview | 9/30/2004 | | Broadview Place - Storage Facility |

01081

# TAB 30



**U.S. Department of
Transportation**

Office of the Secretary
of Transportation

400 7th St., SW, Room 5414
Washington, D.C. 20590

September 26, 2006

Mr. Juan Huey-Ray
Manager
Office of Minority and Women's Business Enterprises
Compliance Division
406 South Water P.O., Box 41160
Olympia, WA 98504-1160

**RECEIVED**

OCT 0 2 2006

**OMWBE**

Dear Mr. Huey-Ray:

This is to advise you that The Grove, Inc., has filed an appeal of a DBE certification denial by Office of Minority and Women's Business Enterprises (OM&WBE).

To assist us in making a Departmental finding on this appeal, please forward copies of all documentation, including hearing transcripts, interviews, investigative reports, etc., used in making a determination.

A copy of the appeal is enclosed for your convenience in responding to the issues raised. Also, in your response indicate whether the appellant was advised of the information required to be certified as a DBE in accordance with 49 CFR Part 26, Subpart's D and E of the Department's DBE regulation.

The information should be forwarded to this office within 15 days. If you have questions regarding this request, please do not hesitate to contact us. Upon receipt and review of the information and the procedure used in making the determination, you will be advised of the Department's position.

We request that you advise us as to whether a similar appeal has been filed with your office. If an appeal has been filed, please advise us of the status.

Thank you for your cooperation in this matter.

Sincerely,

Joseph E. Austin, Chief
External Policy & Program Development Division
Departmental Office of Civil Rights

Reference No.: 06-0149

01082

# TAB 31

 



**U.S. Department of
Transportation**

Office of the Secretary
of Transportation

400 Seventh St., S.W.
Washington, D.C. 20590

December 21, 2006

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Reference No: 06–0149

Mr. William A. Kirk, Jr.
Attorney at Law
Preston, Gates, Ellis, & Rouvelas, Meeds, LLP
1735 New York Avenue, Suite 500
Washington, DC 20006-5209

Dear Mr. Kirk:

This is in response to the appeal that you filed on behalf of your client, Ms. Michelle Dukler, President and Chief Executive Officer of The Grove, Inc. ("The Grove"). We have carefully reviewed the material from the Office of Minority and Women's Business Enterprises ("OMWBE"), as well as the information you provided on behalf of your client, and have concluded that the denial of the firm's certification as an Airport Concession Disadvantaged Business Enterprise (ACDBE) under criteria set forth in 49 CFR Parts 23 and 26 ("the Regulation") is supported by substantial record evidence.

Your appeal is denied based upon our determination that substantial record evidence supports a conclusion that the disadvantaged business owner's contribution of capital to acquire her ownership interest in The Grove was not real, substantial, and continuing, going beyond pro forma ownership of the firm as required by the Regulation §26.69.

Your appeal is denied based upon our determination that substantial record evidence supports a conclusion that the disadvantaged business owner is not economically disadvantaged as defined by the Regulation §23.35.

Your appeal is further denied based upon our determination that substantial record evidence supports a conclusion that the disadvantaged business owner does not possess the power to direct or cause the direction of the management and policies of the firm; and to make day-to-day as well as long-term decisions on matters of management, policy and operations as required by the Regulation §§23.3 and 26.71.

Your appeal is also denied based upon our determination that substantial record evidence supports a conclusion that the firm is not an independent business pursuant to the Regulation §26.71.

The specific reasons for the denial of your appeal include the following:

IN GENERAL

**§23.3 defines an Airport Concession Disadvantaged Business Enterprise (ACDBE) as a concession that is a for-profit small business concern—(1) That is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which 51 percent of the stock is owned by one or more such individuals; and (2) Whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it.**

**§23.31(a) addressing the certification standards and procedures recipients used to certify ACDBEs, states in part, that as a recipient, you must use, except as provided in this subpart, the procedures and standards of part 26, §§26.61–91 for certification of ACDBEs to participate in your concessions program.**

**§26.61(b) states that the firm seeking certification has the burden of demonstrating to you, by a preponderance of the evidence, that it meets the requirements of this subpart concerning group membership or individual disadvantage, business size, ownership, and control.**

I. OWNERSHIP

**§26.69(a) states that in determining whether the socially and economically disadvantaged participants in a firm own the firm, you must consider all the facts in the record, viewed as a whole.**

**§26.69(c) states that the firm's ownership by socially and economically disadvantaged individuals must be real, substantial, and continuing, going beyond pro forma ownership of the firm as reflected in ownership documents. The disadvantaged owners must enjoy the customary incidents of ownership, and share in the risks and profits commensurate with their ownership interests, as demonstrated by the substance, not merely the form, of arrangements.**

**§26.69(e) states that contributions of capital or expertise by the socially and economically disadvantaged owners to acquire their ownership interests must be real and substantial. Examples of insufficient contributions include a promise to contribute capital, an unsecured note payable to the firm or an owner who is not a disadvantaged individual, or mere participation in a firm's activities as an employee. Debt instruments from financial institutions or other organizations that lend funds in the normal course of their business do not render a firm ineligible, even if the debtor's ownership interest is security for the loan.**



3

According to The Grove's DBE certification application received by OMWBE on September 12, 2005, the firm was established in 1981. The firm was incorporated in Louisiana as Natural Energy Unlimited, Inc. ("NEU") and originally owned by Ms. Ruth Ann Menutis and Mr. Paul Valteau. The firm's present corporate office is located in Westchester, Illinois.

The record indicates that The Grove operates concessionaire enterprises at various airports. In 1999, the firm's ownership changed when an investment company, Star Foods, LLC ("Star Foods") was brought on to assist the firm with its short-term cash flow problems. NEU's July 7, 1999, stockholders/directors meeting minutes indicate that The Grove's commitments for growth and expansion would deplete all its cash, "leave the company short by over $1 million," and the firm would have to incur loans to save the company. The minutes stated that:

> . . . [T]his situation was created by poor decisions on airport investments, chronic and serious under-performance and the continuing need to finance local partner's investment in Grove expansion. . . . It was decided in executive session that The Grove should seek to negotiate and develop a long term relationship with Star Foods to solve its short term cash flow problems and to assist in the long term in the growth and development of a stronger and more viable Grove organization.

According to the firm's DBE certification application, Star Foods invested $1.32 million, to acquire 35 shares (49 percent ownership interest) in The Grove on July 23, 1999. The record indicates that Star Foods is owned by Mr. Martin Dukler and Mr. Casey Cowell, both non-disadvantaged individuals.[1] (In various places of the record, the sole manager of Star Foods, Inc. is identified as Durandal, Inc., and Mr. Cowell appears to serve as its President.)

Your September 26, 2006, rebuttal letter to the Department ("rebuttal letter") stated that "contemporaneously with the stock sale, Ms. Menutis and Mr. Valteau elected two representatives of the minority shareholders as company directors . . . [and] on behalf of the company Ms. Menutis and Mr. Valteau negotiated a license for the company's continued use of The Grove trademarks, copyrights, and other intellectual property." You stated that one of the individuals elected as a director was Mr. Dukler, who is the spouse of Ms. Michelle Dukler, the firm's current President.

The firm's DBE certification application indicates that in February 2004, Ms. Dukler purchased 51.02 percent interest in The Grove with a cash contribution of $2.6 million. Ms. Dukler described Star Foods' investment, which occurred prior to her acquisition, in an August 23, 2005, letter to the City of Chicago ("COC") as follows:

> . . . Star Foods original investment in the company was made in July 1999. That investment included the purchase of a minority equity stake, a line of credit, the receipt of rights to certain [sic] of the company's intellectual property and a license agreement for the company's use of the transferred trademark(s) and copyright(s). Specifically, Star Foods purchased a 49% equity stake in The Grove

---

[1] The DBE certification application and your rebuttal letter state that Mr. Dukler owns 20 percent of Star Foods. An attachment to the certification application however, indicates Mr. Dukler's ownership interest is 15 percent.

4

for $1.32 million from Ruth Ann Menutis . . . and Paul Valteau. . . . At that time, the company had done business as Natural Energy Unlimited, Inc. (NEU).

Simultaneous with its stock purchase, Star Foods agreed to provide the company with a $4 million revolving line of credit ("LOC") for working capital purposes. The credit arrangement was memorialized in a written credit agreement between NEU and Durandal, Inc., a company related to Star Foods. In addition, as further consideration for the equity infusion and the LOC, Ms. Menutis and Mr. Valteau apparently also transferred to Star Foods certain intellectual property rights owned by another corporation owned by Ms. Menutis and Mr. Valteau.

Toward the end of 1999, it appears that the owners of Star Foods and Ms. Menutis and Mr. Valteau reached an agreement to restructure the LOC. In January 2000, Star Foods and the company entered into a Restructure Agreement. In the agreement, Star Foods assumed the company's outstanding indebtedness under the LOC and agreed to release the company from any repayment obligations to it. In exchange, the company agreed to credit the debt assumption as an addition to capital. Star Foods subsequently provided other paid-in capital for a total of $6.8 million. However, no additional shares of stock were issued to Star Foods and there is no agreement to do so in the future. . . . As noted under Recital G of the Restructure Agreement, as part of the original purchase transaction, Star Foods had agreed to "furnish Grove with the funding that was deemed reasonably adequate to operate the business."

All of these transactions took place prior to my acquisition of a controlling interest in 2004. You will note that they materially benefited Ms. Menutis and Mr. Valteau and the company. Also of importance . . . they do not confer any special rights directly or indirectly to Star Foods as a minority shareholder nor do they, in any way, affect my ability to run the company as CEO.

In OMWBE's June 28, 2006, decision affirming its earlier certification denial, OMWBE opined that Ms. Dukler's ownership is not real and substantial since she obtained a loan from an ineligible person using secured assets and paid for her ownership interest from a joint checking account she held with her spouse, who has a history of involvement with The Grove and is an owner, officer, and director of Star Foods. The details of Star Foods and Ms. Dukler acquiring their current ownership interests in the firm and related facts are contained in the record and are summarized as follows:

1. It appears that Star Foods held an option to purchase from Mr. Valteau and Ms. Menutis 36.5 shares of common stock, no par value in The Grove for an exercise price of $100,000.00 in cash. On February 5, 2004, Ms. Dukler signed a term note (option) to borrow $100,000.00, from Mr. Cowell; as well as a term note entitled "stock purchase" made payable to Mr. Cowell for $2.5 million. Both notes specify a maturity date of October 31, 2006, at a 2 percent annual interest rate.

Ms. Dukler also signed on February 5, 2004, a "mortgage and security agreement" with Mr. Cowell, which references the $100,000.00, and $2.5 million, notes. In this agreement, Ms. Dukler pledged as security for the notes her residence at 6756 Fieldstone Drive (valued at $580,000.00), antiques, art, "Schlitz Studios," "Schlitz Furnaces," and brokerage accounts. When combined, these assets totaled $2,654,425.00.

Mr. Dukler irrevocably renounced his rights to 36.5 shares of stock from marital property on February 5, 2004, "so that his wife, Michelle Dukler, may hold the assets as her separate and exclusive property." The record contains a document entitled "Exclusion of Certain Property from Marital Property" signed by Mr. Dukler.

2. The next day, February 6, 2004, Star Foods and Ms. Dukler executed two documents—an "options assignment agreement," assigning Star Foods' right to purchase 1.5 shares for $100,000.00, in consideration; and a "stock purchase agreement." The "option assignment agreement" between Star Foods and Ms. Dukler states:

> Star Foods holds an option to purchase 36.5 shares of the common stock, no par value, of The Grove, Inc., a Louisiana corporation, from Paul Valteau and Ruth Ann Menutis for an exercise price of $100,000.00, cash (the Valteau/Menutis Option) pursuant to that certain stock option agreement dated July 26, 1999. [Ms.] Dukler desires to purchase from Star Foods, and Star Foods desires to sell to Dukler, a portion of the rights granted to Star Foods pursuant to the Valteau/Menutis Option. . . . Star Foods shall assign to Dukler the right to purchase 1.5 shares pursuant to the Valteau/Menutis Option (the Dukler portion). . . . Dukler shall exercise her portion of the Valteau/Menutis Option only upon the exercise by Star Foods of its portion of the Valteau/Menutis Option. Upon Dukler's receipt of notice by Star Foods of its intention to exercise the Valteau/Menutis Option, Dukler shall consent to exercise her portion of the Valteau/Menutis Option and shall promptly deliver to Star Foods $4,110.00, representing her pro rata portion of the exercise price under the Valteau/Menutis Option. . . . In consideration of the Dukler portion, Dukler is hereby paying to Star Foods $100,000.00 (the Dukler Portion Purchase Price).

Under the terms of the February 6, 2004, "stock purchase agreement," Ms. Dukler purchased Star Foods' 35 shares, representing "approximately" its 49 percent ownership in The Grove for $2.5 million. The record contains a check drawn on the Dukler's joint checking account dated February 6, 2004, for $100,000.00, made payable to Star Foods, LLC. The notation on the check is "option purchase."

3. On February 17, 2004, Ms. Dukler executed on the firm's behalf a "loan and security agreement" with Fifth Third Bank. Under the terms of the agreement The Grove "may request from time to time" loans from the bank, up to $2.5 million, which is identified as the "project loan limit." The security interest granted was the firm's accounts, inventory, goods, trademarks/copyrights, equipment, and other items. The record contains what appears to be a corresponding "project loan" promissory note in the amount of $2.5 million, as well as a

"revolving promissory note" for $500,000.00, between The Grove and Fifth Third Bank. Both documents are dated February 17, 2004.

An attachment to the loan and security agreement lists the firm's locations and types of concessions at various airports. Section 14 of the agreement, entitled "tangible net worth," required The Grove to maintain various financial covenants, including its tangible net worth and cash flow coverage ratio. The agreement states:

> [The Grove's] tangible net worth shall not at any time be less than the minimum tangible net worth. Minimum tangible net worth is defined . . . as (i) $1,800,000.00, as of the date hereof; and (ii) $2,050,000.00, as of December 31, 2004, and as of the last day of each fiscal year thereafter until all of the liabilities have been paid in full. Tangible net worth is defined for purposes of this subsection as borrower's shareholders' equity (including retained earnings) less the book value of all intangible assets as determined solely by lender on a consistent basis plus the amount of any LIFO reserve plus the amount of any debt subordinated to lender, all as determined under generally accepted accounting principles applied on a basis consistent with the financial statement dated December 31, 2002.

(A handwritten tangible net worth calculation following the loan agreement lists the total equity of $3,029,464.42, minus organization costs ($103,078.09) and goodwill (net) ($523,311.43)). The consolidated income statement for the 12 months ending on December 31, 2003, attached to the agreement indicates that the firm's gross profit was $13,038,546.60, and total stockholders' equity of $3,029,464.42.

4. On February 17, 2004, Ms. Dukler and Mr. Cowell, on behalf of Star Foods, executed a "stockholders agreement," defining aspects of the owners' relationship. The agreement appears to allow Ms. Dukler to transfer her ownership interest to her spouse or descendent, who is termed "permitted transferee," provided that the transfer "will not result in the decertification of the company as a minority business enterprise or disadvantaged business enterprise in any jurisdiction where the company then has such certification." (The implications of this section on Ms. Dukler's control of the firm are addressed below.)

5. Ms. Dukler executed a "consumer note" with Fifth Third Bank, promising to pay $2.6 million at a floating interest rate with a maturity date of August 19, 2006. The effective date of the note is August 19, 2004, however, an attachment identifies that the document was recorded on the books of the bank on August 17, 2004.

6. It appears Mr. Cowell was repaid the $2.6 million, he loaned on August 17, 2004. The record contains a bank withdrawal slip on Ms. Dukler's account ending in 3001 for $2.6 million, and a deposit slip for Mr. Cowell's account for this same amount.

7. The record contains a February 6, 2005, check drawn on the Dukler's joint checking account for $2.5 million, made payable to Star Foods, LLC. The notation on the check is "stock purchase."

The Regulation §26.69 requires that the firm's ownership by socially and economically disadvantaged individuals be real, substantial, and continuing, going beyond pro forma ownership of the firm as reflected in ownership documents. Under §26.69(e), contributions of capital or expertise by the socially and economically disadvantaged owners to acquire their ownership interests must be real and substantial. Examples of insufficient contributions include a promise to contribute capital, an unsecured note payable to the firm or an owner who is not a disadvantaged individual, or mere participation in a firm's activities as an employee. Debt instruments from financial institutions or other organizations that lend funds in the normal course of their business do not render a firm ineligible, even if the debtor's ownership interest is security for the loan. The record does not support a conclusion that Ms. Dukler's contribution of capital to acquire her ownership interest in The Grove was real, substantial, and continuing, within the meaning of the Department's Regulation for the following reasons:

1. According to COC's May 18, 2004, site visit report, Ms. Dukler arranged the financing to start the business by selling the assets of her two firms and dissolving them. There is no evidence in the record which references these two firms and the circumstances of their dissolution. The on-site report also states, "She also has a very valuable art collection. This allowed her to get a line of credit for $2.6 million." Ms. Dukler stated in her August 23, 2005, letter to COC:

> At the time of my acquisition of a controlling interest in the company, the property located at 6756 Fieldstone Drive in Burr Ridge was the personal residence of my spouse and me and was owned jointly by us. My interest in the property was used as partial collateral to borrow $2.6 million from an individual lender to make the acquisition. The loan was evidenced by a written agreement and negotiated at arms-length. However, as COC is aware, to address any concerns regarding the lender, I secured replacement financing from Fifth Third Bank and paid off the original indebtedness in full. As mentioned above, a copy of the promissory note to the bank is included with this letter. Also included is a copy of my check paying off the original indebtedness.

It appears that Ms. Dukler obtained a $2.6 million loan from Mr. Cowell—using her personal and jointly held assets as collateral, followed by a loan in this amount from Fifth Third Bank to repay Mr. Cowell—using the firm's assets as collateral. The record does not support a conclusion that Ms. Dukler paid $2.6 million for her ownership interest in the firm. Rather, Star Foods appears to have bought out Ms. Menutis and Mr. Valteau (the previous owners), and loaned Ms. Dukler—through Mr. Cowell—the funds to purchase the shares from Star Foods. The firm alleges that as maker of the note to Mr. Cowell and as the person listed on the consumer note with Fifth Third Bank, Ms. Dukler is personally liable for the debt. However, it appears Ms. Dukler obtained financing through Fifth Third Bank and then paid Mr. Cowell. There is no indication that Ms. Dukler made a capital contribution of her own funds to acquire her ownership interest in The Grove. Specifically, the record evidence does not clearly demonstrate her actually paying off the loans with her own assets. While Ms. Dukler ultimately provided a check to Mr. Cowell, reimbursing him for his loan, this appears to have been accomplished via the second loan from Fifth Third Bank, which had a security interest in the firm's assets. (The timing of these transactions is addressed in point 3 below.)

01091

You alleged in your rebuttal letter that there are "bank statements from Fifth Third Bank listing interest repayments on the loan and showing Ms. Dukler's personal assets as the source of those payments." The record contains what appears to be an Internet summary of account activity with Fifth Third Bank for two accounts. The first is a commercial loan (account number ending in 0018) for approximately a one-year period from August 24, 2004, to August 19, 2005, which shows interest payments ranging from $10,400.00, to $14,173.62. Ms. Dukler indicated in her August 31, 2005, personal net worth statement under "note payable to banks and others," that in regards to the $2.6 million loan, the payment amount is $14,174, which "fluctuates with the prime rate." A second Internet statement for a platinum account ending in 3001 (showing the period July 29, 2005, to August 26, 2005) appears to indicate that on August 19, 2005, $14,173.62, was withdrawn from this account. The record contains two checks that appear to be in connection with the building of her new home drawn on the 3001 account, with Ms. Dukler's name listed on the check. It is important to note that while the 3001 account shows both payroll as a credit and a $14,173.62 debit for the 0018 commercial account, all of the payments listed are to interest, not principal. The total interest paid for the period (August 24, 2004, to August 19, 2005) is $164,486.12. In comparison to the $2.5 million figure Ms. Dukler allegedly paid for her shares in The Grove this does not appear to be substantial.

The Department finds the record evidence supporting actual payments by Ms. Dukler using her personal funds, as opposed to those of The Grove, lacking and unpersuasive.

As indicated above, Ms. Dukler obtained a loan from Fifth Third Bank for $2.6 million. While these funds may have been deposited in her account, Ms. Dukler has not met her burden of proof in demonstrating that her funds as separate from that of Fifth Third Bank assets (or that of Mr. Dukler's) were used. Simply depositing the proceeds from a loan into one's account to use as payment on another loan is insufficient in the Department's view to meet the requirements of the Regulation §26.69. An attachment to the firm's DBE application reveals that the current balance on the $3 million loan from Fifth Third Bank was $900,000.00, as of May 31, 2005. The purpose of the loan is listed as "business line of credit." The record does not contain supporting documentation demonstrating a payment of $2.1 million (as the attachment implies) by either the firm or Ms. Dukler.

2. The record indicates that the check Ms. Dukler used to repay Mr. Cowell was from an account she jointly owns with her spouse and that the Dukler's personal residence was used as collateral for the note with Mr. Cowell. The firm alleges that (1) the funds were placed in the account temporarily for convenience; (2) the Regulation permits marital assets to be used; and (3) Mr. Dukler renounced his interest in The Grove, which thus rendered Ms. Dukler's ownership interest appropriate under the Regulation. Ms. Dukler cites §26.69(i)(l), which states "when marital assets (other than the assets of the business in question), held jointly or as community property by both spouses, are used to acquire the ownership interest asserted by one spouse, you must deem the ownership interest in the firm to have been acquired by the spouse with his or her own individual resources, provided that the other spouse irrevocably renounces and transfers all rights in the ownership interest in the manner sanctioned by the laws of the state in which either spouse or the firm is domiciled." She stated in her August 23, 2005, letter to COC:

To the extent that marital assets were partially pledged to obtain the original financing for The Grove stock, [the Regulation] state[s] that this is permissible provided that the other spouse (in this case, my husband) irrevocably renounced and transferred any ownership in the company stock that he might assert as a matter of Illinois State law. . . . [C]ontemporaneously with the closing of the transaction, my spouse irrevocably renounced any ownership interest that he might otherwise have in The Grove stock that I acquired. . . . In any event, given that the plain meaning of the underscored phrase "ownership interest" refers to my acquired ownership interest in The Grove stock, whether or not my husband was listed on the deed to our personal residence after the purchase does not seem to be relevant.

While the Regulation addresses the situation where marital assets can be used to form the basis for an individual's ownership in a business, in this instance the question centers on the source of funds used and the manner of the transaction. Ms. Dukler has not met her burden of proof in demonstrating that her funds, as distinct from Mr. Cowell's, formed the basis for her contribution in The Grove. Even if Ms. Dukler contributed her personal funds to acquire her ownership interest, there remains the question of whether her contribution is "substantial" within the meaning of the Regulation §26.69. There are several issues here:

a. Although Ms. Dukler pledged her home as partial collateral to borrow the $2.6 million from Mr. Cowell, the record appears to indicate that the home was jointly owned with her spouse. The attachments to the February 5, 2004, "mortgage and security agreement" between Ms. Dukler and Mr. Cowell indicate that the home was valued at $580,000.00, and had an existing mortgage. If this was the amount valued by the parties at the time of the transaction, Ms. Dukler's share would presumably be no greater than $290,000.00, thus reducing her overall pledge of security at a minimum from $2,654,425.00 to $2,364,425.00. In addition, you indicated in your rebuttal letter that some of the items of collateral "are/were jointly owned by Ms. Dukler and her spouse (i.e. acquired during their marriage)" but that the "bulk of the items were owned by Ms. Dukler prior to her marriage." Without a clearer identification of which items were owned solely by Ms. Dukler, or could be considered shared assets with her spouse, it is difficult to determine whether Ms. Dukler's pledge of collateral can be considered substantial. It is equally unclear as to which of the assets can be attributed to Schlitz Studios or Schlitz Furnaces. The amounts listed for each of these entities are $142,000.00, and $606,500.00, respectively. As mentioned above, Ms. Dukler indicated to COC during its on-site that she sold the assets of her two firms. However, the circumstances and timing of such a sale would be relevant to determine how much of these assets could be attributable to Ms. Dukler, particularly if there were additional owners in these businesses. The record is unclear on these points.

b. Ms. Dukler indicated in her August 23, 2005, letter to COC that the agreed upon purchase price for her ownership interest "was based on arms-length negotiations and reflected the company's financial status at the time, which included significant operating losses from 1999 thru 2003." The Grove's consolidated financial statements for December 31, 2004, 2003, and 2002, indicate that the firm is engaged in retail sales of snack foods; and as of December 31, 2004, operated 60 units (ranging from freestanding cards to in-line stores) at 15 airports and one

train station across the country. As stated above, Ms. Dukler further indicated in her letter to COC that Star Foods assumed the company's outstanding indebtedness under the $4 million line of credit agreement (releasing it from any repayment obligations and crediting the debt assumption as an addition to capital); and provided other paid-in capital for a total of $6.8 million. The "consolidated income statement [for the] 12 months ending in December 31, 2003," attached to the February 17, 2004, "loan and security agreement" with Fifth Third Bank, indicates that the firm's gross profit was $13,038,546.60, and that the total stockholders' equity consisted of $3,029,464.42. In addition, the firm's gross receipts, according to its federal tax returns for the years 2001, 2002, and 2003, amounted to $14,173,854.00, $14,616,019.00, and $16,187,174.00 respectively. Therefore, assuming Ms. Dukler's contribution of $2.6 million was deemed sufficient, this appears less than reasonable to acquire a firm the size of The Grove. In addition, Ms. Dukler's contribution is substantially less than Star Foods' investment, which consisted of an initial investment of $1.32 million, the unknown amount of debts credited as an addition to capital, and the $6.8 million in other paid-in capital provided to the firm with no corresponding ownership share.

The Department finds Ms. Dukler's argument that the purchase price of the firm reflected the firm's financial status "which included significant operating losses from 1999 thru 2003" unpersuasive. The tax returns contained in the record for 2001, 2002, and 2003 indicate the firm claimed large amounts of deductions for these years; however, depreciation and compensation of officers accounted for a large share of the items.

Since the record does not contain the July 26, 1999, Stock Option Agreement between Star Foods, Ms. Menutis, and Mr. Valteau (referenced in various documents), the circumstances of why Star Foods effectuated the purchase in this manner are unclear.

3. While the consumer note between Ms. Dukler and Fifth Third Bank contained a pledge of security, this security consisted of among other things, "any and all property in which the lender is at any time granted a lien for any obligation including, without limitation, all collateral specified in any of the documents executed in connection with this note." This would seem to imply that the only items Ms. Dukler pledged under this agreement were obligations already involving Fifth Third Bank. The connection is that Ms. Dukler's consumer note appears to have occurred well after the firm's loan and security agreement with Fifth Third Bank, wherein the firm's assets were pledged as security. A second connection is evidence in the record showing that Mr. Cowell was repaid for his $2.6 million loan to Ms. Dukler on August 17, 2004, the same day the consumer loan was recorded on the bank's books. (The effective date of this document is listed as August 19, 2004.) This supports a conclusion that Mr. Cowell was repaid with funds from Fifth Third Bank as opposed to Ms. Dukler.

In summary, Ms. Dukler has not met her burden of proof in demonstrating her contribution of capital to acquire her ownership interest in The Grove was "real, substantial, and continuing, going beyond pro forma ownership of the firm as reflected in ownership documents" as specified by the Regulation §26.69.

## II. PERSONAL NET WORTH

§26.61(e) states that you must make determinations concerning whether individuals and firms have met their burden of demonstrating group membership, ownership, control, and social and economic disadvantage (where disadvantage must be demonstrated on an individual basis) by considering all the facts in the record, viewed as a whole.

§23.35 states that the personal net worth standard used in determining eligibility for purposes of this part is $750,000. Any individual who has a personal net worth exceeding this amount is not a socially and economically disadvantaged individual for purposes of this part, even if the individual is a member of a group otherwise presumed to be disadvantaged.

§23.3 defines "personal net worth" to mean the net value of the assets of an individual remaining after total liabilities are deducted. An individual's personal net worth does not include the following: The individual's ownership interest in an ACDBE firm or a firm that is applying for ACDBE certification; the individual's equity in his or her primary place of residence; and other assets that the individual can document are necessary to obtain financing or a franchise agreement for the initiation or expansion of his or her ACDBE firm (or have in fact been encumbered to support existing financing for the individual's ACDBE business), to a maximum of $3 million. An individual's personal net worth includes only his or her own share of assets held jointly or as community property with the individual's spouse.

§26.67(a)(2)(iii) states that in determining an individual's net worth, you must observe the following requirements: (A) Exclude an individual's ownership interest in the applicant firm. (B) Exclude the individual's equity in his or her primary residence (except any portion of such equity that is attributable to excessive withdrawals from the applicant firm). (C) Do not use a contingent liability to reduce an individual's net worth. (D) With respect to assets held in vested pension plans, Individual Retirement Accounts, 401(k) accounts, or other retirement savings or investment programs in which the assets cannot be distributed to the individual at the present time without significant adverse tax or interest consequences, include only the present value of such assets, less the tax and interest penalties that would accrue if the asset were distributed at the present time.

The record contains the following personal net worth statement for Ms. Dukler, dated August 31, 2005.

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on hand and in banks | 63,058 | Accounts payable | 0 |
| Savings Accounts | 0 | Note payable to banks and others | 2,600,000 |
| IRA or other retirement account | 9050 | Installment account (auto) (monthly payments $0) | 0 |
| Accounts and notes receivable | 0 | Installment account (other) (monthly payments $2,400) | 49,300 |
| | | Loan on Life Insurance | 0 |
| Life Insurance Cash Surrender Value Only | 4,684 | Mortgages on real estate | 2,300,000 |

| | | | | | |
|---|---|---|---|---|---|
| Stocks and Bonds | | 2,600,000 | Unpaid Taxes | | 0 |
| Real Estate | | 230,000 | Other liabilities | | 0 |
| Automobile – present value | | 15,440 | | | |
| Other personal property | | 2,027,225 | | | |
| Other Assets | | 0 | | | |
| | Total | 4,949,457 | Total Liabilities | | 4,949,300 |
| | | | Net Worth | | 157 |
| | | | Total | | 157 |

**Section 1. Source of Income**

| | | | Contingent Liabilities | |
|---|---|---|---|---|
| Salary | | 541,935 | As endorser or co-maker.........................300,000 |
| Net Investment Income | | 0 | Legal Claims & Judgments..............................0 |
| Real Estate Income | | 0 | Provision for Federal Income Tax...............189,677 |
| Other Income | | 0 | Other Special Debt (Fifth Third Loan)...........168,000 |

Description of Other Income in Section 1
N/A

**Section 2. Note payable to banks and others**

| Name and Address of Noteholder | Original Balance | Current Balance | Payment Amount | Frequency (monthly, etc.) | How Secured or Endorsed Type of Collateral |
|---|---|---|---|---|---|
| Fifth Third Bank 990 S. Waukegan Rd Lake Forest, IL 60045 | $2,600,000 | $2,600,000 | $14,174 this fluctuates with the prime rate | Monthly | Personal Guarantee |

**Section 3. Stocks and Bonds**

| Number of Shares | Name of Securities | Cost | Market Value Quotation/Exchange | Date of Quotation/Exchange | Total Value |
|---|---|---|---|---|---|
| 37.5 | The Grove, Inc. | | | | $2,600,000 |

**Section 4. Real Estate Owned**

| | |
|---|---|
| Type of Property | Will be primary |
| Address | Lot located at 5509 -----We currently live S. Oak, Hinsdale, Il.    in a rental for a yr. while my home is being built |
| Date Purchased | New construction contract signed 7-14-05 |
| Original Cost | $2,800,000.00 |
| Present Market Value | $2,800,000.00 |
| Name & Address of Mortgage Holder | Fifth Third Bank 990 S. Waukenga Road Lake Forest, IL 60045 |
| Mortgage Account Number | 400853545 |
| Mortgage Balance | $2,300,000.00. |
| Amount of Payment per Month/Year | $13,975 mo. or $167,700 for the yr. |
| Status of Mortgage | Pending until occupancy next year |

**Section 5. Other Personal Property and Other Assets**
See Attached list

**Section 6. Unpaid Taxes**
N/A

**Section 7. Other Liabilities**
N/A

**Section 8. Life Insurance Held**

01096



1) Kansas City Life Insurance Co. $75,000.00 face value - $4,684 surrender value – Martin Dukler, beneficiary.
2) Unicare Health / Life Insurance - $10,000 face value - $0 surrender value – Martin Dukler, beneficiary.

Attached to the statement is the following summary list of Ms. Dukler's assets as of August 18, 2005. (The record contains a more detailed summary listing each individual item.)

| | |
|---|---|
| Antiques | $ 700,050.00 |
| Art | $ 375,875.00 |
| Jewelry | $ 202,800.00 |
| Schlitz Studios Other | $ 142,000.00 |
| Schlitz Furnaces | $ 606,500.00 |
| Total | $2,027,225.00 |

Home Equity $230,000.00
(New Construction at 5509 S. Oak Occupancy not until 2006)

OMWBE stated:

The personal financial statement submitted by Ms. Dukler identifies assets that total $2,027,225. When Ms. Dukler repaid Mr. Cowell on August 17, 2004, those assets were no longer encumbered. However, on her personal financial statement Ms. Dukler identifies $2,600,000 of encumbered assets linked to the personal loan of August 19, 2004. Mr. Dukler does not identify any payments made on that loan. Even though Ms. Dukler took out another loan for $2,600,000 from [Fifth Third] Bank, the firm was used as collateral, not Ms. Dukler's other assets. In addition, since Ms. Dukler had already purchased her ownership interest in the firm and paid off Mr. Cowell for his loan, this loan is a contingent liability, not an encumbered asset. According to [the Regulation] contingent liabilities may not be used to reduce the value of an individual's personal net worth. Ms. Dukler has at least $2,600,000 of unencumbered assets that have not been claimed on her personal financial statement. As such, Ms. Dukler is not an eligible person under the rules of the DBE program.

OMWBE reiterated this finding in its June 28, 2006, letter to the firm as follows:

As stated in the [Department's] decision on June 2, 2005, Ms. Dukler used her assets in the firm in order to secure her loan from Fifth Third Bank. If, as Ms. Dukler contends, the assets used to secure the loan from Mr. Cowell are in fact separate property, the value of those assets alone would cause Ms. Dukler's personal net worth to exceed the personal net worth cap inasmuch as they are no longer encumbered. Note: if Ms. Dukler did not use separate assets to collateralize the loan from Mr. Cowell, she would not be able to successfully establish her claim of separate property ownership of the firm.

The firm argues in essence that Ms. Dukler borrowed $2.6 million secured by her assets and personal property, and as such, the personal property used as security should be excluded from



her personal net worth calculation. You alleged in your September 26, 2006, rebuttal letter to the Department that OMWBE misinterpreted the Regulation §23.35, which addresses permissible exclusions from an ACDBE applicant's net worth. Specifically, you indicate that under §23.35, an individual's personal net worth calculation does not include "other assets that the individual can document are necessary to obtain financing or a franchise agreement for the initiation or expansion of his or her ACDBE firm (or have in fact been encumbered) to support existing financing for the individual's ACDBE business to a maximum of $3 million." You stated:

> In this case, while [OMWBE] acknowledged that in order to pay off the loan from Mr. Cowell, Ms. Dukler borrowed $2.6 million from Fifth Third Bank. However, [OMWBE] simply chose to ignore that this was a personal loan secured by Ms. Dukler's personal promissory note. In addition, the Fifth Third Bank required Ms. Dukler to execute a security agreement in which she pledged all of her assets and personal property (i.e., including the personal assets mentioned by [OMWBE] in the denial) as security for the loan. Information and evidence of this personal loan was provided to OMWBE as well as documentary evidence of the loan agreement, the security agreement, Ms. Dukler's promissory note, and of interest payments on the debt from her personal bank account. In addition, Ms. Dukler has personally guaranteed other company debt and airport lease obligations of the company. Applying the Fifth Third debt (and her other personal debt(s)) (i.e.; reducing . . . the value of her assets by these obligations) demonstrates that Ms. Dukler's PNW does not exceed the standard for the owner of an ACDBE firm. This is even more true if one also applies the company obligations for which she is personally liable.

The Department notes in the preamble to the Regulation that it is sensitive to the concern of commenters that a $750,000.00 standard "could inhibit opportunities for business owners to enter the concessions field and expand existing businesses." As a result, Part 23 excludes from a person's net worth calculation assets that the owner/applicant can demonstrate are necessary to obtain financing to enter or expand a concessions business at an airport. The preamble emphasizes that recourse assets are, for example, those that were encumbered or are "to be encumbered" in order to obtain financing, as in the case where the asset is used as collateral for a loan. Also addressed is the need for documentation that these recourse assets were required before a franchisor or financial institution took action. The applicable portion of the preamble states:

> Assets that the owner/applicant can demonstrate are necessary to obtain financing to enter or expand a concessions business at an airport subject to Part 23 (e.g., by producing letters from banks to that effect) would also be excluded from the PNW calculation, as would assets that have in fact been encumbered to support existing financing for the applicant's business.

> This provision would extend only to "recourse" assets (i.e., those that were encumbered or to be encumbered in order to obtain financing, as in a case where an asset is used a collateral for a loan). For example, if the owner/applicant for ACDBE certification to operate a fast food franchise at an airport could document

15

that MegaBurger Corporation requires the franchisee to have $X in assets before it will grant the franchise, that amount would be excluded from the PNW calculation. Likewise, if the owner of an ACDBE retail or service business who wished to expand operations to another airport could document that a number of financial institutions required $Y in personal assets to back a loan needed for the expansion, $Y would be excluded from the PNW calculation. Airports/UCPs would be responsible for verifying the documentation pertinent to this exclusion.

Without unduly expanding the well-accepted $750,000 standard, this approach will take into account individual circumstances and avoid the "glass ceiling" effect of an across-the-board PNW standard about which commenters were concerned. There will be additional information that owners will have to obtain and recipients and UCPs will have to evaluate, but we believe that this is justified in the interest of a narrowly tailored regulation that remains fair and flexible regulation that achieves the objectives of nondiscrimination and opening business opportunities to ACDBEs.

To prevent the eligibility standards from becoming too open-ended, resulting in the participation of individuals so wealthy that it would be difficult to justify their inclusion in a program aimed at disadvantaged individuals, we are adding a $3 million cap on this third exclusion. This figure is consistent with many comments concerning the appropriate extent of a PNW threshold. That is, an applicant could present documentation to the certifying authority that he or she required a certain amount of assets to open or expand a concessions business. If that amount exceeded $3 million, the amount of the individual's net worth above $3 million would be added to the PNW calculation.

Here is an example of how these provisions would work. A hypothetical business owner, Ms. T, has a gross PNW of $4.6 million. The equity in her primary residence is $400,000. Her equity in the business is $500,000. She produces adequate documentation from at least two financial institutions that they will require $3.6 million in assets to support their granting the loan necessary to open a concession business at a particular airport. (Ms. T's documentation would also need to justify the need for a loan of the amount referenced in the letters from the financial institutions, documenting the build-out costs and other capital investment needed to begin operating the concession.) Because $3.6 million exceeds the $3 million cap on the third exclusion from the PNW calculation, $600,000 would count toward that calculation. In this case, her net PNW would be $700,000. . . . This amount is less than the PNW threshold, so Ms. T would be an eligible ACDBE owner.

Certifying authorities need to carefully evaluate accounting mechanisms that applicants may use to try to circumvent the PNW threshold. For example, if within two years prior to or following an application for certification, an applicant transfers assets (e.g., to a family member or to a trust), the certifying authority should regard those assets as continuing to count against the applicant's PNW.

As stated above, in February 2004 Ms. Dukler entered into an agreement to purchase from Star Foods 35 shares of stock (49 percent) in The Grove for $2.5 million as well as an option agreement to purchase 1.5 shares for $100,000.00. To accomplish this she (1) executed notes with Mr. Casey Cowell for $2.5 million and $100,000.00, and a corresponding security agreement granting Mr. Cowell a security interest in her home, antiques, and art; and (2) later entered into a loan and security agreement with Fifth Third Bank covering this amount, using as security or collateral the firm's accounts, inventory, goods, etc. In August 2004, Ms. Dukler executed a consumer note for $2.6 million with Fifth Third Bank and repaid Mr. Cowell $2.6 million, transferring these funds from Fifth Third Bank. While the record contains evidence of these transactions, for the following reasons, the Department agrees with OMWBE's conclusion that the $2.6 million listed should not be counted as a liability on Ms. Dukler's personal net worth statement.

1. There is no documented record evidence indicating that Ms. Dukler was required or needed to pledge her home and personal assets in order to capitalize or expand The Grove. The preamble section identified above clearly articulates the Department's intent that the ACDBE owner needs to demonstrate that certain assets were required or necessary to obtain financing. The example in the preamble—where an owner exceeds the PNW threshold, yet produces documentation from financial institutions that they require $3.6 million in assets to support their granting the loan necessary—is directly on point. Under the hypothetical example stated in the preamble, "[the applicant's] documentation would also need to justify the need for a loan of the amount referenced in the letters from the financial institutions, documenting the build-out costs and other capital investment needed to begin operating the concession." This does not appear to be the case in The Grove's arrangement.

In addition, the record indicates that Ms. Dukler's personal assets were pledged as security on the loan from Mr. Cowell. However, the Department agrees with OMWBE that once Ms. Dukler executed the loan and security agreement with Fifth Third Bank, pledging as security the firm's assets, Ms. Dukler's personal assets can no longer be considered encumbered. The resulting obligation to Fifth Third Bank can appropriately be considered a contingent liability, would not rise to "encumbered" status as envisioned by the Regulation, and should not be counted as a liability on Ms. Dukler's personal net worth statement. Lastly, as stated above, there is no indication that Ms. Dukler made any payments on the personal loan to Mr. Cowell or to Fifth Third Bank. (This point is addressed in the ownership context above.) As such, it is possible that the transactions that occurred were made to give the appearance that Ms. Dukler actually paid $2.6 million for her ownership share.

2. The Department also has concerns about Ms. Dukler's personal property calculation. Specifically, Ms. Dukler listed on her personal net worth statement real estate of $230,000.00, on the asset side and $2.3 million, as a liability for "mortgages on real estate." Yet, section 4 of the statement listing the real estate she owns indicates that the 5509 S. Oak Street property had an original cost at $2.8 million, and a mortgage balance of $2.3 million. Although section 4 identifies the property as Ms. Dukler's primary residence, it appears to indicate that Ms. Dukler is living in a rental property while her home at this address is being built. Ms. Dukler stated in her August 23, 2005, letter to COC that her prior residence at Fieldstone Drive was sold on July 5, 2005, and that "the proceeds from this sale were then committed in an agreement to purchase a

new home." She further indicated that, "Title to the land has yet to be delivered. My spouse, child and I currently reside in a rental property." As mentioned, section 4 of the statement lists the original cost of the property at 5509 S. Oak Street in Hinsdale as $2.8 million, with a mortgage balance of $2.3 million; however, in the category "status of mortgage," there is an entry of "pending until occupancy next year."

There are two issues here. First, the construction contract was signed by both Martin and Michelle Dukler and could be considered a joint asset. As such, only half the mortgage should be counted as a liability. Second, there is a question as to what value can be placed on the asset since construction may or may not have started. This is relevant to the property's worth since the "new home construction agreement" states that "[i]t is anticipated that the builder will substantially complete the work within 12 months from when construction begins which is defined here as when demolition begins on the existing home." Therefore, if an existing home on the property exists, there presumably is an existing value to this asset. In addition, the timing of the construction is relevant to the asset's value since under the terms of the contract it appears the Duklers paid the builder $62,500.00 in July 2005 (when the construction agreement was signed), but that the remainder is due upon issuance of the building permit ($292,500.00) and at closing ($2,489,750.00). Given these considerations, the entries on Ms. Dukler's personal net worth statement are unclear and the Department determines that she has not met her burden of proof as specified under §26.61(b).

3. Your rebuttal letter states that "Ms. Dukler has personally guaranteed other company debt and airport lease obligations of the company." There is no evidence in the record to support this assertion. The Department's decision is based upon Ms. Dukler's personal net worth statement and background information contained in the record that supports it. There is no company debt or airport lease obligations listed on the statement, other than what has already been discussed above.

III. CONTROL

**§26.71(b) states that only an independent business may be certified as a DBE. An independent business is one the viability of which does not depend on its relationship with another firm or firms. (1) In determining whether a potential DBE is an independent business, you must scrutinize relationships with non-DBE firms, in such areas as personnel, facilities, equipment, financial and/or bonding support, and other resources. (2) You must consider whether present or recent employer/employee relationships between the disadvantaged owner(s) of the potential DBE and non-DBE firms or persons associated with non-DBE firms compromise the independence of the potential DBE firm. (3) You must examine the firm's relationships with prime contractors to determine whether a pattern of exclusive or primary dealings with a prime contractor compromises the independence of the potential DBE firm. (4) In considering factors related to the independence of a potential DBE firm, you must consider the consistency of relationships between the potential DBE and non-DBE firms with normal industry practice.**

**§26.71(c) states that a DBE firm must not be subject to any formal or informal restrictions which limit the customary discretion of the socially and economically disadvantaged**

owners. There can be no restrictions through corporate charter provisions, by-law provisions, contracts or any other formal or informal devices (e.g., cumulative voting rights, voting powers attached to different classes of stock, employment contracts, requirements for concurrence by non-disadvantaged partners, conditions precedent or subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights) that prevent the socially and economically disadvantaged owners, without the cooperation or vote of any non-disadvantaged individual, from making any business decision of the firm. This paragraph does not preclude a spousal co-signature on documents as provided for in §26.69(j)(2).

§26.71(d) states that the socially and economically disadvantaged owners must possess the power to direct or cause the direction of the management and policies of the firm and to make day-to-day as well as long-term decisions on matters of management, policy and operations. (1) A disadvantaged owner must hold the highest officer position in the company (e.g., chief executive officer or president). (2) In a corporation, disadvantaged owners must control the board of directors. (3) In a partnership, one or more disadvantaged owners must serve as general partners, with control over all partnership decisions.

Under §26.71(l) where a firm was formerly owned and/or controlled by a non-disadvantaged individual (whether or not an immediate family member), ownership and/or control were transferred to a socially and economically disadvantaged individual, and the non-disadvantaged individual remains involved with the firm in any capacity, the disadvantaged individual now owning the firm must demonstrate to you, by clear and convincing evidence, that: (1) The transfer of ownership and/or control to the disadvantaged individual was made for reasons other than obtaining certification as a DBE; and (2) The disadvantaged individual actually controls the management, policy, and operations of the firm, notwithstanding the continuing participation of a non-disadvantaged individual who formerly owned and/or controlled the firm.

1. The Grove's bylaws, an August 1999 "Restated Articles of Incorporation," and a July 2001 amendment reference the company's President's ability to control the firm.

- Article III §1 of NEU's bylaws states:

The business and affairs of the corporation shall be managed by its board of directors. The directors . . . may adopt such rules and regulations for . . . the management of the corporation, as they may deem proper.

- Article IV §5 of NEU's bylaws states:

The president . . . shall in general supervise and control all of the business and affairs of the corporation. . . . He may sign . . . certificates of shares of the corporation, any deeds, mortgages, bonds, contracts or other instruments which the directors have authorized to be executed.



- Article XI of NEU's bylaws states:

These bylaws may be altered, amended or repealed and new bylaws may be adopted by a vote of a stockholders representing a majority of all the shares issued and outstanding at any annual stockholders' meeting or at any special stockholders' meeting when the proposed amendment has been set out in the notice of such meeting.

- Article V of NEU's "Restated Articles of Incorporation," dated August 1, 1999, states:

Whenever the affirmative vote of the shareholders at a meeting is required to authorize or constitute corporate action under any provision of the business Corporation Law or the Articles of Incorporation or ByLaws of the Corporation, any such action may be authorized or constituted by a consent in writing, without a meeting, signed by the shareholders having at least that proportion of voting power which would be necessary under any such provision to authorize or constitute the action by the affirmative vote at a meeting; provided, that nay [sic] such written consent shall be filed with the record of proceedings of the shareholders; and provided, further, that prompt notice shall be given to all of the shareholders having voting power on the question, other than those who signed the consent, of the action taken pursuant to such written consent.

- At the firm's July 20, 2001, board meeting, the bylaws were amended to read: "Paragraph 7 Quorum:"

At any meeting of stockholders, 60 percent of the outstanding shares of the corporation entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of the stockholders.

OMWBE determined that as the 51 percent owner, Ms. Dukler cannot convene a quorum of the shareholders on her own, since the bylaws specify that 60 percent of the outstanding shares of the corporation entitled to vote constitute a quorum at a meeting of the stockholders. OMWBE stated:

If Ms. Dukler has to amend the bylaws on a regular basis, [OMWBE] believes this illustrates her inability to control the firm as required by [the Regulation]. Amendment of bylaws should be the exception and not the rule. If the eligible person has to resort to extraordinary measures to conduct its ordinary business operations, then the eligible person does not have the ability to control the business as contemplated by the Federal Regulations.

You alleged in your rebuttal letter that (1) the bylaws set a quorum at a shareholders' meeting at 60 percent for an action; (2) the bylaws can be amended by the affirmative vote of shareholders representing a majority of the company's stock at any annual stockholders' meeting or at any special stockholders' meeting; and (3) Article V of the restated articles of incorporation allows

shareholders representing a majority of the company's stock (i.e., Ms. Dukler) to take any corporate action by a consent in writing without a meeting. You also alleged that OMWBE misinterprets the provisions by claiming that Ms. Dukler would have to amend the bylaws each time she is unable to convene a meeting. You indicated that pursuant to the Louisiana Business Corporations Law and the Articles of Incorporation, Ms. Dukler would only have "to amend the bylaw[s] once to reduce the quorum to stockholders with 51 percent of the outstanding shares." Further, you allege this could be accomplished at any time through a simple written consent without a meeting, and that once done, no further amendments to the quorum requirement is necessary. In your view, OMWBE's analysis that Ms. Dukler must take extraordinary measures to conduct the firm's ordinary business and does not have the ability to control the firm is therefore flawed, as the bylaws provide that the firm's President shall supervise and control its day-to-day (i.e., ordinary) operations. Lastly, you alleged that "in relying solely on a single provision involving a quorum, [OMWBE] violates the DOT requirement to "consider all the facts in the record, viewed as a whole" as specified in §26.71(a). You stated:

> [G]iven that [Ms. Dukler] owns 51% of the company's stock, even such an amendment is not necessary since the company's Restated Articles of Incorporation permit Ms. Dukler to take any corporate action through a simple written consent. . . . Note that the language . . . [in] the Restated Articles (". . . prompt notice shall be given . . . of the action taken pursuant to such written consent") is further evidence that Ms. Dukler (as the majority shareholder) can take any corporate action using a written consent.

> As the company's President and Chief Executive Officer, Ms. Dukler has all of the authority required to conduct or manage its ordinary business operations. Moreover, Ms. Dukler can use a simple written consent to authorize corporate acts that may require Board or stockholder consideration (i.e. corporate matters that do not pertain to ordinary day-to-day business affairs or operations).

> All the facts viewed as a whole clearly establish that Ms. Dukler does control the operations of the firm as required by DOT regulations. Ms. Dukler is the Chair and sole member of the Board of Directors. Article [III] §1 of the bylaws states: "The business affairs of the corporation shall be managed by its board of directors. The directors . . . may adopt such rules and regulations for . . . the management of the corporation, as they may deem proper." As Chair and sole director, Ms. Dukler manages "the business affairs" of The Grove. Ms. Dukler is the President of The Grove.

> Article IV §5 of the bylaws states: "The president . . . shall in general supervise and control all of the business [and] affairs of the corporation . . . He may sign . . . certificates of shares of the corporation, any deeds, mortgages, bonds, contracts or other instruments which the directors have authorized to be executed. . . ." As President of The Grove, Ms. Dukler supervises and controls all of the business affairs of The Grove. Moreover since Ms. Dukler is the company's President and sole director she has the authority to act on behalf of the company with respect to "other instruments which the directors have authorized to be executed."

a. The Regulation §26.71(c) states, in part, that a DBE firm must not be subject to any formal or informal restrictions which limit the customary discretion of the socially and economically disadvantaged owners. There can be no restrictions through corporate charter provisions, by-law provisions, contracts or any other formal or informal devices (e.g., cumulative voting rights, voting powers attached to different classes of stock, employment contracts, requirements for concurrence by non-disadvantaged partners, conditions precedent or subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights) that prevent the socially and economically disadvantaged owners, without the cooperation or vote of any non-disadvantaged individual, from making any business decision of the firm.

Under the terms of The Grove's bylaws, Ms. Dukler is required to obtain the cooperation of Star Foods, the 49 percent owner, in order to call a quorum at any meeting of the stockholders. Should Star Foods not agree to attend a meeting, it appears her recourse would be to seek an amendment of the bylaws in writing, which would permit the meeting to take place. This is contrary to the intent of §26.71(c).

2. On February 17, 2004, Ms. Dukler and Mr. Cowell (on behalf of Star Foods) executed a stockholders' agreement, which appears to restrict Ms. Dukler's ability to transfer her ownership interest to persons other than her spouse or descendent, who is termed a "permitted transferee." Although Ms. Dukler is able to transfer her ownership interest to such a person, she may only do so if it "will not result in the decertification of the company as a minority business enterprise or disadvantaged business enterprise in any jurisdiction where the company then has such certification." While the decertification of the firm may be detrimental to its business operations, this limitation clearly prevents Ms. Dukler from transferring all or even a portion of her shares if this were to be the end result. An owner's ability to choose who to sell or give his or her portion of their business to is an integral part of the concept of control as well as ownership. The restrictions limit Ms. Dukler's ability to control The Grove within the meaning of the Regulation.

INDEPENDENCE

The Grove has not met is burden of proof in demonstrating it is an independent business consistent with the Regulation §26.71(b). This conclusion is based on:

  (a) financial dealings between The Grove, Star Foods, and Georgia's Grove, LLC ("Georgia's Grove"); and

  (b) Ms. Dukler's ownership arrangement with Star Foods and her control of the firm.

Each of these points is addressed separately below.

a. Financial Dealings

It appears that at the time of its purchase of 49 percent of The Grove from Ms. Menutis and Mr. Valteau, Star Foods provided a $4 million revolving line of credit to the firm. According to Ms. Dukler's August 23, 2005, letter to the City of Chicago ("COC"), in the two firm's January 2000


restructure agreement, "Star Foods also assumed the company's outstanding indebtedness under the letter of credit and agreed to release [The Grove] from any repayment obligations to it. In exchange, the company agreed to credit the debt assumption as an addition to capital." Star Foods later provided $6.8 million in additional working capital without a corresponding issuance of stock.

Ms. Dukler alleged that these transactions took place prior to her acquiring the controlling interest in 2004, and that the transactions "materially benefited Ms. Menutis and Mr. Valteau and the company." She also indicated that the transactions "do not confer any special rights directly or indirectly to Star Foods as a minority shareholder nor do they, in any way, affect [her] ability to run the company as CEO."

In the Department's view, the timing of these transactions or when Ms. Dukler actually acquired her ownership shares is not the central issue with regards to The Grove's independence. The issue centers on whether The Grove's relationship with Star Foods is in accordance with the Regulation §26.71(b), which focuses on an independent business' viability depending upon its relationship with another firm or firms. §26.71(b)(1) states that in determining whether a potential DBE is an independent business, you must scrutinize relationships with non-DBE firms, in such areas as personnel, facilities, equipment, financial and/or bonding support, and other resources. (2) You must consider whether present or recent employer/employee relationships between the disadvantaged owner(s) of the potential DBE and non-DBE firms or persons associated with non-DBE firms compromise the independence of the potential DBE firm. (3) You must examine the firm's relationships with prime contractors to determine whether a pattern of exclusive or primary dealings with a prime contractor compromises the independence of the potential DBE firm. (4) In considering factors related to the independence of a potential DBE firm, you must consider the consistency of relationships between the potential DBE and non-DBE firms with normal industry practice.

As Ms. Dukler indicated in her letter to COC, Star Foods assumed the company's outstanding indebtedness under the $4 million line of credit agreement (releasing it from any repayment obligations and crediting the debt assumption as an addition to capital); and provided other paid-in capital for a total of $6.8 million. Thus, The Grove's dependence upon Star Foods for financial support could not be clearer. This conclusion is bolstered by the fact that Star Foods' infusion of $6.8 million in capital appears gratuitous, and was made without a corresponding transfer or purchase of stock ownership in the business. The Grove clearly was dependent upon Star Foods for financial support and received substantial funds. NEU's July 7, 1999, stockholders/directors meeting minutes indicate that The Grove intended to establish a "long term relationship with Star Foods to solve its short term cash flow problems and to assist in the long term in the growth and development of a stronger and more viable Grove organization." The Department notes that it is not merely the language of these minutes that is determinative, but instead the resulting financial arrangement that occurred. While the capital venture arrangement in this instance is not prohibited by the Regulation per se, Star Foods' infusion of capital appears to have been such a vital factor in The Grove's development, that the conclusion that The Grove is not independent as defined by the Regulation is unmistakable and clear. In addition, this arrangement appears designed to rescue a firm in difficulty, provide Star Foods (a non-DBE firm) the opportunity to continue to participate as a shareholder in an existing DBE

certified firm, and install Ms. Dukler as the firm's 51 percent owner and President, who it appears did not acquire her ownership interest in the firm in accordance with the Regulation §26.69.

Another aspect of The Grove's financial dealings with Star Foods and Georgia's Grove involves the firm's February 17, 2004, loan and security agreement with Fifth Third Bank. The agreement appears to indicate that The Grove makes payments to Star Foods and/or Georgia's Grove. Section 11(h) of the agreement states:

> Except as set forth on Schedule 11(h) hereto or as permitted pursuant to subsection 11(c) hereof, borrower is not conducting, permitting or suffering to be conducted, transactions with any parent, affiliate, or subsidiary other than transactions with a parent, affiliate, or subsidiary for the purchase or sale of inventory or services in the ordinary course of business pursuant to terms that are no less favorable to borrower than the terms upon which such transactions would have been made had they been made to or with a person that is not a parent, affiliate, or subsidiary.

Section 11(c) states, "Borrower has not made any loans or advances to any parent, affiliate, or subsidiary or other person except for advances authorized hereunder to employees, officers and directors of borrower for travel and other expenses arising in the ordinary course of borrower's business and loans . . ."

Schedule 11(h), attached to the agreement, lists the following affiliated transactions.

1. The Grove Inc. makes license fee payments to Star Foods;

2. The Grove Inc. may make payments on behalf of Star Foods and/or Georgia's Grove and charge Star Foods and/or Georgia's Grove for such payments;

3. The Grove, Inc. may make payments to Star Foods and/or Georgia's Grove for payments Star Foods and/or Georgia's Grove have made on The Grove, Inc.'s behalf;

4. The Grove Inc. may perform accounting, administrative, or marketing functions for Star Foods and/or Georgia's Grove for which it may or may not be directly or indirectly reimbursed;

5. Any transactions of The Grove, Inc. related to its 70 percent interest and managing partner status for NEU of Chicago.

Section 11(o) of the agreement states, "Except as set forth on Schedule 11(o) hereto, borrower has no parent, subsidiaries, affiliates, or divisions, nor is borrower engaged in any joint venture or partnership with any other person." Schedule 11(o) lists the following as affiliates: "Star Foods, LLC, Georgia's Grove, LLC, and Natural Energy Unlimited of Chicago (a partnership)."



24

This aspect of the relationship between the firms is unclear in the record; however, the issue arises as to why The Grove listed these firms as affiliates in its loan and security agreement with Fifth Third Bank. This could be an instance where the reference to these firms in this manner was necessary in order for the bank to enter into its agreement with The Grove in the first place. However, without more details the Department cannot reach a conclusion in this regard.

Another restriction related to the financial dealings involving The Grove is contained in Section 15 of the "loan and security agreement" between the firm and Fifth Third Bank. This section details the circumstances of default, which include "the failure of Martin and Michelle Dukler to own and have voting control of at least 50 percent of the issued and outstanding voting equity interests of [The Grove]." This appears to be a restriction on Ms. Dukler's ability to sell a portion of her shares to another party, and negatively impacts her ability to control the firm within the meaning of the Regulation.

b. <u>Ms. Dukler's Ownership Arrangement with Star Foods and Her Control</u>

Under §26.71(l) where a firm was formerly owned and/or controlled by a non-disadvantaged individual (whether or not an immediate family member), ownership and/or control were transferred to a socially and economically disadvantaged individual, and the non-disadvantaged individual remains involved with the firm in any capacity, the disadvantaged individual now owning the firm must demonstrate to you, by clear and convincing evidence, that (1) the transfer of ownership and/or control to the disadvantaged individual was made for reasons other than obtaining certification as a DBE; and (2) the disadvantaged individual actually controls the management, policy, and operations of the firm, notwithstanding the continuing participation of a non-disadvantaged individual who formerly owned and/or controlled the firm.

You alleged in your rebuttal letter that §26.71(l) only applies to a former non-DBE firm and is not applicable to The Grove's situation. You stated that "at the time of Ms. Dukler's stock purchase The Grove was a certified DBE and there is no finding in the record to the contrary; nor is there any finding in the record that it was not controlled by its DBE owners (Ms. Menutis and Mr. Valteau)." The Department disagrees. The firm's arrangement is precisely the type addressed by §26.71(l), since it appears Star Foods, a non-DBE firm first held the option to purchase Ms. Menutis and Mr. Valteau's 51 percent interest in The Grove, and remains the 49 percent owner of The Grove. While ultimately, Ms. Dukler and Star Foods entered into an "option assignment agreement," clearly Mr. Cowell and Mr. Dukler were involved with Star Foods at the time of OMWBE's denial. This section's remaining requirements thus apply—i.e. the disadvantaged owner must demonstrate by clear and convincing evidence that the transfer was made for reasons other than obtaining DBE certification and that the individual actually controls the firm notwithstanding the continued participation of a non-disadvantaged individual who formerly owned and/or controlled the firm. For the reasons articulated above, substantial record evidence supports a conclusion that Ms. Dukler has not met these requirements nor controls the firm within the meaning of the Regulation.



25

Other Issues Relative to Ms. Dukler's Control of The Grove

1. OMWBE indicated that it could not determine that The Grove is controlled by an eligible person as distinct from the family as a whole. The record is inconclusive regarding this point.

OTHER ISSUES

1. In its decision OMWBE indicated that it was unable to determine if The Grove was a small business since it failed to provide income tax records for Star Foods. It appears OMWBE based its decision that The Grove and Star Foods were affiliates on information indicating that the "individual owners of Star Foods have had significant control of The Grove in the past"; and that Mr. Dukler, one of Star Foods' owners is "CEO of Georgia's Grove, LLC, which is also owned by Star Foods, LLC and which performs in the same industry as the firm." Under SBA's Regulation, in determining whether affiliation exists, SBA will consider the totality of the circumstances, and may find affiliation even though no single factor is sufficient to constitute affiliation. In this matter, more information is needed to determine whether The Grove, Star Foods, and Georgia's Grove are affiliates.

2. According to Ms. Dukler's personal net worth statement, the new residence is valued at $2.8 million and has a monthly mortgage payment of $13,975.00. In addition, the record indicates that Ms. Dukler receives a weekly salary of $10,422.00, with a reported total personal net worth of $157.00, on her personal net worth statement. These circumstances raise a question as to whether Ms. Dukler can be considered economically disadvantaged, and the Department notes that it is reasonable for a certifying agency to apply a total asset test in this situation.

In summary, the information provided cumulatively supports a conclusion that The Grove, Inc., does not meet the criteria as required for DBE certification under 49 CFR Parts 23 and 26. The company is, therefore, ineligible to participate as a DBE on OMWBE's federal financially assisted projects. This determination is administratively final as of the date of this correspondence.

Sincerely,

Joseph E. Austin, Chief
External Policy and Program Development Division
Departmental Office of Civil Rights

cc: OMWBE

**K&L|GATES**

Kirkpatrick & Lockhart Preston Gates Ellis LLP
1735 New York Avenue NW
Suite 500
Washington, DC 20006-5221

T 202.628.1700    www.klgates.com

February 15, 2007

**VIA E-MAIL AND U.S. MAIL**

Joseph Austin
Chief
External Policy and Program
Development Division
Departmental Office of
Civil Rights
U.S. Department of Transportation
400 Seventh Street, S.W.
Washington, D.C. 20590

Re:    ACDBE Certification Appeal of The Grove, Inc.;
       DOT Reference No: 06-0149

Dear Mr. Austin:

As you will recall, this firm represents The Grove, Inc. ("The Grove" or "the Company"), a woman-owned and controlled firm that is certified as an Airport Concessions Disadvantaged Business Enterprise ("ACDBE") by twenty (20) jurisdictions. The Company's ACDBE application in the State of Washington ("OMWBE") was denied and, as you know, on behalf of our client we filed an appeal with your office on September 26, 2006 ("the Appeal"). In correspondence to me dated December 21, 2006 ("the Decision"), you notified me that the Company's appeal was being denied and that OMWBE's decision was being affirmed.

We have closely reviewed the Decision and disagree with your conclusion that OMWBE met the obligations incumbent on it in reviewing the Company's certification application. We also strongly disagree with the statement in the Decision that the Company "does not meet the criteria as required for [AC]DBE certification" and the stated rationale therefore. We believe that this statement will likely lead to the initiation of decertification proceedings in many of the jurisdictions where the Company is currently certified.

OMWBE's actions and certification denial have caused great harm to the Company. They are materially hampering The Grove's ability to pursue new business opportunities and are also affecting its existing business. For example, the Company has had to expend substantial management time and expense in thwarting allegations that it is in breach of a contract provision with a prime contractor in the State of Washington. Moreover, OMWBE's

01110

Joseph Austin
February 15, 2007
Page 2

egregious actions and OCR's countenance of them are affecting both the reputations of Ms. Dukler and of The Grove—we believe strongly without justification.

In this regard, OCR's decision to uphold OMWBE's unreasonable conduct in fact puts the Company's survival and the jobs of its 340 employees directly at risk. For these reasons our client has instructed us to prepare a lawsuit so that a federal court can establish the facts and decide the legal matters at issue—which we are confident will be decided in favor of our client.

As a matter of courtesy, I contacted the DOT Office of General Counsel to advise it we would very likely file a lawsuit on behalf of our client challenging the Decision and the reasons for the litigation. Subsequently, I was advised by that Office that I should send OCR correspondence addressed to you outlining, in our opinion, the errors in the Decision. Hence this letter is being sent to you.

Respectfully, we believe that the Decision is based on a fundamental misunderstanding by OCR of contract, property and corporate law as well as settled business valuation and accounting principles that are critical to the interpretation of the factual record and to the reasonable and rational application of Department of Transportation ("DOT") regulations under 49 CFR Parts 23 and 26. We also believe that in important aspects the Decision goes far beyond interpretation. Rather, it greatly deviates from past DOT precedents and, in effect, repeals key provisions of the DOT rules upon which Ms. Dukler (and other ACDBE's) have reasonably relied. In this regard, the Decision constitutes unlawful rulemaking and raises serious issues under the federal Administrative Procedures Act ("APA"). Further in this regard, the Decision does not reflect OCR's adherence to due process requirements . We also strongly believe that OCR's actions raise serious equal protection claims for Ms. Dukler individually as a non-minority woman as well as with respect to the application of DOT rules to The Grove (versus other applicants and/or existing ACDBE firms). Following the brief listing and summary below of what we respectfully believe are OCR's most serious errors of law and fact, these points are discussed in greater detail generally in the order set forth in the Decision.

For all of the reasons noted above, we strongly believe and respectfully urge that OCR rescind the Denial immediately, reverse OMWBE's certification denial and approve (or direct OMWBE to promptly approve) the Company's ACDBE certification application. Given all the facts and circumstances, this is the only remedy that is justified. If, however, it becomes necessary to proceed with litigation to achieve this result, we will do so and we would anticipate naming the Department of Transportation ("DOT"), the Departmental Office of Civil Rights ("OCR"), OMWBE and you (individually) as defendants.

Joseph Austin
February 15, 2007
Page 3

## I. Summary of the OCR's Errors.

### A. OCR's Reliance on Grounds Not Specified in OMWBE's Decision.

The DOT's rules set forth clear and unambiguous procedural and due process requirements pertaining to OCR's review of certification denials by a certifying agency. In pertinent part, these requirements set forth in §26.89(f)(5) and (f)(6), state that:

> "The Department does not uphold [the certifying agency's] decision based on grounds not specified in [its] decision." § 26.89(f)(5); and

> "The Department's decision is based on the status and circumstances of the firm as of the date of the decision being appealed." §26.89(f)(6).

In numerous instances, the Decision shows that OCR violated subsection 26.89(f)(5) by reaching conclusions "based on grounds not specified in OMWBE's decision." Thus, not only are the OCR's conclusions in themselves wrong, but the OCR was wrong in even using such conclusions as a basis for its Decision. Examples include:

- The conclusion that Ms. Dukler purchased her shares by using funds from The Grove's loan from Fifth Third Bank, rather than her own funds. Decision at 7 and 8.

- The conclusion that Ms. Dukler's interest payments were not substantial in comparison with the $2.5 million loan. Decision at 8.

- The conclusion that Ms. Dukler did not meet the burden of proof that her funds, as distinct from Mr. Cowell's, formed the basis for her contribution in The Grove. Decision at 9.

- Questions concerning the assets attributed to the Schlitz Studios or the Schlitz Furnaces, two firms previously owned by Ms. Dukler. Decision at 9.

- The conclusion that Ms. Dukler's payment of $2.6 million for The Grove's shares was not a sufficient amount. Decision at 10.

- The conclusion that Mr. Cowell was repaid with funds from Fifth Third Bank rather than Ms. Dukler. Decision at 10.

- The conclusion that the Stockholders' Agreement provision concerning the transfer of shares limits Ms. Dukler's control of The Grove. Decision at 21.

01112

Joseph Austin
February 15, 2007
Page 4

- The conclusion that the Grove was not an independent company in 2006 based on an investment made by Star Foods in the Company seven years earlier in 1999. Decision at 22.

- Questions concerning Section 11 of the February 17, 2004 Fifth Third Bank Loan and Security Agreement. Decision at 23.
- The conclusion that Section 15 of the February 17, 2004 Fifth Third Bank Loan and Security Agreement affected Ms. Dukler's control of The Grove. Decision at 24.

Not only does the Decision show that OCR has repeatedly disregarded the requirement of § 26.89(f)(5), the Decision is invalid because it is not based on the status and circumstance of The Grove as of June 28, 2006, the date of the OMWBE decision that was appealed. The Decision repeatedly and continually focuses on matters pertaining to the Company prior to Ms. Dukler's purchase of a controlling interest in February 2004, including matters as far back as 1999, seven years before the OMWBE Decision.

**B. OCR's Errors of Law.**

The Decision contains numerous errors of law and incorrectly applies the DOT's regulations. The OCR's errors include:

- OCR incorrectly applies § 26.69 in stating that Ms. Dukler's funds to acquire her control of The Grove (and refinance the acquisition) were not her funds because they were obtained through loans. This is wrong as a matter of commercial transactions and contract law.

- OCR incorrectly applies § 26.69 in finding that the financing obtained by Ms. Dukler from an individual and subsequently from a commercial bank violated DOT rules even though Section 26.69 clearly allows disadvantaged individuals to obtain financing through secured loans from individuals and/or through bank loans.

- OCR incorrectly applies § 26.69 in determining that the $2.6 million purchase price that Ms. Dukler paid for her controlling interest in The Grove was in its opinion not enough money and, accordingly, was not "substantial" under § 26.69. It is questionable whether the DOT rules include tests of whether the purchase price for an equity interest is sufficient. However, if they do, the measures of value must be reasonable and rational. OCR's "findings" and methods are neither and reflect numerous errors concerning a rational method of determining fair market value.

- OCR made an error of contract and commercial law in determining that Ms. Dukler's August 2004 bank loan is a "contingent" liability, even though Ms. Dukler is personally liable for the debt and she has made personal payments on the loan.

Joseph Austin
February 15, 2007
Page 5

- OCR made an error of corporate law and § 26.71 in determining that Ms. Dukler was "prevented" from making business decisions of The Grove, despite the fact that Ms. Dukler has the legal authority to take any shareholder actions through a simple written consent, may take any corporate action as the sole Director and may make day-to-day business decisions as the President of The Grove.

- OCR made an error of law in misinterpreting § 26.71(d) to apply to a firm formerly owned and/or controlled by a <u>disadvantaged</u> individual when this provision by its terms applies specifically to a firm formerly owned and/or controlled by a <u>non-disadvantaged</u> individual.

- The OCR violated §§26.69(a) and 26.71(a) by not considering "all the facts in the record, viewed as a whole." For example, the OCR considered only prior gross revenues of the Company and the five-year old price paid by a minority Shareholder in finding that the $2.6 million that Ms. Dukler paid for at 51% ownership stake in The Grove was not "substantial", rather than considering numerous other relevant factors. Similarly, in another instance OCR considered only a pre-existing by-law setting a quorum for a shareholder's meeting in finding that the provision prevents Ms. Dukler from exercising control and making business decisions without the consent of a non-disadvantaged person. In so doing, OCR ignores the facts known to it that the Company's Restated Articles of Incorporation gives Ms. Dukler (as majority shareholder) the authority to change the provision and to otherwise take any shareholder action through a written consent and by virtue of her position as the sole Director and President of The Grove.

- The OCR violated §26.89(f)(b) by not basing its decision on the status and circumstances of The Grove as of June 28, 2006, the date of the OMWBE decision. For example, the OCR focuses on events in 1999, seven years before the OMWBE's decision.

- The OCR repeatedly failed to adhere to the due process standards required of a government agency in making factual findings. General principles of administrative law and DOT due process standards require a rational basis for OCR findings (<u>i.e.,</u> to be based on substantial and competent evidence).

- The OCR's interpretation and application of the DOT rules violates equal protection to be accorded to Ms. Dukler individually and to The Grove vis-à-vis other business owners and firms (applicants and existing ACDBE firms).

- Aspects of the OCR's Decision constitute new rulemaking in violation of legal requirements applicable to DOT.

Joseph Austin
February 15, 2007
Page 6

## C. OCR's Errors of Fact.

Throughout the Decision, the OCR made numerous factual errors, including:

- The OCR acknowledges that Ms. Dukler used money from her personal bank account to make payments on her personal loan account. Decision at 8. However, the OCR is inconsistent and makes a factual error in stating Ms. Dukler used The Grove's funds (as opposed to her personal funds) for this purpose. Decision at 8 and 16.

- The OCR acknowledges that Ms. Dukler has paid $164,406 in interest from her own funds on her $2,600,000 loan. This constitutes a 6.3% interest rate. Nonetheless, the OCR states that the interest payment is not "substantial." Decision at 8.

- The OCR acknowledges that Ms. Dukler borrowed $2.6 million on February 5, 2004 from Mr. Cowell and purchased 51% share of The Grove for $2.6 million on February 6, 2004. Decision at 5 and 6. The OCR also acknowledges that Ms. Dukler executed a $2.6 million Consumer Note with Fifth Third Bank in August 2004 and used her funds from the loan to repay the loan from Mr. Cowell. Decision at 6. Yet, the OCR confuses the August 2004 personal bank loan with The Grove's February 17, 2004 business loan and mistakenly states that The Grove's funds were used to pay for the shares on February 6, 2004. Decision at 8.

- In determining that the $2.6 million price for The Grove's share was not "substantial," the OCR makes numerous errors in its analysis, including reliance on gross revenues and the use of a 5-year old price paid by Star Foods. The OCR also refused to consider annual losses and other relevant facts of The Grove's operations in determining the value of The Grove's shares.

## II. Ms. Dukler's Stock Purchase.

### A. Background.

As set forth in the Appeal, the Company's corporate records show that in February 2004, Ms. Dukler purchased fifty-one percent (51%) of The Grove stock for $2.6 million. The records also show that just prior to her acquisition, Ms. Ruth Ann Menutis, a woman, and Mr. Paul Valteau, a minority, (the Company founders) owned in the aggregate a block of stock representing fifty-one (51%) of the Company's shares. The sale and transfer of these shares was accomplished in a series of essentially contemporaneous steps at the completion of which Ms. Dukler's became the sole owner of a controlling fifty-one percent (51%) ownership interest in The Grove. The Decision seems to attach some significance to whether or not Ms. Dukler purchased the stock in a single transaction directly with Ms. Menutis and Mr. Valteau, or whether the purchase was accomplished in more than one step involving another party (another Company shareholder). Regardless of the number of steps involved,

Joseph Austin
February 15, 2007
Page 7

the legal analysis under the DOT rules is the same. As a matter of contract law, Ms. Dukler is the legal owner of the shares.[1]

To correct certain misstatements in the Decision regarding Ms. Dukler's financing of her purchase of Grove stock, the key facts pertaining to the purchase are as follows. In February 2004, Ms. Dukler borrowed $2.6 million from Mr. Casey Cowell pursuant to a written Mortgage and Security Agreement. Contrary to the statement in the Decision, the lender under this agreement is in fact Mr. Cowell, an individual, and not Star Foods, LLC, a limited liability corporation.[2] As the Appeal noted, Mr. Cowell is the majority investor in Star Foods, a firm that purchased a minority interest in The Grove in 1999. As security for the loan, Ms. Dukler executed a promissory note and pledged most of her personal assets as the primary additional collateral for the loan. As is common in transactions of this type, lenders often insist on over-collateralizing loans to afford them greater security. As a consequence, the list of assets pledged as security also included the personal residence of Ms. Dukler and her spouse.[3]

In § 26.73(b), certifying entities are admonished that "[You] must evaluate the eligibility of a firm on the basis of the <u>present circumstances</u>" (emphasis added). With respect to this matter, even though the Casey Cowell loan was permitted by the DOT rules, to address any concerns, Ms. Dukler took the extra step of obtaining a new replacement loan from a commercial bank (Fifth Third Bank). In August 2004, Ms. Dukler obtained a personal loan pursuant to a written loan agreement from the bank and used the proceeds of this loan to fully pay off the loan from Mr. Cowell. The principal amount of this bank loan is $2.6 million. No joint assets were used as security for this loan. Collateral for the loan is Ms. Dukler's personal promissory note (that legally makes Ms. Dukler personally liable for repayment of this debt and the liability <u>not</u> contingent), a pledge of her stock in the Company (as permitted by DOT rules) and Ms. Dukler's personal guarantee. The record includes a copy of Ms. Dukler's promissory note to the bank and her personal bank checking statements from Fifth Third Bank listing all interest repayments on the loan (to the date thereof) and showing Ms. Dukler's personal funds as the source of those payments. A copy of Ms. Dukler's check paying off the loan from Mr. Cowell is also in the record. Thus, even assuming that the first

---

[1] The Decision discusses the multiple steps used to effect this stock purchase. While this Firm did not represent any of the parties at this time, it appears that the parties went through these steps in the mistaken belief that they were necessary so as not to adversely effect the existing DBE status of the Company. (See Decision at Page 5, paragraph 2).

[2] The contract is styled, "THIS MORTGAGE AND SECURITY AGREEMENT (this "Agreement") is dated February 5, 2004 by <u>Michelle Dukler ("Borrower"), in favor of Casey Cowell ("Lender")</u>"and is executed by each in their individual capacity. Emphasis added. Mr. Cowell lends and makes equity investments in small companies in the normal course of his business.

[3] Also, under Subsection 26.69(i) joint or marital assets can be used under certain circumstances. In this case, contemporaneously with her purchase of the Company's stock with the loan proceeds, in compliance with DOT regulation, Ms. Dukler's spouse irrevocably renounced and transferred any ownership interest in the stock that he might have as her spouse (or because their home was included in the assets used as security for her loan). A copy of Mr. Dukler's "Exclusion of Certain Property from Marital Property" is in the record. Mr. Dukler's renunciation is effective and, as a matter of law, establishes that he has no ownership claim to The Grove stock that Ms. Dukler owns.

Joseph Austin
February 15, 2007
Page 8

financing of the stock purchase was somehow problematic (which it was not), §26.73(b) makes it is clear that the current facts are controlling.

**B. OCR's Errors.**

Notwithstanding this fact pattern, the Decision asserts that the capital used to make the purchase (and to pay off Mr. Cowell) was not Ms. Dukler's and that, as a consequence, even though she is the legal owner of fifty-one percent (51%) of the Company's stock, her contribution of capital is not "real or substantial" within the meaning of §26.69. The Decision states:

> "The record does not support a conclusion that Ms. Dukler paid $2.6 million for her ownership interest in the firm. Rather, Star Foods appears to have bought out Ms. Menutis and Mr. Valteau (the previous owners) and loaned Ms. Dukler—through Mr. Cowell—the funds to purchase the shares from Star Foods. The firm alleges that as maker of the note to Mr. Cowell and as the person listed on the consumer note with Fifth Third Bank, Ms. Dukler is personally liable for the debt. However, it appears Ms. Dukler obtained financing through Fifth Third Bank and then paid Mr. Cowell. <u>There is no indication that Ms. Dukler made a capital contribution of her own funds to acquire her ownership interest in The Grove</u>". (Emphasis added). See Decision at Page 7

> ". . . <u>Ms. Dukler obtained a loan from Fifth Third Bank for $2.6 million. While these funds may have been deposited in her account, Ms. Dukler has not met her burden of proof in demonstrating that her funds as separate from that of Fifth Third Bank assets (or that of Mr. Dukler's) were used. Simply depositing the proceeds from a loan into one's account to use as payment on another loan is insufficient in the Department's view to meet the requirements of the Regulation §26.69.</u>" (Emphasis added). See Decision at Page 8.

Section § 26.69 of the DOT rules recognizes that the stock or equity ownership of a firm can be acquired in a variety of ways (<u>e.g.,</u> by purchase, by gift or transfer, by inheritance or by property settlement). Under §26.69(e) of the DOT rules, in connection with such purchases, contributions of capital or expertise to acquire an ownership interest must be "real and substantial". Where the ownership interest is acquired by purchase, this subsection also addresses the source(s) of funds that can be used to make the acquisition. Subsection (e) explicitly permits a disadvantaged person to use loans and debt financing as the source of capital to acquire an ownership interest in a DBE firm provided that such loans are documented and secured. Further §26.69(e) <u>does not</u> limit the source of the financing (<u>e.g.,</u> loans from individuals are not prohibited). This is logical given that borrowing money from individuals (<u>i.e.,</u> "friends and family") is a key source of capital for an entrepreneur to start or acquire a business. Further, the subsection goes on to explicitly tell certifying officials that a loan from a bank or other financial institution or lenders does not render a firm ineligible, "even if the debtor's ownership interest is security for the loan."

Joseph Austin
February 15, 2007
Page 9

The statements in the Decision referenced above are directly contrary to the plain meaning of §26.69(e) and to the intent of §26.69 generally. The statements in the Decision effectively repeal § 26.69(e). The OCR asserts that its interpretation of the rule reflects the position of DOT, and if so, certifying officials are obligated to follow. Thus, if this represents official DOT policy it places at risk the DBE or ACDBE certification of firms whose eligible owners used debt to acquire their ownership interest. The intent of these provisions of the rule is to ensure that eligible persons own not less than fifty-one percent (51%) of the equity of an ACDBE firm. Thus, under these subsections of the rule, the fundamental question for a certifying entity is not so much whether an eligible person obtained their ownership interest in a firm by gift, inheritance, property settlement or with the proceeds of a loan, but rather has/did a *bona fide* legal transaction occur and, whether post-transaction, any non-disadvantaged person can legally claim an ownership interest in, or legal rights with respect to, the equity/stock that impairs the eligible person's ability to own and control the firm.

Not only is the Decision contrary to the intent of § 26.69, it reflects a fundamental misunderstanding of (or intentional disregard for) contract and property law. The Decision disregards the law with respect to the *bona fide* contracts that are included in the record—which on its face is arbitrary and unreasonable. The Decision takes the position that funds that were borrowed by Ms. Dukler were not her "own" assets. This is simply wrong as a matter of law (and as noted above, as a matter of DOT's own regulations). As a matter of contract and property law, the funds Ms. Dukler borrowed from both Mr. Cowell and later from Fifth Third Bank became her personal property as soon as the loans were consummated and closed.

Another statement in the Decision evidencing OCR's misunderstanding of contract and property law is a comment at Page 10. Noting that Ms. Dukler obtained a loan from Fifth Third Bank in August 2004 in order to pay off her debt to Mr. Cowell, the Decision states: ". . .evidence in the record showing that Mr. Cowell was repaid for his $2.6 million loan to Ms. Dukler on August 17, 2004, the same day that the consumer loan [i.e., the bank's personal loan to Ms. Dukler] was recorded on the bank's books. . . This supports a conclusion that Mr. Cowell was repaid with funds from Fifth Third Bank as opposed to Ms. Dukler." Following the logic of this statement, if the loan funds in question were not Ms. Dukler's and were the bank's property, for what reason would Fifth Third Bank pay Mr. Cowell? Similarly, why was the check drawn from Ms. Dukler's bank account? Furthermore, why is she paying monthly interest payments in excess of $18,000.00 per month?

Again, if the Decision reflects DOT policy on this point it turns contract and property law on its head. It would also repeal §26.69(e)--retroactively--and would prohibit all disadvantaged persons from using borrowed funds to acquire ownership interests in firms. Effectively, it constitutes the promulgation of a new rule in an impermissible manner.

The Decision is completely confused about Ms. Dukler's bank accounts and incorrectly concludes that the evidence does not support the fact that Ms. Dukler used her personal funds, as opposed to those of The Grove. Decision at 8. The first account, which ends

Joseph Austin
February 15, 2007
Page 10

in 0018, is simply the loan account for the Fifth Third Bank Consumer Note under which Ms. Dukler borrowed $2.6 million in August 2004. This account shows Ms. Dukler's payments on her loan. The second account, which ends in 3001, is Ms. Dukler's personal checking account. This account shows various transactions, including Ms. Dukler's monthly interest payment on the Consumer Note, the receipt of which payment was shown on the corresponding loan account, 0018. Thus, contrary to the Decision, this is evidence supporting actual payments by Ms. Dukler on her loan. In the face of this evidence, the Decision is simply wrong in stating that the evidence supporting actual payment by Ms. Dukler is lacking and unpersuasive. Decision at 8.

With respect to Ms. Dukler's interest payments on her loan, the Decision makes a statement that is troubling and is suggestive of bias and pre-judgment. Frankly, it suggests that OCR is searching for reasons to rule against Company. The Decision states:

> The total interest paid for the period (August 24, 2004 to August 19, 2005) is $164,486.12. In comparison to the $2.5 million figure Ms. Dukler allegedly paid for her shares in The Grove, this does not appear to be substantial. Decision at 8.

First, the payments are made pursuant to the repayment terms set forth in the loan agreement—a contract between Ms. Dukler and the bank. Second, Ms. Dukler's payment of $164,486 in interest on her $2.6 million note constitutes an interest rate of 6.3 percent. It appears that the OCR did not perform this simple arithmetic calculation in comparing the interest payments to the principal of the loan and declaring that the interest payments were not "substantial" nor did it respect the terms of the contract between the parties.[4]

After Ms. Dukler's purchase of her ownership in The Grove, she recognized the need for The Grove to have working capital for its operations. Accordingly, The Grove borrowed funds from Fifth Third Bank on February 17, 2004.[5] This February 17, 2004 loan to the Company was clearly separate from Ms. Dukler's personal loan in August 2004. Yet, the Decision repeatedly confuses the two loans. The Decision states that Ms. Dukler's payment to Mr. Cowell was from a "loan from Fifth Third Bank, which had a security interest in the firm's assets." Decision at 7. Ms. Dukler's Consumer Note was not secured by The Grove's assets. Similarly, the Decision refers to "the current balance on the $3 million loan from Fifth Third Bank" and states that there is no documentation supporting payments "by either the firm or Ms. Dukler." Decision at 8. The loan to the Company for working capital is irrelevant to the question of Ms. Dukler's equity ownership and The Grove's eligibility for

---

[4] Depending on the length of time that it takes Ms. Dukler to pay off the loan, for example 10 years, she would have paid approximately $4.3 million. At present, the actual interest rate on this loan is 8.25% ($18,470 per month and $221,649 annually).

[5] The Company loan is structured as a revolving Line of Credit ("LOC"),( i.e., the outstanding indebtedness will fluctuate based on actual draws against the LOC and prevailing interest rates).

Joseph Austin
February 15, 2007
Page 11

ACDBE certification. Further, OCR is simply confused in thinking that Ms. Dukler would have made personal payments on the firm's loan.

### III. Business Valuation Issues.

The Decision questions the price paid for the Company stock that Ms. Dukler purchased. In so doing, the Decision basically questions the price agreed upon between the parties through negotiation and would substitute OCR's judgment for their judgment of the fair market value

("FMV") of the shares.[6] Further, with respect to this matter, the Decision adopts positions regarding business valuation that are contrary to guidance from the Internal Revenue Service ("IRS"), well-settled principles of valuation, and common sense. The Decision states:

> "Even if Ms. Dukler contributed her personal funds to acquire her ownership interest, there remains the question of whether her contribution is "substantial" within the meaning of Regulation §26.69." Decision at Page 9.

The fundamentals of business valuation (and accordingly assessing a reasonable price for shares) requires an analysis of many factors. In particular, it requires an analysis of the company's income potential (e.g. cash flow and gross and net revenues), its assets and the quality thereof, the firm's liabilities and consideration of the market in which it operates and other business risks. A well established set of accounting concepts, standards and procedures—referred to as "General Accepted Accounting Principles" or "GAAP"—have been developed and are the standards of practice for accountants and business valuation experts in reporting on, and analyzing the financial condition of, companies and for valuation purposes. While financial statements are tools of analysis, by themselves they do not establish the value of a company (or of its stock). Rather, they provide financial information that, combined with other data, can be used to evaluate a company. Further, as was noted in the Appeal, the Internal Revenue Service ("IRS") has published specific guidance on the valuation of closely-held companies like The Grove. (See IRS Revenue Ruling 59-60). These matters are briefly addressed below as applied to The Grove prior to Ms. Dukler's stock purchase.

> Earnings. Under accounting standards and the IRS Revenue Ruling, a company's historical earnings and estimated future earnings potential are two critical factors for valuing the stock of firms that sell products or services to the public. In the five years prior to Ms. Dukler's stock purchase, the Company's financial statements indicate that its earnings were very weak. In fact, as noted in Exhibit 11 of the Appeal, the Company experienced an accumulated loss of more than $2 million during the period 1999 through 2003. In 2003, the Company's earnings were slightly positive for the year,

---

[6] Essentially, OCR is saying that, in its opinion, Ms. Dukler did not pay enough for the stock to meet OCR's interpretation of word "substantial" in §26.69(e)—and further states that its view reflects the official policy of the DOT.

Joseph Austin
February 15, 2007
Page 12

however, the cash flow of the Company was a negative $289,548—that
followed a negative cash flow of $287,302 in 2002. Moreover, if the capital
that was spent on necessary store refurbishments (as mandated by airport
leases) is included, the Company's negative cash flow was even worse—a
negative $636,437.

Assets. The quality of a firm's assets are also a key valuation factor. In the
case of The Grove, perhaps the Company's most critical assets are its airport
concession contracts and related leases. At the time Ms. Dukler was
negotiating her stock purchase, the Company had leases for 62 locations. The
Appeal included a schedule of all of the Company's locations and the
respective lease expiration dates as of the time of February 2004 (See Appeal,
Exhibit 12). Analysis of this information reveals that:

- Leases for 7 locations were set to expire or had expired.

- Leases for 23 additional locations had 1 year or less on the lease term.

- <u>In the aggregate, more than fifty percent (50%) of all the Company's locations
  had lease terms of two years or less—with no assurance that any of these
  leases would be extended or renewed.</u>

Market Conditions. The airport concessions business is subject to volatility
and risk factors beyond the control of concession operators. For example,
concession operators like The Grove rely on passenger traffic from the airlines
and the condition of the airline industry is a significant risk factor. Airline
bankruptcies and consolidations can cause the loss of flights and passenger
traffic (e.g., American Airlines acquisition of Trans World Airlines; Delta
Airlines decision to "de-hub" at the Dallas-Ft. Worth Airport.). Moreover, the
industry is very susceptible to labor problems and strikes by airline personnel
that can and have caused dramatic reductions in passenger traffic and, as a
consequence, severe sales losses. The industry is also subject to airport
decisions regarding terminal usage and similar factors over which it has no
control. Literally overnight, The Grove and other concession operators can
be, and have been, adversely impacted by the federal government's decisions
regarding the national airspace (e.g., the grounding of flights for security
purposes) and by an airport operator's decisions concerning the utilization of
terminal spaces (e.g., positioning of security checkpoints, or the closure of a
terminal because of an airline's decision to reduce flights operations at an
airport). Further, not only did the Company suffer a significant reduction in
sales following the tragic events of September 11, 2001, the cost of doing
business for it and other concessions operators has gone up substantially (e.g.,
insurance rates, the cost of bonding, the price of inventory, the price of
building materials and increased costs related to security).

Joseph Austin
February 15, 2007
Page 13

> <u>The Fair Market Value Standard</u>. - As noted above, the FMV standard-- the price that would be demanded and paid in a sale involving a willing buyer under no compulsion to buy and a willing seller under no compulsion to sell, assuming both buyer and seller have reasonable knowledge of the relevant facts about the asset--is well settled and has been articulated and reaffirmed many times by courts. IRS Ruling 59-60 incorporates the above-stated standard.

The factors noted above are only a few of those that are routinely used by investors to evaluate a business opportunity. For example, as noted previously, information in a firm's financial statements can be used to develop financial ratios pertaining to the firm's liquidity, its solvency, its profitability, its operating margins, its return on equity, etc. By contrast, the Decision simply ignores these factors even though they were comprehensively addressed in the Appeal (See Appeal at Pages 51-55). For the OCR to ignore these factors, the specific guidance from the IRS and call the analytical tools employed by an experienced entrepreneur like Ms. Dukler "unpersuasive" does not comport with the rational basis required for agency determinations and is thus arbitrary and unreasonable.

By contrast the Decision reflects a flawed, overly simplistic and naïve "methodology" to the question of valuation. The Decision simply looks to the Company's gross receipts as reflected in its pre-2004 financial statements and tax returns and the stockholder's equity reflected on its balance sheet. It takes no cognizance of the Company's costs incurred, its current or future liabilities, its profitability, operating margins, solvency, or the return on shareholder's equity as of the time of the sale. Moreover, it would have the DOT endorse an essentially static concept of business valuation. It fails to acknowledge or understand that, just as in public firms, the price per share of closely-held firms such as The Grove fluctuates up and down over time based on performance and other conditions. For example, the Decision cites the price paid by another stockholder for its shares in 1999—<u>five years</u> prior to Ms. Dukler's stock purchase. (See Decision at Page 10).

Equally disturbing is the OCR's apparent adoption, on behalf of DOT, of a novel, if not radical, approach to the term "substantial" used in §26.69(e). The Decision authorizes certifying entities to disregard the value established by a seller and buyer as fair and reasonable in an arms-length negotiation and allows them to substitute their own judgment. If this stance reflects the policy position of DOT, it goes well beyond interpretation and is yet another instance of new rulemaking contrary to the requirements of the APA.[7]

OCR has no recognized valuation methodology or probative contrary evidence supporting the notion that the purchase price paid by Ms. Dukler is "less than reasonable" Again, the price a shareholder paid for a 49% stake <u>in 1999</u> is simply not a relevant or reasonable factor for determining the fair market value of The Grove's stock in 2004--<u>five years</u> later. Nonetheless, in the Decision OCR is basing its' supposition, in substantial part, on what a minority stockholder paid for its shares in 1999.

---

[7] I also suspect this will be a matter of great concern by the DBE/ACDBE community.

01122

Joseph Austin
February 15, 2007
Page 14

### IV. Accounting and Personal Net Worth Issues.

Under §23.3 of the DOT rules, "personal net worth" is defined as "the value of the assets of an individual remaining after total liabilities are deducted." Under this subsection, certain assets are excluded from a PNW calculation. Applying the §23.3 definition of personal net worth to Ms. Dukler shows that she has a negative net worth (i.e., that the aggregate value of her personal liabilities is greater than the aggregate value of her assets). A summary of Ms. Dukler's assets and liabilities is presented below. The assets are:

| Assets | |
|---|---|
| Cash on hand and in banks | $  63,058 |
| IRA or other retirement account | 9,050 |
| Life Insurance Cash Surrender Value | 4,684 |
| Stock and Bonds (Value of The Grove stock) | 2,600,000 |
| Real Estate | 230,000 |
| Automobile – present value | 15,440 |
| Other Personal Property | 2,027,225 |
| Subtotal | $ 4,949,457 |
| Less the value of The Grove Shares | 2,600,000 |
| Net Assets | $2,349,457 |

The OCR also shows Ms. Dukler's liabilities as:

| Liabilities | |
|---|---|
| Accounts Payables | $          0 |
| Notes payable to banks and others | 2,600,000 |
| Installment account (auto) (monthly payments $0) | 0 |
| Installment account (other monthly payments $2,400) | 49,300 |
| Loans of life insurance | 0 |
| Mortgages on real estate | 2,300,00 |
| Unpaid Taxes | 0 |
| Other liabilities | $          0 |
| Total Liabilities | $4,949,300 |

Ms. Dukler's Personal Net Worth ("PNW") Statement in the record is straightforward and its analysis is very simple. Under § 23.3, the value of The Grove shares that Ms. Dukler owns are excluded as an asset for purposes of the PNW test. The value of these shares is listed at their cost basis, $2,600,000. Thus, for purposes of the PNW test, Ms. Dukler's assets are $2,349,457. Ms. Dukler's liabilities are $4,949,457. The liabilities include the $2,600,000 that Ms. Dukler personally owes to Fifth Third Bank pursuant to the August 2004 loan agreement and Consumer Note. Thus, under the definition of personal net worth in the DOT rule, deducting (i.e., offsetting) this $2,600,000 liability alone from Ms. Dukler's assets yields a negative net worth. Accordingly, no further analysis is needed to determine that

01123

Joseph Austin
February 15, 2007
Page 15

Ms. Dukler meets the PNW standard of net assets less than $750,000. The PNW Statement
clearly illustrates that she has a negative net worth. Nevertheless, the Decision disagrees and
wrongly asserts that the Company is ineligible for ACDBE certification because of
Ms. Dukler's personal net worth.

With respect to this matter, the Decision makes numerous errors. The most fundamental of
which is stated at Page 6 of the Decision: ". . .the Department agrees with OMWBE's
conclusion that the $2.6 million listed should not be counted as a liability on Ms. Dukler's
personal net worth statement". In effect, the Decision makes a finding that Ms. Dukler's
August 2004 loan from Fifth Third Bank is not a liability for which she is personally
responsible. This contention is erroneous as a matter of law.[8]

Ms. Dukler personally executed a Consumer Note ("Note") (i.e., a promissory note) in which
she obligated herself to repay the bank the principal amount borrowed plus interest. By the
Note's explicit terms and as a matter of law, the Note is her personal, individual obligation
and it is legally enforceable against her. Section 1 of the Note states in pertinent part:

> ". . . the undersigned, Michelle Aimee Dukler, an individual . . .("Borrower")
> for value received hereby promises to pay to the order of Fifth Third Bank . .
> the sum of Two Million Six Hundred Thousand and 00/00 Dollars
> ($2,600,000) (the "Borrowing"), plus interest as provided herein. . ."
> (Emphasis added).

What could be a clearer statement of a personal debt obligation? Pursuant to the Uniform
Commercial Code and contract law, if Ms. Dukler fails to make payment as provided in the
Note or otherwise defaults, the bank has the right to sue her, obtain a judgment against her
and proceed with collection actions (whether or not the loan was further secured by a pledge
of her personal assets does not affect the bank's rights). Accordingly, there is no rational
basis for OMWBE's finding that this loan is not a personal liability of Ms. Dukler's or for
OCR's concurrence. Further, the Decision cites no authority, includes no support or policy
reason why the Department should not respect and apply the law pertaining to personal loans
and promissory notes.

The Decision also wrongly asserts that Ms. Dukler's obligation to Fifth Third Bank is a
"contingent liability". It is clearly not. As discussed above, Ms. Dukler personally owes the
$2,600,000 to Fifth Third Bank and she, and no one else, is personally liable for its
repayment. The amount of the debt and the maturity date are fixed and the loan documents
contain explicit repayment terms and require current amortization payments (which
Ms. Dukler is making). Moreover, there are explicit default provisions and remedies for the
bank against Ms. Dukler for breach. Even though the DOT rules do not contain a specific
definition of the phrase "contingent liability", by any reasonable interpretation, this loan and
note is anything but a contingent obligation. There is no rational basis for the OCR's finding

---

[8] This is analogous to saying that the PNW statement of a homeowner should not show the funds borrowed to
purchase a house or a personal liability.

01124

Joseph Austin
February 15, 2007
Page 16

that this obligation is "contingent" and should not be listed on the liability side of
Ms. Dukler's PNW statement. The OCR's assertion otherwise evidences either a
fundamental misunderstanding of, or a disregard of, basic accounting rules and principles.
Frankly, it is hard to see what would be a non-contingent liability if DOT endorses the
position espoused in the OCR's Decision.[9]

In addition to the points discussed above, the Decision wrongly concludes that Ms. Dukler
was not required to, or did not need to, pledge her personal assets as a condition for the
loan.[10] The loan agreement in force between Ms. Dukler and Fifth Third Bank requires her
to give the bank a lien on all of her personal assets and she has done so. Should she default
on the loan, as noted previously, the bank can obtain a judgment against Ms. Dukler and
proceed with collection action on these assets. Further, Ms. Dukler's obligation in the loan
agreement to give the bank a lien on her personal assets is also reflected in Section 2 of the
Note which states in pertinent part:

> "2. Security Agreement. To secure repayment of this Note . . .Borrower
> hereby grants and conveys to Lender a continuing security interest in all right,
> title, and interest of Borrower . . . (i) any an property in which Lender is at any
> time granted a lien . ."

### V.  Control Issues

With respect to the requirements of §26.71 of the DOT rules and the Company's governance
and control, the Decision again evidences either a misunderstanding of corporate law or an
intentional disregard of it. The Decision asserts that the Company and Ms. Dukler are
subject to restrictions that limit her discretion as the majority shareholder, sole director,
President and Chief Executive Officer by virtue of a stockholder's agreement and the quorum
requirements in the Company's bylaws. OCR is wrong on the facts and as a matter of
corporate law.

### A.  Ms. Dukler's Control as Majority Shareholder.

The Decision cites Section 2.1 of a Shareholder's Agreement dated February 17, 2004 ("the
Shareholders Agreement") as "[limiting] Ms. Dukler's ability to control The Grove within
the meaning of the Regulations". See Decision at Page 21, Paragraph 2. Section 2.1 of the
Shareholders Agreement restricts a Company stockholder's ability to transfer their shares
except to a permitted transferee. However, as known to OMWBE and noted in the Appeal,
Section 2.1 of the Shareholders Agreement has not been in force since July 2004. OMWBE
was given documentation with the Company's certification application and the Appeal also
showed that the Shareholders Agreement was amended on July 30, 2004 at a joint meeting of

---

[9] Again, The Grove's analysis is simple and in accordance with basic accounting (incorporated into the DOT's
own rule). The assets of $2,027,225 are listed in the Asset column. The $2,600,000 personal note payable to
the bank is listed in the Liability column.

[10] The Decision stated that Ms. Dukler's PNW statement identified $2,600,000 of encumbered assets linked to
the personal loan of August 19, 2004. Decision at 13. The PNW does not in fact do so (nor is she required to
do so under the DOT PNW rule). Under the category "Liabilities," the PNW simply lists $2,600,000 as
Ms. Dukler's personal liability for payment of the August 19, 2004 loan.

Joseph Austin
February 15, 2007
Page 17

the Board (at which Ms. Dukler presided) and all of the shareholders. Also, minutes of the meeting were included in the record of the Appeal. This meeting was held in conformity with all applicable charter or by-law requirements. At the meeting, all of the shareholder's <u>unanimously</u> agreed to adopt two amendments to the Stockholders Agreement.

The first amendment (which revised Section 5.10--Termination) permits the Shareholder's Agreement to be terminated upon the written agreement/consent of shareholders representing a <u>majority</u> of the Company's stock. The second amendment (which revised Section 5.13--Amendments; Waivers) permits shareholders representing a <u>majority</u> of the Company's stock to <u>amend, modify, or supplement</u> the Shareholders Agreement and specifically states that <u>all shareholders agree in advance to be bound by any such amendment, modification or supplement.</u>[11] Thus, as the majority shareholder of the Company, Ms. Dukler is free to amend or terminate the Shareholders Agreement at any time without the consent of any person. Effectively, there is no restriction on her right or ability to sell or transfer her stock. A copy of the above-mentioned amendments were included as an exhibit to the Appeal.

There was no rational basis for OMWBE to ignore the amendment to the Shareholders Agreement and fail to respect its legal significance (as a court would). Similarly, there is no rational or legal basis for OCR to condone OMWBE's conduct or act in a similar manner. If DOT does not find OMWBE's conduct with respect to this matter objectionable, as a matter of Departmental policy it would be authorizing certifying agencies (and OCR) to summarily ignore the lawful acts of corporate shareholders and their boards of directors without justification or rationale. If this is not the Department's official policy, OMWBE's conduct (and OCR's affirmation thereof) is arbitrary and unreasonable and discriminatory with respect to The Grove.

**B. Ms. Dukler Controls The Grove as Board Chair, Sole Director and President.**

Ms. Dukler is the Chair and sole member of the Company's Board of Directors and, pursuant to The Grove's by-laws she manages the business affairs of the Company. Article IV. 1 of the Company's by-laws states in pertinent part: "<u>The business affairs of the corporation shall be managed by its board of directors</u>. The directors...may adopt such rules and regulations for...the management of the corporation, as they may deem proper..." (Emphasis added).

Article IV. 5 of the by-laws in pertinent part states: "The president...shall in general supervise and control all of the business affairs of the corporation. [He/she] may sign...certificates of shares of the corporation, any deeds, mortgages, bonds, contracts or other instruments which the directors have authorized to be executed." As President and Chief Executive Officer of the Company, Ms. Dukler supervises and controls all of the business affairs of the Grove. Please note that as President Ms. Dukler manages the affairs of The Grove on a full time basis and she is not subject to an employment agreement. As pointed out in the Appeal, among other things, Ms. Dukler:

---

[11] The only *proviso* is that holders of a majority of the Company's stock may not prevent, or attempt to prevent, the remaining shareholders from voting their shares on corporate matters that require a shareholder vote—something that in any event contrary to state incorporation laws.

01126

Joseph Austin
February 15, 2007
Page 18

- Establishes the Company's budgets and strategic plans

- Reviews and approves all capital spending on all store build-outs that are in
  process and helps craft, review and approve new business proposals for new retail
  locations at airports; negotiates and signs new leases and lease extensions for all
  retail spaces at airports at which The Grove does business

- Reviews payrolls and approves and signs all corporate checks for rent and capital
  expenditures as well as checks over $50,00

- Negotiates, approves and executes all major agreements legally obligating the
  Company

- Negotiates the Company's lines of credit with banks

- Has negotiated the Company's health, property and casualty and life insurance
  policies
- Organizes and conducts weekly senior management headquarters meetings

- Has negotiated the Company's new franchise agreements with Smoothie King,
  Subway, Dunkin Donuts and with Rocky Mountain Chocolate Factory

- Interviews and hires senior area managers and conducts performance reviews for
  the Company's headquarters accounting, business development, human resources
  and technology support and marketing staff.

Neither OMWBE nor the Decision question whether Ms. Dukler has the authority to exercise
the powers noted above—nor do they cite any evidence in the record or otherwise that she
does not in fact do so. Even though it was more than two years from the date of her stock
purchase to the date the Company filed its certification application with OMWBE, there is no
indication that OMWBE made any attempt to assess how The Grove is currently governed
and how its day-to-day operations were/are managed. There is no indication, for example,
that OMWBE conducted a site visit, interviewed staff or vendors, airport officials or others
that would have relevant and first-hand information. Thus, the suggestion that she has
"insufficient control" is wholly unfounded. The facts demonstrate that Ms. Dukler owns and
controls The Grove.

C. Quorum Requirements in the Company By-laws.

On page 21 of the Decision, OCR restates and agrees with an OMWBE argument that a
quorum provision in the Company's by-laws prevents Ms. Dukler from making decisions
pertaining to the business of the firm. Specifically, the Decision states "Under the terms of
The Grove's by-laws, Ms. Dukler is required to obtain the cooperation of Star Foods, the 49
percent owner, in order to call any meeting of the stockholders. Should Star Foods not agree
to attend a meeting, it appears her recourse would be to seek an amendment of the bylaws in

Joseph Austin
February 15, 2007
Page 19

writing . . .This is contrary to the intent of §26.71(c)." (Emphasis added). The Company's
Appeal contained a detailed response to this assertion that, in fact, is cited by OCR.
However, the Decision simply chooses to ignore this information even though it clearly
shows that Ms. Dukler is in now way prevented from making business decisions by this by-
law provision.

The OCR misstates the facts and the law. Ms. Dukler does not have to "seek" an amendment
to the bylaws to permit a meeting to take place. The Appeal included a copy of the
Company's Restated Articles of Incorporation which specifically permit corporate action to
be taken through written consent by a vote representing a simple majority of the Company's
shares. As The Grove's majority shareholder, Ms. Dukler has the authority to permanently
amend the by-law at her discretion, to establish that a quorum for a meeting of stockholders
is 51% of the shares, to convene a meeting of shareholders or to take corporate action
through a written consent without a shareholder's meeting. Accordingly, the quorum
provision cited by OMWBE and by OCR does not limit Ms. Dukler's actual control of The
Grove or otherwise prevent her from making decisions on behalf of the Company.
Consequently, the issue of a quorum is irrelevant and Ms. Dukler is not subject to any formal
or informal restrictions which "limit" her customary discretion. Again, we note that §
26.71(c) provides that "[t]here can be no restrictions … that prevent the … owners, without
the cooperation or vote of any non-disadvantaged individual, from making any business
decision of the firm." (Emphasis added). Since Ms. Dukler can take corporate actions
through a simple written consent, there are "no restrictions … that prevent [her] … from
making any business decision of the firm." (Emphasis added).

With regard to this matter, part of OCR's confusion seems to be the failure to understand the
distinction between "corporate" actions that involve or require shareholder participation
and/or a vote and customary business decisions that are the province of management. In both
instances however, either as the majority shareholder and sole Company director or as
President and Chief Executive Officer, Ms. Dukler has full authority to act without the
consent of any non-disadvantaged individual or of the Company's minority shareholder. In
fact, the OCR does not cite any corporate governance action or business decision that Ms.
Dukler is "prevented" from taking.

## VI. The Grove is an Independent Business

In pages 21 to 24 of the Decision, the OCR discusses whether The Grove is independent of
Star Foods and concludes that The Grove has not met its burden of proof based on (1)
financial dealings and (2) Ms. Dukler's ownership arrangement with Star Foods and her
control of the firm. Neither of these two points provides a basis for the OCR's conclusion.

### A.    Financial Dealings.

The OCR notes that Star Foods provided funding to The Grove through an assumption of the
Company's debt under a line of credit and other paid-in capital for a total of $6.8 million.
The OCR states that:

> "The Grove clearly was dependent upon Star Foods for
> financial support and received substantial funds. …Star Foods'

Joseph Austin
February 15, 2007
Page 20

> infusion of capital appears to have been such a vital factor <u>in</u>
> <u>The Grove's development</u>, that the conclusion that The Grove
> is not independent as defined by the Regulation is
> unmistakable and clear". Decision at 22. (Emphasis added).

The key point is that Star Foods financial support took place in 1999, <u>five</u> years before Ms.
Dukler's acquisition of control of The Grove, and <u>seven</u> years before the OMWBE's
decision. The DOT's rules are clear.

> "The Department's decision is based on the status and
> circumstances of the firm <u>as of the date of the decision being</u>
> <u>appealed</u>." § 26.89(f)(6). (Emphasis added).

Even assuming that The Grove "was" dependent on Star Foods in 1999 and Star Foods
infusion of capital was a factor in The Grove's "development" in 1999—five years prior to
Ms. Dukler's stock purchase, the OCR violated the DOT's rules by not looking at the
circumstances as of the date of the OMWBE's decision in June, 2006. Moreover, the logic
of the Decision on this point is troubling. The Decision seems to suggest that an equity
investment in a DBE or ACDBE (or a debt financing) is a legitimate basis for a finding of
"dependence" even if, as in this case, an equity investment is for less than a majority of the
firm's shares, a debt financing does not include provisions affecting the DBE majority
owners control of the firm and/or the investment or financing does not otherwise violate
DOT rules.

The OCR cites various provisions from the Company's February 17, 2004 Loan and Security
Agreement with Fifth Third Bank. Decision at 23 and 24. With respect to Section 11 of the
security agreement, the OCR acknowledges that "the Department cannot reach a conclusion."
Decision at 24. Thus, section 11 is not relevant to the Decision.

The OCR also discusses Section 15 of the Loan and Security Agreement, which provides
fifteen separate events of default, including "the failure of Martin and Michelle Dukler to
own and have voting control of at least 50 percent of the issued and outstanding voting equity
interests of [The Grove]." We have two responses. First, Section 15 was not specified in the
OMWBE decision as a grounds for its denial of DBE certification. The DOT's rules are
clear.

> "The Department does not uphold [the certifying agency's]
> decision based on grounds not specified in [its] decision".
> § 26.89(f)(5).

OCR violated this fundamental principle in upholding OMWBE's decision based on grounds
not specified in its decision.

Second, Section 15 is a standard provision in financing arrangements, particularly for small,
closely-held corporations such as DBE's. If the OCR's position is that such provisions
violate § 26.71, then many DBEs will be unable to obtain bank financing and retain (or
obtain) DBE or ACDBE certification. Third, Mr. Dukler is not a party to this agreement, is

Joseph Austin
February 15, 2007
Page 21

not a company shareholder (and was not at the time of the loan), and the bank subsequently
agreed to delete this condition as pertains to him as not applicable.

**B.    Ms. Dukler's Ownership Arrangement with Star Foods and Her Control.**

In its June 28, 2006 Decision, OMWBE mistakenly applied § 26.71(l) to The Grove's situation.
We pointed out this error in the Company's Appeal. See Appeal at page 40.  The OCR
repeats this error.  Decision at 24.

By its express terms, § 26.71(l) is clearly not applicable to The Grove's situation.  This
subsection clearly states, in pertinent part:

> "Where a firm was formerly owned and/or controlled by a non-
> disadvantaged individual . . ., ownership and/or control were
> transferred to a socially and economically disadvantaged
> individual, and the non-disadvantaged individual remains
> involved in the firm in any capacity . . . . "(Emphasis added).

By its specific terms, this subsection applies only to a former <u>non-DBE</u> firm.  It addresses the
situation in which a non-disadvantaged owner sells his shares to a disadvantaged individual
and then remains involved in the firm.  The DOT's concern, of course, is that the former
owner of the former non-DBE firm will continue to control the new DBE firm.

In The Grove's case, when Ms. Dukler acquired control, the Company was a certified DBE
firm.  In fact, The Grove had been certified as a DBE by more than a dozen certifying
agencies nationwide.  There is no finding in the record that it was not a certified DBE; nor is
there any finding in the record that it was not controlled by its DBE owners (Ms. Menutis and
Mr. Valteau).  Thus, The Grove was not "formerly owned and/or controlled by a <u>non-
disadvantaged</u> individual."  Accordingly, § 26.71(l) is not applicable and the OCR's reliance
on it as a basis for denying the Appeal violates the Department's rules.

**VII.  <u>Other Issues</u>.**

Under the heading "<u>Other Issues</u>" the Decision states that OMWBE was unable to determine
whether The Grove was a small firm as defined by the rules.  However, any confusion on
OMWBE's part on this matter is the result of their refusal and failure to apply the clear
guidelines in the DOT rules pertaining to size and/or an applicant firm's affiliation with
another firm.  Many of the OCR errors with respect to this matter are addressed above in
Section VI of this letter.  In addition, the Appeal included a detailed review of the facts
applying the specific criteria found in the DOT rules in § 26.71(b)(1)-(4).  The Decision
basically restates these provisions of the DOT rule yet neither comments on OMWBE's
failure to apply them to the facts or does so itself.

The Decision also repeats factual misstatements that were addressed in the Appeal.  For
example, as was pointed out in the Appeal, Ms. Dukler's spouse does not hold any economic
interest in Star Foods, a Company minority shareholder, or in Georgia's Grove, LLC, another
firm.  As any minimal investigation by OMWBE or OCR would have verified, he sold his

Joseph Austin
February 15, 2007
Page 22

interests in these firms sometime ago and neither he nor Casey Cowell play any role in the management operations of The Grove. Moreover, as noted in the Appeal, a past of association with The Grove three years ago is irrelevant to the eligibility and certification of the Company as an ACDBE today and, even if Martin Dukler were involved in The Grove today, § 26.71(k)(l) explicitly acknowledges that family members may participate in a DBE or ACDBE firm.

This section of the Decision also includes comments concerning the value of Ms. Dukler's personal residence, her monthly mortgage payments and her salary from the Company with the insinuation that these are indications that Ms. Dukler should not be considered economically disadvantaged as defined by the DOT rules. The Decision makes the statement:

> "These circumstances raise a question as to whether Ms. Dukler can be considered economically disadvantaged, and the Department notes that it is reasonable for a certifying agency to apply a total asset test in this situation." (Emphasis added). Decision at Page 25.

The statement above authorizes a certifying agency to make a personal net worth determination in a manner that is not specifically set forth and permitted in the DOT rules— referred to by OCR as a so-called "total asset test". This constitutes unlawful rulemaking by OCR and its condoning or arbitrary and unreasonable conduct by OMWBE and other certifying agencies. By what authority may OCR tell a certifying agency that it may apply a "total asset test" instead of the specific provisions in § 26.67(a)(2) or to disregard outstanding personal residence mortgage debt as a liability for PNW purposes?

## VIII. Conclusion: Equal Protection and Due Process.

One of the most actionable aspects of the Decision is OCR's failure to hold OMWBE accountable to the due process standards set forth in the DOT rules—and OCR's own failure to abide by them. **For the reasons and explanations set forth hereinabove, we conclude that the following actions, individually and collectively, violate fundamental standards of due process and of equal protection:**

    1.    **The denial by OMWBE of The Grove's application for certification as an ACDBE.** To reiterate one example: Due process standards require that findings of a certifying agency like OMWBE be based on substantial, probative and competent evidence—not on supposition and speculation. As was shown conclusively in the Appeal, OMWBE consistently violated this basic due process standard. Regrettably, OCR continues this conduct.

    2.    **The failure to follow and apply the applicable and established regulations of the DOT.** Hereinabove, we pointed out numerous

Joseph Austin
February 15, 2007
Page 23

instances of OMWBE's dereliction in this regard. Two striking examples are OMWBE's failure to consider "all of the facts in the record, viewed as a whole," as required by Section 26.61(e) of the regulations of DOT, and its failure to limit eligibility evaluation to the "present circumstances" of The Grove, as required by Section 26.73(b) of DOT regulations.

3.    **OCR's affirmation, in the Decision, of OMWBE's denial of the said application of The Grove.** It is legally impermissible for <u>you and OCR</u> to affirm an OMWBE decision that the Appeal has clearly shown to be in violation of fundamental standards of equal protection and of due process.

4.    **Your and the OCR's failure to require OMWBE to follow and apply existing regulations of DOT.** With respect to properly reviewing and deciding the merits of The Grove's application for ACDBE certification, OMWBE is delegated authority to act as an agent of OCR and DOT. OCR has a legal obligation to require OMWBE to follow and correctly apply the applicable regulations of DOT. In the instant case, you and OCR have been negligent with regard to holding OMWBE accountable.

5.    **The parts of your Decision that, in effect, modify or change existing DOT regulations without providing opportunity for public comment, as required by law.** We have cited several examples hereinabove where a reasonable person would conclude that important aspects of your Decision greatly deviate from past DOT precedents. In effect, it repeals key provisions of the DOT rules upon which The Grove and other ACDBEs have prudently relied. *This is particularly apparent with respect to your Decision's treatment of Section 26.69(e) of the DOT rules.* In this regard, your Decision constitutes <u>rulemaking</u> in a manner that is inconsistent with basic prescriptions and proscriptions of the federal Administrative Procedures Act.

Section 26.61(e) states that a certifying agency must make "[eligibility] determinations . . .by considering all of the facts in the record, viewed as a whole". Moreover, § 26.73(b) explicitly obligates a certifying agency to "evaluate the eligibility of a firm on the basis of present circumstances" and further expressly prohibits a certifying agency from "[refusing] to certify a firm based solely on historical information indicating a lack of ownership or control of the firm by socially and economically disadvantaged individuals at some time in the past, if the firm currently meets the ownership and control standards of this part". OCR does not hold OMWBE to this standard and the Decision itself is replete with discussion of matters well prior to Ms. Dukler's stock purchase (and frankly have little to do with the Company's present circumstances).

Due process also requires that the findings of a certifying agency (and of OCR) be based on substantial, probative and competent evidence. These are not just words. Findings based on

Joseph Austin
February 15, 2007
Page 24

supposition and speculation will be found to be arbitrary and capricious by courts. As was pointed out in the Appeal, OMWBE consistently violated these due process principles.

Unfortunately, we strongly believe that the Decision reflects the same fundamental unfairness with respect to The Grove, and as such OCR's actions are subject to judicial scrutiny on due process and equal protection grounds. With respect to equal protection, we believe that the DOT rules in question have not been applied by OCR to Ms. Dukler or to the Company in the same manner as they have been to other entrepreneurs or firms. We are confident that the discovery process for litigation (including written interrogatories and depositions) will also support this conclusion. In this regard, we have begun the process of collecting information on the experiences of other entrepreneurs and other DBEs and ACDBEs. We believe that we will be able to proffer *prima fascia* proof to a court of bias and the discriminatory treatment accorded to Ms. Dukler and to the Company.

It is our sincere hope that this can be avoided, but I reiterate that our client has instructed us to proceed with litigation if necessary so that a court can assess the merits of this matter. We sincerely hope that you will carefully review the information in this letter, rescind the Decision and direct OMWBE to certify the Company as an ACDBE. We also request that you agree to a face-to-face meeting with Ms. Dukler and me to address the serious matters at issue.

Time is of the essence with respect to this matter. As noted previously, The Grove has been, and continues to be, materially harmed by the actions of OMWBE and of OCR.

Very truly yours,

KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP

By _____
     William Kirk

cc:     Michelle Dukler
        Robert Ashby, Esq.

**U.S. Department of Transportation**

Office of the Secretary
of Transportation

400 Seventh St., S.W.
Washington, D.C. 20590

June 8, 2007

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Reference No: 06–0149

Mr. William A. Kirk, Jr.
Attorney at Law
Kirkpatrick & Lockhart, Preston, Gates, Ellis, LLP
1735 New York Avenue N.W., Suite 500
Washington, DC 20006-5221

Dear Mr. Kirk:

This is in response to your February 15, 2007, letter on behalf of your client, Ms. Michelle
Dukler, President and Chief Executive Officer of The Grove, Inc. ("The Grove"). We have
carefully reviewed your letter, as well as the material previously provided by the Office of
Minority and Women's Business Enterprises ("OMWBE").

On December 21, 2006, the Department upheld OMWBE's determination that The Grove is
ineligible to participate as an Airport Concession Disadvantaged Business Enterprise (ACDBE)
on OMWBE's federal financially-assisted projects under criteria set forth in 49 CFR Parts 23 and
26 ("the regulation"). Pursuant to §26.89(g) all of the Department's decisions following
administrative appeals (including our December 21, 2006, decision regarding The Grove) are
administratively final and are not subject to petitions for reconsideration. However, after
receiving your February 15, 2007, we wish to address specific points you raised as follows. This
letter should be as part of the Department's decision on the matter.

1. The Department's Reliance on Grounds Specified in OMWBE's Decision:

The regulation specifies both the standard of proof for small business applicants wishing to
participate in the ACDBE program as well as our standards for reviewing recipients' decisions to
deny firms entry into the program. Pursuant to §26.61(b), it is the firm seeking certification—
not the recipient—that bears the burden of demonstrating, by a preponderance of the evidence,
that it meets the regulation's requirements concerning group membership or individual
disadvantage, business size, ownership, and control. When an applicant is denied certification
and appeals to the Department, §26.89(e) mandates that we base our decision solely on the entire

01134

administrative record. We decide whether the recipient's decision (e.g., that an applicant failed to carry its burden of proof with respect to one or more of the elements of certification) is based on substantial evidence, consistent with the provisions of the regulation. We do not make a de novo review of the matter; nor do we conduct a hearing. If an applicant wishes to appeal a recipient's determination, the regulation §26.89(c) permits the applicant to submit supplemental information and arguments concerning why the recipient's decision should be reversed. This opportunity was afforded to The Grove.

In The Grove's case (as in all cases), the Department first looked to see if OMWBE met its obligations to review the firm's eligibility after obtaining relevant information. The Department next reviewed OMWBE's record as well as the information you submitted along with your September 26, 2006, rebuttal letter to determine whether substantial record evidence supported OMWBE's decision that The Grove had not met is burden of proof as required by §26.61(b). Pursuant to §26.89(f)(1), the Department affirms a recipient's decision unless it determines, based on the entire administrative record, that the decision is unsupported by substantial evidence or inconsistent with the substantive or procedural provisions of the regulation concerning certification. Having determined that the record supported OMWBE's determination, the Department issued its December 21, 2006, decision.

According to your February 15, 2007, letter, the Department in several instances upheld OMWBE's decision on grounds not specified in the recipient's decision. We disagree. Our references to the record evidence are relevant to the core concepts raised by OMWBE and are appropriately addressed in our decision. For instance, in its June 28, 2006, decision, OMWBE discusses Ms. Dukler failing to meet the personal net worth requirements and mentions the assets she used to secure her loan from Fifth Third Bank. The Department's December 21, 2006, decision includes Ms. Dukler's personal net worth statement as of August 31, 2005, (which was contained in the record) and discusses Ms. Dukler's personal property calculation that includes her interests in real estate. Although all details of Ms. Dukler's net worth were not specifically mentioned by OMWBE, the Department found the entries on Ms. Dukler's personal net worth statement unclear, thereby supporting a conclusion that The Grove had failed to meet its burden of proof. The Department thoroughly examined all issues contained in the record and where appropriate, identified those matters in its written decision.

2. The Department's Decision Based on the Status of the Firm at the Time of OMWBE's Decision

You alleged in your February 15, 2007, letter that the Department disregarded the requirements of §26.89(f)(6) by not basing our decision on the status and circumstances of The Grove as of June 28, 2006, the date of OMWBE's certification denial decision. You also alleged that the Department focused on matters pertaining to the firm prior to Ms. Dukler's purchase of The Grove in February 2004, including matters dating back to 1999, which you believe to be contrary to §26.73(b).

Section 26.89(f)(6) provides that the Department's decision in a certification appeal is based on the status and circumstances of the firm as of the date of the decision being appealed. This

paragraph must be read consistently with paragraph (e) of this section, which directs the Department to consider the entire administrative record. In this context, it is not reasonable to read paragraph (f) literally to mean that the Department is restricted to considering a snapshot of the firm on, in this case, June 28, 2006. The status and circumstances of the firm on the date of an appeal necessarily include relevant information on the record about the ownership and control of the firm, all of which pertained to the ownership and control of the firm before the date on which the appeal was filed and which the recipient acquired before that date.

Likewise, §26.73(b) is not a prohibition of consideration by the recipient of relevant information about the ownership and control of the firm, including information about how the present owner acquired his or her ownership interest. This provision originated with proposed §29.29(i)(2) of a December 1992 notice of proposed rulemaking (NPRM), which provided, in very similar language that:

> Recipients shall evaluate the eligibility of a firm in light of present circumstances. Recipients shall not decline to certify a firm solely on historical information indicating a lack of ownership and control by socially and economically disadvantaged individuals at some time in the past, if the firm currently meets the ownership and control standards of this part (57 FR 58307; December 9, 1992).

The preamble of the NPRM stated the following rationale for the proposed language:

> In some cases, a firm has been certified for a number of years, [but] has lost its certification because of a perceived defect in its ownership or control in the past. Present-day ownership and control matter; long-term circumstances that have no present relevance do not. There is no place for the doctrine of "original sin" in the DBE program (Id. at 58293).

Section 26.63(b) of the Department's 1997 NPRM changed the 1992 language to its present form. The preamble to the 1997 NPRM said that recipients were not precluded from taking action against a DBE for previous fraudulent or deceptive actions that subsequently came to light. It also said that if the owner of a firm first applied in Year 1, was turned down for lack of expertise, and then reapplied in Year 3, after having acquired the needed expertise, the recipient could not properly deny the firm certification in Year 3 because of the owner's lack of expertise in Year 1 (62 FR 29570; May 30, 1997). In adopting the present §26.73(b), the Department reiterated that there is no appropriate basis for "denying certification to a firm on the basis of what it was in the past." (64 FR 5121; February 2, 1999).

Read with this purpose in mind, it is clear that §26.73(b) is not a blanket prohibition on considering how a firm's owner acquired his or her interest in the firm. It is not a mandate for intentional blindness to matters in the firm's past that have continuing importance in determining whether the owner has, for example, made a sufficient contribution of capital to support his or her claim of ownership. The section intends to rule out consideration only circumstances that "have no present relevance" to a determination of a firm's ownership.

Because the present ownership structure of The Grove was established by the series of transactions beginning in 1999, and there have not been intervening changes in the ownership structure of the company that render those transactions irrelevant, we believe that the transactions leading up to, and including, Ms. Dukler's acquisition of her interests in The Grove are relevant and were appropriately considered by OMWBE and the Department.[1]  Clearly, OMWBE had concerns that Ms. Dukler did not purchase her ownership in The Grove directly from the firm's original owners (Ms. Menutis and Mr. Valteau) and that Ms. Dukler's acquisition of her ownership interests did not presently conform to the requirements of the regulation. OMWBE therefore, appropriately explored the circumstances and background of how Ms. Dukler acquired her ownership interests.

3.  Ms. Dukler's Stock Purchase:

Since OMWBE raised Ms. Dukler's ownership as a factor in its denial decision, the Department addressed in detail in its December 21, 2006, letter the issue of whether her contribution to acquire her ownership interest in The Grove met the requirements of the regulation §26.69.  The Department determined that substantial record evidence supported OMWBE's conclusion that Ms. Dukler did not meet her burden of proof.  Specifically, the record indicates that an arms-length transaction between the firm's previous owners and Ms. Dukler did not occur and that the arrangement whereby Ms. Dukler obtained her ownership interest does not appear to meet the requirements of the regulation.[2]  The Department's reasoning is set forth in our December 21, 2006, letter.

4.  Business Valuation Issues:

You alleged in your February 15, 2007, letter that the Department questioned the price Ms. Dukler paid for her interest in The Grove, and that our decision is contrary to business valuation principles.  Specifically, you alleged that the Department used a simplistic methodology for

---

[1] Paralleling the 1997 discussion of a hypothetical control issue, suppose an owner of a firm originally, in Year 1, made a clearly insufficient contribution of capital to start a firm.  By Year 3, however, he or she had made sufficient additional investments so that he or she now clearly had made a sufficient contribution of capital to be considered the 51% or more owner of the firm.  The firm applies for certification.  According to §26.73(b), the recipient should look at the firm's ownership as it stands in Year 3 and not deny certification based on the earlier, but now superseded, lack of genuine ownership in Year 1.  The Year 1 circumstance does not have continuing relevance to the determination of the present ownership of the firm.  If circumstances had not changed in the interim, however (i.e., no additional investments had been made between Year 1 and Year 3), the present relevant circumstances of ownership would remain those of the original situation in Year 1.  Inadequate evidence of sufficient contribution of capital, or other attributes of ownership, does not become sanctified simply by the passage of time.

[2] The facts in this matter can be differentiated from §26.69(e), which states, in part: "Examples of insufficient contributions include a promise to contribute capital, an unsecured note payable to the firm or an owner who is not a disadvantaged individual, or mere participation in a firm's activities as an employee.  Debt instruments from financial institutions or other organizations that lend funds in the normal course of their business do not render a firm ineligible, even if the debtor's ownership interest is security for the loan."  The record appears to indicate that Ms. Dukler did not obtain a loan with a lending institution using her ownership interest in The Grove as collateral, but rather appears to have financed the transaction with assistance from a non-disadvantaged individual, without actually contributing her own funds.

business valuation by examining the firm's "gross receipts as reflected in its pre-2004 financial statements and tax returns and the stockholder's equity reflected on its balance sheet." As stated above, and in our December 21, 2006, letter, the firm bears the burden of demonstrating by a preponderance of the evidence, that it meets the regulation's requirements concerning group membership or individual disadvantage, business size, ownership, and control. It is thus The Grove that must establish that Ms. Dukler, as the disadvantaged business owner, purchased the firm in accordance with the regulation's requirements. It is not the responsibility of OMWBE or the Department to demonstrate the contrary. As stated in our December 21, 2006, decision, substantial record evidence supported a conclusion that Ms. Dukler had not met her burden of proof in demonstrating that her contribution of capital to acquire her ownership interest in The Grove was "real, substantial, and continuing going beyond pro forma ownership of the firm as reflected in the ownership documents" as required by §26.69(c).

5. Accounting and Personal Net Worth Issues:

In February 2004 Ms. Dukler entered into an agreement to purchase from Star Foods 35 shares of stock (49 percent) in The Grove for $2.5 million as well as an option agreement to purchase 1.5 shares for $100,000.00. To accomplish this she (1) executed notes with Mr. Casey Cowell for $2.5 million and $100,000.00, and a corresponding security agreement granting Mr. Cowell a security interest in her home, antiques, and art; and (2) later entered into a loan and security agreement with Fifth Third Bank covering this amount, using as security or collateral the firm's accounts, inventory, goods, etc. In August 2004, Ms. Dukler executed a consumer note for $2.6 million with Fifth Third Bank and repaid Mr. Cowell $2.6 million, transferring these funds from Fifth Third Bank.

The Department affirms its December 21, 2006, decision that OMWBE correctly determined that Ms. Dukler has exceeded the personal net worth standard of $750,000.00. You allege that Ms. Dukler's consumer note should be counted as a liability, thus bringing her personal net worth under the $750,000.00 limitation.

There is no documented record evidence indicating that Ms. Dukler was required or needed to pledge her home and personal assets in order to capitalize or expand The Grove. The preamble section of Part 23 clearly articulates the Department's intent that the ACDBE owner needs to demonstrate that certain assets were required or necessary to obtain financing. This does not appear to be the case in The Grove's arrangement. In addition, the record indicates that Ms. Dukler's personal assets were pledged as security on the loan from Mr. Cowell. However, the Department agrees with OMWBE that once Ms. Dukler executed the loan and security agreement with Fifth Third Bank, pledging as security the firm's assets, Ms. Dukler's personal assets in connection with the loan to Mr. Cowell can no longer be considered encumbered. The resulting obligation to Fifth Third Bank would not rise to "encumbered" status as envisioned by the regulation and should not be counted as a liability on Ms. Dukler's personal net worth statement.

Since Ms. Dukler bears the burden of proof in this matter, the Department agrees with OMWBE that the firm did not present sufficient information to demonstrate that the $2.6 million should be

counted as a liability on Ms. Dukler's personal net worth statement. It is important to recall that the reality and substance of financial arrangements, and not merely what is represented on documents, are what recipients must take into account in making ownership and control determinations. Here, we concluded that the OMWBE had substantial evidence that the reality of the combined transactions did not meet the firm's burden of proof with respect to Ms. Dukler's assets actually being obligated to buy her stake in the firm.

6. Control Issues:

The Department's December 21, 2006, decision addressed Ms. Dukler's ability to control The Grove given restrictions in the firm's bylaws and other documents. We have determined that the firm has met its burden of proof in this regard, and we are removing this section from the decision. In addressing this aspect of the case, you indicated in your February 15, 2007, letter that OMWBE did not conduct a site visit, interview the firm's staff or vendors, airport officials, or others that would have information concerning the management of the firm. The regulation §26.83(e) addresses situations where an out-of-state firm applies for certification with a recipient not in the applicant's home state. This section does not mandate that an out-of-state recipient conduct a site visit or interview individuals as you suggest. Rather, the regulation specifies that, at its option, a recipient may certify the firm in reliance on the other recipient's certification decision; make an independent certification decision based on documentation provided by the other recipient, augmented by any additional information it requires the applicant to provide; or require the applicant to complete its application process without regard to the action of the other recipient. OMWBE appears to have met this requirement by obtaining necessary information from the firm including a site-visit report from the firm's home state of Illinois.

7. The Grove as an Independent Business:

a. The Department determined in its December 21, 2006, decision that the record supported a conclusion that The Grove had not met is burden of proof in demonstrating it is an independent business as required by §26.71(b). This conclusion was based in part on the firm's financial dealings with Star Foods and Georgia's Grove, LLC. You stated in your February 15, 2007, letter: "The decision seems to suggest that an equity investment in a DBE or ACDBE (or a debt financing) is a legitimate basis for a finding of "dependence" even if, as in this case, an equity investment is for less than a majority of the firm's shares, a debt financing does not include provisions affecting the DBE majority owners control of the firm and/or the investment or financing does not otherwise violate DOT rules." The infusion of capital to The Grove by Star Foods is relevant not only to Ms. Dukler's ownership of the firm, but also to the firm's independence. We could not reconcile how Ms. Dukler's investment should be considered differently from Star Foods' infusion of capital for which it received no corresponding transfer or purchase of stock ownership in the business. Ms. Dukler's investment, Star Foods' infusion of capital, as well as the firm's overall assets at the time of these transactions, are relevant when considering The Grove's independence. Again, the firm bears the burden of proof with respect to independence. In our view, substantial record evidence supports a conclusion that, given the balance of assets involved, The Grove did not carry its burden that it was independent of Star Foods.

8. <u>Other Issues</u>:

a. While it is true The Grove was a certified DBE, according to the City of Chicago's July 26, 2004, final denial summary contained in the record, this firm's certification lapsed on June 30, 2002. This raises a question as to who owned and controlled the firm between this time and February 2004, when Ms. Dukler acquired her ownership interest.

b. We reiterate that the record evidence provided by OMWBE supports a conclusion that The Grove has not met is burden of proof in demonstrating it is eligible for the ACDBE program. As our December 21, 2006, decision indicates, The Grove is not eligible to participate as a DBE on OMWBE's federal financially-assisted projects. The Grove may reapply for ACDBE certification with OMWBE after the appropriate waiting period. We wish to remind you that our December 21, 2006, decision is applicable only to OMWBE and is based solely on the record provided to us by that recipient. This decision does not preclude The Grove from participating as an ACDBE in other jurisdictions in which it is currently certified.

Thank you for your interest in the Department's ACDBE program. The Department is taking no further action on this matter and we have closed our case file.

Sincerely,

Joseph E. Austin, Associate Director
External Civil Rights Programs Division
Departmental Office of Civil Rights

cc: OMWBE