**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| THE GROVE, INC. | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 07-1591 (LFO) |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, ET AL. | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND OPINION**

The Grove, Inc. (The Grove) brings this suit against the Department of Transportation

(Department), the Department's Office of Civil Rights (OCR), and Joseph Austin (an Associate

Director at OCR) for violation of the Administrative Procedure Act, 5 U.S.C. § 702, and denial

of equal protection under the Fifth Amendment to the United States Constitution.  The Grove

seeks reversal of a final decision denying it eligibility to participate in the federal Airport

Concessions Disadvantaged Business Enterprise program (the Program) at Seattle-Tacoma

International Airport.[1]  Each side has filed a motion for summary judgment.

**I. Background**

A.      **History of The Grove**

The Grove operates concessionaire enterprises at airports in the United States.  Michelle

Dukler is the current majority owner with 51% of the outstanding stock, while a company, Star

Foods, LLC (Star Foods) owns 49%.  The Grove was founded in 1981 by two "disadvantaged

individuals" (the Original Owners) whose ownership provided the basis for its 1987 certification

---

[1] On June 26, 2008, the Calendar Committee reassigned this case from Judge Henry H.
Kennedy to Judge Louis F. Oberdorfer.  Dkt. No. 21.

as a disadvantaged business under the Program.  In 1999, Star Foods, owned by Martin Dukler

(Mrs. Dukler's husband) and Casey Cowell, purchased a 49% share for $1.32 million.  Between

1999 and the time when Mrs. Dukler acquired her share of The Grove, Star Foods assumed

responsibility for substantial debts owed by The Grove and made direct cash contributions, with

a total capital contribution of $6.8 million.  AR 1087-88.  Despite its substantial contributions,

Star Foods received no additional stock, leaving it a minority owner with 49%.

    1.  <u>Mrs. Dukler's Purchase of a Majority Interest in The Grove</u>

    In February 2004, Mrs. Dukler purchased her 51% interest in the Grove through a series

of complex transactions.  AR 1088-89.  On February 5, Mrs. Dukler signed two notes (the

Cowell Notes), each with a 2% annual interest rate and a maturity date of October 31, 2006, to

borrow $2.6 million from Mr. Cowell, the co-owner of Star Foods.  Mrs. Dukler secured these

notes with personal assets that she represented as having a total value of $2,654,425.  *Id*.  The

next day, Star Foods and Mrs. Dukler executed two agreements, the net result of which was to

transfer 36.5 shares, representing a 51% interest in The Grove, for $2.6 million.  After this

transaction, Mrs. Dukler had a 51% interest and Star Foods a 49% interest.  The $2.6 million was

paid from the Duklers' joint checking account in the form of two checks: (1) check 2249 dated

February 6, 2004 for $100,000, and (2) check 2248 dated February 6, 2005 (most likely in error,

since the check was negotiated February 20, 2004) for $2.5 million.  *Id*.

    In August 2004, Mrs. Dukler paid off the Cowell Notes.  On August 17, 2004, Mrs.

Dukler obtained a $2.6 million loan from Fifth Third Bank, secured by a promissory note (the

Fifth Third Bank Note), at a floating interest rate with a maturity date of August 19, 2006.  The

proceeds from this note were deposited in the Duklers' joint checking account.  The next day,

Mrs. Dukler paid Mr. Cowell $2.6 million from that same joint checking account.  AR 1090.

    2.  Governance and Finance of the Grove

On February 17, 2004, Mrs. Dukler executed an agreement with Fifth Third Bank (the

Loan and Security Agreement) which allowed The Grove to request loans up to $2.5 million and

granted a security interest in the firm's accounts, inventory, goods, trademarks / copyrights,

equipment, and other items.  There is no evidence on the record that Mrs. Dukler personally

guaranteed these loans.  The Loan and Security Agreement provides insight into the nature of

Star Foods' relationship with The Grove.

Schedule 11(h) of the Loan And Security Agreement lists transactions with affiliates of

The Grove.  The schedule lists the following transactions with Star Foods:

> 1. The Grove Inc. makes license fee payments to Star Foods;
>
> 2. The Grove Inc. may make payments on behalf of Star Foods and/or Georgia's Grove and charge Star Foods and/or Georgia's Grove for such payments;
>
> 3. The Grove, Inc. may make payments to Star Foods and/or Georgia's Grove for payments Star Foods and/or Georgia's Grove have made on The Grove, Inc.'s behalf;
>
> 4. The Grove Inc. may perform accounting, administrative, or marketing functions for Star Foods and/or Georgia's Grove for which it may or may not be directly or indirectly reimbursed;
>
> 5. Any transactions of The Grove, Inc. related to its 70 percent interest and managing partner status for NEU of Chicago.

AR at 695.  Schedule 11(o) of the Loan And Security Agreement lists Star Foods and Georgia's
Grove, LLC (Georgia's Grove) as affiliates of The Grove.

**B.**     **Agency Proceedings**

1.  The Program

Under 49 U.S.C. § 47107(e), the Secretary of Transportation may approve an airport

development project grant application provided the airport operator assures that at least ten

percent of the businesses selling consumer products or services to the public are small businesses

owned and controlled by socially and economically disadvantaged individuals.  A firm seeking

to be part of that ten percent must apply for certification for each airport at which it wishes to

operate a concession from the appropriate state agency.  For the Seattle-Tacoma International

Airport (the Airport), the state agency that certifies applicants is the State of Washington's

Office of Minority and Women's Business Enterprises (the Washington Office).  Applicants

denied certification can appeal to the United States Department of Transportation (Department).

2.  Proceedings before the Washington Office

On September 12, 2005, The Grove applied to the Washington Office for certification at

the Airport.  This was The Grove's third application for certification, after submitting and

withdrawing applications in 2003 and 2004.  The Washington Office twice denied The Grove

certification.  The first, dated November 30, 2005, listed five grounds for denial:  (1) Mrs.

Dukler's contribution of capital in The Grove was not "real and substantial;" (2) Mrs. Dukler's

unencumbered assets exceeded the $750,000 personal net worth limit; (3) The Grove is

intertwined with Star Foods and does not operate as an "independent business;" (4) Mrs. Dukler

does not control the operations of The Grove; and (5) The Grove operates as a family owned and

operated business.  This decision also stated that the record was insufficient to determine

whether The Grove qualified as a small business.  On June 28, 2006, in response to The Grove's

request for informal review, the Washington Office issued a decision affirming on all grounds.

      3.   Proceedings before the Department

      On September 26, 2006, The Grove appealed to the Department.  On December 21, 2006,

the Department denied the appeal on grounds (1) through (4) listed above (that is, all grounds

except that The Grove operates as a family owned and operated business).  AR 1085-1109.  On

February 15, 2007, in response to a letter from The Grove's counsel, the Department

supplemented its earlier decision (together with the December 21, 2006 letter, the Final

Decision), agreeing only that Mrs. Dukler did control operations of The Grove.  AR 1134-40.

Therefore, the Final Decision upheld the State Decision on grounds (1) through (3) listed above.

**C.**    **Procedural History**

      The Grove filed this action seeking review of the Final Decision on the grounds that (1)

the Department's certification denial was arbitrary and capricious under the Administrative

Procedure Act; and (2) the Department violated The Grove's Fifth Amendment right to equal

protection under the laws.  On December 6, 2007, the Department moved for summary

judgment.  On January 22, 2008, The Grove filed a cross-motion for summary judgment.

**II. Discussion**

**A.**    **Administrative Procedure Act Claim**

      1.   Standard of Review

      Both parties agree that resolution by summary judgment is appropriate.  A court may set

aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law" or "unsupported by substantial evidence in a case . . . reviewed on the

Case 1:07-cv-01591-LFO   Document 22   Filed 09/23/08   Page 6 of 19

record of an agency hearing provided by statute." *Citizens to Preserve Overton Park v. Volpe*,

401 U.S. 402, 413-15 (1971).  The substantial evidence standard is satisfied if the final agency

decision is supported by "'such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.'" *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619-20 (1966)

(quoting *Consolidated Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  A court "must

judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds

are inadequate or improper, the court is powerless to affirm the administrative action by

substituting what it considers to be a more adequate or proper basis." *SEC v. Chenery Corp.*,

332 U.S. 194, 196 (1947).

> 2.   The Department's Standard of Review for the State Decision

The Department's review of the Washington Office's decision is governed by 49 C.F.R.

§ 26.89, which states in pertinent part:

> (1) The Department affirms [the] decision unless it determines, based on the
> entire administrative record, that [the] decision is unsupported by substantial
> evidence. . . .
>
> . . .
>
> (5) The Department does not uphold [the] decision based on grounds not specified
> in [the] decision.

49 C.F.R. § 26.89(f).

The parties disagree about the construction of these two provisions.  The Grove interprets

§ 26.89(f)(5) as limiting the Department's conclusions to the specific facts cited by the

Washington Office in support of its conclusions.  For example, in upholding the Washington

Office's conclusion that Mrs. Dukler's personal net worth exceeds $750,000, the Final Decision

cites inconsistencies in the record concerning the value of Mrs. Dukler's home equity and

6

mortgage. The Grove argues that the Final Decision violates § 26.89(f)(5) because the value of

Mrs. Dukler's home equity and mortgage was not a "ground" specified in the State Decision.

The Grove, in essence, argues that the Department must ignore evidence in the record

that supports denial of certification. This interpretation fails to account for the requirement in

§ 26.89(f)(1) that the Department examine the *entire* administrative record. Sections 26.89(f)(1)

and (f)(5), when taken together, distinguish between the grounds upon which a decision is based

and the facts that support those grounds. The ground "Mrs. Dukler's personal net worth exceeds

$750,000" is specified in the State Decision. Had it not been, the Department could not have

upheld the State Decision on that basis. However, the Department may still cite other items in

Mrs. Dukler's personal net worth statement since it is reviewing the ground specified in the State

Decision. The court, like the Department, will consider the entire administrative record.

A firm is eligible for the Program as long as "(1) [it] is at least 51 percent owned by one

or more individuals who are both socially and economically disadvantaged or, in the case of a

corporation, in which 51 percent of the stock is owned by one or more such individuals; and (2)

[its] management and daily business operations are controlled by one or more of the socially and

economically disadvantaged individuals who own it." 49 C.F.R. § 26.5. Critical to this court's

review, the firm seeking certification has the burden of demonstrating, by a preponderance of the

evidence, that it meets the requirements concerning group membership or individual

disadvantage, business size, ownership, and control. 49 C.F.R. § 26.61(b).

3.   Real and Substantial Contribution

A firm seeking certification must demonstrate, among other things, that

> [t]he contributions of capital or expertise by the socially and economically
> disadvantaged owners to acquire their ownership interests must be real and

substantial.  Examples of insufficient contributions include a promise to
contribute capital, an unsecured note payable to the firm or an owner who is not a
disadvantaged individual, or mere participation in a firm's activities as an
employee. Debt instruments from financial institutions or other organizations that
lend funds in the normal course of their business do not render a firm ineligible,
even if the debtor's ownership interest is security for the loan.

49 C.F.R. § 26.69(e).  The Department found that The Grove failed to show that Mrs. Dukler's

contribution of capital was real and substantial because:  (1) the record lacks evidence that Mrs.

Dukler used her own funds to acquire her 51% interest; and (2) $2.6 million is not a "real and

substantial" contribution of capital when compared to the overall value of The Grove.

Use of Mrs. Dukler's Funds.  The Department found the record ambiguous concerning

the source of the funds used to acquire Mrs. Dukler's interest.  AR 1091.  Mrs. Dukler purchased

her interest in The Grove using the proceeds from the Cowell Notes—but Mr. Cowell was a co-

owner of Star Foods with Mrs. Dukler's husband.  Mrs. Dukler repaid the Cowell Notes with the

proceeds of the Fifth Third Bank Note, which had been deposited in the Duklers' joint account

the day before.  Therefore, according to the Department, Mrs. Dukler did not use her own funds

to purchase her interest in The Grove, but rather the assets of Mr. Cowell and Fifth Third Bank.

The Department's reasoning is peculiar.  The regulations clearly contemplate the use of

borrowed funds by disadvantaged individuals in the acquisition of a firm, specifically addressing

both types of loans at issue here.  First, the regulations state that unsecured loans from non-

disadvantaged owners of the firm are insufficient contributions of capital.  Even if the court were

to consider Mr. Cowell an owner of The Grove based on his interest in Star Foods, the Cowell

Note does not run afoul of the regulation because it was secured.  Second, the regulations

explicitly state that loans from financial institutions do not render a firm ineligible.  Fifth Third

Bank is a financial institution.  The Fifth Third Bank Note, therefore, does not render the firm

ineligible.  The Department argues that the last sentence of 49 C.F.R. §26.69(e) does not apply to this situation because the Fifth Third Bank Note was not secured by Mrs. Dukler's ownership interest in the firm.  However, that sentence says loans from financial institutions do not create ineligibility "*even* if the debtor's ownership interest is security for the loan," (emphasis added), which does not require that such loans be so secured.

Given that Mrs. Dukler's reliance on the Fifth Third Bank Note does not render the firm ineligible, it follows that Mrs. Dukler's lack of payments on the principal of the note also does not render The Grove ineligible.  The note was not due and payable as of the date of the State Decision, and there is no evidence that that Mrs. Dukler was in default or otherwise behind on her payments.  Given that the regulations explicitly state that this type of note does not render a firm ineligible, it requires more than speculation by the Department to render the firm ineligible.

The Department further argues that because the proceeds from the Fifth Third Bank Note were deposited in the Duklers' joint checking account the day before Mrs. Dukler repaid the Cowell Note, it is not clear whether Mrs. Dukler repaid the Cowell Note with her own assets or with her husband's assets.  According to the Department, this creates doubt that the contribution of capital was actually Mrs. Dukler's.  However, the contribution Mrs. Dukler made is the liability inherent in the Fifth Third Bank Note – a liability that is personal to her and that, under the regulations, counts as Mrs. Dukler's contribution of capital.

Substantial Contribution of Capital.  The Department also argues that $2.6 million was not a substantial contribution in relation to Mrs. Dukler's 51% interest because:  (1) there are questions about the ownership and value of the assets that secured the Cowell Note (collateral);

and (2) $2.6 million "appears less than reasonable to acquire" The Grove considering the size of

the firm and the $6.8 million that Star Foods contributed for its 49% interest.  AR 1093-94.

To secure the Cowell Note, Mrs. Dukler pledged $2,654,42 in assets consisting of real

property, antiques, art, brokerage accounts, and the assets of two businesses (Schlitz Studios and

Schlitz Furnaces) owned by Mrs. Dukler.  AR 1093.  The Department was uncertain how to

attribute these assets since some of the collateral was jointly owned by the Duklers, while other

assets were apparently co-owned by the Duklers, Schlitz Studios and Schlitz Furnaces.

The Final Decision notes that the value of real property the Duklers jointly owned was

$580,000, and that "Mrs. Dukler's share would presumably be no greater than $290,000.00, thus

reducing her overall pledge of security at a minimum from $2,654,425.00 to $2,364,425.00."

AR 1093.  Some of the other items pledged as collateral were jointly owned by the Duklers, but

the "bulk of the items were owned by Mrs. Dukler prior to her marriage."  AR 1093.  According

to the Department, "[w]ithout a clearer identification of which items were owned solely by Mrs.

Dukler, or could be considered shared assets with her spouse, it is difficult to determine whether

Mrs. Dukler's pledge of collateral can be considered substantial."  *Id.*

The Department's conclusion is at odds with its own regulations.  When marital assets

are used to acquire an ownership interest asserted by one spouse, the portion of the joint assets

"state law would recognize as belonging to the socially and economically disadvantaged owner

of the applicant firm" is counted as the individual spouse's contribution toward the ownership

interest, "provided that the other spouse irrevocably renounces and transfers all rights in the

ownership interest."  49 C.F.R. § 26.69(i)(1).  Mr. Dukler did irrevocably renounce and transfer

all rights in The Grove.  AR 727-28; *see also* Def. Resp. to Pl. Statement of Material Facts, ¶ 15.

Therefore, even assuming that *all* of the assets were jointly owned,[2] the value of Mrs. Dukler's

contribution to the security pledge is at least $1.3 million (half of $2.6 million).

The Department argues that a contribution of $2.6 million for a 51% interest is not

substantial when compared to the size of The Grove and the capital contributions made by Star

Foods.  The Department cited the following as evidence that The Grove was worth substantially

more than represented by Mrs. Dukler's contribution of capital:  gross profit in 2003 of

$13,038,547; total stockholder's equity as of 2003 of $3,029,464; gross receipts in 2003 of

$16,187,174; Star Foods' capital contributions of $6.8 million.  AR 1094.  The Department

states that $2.6 million "appears less than reasonable to acquire a firm the size of The Grove."

*Id.*  The Department cites no standards for valuing businesses such as The Grove in reaching this

conclusion.  Moreover, the Department ignores several other relevant factors.  The Grove's

consolidated income statement for 2003 does list a gross profit of $3,029,464.  AR 668.

However, that gross profit excludes over $12 million in other expenses, including payroll and

occupancy expenses.  *Id.*  The operating margin for The Grove in 2003 was only $357,838, and

the net after tax was only $190,355.  The Department cites no reason why gross profit should be

used in calculating the value of a company as opposed to operating margin or net income.  With

no clear rationale, such a valuation method is unreasonable.

The Department similarly errs when considering the stockholder equity and Star Foods'

contribution of capital.  The balance sheet from which the Department obtained the $3,029,464

stockholder equity number shows The Grove's assets at $6,421,947 and its liabilities at

---

[2] The Department does not contend that all assets are jointly owned; rather it argues that it is impossible to tell which assets are jointly owned.  Even assuming all the assets are jointly owned, Mrs. Dukler's individual contribution remains real and substantial.

$3,392,483.  AR 689-90.  The Department does not even attempt to explain why, given these

numbers, $2.6 million is not a substantial contribution for Mrs. Dukler's 51% interest in The

Grove.  In sum, the Department's conclusion that Mrs. Dukler's contribution was not "real and

substantial" is not supported by substantial evidence in the record.

    4.  Mrs. Dukler's Personal Net Worth

"Any individual who has a personal net worth exceeding [$750,000] is not a socially and

economically disadvantaged individual for purposes of" the Program.  49 C.F.R. § 23.35.  The

Department found that Mrs. Dukler's net worth exceeded the $750,000 limit.  The court must

decide whether the $2.6 million Fifth Third Bank Note should be counted as a liability on Mrs.

Dukler's personal net worth statement.  If it is a liability, Mrs. Dukler's net worth is less than

$750,000.  If it is not, then her net worth is greater than $750,000.

The Department notes that Mrs. Dukler has slightly more than $2 million in personal

property plus significant amounts in home equity.  AR 1097.  This equity is in a property on

which the Dukler's are having a new home built.  The property was purchased for $2.8 million

and carries a mortgage of $2.3 million.  The Department does not state what this significant

amount of equity is, but there is nothing in the record to suggest that it would be more than

$500,000.  There is a question concerning how much of this equity, if any, should be counted as

an asset of Mrs. Dukler.  First, Mrs. Dukler jointly owns it with her husband.  Therefore, The

Grove argues, only half of the equity at most should count toward her net worth.  Second, under

the regulations, Mrs. Dukler's equity in her primary place of residence is excluded from the

personal net worth calculation.  49 C.F.R. § 23.3.  However, according to the personal net worth

statement, at the time of The Grove's application, the Duklers were living in a rented house pending completion of construction.  AR 1096.

Assuming, without deciding, that all the home equity can be attributed to Mrs. Dukler's net worth – Mrs. Dukler has assets worth slightly more than $2.5 million.  Therefore, if the Fifth Third Bank Note is counted as a liability, then Mrs. Dukler's net worth is negative.  The Final Decision presents the following reasons why the note should not count as a liability: (1) the note is not "encumbered" as required under the regulations because Mrs. Dukler did not pledge personal assets to secure it; (2) the note is a contingent liability; and (3) there is no indication on the record that Mrs. Dukler made any payments on the note's principal.  AR 1095-1101.

As to the first objection, encumbered status refers not to liabilities, but to assets.  The regulations allow "assets that the individual can document are necessary to obtain financing or a franchise agreement for the initiation or expansion of his or her ACDBE firm (or have in fact been encumbered to support existing financing for the individual's ACDBE business), to a maximum of $3 million" to be excluded from the net worth calculation.  49 C.F.R. § 23.3.  The Department correctly states that The Grove did not provide documentation to support such an exclusion.  However, The Grove is not seeking to exclude assets from the net worth calculation.  Instead, it is seeking to *include* a liability in that calculation.

On the second objection, the Final Decision stated that the Fifth Third Bank Note can "appropriately be considered a contingent liability," AR 1100, which, under 49 CFR § 26.67(a)(2)(iii)(C), should not reduce Mrs. Dukler's net worth.  However, the Department does not identify what Mrs. Dukler's obligation to repay the note is contingent on.  In its filings to the court, the Department does not attempt to justify the classification of the note as a contingent

liability.  Finally, the note itself does not contain any contingencies.  Rather, it states that Mrs.

Dukler promises to repay the amount borrowed on or before August 19, 2006.  AR 635.  The

court finds no evidence on the record that the Fifth Third Bank Note is a contingent liability.

And, as to third objection, the Department concluded that the lack of any payments on

the principal toward the Fifth Third Bank Note raised the possibility that the note was taken to

"give the appearance that Mrs. Dukler actually paid $2.6 million for her ownership share."  AR

1100.  The Department has cited no evidence that Mrs. Dukler is not liable for the balance of the

loan.  The court finds that the Fifth Third Bank Note should be included in Mrs. Dukler's

personal net worth calculation.  Therefore, the Department's conclusion that Mrs. Dukler's net

worth exceeds $750,000 is not supported by substantial evidence.

5.  Independence of The Grove

The regulations require that a firm be an independent business in order to qualify for the

Program:

> Only an independent business may be certified as a DBE. An independent
> business is one the viability of which does not depend on its relationship with
> another firm or firms.
>
> (1) In determining whether a potential DBE is an independent business, *you must
> scrutinize relationships with non-DBE firms*, in such areas as personnel, facilities,
> equipment, financial and/or bonding support, and other resources.
>
> (2) You must consider whether present or recent employer/employee relationships
> between the disadvantaged owner(s) of the potential DBE and non-DBE firms or
> persons associated with non-DBE firms compromise the independence of the
> potential DBE firm.
>
> (3) You must examine the firm's relationships with prime contractors to determine
> whether a pattern of exclusive or primary dealings with a prime contractor
> compromises the independence of the potential DBE firm.

(4) In considering factors related to the independence of a potential DBE firm, you must consider the consistency of relationships between the potential DBE and non-DBE firms with normal industry practice.

49 C.F.R. § 26.71(b) (emphasis added).

The Final Decision provided two reasons in support of its finding that The Grove failed to demonstrate its independence:  (1) Star Foods' capital contributions to the firm before Mrs. Dukler's acquisition of her majority share; and (2) The Grove's ongoing relationship with Star Foods and Georgia's Grove as evidenced in the Loan and Security Agreement.  The burden, again, is on the firm seeking certification: The Grove must, by a preponderance of the evidence, show that it is truly an independent business.  49 C.F.R. § 26.61(b).

Star Foods' Capital Contributions.  After purchasing a 49% share of The Grove for $1.32 million, Star Foods made more than $5.2 million in additional capital contributions (in the form of debt assumption and cash payments) without receiving any additional ownership interest. According to the Department, "The Grove's dependence upon Star Foods for financial support could not be clearer."  AR 1106.  This conclusion is bolstered by the fact that Star Foods' infusion of $6.8 million in capital was made without a corresponding transfer of stock ownership in the business."  *Id*.  The Grove argues that the Department's reliance on payments made years before Mrs. Dukler's acquisition violates the requirement that determinations be based on "the status and circumstances of the firm as of the date of the decision being appealed."  49 C.F.R . § 26.89(f)(6).  The Grove's interpretation would prohibit the Department from examining the history of an applicant firm.  Section 26.89(f)(6) is not so restrictive: the Department may rely on historical events so long as they continue to affect the status and circumstances of the firm as of the date of the decision being appealed.

Certainly, if the contributions had been made after Mrs. Dukler's acquisition of her 51%

interest, the Department's conclusion would be indisputable.  Such a large capital infusion

without an increase in ownership interest by the contributor would be compelling evidence that

The Grove is not a viable firm without Star Foods' assistance.  But even prior contributions may

be relevant to the firm's "status and circumstances" as of the appeal date.  Star Foods made

capital contributions of more than two and a half times those of Mrs. Dukler, yet kept a minority

(49%) interest.  The Grove may not have survived without those capital contributions.  When the

entity that made such large capital contributions is still an affiliate (and owner) of The Grove,

and where its personnel and finances may be intertwined (discussed *infra*), Star Foods' capital

contributions are highly relevant to the question of The Grove's independence.

Current Relationship with Star Foods and Georgia's Grove.  The Loan and Security

Agreement provides evidence that Star Foods and Georgia's Grove are affiliates of The Grove.

*See* Loan and Security Agreement, AR at 695, 698 (listing each under schedule 11(h), which lists

transactions with affiliates, and under schedule 11(o) as affiliates).  According to the agreement,

The Grove makes license payments to Star Foods; may make payments on behalf of the affiliates

and charge them for such payments; may make payments to the affiliates for payments the

affiliates have made on its behalf; and may perform accounting, administrative, or marketing

functions for the affiliates without being reimbursed.  *Id*.  The Department concluded that the

exact nature of the relationship between The Grove and the affiliates was unclear:

> This aspect of the relationship between the firms is unclear in the record;
> however, the issue arises as to why The Grove listed these firms as affiliates in its
> loan and security agreement with Fifth Third Bank. This could be an instance
> where the reference to these firms in this manner was necessary in order for the
> bank to enter into its agreement with The Grove in the first place. However,
> without more details the Department cannot reach a conclusion in this regard.

AR at 1108.

This evidence supports the Department's finding that The Grove failed to meet its burden that it was independent of Star Foods and Georgia's Grove.  Moreover, the intertwined nature of The Grove and Star Foods' finances and debt, the fact that Mr. Cowell (a co-owner of Star Foods) provided Mrs. Dukler the initial loan, and the familial connection (Mr. Dukler is also a co-owner of Star Foods) all go to support the Department's conclusion.  Thus, The Grove failed to meet its burden of proof that it is an independent business whose viability does not depend on its relationship with another firm or firms.  The Department's denial of certification, on this basis, was in accordance with the law and neither arbitrary nor capricious.

\* \* \*

Because there is substantial evidence in the administrative record supporting one of the grounds for denying The Grove certification in the Program (lack of independence), The Grove's claim under the Administrative Procedure Act fails.

**B.      Equal Protection Claim**

The Grove also argues that denial of certification amounts to an equal protection violation under the Fifth Amendment of the Constitution.  The Grove does not claim traditional gender discrimination, as it (the company) is the Plaintiff, not Mrs. Dukler.  However, The Grove claims it has been "'singled out' for invidious discrimination," which constitutes a "class of one" equal protection violation.  Pl.'s Mot. For Summ. J., 35.  The Grove argues that the Department scrutinized its application as to Mrs. Dukler's contributions, while never having done so for similar applications of racial minority owners.

So-called "class of one" equal protection claims are cognizable.  A plaintiff must show:

1) she was intentionally treated differently than others similarly situated; and 2) there was no

rational basis for such different treatment.  *See Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)

(finding that plaintiff had sufficiently stated a class of one equal protection claim, rather than a

gender discrimination claim, where defendant required her to attain a 33 foot easement, while

only requiring 15 foot easements from others).  The Grove claims that it too has been treated

unfairly, since the Department scrutinized Mrs. Dukler's $2.6 million capital contribution and

ownership interest.  This is an odd argument.  The Department, by regulation, *must* carefully

review all applications—certification is not a rubber stamp process.  And, even if The Grove's

application was more scrutinized than other applications (though, there is little, if any, evidence

of this), the Department had *many* good reasons to do so.

First, even The Grove agrees that the plain purpose of the Program is to provide

opportunities for businesses "owned and controlled by socially and economically disadvantaged"

individuals.  Compl. ¶ 9.  It is not surprising, then, that the complexity of Mrs. Dukler's $2.6

million capital contribution raised some eyebrows. Plus, the difficult questions about her net

worth deserved scrutiny—as the court's discussion above on whether the $2.6 million was a

liability makes clear, even additional scrutiny might have been helpful.  In a similar case, the

D.C. Circuit found summary judgment appropriate even when plaintiff showed that the

defendant (the District of Columbia) had "never before required an EIS [Environmental Impact

Statement]" for apartment building projects.  *See 3883 Conn. LLC  v. District of Columbia*, 336

F.3d 1068 (D.C. Cir. 2003).  The court found for the District despite the fact that it subjected

plaintiff to "a more probing analysis." *Id*. at 1075.  Even assuming a "more probing analysis"

here, the Department had a legitimate reason to do so.

Moreover, the Grove's relationship with Star Foods, the non-disadvantaged 49% owner,

provided further reason for careful scrutiny.  Besides the fact that Mrs. Dukler's husband was a

co-owner of Star Foods, Mr. Cowell (the other owner) provided Mrs. Dukler with the initial loan

leaving her the 51% owner—which, incidentally, left The Grove still eligible for certification in

the Program.  The Department may have subjected The Grove's application to close scrutiny

because it was dissimilar to others (i.e., size of capital contribution, relationship with minority

owner, etc.).  *See Senior Resources v. Martinez*, 2003 U.S. Dist. LEXIS 26662 (D.D.C. 2003)

(finding that plaintiff was not "similarly situated" to other homeless organizations because of its

vast requests, lack of experience, and financial qualifications).  The Grove has not met its burden

of showing the Department scrutinized its application without a rational basis.  Thus, The

Grove's equal protection claim also fails.

### III. Conclusion

For the foregoing reasons, an accompanying order grants Defendants' Motion for

Summary Judgment and denies Plaintiff's Cross-Motion for Summary Judgment.

Dated: September 23, 2008                          Louis F. Oberdorfer
                                                   UNITED STATES DISTRICT JUDGE